```
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )            Criminal Action
          Plaintiff,              )            No. 21-10035-ADB
                                  )
v.                                )
                                  )
FAITH NEWTON,                     )
                                  )
          Defendant.              )
                                  )



                      JURY TRIAL DAY TWO


          BEFORE THE HONORABLE ALLISON D. BURROUGHS
              UNITED STATES DISTRICT JUDGE

                     June 28, 2023



          John J. Moakley United States Courthouse
                    Courtroom No. 17
                    One Courthouse Way
              Boston, Massachusetts  02210




                              Kelly Mortellite, RMR, CRR
                              Official Court Reporter
                              One Courthouse Way, Room 3200
                              Boston, Massachusetts  02210
                              mortellite@gmail.com
```

```
1    APPEARANCES:

2    On Behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     On Behalf of the Defendant:
8    George W. Vien
     Michelle R. Pascucci
9    Nathaniel R. B. Koslof
     Donnelly, Conroy & Gelhaar, LLP
10   260 Franklin Street
     Boston, MA 02110
11   617-720-2880
     Fax: 617-720-3554
12   gwv@dcglaw.com
     mrp@dcglaw.com
13   nrbk@dcglaw.com

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                              CONTENTS

3

4    WITNESS                                              PAGE

5
     ALMAS DOSSA
6
         Direct Examination By Mr. Brady                    62
7        Cross-Examination By Mr. Vien                     104
         Redirect Examination By Mr. Brady                 113
8
     AMANDA MUCHIOKI
9
         Direct Examination By Mr. Looney                  119
10       Cross-Examination By Mr. Vien                     158
         Redirect Examination By Mr. Looney                171
11

12   WINNIE WARURU

13       Direct Examination By Mr. Brady                   175

14

15                          E X H I B I T S

16

17   Exhibit No.                          Received

18
         717                                    82
19
         800-808                                98
20
         900                                   112
21
         357                                   129
22
         363                                   132
23
         13.01                                 146
24
         346                                   156
25                      (CONT.)

1   Exhibit No.                          Received

2   353, 360,                                157
    365, 374,
3   383, 387
                                             177
4   700

5   675                                      198

6                    *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3     before the Honorable Allison D. Burroughs, United States
 4     District Judge, United States District Court, District of
 5     Massachusetts, at the John J. Moakley United States Courthouse,
 6     One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7     June 28, 2023.)
 8     (Case called to order.)
 9          COURTROOM CLERK:  Will counsel identify themselves for the
10     record.
11              MR. BRADY:  Good morning, Your Honor.  Bill Brady for
12     the United States.
13              MR. LOONEY:  Chris Looney for the United States.
14              MR. VIEN:  George Vien and Michelle Pascucci for the
15     defendant, Your Honor.  She's out in the hall.
16              THE COURT:  Does she want to be present for this part
17     of the proceedings?
18              MR. VIEN:  I'll tell her and bring her in.
19              THE COURT:  It's up to you.  If she doesn't want to be
20     here, that's fine.  I just want to make sure someone's asked
21     her.
22              MR. VIEN:  I'll tell her she doesn't have to be.
23              THE COURT:  Let her know she has the option.
24              All right.  I think the government requested earlier
25     today you want more findings on the Batson issue.
```

1       MR. BRADY:  Yes, Your Honor.  No need to belabor it,

2   but I just think in light of the challenge and now that we'll

3   have a jury, I think there will be real diversity of the jury.

4   I think it's worth putting on the record at some point somehow.

5       THE COURT:  So are you pressing the objection,

6   Mr. Vien?

7       MR. VIEN:  Your Honor, honestly, in light of your

8   factual finding yesterday, I'm not pressing it.

9       THE COURT:  Okay.  The jury is not in front of me.  I

09:47 10   have to look at it again to be reminded of its exact racial

11  ethnic composition.  I think, if I'm remembering correctly,

12  that the only juror of color that was struck was the one to

13  which Mr. Vien made the Batson challenge.

14      MR. BRADY:  That's correct, Your Honor.

15      THE COURT:  And I think there's diversity on the jury,

16  but I have to look at them again to sort that out, but I do

17  specifically recall that with regards to the juror that the

18  government struck that she was one of the ones that I had to

19  push to sort of determine whether or not she truly believed

09:48 20   that she could be fair and impartial in these proceedings, so

21  it seemed to me to be a rationally based challenge unrelated to

22  her race.  And I think given how the rest of the jury selection

23  went, I didn't see any efforts by the government or the defense

24  for that matter to construct a jury that was negatively

25  influenced by race or ethnicity.

1          MR. BRADY:  Your Honor, I think that's sufficient.  We

2     just wanted to raise it and just to have a brief discussion

3     about it before.

4          THE COURT:  Okay, that's fine.  I'm happy to, at some

5     point, once I look at the jury again -- I'm also going to note

6     that I know from doing these juries before and talking to

7     people later and just my experience in life that I can't always

8     look at a jury and figure out what the ethnicity is.  But to

9     the extent that I can, I'll make a record of what the jurors

09:48 10     look like once I've had a chance to look at them.

11          MR. BRADY:  Thank you, Your Honor.

12          MR. VIEN:  Your Honor, I don't think there's any

13     objection.  I raised the issue of the sequestration order of

14     the witnesses, and I think there's one exception to the IRS

15     agent who is going to be a summary witness I think, but I'll

16     let the government speak for itself.

17          THE COURT:  He's made a motion for sequestration.

18     They're routine in criminal cases.  The government is entitled

19     to have the case agent or the representative sit with them at

09:49 20     counsel table, but unless there's no --

21          MR. BRADY:  Your Honor, I think that's fine.  I think

22     that was maybe raised at the pretrial conference.  I don't see

23     any issue with that.  We have an IRS summary agent.  We also

24     have an HHS OIG case agent who will be in and I expect he will

25     testify in a summary fashion, but other than that, we have no

1  issue.

2  THE COURT:  So the case agent can stay in the

3  courtroom.  Do you have any objection to the IRS summary

4  witness?

5  MR. VIEN:  You know, in fairness, Your Honor, I think

6  she was going to testify that I watched the evidence and that

7  was part of my summary, so I don't object to that.

8  THE COURT:  Kind of like in the nature of an expert

9  type testimony.

09:49 10  MR. VIEN:  Yeah.

11  THE COURT:  Okay.  All right.  So we have ten more

12  minutes.  You can keep talking to each other if you want or you

13  can be at ease.  We'll check with the jurors in a few minutes

14  and see who is here.  I need to swear them in.  We'll do the

15  preliminary charge.  I think just out of fairness we should

16  probably take a ten-minute break after the preliminary charge

17  to make sure they're fresh for openings.  You can let me know.

18  The preliminary charge is 15 or 20 minutes.  I don't normally

19  give as much as I will give on this one.  I can't imagine it's

09:50 20  longer than half an hour, but I don't know.  So we can play

21  that by ear, but I'm happy to take a break before openings.  I

22  won't take a break between openings.  So if you want to break,

23  it's going to be before openings.

24  MR. LOONEY:  It would be nice to have a break just to

25  move the podium around and stuff like that and get set up.

```
 1              THE COURT:  You're free to roam around for ten
 2     minutes.
 3              (Recess, 9:50 a.m. - 10:04 a.m.)
 4              COURTROOM CLERK:  All rise for the jury.
 5              (Jury enters the courtroom.)
 6              COURTROOM CLERK:  Court is in session.  Please be
 7     seated.
 8              THE COURT:  Good morning, everybody.  Thank you for
 9     being here right on time.  We can't start until you're all
10:05 10   here, so the fact you're all here is fantastic.  We're going to
11     do a few things today.  First thing is, Karen is going to swear
12     you all in as members of the jury.  We normally would have done
13     that on Monday.  We didn't do it because I let one of you go
14     for the afternoon, and I wanted you all together as a group
15     before you were sworn in.  So Karen is going to begin by
16     swearing you in.
17              (Jury duly sworn.)
18              THE COURT:  So normally on Monday she would have sworn
19     you in, and then I would have given you preliminary jury
10:05 20   instructions and I would have sent you home for the day, then
21     we would have started fresh today with openings.  But there
22     were 90 of you, and as you all know, it took a long time to get
23     a jury selected, so I didn't have a chance to do the
24     preliminary instruction, so we're going to do that today for
25     the first probably about 20 minutes.
```

1          When I give you things like instructions, the parties

2    have generally, if they haven't agreed, they have at least

3    conferred about them, so I end up, because they've been the

4    subject of discussion and largely agreement, I have to kind of

5    read them to make sure that I'm saying what we've agreed I

6    should say.  So I am going to read them, but I'm going to try

7    and do it in as animated and interesting way as I possibly can.

8    After the charge -- the preliminary charge can be a little bit

9    dense, so we'll take a short break.  That's because right after

10:06  10   the preliminary charge, we go right into opening statements,

11   and it's important that you be alert and be able to pay

12   attention to the opening statements.  So we'll take a short

13   break before we do the opening statements, and then we'll hear

14   the openings from either side, see if it's lunchtime or not,

15   and we'll either, at some point or another we'll have lunch and

16   at some point or another we'll start with the witness testimony

17   today.

18          So I'm going to begin with the preliminary

19   instructions, and before we get to opening statements and the

10:07  20   evidence in this case, I want to take a few minutes to talk to

21   you about your duty as jurors.  I'm going to give you some

22   preliminary instructions on the law that you're to follow.  At

23   the end of the trial I'll give you much more complete and more

24   detailed instructions on the law.  Those instructions will be

25   in writing.  Each of you will have your own copy in the jury

1    room.

2         The reason I'm giving you some instructions now

3    instead of waiting until the end of the trial is to give you a

4    little bit of a framework for considering the evidence and to

5    help you understand it.  I don't want you to think that these

6    preliminary instructions are the only ones that matter or

7    they're somehow more important than the ones that come later.

8    You must apply the instructions that I give to you at the end

9    of the trial as a whole.

10:07 10         It's your duty as jurors to decide from the evidence

11   what the facts of this case are.  You and you alone are the

12   judges of the facts.  You'll hear the evidence, decide what the

13   facts are, and then apply the facts to the law.  You must

14   follow the law as I explain it to you, whether you agree with

15   it or not.  You must decide this case based solely on evidence

16   before you and the law as I will explain it to you.

17         Sometimes jurors are curious about what I think, for

18   example, how I think a case should turn out or whether I think

19   a particular witness is believable or not.  My opinion, if I

10:08 20   have one, and I certainly do not have one now, is not relevant.

21   It is your role, not mine, to decide those issues.  You should

22   not interpret anything I may say or do during the trial as

23   indicating what I think about a witness or what I think your

24   verdict ought to be.

25         Again, this is a criminal case.  It's been brought by

1       the United States government.  I'll sometimes refer to the

2       government as the prosecution.  The government is represented

3       at this trial, I think as we discussed on Monday, by Bill Brady

4       and Christopher Looney.  The defendant in this case is Faith

5       Newton.  She's representing by George Vien and Michelle

6       Pascucci.

7              The defendant has been charged with conspiring to

8       commit health care fraud and health care fraud, conspiring to

9       launder money and money laundering.  These charges are related

10:08 10  to an alleged scheme to defraud Medicare and MassHealth by

11      using Arbor Homecare Services, a home health care agency owned

12      and run by Ms. Newton and her husband, to submit claims for

13      home health care services that were not medically necessary,

14      not authorized by treating physician, not provided by a

15      properly trained home health aide or not provided at all.

16             The defendant denies committing each of the crimes

17      with which she's been charged.  The charges against the

18      defendant are contained in a document called an indictment.

19      The indictment is simply a description of the charges against

10:09 20  the defendant.  The indictment is not evidence of anything.

21      The defendant has pled not guilty to the charges pending

22      against her.  It is a bedrock principle of our system of

23      justice that every person accused of a crime is presumed to be

24      innocent unless and until her guilt is established beyond a

25      reasonable doubt.  This presumption of innocence is critically

1    important.

2        The defendant has the benefit of that presumption

3    throughout the trial, and you are not to convict her of any

4    charge, unless you are persuaded that the government has proved

5    her guilt on that charge beyond a reasonable doubt.

6        This requires that each element of each offense be

7    proven beyond a reasonable doubt.  A reasonable doubt is a

8    doubt that a reasonable person has after carefully weighing all

9    of the evidence.  It is a doubt that would cause a reasonable

10:10 10  person to hesitate to act in a matter of importance in his or

11   her personal life.  Proof beyond a reasonable doubt must

12   therefore be proof of a convincing character that a reasonable

13   person would not hesitate to rely upon in making an important

14   decision.

15       The defendant does not have to prove her innocence.

16   She does not have to put on any evidence.  She does not have to

17   testify.  It is always the government's burden to establish

18   guilt by proving each element of any crime charged beyond a

19   reasonable doubt.  The defendant, Ms. Newton, has the right to

10:10 20  rely upon the failure or inability of the government to

21   establish beyond a reasonable doubt any essential element of an

22   offense charged against her.  That being said, the law does not

23   require the government to prove guilt beyond all possible

24   doubt.  Proof beyond a reasonable doubt is sufficient to

25   convict.

1          At the end of the trial you'll be asked to render a

2     verdict of guilty or not guilty as to the defendant on each

3     charge against her.  Your verdict should be unanimous, that is,

4     you must convict the defendant of a charged offense only if

5     every one of you agrees she is guilty of that offense beyond a

6     reasonable doubt.  You must give separate consideration to each

7     count charged against the defendant.  You're to perform the

8     duty of finding the facts without bias or prejudice as to any

9     party with complete fairness or impartiality.  The fact that

10:11 10   the prosecution is being brought in the name of the United

11    States of America entitles the government to no greater

12    consideration than that accorded to any other party to a

13    litigation.  By that same token, it is entitled to no less

14    consideration.  All parties, whether the government or an

15    individual, stand as equals at the bar of justice.

16          In order to help you follow the evidence I'm going to

17    give you a brief summary of the crimes charged, each of which

18    the government must prove beyond a reasonable doubt to make its

19    case.  I will instruct you on the elements of the crimes

10:11 20   charged at the end the case, and those instructions at the

21    end of the case will be much more detailed.  It is those

22    instructions which will govern your deliberations, but for

23    present purposes -- and I'm going to go through the counts.

24    You'll see there's some numbers missing.  They don't go in

25    quite numerical order.  You're not to concern yourself with the

1    fact that the count numbers, some are missing or they're not in

2    order.

3              Count One of the indictment charges the defendant with

4    conspiring to commit health care fraud and Count Two charges

5    her with health care fraud and aiding and abetting.

6              I'm going to begin with Count Two.  For you to convict

7    on health care fraud, Count Two, the government must prove each

8    of the following beyond a reasonable doubt.  One, that there

9    was a scheme substantially as charged in the indictment to

10   defraud a health care benefit program or to obtain any money

11   owned by or under the custody or control of such a program by

12   means of false or fraudulent pretenses, representations, or

13   promises.

14             Two, that the defendant knowingly and willfully

15   participated in the scheme with the intent to defraud.  And

16   three, that the scheme was in connection with the delivery of

17   or payment for health care benefits, items or services.  As I

18   will explain in more detail at the end of the trial, you may

19   also convict the defendant with aiding and abetting the

20   commission of an offense.

21             To aid or abet means to intentionally help someone

22   else commit an offense.  For you to fine the defendant guilty

23   of aider or abetter, you must unanimously find that the

24   government has proved each of the following three elements

25   beyond a reasonable doubt:

1          One, that someone else committed the charged offense;

2     two, that the defendant took an affirmative act in furtherance

3     of that offense; and three, that the defendant did so intending

4     to facilitate the commission of the offense.  So that's Count

5     Two, the substantive offense of health care fraud.

6          Count One charges the defendant with conspiring to

7     violate the health care fraud statute.  With a conspiracy, the

8     crime is the agreement to commit the substantive offense rather

9     than the commission of the substantive offense itself.  So for

10:13 10    Count One the crime is the agreement to commit health care

11    fraud rather than the actual commission of health care fraud.

12         To find the defendant guilty of Count One, conspiracy,

13    you must unanimously find that the government has proved each

14    of the following elements beyond a reasonable doubt:  One, that

15    at least two people agreed to commit health care fraud; and

16    two, that the defendant willfully joined the agreement

17    intending that health care fraud be committed.

18         Next, Count Seven of the indictment charges the

19    defendant with money laundering conspiracy and Counts Eight

10:14 20    through Ten charge her with substantive money laundering.

21         I'm going to again begin with the substantive counts,

22    Counts Eight through Ten.  For Counts Eight through Ten, the

23    government must prove each of the following elements beyond a

24    reasonable doubt:  One, that the defendant engaged in a

25    monetary transaction over $10,000 involving a financial

institution and affecting interstate commerce on or about the
date specified in the indictment; two, that the defendant knew
that the money came from some kind of criminal activity; three,
that the money was in fact criminally derived from a specified
unlawful activity, which in this case means either conspiracy
to commit health care fraud or health care fraud; and fourth,
that the monetary transaction took place in the United States
or was engaged in by a person in the United States.

In Count Seven, the defendant is charged with
conspiracy to commit money laundering.  Again, with the
conspiracy, the crime is the agreement to commit the
substantive offense, here, money laundering, rather than the
commission of the substantive offense itself.  To prove the
conspiracy charged in Count Seven, the government must prove
each of the following beyond a reasonable doubt:  One, that
there was an agreement between two or more persons to commit
the crime of money laundering; and two, that the defendant
willfully joined in that agreement.

You should understand that what I just gave you is a
very preliminary outline of the elements of the charges.  At
the end of the trial, I'll give you final instructions on these
matters in much more detail, and that will include definitions
of some of the important terms.  If there's any difference
between what I just told you and what I tell you in the
instructions at the end, the instructions at the end will

1    govern.  This is just meant to give you a roadmap to understand

2    the evidence.

3         Okay.  I've mentioned the word "evidence" a number of

4    times, and I'm going to mention it again a number of times.

5    The evidence in this case will probably include the testimony

6    of witnesses, any documents, objects or other things received

7    as exhibits, and any facts on which the parties have agreed.

8    The evidence consists of all the witnesses' testimony, both on

9    direct and cross-examination, and all the exhibits, regardless

10:16 10   of which side introduces them.

11        There are rules that control what you may consider as

12   evidence.  When a lawyer asks a question and the lawyer on the

13   other side thinks that the question is not permitted by the

14   rules, that lawyer may object.  The same thing may happen when

15   a lawyer offers into evidence something into evidence.  The

16   other side may object.  When a lawyer makes an objection, I

17   need to rule on that objection.  It may be necessary for me to

18   discuss the issue with the lawyers outside of the hearing of

19   the jury, either by having a conference at sidebar -- usually

10:16 20   this is sidebar where we normally do it, this is the other

21   side -- so you can't hear.  Sometimes, rarely, I hope never,

22   we'll have to call a recess to discuss it and send you out of

23   the room.

24        The purpose of these conferences or consultations is

25   so that I can get information to make a proper ruling.

1    Sometimes I don't need a conference.  I understand the

2    objection and I'll rule on it.  Sometimes I need more

3    information.  We'll do what we can to keep the conferences and

4    recesses to a minimum.

5        Certain things are not evidence.  Statements and

6    arguments by lawyers are not evidence.  The lawyers are not

7    witnesses.  Questions by lawyers standing alone are not

8    evidence.  Again, the lawyers are not witnesses.  The question

9    and the answer taken together are the evidence.  Objections are

10:17 10   not evidence.  Lawyers have a duty to their client to object

11   when they believe something is improper under the rules of

12   evidence.  If I sustain an objection, in other words, if I

13   agree with the lawyer making the objection, that means I am not

14   allowing the question to be answered or the exhibit to come

15   into evidence.  You must ignore the question or the exhibit,

16   and you should not try and guess what the answer might have

17   been or what the exhibit might have contained.  If I tell you

18   to disregard something or I strike it from the record, it is

19   not evidence, and you cannot consider it.

10:17 20       Sometimes a particular piece of evidence may be

21   received for a limited purpose only.  That is, it can be used

22   for you for only a particular purpose and not for any other

23   purpose.  I'll tell you when that happens, and I'll instruct

24   you on the purposes for which that piece of evidence can and

25   cannot be used.

1          Anything you see and hear about this case outside of

2    the courtroom is not evidence.  I hope you don't see or hear

3    anything about this case outside of the courtroom.  I don't see

4    any reason why you should hear anything about it outside of the

5    courtroom, but you must decide the case based only on what you

6    see and hear in this room.  The indictment is not evidence of

7    anything.  It is merely the way a person is charged with a

8    crime or crimes.

9          Finally, some of you may have heard the terms direct

10:18 10    evidence and circumstantial evidence.  Direct evidence is

11    testimony by a witness about what that witness personally saw

12    or heard or did.  Circumstantial evidence is indirect evidence.

13    That is proof of one or more facts from which one can find or

14    infer another fact.  You may consider both direct and

15    circumstantial evidence.  The law permits you to give equal

16    weight to both, but it is for you to decide how much weight to

17    give any evidence.

18          My example on direct and circumstantial.  If you walk

19    into the kitchen and you see your kid eating a chocolate chip

10:18 20    cookie, that is direct evidence that your kid ate a chocolate

21    cookie.  If you come into the kitchen and the kid is covered in

22    chocolate and the cookie jar is empty and there's crumbs all

23    around him, you didn't see him eat the cookie, but that's

24    circumstantial evidence that he ate the cookie, and from all

25    that circumstantial evidence you can infer the fact that the

1    cookie was eaten by him.

2            Okay.  In deciding what the facts are, you may have to

3    decide what testimony you believe and what testimony you do not

4    believe.  You may believe everything a witness says, only part

5    of it or none of it.  It is entirely up to you.

6            I'm going to talk to you briefly about what I call

7    implicit bias.  Implicit bias refers to the fact that everyone

8    has feelings, assumptions, perceptions, fears and stereotypes,

9    that is, implicit biases which we may or may not be aware of.

10:19 10    As an example, some people may look at an older person and

11   think "Lot of wisdom there," and others might look at the same

12   person and think, "I wonder if they still have all of their

13   marbles."  Some people may meet a doctor and assume she's

14   caring and smart, while others may wonder if she's in it for

15   the money.

16           Other biases might go to race, religion or agenda.

17   These hidden or not so hidden thoughts can impact what we see

18   and hear and affect what we see and hear and how we make

19   important decisions.  Because you'll be making important

10:19 20   decisions in this case, I strongly encourage you to listen to

21   the evidence carefully and to resist jumping to conclusions

22   based on personal likes or dislikes, generalizations, gut

23   feelings, prejudices, sympathies, stereotypes or biases.  The

24   law demands that you return a just verdict based solely on the

25   evidence, your individual evaluation of that evidence, your

1   reason and common sense, and the instructions that I will give

2   you at the end of the trial after you've heard all of the

3   evidence.

4          Some strategies that may be useful to you in doing

5   this include the following:  First, keep an open mind.  Avoid

6   drawing conclusions until the end of the case when you and your

7   fellow jurors deliberate.  Second, listen closely to each of

8   the witnesses.  Third, as you listen to testimony about the

9   people involved in this case, consider each person as an

10:20 10  individual rather than as a member of a particular group.

11         Next, lots of people watch television and movies about

12  courts and courtrooms and lawyers and the justice system.

13  Sometimes people can be affected by what they've seen in the

14  media when they serve as jurors.  TV and movies can create

15  false expectations about real life, for example, how the trial

16  is going to proceed or what the evidence might look like.

17  Don't expect this trial to look like it does on television.

18  You must decide this case on the evidence before you and the

19  law as I give it to you.  Do not decide this case even in part

10:21 20  based on something you saw on television or in a movie.

21         I'm going to turn to the subject of how you're to

22  conduct yourselves during the trial.  To ensure fairness, you

23  as jurors must obey the following rules.  First, do not talk

24  amongst yourselves about the case until the end of the case

25  when you go to the jury room to deliberate and to decide your

1  verdict.  You should feel free to get to know one another.  You

2  should talk about the Red Sox, if you can possibly bear it, or

3  the weather, or your families, or anything but this case.

4       It's particularly important that jurors not start to

5  pair up and have side discussions with one another about the

6  case outside of the hearing of everybody else.  Whether you

7  intend it or not, you may start to influence each other and

8  affect each other's thoughts and opinions during those

9  conversations even if the conversation seems super casual at

10:21 10  the time.  So it's important that you wait and make sure

11  everyone hears everything that anyone has to say about the case

12  all at the same time.

13       Second, do not make up your own mind about what the

14  verdict should be until after you've gone to the jury room to

15  decide the case and you and your fellow jurors have discussed

16  the evidence.  The evidence has to come in one piece at a time.

17  Something has to come first; something has to come last.  It

18  may be that very last question or that very last answer or that

19  very last piece of evidence that are the most important in the

10:22 20  entire trial, so you need to keep an open mind until you've

21  heard all of it.

22       Third, do not talk with anyone else about this case

23  until the trial is ended and you've been discharged as jurors.

24  "Anyone else" includes members of your family, your friends.

25  You can tell them you're a juror, but you can't tell them

1    anything about the case.  You can't discuss the case with them

2    until after the case is over and you've been discharged as

3    jurors.

4         As I think I mentioned on Monday, it's entirely

5    natural that when you go home on Monday and when you go home

6    every day after this trial, someone, your friend or your spouse

7    or your roommate or your significant other, is going to ask you

8    what the case is about and whether or not you think the

9    defendant is guilty or not.  I know it can be awkward and it

10:22 10  can feel rude, but you cannot have that conversation or answer

11   those questions while this trial is going on.  You may not

12   realize it, but your friends and loved ones can have a strong

13   influence on your opinion during those conversations just like

14   if you start to pair up with individual jurors.  Those people

15   in your life, they don't mean any harm, but they've not been

16   here to see the evidence and listen to the testimony.  They've

17   not listened to my instructions.  You can go ahead and blame it

18   on me if you want, but you need to tell those people you've

19   been ordered by the judge not to talk about the case while it's

10:23 20  still going on.

21        Fourth, you should not mention or discuss this case in

22   any way on any social network or in any electronic form.  You

23   may not send an email or text message about the case.  You may

24   not use Twitter, you may not post anything on Facebook or any

25   other social media or discuss the case on any online forum.

1    I'm always afraid that something is going to be invented while

2    I'm here today and people are going to start sharing

3    information.  So this is a blanket instruction not to post

4    anything on any sort of social media.

5          And again, it's important, and nowadays people post

6    all sorts of things on Facebook or tweet about what things that

7    that happened or post a picture of what they ate for lunch.

8    You can't do any of that here.

9          Fifth, don't let anyone talk to you about the case.

10:23 10   If someone should approach you or reach out to you on social

11   media or in person and try to talk to you, you should not talk

12   to them, and you should report to that to me immediately.

13         Sixth, during the trial do not speak with or talk to

14   any of the parties, lawyers or witnesses involved in this case.

15   You should not even say hello to them.  It's important not only

16   that you do justice in this case but that you also give the

17   appearance of doing justice.  So if someone saw you talking to

18   someone else involved in the case, even if you're just waiting

19   for the elevator and trying to be polite, that can arouse

10:24 20   suspicion.  So don't do it.  If one of the lawyers or parties

21   or the witnesses don't speak to you when they pass in the hall

22   or ride in the elevator, it's because they know also they're

23   not supposed to talk to or interact with you in any way.

24   They're not rude people.  I'm sure they'd love to have a polite

25   social interaction with you, but they know not to do that.  So

they're not being rude.  They're just adhering to my rules.

One of the ways in which I try and limit those interactions, especially when there's 16 of you in the box, we'll serve you lunch in the jury room so that you're not interacting with them in the elevators or cafeteria when you go down for lunch.

Seventh, don't read any news stories or articles about the case or anyone involved with it.  Don't listen to any radio or television reports about the case or anyone involved in it. I don't expect there to be any media coverage of this, but if by chance there is or you hear something on the radio or see something in the newspaper, you turn the dial, you turn the volume down, you flip the page of the newspaper, but you should not be getting any information about this case outside of the courtroom.

Eighth, no extracurricular research on your own.  No sort of investigation about the case.  Don't look up anything on the Internet.  If you think some piece of information is missing, you are not allowed to find that information on your own.  This is true even if you think it's harmless or you're curious or you're frustrated because you don't know something and you think the parties should be telling you but they haven't.  You must decide this case solely on the evidence you've been given in this case in this courtroom.

Finally, during the course of the trial, if you've any

1    problem of any kind, raise your hand.  We'll stop the

2    proceeding and try and take care of the problem.

3         If the lawyer steps between you and the witness, for

4    example, and you can't see the witness, raise your hand and

5    we'll have the lawyer move.  If you can't hear a witness, raise

6    your hand and we'll have the witness repeat his or her answer.

7    If you want a glass of water, let us know.  We generally keep

8    pitchers of water and cups at the end of the jury box.  If you

9    run out of water or need something else, let us know.  If you

10:26 10   need a short break for any reason, let us know and we'll take

11   the break.  And if you need to communicate with me when we're

12   not in court, give a signed note either to Karen or the court

13   security officer who will be outside your room.

14        Again, these rules are important.  They're intended to

15   make sure that this trial is fair.  You know, we went to a lot

16   of trouble on Monday to make sure we had a fair and impartial

17   jury.  We want to keep you that way, so adhering to those rules

18   helps us make sure that happens.

19        If you're having any difficulty in following the rules

10:26 20   for any reason or you have questions about what you should and

21   should not be doing your during your jury service, you let us

22   know and we'll try to get that taken care of.

23        I think you all have notebooks on your laps at this

24   point.  We're going to let you take notes during this case.

25   There should be a number on the front of the notebook that

corresponds to your jury seat number.  A couple of warnings

about taking notes.  First, you're not required to take notes,

and you can certainly choose not to take notes.  If you do take

notes, don't let your note-taking distract you from actually

listening to the testimony that is being presented.  It's

important that you observe and listen to the witnesses.  Some

people like to take copious notes.  Some people only take a

few.  Some people take none at all.  All of that is fine, but

please remember that not everything that winds up being written

down is necessarily what was said.

So when you return to the jury room to discuss the

case, don't assume that just because something appears in

somebody's notebook that it's necessarily what took place in

court.  For example, sometimes people write down a question or

part of a question but not the answer.  Sometimes people's

notes are inaccurate.  Notes are meant to be an aid to

recollection, nothing more.  So the fact that it's written down

does not mean that it accurately reflects what was said.  It is

your collective memory of the evidence that will govern during

your deliberations.

Your notebooks can either go to the jury room with you

or stay on your chair here.  They can't be anywhere besides

here or there.  No one will ever look at your notes.  When the

case is over, the notes will be destroyed.  No one but you will

ever read your notes unless you decide to share them in the

1    jury room during your deliberations.

2         As you can see, we have Kelly here, the court

3    reporter.  It won't always be Kelly, but throughout this trial

4    there will be a court reporter here.  I think it's going to

5    mostly be Kelly.  It's her job to create a record of everything

6    that happens during this trial.  Sometimes jurors see the court

7    reporter and they think they'll be able to have a transcript of

8    what was said during the trial during the deliberations.

9    That's not true.  There's not going to be a transcript.  There

10:28 10   are lots of reasons for that, but the main one is strictly

11   practical.  There is just not enough time for us to prepare

12   one.  Her job is a tough one, and it's time-consuming to take a

13   raw record, which is what she's creating now, and turn it into

14   a final transcript.  So you will not have a transcript.  So you

15   should listen very carefully and take whatever notes you think

16   might be necessary to help you remember the testimony.

17        I'm going to give you one caveat to that.  If there's

18   some dispute about what one witness said or a particular answer

19   to a particular question, we can probably get you a small

10:29 20   excerpt if there's something that you really need during

21   deliberations, but you will not have access to a complete

22   transcript.

23        An outline of the trial, and then we'll get to it.

24   The first step in the trial will be the opening statements

25   which come next.  The government in its opening statement will

1    tell you about the evidence that it intends to put before you

2    so that you have an idea of what their case is going to be.

3    After the government's opening statement, the defense attorney

4    may make an opening statement if one of them chooses to do so,

5    but they don't have to.

6          Like the indictment, the opening statements are not

7    evidence.  Opening statements may reference what the government

8    or the defense believe what the applicable law to be.  But as I

9    mentioned earlier, it's my job to tell you what the law is, and

10:29 10   I'll do that at the end of the trial.

11         Next, the government will present its evidence, which

12   will consist of the testimony of witnesses and may include

13   documents and other exhibits.  After the government's evidence,

14   the defense may present evidence on behalf of Ms. Newton, but

15   they are not required to do so.  Both the government and the

16   defense attorneys will have the opportunity to cross-examine

17   any witnesses called by the other side.

18         Again, the defendant is presumed innocent and it is

19   the government's burden to prove her guilt beyond a reasonable

10:30 20   doubt for each element of each charged offense.  The defendant

21   does not have to prove her innocence and does not have to

22   cross-examine, testify or put on any evidence.  After you've

23   heard all of the evidence, the government and the defendant

24   will each be given time for their own final arguments.  Like

25   the indictment and opening statements, closing arguments are

not evidence.  In their closing arguments the lawyers for each
side will attempt to summarize and help you understand the
evidence that was presented.  I will then instruct you about
the rules of law that you're to use in reaching your verdict.

After hearing my instructions, you'll leave the
courtroom together to make your decision.  You'll have a
written copy of the instructions with you in the jury room that
you can refer to during your deliberations.  After you've
reached a verdict on each charge brought against the defendant
and filled out the verdict form that I will give you, you will
return your verdict in open court.  I will then discharge you.
You will never have to reveal your deliberations or explain
your verdict to anyone.

Okay.  As I've indicated, our normal trial day is
generally going to be about 10:00 in the morning until about
4:00 in the afternoon.  We'll generally take a lunch break
12:00 to 12:45, with another short break about 2:15, and then
break for the day at about 4:00.  We may do some minor
adjusting to that, like, for example, sometimes jurors will
tell me they don't actually need 45 minutes for lunch, they'd
rather take 30 minutes for lunch and leave 15 minutes early.
We can accommodate that as well.  Sometimes I have other things
scheduled that require a little bit of juggling, but generally
that will be our day.  There will also be days we will sit from
9:00 to 1:00.  I sort of aim to do that one day a week.  This

1    week we'll sit from 9:00 to 1:00 on Friday because we're

2    heading into a holiday weekend.  On 9:00 to 1:00 days we'll

3    take a short midmorning recess and break for the day before

4    lunch.  Again, we will not sit on July 3 or 4, and the Friday

5    before will be half a day.

6          When the time comes for you to deliberate, we presume

7    you'll meet all day, that's 9:00 to 5:00, until you reach a

8    decision.  That being said, the deliberation schedule is yours

9    to control, and you'll be able to let us know if you want to

10:31 10   work later than 5:00 or break a bit earlier so you can sleep on

11   it.  Whatever you want to do is fine.  That's up to you.

12         To make this work properly and ensure that the trial

13   schedule moves along, we will all have to be disciplined about

14   it and keep to a tight schedule.  We're going to continue every

15   day right on time to the extent that it is humanly possible,

16   which is why I so appreciate the fact that you were all here on

17   time today.

18         Every morning I meet with counsel before we're

19   scheduled to begin so that we're ready to start on time.  But

10:32 20   in order for us to begin the presentation of evidence on time,

21   each and every one of you has to be here.  We can't start

22   without all of you.  That means you need to be here before

23   10:00 so we can start right at 10:00.  I want you to know that

24   counsel and all the court personnel have worked hard during the

25   pretrial phase of this case to ensure that the trial schedule

1    works smoothly and efficiently.  Sometimes things will come up

2    that can delay the presentation of evidence or will require us

3    to end a little bit early.  Please be patient if that happens.

4    We'll finish this trial on the timeline that I gave you, but

5    there may be sort of variations between here and there.  And so

6    you may have to be a little bit patient with us.

7            I'll do my very best to keep you informed of the trial

8    schedule as we go along, give you a little bit of notice about

9    which days we're going to end early so that you can make your

10:33 10   own plans.

11            My last instruction.  Under our Constitution, all

12    persons are equal before the law.  All persons accused of a

13    crime are entitled to a fair trial.  You should not hesitate to

14    convict if the government has met its burden of proof beyond a

15    reasonable doubt, and you should not hesitate to acquit if it

16    has not, but you must be completely and scrupulously

17    open-minded, honest and fair.  That's your duty.  It's your

18    obligation both as jurors and as citizens of the United States.

19            And I think I mentioned to you before but I'll mention

10:33 20   again.  Every time I speak to you directly like this, the

21    parties have a chance to let me know if I omitted something or

22    misstated something or should add something.  I always give

23    them the chance to do that.

24            From the government, anything on the preliminary

25    instructions?

```
 1              MR. BRADY:  Nothing for us, Your Honor.

 2              THE COURT:  Ms. Pascucci or Mr. Vien?

 3              MR. VIEN:  Nothing, Your Honor.

 4              THE COURT:  Okay.  All right.  We're going to take

 5    about around a ten-minute break, ten-to-15-minute range just so

 6    you can come back fresh for opening statements, because I know

 7    the preliminary instructions can be a little dense.  So we'll

 8    recess for 15 minutes.

 9              COURTROOM CLERK:  All rise for the jury.

10            (Jury exits the courtroom.)

11              THE COURT:  One of them asked to speak to Karen.

12    That's never a good sign.  Ten or 15 minutes.  How long do you

13    want?

14              MR. VIEN:  Ten is fine.

15              MR. LOONEY:  Ten is great.

16              THE COURT:  Come back in the quarter-of range.  I

17    won't start without any of you.

18            (Recess, 10:34 a.m. - 10:42 a.m.)

19    SIDEBAR:

20              THE COURT:  Okay.  I know you heard one of the jurors

21    asked to speak to Karen on the way out the door, and I think it

22    was juror 13.  She's wearing a green shirt.  She had an

23    inadvertent interaction with the defendant on the way in this

24    morning.  I think she thought she was a juror in the case and

25    said, Hey, are you going upstairs?  There was no substance to
```

1    it, but she wanted to report it, so she reported it to me and

2    I'm reporting it to you.

3            MR. VIEN:  I don't have a problem with it.  I don't

4    know what the government thinks, but it seems inadvertent and

5    that's fine.

6            THE COURT:  I think she's an over-reporter.

7            MR. BRADY:  If that's the extent of it, Judge, I don't

8    think there's anything else.

9            THE COURT:  I think she was sort of assuming that it

10:43 10    was another juror, and I think your client said, Oh, I'm the

11    defendant, and I think they parted company and came up.

12            MR. VIEN:  Did she say something like, You look really

13    innocent, too?

14            THE COURT:  She did, that's what she said.

15            MR. BRADY:  Then I want to revisit --

16            THE COURT:  No, it wasn't anything like that.

17            MR. VIEN:  I shouldn't joke.  I understand.  We don't

18    object.

19            THE COURT:  Just letting you know.

10:43 20            MR. BRADY:  We have no issue with that, Your Honor.

21            COURTROOM CLERK:  All rise for the jury.

22            (Jury enters the courtroom.)

23            COURTROOM CLERK:  Court is back in session.  Please be

24    seated.

25            THE COURT:  Are you using any demonstratives during

1    your openings?

2            MR. LOONEY:  We have some slides that are on

3    PowerPoint.

4            THE COURT:  So the jurors in the front row, do you see

5    your screens in front of you?  The jurors in the back row, if

6    anyone shows anything on your screen, they're inside your

7    armrest.  So if you flip it open, you'll be able to pull the

8    screen out.  You don't have to pull them out now.  Don't break

9    the joint.  Just so you know, that's how they come out.

10:47 10         There's also a big screen up here that you may be able

11    to see some things on.  We can move it closer too if anyone

12    needs it.  That's generally for the gallery.  All right.

13    Mr. Looney, when you're ready.

14            MR. LOONEY:  This case is about a nurse whose company

15    received more than $160 million from MassHealth in just four

16    years.  She didn't get that money through hard work, and she

17    didn't get that money by caring for her patients.  She got it

18    through fraud, by bribing patients to get them in the door, by

19    billing MassHealth for services that never happened, by billing

10:48 20    MassHealth for care for patients who just didn't need it, and

21    by billing MassHealth for services provided by home health

22    aides who were unqualified, untrained, and uncertified.

23            In this case you're going to hear about fake

24    documents, falsified patient notes, and backdated checks all to

25    cover up this enormous fraud by that nurse, that woman right

1    there, Faith Newton.

2         To remind you, my name is Chris Looney.  With me at

3    counsel table is Bill Brady.  Seated behind us is Alex Apfel.

4    Together we represent the United States in this case.  What I'm

5    going to try and accomplish this morning are two things.

6         First, I want to give you an overview of what I expect

7    the evidence will show in this case.  I'm going to fill in the

8    details of the story I just told.  At the same time, as I'm

9    going along, I'm going to introduce you to the witnesses and

10:49 10   the types of documents that I expect you'll see in this trial.

11    My goal is to orient you and provide some context for these

12    witnesses.

13         As you heard from Judge Burroughs and as you'll find

14    out during this trial, witnesses come up one at a time, and

15    they share only what they know, what they saw, and what they

16    recall.  So each witness is a little bit like a single piece of

17    a jigsaw puzzle.  I'm trying to give you a sense of how all

18    those pieces will fit together to form an overall picture, the

19    overall picture of Faith Newton's fraud scheme.

10:50 20        Faith Newton, as I said, was a nurse by training, and

21    she ran a company called Arbor Homecare Services LLC.  The CEO

22    of that company was a man named Ben Muiruri, who is Faith

23    Newton's husband.  But you'll hear in this trial that it was

24    Faith Newton who ran the show.

25         Arbor was a home health care company.  The first

witness you'll hear from in this case is a woman named Almas

Dossa.  She works at MassHealth, and she's the director of home

and community-based fee for services programs, which is a long

way of saying that she oversees MassHealth's home health care

program.

        I expect what you'll hear from Ms. Dossa is that home

health care is just what it sounds like.  It's health care that

is provided in the patient's home.  It's care for patients that

have medical conditions or medical needs that make it difficult

to care for themselves or accomplish the everyday activities of

daily living but where the conditions aren't so severe that

they require hospitalization or a trip to the doctor's office

or the emergency room.

        For patients with appropriate medical needs, trained

and certified health care providers -- I'm going to come back

to this point -- trained and certified health care providers

come to the patient's home and provide the necessary care.

Ms. Dossa will also tell you about the rules that MassHealth

has established for home health care.  These rules act as

guardrails.  They're guardrails to prevent fraud and waste and

also to ensure that patients who actually need care receive

quality legitimate health care.

        Here are what I expect Ms. Dossa will tell you are the

requirements for home health care to be reimbursable by

MassHealth.  First, the patients to whom the services are

1    provided must have a bona fide medical need for care.  It's not

2    for a person who just wants chores done.  It's not for a person

3    who wants their son or relative or friend employed as a sham

4    home health aide.  In order to be eligible for home health care

5    services, a patient must have a genuine medical need for the

6    services.  That's one.

7         Second, for a patient to receive home health care,

8    there must be an established Plan of Care.  That Plan of Care

9    must be authorized by a doctor or other qualified medical

10   professional.  What a Plan of Care is is a document that sets

11   forth the medical diagnosis or medical need that qualifies the

12   patient for home health care and sets forth the type and the

13   frequency of home health care that the patient needs.  So it

14   may say that a patient needs daily or weekly visits from a

15   skilled nurse, and then in addition to that, they might say the

16   patient needs two hours of daily care from a home health aide.

17   So there had to be a doctor-approved Plan of Care.  That's two.

18        Third, the care must be provided by an appropriately

19   trained and certified medical provider.  In home health care,

20   more complicated sophisticated procedures or treatment can be

21   provided by a trained and licensed nurse.  Less complicated

22   home care can be provided by a home health aide.  But those

23   home health aides, in order to become a home health aide,

24   someone has to receive 75 hours of training.  A portion of that

25   training has to be done in the classroom, and a portion of that

1  training has to be done on-site with a patient, getting

2  practical experience.  So that's three.

3       Fourth, and this one is obvious, the care has to

4  actually be provided.  A provider can't bill MassHealth for

5  nursing visits or home health aide visits that just didn't

6  happen.  MassHealth only pays for medical care and home health

7  visits that actually happen.  That's fundamental.

8       Finally, you'll hear that it's improper for a health

9  care provider such as in this case, Arbor Health Care, to make

10:54 10  payments to induce the referral of patients for care, including

11  home health care.

12       So you can't bribe a patient to enroll with a home

13  health care agency like Arbor, and you can't bribe someone else

14  to refer patients to enroll with an agency like Arbor.  Those

15  are the rules on your screen.  Providers like Arbor agree to

16  follow those rules, and when MassHealth pays for claims,

17  MassHealth trusts that providers follow those rules.

18       After you hear from Ms. Dossa, the MassHealth

19  representative, you're going to hear from a group of Arbor

10:55 20  insiders, Arbor employees who worked for the defendant Faith

21  Newton.  And what they will tell you is that at Faith Newton's

22  direction, under her supervision, Arbor broke each of these

23  rules.  They will tell you that patients enrolled with Arbor

24  did not need home health care.  There was no medical necessity.

25       You'll hear about Plans of Care for patients that say

things like the patient was homebound or lacked the ability to

take care of themselves or attend to activities of daily

living, but Arbor employees will tell you those statements were

not true, and Arbor employees will tell you that there

frequently was no Plan of Care at all for patients or that no

doctor had signed off on a Plan of Care.  So you'll hear that

Arbor employees would hound doctors well after the fact to

backdate Plans of Care for care that hadn't been previously

provided or billed for.

You'll also hear from these Arbor employees that Arbor

billed for claims for home health aides that were unqualified,

untrained and uncertified.  What you'll hear is when a new

patient came in, they often brought with them a friend or

relative who could who sign up as an HHA, and that person could

draw a salary paid for by MassHealth.

And then you'll hear that nurses and home health aides

just did not provide the care that Arbor was billing for.  And

what's more, you'll hear that they covered this up by creating

fake nursing notes and falsifying time sheets, all at the

direction of Faith Newton.  And then you'll hear about bribes,

envelopes of cash paid to get patients enrolled in Arbor in

violation of MassHealth's rules.

The first of these Arbor witnesses that you'll hear

from I expect later today is Amanda Muchioki.  Ms. Muchioki

will explain that at Arbor she was responsible for maintaining

1    personnel files, files for nurses, and files for home health

2    aides.  Within those records, you'll see certificates that look

3    like this one on the screen in front of you.  This is an

4    example for a home health aide named Adriana O'Donoghue.  It

5    states that, "Ms. O'Donoghue has successfully completed the HHA

6    required course of study approved by the State of Massachusetts

7    and is therefore awarded this certificate."  Then it bears

8    Faith Newton's signature in the lower corner.

9         But Ms. Muchioki will tell you that she created this

10:58 10    document and hundreds like it at Faith Newton's direction.

11    While it's dated March 3, 2014, she'll tell you that it was

12    created years after, in 2015 or 2016.  And she created these

13    documents to fool regulators into believing that the sham HHAs

14    at Arbor were properly trained and certified when that was not

15    true.

16         You'll even hear that these documents bore Faith

17    Newton's signature because another nurse who worked at Arbor,

18    Regina Arrey, who you will also hear from, refused to sign

19    these fake documents.  Ms. Muchioki and other witnesses will

10:58 20    also tell you that during the time they were at Arbor, Arbor

21    never provided 75 hours of training for its home health aide

22    employees.  The only training Arbor provided was a brief

23    orientation of just a few hours during one morning.

24         You'll also hear from Ms. O'Donoghue herself, whose

25    name is on the certificate.  She'll tell you that she never saw

1    this document until it was shown to her by the government

2    during its investigation and that the statement on there is

3    just not true.  She didn't successfully complete the state

4    required course of study to be on HHA.  She didn't receive any

5    HHA training at all.

6        You'll see other documents from Ms. O'Donoghue's

7    personnel file, like this one, this document has Ms. Newton's

8    name, has the preceptor/supervisor at the top, and then it

9    bears her signature in the lower right.  And this document

10:59 10    indicates that Faith Newton went out and performed an on-site

11    patient visit with Adriana O'Donoghue, ensuring that

12    Ms. O'Donoghue was competent in all the skills listed on this

13    checklist.  But Ms. O'Donoghue will tell you that this training

14    never happened.  She never went on a patient visit with Faith

15    Newton, and she never received on-site training.  This was

16    false.

17        You'll also hear that as part of the orientation for

18    new home health aides, they were given examinations to take.

19    Here is an example.  Again, this is from Ms. O'Donoghue's file.

11:00 20    The topic of this particular examination is the Resurgence of

21    Tuberculosis.  But you'll hear that these exams were a sham.

22    When HHA employees came in to take the exams, they were

23    provided with the answer key and instructed just to copy down

24    the answers.  Sometimes the HHAs didn't take the exams at all,

25    and they were filled in by someone else.  I anticipate that

1    Ms. O'Donoghue will testify this is not her handwriting on the

2    document and she never took this test, even though it's in her

3    personnel file.

4         All of these fake documents were there to fool

5    government regulators into believing that Arbor's home health

6    care program was legitimate when in fact it was a sham and the

7    HHAs were unqualified, untrained and uncertified.

8         Another witness you'll hear from in this case is a

9    woman named Winnie Waruru.  Like Faith Newton, Ms. Waruru was a

11:01 10    nurse at Arbor.  She was also a close friend of Faith Newton

11    who attended church with the defendant.  She was also one of

12    Faith Newton's co-conspirators.  She will tell you that she

13    agreed, that is, conspired to commit crimes with the defendant.

14    She's going to tell you that she was employed at Arbor as a

15    nurse.  And she was employed to provide -- she was a nurse for

16    patients who didn't need care and didn't receive care, and that

17    Ms. Newton trained her and instructed her on how to fill in

18    false patient notes to make it appear in patient records that

19    care had been provided to these patients when it never

11:02 20    happened.

21         Here is an example of this.  These are notes for an

22    Arbor patient named John Enwright.  It's dated January 30,

23    2015.  Blow it up.  And there's a narrative of the care that

24    was supposedly provided on that date.  The language I've

25    highlighted on there is "SN flushed the expired medication in

1    the toilet."  "SN" stands for skilled nurse.  That's from

2    January 30, 2015.  Here is the note from the next day, January

3    31, 2015.  It includes an identical narrative, right down to

4    that phrase, "SN flushed expired medication in the toilet."

5    Then there's a note from the following day to that, February 1,

6    2015.  The narrative is identical.  Once again, it indicates

7    that the skilled nurse flushed the expired medication in the

8    toilet.  This is just a sample.  You'll see many examples like

9    this where the same note is being repeated day after day after

11:03 10    day, over and over.

11        Ms. Waruru was not disposing of expired medicine day

12    after day after day.  That obviously makes no sense.  Instead,

13    as Ms. Waruru will explain, she was instructed by Faith Newton

14    to copy and paste patient notes day after day to cover up the

15    fact that visits weren't taking place.

16        Like the HHA certificates I showed you before, these

17    falsified patient notes show two things.  First, they

18    demonstrate the fraud itself.  These documents are replete with

19    falsehoods and fraud, false representations that care was

11:03 20    needed and false representations that care was provided.

21        Second, these documents show you that Ms. Newton knew

22    it was wrong.  She was creating the false documents and

23    directing others to do it to cover up for what she knew was

24    fraud.  You're going to find out that Ms. Waruru, this witness,

25    has pled guilty to criminal offenses, including lying to

1    investigators by initially denying that she committed these
2    crimes.  And you're going to hear that she is now testifying in
3    the hopes of receiving a more lenient sentence than she would
4    otherwise.  I expect Judge Burroughs will instruct you that for
5    that reason, you should consider her testimony with particular
6    care, and you should.  But in weighing that testimony, you
7    should also consider whether what she tells you is corroborated
8    by the other evidence in this case, like those patient notes,
9    and by what you hear from other witnesses.
11:04 10          After you hear from a group of those Arbor employees,
11    you'll hear testimony from medical professionals outside of
12    Arbor.  Here is the common thread you'll hear from them.
13    They're all going to tell you that patients enrolled with Arbor
14    didn't need the medical care that was set out in Plans of Care
15    created at Arbor.  What you'll hear is Arbor generated Plans of
16    Care for patients.  As I said earlier, these documents contain
17    a diagnosis, symptoms, and medical conditions justifying
18    medical care.  And then they include a treatment plan setting
19    forth the number of weekly visits from a skilled nurse and the
11:05 20    number of hours of home health aide care the patient was to
21    receive.
22          Arbor would send these Plans of Care to doctors,
23    asking these doctors to sign off on the Plans of Care.  But
24    you'll find out when these medical professionals actually saw
25    the patients themselves, what they observed didn't match what

was set out in the Plans of Care.  The patients didn't need the
amount of care listed in the Plans of Care, and sometimes they
didn't need care at all.

Some of these doctors and medical professionals
refused to sign off on the Plans of Care.  And you'll learn
that when this happened, patients became upset.  Patients
became angry and sought to switch doctors to find someone who
would sign off on the Plans of Care regardless of medical
necessity.

11:06 10        Frequently that meant switching to a doctor named
Anthony Eaton.  You'll hear that Dr. Eaton was recruited by
Faith Newton herself to be the medical director at Arbor and
that without conducting any medical assessment, without
independently assessing the medical needs of Arbor patients, he
would sign off on Plans of Care sent to him by Arbor.  I expect
that he will tell you he now knows it was wrong, but he put his
trust in Faith Newton, and he put his trust in Arbor.  And I
expect he will tell you that was a mistake.

That's the evidence related to the health care fraud
11:07 20   counts, Counts One and Count Two of the indictment.

The evidence will show that Faith Newton orchestrated
an elaborate scheme to defraud MassHealth, and you'll learn
that the scheme in fact worked.  Arbor was in business for less
than four years.  Over that period, MassHealth paid Arbor more
than $160 million.  Of that, 100 million was attributable just

1    to claims submitted for care supposedly provided by home health

2    aides who were in fact untrained, unqualified and uncertified;

3    and that if MassHealth had known that, they never would have

4    paid those claims.  The proceeds of this fraud flowed right

5    into Arbor's bank accounts, and you'll hear from the government

6    investigator, Special Agent Alina Cleverly, who will trace the

7    flow of this money from Arbor's bank accounts into accounts

8    controlled by Faith Newton.

9           And Special Agent Cleverly as well as other witnesses

11:08 10   involved in the transactions will tell you about how Faith

11   Newton used that money to purchase expensive real estate, to

12   pay for construction on that real estate, and to purchase a

13   Maserati.  That's a photograph of one of the properties that

14   Faith Newton purchased.  You'll find out that just as Arbor was

15   closing at the beginning of 2017, after Faith Newton had become

16   concerned that she was being investigated, Faith Newton wrote

17   two backdated checks from Arbor's accounts, backdated from

18   early January 2017 to late December 2016 to appear as

19   end-of-year bonuses for $2 million each, one to herself and one

11:09 20   to her husband, Ben Muiruri.  And that's the money laundering

21   conspiracy and the money laundering counts.

22           That's what I anticipate the evidence will show in

23   this case:  that Faith Newton orchestrated a scheme to defraud

24   MassHealth to line her pockets with money that Massachusetts

25   had set aside to provide care for sick and old patients.

<table>
<tr><td></td><td>1</td><td>          Thank you for your attention this morning.  The next</td></tr>
</table>

1          Thank you for your attention this morning.  The next

2      time that we'll get to speak with you directly will be after

3      you've heard all of the testimony in this case and after you've

4      heard and seen all the evidence and seen all the witnesses, and

5      I expect it will be Mr. Brady who is next to speak to you

6      directly from the government.  When he does, he will ask you to

7      deliver the only verdict that is consistent with the evidence

8      in this case:  that the defendant Faith Newton is guilty beyond

9      a reasonable doubt.

11:10  10          THE COURT:  Is Mr. Vien or Ms. Pascucci going to open?

11          MR. VIEN:  I will, Your Honor, but could I ask for one

12     clarification before I talk.  It's very brief.

13          THE COURT:  Sure.

14     **SIDEBAR:**

15          MR. VIEN:  Judge, I was concerned about the kickback

16     payment to patients issue, because I thought you were pretty

17     clear about saying we don't want to call them kickbacks.

18     They're part of the conspiracy, they show this and that, but

19     don't say kickback, don't say kickback, don't say kickback.

11:13  20     And instead he said bribing patients to get them in the door,

21     you can't bribe people to refer patients, bribes in violation

22     of the MassHealth rules.

23          She's not charged with bribery, and I respectfully

24     request that you correct that and say that was improper and

25     that she's not charged with bribery.  And if you think it's

1    relevant to the conspiracy that patients were paid, if that's
2    the evidence, you can consider it but for no other purpose.
3            MR. LOONEY:  I think that is absolutely intrinsic
4    to --
5            THE COURT:  No, he's not complaining about the
6    conduct.  He's complaining about your characterizing it was a
7    bribe rather than a payment.
8            MR. VIEN:  Correct.
9            MR. LOONEY:  It's a corrupt payment intended to get
11:13 10   someone who does not necessarily need care or not otherwise to
11   enroll for services, that is a bribe --
12           THE COURT:  Let's not call them bribes, okay.  It's a
13   loaded word.  I'll give a corrective instruction if you want,
14   but I think that will be drawing more attention to the issue.
15           MR. VIEN:  What would you say, if you say it was
16   improper?
17           THE COURT:  I'm not going to say it's improper.  What
18   I would say, I would just say she's not charged with bribery.
19   Mr. Looney referenced payments, and if you think those payments
11:13 20   are relative to the health care fraud, you can consider them,
21   but she's not charged with bribery.
22           MR. VIEN:  I'll take that correction.  Thank you.
23           THE COURT:  All right.
24   (End of sidebar.)
25           THE COURT:  Before Mr. Vien opens, one point of

clarification. I think I told you the defendant has been
charged with health care fraud and conspiracy, money laundering
and money laundering conspiracy. She's not been charged with
bribery. Mr. Looney referenced payments made during the
course, and if you decide that those payments are relevant to
your deliberations on health care fraud conspiracy or
substantive offense, that's up to you to determine, but I just
wanted to be clear that she's not charged with bribery. Okay?
Anything from the government on that?

11:13     MR. LOONEY: No, Your Honor. Thank you.

          THE COURT: Mr. Vien?

          MR. VIEN: No.

          THE COURT: Okay. When you're ready.

          MR. VIEN: Thank you, Your Honor.

          Good morning. Before we get started, I just want to
clarify a couple of things. Remember, the indictment does not
charge the defendant with violation of the Massachusetts
regulations. They charge her with committing federal crimes.
So violating a Massachusetts regulation does not equal a
11:14 federal crime as charged in the indictment.

          Second, as far as the money, she made money. She
bought a nice house in North Andover. And some people like
cars; some people don't. She bought a used Maserati from the
guy who sold her their house. So there's no crime in America
for making a lot of money. In fact, a lot of people make a lot

1    of money.  It's a question of whether she did it illegally as

2    alleged in this indictment.  It's not a referendum on we don't

3    like the fact that Faith Newton, who immigrated from Kenya,

4    made a lot of money in America.

5            So just let me take a step back and tell you a little

6    bit about Faith Newton.  As I indicated, she immigrated from

7    Kenya.  She is a legal U.S. citizen.  She worked hard and went

8    to community college, became a licensed practical nurse and

9    then a registered nurse.  She met and married her husband, also

11:15 10    a U.S. citizen, also a Kenyan immigrant, also a nurse.  She

11    worked for years as a nurse in various places, including the

12    Veterans Administration.

13            Then her husband wanted to start a home health care

14    business.  So she went to work helping her husband open the

15    business and worked as a nurse there and then took various

16    roles for a while until she moved on.  Not from her husband.

17            So anyway, the business was very successful.  It grew

18    rapidly.  It wasn't long before there were probably 50 people

19    working in the office, hundreds of home health care aides and

11:16 20    nurses and thousands of patients.  Frankly, the business grew

21    too fast and it became an administrative mess.  There were

22    files all over the place.  They were struggling desperately to

23    keep up with the work and keep up with all the documents and

24    all the regulations that they had to follow.

25            Now, the way it works is the home health care aide is

1    the one that goes to the patient's home and does the services.

2    Then the home health aide comes back, documents what happened,

3    and then at Arbor it gets sent through a variety of channels to

4    ultimately get paid.

5         And what can happen is that system can break down at

6    various points throughout the billing system, and it did, and

7    you'll see it was a difficult business to manage and run.

8    There was a lot of turnover among the home health aides, there

9    was a lot of turnover among office employees, and there was a

11:17 10    lot of turnover regarding patients.  Of course dealing with

11    MassHealth, which you'll see some of the morass of regulations

12    that these people are supposed to comply with, was a difficult

13    task in itself.  And you'll see that there was a lot of back

14    and forth with MassHealth about bills and about what they were

15    doing and whether or not MassHealth was going to come and audit

16    them.  And ultimately MassHealth stopped payment, okay,

17    stopping payment in January of 2017.  That basically put Arbor

18    out of business.

19         So four years go by, four years, and then we get this

11:17 20    indictment alleging criminal acts between January 2014 and

21    January of 2017.  So some of the events you're going to hear

22    about are over nine years old.  I think all of them are over

23    six years old.

24         And without getting too bogged down in the charges,

25    and the judge summarized them to you, again, it's not a

violation of the Massachusetts regulations that we're dealing

with here.  It's whether or not Faith Newton had the required

criminal intent to violate the federal law.  And you have sworn

to hold the government to its duty in this case, which is to

prove that, to prove what was in Faith Newton's head, beyond a

reasonable doubt.  That's the only issue before us today, is

whether the government can satisfy its burden to prove beyond a

reasonable doubt that Faith Newton acted willfully and wasn't

in some kind of desperate mood -- mode, trying to run a

business, but rather did it because she was trying to violate

the law.  And again, please don't substitute the Massachusetts

regulations for the charges in this indictment.  They are

different.

        So what will the evidence be?  You've heard in kind of

passing reference there will be a lot of documents.  Okay.  One

problem with the documents is the case goes back to 2017.  The

documents in the first place were a mess to start with.  And

you'll see a very strange document flow about what documents

are supposed to be filled out when, who is supposed to sign

them, where they're supposed to be uploaded, and how they're

retrieved from the database that will bring them into court for

you.  And you'll see there were problems all along the way.

        So the documents, you're going to see -- I don't know

what the judge is going to let in and keep out, but you're

going to hear objections about certain documents.  And

1    basically it will be, Well, where did that one come from?  Is

2    that one a real document?  Is it not a real document?  So

3    you're going to see all of that.  I don't want to look like a

4    jerk standing up and objecting all the time, but these

5    documents are very important.  And there's a mess and there's a

6    history of problems getting the documents from 2017 into court

7    to show you the real documents today.  And that will be an

8    issue throughout this trial.

9              So also there will be witnesses.  Now, the government

11:20  10   told you a couple of witnesses.  Co-defendant Winnie Waruru

11   pled guilty, was charged and pled guilty.  Faith Newton hired

12   her, treated her well.  She's a nurse.  She had prior

13   experience, and Faith Newton was good to her.  And she's pled

14   guilty to some of the charges that Faith Newton is charged

15   with, and she's pled guilty to other charges that I think even

16   the government and Ms. Waruru would say had nothing to do with

17   Faith Newton.

18             But she's got a bigger problem because Winnie Waruru,

19   unlike Faith Newton and her husband, are not U.S. citizens.

11:21  20   And she has to know that, given the fraud that she's pled

21   guilty to, it's going to result in deportation under normal

22   circumstances.  The deportation of course would go back to

23   Kenya.  And I've never been to Kenya, but things look like

24   they're really struggling in Kenya right now.  She doesn't want

25   to go back.

1          So how is she going to not go back?  Well, she's
2     already overstayed her visa, but the government has kept her in
3     the country.  So before we even start about will Winnie Waruru
4     go to jail, what's the government going to say, overarching all
5     of that is the fact that she doesn't want to be deported back
6     to Kenya.  Look, I understand.  I would not, if I came to
7     America and lived that long here, I wouldn't want to be
8     deported back.  But she's under a lot of pressure.  She's under
9     a lot of pressure.  She has a family.  She doesn't want to go
11:22 10   back, and she's been willing to help the government even when
11    it means changing her story.
12          You'll see during this investigation, which has gone
13    on a long time, she's been interviewed six or seven times, and
14    during one of the earlier interviews, after she said she
15    started telling the truth, she says, I paid patients.  Faith
16    Newton gave me money and I paid patients to come to Arbor and
17    stay at Arbor, and basically, I didn't know it was wrong.
18    Okay.  That's important for a variety of reasons.
19          One is, this is a white-collar case.  It's mental
11:23 20   intent.  It's not like robbing a bank.  Everybody knows it's
21    wrong.  You go in and rob a bank.  You have a gun.  Boom.  This
22    is different.  This is a regulation they made up or law made up
23    that says you can't pay patients.  So she ends up saying yeah.
24    And you've got to know you're doing something wrong.  She said
25    initially I didn't know what I was doing was wrong.  So she

goes on.  The case goes on.  She gets interviewed again.  She

pleads guilty to everything.  She pleads guilty to kickbacks,

which Faith Newton isn't being charged with, in relation, I'll

say generally, with a health care offense.

Then what happens is sort of a new prosecution team

comes in, and they interview Winnie Waruru again.  And these

guys, as you saw, they're bright guys and they have all the

reports.  So they interview Winnie Waruru again, but this time

she does a 180 and says, Oh, yeah, I knew it was wrong when I

11:24  was working at Arbor, because that allows her to be guilty to

the kickback and allows her to say, I knew it wasn't right and

probably Faith Newton knew it wasn't right.

But she changed her testimony in these interviews.

Let me say it more precisely.  She changed what she told the

agents:  I didn't think it was wrong.  Then I realized it was

wrong, and I knew that while I was doing it, which is a big

important thing in this case.  So not only she entered into a

plea agreement and she's hoping for great benefits from the

government.  But frankly, the government has already given her

11:25  some great benefits because the indictment in this case alleges

that between in or about January 13 and January 17 -- excuse

me -- January 2013 and January 2017, the defendants Newton and

Waruru, together with others known and unknown to the grand

jury, devised a scheme and artifice to defraud health care

programs.  Okay.  That's a crime.  And the people who devised

1    it are Winnie Waruru and Faith Newton.

2        And later on in the indictment, just like Mr. Looney

3    said, over $100 million of the claims were fraudulent.  Okay.

4    So Winnie Waruru and Faith Newton, according to this

5    indictment, devised this scheme, and they got $100 million in

6    fake claims.  Okay.

7        Now, Winnie Waruru pleads guilty.  And at the time of

8    her guilty plea -- and in fairness to these guys, this was by

9    their predecessor prosecutors.  They didn't do this and sign

11:26 10    this, but their predecessors in the office did.  So the

11    government agrees that the defendant, Ms. Waruru, her offense

12    level -- this is the sentencing guidelines you'll hear about --

13    because the defendant caused a loss of more than $550,000 but

14    less than 1.5 million.  Both those things can be true, right?

15        So anyway.  Ms. Waruru has already gotten some great

16    benefits by pleading guilty and agreeing to testify against

17    Faith Newton by pleading guilty to conspiracy but then getting

18    a deal in her plea agreement about how much loss and fraud she

19    caused.  That's not right.  That's not fair.  Okay?

11:27 20        And she's looking for more, more benefit from the

21    government because you'll hear that she pleaded guilty in front

22    of another judge, and it will be entirely up to the government,

23    if they file a motion for Winnie Waruru based on her

24    cooperation, to give her a lower sentence than whatever she

25    might otherwise get.

1          And usually oftentimes in these cases, the person who

2     is going to sentence, the judge is the same judge presiding and

3     watching them testify.  So the judge can decide for him or

4     herself, is this person telling the truth.

5          Now, the other judge who is sentencing Winnie Waruru

6     is not Judge Burroughs, obviously.  So Winnie Waruru is totally

7     dependent on the government to go to bat for her with Judge

8     O'Toole.  So, look, Winnie Waruru is in a tough situation.

9     It's pretty sad.  But she's highly motivated to do whatever she

11:28 10    needs to do to help the government and around the edges say,

11    Oh, Faith Newton told me to do that; Faith Newton told me to do

12    this; Faith Newton was in charge.  Winnie Waruru was a nurse.

13    She had worked as a nurse before, and she's saying she did all

14    of these things because Faith Newton told her to.

15         You'll also hear some witnesses that are kind of

16    generally called relators.  Relators are people who came to --

17    these people, these relators came to work at Arbor for a very

18    short time.  They already have it in their heads that they're

19    going to start a new business, their own health care business

11:28 20    and file a lawsuit and try to be whistleblowers so they can

21    collect money from Arbor and from the government, if the

22    government gets it.

23         Anyway, those people will testify.  They'll have a

24    very narrow kind of perspective because they only worked at

25    Arbor for a short time.  But when you're listening to them

1  testify, remember, in their mind they're thinking Faith Newton

2  gets convicted, I, the relator, not me, can make more money.

3          So there will be, as Mr. Looney said, there will be a

4  special jury instruction about people like Winnie Waruru and

5  the relators and other people who weren't prosecuted in this

6  case.  There will be other witnesses called by the government,

7  and they were at Arbor at different periods, different

8  perspectives, or they have their own motives to lie, either

9  they weren't prosecuted when they got up and said, Oh, yeah, I

11:29 10  was involved in fraud but I wasn't prosecuted.

11          And of course what we can see is, you know, when the

12  home health aide goes to visit these patients, there's

13  basically, you know, 90 percent of the time two people in the

14  room.  There's the home health aide and the patient.  So the

15  home health aide, some will testify, a couple, but I don't

16  think you're going to hear from one patient in this case about

17  what services they needed and why they thought they needed

18  services and what services they received.

19          But anyway, during the time period that Arbor was in

11:30 20  operation, there were over 50 or several office workers.  There

21  were hundreds of home health care workers and nurses.  And

22  there were thousands of patients.  No company with this many

23  people, this size, people with different agendas, is perfect.

24  But it's not a crime to be involved with an imperfect business.

25  It's not a crime to do a terrible job in a business.  It's not

1    a crime to be an administrative mess in a business.  And you'll

2    hear, despite all these other people being involved in this

3    business and this operation and the allegations of fraud, just

4    two people have been charged, Faith Newton and Winnie Waruru.

5    No doctors have been charged.  No other people at Arbor were

6    charged.  Just Winnie Waruru, who desperately wants to stay in

7    the U.S., and Faith Newton.

8            And, you know, during the government's opening, it

9    kind of struck home because there's this doctor, I think it's

11:31 10   Dr. Eaton, and he said I kind of phonied up these Plans of

11   Care, and I would sign whatever they brought in.  I didn't

12   really check.  I didn't have in-person things, and, you know,

13   now I realized what I was doing was wrong.  Because he said at

14   the time, just like the Winnie Waruru issue, if I said yeah, I

15   was doing this and I knew I shouldn't have been doing it, then

16   he's guilty too.  But we're expected to accept that he had an

17   epiphany after the fact to say, Oh, yeah, I shouldn't have been

18   signing these things, because now he's going to come in and

19   testify for the government and point his finger at Faith Newton

11:32 20   and say, I'm a medical doctor, I went to med school, and I walk

21   around, you know, but it's Faith Newton who made me do it.

22           Again, we go back to the basics of this case, though.

23   Remember, these cases are willful violations of the federal

24   criminal law.  If there's no intent, there's no crime.  And we

25   go back to the burden on the government.  You swore an oath to

1    hold them to that burden, and the burden of proof is can they

2    prove beyond a reasonable doubt that Faith Newton committed the

3    crimes in this indictment, not that they didn't like how she

4    operated, not that it wasn't a perfect business, but these

5    charges in this indictment during the time period alleged with

6    the people alleged.  And the answer to that question will be

7    no.  Thank you.

8              THE COURT:  All right.  Government, ready to call your

9    first witness?

11:33 10           MR. BRADY:  Yes, we are, Your Honor.  The United

11   States calls Almas Dossa.

12             ALMAS DOSSA, Sworn.

13             COURTROOM CLERK:  Can you please state your name and

14   spell your name for the record.

15             THE WITNESS:  Sure.  My name is Almas Dossa.  It's

16   A-l-m-a-s, D-o-s-s-a.

17             THE COURT:  I'm going to ask you to keep your voice

18   up.  That whole microphone stand moves, so you can -- the whole

19   thing slides, not just up and down, but you can slide it.

11:35 20   Whatever makes you comfortable.  I just want to make sure we

21   can hear you.

22             THE WITNESS:  Is that better?

23             THE COURT:  You're soft-spoken, so keep your voice up.

24             Go ahead, Mr. Brady.

25   DIRECT EXAMINATION BY MR. BRADY:

1    Q.    Good morning, Ms. Dossa.

2    A.    Good morning.

3    Q.    I'm over here.  Can you hear me okay?

4    A.    Yes.

5    Q.    Okay.  I know you just stated and spelled your name, but

6    why don't you go ahead and please introduce yourself again to

7    the jury, please.

8    A.    Sure.  My name is Almas Dossa.  What was the other

9    question?

11:35 10    Q.    Let me follow up.  Where do you live, Ms. Dossa?

11    A.    I live in Brookline, Massachusetts.

12    Q.    And what do you do for work?

13    A.    I work for the MassHealth Office of Long Term Services and

14    Support.

15    Q.    And what's your job at MassHealth?

16    A.    I'm senior director of the home-based programs there.

17    Q.    And you mentioned home-based programs.  What does that

18    mean, Ms. Dossa?

19    A.    So I oversee about eight different programs in home

11:36 20    health, hospice, outpatient therapy programs, to check medical

21    equipment, oxygen, orthotics, prosthetics and case management

22    program.

23    Q.    How long have you been in that role?

24    A.    As senior director I have been in that role since 2019, I

25    believe.

1    Q.    Now, did you have other jobs at MassHealth before that?

2    A.    Yes, I did.

3    Q.    And we'll walk through that.  But just overall, how long

4    have you worked at MassHealth for?

5    A.    Since March 2014.

6    Q.    Okay.  So Ms. Dossa, if you can start back in March 2014

7    and just walk us through the jobs that you've had at

8    MassHealth, please.

9    A.    Sure.  So I started as a program manager for home health,

11:36 10   hospice, therapy and case managing program.  And then in 2017,

11    I was promoted to being assistant director and then senior

12    deputy director of the home-based programs.

13          Between 2019 and 2021, I was the director of home and

14    community-based programs.  And then in 2021 until now, I am

15    senior director of the home-based programs.

16    Q.    Now, you testified that you started at MassHealth back in

17    2014?

18    A.    Correct.

19    Q.    Can you describe for the jury your work experience prior

11:37 20   to you going to MassHealth?

21    A.    Sure.  So I've been in health care for over 40 years, and

22    I started as a physical therapist, and I have worked in a

23    variety of different settings, hospitals, rehab, home care,

24    nursing homes.  And then after that I went back to school for,

25    I have a master's in public health as well as a master's in

physical therapy.  Then I went back to school for a Ph.D. in

social policy.  And I did research for many years.  And then I

wanted to do work for the state, so I came to MassHealth since

I wanted to do more -- related jobs.

Q.    And Ms. Dossa, you mentioned you have about four years of

experience in health care?

A.    Correct.

Q.    Roughly how much of that time have you spent working in

and around home health?

A.    So I did have a variety of home health positions as a

physical therapist.  And again, in my position as a physical

therapist also in hospitals I had to deal with, you know,

discharging patients to home care.  So I had that experience.

And then at MassHealth I was overseeing the home health

program.

Q.    Ms. Dossa, you mentioned MassHealth, which is your

employer?

A.    Correct.

Q.    So I'd like to just take a step back and talk a little bit

about MassHealth.  Is that okay?

A.    (Nods.)

Q.    So a very general question to start.  What is MassHealth?

A.    So MassHealth is a federally and state funded insurance

program for the lower income population.  You have to have a

certain income limit in order to be eligible for that insurance

1    program.

2    Q.    And you say it's for lower income people.  Is it people

3    within Massachusetts?  Is that right?

4    A.    Exactly.

5    Q.    Are you familiar with the term "Medicaid"?

6    A.    Yes.

7    Q.    Could you describe generally what Medicaid is.

8    A.    So Medicaid -- so MassHealth basically is the Medicaid

9    program.  We call it MassHealth here.  And it's a Medicaid

11:39 10    program plus the children's health insurance program.  That's

11    MassHealth.

12    Q.    So MassHealth is the Massachusetts version of Medicaid?

13    A.    Correct.

14    Q.    Okay.  And have you heard of something called Medicare?

15    A.    Yes.

16    Q.    Can you explain to the jury the difference between

17    Medicare and MassHealth, Medicaid?

18    A.    Medicare is only for the 65-year-old, 65-plus population,

19    so there is the age limit there.  But there are also some

11:40 20    younger people who have certain physical disabilities that can

21    also apply to being Medicare beneficiaries.

22    Q.    Now I'll ask you a pretty general question.  How does

23    MassHealth work?

24    A.    So basically you have to be eligible to be a MassHealth

25    member.  And there are providers that we pay to provide

```
 1    services to MassHealth members.  We call on MassHealth, the

 2    ones who join MassHealth, we call them MassHealth members, to

 3    distinguish that term.  And so we pay providers to provide the

 4    service.  Providers have to enroll.  They have to go through

 5    the enrollment process in order to be eligible to become

 6    MassHealth providers.

 7    Q.    Ms. Dossa, if I may follow up, you referred to MassHealth

 8    members.

 9    A.    Yes.

11:41 10   Q.    And those are people who, basically, they're patients who

11    get services that are paid for by MassHealth; is that fair?

12    A.    Yes, correct.

13    Q.    Now, generally do MassHealth members have to pay out of

14    pocket for services they get for MassHealth?

15    A.    Generally they don't have to pay out of pocket.  There are

16    certain services that we have to have some co-pay.  But on the

17    whole, they don't really have to pay out of pocket.

18    Q.    How about for home health care services?  Do members have

19    to pay out of pocket for those services?

11:41 20   A.    They should not have to pay out of pocket.

21    Q.    Ms. Dossa, how big is MassHealth?  How much money, how big

22    a part of the budget are we talking about?

23    A.    Sure.  So I believe at the last point there were about 2.3

24    million MassHealth members, patients who enrolled in

25    MassHealth, 2.3 million.  And I believe the budget is something
```

```
 1   like 19.5 billion, just about 40 percent of the state budget.
 2   Q.   Where does the money for MassHealth come from?
 3   A.   It comes from state taxes, and we also have a federal
 4   matching, federal -- the government also gives us money,
 5   matching money for us, for our program.
 6   Q.   So the federal government kicks money into MassHealth as
 7   well; is that right?
 8   A.   Yes.
 9   Q.   Okay.  Am I right, Ms. Dossa, that MassHealth is what is
10   considered a health care benefit program?
11   A.   That's correct.
12   Q.   Okay.  In describing MassHealth before, Ms. Dossa, you
13   referred to MassHealth providers.
14   A.   Yes.
15   Q.   What is a provider?  What does that mean when you're
16   talking about MassHealth?
17   A.   So a provider is an entity that supplies the services that
18   we need to serve our MassHealth members.  And so again, they
19   are -- they have to apply to be a MassHealth provider so they
20   can provide the services, and that's basically what we call
21   providers.
22   Q.   Let me ask you about another MassHealth term, and that's
23   claim.  What's a claim in reference to MassHealth?
24   A.   So a claim is something that our providers, the ones who
25   are servicing our members, when they do service our members,
```

1    they will put in a claim to be reimbursed by MassHealth.

2    Q.    Okay.  And I believe in one of your answers before you

3    said something about providers enrolling with MassHealth; is

4    that right?

5    A.    Right.

6    Q.    Is that a step in the process for a provider?

7    A.    Yes, exactly.  In order to be paid --

8    Q.    Please describe that.

9    A.    Sure.  So in order for the provider to be paid by

11:43 10   MassHealth, they do have to be enrolled.  There are certain

11    enrollment criteria that have been established that the

12    provider has to follow in order to be enrolled in MassHealth.

13    Q.    When a provider submits claims to MassHealth, does

14    MassHealth audit every claim it gets before it pays?

15    A.    No, MassHealth does not audit manually every claim.  The

16    system has some specific automated edits that look at the claim

17    in order to make sure that the claim is valid.  But so those

18    edits are like automated.  Nothing is manually reviewed.  There

19    are some claims that are manually reviewed, but they're just

11:44 20   far and few between.  On the whole, it's just automated.

21    Q.    So Ms. Dossa, setting aside the few and far between or the

22    edits that you talked about, does anybody at MassHealth look at

23    claims generally before MassHealth pays the claim?

24    A.    Not generally.  Again, it's a system, it goes through the

25    system and follows certain system edits in order to be paid.

1    But the only time you might be looking at claims is when we're

2    doing post audits on a provider and then there are a lot of

3    post claim reviews that are done.

4    Q.    Just so we're clear on what you're talking about, so you

5    said post claim reviews.  That's after claims have been

6    submitted, they've been paid, and then MassHealth is looking

7    back?

8    A.    Correct.

9    Q.    Okay.  Why doesn't MassHealth review the claims before it

11:45 10    pays them generally?

11    A.    I think it would take a lot of people to do that.  And as

12    I said, there are 2.3 million members and thousands, if not

13    millions, of claims that come through.  So the system is set up

14    to really look at automated to make sure the claim is valid.

15    There are many edits in the system to look at that in an

16    automated fashion.  So MassHealth is not able to look at every

17    single claim that comes through the system every day.

18    Q.    And Ms. Dossa, when a provider submits a claim to

19    MassHealth for payment, what does MassHealth expect?

11:46 20    A.    We expect that the provider has followed the regulations,

21    federal, state regulations.  They follow what the contract

22    states that they have to do when they signed the contract.  And

23    we expect that they follow that accurately before they submit a

24    claim.

25    Q.    So Ms. Dossa, is it fair to say that when a provider

submits a claim, MassHealth trusts that provider to follow the

regulations you mentioned?

A.    Yes, we do trust that provider to follow the regulations.

Q.    Okay.  I believe you mentioned before, Ms. Dossa, from

2014 to 2017, your job was to oversee MassHealth's home health

care programs?

A.    Correct.

Q.    So I want to ask you just a couple of general questions

about that.  And currently you're now a senior manager

overseeing this program?

A.    Senior director.

Q.    Senior director, okay.  So just kind of at a very general

level, what is home health care?  What does that mean?

A.    So home health care consists of nursing care provided in

the home.  It can be home health aide care for personal care

needs, physical therapy, occupational therapy, speech language

pathology.  And this is to ensure that, you know, the

MassHealth members can stay safely in their home and get those

services.

Q.    So those are some of the general examples.  For

MassHealth, what are the types of home health services that

MassHealth provides or pays for for its members?

A.    So we do pay for the services I mentioned for nursing

care, for home health aide care and for the therapy services as

well.

```
 1   Q.   Okay.  And just to kind of break down those types of care,

 2   so skilled nursing care.  What does that entail and who does

 3   that?

 4   A.   So this can be provided either by a registered nurse or a

 5   licensed practical nurse.  And again, it could be, you know,

 6   administering specific medications, checking your blood

 7   pressure, making sure that you're -- again your vital signs

 8   are, you know, within a certain range.  It can provide -- it

 9   can include education about various different things,

10   medication management, nutrition, and so on.

11        So these are all skilled needs that only a nurse can

12   provide to make sure that the MassHealth member is safe at

13   home.

14   Q.   So let me ask you about home health aides.  Are you

15   familiar with that term?

16   A.   Yes.

17   Q.   Sometimes referred to as an HHA?

18   A.   Correct.

19   Q.   Okay.  What kind of care can HHAs provide?

20   A.   So they provide personal care, so things like if somebody

21   needs help with, you know, activities, what we call activities

22   of daily living, which is bathing, showering, dressing,

23   grooming, transfers, toileting, ambulation, things like that

24   where you need some hands-on care.  And that's what the home

25   health aide would provide.
```

11:48 appears at line 10, 11:49 appears at line 20.

1    Q.    Ms. Dossa, you mentioned something called activities of

2    daily living, and you gave a couple examples, right?

3    A.    Yes.

4    Q.    Is that sometimes referred to as ADLs?

5    A.    Yes.

6    Q.    Okay.  These services that you describe, Ms. Dossa, why

7    does MassHealth cover those for its members?

8            MR. VIEN:  Objection, relevance, Your Honor.

9            THE COURT:  I'm not going to sustain it on relevance,

11:50 10   but try another question, please.  To the extent she knows.

11    Q.    Okay.  To the extent you know, are there benefits

12    MassHealth sees to its members for those services?

13            MR. VIEN:  Objection, Your Honor.

14            THE COURT:  On relevance?

15            MR. VIEN:  I think I'm going on relevance, and I think

16    I'm going on basis of knowledge.

17            THE COURT:  All right.  Overruled on relevance.  Lay a

18    foundation, please.

19    Q.    Ms. Dossa, how long have you worked at MassHealth in

11:50 20   positions relating to home health services?

21    A.    Since March 2014.

22    Q.    Okay.  And through your experience in those roles, have

23    you become familiar with the various types of home health

24    services that MassHealth provides to its members?

25    A.    Yes, I have.

Q.    Okay.  And have you come to understand the impact or
benefits that those services may have on the members of
MassHealth?

A.    Yes, I have.

Q.    So what benefits do those services have on members of
MassHealth, the home health services that you've referred to?

A.    One of the biggest benefits that I see is keeping someone
safely at home so they don't have to be hospitalized or they
don't have to go to the emergency room.  And they can, you
know, again stay safely at home.  Their quality of life is also
better when they're at home rather than in a hospital.

Q.    So when a provider provides some of these services to a
MassHealth member and the provider submits a claim, how is the
amount that the provider gets paid determined?

A.    So we have certain rates that we have set.  Those are the
rates that the provider should bill for.  And if the provider
submits a claim, they should follow those rates and submit that
amount and then get paid for it.

Q.    Ms. Dossa, we've talked about nurses, home health aides.
I want to ask you about another type of helper.  Personal care
attendant or PCA.  Are you familiar with that?

A.    Yes.

Q.    What's a PCA?

A.    So a PCA -- and this is not a program I manage, but I know
about it.  The personal care attendant program is a

1    consumer-directed program.

2            MR. VIEN:  Judge, just the basis of knowledge, Your

3    Honor, she doesn't manage it.

4            THE COURT:  All right.  Because she says she doesn't

5    manage it, let's lay a foundation.

6            MR. BRADY:  Okay.

7    Q.   So Ms. Dossa, I understand that you don't manage the PCA

8    services provided by MassHealth.

9    A.   That's correct.

11:53 10   Q.   Okay.  Nevertheless, have you had, through the course of

11   your work, have you come to develop any understanding of what a

12   PCA is or what those services are?

13   A.   Yes, I have a lot of understanding.

14           MR. VIEN:  Objection.  After the answer --

15           THE COURT:  Hold on.

16           MR. VIEN:  The question was a yes or no.

17           THE COURT:  Okay.  So she said, "Yes, I have a lot of

18   understanding," and you objected.  Next question.

19   Q.   How did you develop that understanding?

11:53 20   A.   I work very closely with the people that do manage the

21   program.  Frequently, since I manage the home health program,

22   we also need to figure out whether a PCA is more appropriate

23   than a home health aide, and so I work very closely with the

24   folks that do manage the PCP program to determine the needs.

25   So again, I would say I'm very well versed in that program.

1    Q.    Okay.  So just to kind of start over, what is a PCA?

2    A.    So this is a personal care attendant.  This is

3    consumer-directed.  So what that means is that the MassHealth

4    member supervises that personal care attendant who can provide

5    personal care services, such as the showering, bathing,

6    dressing, grooming, toileting and so on.  But again, this is

7    the MassHealth member that is able to supervise the personal

8    care attendant.

9    Q.    So Ms. Dossa, you described some of the things a PCA does.

11:54 10    What's the difference between a PCA and a home health aide,

11    HHA?

12    A.    Okay.  So the main difference is the fact that the home

13    health aide is supervised by a nurse from an agency.  So this

14    is an agency-based model.  The home health aide is part of a

15    home health agency, and so the nurse from the agency supervises

16    the aide.  The personal care attendant doesn't have -- it's not

17    an agency model.  It's a consumer-directed model.  And as I

18    said, that means the MassHealth member can directly supervise

19    and tell the personal care attendant what to do, how to do it

11:55 20    and so on.

21    Q.    So I think you described the model for PCA.  Is it okay

22    for a home health agency to bill for a PCA's services?

23    A.    No, it is not.

24    Q.    Why not?

25    A.    It is not part of what we pay home health agencies for.

Home health agencies can only bill for nursing, home health
aide and therapy services.

       The way to bill for a PCA is in a completely different
way.  And there are PCM agencies that oversee the PCA program,
and that's -- again, a PCA will have to come from that PCM
agency and then the billing is different.

Q.    Are you familiar with the idea of levels of care, levels
of service?

A.    Yes.

Q.    So what are the levels of service for home care between
skilled nursing, home health and PCA?  How do those levels
work?

A.    So the highest level is the nursing care because that
requires skilled, what we call skilled services, and it
requires a licensed nurse or registered nurse to provide that
service.  So those are professionals, and that would be the
highest level.  Along with the therapy services, I would say
they also require licensed professionals.  Home health aides
are not licensed professionals.

Q.    They're not licensed, but do they require special
training?

A.    Yes, they do require special training.

Q.    Okay.  How about the PCAs, is that different from the
HHAs?

A.    So the PCAs do not require as much training as home health

1    aides do.

2    Q.    Okay.  And for these different levels of types of service,

3    do they get paid differently based on the level?

4    A.    So, yes, the nurses and the therapy services get paid

5    more.  Home health aide is a little bit higher than the PCAs, I

6    would say.

7    Q.    So I want to shift a little bit here.  Earlier you

8    mentioned that when providers start with MassHealth, they go

9    through an enrollment process?

11:57 10    A.    Right.

11    Q.    Let me come back to that.  Can you describe for the jury

12    what that enrollment process is?

13    A.    Sure.  So the enrollment process consists of filling out

14    an application and providing certain things that the

15    application requires.  This includes the fact that they have to

16    be Medicare certified, so that is one of the enrollment

17    requirements, that this provider, home health provider has to

18    be Medicare certified.  And then the enrollment unit looks at

19    other things like have there been any sanctions against this

11:58 20    provider for Medicare or Medicaid, has there been anything with

21    OIG, the Office of Inspector General, that has happened, any

22    department.  So they look at all those things and then,

23    together with the knowledge, they would enroll that provider.

24    Q.    Okay.  Ms. Dossa, what are conditions of participation or

25    COPs, what are those?

1     A.    So the conditions of participation is something that

2     Medicare, Centers for Medicaid and Medicaid puts together.    And

3     they called them Medicare Conditions of Participation.    So the

4     home health provider has to follow the conditions of

5     participation.    And that's part of the requirement.    If you're

6     Medicare certified, that means you need to be following these

7     conditions of participation.

8     Q.    Is it fair to say those are the rules of the program?

9     A.    Yes.

11:59 10    Q.    And you said that providers have to abide by them?

11    A.    Correct.

12    Q.    Do providers have to agree to abide by them?

13    A.    Yes, they do.

14    Q.    And how do you know that?

15    A.    They sign a provider contract that states they need to

16    follow the state and federal regulations that they're required

17    to follow as a type of provider.

18    Q.    Okay.    As part of the enrollment process, is there

19    something called accreditation?

11:59 20    A.    Yes.

21    Q.    Could you describe for the jury what that means and how

22    that plays into the process?

23    A.    Sure.    So in order to be Medicare certified, these

24    agencies, before they get enrolled, have to get accreditation

25    through a certain entity that CMS, Centers for Medicare and

1    Medicaid has agreed to let this entity do this accreditation.

2    So it's a survey basically, an accreditation survey that these

3    agencies have to go through and follow, you know -- the

4    surveyor will go through all these questions, which are based

5    on the conditions of participation.  So we make sure that the

6    agency passes through that in order to be accredited and then

7    therefore to become Medicare certified.

8    Q.    Is one of the groups that does this accreditation called

9    CHAP?

12:00 10    A.    Yes.

11    Q.    C-H-A-P?

12    A.    Correct.

13    Q.    That stands for something?

14    A.    I think it's Community Accreditation Health Program,

15    something like that.

16    Q.    So Ms. Dossa, let me ask you about an example --

17          THE COURT:  Are you changing subjects?

18          MR. BRADY:  Yes.

19          THE COURT:  Lunch break?

12:01 20          MR. BRADY:  Yes, Your Honor.  Yes, that's fine.

21          THE COURT:  Is this a good time to stop?

22          MR. BRADY:  It's a fine time to stop.

23          THE COURT:  All right.  Lunch should be upstairs.  It

24    was supposed to be up there at 12:00, 12:00 to 12:45.  I'll see

25    you back then.

|    |    |
|----|----|
| 1  | COURTROOM CLERK:  All rise for the jury. |
| 2  | (Jury exits the courtroom.) |
| 3  | (Recess, 12:01 p.m. -12:49 p.m.) |
| 4  | (Jury enters the courtroom.) |
| 5  | MR. BRADY:  May I proceed, Your Honor? |
| 6  | THE COURT:  Go ahead, Mr. Brady. |
| 7  | CONTINUED DIRECT EXAMINATION BY MR. BRADY: |
| 8  | Q.    Welcome back, Ms. Dossa. |
| 9  | A.    Thank you. |
| 12:51 10 | Q.    So before we broke for lunch, you were testifying about |
| 11 | the rules for the MassHealth program.  Do you remember that? |
| 12 | A.    Uh-huh. |
| 13 | Q.    And the conditions of participation, COPs? |
| 14 | A.    Correct. |
| 15 | Q.    And are there a lot of rules for MassHealth? |
| 16 | A.    Yeah, we want to make sure there's program integrity so we |
| 17 | do have our providers following specific regulations and |
| 18 | guidelines. |
| 19 | Q.    And you mentioned something, program integrity. |
| 12:51 20 | Generally, what does that mean? |
| 21 | A.    That's just to make sure that we have quality providers |
| 22 | that are providing the best service to our MassHealth members |
| 23 | and, you know, in a way that ensures that they get quality care |
| 24 | and that MassHealth is paying for services accurately. |
| 25 | Q.    Okay.  These COPS, these conditions of participation, was |

1    there a COP relating to home health aid training?

2    A.   Yes.

3    Q.   Okay.  Could I ask just for the witness that we pull up

4    Exhibit 717, please?

5         MR. VIEN:  Judge, I'll stipulate to this if it helps.

6         THE COURT:  Are you going to move for its admission,

7    Mr. Brady?

8         MR. BRADY:  I am, Your Honor.

9         THE COURT:  He's not objecting to the admission, so

12:52 10   Exhibit 717 is admitted.  I don't have the exhibit up.

11         (Exhibit 717 admitted into evidence.)

12   BY MR. BRADY:

13   Q.   All right, Ms. Dossa.  Do you see Exhibit 717 on the

14   screen in front of you?

15   A.   Yes.

16   Q.   And if we could blow up the part on the right side of the

17   page where it says Section 484.36, Condition of Participation.

18   That's great.  Thank you.  Ms. Dossa, what are we looking at

19   here in Exhibit 717?

12:53 20   A.   So we're looking at the conditions of participation for

21   home health aide services and what is required by the home

22   health agency to provide the service.

23   Q.   So you were talking before about the COP for home health

24   aide training.  Is this it?

25   A.   Yes.

1    Q.    And I'm going to ask you to read starting at the

2    beginning, where it says, "Home health aides are selected on

3    the basis of such factors." Can you read that paragraph,

4    please?

5    A.    "Home health aides are selected on the basis of such

6    factors as the sympathetic attitude toward the care of the

7    sick, ability to read, write, and carry out directions and

8    maturity and ability to deal effectively with the demands of

9    the job.  They're closely supervised to ensure their competence

12:54  10    in providing care.  For home health services furnished either

11    directly or through arrangements with other organizations after

12    August 14, 1990, the home health agency, HHA, must use

13    individuals who meet the personnel qualifications specified in

14    484.4 for home health aide."

15    Q.    Let me stop you there, Ms. Dossa.  Do you see after that

16    it sets forth a requirement for training in paragraph (a)?

17    A.    Right.

18    Q.    What was the requirement?

19    A.    The requirement that they have to have a specific area --

12:55  20    they have to address specific areas through classroom and

21    supervised practical training totalling at least 75 hours with

22    at least 16 hours devoted to supervised practical training.

23    Q.    So what did that mean?  The 75 hours?

24    A.    So that means they have to have 75 clock hours of training

25    before they can provide the service to a MassHealth member and

1    that 75 hours will have some classroom but at least 16 hours

2    hands-on practical training.

3         MR. BRADY:  And if we could zoom out of that, please.

4    If we could go to Page 2 of this exhibit.

5    BY MR. BRADY:

6    Q.   : And on the right-hand side of this screen, the right

7    column, about halfway down there's a heading it says 3,

8    "Documentation of Training."

9         MR BRADY:  Can we blow that up?

12:56 10   BY MR. BRADY:

11   Q.   So was there a requirement to keep documentation of the

12   training for home health aides, Ms. Dossa?

13   A.   Yes, there is a requirement to make sure that the training

14   was done.

15   Q.   And that comes right out of the condition of

16   participation, right?

17   A.   Correct.

18   Q.   Now, just to be clear, was this a requirement for the

19   State of Massachusetts for MassHealth?

12:56 20   A.   Yes.

21   Q.   Now, Ms. Dossa, if MassHealth knew that a provider did not

22   meet those requirements for HHA services it was billing, what

23   would MassHealth have done with claims for HHA services from

24   that provider?

25   A.   If MassHealth knew that this wasn't done, we wouldn't be

1    paying for the services.

2    Q.    Would not be paying for the services?

3    A.    Correct.

4    Q.    Why not?

5    A.    Because, according to our regulations, that aide has to be

6    competent in order to provide the service.  And if the aide

7    hasn't got that training, they're no longer competent and we do

8    not want to pay for such a service.

9              MR. BRADY:  We can take that down, thank you.

12:57 10   BY MR. BRADY:

11   Q.    Were there other requirements that had to be met before

12   MassHealth would pay a claim for home health services?

13   A.    So, the service would need to be provided.  There's a Plan

14   of Care that has to be followed that tells the agency how many

15   hours of home health aid can be provided, and so that has to be

16   followed as well, to make sure that they're providing the hours

17   that has been signed off by the physician.

18   Q.    And was it a requirement that the care be medically

19   necessary for MassHealth to pay?

12:58 20   A.    That's right, it also needs to be medically necessary.

21   Q.    And I think you may have mentioned this, but just to be

22   clear, did the care actually have to be provided for MassHealth

23   to pay the claim?

24   A.    The care has to have been provided.

25   Q.    Did MassHealth permit providers to pay money or other

```
 1   things of value for the referral of patients to that provider?
 2   A.    No.
 3   Q.    That was also against the rules?
 4   A.    That would be against, yes.
 5   Q.    So, Ms. Dossa, are you familiar with a company called
 6   Arbor Homecare Services?
 7   A.    Yes.
 8   Q.    And you testified before that between 2014/2017 you used
 9   to oversee the program for home health services?
10   A.    Correct.
11   Q.    Did you deal directly with Arbor when you were overseeing
12   that program?
13   A.    So the way I would have dealt with them, is if they had
14   any type of training, they would come to the training.  I would
15   be not dealing directly, but they would be part of the
16   training.  And the other time that I did deal with them
17   directly is when we put a payment suspension on them and they
18   had to transfer a lot of their members to other agencies, and I
19   would have dealt with them at that point.
20   Q.    Was Arbor enrolled in MassHealth?
21   A.    Yes.
22         MR. BRADY:  Can we pull up, I think to start, just for
23   the witness, please, Exhibit 318-01?
24   BY MR. BRADY:
25   Q.    Can you see this exhibit on the screen in front of you,
```

```
 1    Ms. Dossa?

 2    A.    Yes.

 3            MR. BRADY:  And maybe if we could go to the second

 4    page of this as well, or the third page.  There we go.

 5    BY MR. BRADY:

 6    Q.    Can you see the third page of this exhibit, Ms. Dossa?

 7    A.    Yes.

 8    Q.    What is this document?

 9    A.    This is a contract between MassHealth and the providers

10    that has to be signed on enrollment.

11    Q.    Who is the provider for this contract?

12    A.    It's Arbor Homecare Services.

13            MR. BRADY:  Your Honor I offer Exhibit 318-01.

14            MR. VIEN:  Objection, authenticity.

15            THE COURT:  You want to lay a foundation for it,

16    please?

17    BY MR. BRADY:

18    Q.    You've had a chance to review this document, Ms. Dossa?

19    A.    I've seen it before.

20    Q.    And do you recognize this -- what do you recognize this to

21    be?

22    A.    This is a contract between MassHealth and the provider,

23    Arbor Homecare Services.

24    Q.    I offer it, Your Honor.

25            MR. VIEN:  Objection, Your Honor.
```

```
 1                (A discussion was held at sidebar.)
 2           THE COURT:  Where does it come from?
 3           MR. BRADY:  It comes from MassHealth.
 4           THE COURT:  You haven't elicited that at all.  You
 5      just put this document in front of her and asked her what it
 6      is.
 7           MR. BRADY:  She recognizes it as the contract between
 8      them --
 9           THE COURT:  Well if it came from MassHealth, that
10      might be so.  But it could have come out of your desk drawer.
11      You have to say where it came from.  It can't just disappear
12      and it can't just be borne onto the witness stand.
13           MR. BRADY:  I thought that was -- I mean, she
14      recognized it as the document she's seen and that it's
15      authentic copy of it.  I can ask her that.
16           THE COURT:  If it's a MassHealth document, it's going
17      to come in but you haven't established that.
18           MR. BRADY:  I'll establish that, Your Honor.
19           MR. VIEN:  Further, she can say it looks like a
20      MassHealth document but at least she's dealt with it in
21      MassHealth, normally someone come in and says what is this or
22      this is a record I saw, where did you see it, it was in my
23      office, what did you do, I gave it to him and this is the copy.
24           THE COURT:  You have to -- I mean --
25           MR. VIEN:  She's not the right person for the exhibit
```

1    to come in because she had no basis for knowing what it was

2    before it got to court.

3         THE COURT:  She might be able to get it in, but she

4    might not.

5         MR. BRADY:  I'll ask her.  I mean, she will say -- she

6    know this is came from MassHealth, they keep these records and

7    we got it from there so she knows that.

8         MR. VIEN:  The question would be how does she know it

9    came from MassHealth?  That's all.

01:04 10        MR. BRADY:  Because she sees it, she's reviewed it,

11   she knows et.

12        MR. VIEN:  She saw it at MassHealth and then she sees

13   it again today and says yeah, that was the same document I saw

14   in MassHealth, I get it but if she's just going to say this

15   looks like a MassHealth document, I don't think that's enough.

16        THE COURT:  It's not.

17        MR. BRADY:  If we have to go and call a separate

18   reference custodian for MassHealth.

19        THE COURT:  You either need a reference custodian

01:04 20   and -- did you ask them to stipulate which documents came from

21   MassHealth?  I'm assuming given the other stipulations I got

22   yesterday that that wouldn't be a big deal but that could have

23   come from any place, she has to know where it came from.

24        MR. BRADY:  I'll ask the question.  I think she knows,

25   Your Honor.

```
 1              THE COURT:  And if it doesn't come in through her,
 2     what's your -- she can testify about it and they can try to get
 3     it in later, I'll let her testify about it.  I'm not going to
 4     hold you up on it but it doesn't lay a foundation we have right
 5     now.
 6              (End sidebar).
 7              MR. BRADY:  May I proceed, Your Honor?
 8              THE COURT:  You may.
 9     BY MR. BRADY:
01:04 10  Q.   Ms. Dossa, do you know if MassHealth maintains records
 11    like this exhibit, this agreement in front of you?
 12    A.   Yes.
 13    Q.   And do you know that this -- do you know that this copy
 14    came from MassHealth?  Are you aware of that?
 15    A.   Yes.
 16              MR. BRADY:  I offer it, Your Honor.
 17              THE COURT:  You have to ask her how she knows.
 18              MR. BRADY:  How do you know that, miss Dossa.
 19    A.   Because when I was overseeing -- actually enrolling some
01:04 20  of these agencies, when I started, this was the contract that
 21    they were supposed to sign when they got enrolled.  And I've
 22    seen those before.
 23              MR. VIEN:  Same objection, Your Honor.
 24              THE COURT:  Why don't you -- I'm going to hold off on
 25    admitting this document.  You can question her about it.  We'll
```

```
 1    just show it to the jury at another time, assuming it's

 2    submitted.

 3              MR. BRADY:  Okay, thank you, Your Honor.

 4    BY MR. BRADY:

 5    Q.   So, Ms. Dossa, this is -- you testified this is a copy of

 6    a contract between Arbor Homecare Services and MassHealth?

 7    A.   Right.

 8    Q.   And in this contract what did Arbor Homecare agree to do?

 9    A.   So they've agreed to follow the regulations that

10    MassHealth has and any state and federal regulations that they

11    have to follow, that they -- that they need to follow those.

12    Q.   And did that include -- did those regulations include the

13    regulation, the condition of participation, we just looked at?

14    A.   Correct.  Because those are federal regulations.

15    Q.   Did Arbor Homecare agree to follow all state laws and

16    regulations applicable to their participation in MassHealth?

17    A.   Yes.

18              MR. BRADY:  Let's pull up -- we can take that down.

19    Can we pull up Exhibit 318-02?  Can we make it a little bigger?

20    BY MR. BRADY:

21    Q.   Ms. Dossa, what is this document?

22    A.   This is the accreditation entity that accredits home

23    health agencies, so it's the Community Health Accreditation

24    Program.

25    Q.   And to what company is this addressed to?
```

```
 1   A.    It's addressed to Arbor Homecare Services.

 2   Q.    And what's the date on this?

 3   A.    It's March 29, 2013.

 4   Q.    And was this a document that was maintained in the records

 5   of MassHealth?

 6   A.    Yes.

 7   Q.    How do you know that?

 8   A.    I know that because I used to have to do some of this

 9   myself when I first started, and it's part of the enrollment

10   documents that the enrollment unit of MassHealth keeps as part

11   of MassHealth records.

12             MR. BRADY:  Your Honor, I offer this Exhibit 318-02.

13             MR. VIEN:  Objection, Your Honor.  Type of documents

14   is not sufficient in our view.

15             THE COURT:  You've got to lay a foundation for it, for

16   the authenticity of the documents.

17             MR. BRADY:  Let's move off from this document.

18   BY MR. BRADY:

19   Q.    So, Ms. Dossa, when a home health provider assesses --

20   What's an assessment in connection with home health services?

21   A.    So an assessment from a home health agency would involve

22   evaluating the MassHealth member to determine medical necessity

23   for home health agency services.  So it would be carried out,

24   most often by a registered nurse to evaluate the MassHealth

25   member to see what they can do, what they can't do as far as
```

1    functional or activities of daily living, medication and so on.

2    Q.    Have you heard of something called an OASIS Assessment?

3    A.    Yes.

4    Q.    What is an OASIS Assessment?

5    A.    It's a CMS, it's a Center of Medicare and Medicaid

6    requirement that home health agencies have to do this.  It's

7    basically an assessment tool that has been developed that the

8    agency has to do when they admit the member.

9    Q.    And I believe you mentioned this before, but what is a

01:10 10   Plan of Care in connection with home health services?

11   A.    So the Plan of Care is something that, again, involves all

12   of the different things that the agency needs to carry out for

13   this MassHealth member.  So whether it's nursing, home health

14   aide, therapy.  And this Plan of Care is signed off by the

15   physician who has ordered the service in collaboration with the

16   home health agency nurse.

17   Q.    Now, the Plans of Care documents, would those be provided

18   to MassHealth?

19   A.    No, not usually.  Not usually.

01:10 20   Q.    When was a Plan of Care required to be obtained and signed

21   by a doctor relative to the services?

22   A.    So the Plan of Care is required to be signed on admission.

23   You can have a verbal order to begin with, to start the

24   service, but then the Plan of Care has to be signed after that.

25   And then every 60 days that Plan of Care has to be again

1    reviewed by the physician and signed off.

2    Q.   And is it ever okay to get a Plan of Care signed after the

3    services start?

4    A.   We have about -- we have a requirement in our regulations

5    that the Plan of Care needs to be signed before the claim is

6    submitted or within the first 45 days after the claim is

7    submitted.

8    Q.   Is it ever okay to backdate a Plan of Care --

9    A.   No.

01:11 10    Q.   -- to make it look like it was signed earlier?  Is that

11    ever okay?

12    A.   No, it's not okay.

13    Q.   Why not?

14    A.   That would be basically committing something that's

15    against the MassHealth regulation to backdate something.  You

16    really need to put the date, the correct date on.

17    Q.   And, Ms. Dossa, based on your experience in the field of

18    home health services, when a nurse or a home health aide would

19    actually do a visit, what documents would typically be created

01:12 20    in connection with that?

21    A.   So the OASIS that you mentioned, that's one document.

22    Besides that, the nurse would also create their own assessment.

23    In the documentation for the assessment, there could be a

24    medication record, as well, kept for the member.  Those are

25    some of the examples.

1    Q.   And the record created by the nurse, would that sometimes,

2    often, be referred to as a nursing note?

3    A.   Yes.

4    Q.   And, Ms. Dossa, would those notes typically be provided to

5    MassHealth?

6    A.   No, not typically.

7    Q.   Was it MassHealth's practice to go and obtain the notes

8    that were created for services?

9    A.   It's not the practice.  The only time we would do it would

01:13 10   be if we were doing a post-audit of some type.

11   Q.   So MassHealth isn't checking the notes before it pays a

12   claim?

13   A.   Correct.

14   Q.   I want to ask you, Ms. Dossa, about the claims process and

15   how providers submit claims to MassHealth.  So, generally how

16   did that work?  For a provider of home health services,

17   generally how would claims be provided to MassHealth for

18   payment?

19   A.   So after the provider provides the service for the

01:13 20   MassHealth member, they can put the claim into the system.

21   It's an automated system, online submission, of the claim.  And

22   that would just, again, go through, then get paid within a

23   certain amount of time.

24   Q.   And would those claims -- would that data be in the form

25   of spreadsheets?

A.    Yes.   There is a -- it could be in a spreadsheet.   And the
system can be pulled up as a spreadsheet or otherwise.

Q.    And does MassHealth maintain records of claims that are
submitted by providers?

A.    Yes.

Q.    How does MassHealth maintain those records?

A.    So there's a data warehouse that all these claims that are
submitted into the system will then go into this data warehouse
that collects all the claims, all the information on that.

Q.    And can that data warehouse be searched to pull all the
claims for a particular provider?

A.    Yes.

Q.    And are you aware that MassHealth searched the database
and provided -- and produced a report of claims that were paid
to Arbor?

A.    Yes.

          MR. BRADY: Just for the witness, if we could just pull
up on the screen, please, Exhibit 800 first, please?

BY MR. BRADY:

Q.    And is Exhibit 800 a spreadsheet of data from the data
warehouse produced by MassHealth?

A.    Yes.

          MR. BRADY:  Could we go to Exhibit 801?

BY MR. BRADY:

Q.    Is Exhibit 801 also a spreadsheet of Mass claims data from

```
 1    the warehouse at MassHealth?

 2    A.    Yes.

 3    Q.    Exhibit 802.  Is that another spreadsheet for MassHealth

 4    with claims data?

 5    A.    Yes.

 6    Q.    Exhibit 803, same question.  Is that another spreadsheet

 7    of MassHealth claims data?

 8    A.    Yes.

 9    Q.    Exhibit 804?

10    A.    Yes.

11    Q.    Is that another spreadsheet with claims data from

12    MassHealth?

13    A.    Right.

14    Q.    Exhibit 805.  Same question, is that also another

15    spreadsheet of data from MassHealth?

16    A.    Yes.

17    Q.    Exhibit 806.  Is that another spreadsheet for MassHealth

18    with claims data for MassHealth?

19    A.    Yes.

20    Q.    Exhibit 807.  Do you recognize that also as another

21    spreadsheet of claims added for MassHealth?

22    A.    Yes.

23    Q.    And then finally, Exhibit 808.  Do you recognize that as

24    additional claims data for Arbor home services for MassHealth?

25    A.    Yes.
```

1          MR. BRADY:  Your Honor, I offer Exhibits 800 through

2     808.

3          MR. VIEN:  Objection.  Authenticity again, Your Honor.

4          THE COURT:  I think he properly authenticated those.

5     They're admitted.

6          (Exhibits 800-808 admitted into evidence.)

7          MR. BRADY:  May we be seen on this?

8          THE COURT:  I just ruled in your favor.  Do you still

9     want to see me?

01:17 10        MR. BRADY:  I don't, Your Honor.  I didn't hear you,

11    sorry about that.  I withdraw that.  All right.  So let's look

12    at -- can we look at Exhibit 800?  Could we put that up on the

13    screen, please?

14    BY MR. BRADY:

15    Q.   And, again, Ms. Dossa, what is -- what are we looking at

16    here?  What is shown on this?

17    A.   So this is a spreadsheet of the claims data.

18    Q.   Now, just to kind of walk through what this looks like,

19    what's the first column, where it says -- it looks like Payment

01:18 20   Date.  What's that showing?

21    A.   Yeah, payment date.

22    Q.   Next to that there's a Voucher Number.  What's that

23    showing?

24    A.   It's just the number of the voucher.

25    Q.   And then there's a Check Number next to that, in Column C;

1    do you see that?

2    A.    Yes.

3    Q.    And then it looks like the next column is -- ID Medicaid

4    is the heading.  Do you see that?

5    A.    Right.

6    Q.    What's that?

7    A.    That's the provider ID.

8    Q.    And next to that there's a column for the Member Name?

9    A.    Correct.

01:18 10    Q.    And what's that showing us?

11    A.    And that's showing us the specific member's name that was

12    provided the services.

13    Q.    And then next to that there's a column where the heading

14    begins DOS From Date?

15    A.    Date of Service.  That's DOS, and then the date.

16    Q.    And then in the column next to that, Column H, it looks

17    like there's a code in there.  Do you see that?

18    A.    Yes.

19    Q.    What is that?

01:19 20    A.    That's a procedure code.  That's a specific nursing

21    procedure code.

22    Q.    Okay.  So it looks like for this data we're talking about

23    two procedure codes?

24    A.    Yes.

25    Q.    And let me just kind of take a step back.  For MassHealth

1    and billing, what are these procedure codes?  What do they

2    mean?

3    A.    So these are procedure codes that are, again, set by --

4    for medical purposes in order for us to know -- for example,

5    this one is -- User 154 is a nursing code that allows us to pay

6    a certain amount based on that particular code and what we're

7    allowed to -- what providers are allowed to bill for.

8    Q.    So the first code we see here is -- it looks like GO154?

9    A.    Uh-huh.  Right.

01:19 10    Q.    And what code is that for?  What kind of service?

11    A.    That's for a skilled nursing service.

12    Q.    And a skilled nursing service provided where?

13    A.    Provided in the home.

14    Q.    And there's a description next to that, next to the code;

15    do you see that?

16    A.    Yes.

17    Q.    And it refers to Each 15.  What does that mean?

18    A.    So that means -- this is the way that CMS defines it, Each

19    15.  And it's for Each 15 minutes.  But the way we do in the

01:20 20    MassHealth, it's really the visit.  It's not really how we pay

21    it.  It's basically -- it could be an hour long, but we just

22    pay the $86.99 for that visit.  The way it's written,

23    mismatches what CMS has, but it's not what our regulations

24    state.

25    Q.    The other code we see here -- and maybe if you look in Row

16.  It's G0156.  Do you see that?

A.    Yes.

Q.    What's that code mean?

A.    That's the home health aide service code.

Q.    So is that the code that was used to bill for home health aide services?

A.    Yes.

Q.    And then next to that you can see the amount paid?

A.    Right.

        MR. BRADY:  And if we could just scroll down in this sheet and we could just stop there.

BY MR. BRADY:

Q.    And you see -- just to go to the line 500 on this spreadsheet.  Do you see that?

A.    Yes.

Q.    And so what's the payment date for that line?

A.    That's January 6, 2014.

Q.    All right.  So just on those dates, there's close to 500 claims that are submitted and paid?

A.    Yes, I guess --

Q.    In terms of volume.  Is that right?

A.    Uh-huh.

Q.    You see that?

A.    Yes, I do.

        MR. BRADY:  We can take that one down.

```
 1   BY MR. BRADY:
 2   Q.   Ms. Dossa, when MassHealth paid claims submitted by Arbor,
 3   did MassHealth expect that Arbor was abiding by the terms of
 4   its contract with MassHealth?
 5           MR. VIEN:  Objection, Your Honor.  It's been asked and
 6   answered before.
 7           THE COURT:  Overruled.
 8   A.   THE WITNESS:  Yes, we do expect that they follow the
 9   rules.
01:22 10 BY MR. BRADY:
11   Q.   So, Ms. Dossa, for claims for nursing services, for
12   skilled nursing services, if MassHealth knew that when the
13   claim was submitted that the care had not been provided, what
14   would MassHealth have done?
15   A.   We would not have paid the claim.
16   Q.   If MassHealth knew when a claim was submitted that the
17   care was not medically necessary, what would MassHealth have
18   done with that claim?
19   A.   We would not have paid it.
01:23 20 Q.   And, Ms. Dossa, for HHA, so home health aide claims, if
21   MassHealth had known when the claim was submitted for those
22   services that the HHA was not trained and certified, what would
23   MassHealth have done with those claims?
24   A.   We would not have paid it.
25   Q.   Ms. Dossa, what ended up happening with Arbor's
```

1    participation in MassHealth?

2    A.    So when we put the payment suspension plan, Arbor had to

3    transfer their members to other agencies and they stopped

4    providing services to MassHealth members.

5    Q.    And do you remember when that was?

6    A.    It could have been some time in 2017.  I'm not sure, but I

7    believe so.

8    Q.    If -- You should have in the book in front of you.  If you

9    could flip to the tab that says 719.

01:24 10    A.    719.

11    Q.    Yeah, do you see that?

12    A.    Yup.

13    Q.    Just take a look at that, to yourself.  Do you see that

14    document?

15    A.    Yes.  What was the question?  Sorry.

16    Q.    I'm sorry?

17    A.    Did you ask me a question?  I'm sorry, I missed it.

18    Q.    Just take a look at that, to yourself, for a moment,

19    please.  You can set that aside, Ms. Dossa.  And my question

01:25 20    is, does that help refresh your recollection as to when Arbor

21    was suspended -- payments to Arbor were suspended by

22    MassHealth?

23    A.    Yes.

24    Q.    When was that?

25    A.    So that was 2017, January.

```
 1    Q.    January of 2017?

 2    A.    Uh-huh.  Yeah.

 3          MR. BRADY:  Nothing further, Your Honor.

 4          THE COURT:  Cross?

 5          MR. VIEN:  Yes, Your Honor.

 6    CROSS-EXAMINATION BY MR. VIEN:

 7    Q.    Good afternoon, Ms. Dossa.  How are you?

 8    A.    Good, thank you.

 9    Q.    I'm sure everyone's wondering what happened to your wrist.

10    A.    I fell off my bicycle.  I fractured my wrist and tore some

11    ligaments.

12    Q.    Ms. Dossa, is it fair to say that MassHealth changed a lot

13    of their regulations in July of 2017?

14    A.    Yes.

15    Q.    And is it also fair to say that a lot of changes went into

16    effect in 2016?

17    A.    Correct.

18    Q.    And, normally, is it your understanding that MassHealth

19    changes its regulations to clarify them?

20    A.    I'm sorry, I'm having a hard time hearing you.

21    Q.    I'm sorry.  Why don't I speak up.  Is it your

22    understanding that the regulations have changed to make them

23    clearer or to institute new regulations?

24    A.    To make them clearer and also to make them stronger and

25    more stringent.
```

```
 1   Q.   And when MassHealth realizes there wasn't a regulation
 2   addressing a problem or an issue, they would pass a regulation
 3   to take care of that; is that correct?
 4   A.   That's possible, yes.
 5   Q.   Now, when a home health care agency is applying to get
 6   authorized with MassHealth, is it true that the home health
 7   care agency has to do free care for a while?  Is that true?
 8   A.   They would have to do that in order to be Medicare -- like
 9   they have to be Medicare-certified, so Medicare requires that
10   they have a certain number of patients that they serve
11   initially.  It's not a MassHealth regulation, but I believe it
12   comes from Medicare.
13   Q.   And I get confused, so that's why -- But that's the
14   Federal Government's rule?
15   A.   Yes, so they can get Medicare-certified, right.
16   Q.   I understand.  Okay.  And a lot of those patients are done
17   for free.  The home health care agency can't bill for those; is
18   that correct?
19   A.   Yes.  I mean, they wouldn't have been MassHealth-enrolled
20   at that time, anyway, so I can't really answer that question.
21   Q.   So they couldn't bill for those?
22   A.   They wouldn't be able to bill because they wouldn't be
23   MassHealth-enrolled.
24   Q.   Now, is it acceptable to MassHealth if a home health care
25   aide is a family member?
```

1    A.    It is acceptable, yes.

2    Q.    That's not a violation of regulations, is it?

3    A.    No.

4    Q.    And what is the role of the doctors in all this service

5    and billing?  What are they supposed to do?

6    A.    So the doctors have to really work with the agency to find

7    the Plan of Care.  So they'll write the Plan of Care.  It's

8    really a physician order that you need in order to get referred

9    to agencies.  And so that Plan of Care is worked on by the

01:29 10    physician and the agency; they collaborate.  Plan of Care is

11    filled out and then signed by the physician.

12    Q.    And are there rules to -- for what the physician has to do

13    for interacting with the patient to get a Plan of Care done?

14    A.    They have to be able to see the patient and, you know, and

15    evaluate them and assess them for that home health referral.

16    So that is something that they would need to be doing in order

17    to be able to sign that Plan of Care.

18    Q.    And the physicians, there's actually a MassHealth rule

19    that says the physician has to have a face-to-face meeting with

01:30 20    the patient; is that correct?

21    A.    That's right, there is a rule like that.

22    Q.    And the doctor needs to evaluate the patient, correct?

23    A.    Correct.

24    Q.    Now, if a doctor signed a Plan of Care in error and

25    services were not medically necessary and MassHealth knew that

1    it was signed when services were not medically necessary, would

2    MassHealth pay the claim?

3    A.    If MassHealth knew the physician signed it incorrectly,

4    then, yes, we wouldn't pay the claim if they were medically

5    unnecessary.

6    Q.    I'm sorry, I couldn't hear you.

7    A.    I said if MassHealth knew that the services were not

8    medically necessary, we would not pay for the claim.

9    Q.    And now I just wanted to ask you a couple questions about

01:31 10    the rules on training.

11    A.    Uh-huh.

12    Q.    Now, are you familiar with an online training company

13    called Institute for Professional Care Education?

14    A.    I'm not familiar with them.

15    Q.    And there's nothing in the MassHealth rules and

16    regulations that exclude online training, is there?

17    A.    I don't believe so.  Again, the conditions of

18    participation, I don't believe, say that specifically.  There

19    has to be some classroom training, but it doesn't say it can't

01:31 20    be online, I don't think.

21    Q.    And when did the rule requiring prior authorizations go

22    into effect?

23    A.    For MassHealth?

24    Q.    For MassHealth, sorry.

25    A.    2016.

```
 1    Q.   And what does that require?
 2    A.   So that requires that the care has to be -- the service
 3    has to be prior authorized after a certain number of visits
 4    made.  And so that's pretty much the rule that was put into
 5    place on 2016.
 6    Q.   And how does that -- how does that work?  The doctor has
 7    to sign a prior authorization and send it to MassHealth?
 8    A.    No, that doesn't -- it's not by the doctor.  We have a
 9    Prior Authorization Unit that the home health agency is
10    required, after a certain number of visits are complete or
11    before they're complete submit documentation to the Prior
12    Authorization Unit asking and providing documentation that that
13    many more visits are needed and for how long.  And that's
14    submitted to the Prior Authorization Unit at MassHealth that
15    will review the documentation and then will either modify it or
16    approve it or deny it.
17    Q.   So the home health agency does the prior authorization and
18    sends it to MassHealth; is that correct?
19    A.   The request, yes.  The home health agency makes the prior
20    authorization request.
21    Q.   And then MassHealth assesses it.  And if it's okay they
22    sign off on it and send it back to the home health agency; is
23    that correct?
24    A.   Yes, they do that.  But they also enter it into the
25    computer so that the claims don't get denied, so that's all
```

```
 1  systematically allowed.
 2  Q.    And who enters it into the computer?
 3  A.    So, again, the Prior Authorization Unit would enter it
 4  into the computer.
 5  Q.    MassHealth?
 6  A.    MassHealth.
 7  Q.    And if the prior authorization isn't entered into the
 8  computer, then a claim doesn't get paid?
 9  A.    Correct.
10  Q.    Now, we've also -- you said on direct that it's
11  inappropriate to pay a finder's fee or referrals, under the
12  MassHealth rules.  Did I hear you correctly?
13  A.    Yes.  I don't know if I used that exact word, but, yeah,
14  you cannot ask a MassHealth member to pay something, and that
15  was a reference.
16  Q.    But I meant the other way around.  For the home health
17  agency, would it be a violation of MassHealth rules to pay
18  someone who brought a patient in or to pay a patient?
19  A.    That would be against, yes.
20  Q.    Okay.  And when did that rule go into effect?
21  A.    I really couldn't say.  I believe it's in our -- Not in
22  our home health regulations.  It would have been in our
23  all-provider regulations.  In the home health regulations.  I
24  believe we put it in -- I'll have to look that up.  I believe
25  it was maybe 2017.  But I'd have to check.
```

```
 1   Q.   As you sit here today, your best memory is it went into
 2   effect sometime --
 3   A.   As far as the home health regulations.  But it's always
 4   been in our all-provider regulations that you're not allowed to
 5   do that.
 6   Q.   Been in your what regulations?
 7   A.   There's another MassHealth regulation called all-provider
 8   regulations.  So it would have been in that, as far as not
 9   allowing that.
10           MR. VIEN:  May I approach the witness, Your Honor.
11           THE COURT:  Yes.
12   BY MR. VIEN:
13   Q.   I have placed before you a document.  Do you recognize
14   what that is?
15   A.   Yes.
16   Q.   And what is it?
17   A.   It's the letter which is a cover sheet for home health
18   regulations that went into effect in 2022, I believe.
19   Q.   2022.  And could you look at the second page, "Prohibited
20   Marketing Activities"?
21   A.   Yes.
22   Q.   Have you had a chance to look at that?
23   A.   At the second page?
24   Q.   Yes.
25   A.   Yes.
```

1    Q.    And isn't this the regulation --

2    A.    Yes, this is the regulation that was put into the home

3    health regulations.

4    Q.    This is for home health?

5    A.    Uh-huh.

6    Q.    And this is the regulation that says referrals aren't

7    allowed under MassHealth rules; is that correct?

8    A.    Correct.

9    Q.    And that was put into effect in June of 2022?

01:37 10    A.    I believe the regulations were effective July 1, 2022.

11    Q.    Okay.  And I think it's the -- it's hard because of the

12    pagination, but I think it's -- if you look on the upper

13    right-hand corner, it's 4-28 where it says page.

14    A.    Yes.

15    Q.    And that's where the full text of the regulation --

16    A.    Uh-huh.

17    Q.    Correct?

18    A.    Right.

19         MR. VIEN:  Your Honor, I don't have an exhibit for

01:37 20    identification, but I offer this document.

21         THE COURT:  For identification?  Or you want it

22    admitted?

23         MR. VIEN:  I want it admitted I didn't mark it for

24    identification.  I didn't offer, but I'd like it marked for

25    identification Number 1.  I didn't do that.

```
 1              MR. BRADY:  Your Honor, I'm going to make the same
 2     authenticity objection.
 3              THE COURT:  I think that self-authenticates, doesn't
 4     it?  The regulation?
 5              MR. VIEN:  The regulation -- I have my last copy,
 6     which I don't need.  I can hand it up, if that's helpful.
 7              THE COURT:  Show it to him.
 8              MR. VIEN:  I already gave him a copy.
 9              THE COURT:  Is it a regulation?  It
10     self-authenticates, doesn't it?
11              MR. BRADY:  That's right, Your Honor.  Yes.  I'll
12     withdraw that.
13              THE COURT:  It's admitted.
14              COURTROOM CLERK:  I don't know what number to go up
15     to.
16              THE COURT:  Where do your numbers go up to?
17              MR. BRADY:  Why don't we call this 810?
18              THE COURT:  Why don't we start at 900?
19              MR. BRADY:  Or 900.
20              COURTROOM CLERK:  Do you want this back?
21              MR. VIEN:  No.  Thank you, though.
22                (Exhibit 900 admitted into evidence.)
23     BY MR. VIEN:
24     Q.  Ms. Dossa, while you were at MassHealth, did MassHealth
25     ever do an audit of Arbor home health care?
```

```
 1   A.   There were a few audits that were what we call desk

 2   audits.  So there was -- there are some algorithms that are run

 3   periodically to catch certain -- like post-pay audit types of

 4   things.  So there were two or three like that.

 5   Q.   By an audit, there was no audit where people from

 6   MassHealth went out to Arbor and --

 7   A.   No.  There was no audit like that, no.

 8            MR. VIEN:  I don't have anything further, Your Honor.

 9            MR. BRADY:  Brief redirect, Your Honor.

10            THE COURT:  Of course.

11                         REDIRECT EXAMINATION

12   BY MR. BRADY:

13   Q.   Hello again, Ms. Dossa.  Ms. Dossa, on cross-examination,

14   Mr. Vien asked you a series of questions about some changes to

15   the MassHealth regulations in 2017.  Do you remember those

16   questions?

17   A.   Yes.

18   Q.   And in your direct testimony, you described the

19   requirements for HHA training, the 75-hour requirement?

20   A.   Right.

21   Q.   Just to be clear:  Was there ever a time, going back to

22   2012, when that 75-hour requirement was not in place?

23   A.   No.  In my recollection, it's been there for many, many

24   years now.

25   Q.   And whatever happened to the regulations in July, 2017,
```

```
 1   was there ever a time where it was okay to bill MassHealth for
 2   services that didn't happen?
 3   A.   No.
 4   Q.   Was there ever a time that it was okay to bill MassHealth
 5   for services that were not medically necessary?
 6   A.   No.
 7   Q.   Mr. Vien asked you if it was okay -- if it was okay to
 8   have a family member be a home health aide.  Do you remember
 9   that?
10   A.   Yes.
11   Q.   And what was the answer?  Is it generally okay to do that?
12   A.   It's generally okay, yeah.
13   Q.   But, Ms. Dossa, are there requirements -- even if it's a
14   family member, are there requirements that still have to be met
15   before MassHealth has to pay for that?
16   A.   Yes.
17   Q.   What do those requirements include?
18   A.   They still need to have the 75 hours of training and be
19   competent.
20   Q.   Mr. Vien asked you some training related to HHAs and he
21   mentioned something about online training?
22   A.   Right.
23   Q.   And is it possible to do that training through some online
24   service?  Is that possible?
25   A.   I haven't heard that many of the agencies do that,
```

1    honestly.  It's more likely classroom training, but it's

2    possible that it can happen that way, too.

3    Q.   And in your testimony earlier, you described there were

4    documentation requirements for HHA training?

5    A.   Right.

6         MR. VIEN:  Objection to the scope, Your Honor.

7         THE COURT:  Overruled.

8    BY MR. BRADY:

9    Q.   Would those documentation requirements also have applied

01:43 10   to any online training at a provider?

11   A.   They would.

12   Q.   Mr. Vien asked you some questions about prior

13   authorizations for some home health services?

14   A.   Right.

15   Q.   And can you explain to the jury, what does that mean?

16   What was a prior authorization for home health services?

17   A.   So basically it's -- it's a requirement that we have to

18   review the documents and make sure that this member really does

19   need the service that the agency is asking us for authorization

01:43 20   for.  So prior authorization just means, like, we -- before the

21   service can continue, we basically give authorization before

22   that, before that service is allowed to continue.

23   Q.   And, Ms. Dossa, I think you testified that that went into

24   effect at some point in 2016?

25   A.   Correct.

```
 1   Q.    That was a new requirement by MassHealth?

 2   A.    Yes.

 3   Q.    Why did MassHealth put that requirement in place?

 4         MR. VIEN:  Objection, Your Honor.

 5         THE COURT:  Foundation, please.

 6   BY MR. BRADY:

 7   Q.    Are you familiar with -- Were you involved with the

 8   implementation of that requirement at MassHealth?

 9   A.    Very much so.

10   Q.    Can you describe for the jury your involvement with that,

11   the implementation of that requirement?

12   A.    So we put this into effect after a lot of work with

13   leadership and other people because of the abuse that was

14   happening and, basically, home health agencies providing

15   services without any oversight, as much as we should have

16   required.  So we decided to have -- put the prior authorization

17   so, that way, some services could start, but then after a

18   certain number of visits they had to submit documentation to

19   show us that this member really does need continuation of the

20   home health services?

21   Q.    Ms. Dossa, you referred to abuses that you saw happening?

22   A.    Yes.

23   Q.    What was that?

24   A.    So we --

25         MR. VIEN:  Objection.  Scope, Your Honor.
```

```
 1              THE COURT:  Just narrow the question for me, please.
 2    BY MR. BRADY:
 3    Q.    Ms. Dossa, you testified that one of the reasons for this
 4    requirement of prior authorizations -- let me ask you a
 5    different question.
 6              MR. BRADY:  Your Honor, I'll withdraw that.
 7    BY MR. BRADY:
 8    Q.    What was required prior to this -- prior to the prior
 9    authorizations?  Was there any prior authorization -- Was there
 10   any authorization from MassHealth required before?
 11   A.    There was no prior authorization before.  Again, we still
 12   required different things like the physician Plan of Care, like
 13   medically necessary.  There were some post-audits done.  But
 14   there was no prior authorization.
 15   Q.    And, finally, Mr. Vien asked you some questions about
 16   paying for referrals of patients.  Remember those questions?
 17   A.    Yes.
 18   Q.    And he asked you to take a look at a regulation that was
 19   from 2022, right?
 20   A.    Right.
 21   Q.    What was that about?
 22   A.    So that was about not allowing home health agencies to,
 23   again, try to solicit or pay members to become home health --
 24   you know, become home health agency members to -- again,
 25   avoiding that sort of marketing that we had heard about and,
```

1    you know, wanting to protect our members from that.

2    Q.    So prior to that in 2022, Ms. Dossa, were there rules in

3    place against payments for referrals of patients?

4    A.    So, again, there was nothing in the home health

5    regulations about it.  But there are other, like, federal and

6    there are other MassHealth regulations that have to be

7    followed, or other state regulations that need to be followed,

8    that do talk about this.

9    Q.    So just to be clear, it wasn't specific to home health,

01:47 10    but it applied to everybody, those rules.  Right?

11    A.    Yes.

12    Q.    And what do those rules say about payments for referrals?

13    A.    Right.  Payments for referrals or, again, paying a member

14    due to be -- you know, get referred, or whatever.

15    Q.    Fair to say that was always against the rules?

16    A.    I believe so, but I can't -- you know, I can't point out

17    the rule.

18    Q.    And one other question.  So you testified before that

19    MassHealth didn't do an audit of Arbor.

01:48 20    A.    So I -- MassHealth didn't do an on site.  We didn't

21    actually go out and -- you know, to be physically there.  There

22    were desk audits, what we call desk audits, that have been done

23    and -- you know, against Arbor.

24    Q.    But you don't know, Ms. Dossa, if some other people, an

25    accreditation group, did an audit of Arbor.  That's something

```
 1   you wouldn't know about, right?
 2   A.   I wouldn't know about that.
 3        MR. BRADY:  Nothing further, Your Honor.
 4        THE COURT:  Recross?
 5        MR. VIEN:  No, Your Honor.
 6        THE COURT:  You're excused, thank you.
 7        (The witness stepped down.)
 8        THE COURT:  Next witness.
 9        MR. LOONEY: The United States calls Amanda Muchioki.
10        (The witness was sworn.)
11        COURTROOM CLERK:  Can you please state your name and
12   spell your name for the record?
13        THE WITNESS:  Amanda, A-M-A-N-D-A. Muchioki,
14   M-U-C-H-I-O-K-I.
15                       AMANDA MUCHIOKI,
16   having being duly sworn by the Clerk, was questioned and
17   testified as follows:
18                     DIRECT EXAMINATION
19   BY MR. LOONEY:
20   Q.   Good afternoon, Ms. Muchioki.  Over here.  Can you hear me
21   all right?  I'm a little ways away.
22   A.   Yes.
23   Q.   Can you start just by introducing yourself?  Where do you
24   live right now?
25   A.   I live in Rochester, New York.
```

            1     Q.   And what do you presently do for work?

            2     A.   I am a manager at the UPS store.

            3     Q.   How long have you been doing that?

            4     A.   I've been doing that five years.

            5     Q.   Since -- When does that take you back to?

            6     A.   2018.

            7     Q.   Could you walk us through your educational background,

            8     starting with post-high school?

            9     A.   Yes.  I went to a couple of different -- how can I put

    01:50  10     this.  Sorry, I'm nervous.

           11     Q.   Take your time.

           12     A.   I went to grammar school first.  I went to three different

           13     grammar schools.  I went to academic university -- Academic

           14     High School in Jersey City and then I transferred to high tech

           15     university, or voc tech, in Jersey City.

           16     Q.   And where did you go after that?

           17     A.   After that I went to Rutgers University for four years.

           18     Q.   Did you obtain a degree?

           19     A.   An associate's degree, as far as I'm aware.

    01:51  20     Q.   In a specific subject?

           21     A.   It was just general.

           22     Q.   Are you familiar with someone named Faith Newton?

           23     A.   Yes.

           24     Q.   Do you see that person in the courtroom today?

           25     A.   I'm behind the computer.  Yes.

```
 1    Q.   Can you just identify her by pointing her out?

 2    A.   She's wearing the green outfit.

 3    Q.   Thank you.  How do you know Ms. Newton?

 4    A.   She's my cousin.

 5    Q.   Can you tell me --

 6              JUROR:  I'm sorry.  It's tough to hear the witness.

 7              THE COURT:  That whole microphone stand moves a little

 8    closer.  I know you're nervous, but if you can try to speak up

 9    a little bit.  Thank you for letting us know.

10    BY MR. LOONEY:

11    Q.   I think you just identified Ms. Newton as wearing the

12    green suit.  Is that right?

13    A.   Yes.

14    Q.   And to repeat the last question, how do you know

15    Ms. Newton?

16    A.   She's my cousin.

17    Q.   How long have you known her?

18    A.   Twenty-five years.

19    Q.   At some point in time, did you come to work with Faith

20    Newton?

21    A.   Yes.

22    Q.   When was that?

23    A.   That was end of June/July of 2014.

24    Q.   Prior to going to work for Ms. Newton, where were you

25    living?
```

1    A.    I was living in Jersey City, New Jersey.

2    Q.    And how did you end up working with Ms. Newton?

3    A.    I was made aware of the fact that she needed help filing

4    paperwork and at the office.

5    Q.    How did you become aware of that?

6    A.    My father told me.

7    Q.    Did you eventually go to work for Ms. Newton?

8    A.    Yes.

9    Q.    And when was that?

01:53 10    A.    End of June is when I got there.  So by July, because I

11    got there, I believe, the last week of June.

12    Q.    And what was the company you were working for for

13    Ms. Newton?

14    A.    Arbor Homecare.

15    Q.    Where was Arbor located?

16    A.    On Chelmsford Street, I believe.  If I'm correct.

17    Q.    Chelmsford in what state?

18    A.    In Massachusetts.

19    Q.    And in what town?

01:54 20    A.    Well, Chelmsford was a town.  It was on Courthouse Lane, I

21    believe.

22    Q.    What kind of company was Arbor Homecare?

23    A.    It was a home care service providing nursing -- skilled

24    nursing, home health aides to patients who needed services in

25    home.

```
 1   Q.   Who owned Arbor?

 2   A.   As far as I knew, Ben Muiruri.

 3   Q.   Can you spell his name if you know it?

 4   A.   M-u-i-r-r-i.  I believe so.

 5   Q.   And is Mr. Muiruri related to Ms. Newton?

 6   A.   Yes.

 7   Q.   What's the relationship?

 8   A.   They're a couple.  As far as I know, they were married.

 9   Q.   When you went to Arbor, who ran the business on a

10   day-to-day basis?

11   A.   When I first went there, it was Syed Hussain.  He was the

12   administrator.  And then Rosa Gonzalez was the office manager.

13   Q.   And those are the people who supervised your work?

14   A.   Yes.

15   Q.   Was there someone who was the ultimate authority or

16   ultimate decision-maker at Arbor?

17   A.   That would be both Ben and Faith.

18   Q.   And by Ben you mean Ben Muiruri, and by Faith you mean

19   Faith Newton; is that right?

20   A.   Yes, correct.

21   Q.   You mentioned home health aide.  What is your

22   understanding of what a home health aide is?

23   A.   They provide day-to-day basics for a patient in need.

24   They can do cooking, cleaning, run basic errands for them.  If

25   they need, you know, help showering, anything like that.  If
```

1    the client needs more, then they -- if they're skilled enough,

2    they can then have those skills given to them.

3    Q.    How many home health aides -- At the time you began with

4    Arbor, how many home health aides were employed there,

5    approximately?

6    A.    Approximately 300 to 400.

7    Q.    Do you know how many nurses were employed approximately at

8    the time you came?

9    A.    Between RNs and LPNs, 30 to 40.

01:56 10    Q.    Do you know how many patients were enrolled for care with

11    Arbor?  Do you have any idea?

12    A.    At that time when I first started, no, I'm not aware.  I

13    want to say anywhere between 600 or higher.

14    Q.    Just focusing on the home health aides. Did the number of

15    home health aides change over time?

16    A.    Yes, it increased.  By a lot.

17    Q.    How long did you stay with Arbor?

18    A.    I stayed until the end, in 2017.

19    Q.    By the end how many home health aides were employed at

01:57 20    Arbor?

21    A.    At the end of the company, at least 800.

22    Q.    When you joined Arbor, what were you hired to do there?

23    A.    I was hired to be an HR assistant.

24    Q.    What did that mean in practice?  What did you do?

25    A.    In practice, I would help gather up the files, collect

1  them, organize the HR department.  I also helped out on

2  weekends filling out the medical files from the paperwork that

3  had been faxed and making sure that the patient files were

4  complete.  And then it increased from there.

5  Q.    Starting first, I think you mentioned maintaining

6  personnel files, or HR files; is that right?

7  A.    Yes.

8  Q.    For whom were those personnel files?  What types of

9  employees?

01:58 10  A.    The home health aides, the LPNs, and RNs.

11  Q.    When you came to organize these files, what state did you

12  find them in?

13  A.    It was not in a good state.  They were piled everywhere.

14  We eventually were able to get file cabinets in order to

15  organize them between the different job descriptions, as well

16  as being alphabetically organized so we would be able to go

17  back and look at the files.

18  Q.    Who directed you to undertake those tasks?

19  A.    I'm sorry, say again?

01:58 20  Q.    Who told you to do that?

21  A.    Both Ben and Faith.

22  Q.    They're the people who directed you to organize the files?

23  A.    Yes.  As well as Syed Hussain and Rosa Gonzalez.  They

24  were all above me.

25              MR. LOONEY:  May I approach the witness?

1          THE COURT:  Sure.

2    BY MR. LOONEY:

3    Q.   I placed a binder in front of you.  If you could just open

4    it up and turn to the first tab.

5          MR. LOONEY:  If you want to pull this up just for the

6    Court and the witness.  It's Exhibit 356.

7    BY MR. LOONEY:

8    Q.   This document has been placed in front of you.  And you

9    can flip through it if you want to orient yourself.  But is

01:59 10   this a document that you recognize?

11   A.   Yes.

12   Q.   And before you testified, did you have a chance to review

13   this document?

14   A.   Yes.

15   Q.   Can you tell us what it is?

16   A.   It's the hiring file as well as the HR file that's there

17   for the home health aide.

18   Q.   And for what home health aide?

19   A.   George Castro.

02:00 20   Q.   Is this a file that you maintained at Arbor?

21   A.   Yes, once I was hired there.  But he came in before I was

22   there.  So it was one we probably had to complete.

23   Q.   Pardon me?

24   A.   It was one we probably had to complete.

25   Q.   But were you responsible for maintaining these files?

1    A.    Yes.

2    Q.    And this one in particular?

3    A.    Yes.

4          MR. LOONEY:  I'd ask this be admitted as Exhibit 357.

5          MR. VIEN:  Your Honor, I think this was the subject of

6    some discussion earlier.  So I would object based on the

7    earlier objections.

8          THE COURT:  You need to flesh out how she maintained

9    it.

02:01 10   BY MR. LOONEY:

11   Q.    Going back to how you kept the HR files, where did you

12   maintain these?

13   A.    We had an HR office.  And what we did within the next

14   couple months was we created file cabinets, and then we would

15   go through the files and go through the checklist in order to

16   make sure that everything that needed to be in the file was

17   there.

18   Q.    And when you say "go through the checklist," is that the

19   checklist on the front of this document?

02:01 20   A.    Yes.

21   Q.    And when you had that file, where did you physically keep

22   it?

23   A.    Once we organized everything, we had them in file

24   cabinets, alphabetically ordered.

25   Q.    Is that where this file was kept?

```
 1    A.    Yes.
 2              MR. LOONEY:  I'd ask that it be admitted as a business
 3    record.
 4              MR. VIEN:  Your Honor, it contains -- There's
 5    different levels of objection to this document that we
 6    discussed before, and I want to preserve that objection.
 7              THE COURT:  All right.  I will admit it, but I'm
 8    anticipating, with the objection that he just made, that I'm
 9    going to have to go through it page by page before I can
10    determine what can be shown to the jury.  So it's admitted
11    subject to redacting.  So why don't you tell me what pages
12    you're going to show her, and we'll take it like that for the
13    time being.
14              MR. LOONEY:  What I anticipate showing of this
15    document are Pages 14 --
16              THE COURT:  Fourteen on the Bates or 14 on the --
17              MR. LOONEY:  Fourteen on the PDF.  Can you bring that
18    up?  Actually, I apologize.  For this one, I just want to get
19    it admitted.  There are -- at some point there is a single page
20    in here, which is a certificate, that we'll show separately, as
21    a separate exhibit.
22              THE COURT:  Okay.  Well, I'll admit, it understanding
23    that there may be portions of it that are redacted depending on
24    what the nature of the objection is.  I'm not going to deal
25    with it in front of the jury now because we're not going to
```

1  show them the whole file.  So the document that you have, is

2  that a document that you want to show her?

3       MR. LOONEY:  Not at this point.  I want to go to the

4  second exhibit in this binder, seek to admit it in the same

5  way, and I can identify the pages I'd like to review with the

6  jury.

7       THE COURT:  That's fine.  This is admitted, and we'll

8  sort through if there's any issues with it later.

9       (Exhibit 357 admitted into evidence.)

02:03 10  BY MR. LOONEY:

11  Q.  Ms. Muchioki, can you turn to -- The next tab in your

12  binder I believe is marked as Exhibit 363.

13       MR. LOONEY:  And can we take it off the screen?  I'm

14  sorry.

15       COURTROOM CLERK:  I thought that was another exhibit.

16  This is a new one?

17       MR. LOONEY:  This is Exhibit 363.  It is not admitted,

18  and I'm going to ask some questions of Ms. Muchioki about it.

19  BY MR. LOONEY:

02:04 20  Q.  First, do you recognize this document?

21  A.  Yes.

22  Q.  And what is this document?

23  A.  It's the initial checklist when we're hiring, when they

24  come in and do their application.

25  Q.  And that's the first page of this document?

          1    A.    Yes.

          2    Q.    If you're in the -- Looking at the binder itself, what is

          3    that full section underneath Tab 2?

          4    A.    Which part are you referring to?

          5    Q.    Can you identify this whole document, the packet?

          6    A.    Uh-huh.  This would be done within the first page of an HR

          7    file.  So we needed to make sure they had their ID card, their

          8    social security card, their TB test, referrals, the CORI.  And

          9    then from there they would then be enrolled in orientation.

02:05    10    Q.    That's what that checklist is?

         11    A.    Yes.

         12    Q.    What is the whole document, though?

         13    A.    The whole document is the full HR file.

         14    Q.    For whom?

         15    A.    So we would need to make sure in the manila folder the

         16    first items were listed, in the red folder the second items

         17    were listed.  And in the third folder the blue --

         18    Q.    We'll get to the contents in a moment, but I just want to

         19    identify what this document is.  So this is a personnel file;

02:05    20    correct?

         21    A.    Yes.

         22    Q.    For whom?

         23    A.    For any employee.

         24    Q.    But the one at tab 2?

         25    A.    This one is for Adriana Kam O'Donoghue.

```
 1   Q.   Is this a document you recognize?

 2   A.   I have seen the document before.

 3   Q.   Is it a document that you maintained while at Arbor?

 4   A.   Yes, after she was hired.

 5   Q.   And where was that document kept at Arbor?

 6   A.   It was kept in the HR file room.

 7   Q.   And were you responsible for keeping all of the paperwork

 8   together for -- that constitutes this document?

 9   A.   Yes.  After I was hired, we did thorough reviews of what

02:06 10  needed to be in the document as well as what was missing.

11             MR. LOONEY:  I'd ask this document be admitted as

12   Exhibit 363.

13             MR. VIEN:  The same procedure would be acceptable,

14   Your Honor.

15             THE COURT:  I will do that, but give me an example of

16   a page that you object to.

17             MR. VIEN:  On this one I don't have a page.

18             THE COURT:  Give me an example.  I'm not sure what

19   we're talking about.  I don't want to take up too much of the

02:06 20  jury's time --

21             MR. VIEN:  Why don't we just let them in and --

22             THE COURT:  It seems to be admissible to me.  Because

23   if there's individual issues --

24             MR. VIEN:  I understand.  And I don't want to screw up

25   the process.
```

```
 1              THE COURT:  Exhibit 363 is also admitted.  You'll let
 2   me know the individual pages and he'll let me know if there are
 3   pages he has an issue with.
 4              (Exhibit 363 admitted into evidence.)
 5              MR. LOONEY:  I hope it will be uncontroversial.  Can
 6   we pull up just Page 1 of the document for the jury?
 7   BY MR. LOONEY:
 8   Q.    Can you tell me what this page is, Ms. Muchioki?
 9   A.    This is the first page of the HR file.
10   Q.    And there's the name of an individual here.  Who is that?
11   A.    Adriana Kam O'Donoghue.
12   Q.    And can you tell from this page was she an employee at
13   Arbor?
14   A.    Yes.  She was a home health aide.
15   Q.    And there's a line that says DOH, correct, next to the
16   name?
17   A.    Date of Hire.
18   Q.    That's Date of Hire?
19   A.    Uh-huh.
20   Q.    And then the sections below, what do they address, or
21   describe?  What are those sections below that?
22   A.    Those describe what needs to be in each folder of the
23   actual HR file.
24   Q.    So the HR file is broken into individual folders with
25   different documents within them; is that accurate?
```

```
 1   A.    Yes.
 2   Q.    Without going into the specific details, what types of
 3   documents were kept in the first folder, the manila folder?
 4   A.    That would be all the hiring documents.
 5   Q.    And what's kept in the second folder, the red folder?
 6   A.    The second folder would be any certificates, as well as
 7   checklists and testing.
 8   Q.    And then what's in the blue folder?
 9   A.    The health questionnaires, so the TB test and such.
02:08 10  Q.    Were these folders -- When you came to Arbor, were these
11   files complete, as in they had each of the documents listed on
12   these checklists?
13   A.    No.
14   Q.    If this file was missing documentation, what was done
15   about that?
16   A.    We would try to rectify it.  We would try to bring home
17   health aides in to complete stuff or bring in items that we
18   needed, such as identification, a TB test, or whatever files
19   were missing from this list.
02:09 20  Q.    What if -- were there ever -- What if there were files
21   missing from the training section?  How did you address that?
22   A.    We would still have them come in and complete the training
23   tests.
24   Q.    Complete the training what?
25   A.    Exams.
```

```
 1   Q.    The examinations?

 2   A.    Yes.

 3   Q.    Can you describe the process of completing those exams?

 4   A.    For the ones that were missing.

 5   Q.    Yes.

 6   A.    Okay, so we would actually pull them into the office and

 7   have them sit down in a conference room, let them know which

 8   items were missing and which needed to be completed from their

 9   file.

10   Q.    So for exams, how did they -- how were the exams

11   administered?

12   A.    Normally, they were administered during orientation after

13   watching a video.

14   Q.    How were they scored?

15   A.    They were scored based on the exam key that was at the

16   back of the test.

17   Q.    When you say it's at the back of the test, was that the

18   back of the test when they were taking the exam?

19   A.    Yes.

20   Q.    So, just so I'm clear -- Well, how was the exam actually

21   taken by these HHAs?  Did you observe that?

22   A.    Yeah.  They would sit in the orientation room and take the

23   test.

24   Q.    With the answer key?

25   A.    Yes.
```

```
 1              MR. LOONEY:  Can we go to Pages 26 and 27 of this
 2    document?  Shall we take it down for the jury and publish it
 3    just for the Court, so you can take a quick look?
 4              THE COURT:  I have the binder.
 5              MR. LOONEY:  Probably easier just for page number
 6    purposes, because the way this is organized -- It's Bates
 7    number 829.
 8              THE COURT:  Mr. Vien, any objection to that?
 9              MR. VIEN:  No, that's fine.
10              THE COURT:  You can show that to the jury.
11    BY MR. LOONEY:
12    Q.   Ms. Muchioki, it's up on the screen for you if you want to
13    take a look.
14    A.   THE WITNESS:  Okay.
15    Q.   Do you recognize this document as a part of the HR file?
16    A.   Yes.
17    Q.   Were these ever the files that were missing or omitted
18    from the personnel files?
19    A.   Yeah, they could have been because they would not have
20    been initialed or dated for the correct date.
21    Q.   If that happened, what did you do?
22    A.   We would have them come in and fill it out.
23    Q.   When they came and filled it out, did you actually
24    administer any orientation or training at that time?
25    A.   Not if we were just filling out for the HR paperwork.  We
```

 1    did at one point try to hold an orientation.

 2    Q.    Pardon me?

 3    A.    We did at one point try to hold another orientation for

 4    people, but that was also for them to complete the paperwork,

 5    where we'd show videos and have them come in.

 6    Q.    What date -- when people came in and dated the documents,

 7    what date was put on the documents?

 8    A.    The date of their hire.

 9    Q.    Why was that?

02:12 10    A.    So it would match the HR files.

 11    Q.    That wasn't the date -- that wasn't the date the documents

 12    were actually filled out?

 13    A.    Not at all times, no.

 14          MR. LOONEY:  Can we take it down for the jury?  I just

 15    want to show one more page of this document.  Can you go to

 16    Page 145, just for the Court.

 17          THE COURT:  What page?

 18          MR. LOONEY:  145 which is Bates number -- sorry.  I

 19    apologize.  Page 14.

02:13 20          MR. VIEN:  Could I just have the Bates so I can --

 21          MR. LOONEY:  Yes.  It's Page 817.  May we publish this

 22    document to the jury?

 23          THE WITNESS:  This is a certificate --

 24          THE COURT:  Hold on.  Any objection to this one being

 25    shown to the jury.

```
 1              MR. VIEN:  No.

 2              THE COURT:  You can show it to the jury.

 3    BY MR. LOONEY:

 4    Q.    Do you recognize this document?

 5    A.    Yes.

 6    Q.    Who created this document?

 7    A.    I did.

 8    Q.    I'm going to read it -- It states, "Adriana Kam O'Donoghue

 9    has successfully completed the HHA required course of study

02:14 10    approved by the State of Massachusetts and is therefore awarded

11    this certificate dated this third day of March, 2014."  And

12    then it's signed by Faith Newton in the lower right; is that

13    right?

14    A.    Correct.

15    Q.    When you arrived at Arbor, how many home health aides were

16    working there?  I think you said this earlier.

17    A.    Yeah, I think it was about 500.

18    Q.    Several hundred?

19    A.    Uh-huh.

02:14 20    Q.    And was there a personnel file for each of them?

21    A.    Yes.

22    Q.    Did any of those personnel files have a certificate like

23    this in it?

24    A.    No.

25    Q.    And who created this certificate?
```

```
 1    A.    I did.

 2    Q.    When did you create it?

 3    A.    I want to say around 2016.

 4    Q.    So, wait.  Was it created on the date indicated on the

 5    document?

 6    A.    No.

 7    Q.    At whose direction did you create this document?

 8    A.    Faith Newton.

 9    Q.    Why did Ms. Newton have you create these documents?

10          MR. VIEN:  If she says it, objection.

11          THE COURT:  We need to take our break.  So we'll get

12    back to it.  2:15 to 2:30, okay.

13          (Recess, 2:15 p.m. - 2:32 p.m.)

14          COURTROOM CLERK:  All rise for the jury.

15          Court is back in session.  Please be seated.

16          THE COURT:  That was like an abrupt -- I'm trying to

17    find a good stopping spot when I release you on your breaks,

18    but I schedule other things in here, another 12:00 and 2:15

19    sometimes.  And today I had a hearing at 2:15, and I had to

20    stop right at 2:15.  I try to find reasonable stopping points.

21    Sometimes when I'm a little abrupt, it's because I have the

22    next thing coming.

23          So there was an objection pending and the question has

24    been withdrawn.

25          Next question, Mr. Looney.
```

```
 1              MR. LOONEY:  Could we just bring up page 15?  Rotate.
 2    Thank you, Ms. Apfel.
 3    BY MR. LOONEY:
 4    Q.   I'm going to go back a couple of questions -- quick ones.
 5    Who created this document?
 6    A.   I did.
 7    Q.   And when did you create it?
 8    A.   Around 2015, 2016.  I'm not exactly sure the date.
 9    Q.   Okay.  Why did you create the certificate?
10    A.   In order to complete the HR files.
11    Q.   Were you instructed to do that?
12    A.   Yes.
13    Q.   By whom?
14    A.   Faith Newton.
15    Q.   Did Ms. Newton tell you why she wanted the certificate in
16    the files?
17    A.   Because it was a requirement of the HR file.  During the
18    audits, they were looking for those certificates.
19    Q.   Okay.  What audit are you referring to?
20    A.   The one from Massachusetts state.
21    Q.   Okay.
22    A.   Or MassHealth.
23    Q.   From whom did you hear about this audit?
24    A.   From Faith Newton.
25    Q.   Do you know whether the statement on here that
```

1    Ms. O'Donoghue has successfully completed the HHA required

2    course of study approved by the state of Massachusetts, do you

3    know whether that statement is accurate?

4    A.    No.  That was not under my purview.

5    Q.    Why don't you know that?

6    A.    Because I was only there for HR.  I didn't do any of the

7    training as far as in home to complete the 75 hours.

8    Q.    Okay.  Were you there at -- were you at Arbor on the date

9    of this certificate?

02:34 10    A.    No.

11    Q.    That was before your time at Arbor; is that right?

12    A.    Yes.

13    Q.    Aside from this one certificate we're looking at, how

14    many -- did you create any other similar certificates?

15    A.    Yes.

16    Q.    How many?

17    A.    Roughly between seven and 800 certificates.

18    Q.    Were they created in the same manner as this one?

19    A.    Yes.

02:35 20    Q.    Why does Ms. Newton's signature appear on this?

21    A.    Because I had her sign for them and pasted it on to the

22    certificates.

23    Q.    So you copy and pasted her signature on all --

24    A.    Yes.

25    Q.    -- roughly 700 certificates?

```
 1   A.   Yes.
 2   Q.   All right.  Did anyone else's signature appear on
 3   certificates you created at Arbor?
 4   A.   Yes.
 5   Q.   Whose signature?
 6   A.   Regina Arrey.
 7   Q.   How did Ms. Arrey's name come to appear on the
 8   certificates?
 9   A.   In the same way.
10   Q.   And what was in the same way?
11   A.   I had her give me her signature, and then I was able to
12   copy and paste on to the certificates.
13   Q.   Okay.  What happened to the certificates that were created
14   with Ms. Arrey's signature?
15   A.   They were taken out mostly and destroyed because she
16   didn't --
17   Q.   Sorry.
18   A.   They were taken out and replaced with the ones that have
19   Faith Newton's name on there.
20   Q.   Taken out of the personnel file?
21   A.   Yes.
22   Q.   Why did that happen?
23   A.   Ms. Arrey decided she did not want her name associated
24   with those certificates.
25   Q.   Okay.  Did she tell you why?
```

1    A.    Yes.

2    Q.    What was that?

3          MR. VIEN:  Hearsay, not on the first one, but this

4    one.

5          MR. LOONEY:  I'm asking about the province of

6    documents that are both here and that are absent.

7          THE COURT:  Okay.  Well, this is -- are you looking

8    for it for the truth of the matter?

9          MR. LOONEY:  No.

02:36 10          THE COURT:  Okay.  So I'm going to admit, not for the

11    truth of the matter asserted.  So I'm going to give them a

12    corrective instruction.

13          Is she going to testify or no?

14          MR. LOONEY:  Ms. Arrey?

15          THE COURT:  Yes.

16          MR. LOONEY:  We anticipate she will.

17          THE COURT:  Remember, I told you in the preliminary

18    instructions that there were some things that you could

19    consider for certain purposes and not for other purposes.  So

02:37 20    in this case, she's saying something to her, and as a result,

21    she's taking her names off of the certificates.  So she's not

22    here right now.  She's not being cross-examined.  So it doesn't

23    come in for the truth of the matter asserted, like we don't

24    know what she told her is truthful or not.  It's just an

25    explanation for why she did what she did.

1            Okay.  So just to give you another example, a separate

2     example, if somebody says -- if a witness is going to say she

3     told me that it was raining out, that's hearsay, because the

4     person that said it was raining isn't here.  So she's not being

5     cross-examined.  We don't know if it's actually raining out or

6     it's not, but it explains why when I leave the building I take

7     my umbrella.  Okay.

8            So whether it's raining or not, whether it's truthful

9     or not, it has caused me to do something.  So at this point,

02:37 10    she's testifying about why -- what she told her about why she

11    wanted her name off of it.  You cannot accept it for the truth

12    at this point, but it's only to understand why she does what

13    she does next.  Okay?

14           Anyone want to question, comment or complain about the

15    instruction?

16           MR. VIEN:  None of the above, Your Honor.

17           MR. LOONEY:  No, Your Honor.

18           THE COURT:  Go ahead, Mr. Looney.

19           Again, I should say you can answer the question.

02:38 20    THE WITNESS:  It was explained to me that she did not

21    want her name on the certificate, especially since she had not

22    been the director of nursing when those people were hired.

23    BY MR. LOONEY:

24    Q.   And I think you said you don't know whether the statement

25    on these certificates is true, correct?

1   A.    Yes.   There was no way for me to verify that.

2   Q.    And that's because it happened before your time?

3   A.    Before my time, and I didn't go at homes and train home

4   health aides.  So there's no personal way for me to know, other

5   than them telling me that it was done.

6   Q.    Who's the "them" there?

7   A.    The nurses, the advisors that -- the administrator.  They

8   were the ones who were verifying it.

9   Q.    Okay.  Before you created these certificates, did someone

02:39 10   tell you that the training required by the state of

11   Massachusetts for an HHA had been performed?

12   A.    Yes.

13   Q.    Who was that?

14   A.    Faith Newton and any person of the director of nursing.

15   Q.    Okay.  Did there come a time when you became involved in

16   the training and orientation of new HHAs at Arbor?

17   A.    Yes.

18   Q.    Okay.  When did that take place?

19   A.    That took place, I want to say, by the end of August of

02:39 20   2014 when I was conducting the orientation.

21   Q.    I started to speak over you.  I apologize.  Could you

22   repeat that for me?

23   A.    About the end of August of 2014, when I started conducting

24   the orientation.

25   Q.    Okay.  When you arrived at Arbor, what training was

1    provided at Arbor to new home health aides, if you know?

2    A.   As far as I know, they came for the orientation.  They

3    watched videos and completed their paperwork.  Then any

4    other -- sorry.

5    Q.   Okay.  How long did that orientation session take?

6    A.   Originally, about four hours.

7    Q.   Okay.  So was any other orientation provided by Arbor as

8    an agency to new home health aides?

9    A.   That I would -- I would assume would be done in the

02:40 10   patient's home.

11   Q.   Okay.  So the only classroom training you are aware of

12   performed for new home health aides at Arbor was that four-hour

13   orientation; is that accurate?

14   A.   Yes.

15        MR. LOONEY:  Could we take this down, and could we put

16   up for the witness Exhibit 13.01, not for the jury, please.

17   BY MR. LOONEY:

18   Q.   Do you recognize this document?

19   A.   Yes.

02:41 20   Q.   Okay.  And what is it?

21   A.   It is a PowerPoint that I created in order to go through

22   with the home health aides what we were doing during

23   orientation.

24   Q.   Okay.  When about did you create this document?

25   A.   I want to say 2016.

```
 1              MR. LOONEY:  I would ask that this be admitted as
 2    Exhibit 13.01?
 3              MR. VIEN:  No objection.
 4              THE COURT:  Admitted.
 5              MR. LOONEY:  If we could publish it for the jury.
 6              (Exhibit 13.01 admitted into evidence.)
 7    BY MR. LOONEY:
 8    Q.    Can we go to page 6 of this document?  Does this slide
 9    accurately reflect your understanding what training was
10    required for home health aides?
11    A.    Yes.
12    Q.    Okay.  How did you learn this?
13    A.    After a couple of years, I've learned all of this through
14    our training aids as well as our orientation books.
15    Q.    When you say your training aids, what do you mean by that?
16    A.    We had videos that were shown to us as HR, as well as the
17    videos we were showing to home health aides.
18    Q.    Okay.  At any time you were at Arbor, did Arbor provide 16
19    hours of classroom training before beginning on-site training
20    with patients?
21    A.    No.
22    Q.    During all of your time at Arbor, what was the most
23    classroom training provided to new HHAs before they went onsite
24    with patients?
25    A.    To new HHAs, by the end, we had it up to eight hours.
```

```
 1    Q.    Okay.  Did you discuss training for new HHAs with the
 2    defendant, Faith Newton?
 3    A.    Yes.
 4    Q.    What did you discuss, if you recall?
 5    A.    Well, at the time, I was trying to figure out everything,
 6    so we were discussing -- we need more days involved with them
 7    coming in for home health aide before they go out to see
 8    patients.
 9    Q.    Okay.  Who said that to whom?
10    A.    I said that to her.
11    Q.    Okay.  What was Ms. Newton's response to that?
12    A.    We're fine right now.
13    Q.    And what did you take that to mean, just that we're fine?
14    A.    That we're keeping it as business as usual.
15    Q.    Okay.  So just so I understand clearly, you suggested
16    there should be more days of training?
17    A.    Yes.
18    Q.    Okay.  And the response was?
19    A.    We're fine with what we're doing.
20          MR. LOONEY:  We could take this document down.
21    BY MR. LOONEY:
22    Q.    Were you involved, at any point in time, with the hiring
23    for new home health aides?
24    A.    No.
25    Q.    At some point did you change roles from being an HR
```

```
 1   assistant to a different role?

 2   A.   Yes.

 3   Q.   And what was that other role?

 4   A.   Home health aide manager.

 5   Q.   You managed the home health aide program?

 6   A.   Yes.

 7   Q.   Through that, did you become familiar with the onboarding

 8   and hiring process for new home health aides?

 9   A.   Yes, but I had been familiar since being in HR.

10   Q.   Okay.  So you were familiar before then as well?

11   A.   Uh-huh.

12   Q.   Can you tell -- can you tell us about the process of

13   hiring a new home health aide?  How did a new home health aide

14   come in and apply for a job?

15   A.   Normally, they would come in with a patient, fill out the

16   paperwork.  And once the patient is authorized to have home

17   health aides services is when they would be called in for

18   orientation.

19   Q.   Okay.  So just -- what did you mean by -- I think you said

20   when the new patient is qualified.  What did that mean?

21   A.   They had to qualify through Medicare/Medicaid.

22   Q.   Okay.  So once you ensured that the patient was Medicare

23   or Medicaid qualified, then you would hire the home health

24   aide; is that accurate?

25   A.   Yes.
```

Q.   Okay.  Was there any evaluation done to determine whether the HHA was appropriate or capable of filling the role?

A.   That's when the CORI comes in and the background check.

Q.   Can you tell us quickly what a CORI and background check is?

A.   CORI means that they don't have any, like, felonies that would deny them from qualifying to be a home health aide, and the same thing with the background check.  It runs their background to make sure there is no felonies or open cases.

Q.   So you've identified two steps to be hired as a home health aide.  You had to have the patient you came in with qualified for benefits for insurance benefits?

A.   Yes.

Q.   And you had to not have a felony on your background, correct?

A.   Correct.

Q.   Were there any other requirements to be hired as a home health aide at Arbor?

A.   They were supposed to have current ID, free TB test, and then come and complete orientation.

Q.   Okay.  But was anything done to determine whether they were actually able to perform the job?

A.   Not that I'm aware of.

Q.   You talked earlier about personnel records, records of Arbor's employees.  Did you also help to maintain other records

1    at Arbor?

2    A.    Yes.

3    Q.    What other types of records?

4    A.    In the beginning, I was helping to file medical patient

5    records.

6    Q.    Okay.  What types of records were maintained for Arbor's

7    patients?

8    A.    The plan of care, the doctor referral, meaning that the

9    doctor signed off on it, anything that needed to be put in the

02:47 10    file.

11    Q.    Okay.  And can you tell us briefly what the plan of care

12    is?

13    A.    So it's what the nurse assesses the patient after an

14    in-home visit and looking at their records to find out what the

15    patient requires for service?

16    Q.    And after the nurse performed that assessment, what

17    happened to the plan of care?

18    A.    It's supposed to then be faxed over to the doctor to have

19    the doctor sign off on it.

02:47 20    Q.    At the time you joined Arbor, did signed plans of care

21    exist for all Arbor's patients?

22    A.    Not for all of them, no.

23    Q.    Okay.  What did you -- what did you do about that, if

24    anything?

25    A.    Well, anything, we would make note.  We did have a medical

1    file person who would try to refax the plans of care in order

2    to get it signed within a required time.

3    Q.    Okay.  When you say the required time, what do you mean by

4    that?

5    A.    I believe it was 30 to 60 days from the start of care.

6    Q.    Were plans of care ever signed after that?

7    A.    Yes.

8    Q.    Okay.  How far after that?

9    A.    It could have been months.

02:48 10   Q.    Okay.  Were those plans of care created before or after

11   the patients received care?

12   A.    They were created when the patient file was created.

13   Q.    Okay.  Changing topics again, did you ever discuss any

14   issues with Ms. Newton about whether or not nurses were showing

15   up for visits?

16   A.    Yes.

17   Q.    And what did Ms. Newton tell you about that issue?

18   A.    She'd take care of it.

19        MR. VIEN:  Objection, just for context, Your Honor.

02:49 20   Time, place, et cetera.

21        THE COURT:  Yes.  Just lay a foundation.

22        MR. LOONEY:  Okay.

23   BY MR. LOONEY:

24   Q.    Do you recall how that topic came up with Ms. Newton?

25   A.    Yes.  It was reported.

```
 1              MR. VIEN:  Objection, Your Honor.  Yes-or-no answer.
 2              THE COURT:  All right.  Yes.  Next question.
 3   BY MR. LOONEY:
 4   Q.   How did that issue come up with Ms. Newton?
 5   A.   Because --
 6              MR. VIEN:  Your --
 7              THE COURT:  Go ahead.
 8   BY MR. LOONEY:
 9   Q.   I think you can answer.
10        The question was:  How did that topic come up with Ms.
11   Newton?
12   A.   Because of complaints.
13   Q.   Okay.  How did you end up addressing -- speaking to
14   Ms. Newton --
15              THE COURT:  Let's get a date.  Let's get a time frame.
16   BY MR. LOONEY:
17   Q.   When did these occur?
18   A.   Between -- it was several different instances.  Between
19   2015 and 2016.
20   Q.   So it was multiple occasions?
21   A.   Yes.
22   Q.   Okay.  Were the conversations -- you had -- and -- there
23   were multiple instances where you discussed this topic; is that
24   right?
25   A.   Yes.
```

1    Q.    Okay.  Can you recall, on any of those instances, what

2    Ms. Newton told you?  That's a yes-or-no question.

3    A.    Not by word.

4    Q.    Not by word.  Can you describe, in general, how Ms. Newton

5    responded?

6    A.    In general, that it would get taken care of, that instance

7    would get taken care of.

8            MR. VIEN:  Objection and move to strike.  Just for no

9    context.  Who was there; how it came up; when --

02:51 10           THE COURT:  I'm not going to strike it.  If you want a

11    better foundation, if the conversation was just between the two

12    of them, who was there, how many did she think she had, I'll

13    have him lay a foundation, but I'm not going to strike it.

14    BY MR. LOONEY:

15    Q.    Do you recall how many times you had this conversation?

16    A.    No.

17    Q.    Okay.  Were there other people with you when you discussed

18    this issue?

19    A.    No.

02:51 20    Q.    It was you and Ms. Newton?

21    A.    Yes.

22    Q.    Where did these conversations typically take place?

23    A.    They would either take place in the office.  I could even

24    mention them at home when I would see her.

25    Q.    Okay.  When you say at home when you would see her, how

1    did that come up?

2    A.   Well, initially, I did live with her, when I moved from

3    New Jersey to Massachusetts.

4    Q.   Did Ms. Newton ever give you any instructions about what

5    to do in response to complaints?

6    A.   It was to bring them to up to her.

7    Q.   Bring them up to her?

8    A.   Or whoever the director of nursing was.

9    Q.   Were you instructed to record the complaints anywhere?

02:52 10         MR. VIEN:  Objection, leading, Your Honor.

11         THE COURT:  Not leading.  It's a yes-or-no question.

12    Were you instructed, yes or no?

13         MR. LOONEY:  Let me ask a better question.

14    BY MR. LOONEY:

15    Q.   Did you receive any instructions about whether or not you

16    should record those directions -- whether you should record

17    those issues?

18    A.   Yes.

19    Q.   What was the direction you received from Ms. Newton?

02:52 20    A.   At the time, we were recording instances of issues on our

21    Axxess Point.  Then we were instructed not to do that because

22    it could be reviewed.

23    Q.   Okay.  You said you were instructed not do that.  By whom

24    were you instructed not to do that?

25    A.   Faith Newton.

```
      1   Q.   Okay.  And just to clarify, you said there was a point

      2   when you were recording issues in Axxess Point.  What is Axxess

      3   Point?

      4   A.   Axxess Point was our medical records.

      5   Q.   Okay.  And -- okay.

      6        I want to go back to those HHA certificates that we talked

      7   about earlier.  And can I pull up on the screen for the witness

      8   only Exhibit 346.

      9        Do you recognize this document?

02:53 10   A.   Yes.

     11   Q.   What is it?

     12   A.   It's a certificate certifying that Carlos Andrade has

     13   successfully completed the home health aide required course.

     14   Q.   Do you know who created this document?

     15   A.   I did.

     16   Q.   Do you know where this document was kept?

     17   A.   In his file.

     18        MR. LOONEY:  I'd ask that this be admitted into

     19   evidence.

02:54 20        THE COURT:  We've admitted the whole file.  You want

     21   it shown --

     22        MR. LOONEY:  This is for a separate individual.

     23        THE COURT:  I'm sorry.

     24        MR. LOONEY:  I'm going to put in several of these.

     25        THE COURT:  Are you admitting the certificate or are
```

 1    you admitting the whole file?

 2            MR. LOONEY:  Just the one-page certificates.  I'm

 3    going to do it for a number of individuals just so they are in

 4    evidence.

 5            THE COURT:  Any objection to that, Mr. Vien?

 6            MR. VIEN:  No, Your Honor.

 7            THE COURT:  346 is admitted.

 8            (Exhibit 346 admitted into evidence.)

 9            MR. LOONEY:  And maybe Mr. Vien -- or I'll address

02:54  10    you.  Maybe we could do this more quickly.  I'm intending to

11    introduce Exhibits 353, 360, 365, 374, 383, and 387 in the same

12    manner, all of which are similar documents.

13            MR. VIEN:  If it's same answers that she corrected --

14    created them and put them in the same place, then that's fine.

15            THE COURT:  Pull a microphone closer to your mouth,

16    Mr. Vien.

17            MR. LOONEY:  How about I ask a group of questions

18    about all of them.

19            THE COURT:  I think he's not objecting to them if they

02:55  20    are all the same documents.  So I think these numbers came up

21    wrong on my screen, but 353, 360.  Was it 364 or 365?

22            MR. LOONEY:  365.

23            THE COURT:  367?

24            MR. LOONEY:  374, 383, 387.

25            THE COURT:  Okay.  All those are admitted.

1          (Exhibits 353, 360, 365, 374, 383, 387 admitted into

2          evidence.)

3          MR. LOONEY:  And could we publish the first of these

4   for the jury?

5   BY MR. LOONEY:

6   Q.   You said this is a document that you created, correct?

7   A.   Yes.

8   Q.   Okay.  And when did you create this document?

9   A.   About 2015, 2016.

02:55  10   Q.   2015 or 2016.  And do you know whether Mr. Andrade

11   successfully completed the required HHA course of study by the

12   state of Massachusetts?

13   A.   I cannot confirm that.

14   Q.   Because it was before the time you were hired?

15   A.   Correct.

16   Q.   And again, on this document, why did Ms. Newton's

17   signature appear on there?

18   A.   It was copied and pasted.

19   Q.   And who instructed you to do that?

02:56  20   A.   Faith Newton.

21   Q.   I am trying to think how to do this most efficiently

22   without calling up all of them.  Could we just actually pull up

23   in sequence and show to the jury Exhibits 353, 360, 365, 374,

24   383, and 387.

25          Now, I'll ask these questions in a group.  Did you create

```
 1    all those records?
 2    A.    Yes.
 3    Q.    At whose instruction?
 4    A.    Faith Newton.
 5    Q.    Okay.  Did you -- what dates did you use for the date of
 6    these documents?
 7    A.    The date of hire based on their HR records.
 8    Q.    Okay.  And why is Ms. Newton's name on there?
 9    A.    Because she's -- she was the director of nursing.
10    Q.    Okay.  Who instructed you to put her name on it?
11    A.    She did.
12    Q.    And you're instructed -- were you told why these documents
13    were required?
14    A.    So that the file will be complete for audit purposes.
15    Q.    And who were you told that by?
16    A.    Faith Newton.
17          MR. LOONEY:  No further questions at this time.
18                      CROSS EXAMINATION
19    BY MR. VIEN:
20    Q.    I apologize.  I'm going to get your name wrong, but good
21    afternoon.  It's Ms. --
22    A.    Muchioki.
23    Q.    -- Muchioki.  George Vien.  I represent Faith Newton along
24    with Michelle Pascucci.  When you came up to move up to this
25    area, you actually lived with Faith Newton?
```

```
 1   A.   Yes.

 2   Q.   And where did you live?

 3   A.   We lived on -- what is -- we lived in Lowell, Lowell,

 4   Mass.

 5   Q.   And who else did you live with?

 6   A.   Ben Muiruri, their children.

 7   Q.   And how many children do they have?

 8   A.   Two.

 9   Q.   And what are their genders?

10   A.   One male, one female.

11   Q.   And approximately how old are they?

12             MR. LOONEY:  Objection, relevance.

13             THE COURT:  Sustained.

14   BY MR. VIEN:

15   Q.   And initially your job was as an HR assistant?

16   A.   Correct.

17   Q.   And your job was to clean up all the files?

18   A.   Yes.

19   Q.   And where did you go to work every day?

20   A.   In Chelmsford, at the office.

21   Q.   Okay.  And do you remember what street it was on?

22   A.   Off the top of my head, it was Courthouse Lane.

23   Q.   Okay.  And approximately how many other people were

24   working in the office while you were working there?

25   A.   Initially, five to six other people.
```

160

| | | |
|---|---|---|
| 1 | Q. | And when you say "initially," after a while, did -- |
| 2 | A. | More people were hired into the office. |
| 3 | Q. | I'm sorry.  More people were hired into the office? |
| 4 | A. | Yes. |
| 5 | Q. | And approximately how many people came to work at the |
| 6 | | office while you were there? |
| 7 | A. | Initially, five to six people. |
| 8 | Q. | Okay.  After initially, did it increase or decrease? |
| 9 | A. | It increased. |

03:00 10    Q.    And what did it increase to, approximately?

11    A.    I will say about 15 people.

12    Q.    About 15.  And those don't include the home health aides,

13    do they?

14    A.    No.

15    Q.    Because they didn't come to work in the office every day?

16    A.    No.  They were at patients' homes.

17    Q.    Is the same true for the nurses?

18    A.    The same for the nurses, who were out doing visits.

19    Q.    And approximately how many home health aides and nurses

03:00 20    were working there while you were working there?

21    A.    In the office?

22    Q.    No, no.  Just for the company.

23    A.    I would say about 50 nurses and about 800 home health

24    aides.

25    Q.    And how many patients were there, approximately?

A.   I want to say between six and 700.  I wouldn't recall the
exact amount.

Q.   When you came to work there, was the office -- was the
office a mess?

A.   In some places, yes.

Q.   What areas was it kind of a mess, if you will?

A.   Well, like I said, the HR files were stacked up against
the wall.  We had to go through that.  A lot of, you know,
deconstruction and construction was going on in the office in
order to create office space.

Q.   And were there -- were there storage cabinets or other
areas available to store hard copies of documents, other than
the HR files?

A.   Yes.  We had medical records.

Q.   I'm sorry.  I couldn't hear you.

A.   Medical records.

Q.   Oh.  And where were they kept in relation to where you
worked?

A.   They were downstairs where I was upstairs.

Q.   Okay.  And could you tell us the area where the hard copy
of the medical records were stored?

A.   Yeah.  There was a small office where there were filing
cabinets located.

Q.   All right.  And have you been in that office?

A.   Yes.

```
 1   Q.   And could you describe it to the jury, please.
 2   A.   It was very tiny.  Most of the filing cabinets took it up,
 3   and then you had like a little desk with a computer and a
 4   phone.
 5   Q.   Okay.  And were all the records stored in the file
 6   cabinets, or were they outside the file cabinets as well?
 7   A.   For the patients, they were in the cabinets.
 8   Q.   And who's in charge of the medical records?
 9   A.   There were a couple of people in charge.  At one point, it
10   was Jenny Sech then I believe Wilma Rae Astraya also took it at
11   one point.  There was -- I am trying to remember all the names.
12   Helen Sech.  Airanisse -- I can't remember her last name.  But
13   yeah, it was a couple of different people who went through the
14   files.
15   Q.   Okay.  And was Syed Hussain there when you were there?
16   A.   Yes, he was there when I first began.
17   Q.   What was his job?
18   A.   Administrator for the company.
19   Q.   He was the head administrator?
20   A.   Yeah, under Faith and Ben.
21   Q.   So Faith and Ben, and he reported to Faith and Ben; is
22   that correct?
23   A.   Yes.
24   Q.   Okay.  And who reported to him, if you remember?
25   A.   Rosa Gonzalez, and then all the other employees reported
```

1      through him.

2      Q.   And what time period did he work at the office?

3      A.   Well, I'm not sure when he started.  He was there when I

4      already got there.  He was there until end of December of 2014.

5      Q.   So he didn't go into 2015; is that correct?

6      A.   Correct.

7      Q.   Okay.  And what about Joseph Ouko?

8      A.   Joseph Ouko, he started -- because I started, like I said,

9      the end of June, so he started August of 2014.

03:04 10     Q.   And when did he leave the company?

11     A.   Same time, December of 2014.

12     Q.   Okay.  So Joseph Ouko only worked there October, November

13     and December?

14     A.   From August.

15     Q.   Oh, I'm sorry.  From August, September, October, November

16     and December; is that correct?

17     A.   Yes.

18     Q.   All in 2014?

19     A.   Yes.

03:04 20     Q.   And then -- are you -- do you stay in contact with him?

21     A.   No.

22     Q.   Okay.  When you were at Arbor, were you friends with him?

23     A.   Coworkers.

24     Q.   You never socialized with him?

25     A.   No.

```
 1    Q.    You've gone to college now, and you've been working for

 2    five years, but when you were back at Arbor, you had an alcohol

 3    problem; is that true?

 4    A.    Yes.

 5    Q.    And you've gone to rehab and got yourself together, and

 6    you're doing well now, right?

 7    A.    Yes.

 8    Q.    But at Arbor, you weren't doing so well during that time

 9    period; is that correct?

10    A.    I don't believe it was that way.  Because they did keep me

11    on until the end of the company.

12    Q.    I understand.  But at some point you went to rehab; is

13    that correct?

14    A.    Yes, in New York.

15    Q.    And when did you go there?

16    A.    I went there end of 2017.

17    Q.    And when did you leave Arbor?

18    A.    Beginning of 2017.

19    Q.    And were you drinking heavily while you were at Arbor?

20    A.    Sometimes, yes; sometimes, no.

21    Q.    Now, as far as training goes, there was an online training

22    program, wasn't there?

23    A.    Yes.

24    Q.    And do you know whether or not home health care aides did

25    the training program online?
```

```
 1   A.   Yes.  I got some of them to complete it.
 2   Q.   So some people completed all the training; is that right?
 3   A.   Yes.
 4   Q.   And also, you understood that the nurses were supposed to
 5   do sort of on-the-job training with the home health care aides;
 6   is that correct?
 7   A.   Yes.
 8   Q.   And you're -- you were never in a position to see whether
 9   or not that was taking place, because you were always in the
10   office; is that also correct?
11   A.   Correct.
12   Q.   Now, you said that, at some point, Faith Newton, excuse
13   me, told you to put her signature on the certificates of
14   completion; is that correct?
15   A.   Yes.
16   Q.   Okay.  And how did -- will you agree that all of Faith
17   Newton's signatures on those documents look exactly the same?
18   A.   No, there is some differences in some of them.
19   Q.   Really?  How did you put her signature on the documents?
20   A.   Because I had her sign a sheet of paperwork, and then I
21   copy and pasted it on to the certificates that I created on the
22   computer.
23   Q.   And how did you get access to her signature that you could
24   cut and paste from?
25   A.   I went into her office and I let her know these
```

1    certificates need to be signed, if you want the HR file to be

2    complete.  So she signed a piece of paper.  I was able to scan

3    it into the computer, and then copy and paste it from there.

4    Q.    Okay.  And did other people have access to the Faith

5    Newton copied signature, or is that just you?

6    A.    No.  The whole office had access to the computer.

7    Q.    So the whole office had access to her signature?

8    A.    Yeah, if it was still on the computer.

9    Q.    At some point, you went with another employee to doctors'

03:08 10    offices; is that correct?

11    A.    Yes.

12    Q.    And why did you do that?

13    A.    There were plans of care missing from the medical records.

14    Q.    And why did you go to the doctors' office?

15    A.    To see if they would still sign off on them.

16    Q.    And did some of the doctors sign off on them?

17    A.    Yes, some did and some didn't.

18    Q.    And the ones that signed off on them, you took the plans

19    of care back to Arbor and put them in the system, so to speak;

03:08 20    is that right?

21    A.    Correct.

22    Q.    And you never -- when you ran into a doctor who wouldn't

23    sign, you didn't sign -- you didn't forge their signatures or

24    anything like that, did you?

25    A.    No.

1    Q.    The plan of care was just never done if the doctor said

2    I'm not going to sign?

3    A.    Correct.

4    Q.    Now, are you aware that there could also be verbal or oral

5    non-written plans of care?

6    A.    Initially, but they -- an actual plan of care still needs

7    to be signed within a certain amount of time as far as I knew.

8    Q.    And do you know how much time that is?

9    A.    I believe it was anywhere between 60 to 90 days.

03:09 10    Q.    But initially, service could begin without a signed plan

11    of care; is that correct?

12    A.    Correct, because the nurse would get the permission.

13    Q.    What's your -- what's your understanding about whether it

14    was proper or improper for a family member to be an HHA?

15    A.    At that time, I thought it was fine.

16    Q.    Now, did you also text message with Faith Newton?

17    A.    Probably.

18    Q.    Do you --

19           MR. VIEN:  Well, if I may approach, Your Honor?

03:10 20           THE COURT:  Yes.

21    BY MR. VIEN:

22    Q.    Could you take a look at the document I've placed before

23    you.

24    A.    Uh-huh.

25    Q.    And what is this document?

1    A.    It's text messages between me and Faith.

2    Q.    Okay.  And is it fair to say that in the document you were

3    telling Faith Newton about your efforts to get coverage, HHA

4    coverage for patients?

5    A.    Yes.

6    Q.    And Faith was supportive of your efforts to do that,

7    right?

8    A.    Oh, yes.  We always wanted people to have coverage.

9    Q.    And Faith wanted the patients to have coverage as well,

03:11 10   right?

11   A.    Yes.

12   Q.    And at some point, do you remember telling Faith that

13   Joseph Muiruri had changed things in the office?

14   A.    Yes.

15   Q.    And who is Joseph Muiruri?

16   A.    He was the director of nursing.

17   Q.    And do you remember what time period that was?

18   A.    It would have been 2016 to 2017, around there.

19   Q.    And Faith Newton wasn't the director of nursing at that

03:12 20   point?

21   A.    No.

22   Q.    And what changes did Joseph Muiruri institute?

23   A.    I would say there were a lot.  So he had redone the

24   office, so that's how I went from HR to home health aide

25   manager.  He hired someone else as an HR manager, who -- and

1  then there were other people who were hired in.  He made sure,

2  you know, everybody did certain things at certain times, such

3  as the job descriptions.

4  Q.   So at some point, it sounds like he was actually running

5  the office; is that correct?

6  A.   Yes.

7  Q.   And Faith Newton also told you in 2016 that she was

8  stepping away from the business; isn't that true?

9  A.   Yes, that was the plan.

03:12 10  Q.   And that meant that she wasn't there so often, right?

11  A.   Right.  She wasn't -- she wasn't always in office,

12  especially once they decided to step away, it became Joseph

13  Muiruri and Rosa Gonzalez, who were in charge of the office.

14  Q.   And she stepped away in about 2016?

15  A.   Yes, that would be about right.

16  Q.   Okay.  Now, you've indicated that Faith Newton was

17  concerned that the patients get their coverage; is that

18  correct?

19  A.   Oh, yes.

03:13 20  Q.   And some of the nurses you worked with or worked at Arbor,

21  you thought were quite good; isn't that true?

22  A.   Yes.

23  Q.   And could you give some of the names of people that you

24  thought were good nurses?

25  A.   Off the top of my head, Gladys Kiboi.  She's a great

nurse.

Q.   When you say a great nurse, what do you mean?

A.   Meaning that, you know, she went and saw the patients, always kept in touch with everyone to let them know what was going on with the patient.  Without a list in front of me, unfortunately --

Q.   Okay.  Let me try to refresh your recollection.  Do you remember Joan Kagendo?  How do you say her last name?

A.   Joan Kagendo.

Q.   Yes.  What's your opinion of her?

A.   She's one of my cousins.  I love her.

Q.   I'm sorry.  I couldn't hear you.

A.   She's related to me.

Q.   What about her as a nurse?

A.   She's a fantastic nurse.

Q.   And she did her job, correct?

A.   Yeah.  And at one point, she was in charge of the nurses.

Q.   What about Abraham Wawero?

A.   Abraham.  I didn't really have a lot of interaction with him, where he was more of an LPN.

Q.   Charles --

A.   Githinji

Q.   Excuse me?

A.   Githinji.  I had interactions with him.  He seemed very nice.

1    Q.    And you thought he was a good nurse as well, right?

2    A.    Yeah, but I only had office interactions with them, so...

3    Q.    But is it fair to say that, to your knowledge, a lot of

4    these people were doing the services for patients were doing a

5    good job?

6    A.    Yes, that I'm aware of.

7          MR. VIEN:  I don't have anything else, Your Honor.

8          THE COURT:  Redirect?

9    REDIRECT EXAMINATION BY MR. LOONEY:

03:15 10   Q.    Just a couple of questions.  You were asked questions

11   about an individual named Joseph Ouko; is that right?

12   A.    Yes.

13   Q.    And I think you said he only worked at Arbor from August

14   2014 to December 2014; is that right?

15   A.    It's about that.  It may have even been July.  Because I

16   know he started like right after I did, within a couple of

17   weeks.

18   Q.    Why did he stop working at Arbor, if you know?

19   A.    He --

03:15 20         MR. VIEN:  Objection.  This is going to be hearsay,

21   obviously.

22         THE COURT:  Well, ask her if she knows.

23   BY MR. LOONEY:

24   Q.    Do you know why he left Arbor?

25         THE COURT:  Yes-or-no question.

```
 1              THE WITNESS:  Yes.
 2     BY MR. LOONEY:
 3     Q.   Okay.  And how do you know that?
 4     A.   I was made aware of the situation as being part of HR.
 5     Q.   Okay.  From whom were you made aware of the situation?
 6     A.   Faith Newton.
 7     Q.   Okay.  And what did Ms. Newton tell you about why Joseph
 8     Ouko left Arbor?
 9     A.   Well, it had to do with -- how could I put this?  Not an
10     argument, but a difference of opinion --
11     Q.   Okay.  About what?
12     A.   -- between them two.  About services being offered by some
13     nurses.
14     Q.   What services were those?
15     A.   As far as missed visits.
16     Q.   Sorry.
17     A.   Missed visits.
18     Q.   Okay.  Can you explain a little more?
19     A.   So he had -- it was more of like he was getting complaints
20     that --
21              MR. VIEN:  Your Honor, just for clarification, this is
22     what Faith Newton said to her; is that correct?
23              THE COURT:  Yes.
24              MR. VIEN:  Thank you.
25     BY MR. LOONEY:
```

```
 1    Q.    Yes.  What did Faith Newton tell you about why Joseph Ouko
 2    left Arbor?
 3    A.    It was very -- so it was pretty much he quit.
 4    Q.    Did she tell you why he quit?
 5    A.    Because they weren't getting along about how services were
 6    doing.
 7    Q.    Okay.  And what do you mean by how -- did she tell you any
 8    more about their disagreement about how services were being
 9    provided?
10    A.    Yes.
11    Q.    And what more did she tell you about that?
12    A.    Well, he had fired two nurses.
13    Q.    Okay.
14    A.    She was not happy with that.
15    Q.    Why was she unhappy with that?  If she told you, did she
16    tell you why she was unhappy with that?
17    A.    It wasn't really tell me as more of I was aware of the
18    situation, if that makes sense.
19    Q.    I think I'll stop the questioning there.
20          You were asked about an alcohol problem you had at one
21    point; is that right?
22    A.    Yes.
23    Q.    Did you ever drink while you were working at Arbor?
24    A.    Yes.
25    Q.    While you were actually on the job?
```

```
 1   A.   Yes.
 2   Q.   Okay.  Were you ever drunk while at Arbor?
 3   A.   No.
 4   Q.   Okay.  When you say while at the job, you mean while
 5   performing your job?
 6   A.   No.  What I would do is, if anything, I'd be on a break.
 7   Q.   Were you ever intoxicated while at Arbor?
 8   A.   No.
 9   Q.   Did it affect -- does your issues with alcohol affect your
10   ability to remember things that occurred at Arbor?
11   A.   No.
12   Q.   You said you lived with Ms. Newton.  Did she raise any
13   issues with you about your use of alcohol?
14   A.   No.  The whole family was aware.
15   Q.   Okay.  Does your use of alcohol affect your ability to
16   testify today in any way?
17   A.   No.
18             MR. LOONEY:  Nothing further.
19             MR. VIEN:  Nothing, Your Honor.
20             THE COURT:  You are excused.
21             THE WITNESS:  Thank you.
22             MR. BRADY:  Your Honor, the United States calls Winnie
23   Waruru.
24             COURTROOM CLERK:  Can you raise your right hand.
25               (Witness sworn.)
```

1          THE WITNESS:  Help me God.

2          COURTROOM CLERK:  Okay.  Thank you.  You can be

3     seated.  And can you please state your name and spell your last

4     name for the record.

5          THE WITNESS:  Winnie Waruru, last name is W-A-R-U-R-U.

6          MR. BRADY:  May I proceed, Your Honor?

7          THE COURT:  You may proceed.  Let me tell the witness,

8     the microphone -- the arm moves up and down, but you can also

9     pull the whole thing closer.  The whole stand moves if you want

03:21 10   to pull it closer.  Whatever is comfortable for you, but the

11    whole thing moves.

12          Go ahead, Mr. Brady.

13          MR. BRADY:  Thank you, Your Honor.

14                WINNIE WARURU, duly sworn

15    DIRECT EXAMANATION BY MR. BRADY:

16    Q.   Good afternoon, Ms. Waruru.

17    A.   Good afternoon.

18    Q.   Can you hear me okay?

19    A.   Yes.

03:21 20   Q.   I'm going to try and keep my voice up.  I'll ask you to do

21    the same, okay?

22    A.   Okay.

23    Q.   And I know you just stated and spelled your name, but

24    could you just remind the jury who you are?

25    A.   Winnie Waruru.

```
 1   Q.   And Ms. Waruru, how old are you?

 2   A.   I'm 43.

 3   Q.   And where do you currently live, Ms. Waruru?

 4   A.   I live in Lowell, Massachusetts.

 5        MR. BRADY:  Okay.  I am going to ask Ms. Apfel if we

 6   could pull up just for the Court and the witness Exhibit 700,

 7   please.

 8   BY MR. BRADY:

 9   Q.   Ms. Waruru, can you see -- actually, in front of you,

10   there should be a binder of documents, and it should also be on

11   the TV screen in front of you.

12        Can you see that?

13   A.   Yes.

14   Q.   Okay.  And do you see a document on the screen in front of

15   you?

16   A.   Yes.

17   Q.   And do you recognize that as a copy of your plea agreement

18   with the government?

19   A.   Yes.

20        MR. BRADY:  Your Honor, I offer Exhibit 700.

21        MR. VIEN:  Judge, I don't have an objection to the

22   plea agreement going in.  I just am concerned that this version

23   is redacted, and I have -- the version I have is unredacted.

24   I'm not sure why this is redacted.

25        THE COURT:  Do you want to talk about that at sidebar,
```

1    or do you want to talk about it at the end of the day today?

2         MR. VIEN:  Whatever you want to do is fine with me,

3    Your Honor.

4         MR. BRADY:  Your Honor, I think if we are going to

5    talk about it, it would be appropriate for sidebar.

6         THE COURT:  Can we wait to 4:00 to discuss it, or do

7    we need to discuss it now?  We'll use this either until

8    cross-examination or until I have had a chance to look at the

9    unredacted and decide whether it should be substituted.  Or I'm

03:23 10    happy to talk about it now.

11         MR. VIEN:  Whatever is more easiest for everyone.  I

12    am more than willing to wait until 4:00 o'clock to talk about

13    it.  I'm willing to talk about it now, too, whatever.

14         MR. BRADY:  Your Honor, I think it makes sense to

15    wait.  And I do think when we wait to talk about it, I don't

16    think it's going to be too much of an issue.

17         THE COURT:  You can put up the redacted version.  It's

18    admitted.  And we'll decide if we are going to substitute it

19    with an unredacted version.

03:23 20         (Exhibit 700 admitted into evidence.)

21         MR. BRADY:  And Ms. Apfel, can I ask you to blow up

22    above the redaction, please, to make that a little bigger.

23    BY MR. BRADY:

24    Q.   Now, Ms. Waruru, now that we can all see this, again, what

25    is this document that we're looking at?

```
 1    A.   It's a plea agreement.

 2    Q.   Your plea agreement?

 3    A.   Yes.

 4    Q.   Okay.  And do you see there, the first paragraph, the

 5    title says "Change of Plea"?  Do you see that?

 6    A.   Yes.

 7    Q.   And it says here, "Defendant will plead guilty" -- do you

 8    see where it starts to say that?

 9    A.   Yes.

10    Q.   And where it refers to the defendant here, who is that

11    referring to, Ms. Waruru?

12    A.   It's me, Winnie Waruru.

13    Q.   Okay.  And in this agreement, you agreed to plead guilty

14    to five different crimes, right?

15    A.   Yes.

16    Q.   And those were conspiracy to commit health care fraud,

17    correct?

18    A.   Yes.

19    Q.   Health care fraud; is that right?

20    A.   Yes.

21    Q.   Conspiracy to pay and receive kickbacks?

22    A.   Yes.

23    Q.   Making false statements?

24    A.   Yes.

25    Q.   And making false statements in the health care matter; is
```

```
 1   that right?
 2   A.   Yes.
 3   Q.   Ms. Waruru, did you plead guilty to those crimes?
 4   A.   Yes.
 5   Q.   Why did you plead guilty to those crimes?
 6   A.   Because I did it.
 7   Q.   And one of those crimes -- well, one of the things you
 8   pled to -- let me start that question over, Ms. Waruru.
 9        One of the things you did, was you conspired to commit
03:25 10 health care fraud, and you committed health care fraud; is that
11   right?
12   A.   Yes.
13   Q.   Who did you agree to do that with?
14   A.   Faith Newton.
15   Q.   And do you see Ms. Newton here in this courtroom?
16        MR. VIEN:  I'll just ask her to stand up, Your Honor,
17   if there's things blocking the witness, if that's okay.
18        Will you stand up.
19        THE WITNESS:  Yes.
03:26 20 BY MR. BRADY:
21   Q.   It's the woman at the defense table wearing a green shirt?
22   A.   Yes.
23        THE COURT:  The record can reflect that she's
24   identified the defendant.
25        MR. BRADY:  We can take that down.  Thank you.
```

```
 1    BY MR. BRADY:
 2    Q.   So Ms. Waruru, I want to take a step back, I guess all the
 3    way back.  I want to ask you, where were you born?
 4    A.   I was born in Kenya.
 5    Q.   And did you go to school in Kenya?
 6    A.   Yes.
 7    Q.   How far did you go in school?
 8    A.   Up to high school.
 9    Q.   And at some point, Ms. Waruru, did you come to the United
10    States?
11    A.   Yes.
12    Q.   When was that?
13    A.   2002.
14    Q.   In 2002?
15    A.   Yes.
16    Q.   Did you have a visa when you came to the U.S.?
17    A.   Yes.  I had a visiting visa.
18    Q.   A visiting visa.  And then did that have a time limit on
19    it?
20    A.   Yes.  It was a one-year visa.
21    Q.   It was one year.  And did that one-year visa expire?
22    A.   Yes.
23    Q.   And what did you do after that visa expired?
24    A.   I didn't go back to our country.
25    Q.   You stayed here in the U.S.?
```

1   A.   Yes.

2   Q.   Okay.  Now, after you came to the United States,

3   Ms. Waruru, did you get married?

4   A.   Yes.

5   Q.   Who did you get married to after coming to the U.S.?

6   A.   Woodberry, Reginald.

7   Q.   Mr. Woodberry?

8   A.   Yes.

9   Q.   Tell the jury why you married Mr. Woodberry.

03:28 10   A.   When I came here in United States, I was told that there

11   is no way to stay here unless I get married.  So I was

12   connected, and I got married.  And after, I was told I have to

13   give money, but I knew it was not the right way.  So I applied,

14   but I didn't pursue my green card because I realized it was not

15   the way to stay here.

16   Q.   And Mr. Woodberry, was he a U.S. citizen?

17   A.   Yes.

18   Q.   What is your current immigration status?

19   A.   I don't have any status.

03:28 20   Q.   What is that to you?  What do you understand that means

21   for you?

22   A.   I'm not supposed to be here.

23   Q.   And we're going to talk a little bit about the different

24   jobs you've had in the U.S.

25   A.   Yes.

```
 1   Q.   Because you had a couple, right?
 2   A.   Yes.
 3   Q.   And when you applied for those jobs, did you provide
 4   information to the employers about what your immigration status
 5   was?
 6   A.   I didn't speak the truth about the application.
 7   Q.   What did you put on those applications?  What did you say?
 8   A.   I put I was a citizen.  I was advised if you put that
 9   you're a citizen, you're not going to be asked to bring your
10   green card or your status here.  So I always put that I'm a
11   citizen.
12   Q.   And that wasn't true?
13   A.   It wasn't.
14   Q.   Okay.  At some point, did you and Mr. Woodberry divorce?
15   A.   Yes.
16   Q.   Are you currently married today to somebody else?
17   A.   Yes.
18   Q.   How long have you been married to that person?
19   A.   Three years.
20   Q.   You mentioned before, Ms. Waruru, that you worked after
21   coming to the U.S.?
22   A.   Yes.
23   Q.   What was your first job after you got to the U.S.?
24   A.   My first job was at Canobie Lake Park in New Hampshire.
25   Q.   That's the amusement park?
```

```
 1    A.    Yes.

 2    Q.    And what was your job at the Canobie Lake Park?

 3    A.    Ride operator.

 4    Q.    You worked the rides?

 5    A.    Yes.

 6    Q.    At some point, Ms. Waruru, did you decide to go back to

 7    school?

 8    A.    Yeah, I went back to school.

 9    Q.    Why did you go back to school?

10    A.    Because I wanted to help those people who cannot help

11    themselves.  Back home, I had issues.  I had heart surgery, and

12    I was not treated right.  So I told God if I have an

13    opportunity, I will help people, and I'll treat them right.

14    Q.    So you mentioned that you went back to school to try and

15    help people.  Did you go back to school for a particular job,

16    for a type of job?

17    A.    Yes.  I started with certified nurse aide, which I went to

18    school for three weeks.

19    Q.    So certified nurse aide, is that like a CNA?  Is that the

20    same thing?

21    A.    Yes.

22    Q.    Okay.  And you said you went to school for three weeks for

23    that?

24    A.    Yes.

25    Q.    Okay.  Did you end up getting like a certification after
```

1    those three weeks after completing that?

2    A.    Yes, I got a CNA certificate.

3    Q.    And after you got the CNA certificate, did you go to work

4    someplace?

5    A.    Yes.

6    Q.    Where did you go to work?

7    A.    I started at the nursing home called Willow Manor Nursing

8    Home.  I had different jobs, and I also worked at Westford

9    House Nursing Home.

03:32 10    Q.    So let's just talk briefly about Westford House first.

11    A.    Yes.

12    Q.    What was Westford House?

13    A.    It was a nursing home for elderly.

14    Q.    And do you remember where it was located?

15    A.    In Westford.

16    Q.    What kind of work did you do at Westford House?

17    A.    I did patient care.  I, like, showering patients, feeding

18    those who cannot feed themselves, and socializing with those

19    patients who had dementia, trying to talk to them.

03:32 20    Q.    What kind of hours did you work at Westford House?

21    A.    I worked all kind of shift.  I worked 7:00 to 3:00,

22    sometimes 11:00 -- or 11:00 to 7:00.

23    Q.    So that was when you had your CNA as a certified nurse

24    assistant, right?

25    A.    Yes.

```
 1   Q.   Now, at some point after that, did you go back to school
 2   again?
 3   A.   Yes.
 4   Q.   Tell the jury about that.
 5   A.   I went back to school to do licensed practical nurse
 6   because I thought that way I will help more people, and I'll do
 7   more work for helping people.
 8   Q.   And that's -- you mentioned, Ms. Waruru, you mentioned you
 9   went back to become a licensed practical nurse?
10   A.   Yes.
11   Q.   Is that -- that's sometimes called an LPN?
12   A.   Yes.
13   Q.   And that's -- before you were a nurse assistant, this is
14   now you're an actual nurse, right?
15   A.   Yes.
16   Q.   What's the difference between an LPN and an RN, a
17   registered nurse?  Are those different things?
18   A.   They are different things.  Like, RN, the ones who do like
19   more paperwork.  And LPN, they do more of medication
20   administration.
21   Q.   So, and I'm sorry if you mentioned this before, but where
22   did you go to school to get the LPN?
23   A.   Harmony Health Care in New Hampshire.
24   Q.   Harmony Health Care?
25   A.   Yes.
```

1    Q.   And that was a program where you'd come out with the LPN?

2    A.   Yes.

3    Q.   How long was that program?

4    A.   Around 12 months.

5    Q.   And did you go to work -- did you get the LPN?

6    A.   Yes, I did.

7    Q.   And did you go to work as an LPN after that?

8    A.   Yes.

9    Q.   Where did you go to work as an LPN after that?

03:34 10   A.   I started with Willow Manor Nursing Home.

11   Q.   At Willow Manor Nursing Home?

12   A.   Yes.

13   Q.   And tell the jury what kind of work did you do at Willow

14   Manor.

15   A.   I did medication administration.  I did like wound care.

16   And I also do patient care.  When there is not enough aides to

17   help, I helped with that, too.

18   Q.   Okay.  How long did you work at Willow Manor for?

19   A.   Around two to three years.

03:35 20   Q.   Two to three years?

21   A.   Yes.

22   Q.   Ms. Waruru, how did you meet Faith Newton?

23   A.   I met Faith Newton at church.

24   Q.   At church?

25   A.   Yes.

```
 1   Q.   What's the name of the church -- of your church -- or --
 2   what was the name of the church where you met Faith Newton?
 3   A.   Ushindi Church.
 4   Q.   I'm going, for the benefit of the record, could you maybe
 5   spell that for the court reporter, please?
 6   A.   U-S-H-I-N-D-I.
 7   Q.   Thank you.  Did you get to know Ms. Newton through church?
 8   A.   Yes.
 9   Q.   Tell the jury about that.
10   A.   I met Faith Newton through church, and we made a group of
11   singers.  So we used to sing together in church or other places
12   we are called to sing.
13   Q.   Like a choir?
14   A.   Yes.
15   Q.   And fair to say, that you grew close to Faith Newton?
16   A.   Yes.
17   Q.   Now, Ms. Waruru, have you heard of a company called Arbor
18   Homecare?
19   A.   Yes.
20   Q.   How did you first hear about Arbor?
21   A.   Faith Newton told me about it.
22   Q.   And what did Faith Newton tell you about Arbor?
23   A.   She told me she opened a company, and she would like for
24   me to work for her, because the worker used to work before, I
25   worked with children, and I used to stay there like 8 hours or
```

1    sometimes 16 hours.  And she told me the home care job, it's

2    easy.  So I decided to work for her.

3    Q.    Okay.  So let's see if we can kind of fill in because I

4    think I maybe skipped a step.

5          After working in the nursing home, did you go to work for

6    a family as a nurse?

7    A.    Yes.

8    Q.    And what did you do for that family?

9    A.    They had children with respiratory issues.  One had trach

03:37 10   and the other one had oxygen, so I used to take care of them.

11   Q.    And, Ms. Waruru, that was your job when Ms. Newton raised

12   with you about coming to work at Arbor for her?

13   A.    Yes.

14   Q.    Okay.  What did Ms. Newton -- what, if anything, did

15   Ms. Newton say to you about the hours and how much you'd have

16   to work at Arbor?

17   A.    She told me it's an easy job.  I don't have to work like

18   the way I used to work, eight hours.  Home care is -- I

19   wouldn't work too many hours.

03:38 20   Q.    You wouldn't work too many hours compared to the hours you

21   were working before?

22   A.    Yes.

23   Q.    Okay.  Did Ms. Newton say anything to you about the pay at

24   Arbor?

25   A.    Yes.  She told me she pay good.  And the other job I was

1    getting $25, but she offered me $28.

2    Q.   So she offered you $28 an hour?

3    A.   Yes.

4    Q.   So that's $3 more an hour than you were making before?

5    A.   Yes.

6    Q.   Okay.  So did you decide to go to work at Arbor?

7    A.   Yes.

8    Q.   When did you decide to go to work at Arbor?

9    A.   2014.

03:39 10   Q.   What was Faith Newton's role at Arbor?

11   A.   She was in charge of Arbor.

12   Q.   She was in charge?

13   A.   Yes.

14   Q.   Why do you say that?

15   A.   Because everyone was going to her if they need something

16   or they need help with anything, including me.

17   Q.   Okay.  And when you went to work at Arbor, what was your

18   job there?  What was the position you took at Arbor?

19   A.   Medication administration.  I go to see the patient in

03:40 20   their house.

21   Q.   So as a nurse, as an LPN, you were one of the nurses at

22   Arbor who would go and visit the patients in their homes?

23   A.   Yes.

24   Q.   Okay.  Do you know who Ben Muiruri is?

25   A.   Yes.

```
 1   Q.    Who is Ben Muiruri?

 2   A.    Faith Newton's husband.

 3   Q.    How do you know Mr. Muiruri?

 4   A.    I know him through Faith.

 5   Q.    What was Mr. Muiruri's role at Arbor?

 6   A.    I wasn't sure because I never go to him for anything, but

 7   I could see him in the office sometimes, but I didn't know the

 8   specific role he had in Arbor.

 9   Q.    Now, Ms. Waruru, when you started at Arbor in 2014, was

10   Faith Newton still visiting, seeing patients in the field?

11   A.    Yes.

12   Q.    When I say "seeing patients in the field," what does that

13   mean for a home service company?

14   A.    It mean going to see patients in their house.

15   Q.    Okay.  Did Faith Newton say anything to you about that,

16   about working in the field when you started?

17   A.    Yeah.  When I started, she told me she don't work in the

18   field anymore because it's a lot of work in the office.  So she

19   told me she's going to hire me -- the patient that she was

20   seeing -- and by the time I will have more patients.  So she

21   handed over the patient that she was seeing, and I started

22   seeing them and she went back to the office.

23   Q.    Okay.  So Ms. Faith -- Faith Newton handed over a number

24   of patients she had been seeing to you?

25   A.    Yes.
```

1    Q.   And so she -- and then Faith Newton took a larger role in

2    the office?

3    A.   Yes.

4    Q.   Okay.  I want to ask you about -- I want to ask you about

5    training that you received when you started at Arbor, okay?

6    A.   Okay.

7    Q.   Did you receive training when you started there?

8    A.   Yes.

9    Q.   And tell the jury about how you were trained when you

03:42 10   started at Arbor.

11   A.   I was trained in the computer by Faith Newton, and I was

12   shown where to put like the vital signs, like the blood

13   pressure; and where to copy and paste the notes; and where to

14   put the narrative; and where to get the medication, when you

15   are going to see the patient; where you get the paperwork for

16   the medication.

17   Q.   And Faith Newton told you how to do that?

18   A.   Yes.

19   Q.   You mentioned, Ms. Waruru, you mentioned about doing this

03:43 20   in the computer?

21   A.   Yes.

22   Q.   Did you -- do you have a laptop from Arbor?

23   A.   Yes.  I was shown in the computer in the office, but

24   during the notes, I had to use my own computer.

25   Q.   Okay.  So you would put the information into a computer?

A.    Yes.

Q.    Okay.  And was there a computer program that Arbor used to keep track of those documents and those notes?

A.    Yes.

Q.    What was the name of that program?

A.    Axxess.

Q.    Axxess?

A.    Yes.

Q.    Okay.  What did Faith Newton say to you about doing nursing notes?

A.    She showed me how to do nursing notes.  And because she said you don't have to see the patient every day, so there is a space that she showed me where to copy and paste if you didn't get to see the patient.

Q.    So Faith Newton told you, you could do a note even if you didn't see a patient?

A.    Yes.

Q.    And then what, if anything, did she tell you about what to put in that, you know, put in notes, if that's what you did?

A.    If you don't see the patient, she showed me where to copy and paste the note and where to send it.  But she said, if they don't have issues, there are people in the office who will return the note to me and tell me where to change.

Q.    So Faith Newton told you, you had to copy and paste into nursing notes?

```
 1   A.   Yes.
 2   Q.   And I guess, let's start with the copying part.  Where
 3   were you copying from?
 4   A.   Sometimes from the previous note or the note before.
 5   Q.   Okay.  Did Faith Newton say anything to you about times
 6   when you wouldn't have to do a nursing note?
 7   A.   Sorry?
 8   Q.   Did Faith Newton say to you if there were times that you
 9   shouldn't do a nursing note, if there are any times you
10   shouldn't do a note?
11            MR. VIEN:  Objection, leading, Your Honor.
12            THE WITNESS:  Yes.
13            THE COURT:  Hold on a minute.
14            Overruled.
15   BY MR. BRADY:
16   Q.   Let me just follow up.  What did Faith Newton say to you
17   about when you didn't have to do a note?
18   A.   When the patient is in the hospital or when the patient is
19   dead.
20   Q.   So Faith Newton said if the patient is in the hospital or
21   dead?
22   A.   Yes.
23            MR. VIEN:  Objection to the leading now.
24            THE COURT:  That one's sustained.
25            MR. LOONEY:  Okay.
```

```
 1   BY MR. BRADY:
 2   Q.   Let me ask a different question.  Did you ask Faith Newton
 3   why you had to do that?
 4        MR. VIEN:  We are getting into a lot of leading, Your
 5   Honor.  Objection.
 6        THE COURT:  That's not leading.
 7        THE WITNESS:  Yes.
 8   BY MR. BRADY:
 9   Q.   Did you say "yes" to that?
10   A.   Yes.
11   Q.   And what did Faith Newton say in response to that?
12   A.   That's how the home care is done, as long as the patient
13   is safe.
14   Q.   And did you generally do your nursing notes the way Faith
15   Newton told you to do them?
16   A.   Yes.
17   Q.   Were there times that you didn't do your nursing notes
18   that way?
19        THE COURT:  Sustained.
20        MR. VIEN:  Thank you.
21        THE WITNESS:  Repeat the question, please.
22        MR. BRADY:  There's an objection.  I'll ask you a
23   different question.
24   BY MR. BRADY:
25   Q.   Were there times that you did nursing note -- well, start
```

1    over.

2        Were there times that you didn't do a nursing note for a

3    visit that you were scheduled to do?

4    A.    No.

5    Q.    You testified before that when you started, that you

6    started at Arbor, you got patients from Faith Newton?

7    A.    Yes.

8    Q.    Explain to the jury how that worked.

9    A.    When I started working with Arbor, Faith hired me.  The

03:48 10    five -- three patients she was taking care of them before.

11    Q.    And about how many patients were those that you started

12    with?

13    A.    I started with three.

14    Q.    Three.  Who were those three patients that you started

15    with?  What were their names?

16    A.    Larry Logan.

17    Q.    Larry Logan?

18    A.    Yes.

19    Q.    Please go on.

03:48 20    A.    Jane Flanagan.

21    Q.    Jane Flanagan?

22    A.    Yes.

23    Q.    And then who was the third?

24    A.    Amiss Git.

25    Q.    Ms. Waruru, you described -- you described how before you

1    got to Arbor, you worked at other health care companies?

2    A.    Yes.

3    Q.    Remind us what those companies were, the types of places?

4    A.    One was Willow Manor Nursing Home.  I worked with Family

5    Life.  That's all working with children.

6    Q.    And at those places, Ms. Waruru, did you receive training

7    about the rules or any rules on giving money or other things of

8    value to patients?

9    A.    Yes.

03:49 10    Q.    What did you learn from that training?

11    A.    You are not supposed to receive any gift or to give any

12    money to patients.

13    Q.    Now, did anyone at Arbor provide money to patients?

14    A.    Yes.

15    Q.    Who?

16    A.    I did.

17    Q.    Did somebody tell you to do that?

18    A.    Yes.

19    Q.    Who?

03:50 20    A.    Faith Newton.

21    Q.    Tell the jury what happened.

22    A.    When I got those first patients, Faith Newton told me they

23    helped her to open the agency, because the agency, before you

24    open it, you have to have patient for you to be able to be

25    approved.  So -- and she told me she was giving them something

1      for like a token.  Because in our culture, when somebody do

2      good to you, you do good to them.  So I thought it's the same,

3      but of course, she told me health home care is different.  So

4      she gave me the envelope to give to the patient because they

5      help her to open the agency.

6      Q.    Ms. Waruru, you mentioned -- you mentioned an envelope?

7      A.    Yes.

8      Q.    And who gave you that envelope?

9      A.    Faith Newton.

03:51 10   Q.    And I say "envelope," but it was more than one envelope?

11     A.    Yes.

12     Q.    And what was in the envelopes that Faith Newton gave to

13     you?

14     A.    Money.

15     Q.    And did you give those envelopes to other people?

16     A.    Yes.

17     Q.    Who did you give -- who do you remember giving those

18     envelopes to?

19     A.    Jane Flanagan and Larry Logan.

03:51 20   Q.    Jane Flanagan and Larry Logan?

21     A.    Yes.

22     Q.    And those were patients that used to be Ms. Newton's

23     patients, and then you started with them; is that right?

24     A.    Yes.

25     Q.    And how often did that happen, that you gave them

1  envelopes with money?

2  A.   Every month or sometimes two weeks.

3       MR. BRADY:  Can we, for just the witness, pull up

4  Exhibit 675, please.

5  BY MR. BRADY:

6  Q.   Ms. Waruru, can you see Exhibit 675 on the screen in front

7  of you?

8  A.   Yes.

9  Q.   Did you -- did you send and receive text messages with

03:53 10  Faith Newton?

11  A.   Yes.

12  Q.   Like, using your phone to her phone?

13  A.   Yes.

14  Q.   Okay.  What is Exhibit 675?

15  A.   It's text messages.

16  Q.   Between you and Faith Newton?

17  A.   Yes.

18       MR. BRADY:  Your Honor, I offer 675.

19       MR. VIEN:  No objection, Your Honor.

03:53 20       THE COURT:  It's admitted.

21       (Exhibit 675 admitted into evidence.)

22       MR. BRADY:  And Ms. Apfel, maybe if we could blow up

23  like the top half, so we can get the headers, too.  That's

24  great.  Thank you.  Okay.

25       THE WITNESS:  Can you give me one minute.  I seen --

```
        1   one second I calm down.  I'm sorry.  I had see a text from my
        2   mom, and she's not there anymore.
        3           MR. BRADY:  Maybe I can ask a question to try and
        4   clarify.
        5   BY MR. LOONEY:
        6   Q.   Ms. Waruru, do some of these messages here -- they're for
        7   your mother?
        8   A.   Yes.
        9   Q.   And does seeing that make you feel emotional?
03:54  10   A.   Yes.  I'm sorry.
       11   Q.   I do apologize.
       12           MR. BRADY:  Okay.  Let's -- we can back out of that.
       13   Can we go to page 17, please.
       14   BY MR. BRADY:
       15   Q.   Ms. Waruru, you see in these text messages that some are
       16   shaded green and some are shaded blue?
       17   A.   Yes.
       18   Q.   Okay.  And do I have it right, that the ones that are
       19   shaded green are ones -- messages that were sent from Faith
03:55  20   Newton to you?
       21   A.   Yes.
       22   Q.   And the messages that are shaded in blue, those are text
       23   messages from you to Faith Newton; is that right?
       24   A.   Yes.
       25   Q.   Okay.  I want to ask you about the message here.  On April
```

1    22nd, 2015, that was sent from Faith Newton to you; do you see

2    that?

3    A.    Yes.

4    Q.    What was in that message that she sent to you?  Can you

5    read that to us?

6    A.    Yes.  "From cc at mobile.com.  MSG 47.  Ken at Lowell

7    Community Health Center, 6719, RE.  Would like to give

8    information on Larry Logan."

9    Q.    Thank you.  And Larry Logan was one of the patients that

03:56 10    you got from Ms. Newton?

11    A.    Yes.

12    Q.    One of the patients who you gave the envelope of cash to,

13    right?

14    A.    Yes.

15    Q.    What did you write back in response to that to Ms. Newton?

16    A.    "Hope they did not find cocaine in his system.  Lol.  But

17    he is having surgery on Thursday."

18            MR. BRADY:  Now, could we go -- would we back out of

19    that, please.  And could we go to page 60 of this exhibit,

03:57 20    please.  And could we blow up the top couple of messages,

21    please.  Thank you, Ms. Apfel.

22    BY MR. BRADY:

23    Q.    Do you see these are messages from January 2016 between

24    you and Faith Newton?  Do you see that?

25    A.    Yes.

```
 1   Q.   And I want to ask you about the second message down here
 2   that's in green; do you see that?
 3   A.   Yes.
 4   Q.   And that one was from Faith Newton?
 5   A.   Yes.
 6   Q.   What did Faith Newton write to you?
 7   A.   "Please tell your patient not to come to the office
 8   looking for me."
 9   Q.   Okay.  And what did you write back to Ms. Newton?
10   A.   "Which one?"
11   Q.   And then what did she write to you?
12   A.   "Larry, Helen, and Jane."
13   Q.   Is that Larry Logan?
14   A.   Yes.
15   Q.   And is the Jane, Jane Flanagan?
16   A.   Yes.
17   Q.   And who's the Helen?
18   A.   Helen was girlfriend to Larry Logan.
19   Q.   Is it Helen Troy; was that her last name?
20   A.   Yes.
21   Q.   And what did you write after that?
22   A.   "Oh my."
23   Q.   And then after that?
24   A.   "What I offered, they refused."
25   Q.   Okay.  So explain to the jury what happened, what this was
```

1   about.

2   A.    Sometimes the patient, who go to the office, if Faith

3   Newton don't give me the envelope to give it to them.  So

4   sometimes she would tell me to give the money to them, and she

5   will refile it or she will come to give it to them.

6           THE COURT:  Good time to stop.  I see you looking at

7   your watch.

8           MR. BRADY:  I can keep going for another minute or

9   two.

03:59 10          THE COURT:  I would like to let them go, but I don't

11   want to interrupt your train of thought.

12           MR. BRADY:  This is a perfectly fine spot, Your Honor.

13           THE COURT:  We're done today.  See you back at 10:00

14   o'clock tomorrow.  The instructions I'm going to give you every

15   night:  Keep an open mind.  Don't talk to anybody about the

16   case, and no extracurricular research.  I call it the homework

17   rule.  No getting online to find out who someone is or where

18   they live, what the case is about, nothing.  All this

19   information you get from the case, you should get from the

04:00 20   courtroom.  No extracurricular research.  Keep an open mind.

21   I'll see you tomorrow morning at 10:00.

22           COURTROOM CLERK:  All rise for the jury.

23           (The jury is not present for the following.)

24           THE COURT:  You're excused for the day.

25           We have the Axxess issue.  I'll talk to you about the

1    authentication issue if you want, and we have the plea

2    agreement.  I don't know what they're redacting either.  So do

3    you want to pass those two up.

4            MR. BRADY:  Your Honor, maybe I can explain.

5            THE COURT:  Let me take a look at it.

6            MR. BRADY:  We redacted out the penalties -- oh,

7    sorry.

8            COURTROOM CLERK:  You can be seated, everyone.

9            THE COURT:  He's entitled to cross on the penalties.

04:01 10         MR. BRADY:  That's -- I don't have an -- well, yeah, I

11   don't have an objection to that.  I mean, I think -- my memory

12   is it's the max penalties for --

13           THE COURT:  You want to keep it out because they're

14   not supposed to consider the penalties, and the penalties for

15   her charges are the same as her charges, which I understand.

16   I'll give them an instruction on it.  But that shouldn't be

17   redacted out of the plea agreement unless he wants it redacted.

18           MR. VIEN:  I do not.

19           THE COURT:  I think that comes back in.

04:01 20         MR. BRADY:  No problem, Your Honor.  No issue with

21   that.

22           THE COURT:  So there's that.  So the authentication, I

23   mean, that -- that document -- those documents purport to be

24   something, and the point of authenticating is to show that it

25   is what it purports to be.  So for her to say that this is a

1    contract, and I know it is because I know what all our

2    contracts look like, that doesn't authenticate the document.

3         I don't know where you got them from, but then there

4    should be a certificate of authenticity or you have a custodian

5    of records or someone testifies to actually authenticate the

6    document.  The point of the rule is that just saying it looks

7    like it is this, is not sufficient.

8         MR. BRADY:  I understand that, Your Honor.  I thought

9    she was saying like it's not just -- it doesn't just look like

04:02 10    this, it is this.  It's what --

11         THE COURT:  She doesn't have any way of knowing that,

12    right?  I mean, the whole case is about doctored-up documents.

13    So it has a seal from her office or, you know, it's one of the

14    things that self-authenticates under the rule, then it comes

15    in.  If you want to make an argument about one of these things

16    self-authenticating, you can make it, but I didn't -- I looked

17    and I didn't see any that were applicable that were

18    self-authenticating, and they don't think that she -- I don't

19    think she's sufficiently authenticated them.  Like, she didn't

04:03 20    say this document came from my file cabinet.

21         MR. BRADY:  Your Honor, so I -- she didn't say that,

22    and it didn't -- it didn't come from her file cabinet.  I guess

23    I'm not sure -- and I know at sidebar Your Honor gave the

24    example, well, Mr. Brady, it could come from your desk.

25         And I guess, you know, if it were, you know, a true

```
 1   copy of the actual agreement between MassHealth and Arbor that,

 2   like, came from my desk, if she can identify it as such, then I

 3   think that clears the bar for authentication, right?

 4           THE COURT:  But she didn't.

 5           MR. BRADY:  Okay.

 6           THE COURT:  It look -- I mean, let me give you an

 7   example.  The whole case is about sort of doctored-up

 8   documents, right?  Like there's no way of knowing -- to know

 9   whether this is a real document, you have to know where it came

10   from.

11           MR. BRADY:  Right.  And I don't -- I don't think we

12   need to argue it.  I mean, I think probably for this one

13   there's a quick fix, which is we'll go back and see if we don't

14   have a certificate for it.  We can -- I mean, I'm sure it came

15   from CMS or MassHealth, and then we can fix it.

16           THE COURT:  Right.

17           MR. BRADY:  If that sounds right to Your Honor, I

18   don't want to screw it up.

19           THE COURT:  No.  I think that sounds right.

20           MR. BRADY:  Okay.  So that's what we'll do, and I

21   think, hopefully, that gets us around the authentication issue,

22   and then we can get that in.

23           MR. VIEN:  We'll see, Your Honor.  They offer.  I

24   object.  You make the decision.

25           THE COURT:  All right.  What about -- are we going to
```

1    do the Axxess thing today?

2        MR. BRADY:  I think so -- we have the witness, who is,

3    I'm told, in Boston and ready to go.  And we have more -- we've

4    done some homework on this, Your Honor, and so we can address,

5    and I think it does make sense to address it now.

6        THE COURT:  Okay.

7        MR. BRADY:  I think I'll throw Mr. Looney under the

8    bus, but he's closer to the facts on this, so I'll sit down.

9        MR. LOONEY:  I am trying to think of exactly how to

04:05 10   start to address this issue.  I'll start with what Axxess is

11   and how we got it in the U.S. Attorney's Office.  Axxess is an

12   electronic records management program.  So it keeps the records

13   as not -- these plans of care don't exist as a document within

14   the system.  It's data within the system.  And you query that

15   in different ways, and it exports data from there.  So

16   depending on how you query and export things, you can get

17   different results.

18        That page of one versus page one of three issue, my

19   understanding is, it doesn't exist as a page one of one or page

04:05 20   one of three in the system.  That's what happens when it is

21   printed.  And it prints in different formats.  So what our

22   office did, and how the document with the one-page version that

23   we have presented and put on the exhibit list came out, is we

24   used a bulk download feature that exists within Axxess.  And

25   you can download 60 days at a time worth of reports for a

1    patient.  And that's what we did.  And we pulled out 60 days

2    worth of all the reports.

3            We understand from the Axxess representative, who will

4    be here tomorrow, that when you do that, it grabs almost all of

5    the files that exist for that patient.  For some reason, that

6    print function does not export the addendum to the plans of

7    care.  And the one other document that I'm aware, that typed

8    document category that has a similar thing, they do not export

9    image files.

04:06 10         So if something is -- rather than being typed in as a

11   record, a photograph is uploaded, like an x-ray or something,

12   that doesn't come with the patient file when it's bulk

13   exported.  So what we did is we bulk exported it 60 days at a

14   time for each patient to get the full patient file, which we

15   understood and believed was the full patient file.

16           We have learned that, you know, these addendums don't

17   come with the plans of care.  If you go into the system and

18   access the records individually and go and search for the plans

19   of care and click on each plan of care, it does come out in the

04:07 20  format that they have presented documents and obtained them.

21           The contents of the first page are identical.  They

22   are, you know, they are both a -- it's a form 485.  It's that

23   form.  Ours don't include the addendum because of the -- it is

24   the computer function.  It's not a manipulation from our

25   office.  I just want to be very clear about that.  That's one

1    thing I want to be clear of.  We did not manipulate anything,

2    certainly not intentionally.  I don't think we did at all.  We

3    bulk exported them using the software that existed.

4         THE COURT:  I'm not suggesting there was any

5    misconduct on the part of the government.  It's not what I am

6    suggesting.  What I want to make sure is that they are not --

7    that they have an accurate picture of what exists out there in

8    some way or another.

9         MR. LOONEY:  So, you know, I don't want to ignore you

04:08 10    with this answer.  They have the Axxess database.

11        THE COURT:  That's not -- that's not going to cut it.

12        When you sent to them a patient file, you told me

13   yesterday that you gave them, a Bates range or whatever you

14   gave them to identify the whole file, and you said that

15   those --

16        MR. LOONEY:  I was incorrect when I said that.  I said

17   that -- I believed at the time I thought it was complete.

18   Because I thought that method generated the complete file.  I

19   was incorrect, absolutely, on that account.

04:09 20        My understanding, and this has been relayed to me from

21   the Axxess witness, is that it affects just these addendums to

22   plans of care, and then image -- picture files are the two

23   categories of documents that have --

24        THE COURT:  Have you gone back now through all the

25   documents on your exhibit list and make sure that he is very

1    clear how many pages there are of each?

2            MR. LOONEY:  The Axxess or --

3            THE COURT:  Where it said page one of one, and it's

4    actually page one of three, have you given him the additional

5    pages or let him know which documents there are that were

6    misleading in that way; although, not intentionally so.

7            MR. LOONEY:  I believe that the universe of those

8    documents is captured in the exhibits to the motion.  I don't

9    believe that there are any other exhibits --

04:09 10           THE COURT:  His motion?

11           MR. LOONEY:  Yes.

12           THE COURT:  You think he found all of them?

13           MR. LOONEY:  I want to verify this, but I have not had

14    a chance to go through all the plans of care, but I believe --

15    what I understand is it only affects the plan of care

16    documents.  And the Axxess custodian will be there.

17           THE COURT:  Which are, of course, critical to your

18    case and their defense.

19           MR. LOONEY:  Absolutely.

04:10 20           THE COURT:  Okay.  So you're going to make sure that

21    all documents that have been produced in the format, I'm going

22    to call it misleading for lack of a better word, have been

23    corrected.

24           Now, how -- how does this affect your case?  Because

25    you're -- you've based your case on the fact that it looks like

1    care was not medically necessary.  And now they're saying when

2    you see all this additional information, it was medically

3    necessary, right?  Do I have the gist of that correct?  All

4    right.  So how does this affect your case?

5              MR. LOONEY:  I do not think it does because the

6    plans -- the relevance there is what the doctors, who evaluated

7    them, did.  And that -- the plans of care -- the treatment to

8    be provided, the number of nursing visits, the number of home

9    health aide visits are on that front page.  The doctors, who

04:11 10    saw these -- doctors who I bring in will tell -- I believe will

11    tell the Court and tell the jury that that was unnecessary

12    care, based on what they saw in the -- of the patients.  So

13    what Arbor was asking for and in someplace what is Arbor billed

14    for did not match what the doctors believed was appropriate.

15              MR. VIEN:  Isn't that expert testimony, Your Honor?

16              MR. LOONEY:  No.  It's a percipient witness.

17              THE COURT:  The doctor is on the file.  It's not

18    expert testimony.  One doctor can't testify about every other

19    doctor's files.

04:11 20              MR. VIEN:  Okay.  I understand.

21              THE COURT:  I'm not going to exclude the documents

22    wholesale, but what else do you need to -- do you have what you

23    need to mount the defense you've contemplated?

24              MR. VIEN:  No, I don't.  We still haven't gotten to

25    the authenticity question and what's in Axxess.  We've been --

1    I'm not -- these guys didn't do anything wrong.  I agree.  We

2    all agree.  Everyone loves each other.  We are not accusing

3    everyone.  I know they are very sensitive, and they have

4    weaknesses.  And I don't want to trigger anyone, because I know

5    they are easily triggered.

6          No, but I still don't understand what the exhibits

7    are.  And unless the Axxess guy goes through every exhibit and

8    says I looked at this exhibit and I checked it against Axxess

9    and this is the entire document, how are they possibly -- how

04:12 10   do we possibly accept them as the documents that were uploaded

11   into Axxess?  I don't think we can do that.  Right?

12         THE COURT:  I don't know.  I'm not sure or not.

13         MR. VIEN:  Well, someone has to get on the stand and

14   say I went into Axxess.  I downloaded this guy's file.  And I

15   did it in a manner, so I got the complete file with the

16   addendums.  And I didn't do it in a manner where I only got one

17   of one instead of one of three.  And these documents that are

18   with me right now are the ones that I downloaded after I

19   checked so carefully.  If they can't do that, then there's no

04:13 20   foundation.  There's no authenticity, and it shouldn't be

21   admitted.

22         THE COURT:  I think you take the argument a little

23   far, but how are you going to present those documents?  Who's

24   going to get on the stand and say this is the file for patient

25   X, it's the whole file, I reviewed it, I printed it off Axxess?

```
 1              MR. LOONEY:  I'm going to let Mr. Brady -- Mr. Brady
 2     is going to present the witness.
 3              THE COURT:  He's the authentication expert today?
 4              MR. BRADY:  I think we're in trouble if that's the
 5     case, Your Honor.
 6              So I'm going to put on the Axxess witness.  His name
 7     is Andrew Olowu.  He's the chief technology officer for Axxess.
 8     And we are not going to offer, Your Honor, or purport to offer
 9     the entire patient file for any of these patients, right?
04:14 10         What we've done is we have identified the exhibits
11     from Axxess that we plan to use.  In fact, we've identified the
12     exhibits from Axxess that we plan to introduce through this
13     witness, and we sent that over actually to the defense Monday.
14     I think with -- kind of with the notice.  So, like, we've
15     identified the universe of exhibits we plan to use.
16              Through Mr. Olowu from Axxess, will be able to testify
17     that they got a search warrant from the government.  In
18     response to that, they provided to the government a replicated
19     database.  So basically it took Arbor's database, what it
04:15 20    looked like at the time, they made a copy of that and they
21     provided it to the government.  And they provided it to the
22     government as read-only data.  So we can't change it or alter
23     it, and we haven't.  What we can do is just pull things out of
24     it.
25              And then what we're going to do is we've identified
```

1    this, I think relatively finite universe of records from

2    Axxess, which the defense has had for a couple of days, and

3    we've put them in a binder.  We've sent -- we've already sent

4    it.  The witness has reviewed it.  And we are going to ask him,

5    are these records that come out of the Axxess database, how do

6    they maintain them, are they maintained in the ordinary course,

7    and he's going to be able to authenticate them and lay the

8    foundation for exactly what these records are.

9            But I just want to be clear, I mean, we're not

04:15 10    purporting to put in the entire patient file for anybody.

11    That's not the plan.

12            THE COURT:  Okay.  All right.  What -- if he says to a

13    witness, is this -- this document in front of you, is this the

14    complete plan of care, is there anything else in the database

15    concerning this patient's -- we have got this document.  It was

16    one of three, and now it's three of three, do I have all of it.

17            MR. BRADY:  I mean, is this witness going to say do I

18    have all of it?  Yeah.  You have the plan of care.  You have

19    the addendum.  Then yeah, that's the -- that's the document

04:16 20    from the database.  I think he would say that.

21            THE COURT:  So he's going to be able to say that?

22            MR. BRADY:  I don't think -- he's not going to be able

23    to say, you know, at the level of each specific -- but he's

24    going to say it came out of the database, and that's the way we

25    maintain it.

1        MR. VIEN:  If the guy can say it, and the documents

2   come in.  And if he can't lay a foundation, then they don't.  I

3   don't want to belabor it.  And I don't think we can decide it

4   until the witness gets up there and starts talking about

5   specifics.

6        THE COURT:  They can authenticate the database, right?

7   If he says we sent it over.  It was complete.  It's read only,

8   right?  But you've put yourself in this position by turning

9   over things that look like they were complete that aren't.

04:17 10       So how do they get to verify through a witness that

11   they have what they're supposed to have at this point?  Like,

12   how do we know it's not -- now it's one of three, how do we

13   know it's not one of five?  Who's checking for that?

14        MR. BRADY:  I think the reason why we know that is

15   because we spent today -- while we were in court, colleagues,

16   people were talking with Axxess to get to the bottom of this.

17   And what they figured out is this one of one, one of three

18   issue happened because, as Mr. Looney described, when you do

19   that bulk pull, that bulk print, which is what we did to try

04:18 20   and, you know -- we -- what my colleagues did to try and get

21   what they thought was the whole thing, when you do that, the

22   software, it pulls just that one page.  It's just a feature of

23   how you pull that one thing.

24        THE COURT:  I understand.  But now, so is there going

25   to be somebody that says we did this bulk pull.  It was not the

1    right way to do it.  We've now done it the right way, and they

2    have complete copies of these care plans?  How did that happen?

3            MR. BRADY:  We have done the bulk pull the right way.

4            THE COURT:  No.  We did a bulk pull.  It wasn't

5    complete because of this, you know, whatever you want to call

6    it, a glitch or characteristic of the system.

7            MR. BRADY:  Sure.

8            THE COURT:  And they -- you know, it looked like it

9    was one of one, it turns out it was one of three.  We have

04:18 10  now -- somebody has now gone and done -- normally, I would

11   expect it to be the case agent, right?  We did a bulk pull.  It

12   turned out to be incomplete.  We have now searched it in this

13   way, and I can represent that this is everything that came out

14   of the system.  And somebody else, the Axxess guy, will

15   authenticate the system.  But who's going to say how we got the

16   documents out of the system so that the jury and the defense

17   can all be comfortable that it was done with some integrity?

18           MR. BRADY:  Well, I'll say, Your Honor, I mean, we

19   hadn't contemplated having an agent or a paralegal, you know,

04:19 20  who pulled these out, testify to that.  So I don't have an

21   answer on this spot right here.  But...

22           THE COURT:  I mean, you don't necessarily have to do

23   it, but if they're going to press the point, you do.

24           MR. BRADY:  Your Honor, I can understand why -- I can

25   understand why we're having this discussion and why, you

1    know -- I can understand why we are talking about it here in

2    this context.  But if we have a witness from Axxess who can --

3    he will authenticate the database and all the data in there,

4    you know, as records of Axxess and records that, you know,

5    records that Axxess maintains from and on behalf of Arbor.

6          You know, I think -- you know, I think from the Axxess

7    witness, Your Honor, just to be able to authenticate, you know,

8    that the document, you know, each of the finite examples of the

9    documents that we're going to use, just to authenticate that as

04:20 10   it is the thing it purports to be, which is a document out of

11   Axxess from Arbor, I don't see why the witness can't

12   authenticate that, and then also lay the foundation necessary

13   for it to come in either as a business record, and then we'd

14   also argue --

15         THE COURT:  He can.  He can do all of that.  But then

16   they have the next step.  You produced this thing.  If he wants

17   to, he should be able to say, you thought this document was

18   just this one page, and it turns out to be this three pager,

19   and how did you figure it out and how did you get the three

04:21 20   pages.

21         MR. BRADY:  So, Your Honor, I think the Axxess witness

22   and -- may I just have a moment, just to confer with my

23   colleagues, who have been -- while we've been in court -- I

24   just want to make sure I have got my facts straight.

25         THE COURT:  That's fine.  Go ahead.  My husband and

1    both my kids are sick.  I'm happy to stay here till midnight.

2              (Pause.)

3              MR. BRADY:  I appreciate the Court's patience, Your

4    Honor.  So I wanted to -- one of the things I want to confirm

5    is that just our Axxess witness is going to be able to speak to

6    this, to speak to the issue -- the issue, glitch, whatever you

7    want to call it.  Why these things printed out the way they

8    printed out, one of one -- I think he can, and I think he can

9    be cross-examined by the defense about that.  And, in fact, if

04:24 10    this is -- if the Court is accepting that this is something

11    relevant that the jury needs to hear, I'll probably elicit it

12    on direct and sort of walk him through it.  Look, when you

13    print these out, can it happen this way, why does that happen,

14    what documents does it affect, and he would say it's these

15    plans of care, they come one page, you don't get the addenda,

16    also the image files that got loaded in, that's what happens,

17    it's something that happens.  And, you know, so the person from

18    Axxess can kind of lay that out there, and the defense can have

19    at it.

04:24 20              I think, Your Honor, given that we're dealing with a

21    database, which has been certified by Axxess as, you know, kind

22    of a self- -- you know, it's a self-authenticating database.

23              THE COURT:  I'm not arguing about the authenticity of

24    the database.

25              MR. BRADY:  We will have a witness from Axxess here.

1      I'm hopeful, Your Honor, that sort of gets us through this

2      issue.

3              THE COURT:  I mean, my point is, I don't know what

4      he's going to do.  I don't know how he's going to defend this

5      aspect of the case, but it seems to me, that he might be

6      entitled to do a cross-examination to the effect of, you built

7      your case around the idea that this was a one pager, and it's a

8      three pager, and he didn't have any of this information.

9              MR. BRADY:  Your Honor, I understand the defense

04:25 10   argument here, which -- and I'm sure Mr. Vien will correct me

11     when I mischaracterize it, but it's that, well, government, you

12     guys say this care wasn't needed, wasn't necessary, but look,

13     there's all this additional information about medications,

14     other information that's in the other pages here, that might

15     justify care for this individual, right?  And I get it.  That's

16     an argument.  They can make that argument.

17             But that's, Your Honor, I don't -- that's not like the

18     whole case, and that's not the whole argument for us, right?  I

19     mean, after one day of testimony, I think that's just kind of

04:26 20   one aspect of the issues of Arbor here.  So I understand why

21     the defense is interested in this.  I think I understand what

22     they plan to do with it.  But I would kind of caution against,

23     you know, saying that this is like the whole case for the

24     government here.

25             THE COURT:  I get it.  I'm just -- it's not that

1    authenticity of the data.  It's that he's -- he's entitled, I

2    think, I'm not going to totally prejudge it, but I think that

3    he may well be entitled to cross-examine somebody on, not the

4    authenticity of the documents but how those documents were

5    pulled, and why the documents everybody was looking at were

6    incomplete, and were prosecutorial decisions made based on

7    incomplete documents.

8          MR. BRADY:  Your Honor, I guess, on that, I want to --

9    I want to think -- try to think through the relevance of that,

04:27 10   right?  I mean, right, these -- so we're talking about

11   documents that were pulled, I think, kind of this calendar

12   year, right, in connection with preparing for trial, right?

13   And I think -- we certainly wish that, you know, they were

14   pulled a different way, where we didn't have this issue.  And I

15   appreciate the Court has noted that there's no indication of

16   any intentional misconduct or wrongdoing here, by the

17   government.  And so --

18         THE COURT:  I know your office is very sensitive to

19   this.  So I will just put on the record that Mr. Vien has made

04:27 20   no such allegations either.

21         No one has made any suggestion that there's been

22   misconduct.  It's one of those things that happens in a big

23   document case.

24         MR. BRADY:  You know, and I was about to say I

25   appreciate that.  But I'm not supposed to say that.  But with

1    that being the case, Your Honor, that, you know, this isn't --

2    this isn't a story of prosecutorial misconduct in how these

3    documents were presented to the defense.  Then, like, what's --

4    like what -- for what the jury has to decide here, what's the

5    relevance of dragging this in front of them?

6    THE COURT:  I don't know.  There may not be any, but

7    I'm just -- you get the documents in the form that you want to

8    get them in, right?  You want to put in a plan of care.  And

9    maybe you want to just put in the first page, right?  And then

04:28 10   maybe he wants to move in pages two and three.  But there needs

11   to be some way for us all to assure ourselves that he has the

12   pages two and three on all of these things, and that there are

13   only pages two and three, right?

14   Now, if he wants to cross-examine a witness on that, I

15   think he's entitled to do it.  Maybe it turns out not to be

16   relevant, like maybe that's true.  But when you're

17   establishing, not the authenticity of the database, but the

18   reliability of the actual documents we're showing, they have to

19   be complete.  Like, that's the rule of completeness.  So he's

04:29 20   entitled to figure out if what he has is the complete thing.

21   And if he wants to do it -- look, he may try do it on

22   cross-examination, and it might bite him in the butt.  Because

23   it's maybe a slam dunk thing and you have everything and you

24   have the database and you searched it yourself last night, so

25   you know you have it all, but if he wants -- I just want to

221

1    make sure that given the way it's played out, I don't want to

2    exclude the documents, right, I don't want to characterize the

3    Arbor documents as unreliable, but he is entitled to probe

4    whether they are unreliable and how we know that they're not, I

5    think.

6            MR. BRADY:  And, Your Honor, I guess -- I think the

7    defense can probe that, right?  I guess, it comes down -- and I

8    think Mr. Vien will have a full opportunity to do that with the

9    Axxess witness, who we're going to bring -- and to the extent

04:30 10   that we have other witnesses who are going to be talking about

11   any of these documents, cross-examine them, too, right?  And as

12   far as putting in parts of the documents -- I mean, we've

13   already agreed that, you know, three is better than one, right?

14   So we've agreed we're going to do the three -- you know, the

15   three page -- that's what we're going to offer.  So, you know,

16   if there is still an issue relating to any of these documents

17   and their completeness -- and, you know, we've spent enough

18   time with these documents.  I don't think there is.  And I also

19   am confident that the defense, you know -- you know, they've

04:30 20   clearly been through these.  If there were an issue, they would

21   have raised it.

22           THE COURT:  They have raised it.

23           MR. BRADY:  What's that?

24           THE COURT:  They have raised it.  Let me ask you a

25   question.  So he points out to you that there's a problem with

           1   these documents.  You go back to try and figure it out, right?
           2   At some point, somebody reprints or repulls the documents in a
           3   more complete form.  I know the Axxess guy explained to you
           4   what the problem was, but who actually pulled the documents?
           5          MR. BRADY:  Like, when you say repull the documents?
           6   I think it's a paralegal, right?
           7          MR. LOONEY:  Yeah, a paralegal has access to the
           8   online database that they printed to us.
           9          MR. BRADY:  Your Honor, it's a case agent or a
04:31     10   paralegal.  Those are kind of --
          11          THE COURT:  So that person may need to testify.
          12          MR. BRADY:  Your Honor, again, like to testify that
          13   they pulled documents, and when they pulled them, they did a --
          14   they basically say what the Axxess witness is going to say,
          15   right, like they pulled documents, they did it at a bulk --
          16   they did like the bulk print.
          17          THE COURT:  No, no, not the bulk print.  The new ones.
          18          MR. BRADY:  The new ones that the defense has
          19   identified, and we've agreed to put --
04:31     20          THE COURT:  The defense identifies to you that there's
          21   a problem with the exhibits, right?  You do two things.  You
          22   talk to the Axxess guy to figure out how this all happened,
          23   right?  You may not have done it in this order, but at some
          24   point you talk to the Axxess guy.  And at some point, you go
          25   back and look at the exhibits that they I've identified as

```
 1    incomplete.  You see for yourself, you check whether they're
 2    complete or incomplete.  And then you redump for yourself,
 3    complete ones.  Who does that?
 4         MR. BRADY:  Who does -- a paralegal or an agent does
 5    that for us.
 6         THE COURT:  So no one has to talk about how there was
 7    a mistake made necessarily, but he is entitled to have somebody
 8    up there to say this was a three-page document.  This is how I
 9    know this, this is how I searched it, this is how I pulled it.
10    This is how I know that document is complete.  The integrity,
11    not of the database, but of the document that you are showing
12    to the witness.
13         MR. BRADY:  Okay.  Your Honor, we're going to have an
14    Axxess witness who can speak to the -- who can speak to the
15    integrity of that Axxess -- it's an Axxess document, and this
16    witness can say that's from Axxess --
17         THE COURT:  I'm not talking about the Axxess document.
18    I'm talking about how it was pulled off the database.  How do
19    we know that that -- what was the criteria used to pull these
20    documents to make sure that they were complete?  You don't
21    even -- as far as I'm concerned, if he wants to get into the
22    original mistake that was made, I mean, maybe yes, maybe no,
23    but to get -- if you want to admit this document, like a care
24    plan, right, it's not that it's not -- I'm not sure why I am
25    having trouble conveying this.  Either my choice of words is
```

1    bad or -- but that whatever comes off the database has been

2    authenticated, but how do we know that what's coming off the

3    database is complete, not that it's not accurate?  The database

4    is fine.  I don't even think he's contesting the database.

5         What we're talking about is when you pull this thing

6    out of the -- this is all of -- I checked this patient, I

7    checked this patient's care plans, this is what's there for

8    that patient, and this is all that's in the file, and I know

9    because I pulled it this way.

04:34 10        MR. BRADY:  Your Honor, again, we're not putting in

11    every plan of care.  We're not putting in every document.

12        THE COURT:  Oh, my gosh.  I'm hoping that somebody

13    back there, Patrick or Kelly, is understanding me better, and

14    that you guys can figure out a way to do this tomorrow.  But

15    I'm just telling you, it's not the database.  Okay.

16        The database is going to be authenticated by the

17    Axxess guy.  The database is reliable.  I'm not contesting the

18    reliability of the database, but he is entitled to understand

19    how these things were pulled off the database, like what was

04:34 20    not pulled off the database.

21        So you, I think you're going to need to have a

22    witness, a paralegal or a case agent, that can testify that we

23    did this search and this is -- there's billions of pages on

24    this database, and this is how we got this document.

25        Does that cover what you are looking for, Mr. Vien?

1              MR. VIEN:  I think it would, Your Honor.

2              THE COURT:  Are he and I just too close to this.  Am I

3    making sense to anybody that's not so close to it?  Or just no.

4    Tell me.  If I'm not, you can tell me, Kelly.

5              MS. LAWRENCE:  No, Your Honor.  I think we understand

6    what the issue is.  I think we disagree that it should be an

7    issue, but I think we understand the difference.  I would say

8    that we had a conversation with the Axxess witness during the

9    trial session this afternoon, and he can talk about all of the

04:35 10   issues with the one and three pages.

11             But what I think we don't understand is why our U.S.

12   Attorney's Office actions in preparing the exhibits are

13   relevant to what's presented to each witness.

14             THE COURT:  Well, somebody has to deal -- I mean, what

15   he got was incomplete.  It was represented as being complete.

16   Page one of one.  Okay.  Now you're saying to him, oh, no,

17   you're right.  It's three pages, right?  And that's it.

18             MS. LAWRENCE:  And the Axxess witness will explain why

19   that happened.

04:36 20          THE COURT:  But someone should explain, so we did a

21   bulk data dump.  We didn't get everything.  So instead what we

22   did is we went back and we did this, and now we have everything

23   and here it is.

24             MS. LAWRENCE:  Which is what we explained here.  I

25   guess -- I don't want to speak over Mr. Brady and Mr. Looney,

but that doesn't seem to be an issue for the jury as much as an issue for this group here, which we have explained.  So the jury doesn't know about this yet, but the integrity of the data extraction can be tested through the Axxess witness as well.

THE COURT:  Right.  And that may not be enough.  I'm not sure that it is, though.

MS. LAWRENCE:  Okay.

THE COURT:  We won't know until tomorrow.

MR. VIEN:  If it is, the documents come in.  And if it isn't, they don't come in.

THE COURT:  I mean, or they'll call another witness and supplement what the Axxess guy is saying.

MR. VIEN:  Maybe they will, maybe they won't.  I don't know what they are going to do.  I just, you know, catch the pitch that's pitched or deal with the situation as it comes.  I'm trying to look for some analogy that I can't really find one.  But look, they put on the witness.  We ask questions.  We object.  You decide.  And whatever happen, happens.

THE COURT:  Okay.  We'll leave it at that.  The problem, the issue of the one of one does not need to be fronted to the jury.  What he is entitled to cross-examine on is -- is there anything else that's relevant to this patient that should be here, right?  I don't know how to explain it any better.  Maybe I'm wrong, but I don't think so.  Plenty of decisions that I question every night all night.  This is not

 1    going to be one of them, I don't think.  I'll let you know in

 2    the morning.

 3              Anything else for today?

 4              MR. VIEN:  No, definitely not.

 5              THE COURT:  I have a status at 9:15.  I'll be on the

 6    bench at 9:30.  We can revisit this if need be.

 7              MR. VIEN:  Thank you, Your Honor.

 8              THE COURT:  Don't come at 9:30 unless you feel like,

 9    but if you feel like it, I'll be here.

04:38 10              MR. VIEN:  Thank you, Your Honor.

11                 (Adjourned at 4:38 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            CERTIFICATE OF OFFICIAL REPORTERS

2

3            Kelly Mortellite, RPR, RMR, CRR, Linda Walsh,

4    RPR, CRR, and Jessica Leonard, RPR, in and for the United

5    States District Court for the District of Massachusetts, do

6    hereby certify that the foregoing transcript is a true and

7    correct transcript of the stenographically reported proceedings

8    held in the above-entitled matter to the best of our skill and

9    ability.

10                    Dated this  28th day of June, 2023.

11

12                /s/ Kelly Mortellite

13            _____

14

15                /s/ Linda Walsh

16            _____

17

18                /s/ Jessica Leonard

19            _____

10:33 20

21

22

23

24

25