UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                            )
UNITED STATES OF AMERICA,    )
                            )          Criminal Action
         Plaintiff,          )          No. 21-10035-ADB
                            )
v.                          )
                            )
FAITH NEWTON,                )
                            )
         Defendant.          )
                            )
```


JURY TRIAL DAY THREE

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

June 29, 2023


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     On Behalf of the Defendant:
8    George W. Vien
     Michelle R. Pascucci
9    Nathaniel R. B. Koslof
     Donnelly, Conroy & Gelhaar, LLP
10   260 Franklin Street
     Boston, MA 02110
11   617-720-2880
     Fax: 617-720-3554
12   gwv@dcglaw.com
     mrp@dcglaw.com
13   nrbk@dcglaw.com

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          <u>CONTENTS</u>

3

  <u>WITNESS</u>                                          <u>PAGE</u>

4

5    WINNIE WARURU, Resumed

6       Cont. Direct Examination By Mr. Brady              6
        Cross-Examination By Mr. Vien                     57
7       Redirect Examination By Mr. Brady                 95

8    ANDREW OLOWU

9       Direct Examination By Mr. Brady                   99
        Cross-Examination By Mr. Vien                    115
10

11   ADRIANA O'DONOGHUE

12      Direct Examination By Mr. Looney                 120
        Cross-Examination By Ms. Pascucci                151
13      Redirect Examination By Mr. Looney               175

14   AIRANISSE QUINTANA

15      Direct Examination By Mr. Brady                  176

16
                        E X H I B I T S
17
     <u>Exhibit No</u>.                      <u>Received</u>
18
        542                                 37
19      543                                 38
        444-461                             42
20      701                                 53
        410 to 429                         113
21      431 to 461
        463 to 485
22      489 to 497
        499 to 515
23      517 to 532
        537, 539 to 548
24      706 to 710

25      (CONT.)

1    Exhibit No.                                    Page

2    536                                            128
     654                                            130
3    901                                            154
     902                                            169
4    903                                            171
     50.2                                           201
5    50.3                                           203
                        *   *   *   *   *
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                      P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3      before the Honorable Allison D. Burroughs, United States
 4      District Judge, United States District Court, District of
 5      Massachusetts, at the John J. Moakley United States Courthouse,
 6      One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7      June 29, 2023.)
 8              THE COURT:  I know you're not going to raise anything.
 9              MR. BRADY:  It's like a ten-second housekeeping thing
10      that I just wanted to mention if we're on the record.
11              So, Your Honor, just very briefly, we learned last
12      night that one of our witnesses, our IRS summary witness, has
13      had a serious medical emergency and she's not going to be
14      available to testify.  We shared that with the defense.  So
15      we're going to have somebody come in and, you know, be that
16      summary witness instead.  There are summary charts that go
17      along that have been disclosed in draft form to the defense.  I
18      just wanted to advise the Court of that.  That's it.
19              THE COURT:  Okay.
20              Do you want to see if they're here, Karen?
21              COURTROOM CLERK:  Yeah.
22              All rise for the jury.
23              (Jury enters the courtroom.)
24              COURTROOM CLERK:  You can be seated.
25              THE COURT:  Thanks everybody for being right on time.
```

```
 1    I really appreciate it.  We're going to get started.  The
 2    government can put their witness back on the stand.
 3          While they're moving her up there I'm going to say,
 4    we've turned this little clock around today.  So I don't know
 5    who's been noticing it, but it's 15 minutes off.  And someone
 6    pointed it out to me yesterday.  And it's been that way for a
 7    number of trials and every jury has mentioned it to me.  And
 8    it's not that we don't know about it.  We just can't seem to
 9    fix it.  So rather than mislead, I've turned it around.
10    10          But that clock on the wall is accurate.  So don't look
11    at this one.  Look at that one.  I don't know why we can't fix
12    it.  It seems like we should be able to, but it's . . .
13          Is someone getting the witness?
14          MR. BRADY:  Yes, Your Honor.  I think she's right
15    outside.
16          THE COURT:  Come on back up.
17          While you're getting settled, I'm just going to remind
18    you that you're still under oath.  And you see the microphone
19    has been moved, but you can pull it right back so it's in front
20    of you.  I believe that was the cleaning folks last night.
21          When you're ready.
22          MR. BRADY:  Thank you, Your Honor.
23                    WINNIE WARURU, Resumed
24    CONT. DIRECT EXAMINATION BY MR. BRADY:
25    Q.   Good morning, Ms. Waruru.
```

1    A.    Good morning.

2    Q.    Be sure to speak right into that microphone, please.

3    Okay.

4         When we broke for the day yesterday, Ms. Waruru, you were

5    testifying about Larry Logan.

6         Do you recall that?

7    A.    Yes.

8    Q.    Could you please remind us who Larry Logan was?

9    A.    Larry Logan was one of my patients.

10:05 10    Q.    Okay.  And remind us again what Faith Newton asked you to

11    give to Larry Logan.

12    A.    An envelope.

13    Q.    And what was in the envelope?

14    A.    Money.

15    Q.    Okay.

16         MR. BRADY:  Could we please pull up Exhibit 675, which

17    I believe is in evidence.  And go to page 61, please.

18         And the Bates number on -- the Bates number on that

19    page ends in 5121.

10:05 20    Q.    And, Ms. Waruru, these were more text messages between you

21    and Faith Newton; is that right?

22    A.    Yes.

23    Q.    And do you see there's a message that she sent -- sent

24    here to Ms. Newton February 16, 2016, at 1717.

25         MR. BRADY:  If we can highlight that.

```
 1    Q.   What did you write to Ms. Newton, then?

 2    A.   "I have begged with $100 each."

 3    Q.   Can you please explain to the jury what that was about?

 4    A.   Because sometimes they -- the patient will want the money,

 5    and Faith Newton didn't want them to go to the office, so

 6    sometimes Faith Newton would tell me to give them the money and

 7    then she will refund it to me.

 8    Q.   So she's saying, give the money to the patients and I'll

 9    pay you back?

10    A.   Yes.

11    Q.   Were you always paid back?

12    A.   Sometimes.

13              MR. BRADY:  We can take that down.  Thank you.

14    Q.   Now, Ms. Waruru, I want to shift and talk a bit about

15    patient visits and nursing visits, okay?

16    A.   Yes.

17    Q.   Okay.  Now, before home care can start for a patient, am I

18    right that there has to be an assessment done?

19    A.   Yes.

20    Q.   And who does that assessment, that initial assessment of

21    the patient?

22    A.   The registered nurse.

23    Q.   It's the registered nurse?

24    A.   Yes.

25    Q.   Okay.  And is that assessment, is that referred to as an
```

1    Oasis assessment?

2    A.    Yes.

3    Q.    Okay.

4          MR. BRADY:  Can we show just for the court and the

5    witness Exhibit 501, please.

6    Q.    And can you see that Exhibit 501 is an Oasis Start of

7    Care?

8    A.    Yes.

9    Q.    Who is the patient, for what patient was this Start of

10:08 10   Care for?

11   A.    Larry Logan.

12   Q.    Okay.  And can you tell the date of this assessment?

13   A.    1-23-2013.

14         MR. BRADY:  Your Honor, I offer Exhibit 501.

15         MR. VIEN:  Objection, foundation, Your Honor.

16         THE COURT:  Can you lay a foundation, please.

17         MR. BRADY:  Okay.

18   Q.    So you treated Larry Logan?

19   A.    Yes, I did.

10:08 20   Q.    And by treating Larry Logan, did you become -- through

21   treating Larry Logan, did you become familiar with his physical

22   and medical condition?

23   A.    Yes.

24   Q.    Did you come familiar with his symptoms, his ailments?

25   A.    Yes.

1    Q.    Okay.  And in this document, does this document describe

2    or have information relating to Mr. Logan's condition, his

3    medical condition, his medical needs?

4    A.    Yes.

5    Q.    Okay.

6             THE COURT:  Is this a business record?

7             MR. BRADY:  I'm sorry?

8             THE COURT:  Is it a business record?

9             MR. BRADY:  It's an Axxess record, Your Honor.

10:09 10          THE COURT:  Okay.  Come up to sidebar for just a

11    second, please.

12   **SIDEBAR:**

13            THE COURT:  Has she ever seen this before?

14            MR. BRADY:  She has, Your Honor.  The reason why I'm

15   offering this is she didn't create this document, right?  The

16   point why I'm offering this is there are statements in there

17   about this patient's condition that she knows.  She can testify

18   that is not true, that is not true.  It says he required this.

19   You treated him, was that true?  No.  It says that he did

10:15 20   help -- he needed help with this.  Was that true?  No.

21            And so, Your Honor, it is an Axxess record.  The

22   original plan was to try to get the Axxess records in so she

23   could speak to it that way.  So if there's concerns -- and I

24   understand that this is a live issue we've been talking about.

25            THE COURT:  Right.

1          MR. BRADY:  So we kind of can offer it subject to it

2     being tied up by the Axxess -- through the Axxess custodian who

3     could lay the foundation that this came from the database.

4     This is a business record, but that's the purpose for which I'm

5     offering it.  I want to be able to show it with this witness.

6          THE COURT:  Okay.

7          MR. VIEN:  That's all nice, but there's no foundation

8     and it shouldn't go to the jury.  It shouldn't go to the jury

9     until they establish one.  I'm not sure any of the Axxess

10:15 10     records are going to come in because I'm going to object to all

11     of them.

12          THE COURT:  As I tried to make clear yesterday,

13     perhaps inartfully, the Axxess database is going to be okay.

14     I'm confident that they will put on an Axxess person.  So now

15     we have a dataset that's been properly authenticated.  Then

16     somehow or another you have to get somebody to say this came

17     off that authenticated database, right?

18          MR. BRADY:  That's the next guy, the next witness.

19          THE COURT:  Then those are going to come in, as far as

10:15 20     I can tell, and you'll be able to cross-examine.  Like, what

21     did you search?  How do you know?  You know, you can go through

22     what they pulled, how they pulled it.  How you know that it's

23     accurate.  You can do all of that, but I think that document is

24     going to come in.  But they have not laid a proper foundation

25     now.  So if you're going to object to the de bene admission,

      1    you can have her testify about it without showing her the

      2    document, then we move it in later.

      3              MR. VIEN:  I object.

      4              THE COURT:  You object to what?

      5              MR. VIEN:  To the de bene admission or the reference.

      6    Let her testify without the document because it's not proper

      7    for her to have the document in front of her and comment on the

      8    document.

      9              THE COURT:  Well, she can testify about the document

10:15 10    without the document being admitted.

     11              MR. VIEN:  Depends on how that goes.  That's a

     12    question --

     13              MR. BRADY:  I'm sorry to interrupt, Your Honor.

     14              THE COURT:  Go ahead.  I can't admit the document on

     15    this foundation without -- over his objection.  It seems to me

     16    the document is going to come in, but not right now.  So you

     17    can talk to her about it.  Does it say -- you know, does it

     18    say -- what does it say about his conditions?  And you can have

     19    her comment on it.

10:15 20              MR. BRADY:  This is what I propose to ask -- and it

     21    doesn't have to be shown to the jury -- say, you know, turn to

     22    page blank, do you see that it says he's at grave risk of, do

     23    you see that?

     24              THE COURT:  Yes.

     25              MR. BRADY:  Based on your dealings with Mr. Logan, was

1  that true?  No.

2          THE COURT:  Yes, you can do that.

3          MR. BRADY:  Then at the end of it, who signed this

4  document.

5          THE COURT:  Yes, as far as I'm concerned, that's --

6          MR. VIEN:  Slightly different objection then, or

7  another objection.  We're doing the classic referring to

8  matters that aren't in evidence.  And that's improper, too.

9          THE COURT:  Well, I'm going to let them have that.

10:15 10          MR. VIEN:  Thank you, Your Honor.

11          THE COURT:  You're welcome.

12          MR. BRADY:  Your Honor, excuse me.  Your Honor, just

13  to maybe save us the trouble of another sidebar, I am also

14  going to show skilled nursing notes that Ms. Waruru created and

15  put into Axxess.

16          MR. VIEN:  The foundation there is different, and it's

17  clear she created it and she can speak to that.

18          THE COURT:  Yes, what comes out of Axxess is the same

19  thing she created, that's fine.

10:15 20          MR. VIEN:  The objection is are these the nursing

21  notes you created and are they exactly the same before they

22  went into Axxess.

23          THE COURT:  Well, if the substance is the same, if

24  it's what she said but in a different form, I'm going to let

25  that come in.

1          MR. BRADY:  Mr. Vien can cross her on that question,

2     the reliability and weight that those documents are afforded.

3          THE COURT:  You have to get your Axxess records on.

4     You have to get these documents in.  This is like a crazy way

5     to try and do this.  You're asking the jury to focus on

6     documents we're not letting them see.  He's being a pain in the

7     butt, but that's his job, so you're going to have to accept

8     that he's going to be stringent about the rules and get your

9     documents in before you start questioning witnesses about them.

10:15 10          MR. VIEN:  They don't have to come in, Your Honor.

11          THE COURT:  If they don't come in, they don't come in,

12     (End of sidebar.)

13     BY MR. BRADY:

14     Q.   So, Ms. Waruru, can you see what is on the screen in front

15     of you?

16     A.   Yes.

17     Q.   And this is an assessment for Larry Logan, right?

18     A.   Yes.

19     Q.   And Larry Logan was one of your patients; is that right?

10:16 20     A.   Yes.

21     Q.   Okay.

22          MR. BRADY:  Can we go to page 5, please.

23     Q.   Do you see at the bottom a section where the heading says

24     "Homebound"?

25     A.    Yes.

1    Q.    Okay.  And it says, "Is the patient homebound?"  And "yes"

2    is checked?

3    A.    Yes.

4    Q.    What is that -- what does that term mean, "homebound"?

5    A.    It means that the patient doesn't come out from the home.

6    Q.    Okay.  So it says -- checked "yes" for Mr. Logan here.

7    Based on your treatment, your interactions with Mr. Logan, was

8    that true?

9    A.    No.

10:16 10    Q.    Okay.

11         MR. BRADY:  Can we go to page 17.

12    Q.    Ms. Waruru, on this page, there is assessments relating to

13    something called ADLs.

14         Do you see that?

15    A.    Yes.

16    Q.    And what were ADLs?

17    A.    Activities of daily living.

18    Q.    Now, this states that someone must help the patient put on

19    upper body clothing.

10:17 20         Do you see that?

21    A.    Yes.

22    Q.    Based on your knowledge of Mr. Logan, was that true?

23    A.    No.

24    Q.    This says that someone must help the patient put on

25    undergarments, slacks, socks or nylons, and shoes.

1        Do you see that?

2   A.   Yes.

3   Q.   Based on your dealings with Mr. Logan, was that true?

4   A.   No.

5   Q.   This says that Mr. Logan was able to bathe with

6   intermittent assistance with supervision/reminders to get in

7   and out of the shower or tub or washing difficult to reach

8   errors -- areas.

9        Do you see that?

10:18 10   A.   Yes.

11   Q.   Was that true?

12   A.   No.

13   Q.   Okay.  Now, if we go to page 23, please.  Ms. Waruru, who

14   signed this assessment?

15   A.   This is signed by Faith Newton.

16        MR. BRADY:  Can we pull up Exhibit 507 just for the

17   witness, please.

18   Q.   Is this another assessment for Mr. Logan?

19   A.   Yes.

10:19 20   Q.   Okay.  What's the date on this assessment?

21   A.   12-5-2013.

22   Q.   Okay.

23        MR. BRADY:  And if we could go to page 17, please.

24   Q.   Do you see here on page 17 that there's assessments of

25   Mr. Logan's ADLs?

A.    Yes.

Q.    Those are those activities of daily living, right?

A.    Yes.

Q.    Okay.  And here, again, it says someone must help Mr. Logan to put on undergarments, slacks, socks or nylons, and shoes.

      Do you see that?

A.    Yes.

Q.    Was that true?

A.    No.

Q.    Okay.  And, again, here it says that Mr. Logan was able to participate in bathing self in shower/tub, but requires presence of another throughout the bath for assistance and supervision.

      Do you see that?

A.    Yes.

Q.    Again, based on your dealings with Mr. Logan, was that true?

A.    No.

Q.    Okay.

      MR. BRADY:  And could we go to page 22 of this assessment, please.

Q.    Do you see there's part of this, it says "orders for discipline and treatment" towards the top, top half of this?

A.    Yes.

Q.   And is there something about how many visits were ordered
for Mr. Larry Logan?

A.   Yes.

Q.   How many visits were ordered for Mr. Logan?

A.   Ten to fourteen visits per week.  Ten to fourteen
visits -- I believe it's per week -- with three PRN for acute
condition changes for nine weeks.

Q.   Okay.  And, Ms. Waruru, who was to do those visits?

A.   Me, Winnie Waruru.

Q.   You, Winnie Waruru.  So in other words, a nurse, a skilled
nurse, right?

A.   Yes.

Q.   And ten to fourteen visits per week, that would be up to
two visits a day?

A.   Yes.

Q.   And then it says "three PRN," right?

A.   Yes.

Q.   What does PRN mean there?

A.   It means like when a patient changes the condition, you
can add another visit.

Q.   So that means you could add more visits on top of the two
a day?

A.   Yes.

Q.   Okay.

        MR. BRADY:  Can we go to page 23, please.

```
 1   Q.   And my question here, Ms. Waruru, is who signed this
 2   assessment?
 3   A.   Faith Newton, RN.
 4        MR. BRADY:  We can take that down.  Thank you.
 5   Q.   Now, Ms. Waruru, how often were you scheduled to do
 6   nursing visits for Larry Logan?
 7   A.   Two times a day.
 8   Q.   Two times a day every day for Larry Logan?
 9   A.   Yes.
10   Q.   Did you do all of those visits?
11   A.   No.
12   Q.   What did you do instead?
13   A.   I was shown -- or I was trained when I don't see the
14   patient I have a place where I can go and copy and paste the
15   previous note as long as the patient is home.  So I'll go to
16   copy and paste and I'll paste the note.
17   Q.   So, Ms. Waruru, even for visits that you didn't do, you
18   still copy and pasted and put in a nursing note for the visit?
19   A.   Yes.
20   Q.   And why did you do that?
21   A.   Because that's what I was trained.
22   Q.   Ms. Waruru, in addition to copying and pasting notes, did
23   you also add in other language to notes for visits that you
24   didn't do?
25   A.   Yes.
```

1    Q.    And where did you get that language?

2    A.    Sometimes I'll go to Google and get some information.

3    Q.    And would that be, you would Google information based on

4    the patient's symptoms or diagnoses?

5    A.    Yes.

6    Q.    So, Ms. Waruru, did you do a nursing note at least daily

7    for Mr. Logan?

8    A.    Yes.

9    Q.    And when did you stop doing that?

10:24 10    A.    I stop doing the note if the patient is in the hospital.

11    Q.    All right.  So for Mr. Logan, did you continue to do notes

12    for visits all the way up to 2017?

13    A.    Yes.

14    Q.    Okay.  Let me ask you about another patient.  Amber

15    Gardner.  Do you know who Amber Gardner is?

16    A.    Yes.

17    Q.    Who is Amber Gardner?

18    A.    She was one of my patients that I was assigned to.

19    Q.    Okay.  And I believe yesterday you mentioned somebody

10:25 20    named Helen Troy?

21    A.    Yes.

22    Q.    Do you remember that?

23    A.    Yes.

24    Q.    Could you remind us who Helen Troy was -- is?

25    A.    Helen Troy was the girlfriend to Larry Logan.

```
 1    Q.   Okay.  And what was -- do you know if there was any
 2    relationship between Helen Troy and Amber Gardner?
 3    A.   Helen Troy was mother to Amber Gardner.
 4    Q.   To Amber Gardner.  Okay.
 5         Now, Amber Gardner was a patient of yours?
 6    A.   Yes.
 7    Q.   And so -- and did you meet with her?  Did you treat her?
 8    A.   Yes.
 9    Q.   Okay.  And through that, did you become familiar with her
10    physical and medical condition?
11    A.   Yes.
12    Q.   Okay.
13         MR. BRADY:  Could we please pull up, just for the
14    court and the witness, Exhibit 465, please.
15    Q.   Ms. Waruru, can you see Exhibit 465 on the screen in front
16    of you?
17    A.   Yes.
18    Q.   And is this another one of those assessments?
19    A.   Yes.
20    Q.   And who is this assessment for?
21    A.   Amber Gardner.
22    Q.   Okay.  And can you tell the date on this assessment?
23    A.   1-12-2014.
24    Q.   All right.  So that's January 12, 2014, right?
25    A.   Yes.
```

1   Q.   Okay.

2        MR. BRADY:  Now, if we could go to page 4 of this

3   assessment, please.  And if we could blow up at the top there

4   under "Risk Assessment," please.

5   Q.   Can you see, Ms. Waruru, there's a description of

6   something called a risk assessment here?

7   A.   Yes.

8   Q.   Okay.  And under -- there's part where it says, "Which

9   description best fits the patient's overall status?"

10       Do you see that?

11  A.   Yes.

12  Q.   What was checked off for that?

13  A.   "The patient is likely to remain in fragile health and

14  have ongoing high risk of serious complications and death."

15  Q.   Based on what you knew about Amber Gardner, was that true?

16       MR. VIEN:  Objection.  Just the --

17  A.   No.

18       MR. VIEN:  -- timing of it, Your Honor.  Date of the

19  assessment, when she met, and what time she's talking about.

20       THE COURT:  That's fine.

21       Can you narrow it on the timeframe, please.

22       MR. BRADY:  Sure.

23  Q.   Do you remember -- do you remember when you started seeing

24  Amber Gardner?

25  A.   I don't remember when I started seeing her.

1    Q.    Okay.  Let me ask you this.  During any time that you were

2    seeing Ms. Gardner, was that statement true?

3    A.    No.

4         MR. BRADY:  And now, can we go to page 18, please.

5    Q.    Down at the bottom there's a section, this section that

6    refers to oral medications.

7         Do you see that?

8    A.    Yes.

9    Q.    And what did this say, what was checked in relation to

10:28 10   medication?

11   A.    "Unable to take medication unless administered by another

12   person."

13   Q.    Based on what you knew about Ms. Gardner, was that true?

14        MR. VIEN:  Objection --

15   A.    No.

16        MR. VIEN:  -- again to the undetermined time period,

17   Your Honor.

18        THE COURT:  Well, go back and rephrase the question,

19   please, Mr. Brady.

10:29 20        MR. BRADY:  Okay.

21   Q.    While you were treating Ms. Gardner during that period of

22   time --

23   A.    Yes.

24   Q.    -- was that statement true?

25   A.    No.

```
 1              MR. VIEN:  Objection.  The answer was:  I can't
 2    remember when I was treating Ms. Gardner.
 3              THE COURT:  Well, he can ask if at any time while she
 4    was treating Ms. Gardner that statement was true.
 5              MR. BRADY:  I think I asked that.  I can put that
 6    question to the witness, Your Honor.
 7              THE COURT:  You asked it the last go-round, but I
 8    don't think you've asked it here.
 9              MR. BRADY:  Okay.
10:29 10   Q.    So, Ms. Waruru, at any time while you were treating Amber
11    Gardner, as a nurse, was that statement about her need for
12    medication, was that true?
13    A.    No.
14    Q.    Okay.
15              MR. BRADY:  And could we go to -- could we back out of
16    that and go to page 21, please.
17    Q.    Ms. Waruru, who signed this assessment?
18    A.    Faith Newton, RN.
19              MR. BRADY:  We can take that down.  Thank you.
10:30 20   Q.    Ms. Waruru, did you ever talk with Faith Newton about
21    Amber Gardner's care?
22    A.    Yes.
23    Q.    Why did you do that?
24    A.    Because I didn't see any need of seeing this patient.  She
25    could do everything for herself.  And when I talked to her, she
```

1    told me that RN is the one who do the assessment.  They're the

2    one who knows when the patient need to be seen.  So I just do

3    what is on the schedule.

4    Q.    And, Ms. Waruru, you mentioned that Ms. Faith Newton told

5    you that the RN is the one to do the assessment?

6    A.    Yes.

7    Q.    And for Amber Gardner, who was the RN?

8    A.    Faith Newton.

9    Q.    Okay.  Now, as for the timeframe for Ms. Gardner, do I

10:31 10   have it right that from January 13, 2014, through November 24,

11   2014, you put in notes for visits to Ms. Gardner?

12   A.    Yes.

13   Q.    Okay.  In fact, you put in notes for visits twice a day,

14   right?

15   A.    Yes.

16   Q.    Did you do all of those visits?

17   A.    No.

18   Q.    Okay.  Ms. Waruru, you should have in front of you a

19   binder, a binder of documents.

10:32 20        Do you see that?

21   A.    Yes.

22   Q.    And I'd ask you to -- one of the tabs in there should say

23   466.  If you want to open that up.

24        Do you see Exhibit 466?

25   A.    Yes.

1    Q.    And what is Exhibit 466?

2    A.    Skilled nurse visit.

3    Q.    So is that a nursing note?

4    A.    Yes.

5    Q.    Okay.  And can you tell who the patient was for this?

6    A.    Amber Gardner.

7    Q.    And does it indicate on there what the date of the visit

8    was?

9    A.    Yes.

10:33 10    Q.    What was the date of this visit?

11    A.    January 13, 2014.

12    Q.    Okay.  Who created this nursing note?

13    A.    Me, Winnie Waruru.

14    Q.    Okay.  And how do you know that?

15    A.    I see my name, that I signed it.

16    Q.    Okay.  And how -- at Arbor, how were the nursing notes

17    kept?  Where were the nursing notes entered and where were they

18    kept?

19    A.    We had a program called Axxess, that you go and fill the

10:33 20    nursing note.

21    Q.    Okay.  So I'd ask you, Ms. Waruru, if you can flip with me

22    to Exhibit 467 in your book.  Is that another nursing note you

23    did for Amber Gardner?

24    A.    Yes.

25    Q.    And that one is from January 14, 2014?

```
 1   A.    Yes.
 2   Q.    Okay.  Can you flip to page 468.
 3         And is Exhibit 468 another nursing note you did for Amber
 4   Gardner?
 5   A.    Yes.
 6   Q.    Okay.  And maybe to save time here, if we were to keep
 7   flipping, for these exhibits, from 468 up to 482, are all of
 8   those exhibits nursing notes that you did and put into Axxess
 9   for Amber Gardner?
10   A.    Yes.
11         MR. BRADY:  At this time, Your Honor, I offer Exhibits
12   466 through 482.
13         MR. VIEN:  No objection to these.
14         THE COURT:  They're admitted.
15         (Exhibits 466-482 admitted into evidence.)
16         MR. BRADY:  Okay.  Ms. Apfel, could we pull up on the
17   screen Exhibit 466 for us, please.  Thank you.
18   Q.    Can you see Exhibit 466 on your screen?  It's also in the
19   book.
20   A.    Yes.
21   Q.    Now that we can all see it together, remind us again, what
22   is this, what is this exhibit?
23   A.    It's a nursing note.
24   Q.    Okay.
25         MR. BRADY:  And if we could blow up the top part.
```

```
 1   Q.   All right.  Do you see where it says the patient name on
 2   there?
 3   A.   Yes.
 4   Q.   Okay.  That's Amber Gardner.  And then right below that it
 5   gives the date of the visit, right?
 6   A.   Yes.
 7   Q.   Okay.  And then along the top, there's a couple of boxes.
 8   The first one says "vital signs."
 9        Do you see that?
10   A.   Yes.
11   Q.   Can you explain to the jury what that's showing, or what
12   it's supposed to show?
13   A.   This shows when you go to patient's house, you take, like,
14   the temperature, the pulse, the blood pressure, the oxygen.
15   This is where we document them.
16   Q.   Okay.
17        MR. BRADY:  And, Ms. Apfel, if we could zoom out of
18   that.  Great.  If we could scroll down to page 2.  And then
19   let's keep scrolling.  I'm sorry.  I think we have a different
20   document up.  466, please.  Okay.
21        All right.  So now we're looking at this nursing note.
22   Can we blow up the bottom part where it says the "Narrative and
23   Teaching."
24   Q.   Do you see that, Ms. Waruru?
25   A.   Yes.
```

1   Q.   What does that part of the nursing note show?

2   A.   This shows on how you got the patient, that's where you

3   document.

4   Q.   Okay.  And did you write what's in this narrative?

5   A.   Yes.

6   Q.   Okay.  Could I ask you, can you walk us through, kind of

7   read through what you put in for this narrative?

8   A.   "SN assessed for patient.  Patient is" -- "oriented times

9   two.  Vital signs are within the normal limit.  Patient with

10:38 10   flat affect, withdrawn, negative thoughts about self, has poor

11   insight and poor judgment into disease process and medication

12   due to lack" -- "of medication and disease.  Noncompliant with

13   meds, ineffective coping, disturbed thought process, improper

14   nutrition.  Reviewed all."

15        MR. BRADY:  Okay.  Let's zoom out of that, please,

16   Ms. Apfel.  Then if we can scroll down on the next page.  If we

17   can blow up that narrative.

18   Q.   I don't think we need to read through it, but does the

19   narrative continue on to the next page?

10:39 20        Do you see that, Ms. Waruru?

21   A.   Yes.

22   Q.   Okay.  And I do want to ask you about, in the second line

23   about halfway through it says, "SN instructed patient on

24   positive self-talk, socializing with supportive friends, taking

25   a walk and exercising.  Patient encouraged on benefits on daily

1    exercise and weight control and choosing proper and healthy

2    nutrition."

3        And it goes on from there.  Do you see that?

4    A.    Yes.

5    Q.    And what's that part of the narrative?  What was that

6    about?

7    A.    It's the teaching that you're supposed to teach the

8    patient.

9    Q.    Okay.

10:39 10        MR. BRADY:  Let's back out of that.  And, Ms. Apfel

11    can we bring up Exhibit 467.

12    Q.    For this visit --

13        MR. BRADY:  Could you blow up the top, please.

14    Q.    Who was the patient for this visit?

15    A.    Amber Gardner.

16    Q.    And what was the date of this visit?

17    A.    January 14.

18    Q.    Okay.

19        MR. BRADY:  And if we zoom out of that and we go down

10:40 20    to page 2, page 2 and 3, if we can blow that up.

21    Q.    Do you see the narrative there?

22    A.    Yes.

23    Q.    Okay.  How does that narrative compare to the one in the

24    last note?

25    A.    It is the same teachings.

1   Q.   Okay.

2        MR. BRADY:  Now, if we could back out of that and if

3   we could show Exhibit 468, please.

4   Q.   Who was the patient for this visit?

5   A.   Amber Gardner.

6   Q.   And what was the date of this one?

7   A.   January 14, 2014.

8   Q.   Okay.

9        MR. BRADY:  If we could kind of zoom out of that and

10:41 10  go down to page 2 and blow up the narrative, please.

11  Q.   Do you see the narrative for this visit, Ms. Waruru?

12  A.   Yes.

13  Q.   How does that compare to the narrative in the prior notes?

14  A.   It's the same narrative.

15  Q.   Okay.  And, Ms. Waruru, if we were to keep going through

16  these exhibits of these notes, would we continue to see the

17  same thing?

18  A.   Yes.

19  Q.   So are these examples of the copy and pasted notes that

10:41 20  you described?

21  A.   Yes.

22  Q.   And who told you to do the notes that way?

23  A.   I was trained by Faith Newton.

24  Q.   Okay.

25       MR. BRADY:  Ms. Apfel, we can take that one down,

```
 1   please.
 2   Q.   I want to ask you about somebody else.  Oscar Ortiz.  Who
 3   is Oscar Ortiz?
 4   A.   He was also one of my patients.
 5   Q.   Okay.  What was the connection between Oscar Ortiz and
 6   Amber Gardner, who we just talked about?
 7   A.   He was boyfriend to Amber Gardner.
 8   Q.   Okay.  Do you remember saying anything to Faith Newton
 9   about Oscar Ortiz?
10:42 10  A.   Yes.
11   Q.   Tell the jury what you said to Faith Newton about Oscar
12   Ortiz.
13   A.   I also talked about Ortiz, together with Amber Gardner,
14   because I didn't see any need of the patient to be seen.  They
15   were young people.  They can take their own medication.  But I
16   was told that I'm not the RN.  My work is just to check the
17   schedule and do the notes for the patient.
18            MR. BRADY:  Could we pull up, just for the court and
19   witness, Exhibit 520, please.
10:43 20  Q.   Now, can you see Exhibit 520, Ms. Waruru?
21   A.   Yes.
22   Q.   And is this another one of those assessments for a
23   patient?
24   A.   Yes.
25   Q.   Who was this assessment for?
```

1   A.   Oscar Ortiz.

2   Q.   And what was the date on this assessment?

3   A.   January 12, 2014.

4   Q.   Okay.  Now, January 12, 2014, is that the same date you

5   mentioned before for the assessment of Amber Gardner?

6   A.   Yes.

7          MR. BRADY:  Okay.  And if we could go to page 4,

8   please, Ms. Apfel.

9   Q.   There's also a "risk assessment" section for this in this

10:44 10   assessment, Ms. Waruru.

11          Do you see that?

12   A.   Yes.

13   Q.   Okay.  And under, "What description best fits the

14   patient's overall status," what was checked off for Oscar

15   Ortiz?

16   A.   "The patient is likely to remain in fragile health and

17   have ongoing high risk of serious complications and death."

18   Q.   While you were the nurse for Oscar Ortiz, was that true?

19   A.   No.

10:44 20          MR. BRADY:  Could we back out of that and go to page

21   19 of this exhibit, please.  In the middle of the page, if we

22   could blow it up.

23   Q.   There's a question about Mr. Ortiz's ability to take oral

24   medications.  Do you see that?

25   A.   Yes.

```
 1    Q.    What was checked off in response to that?

 2    A.    "Unable to take medication unless administered by another

 3    person."

 4    Q.    And, Ms. Waruru, while you were treating Oscar Ortiz, was

 5    that true?

 6    A.    No.

 7    Q.    Okay.

 8          MR. BRADY:  So let's back out of that.  If we could go

 9    to page 21, please.

10:45 10  Q.    Do you see that there's -- do you see that there's an

11    order for a number of visits by a nurse for Mr. Ortiz?

12    A.    Yes.

13    Q.    How many visits were ordered for Mr. Ortiz?

14    A.    Ten to fourteen visit per week with three PRN, condition

15    acute changes for nine weeks.

16    Q.    Okay.  And that's twice a day?

17    A.    Yes.

18    Q.    Same as Amber Gardner?

19    A.    Yes.

10:46 20  Q.    Okay.

21          MR. BRADY:  And if we could zoom out of that.

22    Q.    There's a narrative section at the bottom here.

23          Do you see that?

24    A.    Yes.

25    Q.    There is, about three lines down, refers to "medication
```

1   review done" and "patient reports noncompliance with

2   medications."

3       Do you see that?

4   A.   Yes.

5   Q.   And does this refer to Oscar Ortiz by "she"?

6   A.   Yes.

7   Q.   Again, based on your dealings with Mr. Ortiz, was that

8   accurate?

9   A.   No.

10:47 10   Q.   Why not?

11   A.   Because he's not a she.

12   Q.   And do you know how this narrative compares to the one

13   that was in the assessment we looked at for Amber Gardner

14   before?

15   A.   It's a copy and paste.

16       MR. BRADY:  So if we could back out of that, please.

17   Can we go to the -- go to page 22 of this one.

18   Q.   Ms. Waruru, who signed this assessment for Oscar Ortiz?

19   A.   Faith Newton, RN.

10:47 20   Q.   Okay.  And how often -- Ms. Waruru, how often were you

21   scheduled to do visits for Oscar Ortiz?

22   A.   Twice a day.

23   Q.   Did you do all of those visits?

24   A.   No.

25   Q.   How often did you go to see Mr. Ortiz?

A.   Sometimes once or twice a week, I will put his medication in the med planner for a week.

Q.   Okay.  Did you still put in nursing notes for each of those twice-a-day visits?

A.   Yes.

Q.   Were those notes true or false?

A.   False.

Q.   Okay.  Let me ask you about another patient.  Jane Flanagan.  Who is Jane Flanagan?

A.   She was one of my patients.

Q.   Was that a patient who you got from Faith Newton?

A.   Yes.

Q.   Did you also put in nursing notes for Jane Flanagan twice a day?

A.   Yes.

Q.   Did you do all of those visits?

A.   No.

Q.   Did you submit copy and pasted notes for visits you did not actually do?

A.   Yes.

Q.   Okay.

        MR. BRADY:  Can we pull up Exhibit 542, please.

        COURTROOM CLERK:  Just for the witness?

        MR. BRADY:  Just for the witness, yes, sorry.

Q.   Ms. Waruru, what is Exhibit 542?

          1   A.   It's a nursing note.

          2   Q.   For which patient?

          3   A.   Jane Flanagan.

          4   Q.   And what was the date for that visit?

          5   A.   April 3, 2014.

          6   Q.   And who created this note?

          7        MR. BRADY:  Zoom out, please.

          8   A.   Winnie Waruru, my name.

          9   Q.   Okay.

10:49    10        MR. BRADY:  Your Honor, I offer Exhibit 542.

         11        MR. VIEN:  No objection, Your Honor.

         12        THE COURT:  It's admitted.

         13        (Exhibit 542 admitted into evidence.)

         14        MR. BRADY:  Okay.  Can we go to page 2 of this

         15   exhibit, and if we could blow up the narrative, please.

         16   Q.   Can you see the narrative there, Ms. Waruru?

         17   A.   Yes.

         18   Q.   Is this the narrative that you entered for this visit?

         19   A.   Yes.

10:50    20   Q.   And do you see the part three lines down where it begins,

         21   "Patient educated on S/SX of depressions"?

         22   A.   Yes.

         23   Q.   What does that mean, "S/SX"?

         24   A.   Signs and symptoms of depression.

         25   Q.   And then you went on to write, "The actions to take when

1    verbalizing her needs, ineffective coping, relaxation skills."

2         And it goes on from there.  Do you see that?

3    A.    Yes.

4    Q.    And that's what you put into your nursing note for this

5    visit, right?

6    A.    Yes.

7         MR. BRADY:  Okay.  Could we pull up, just for the

8    witness, Exhibit 543, please.

9    Q.    And is Exhibit 543 another nursing note for Jane Flanagan?

10:51 10   A.    Yes.

11   Q.    And that's from a visit on April 4, 2014; is that right?

12   A.    Yes.

13   Q.    Okay.  And you created this note?

14   A.    Yes.

15        MR. BRADY:  I offer Exhibit 543.

16        MR. VIEN:  No objection.

17        THE COURT:  It's admitted.

18        (Exhibit 543 admitted into evidence.)

19        MR. BRADY:  Okay.  If we could go to page 2 of this

10:52 20   exhibit, please.  And if we could blow up the narrative.

21   Q.    Do you see the narrative for this visit?

22   A.    Yes.

23   Q.    And who wrote this narrative, Ms. Waruru?

24   A.    Me, Winnie Waruru.

25   Q.    Okay.  Now, does this narrative compare to the one we just

```
 1   saw?
 2   A.   It's the same note.
 3   Q.   And if we were to continue to look through other nursing
 4   notes for this patient, what would we expect to see in the
 5   narratives?
 6   A.   The same person --
 7             MR. VIEN:  Objection as to form --
 8             THE COURT:  Yes, sustained.
 9             MR. BRADY:  Okay.  Let me rephrase that.
10   Q.   Did you repeat this same narrative in other nursing notes
11   for this patient?
12   A.   Yes.
13   Q.   Let me ask you about John Enwright.  Who is John Enwright?
14   A.   He was one of my patients.
15   Q.   Okay.
16             MR. BRADY:  Can we pull up, just for the witness,
17   please, Exhibit 432.
18   Q.   Ms. Waruru, is Exhibit 432 another -- another one of the
19   assessments?
20   A.   Yes.
21   Q.   Okay.  And can you tell the date this assessment was done?
22   A.   11-18-2014.
23   Q.   Okay.  And the patient for this assessment was who?
24   A.   John Enwright.
25             MR. BRADY:  And, Ms. Apfel, if we could go to page 16
```

```
 1   of the assessment, please.

 2   Q.   Do you see there's also an assessment of the activities of

 3   daily living, ADLs, here?  Do you see that?

 4   A.   Yes.

 5   Q.   Okay.  And one of the things that's checked off here is

 6   that Mr. Enwright needed help with grooming and using the

 7   toilet.

 8        Do you see that?

 9   A.   Yes.

10   Q.   Based on your dealings with Mr. Enwright, was that true?

11   A.   No.

12        MR. BRADY:  And if we go to page 21 of this document,

13   please.

14   Q.   How many visits were ordered for Mr. Enwright?

15   A.   Five to seven visits per week with three PRNs.

16   Q.   And was there also an order for Mr. Enwright to get HHA or

17   home health aide services?

18   A.   Yes.

19   Q.   What was that order?

20   A.   Six to eight hours per day.

21        MR. BRADY:  If we go to page 22.

22   Q.   Ms. Waruru, who signed this assessment for Mr. Enwright?

23   A.   Faith Newton, RN.

24   Q.   Okay.  Now, Ms. Waruru, I'm going to ask you in the

25   notebook, the binder in front of you, if you could look at
```

```
 1   Tab 444.  Can you see -- take your time to get there.

 2   A.    Yes.

 3   Q.    Can you see Tab 444?

 4   A.    Yes.

 5   Q.    And what is -- what's the document at Tab 44 that's

 6   Exhibit 444?

 7   A.    It's a skilled nursing visit note.

 8   Q.    And who was the patient for that visit?

 9   A.    John Enwright.

10   Q.    And what was the date of that visit?

11   A.    January.

12   Q.    January --

13   A.    1-1-2015.

14   Q.    I'm sorry.  I interrupted you.  Okay.

15         And is that a nursing note you created?

16   A.    Yes.

17   Q.    Okay.  And if you flip ahead to Exhibit 445.

18         Do you see that?

19   A.    Yes.

20   Q.    And 446.

21   A.    Yes.

22   Q.    If you flip all the way to Exhibit 461.

23   A.    Yes.

24   Q.    Ms. Waruru, are those all nursing notes that you created

25   for John Enwright?
```

10:56 (line 10)
10:57 (line 20)

```
 1   A.    Yes.

 2   Q.    Okay.

 3              MR. BRADY:  Your Honor, I offer Exhibits 444 through

 4   461.

 5              MR. VIEN:  No objection.

 6              THE COURT:  444 to 461, they're admitted.

 7              (Exhibits 444-461 admitted into evidence.)

 8              MR. BRADY:  Can we pull up Exhibit 444, please.  Thank

 9   you.

10   Q.    Now that we can all see it, Ms. Waruru, who was the

11   patient for this nursing visit?

12   A.    John Enwright.

13   Q.    Okay.  And what was the date?

14   A.    1-1-2015.

15              MR. BRADY:  Okay.  And if we go to page 3 of this

16   note, can we blow up the narrative and training -- narrative

17   and teaching, please.

18   Q.    Do you see where it's a section for "Narrative and

19   Teaching," Ms. Waruru?

20   A.    Yes.

21   Q.    Okay.  And is that a narrative that you wrote into this

22   patient note?

23   A.    Yes.

24   Q.    Okay.  I want to ask you about part of this note, and it's

25   about five -- it's five lines down.  It says, "SN flush the
```

```
 1   expired medication in the toilet.  SN called doc's office and
 2   asked for new prescriptions."
 3        And then it goes on from there.  Do you see that?
 4   A.   Yes.
 5   Q.   Okay.  Then the last line of this narrative, it says, "SN
 6   instructed patient on proper diet, to take more fiber and more
 7   intake of fluids to prevent constipation."
 8        Do you see that?
 9   A.   Yes.
10   Q.   And that's what you put into this nursing note, right?
11   A.   Yes.
12   Q.   Okay.
13        MR. BRADY:  Ms. Apfel, could you take that one down.
14   Could you pull up Exhibit 445, please.
15   Q.   Now, this is another nursing note you did for John
16   Enwright; is that right?
17   A.   Yes.
18   Q.   And what was the date on this one?
19   A.   1-2-2015.
20   Q.   So the next day, right?
21   A.   Yes.
22        MR. BRADY:  Let's go to page 3 of this note, please,
23   and can we blow up the narrative.
24   Q.   Ms. Waruru, how does this narrative compare to the one we
25   just saw from the day before?
```

1    A.    It's the copy and paste from the previous note.

2    Q.    Okay.  And so the copy and paste includes that line about

3    flushing the expired medication in the toilet and calling the

4    doctor's office to ask for new prescriptions?

5    A.    Yes.

6    Q.    Did you, in fact, do that every day for Mr. Enwright?

7    A.    Not every day.

8    Q.    Okay.  And then that line at the bottom about instructing

9    him on a proper diet and taking more fiber, that's also

11:01 10    included here as well?

11    A.    Yes.

12    Q.    Okay.  And you flipped through the notes -- you flipped

13    through the notes for the visits that follow after this date,

14    right?

15    A.    Yes.

16    Q.    And did you see that -- that same narrative repeated over

17    and over?

18    A.    Yes.

19    Q.    Now, did you actually do all of those visits?

11:02 20    A.    No.

21    Q.    How many times -- how many times in a week do you remember

22    visiting Mr. Enwright, actually?

23    A.    Two to three days.

24    Q.    Two to three days.  But you still put in a nursing note

25    for every day, right?

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | A.   Yes.                                                    |
|       | 2  | Q.   Okay.  Let me ask you about one more patient.  Who was  |
|       | 3  | Ernest Cate?                                                 |
|       | 4  | A.   He was one of the patients I had.                       |
|       | 5  | Q.   One of the patients you had, okay.                      |
|       | 6  | MR. BRADY:  Can we pull up, please, just for the             |
|       | 7  | witness, Exhibit 423.                                        |
|       | 8  | Q.   And is this -- this is another one of those assessments, |
|       | 9  | right?                                                        |
| 11:02 | 10 | A.   Yes.                                                     |
|       | 11 | Q.   And who is this one for?                                |
|       | 12 | A.   Ernest Cate.                                             |
|       | 13 | Q.   And what was the date on this assessment?               |
|       | 14 | A.   11-18-2013.                                              |
|       | 15 | MR. BRADY:  Okay.  And let me -- let me ask,                 |
|       | 16 | Ms. Apfel, can we go to page 15, please.                     |
|       | 17 | Q.   How many visits, how many nursing visits were ordered for |
|       | 18 | Ernest Cate?                                                  |
|       | 19 | A.   Ten to fourteen visits per week with three PRN.         |
| 11:03 | 20 | MR. BRADY:  And let's go to the next page, Ms. Apfel,        |
|       | 21 | please.                                                       |
|       | 22 | Q.   Who signed this assessment?                             |
|       | 23 | A.   Faith Newton, RN.                                        |
|       | 24 | Q.   All right.  So, Ms. Waruru, how many times did you      |
|       | 25 | actually visit Mr. Cate each week?                           |

1    A.    Like three to four days.

2    Q.    Three to four days.  And what did you do during those

3    visits when you would go to see him?

4    A.    I do the assessment and I put medication in the med

5    planner.

6    Q.    Now, how often did you put in nursing notes for Mr. Cate?

7    A.    Twice a day.

8    Q.    And so those notes for visits that you didn't actually do,

9    were those true or false?

11:04 10    A.    False.

11          MR. BRADY:  Now, we can take that down, Ms. Apfel.

12    Thank you.

13    Q.    We've gone through a couple of examples of nursing notes

14    for a couple of patients, right?

15    A.    Yes.

16    Q.    And you've testified that there were notes for patients

17    you didn't see.  The examples we saw, right?

18    A.    Yes, yes.

19    Q.    Were there other patients for whom you did notes for

11:04 20    visits that didn't actually happen?

21    A.    Yes.

22    Q.    Now, Ms. Waruru, before you were charged in this case,

23    before you were charged, you were interviewed by the

24    government; is that right?

25    A.    Yes.

1    Q.    You were interviewed on two separate occasions by

2    government agents?

3    A.    Yes.

4    Q.    And one of the things that the agents asked you was

5    whether you did all of your visits.

6    A.    Yes.

7    Q.    Do you remember that?

8    A.    Yes.

9    Q.    What did you tell them?

11:05 10    A.    I said yes.

11    Q.    Was that true?

12    A.    No.

13    Q.    Why did you tell them that?

14    A.    I was scared.

15    Q.    What were you scared of?

16    A.    I was scared I will lose my job, and I was scared for

17    Faith Newton.  I was scared to be embarrassed by her.

18    Q.    Okay.  Now, do you remember that the agents also asked you

19    if you had heard -- ever heard complaints from patients?

11:06 20    A.    Yes.

21    Q.    And what did you tell them?

22    A.    I said no.

23    Q.    Was that true?

24    A.    No.

25    Q.    And were you also asked if you knew about billing for

1    visits that never happened?  Do you remember being asked about

2    that?

3    A.    Yes.

4    Q.    And what did you tell the agents then?

5    A.    I said no.

6    Q.    And was that true?

7    A.    No.

8    Q.    And do you remember telling the agents that you didn't

9    think there was -- you didn't believe there was anything

11:06 10    improper about Arbor's business practices?

11    A.    Yes.

12    Q.    Was that true?

13    A.    No.

14    Q.    And you testified that you spoke with the agents twice,

15    right?

16    A.    Yes.

17    Q.    And n the second time you spoke with them, did you tell

18    them the whole truth then?

19    A.    Yes.

11:07 20    Q.    The second time when they asked you, before you got

21    charged, did you tell them the whole truth then?

22    A.    No.

23    Q.    Because they asked you again if you did all your visits,

24    right?

25    A.    Yes.

1    Q.    And did you tell them the truth?

2    A.    No.

3    Q.    Do you remember telling him that sometimes you forgot to

4    change the notes on the computer; that was the -- the issue?

5    A.    Yes.

6    Q.    And was that true or false?

7    A.    False.

8    Q.    And in your testimony yesterday, you testified about

9    pleading guilty to crimes?

11:07 10    A.    Yes.

11    Q.    And one of the crimes was making false statements?

12    A.    Yes.

13    Q.    Was that because of the false statements you just

14    testified about?

15    A.    Yes.

16    Q.    Now, Ms. Waruru, do you know if other nurses at Arbor also

17    cut and pasted notes for their nursing visits?

18    A.    Yes.

19    Q.    How do you know that?

11:08 20    A.    I had one of the nurses, we are sharing one of the

21    patients, and when I'm doing the note I could see maybe I

22    copied from her or she copied from me.  It was the same note.

23    Q.    So for one of your patients, you shared that patient with

24    another nurse at Arbor?

25    A.    Yes.

1    Q.    Okay.  Who was that other nurse?

2    A.    Her name was Kiboi, Gladys.

3    Q.    Gladys Kiboi?

4    A.    Yes.

5    Q.    Was that K-i-b-o-i?

6    A.    Yes.

7    Q.    Okay.  Do you know how Ms. Kiboi is connected to

8    Ms. Newton?

9    A.    We are friends, and we came from one church.

11:09 10    Q.    I'll ask you about Santiago Velasquez.  Mr. Velasquez.

11    A.    Yes.

12    Q.    Do you know somebody by that name?

13    A.    Yes.

14    Q.    Tell the jury who Mr. Velasquez was.

15    A.    He was one of my patients.

16    Q.    And did Mr. Velasquez have health issues?

17    A.    Yes.

18    Q.    What do you remember were some of his health issues?

19    A.    He had depression, he had bipolar, he was schizophrenic.

11:09 20    Q.    And he was one of your patients as a nurse?

21    A.    Yes.

22    Q.    So what role did you play in Mr. Velasquez's care?

23    A.    I was doing medication administration.

24    Q.    Now, was there also a home health aide or HHA who was

25    assigned to Mr. Velasquez?

```
 1   A.    Yes.
 2   Q.    Who was that HHA?
 3   A.    Lucy Muthoni.
 4   Q.    Lucy Mooey -- Muthoni?
 5   A.    Muthoni.
 6   Q.    And who is Lucy?
 7   A.    Sister to Faith Newton.
 8   Q.    And do you know if that HHA was doing all of the visits
 9   she was scheduled to do?
10   A.    No.
11   Q.    How do you know that?
12   A.    Because the patient will complain to me, and sometimes I
13   will go to the house and the patient has gone to the bathroom
14   to himself and the bed is soiled, and he will complain that HHA
15   hasn't come.  And, also, he had a advocator, her name was
16   Andrea, and he complain to -- to the -- I'm not sure that she
17   was advocator -- she was one of the person was taking care of
18   Velasquez.
19   Q.    Okay.  I want to ask you, Ms. Waruru, about the money you
20   made at Arbor, okay?  How was your pay at Arbor?  How was that
21   determined?
22   A.    By the hours you make.
23   Q.    So you got paid by the hour?
24   A.    Yes.
25   Q.    Now, if a -- if you did a visit for a patient and it was
```

11:10 (line 10)
11:11 (line 20)

1    just like a 15-minute visit, how would that count for pay?

2    A.    It would count an hour.

3    Q.    Can you tell the jury roughly how much you made per year

4    when you were working at Arbor?

5    A.    I made over 100,000, and sometimes over 200,000.

6    Q.    That was while working as a nurse at Arbor?

7    A.    Yes.

8    Q.    Is that more money than you made before?

9    A.    Yes.

11:12 10    Q.    Now, one of the crimes -- one of the crimes you pled

11    guilty to, as you testified yesterday, was making false

12    statements in connection with a MassHealth application?

13    A.    Yes, yes.

14    Q.    Okay.  Tell the jury what happened with that.

15    A.    I will start, like, when I came here, 2002.  And I had

16    issues, I had problems with heart and I was told there is free

17    care, MassHealth, and all you have to do is to give two checks

18    for two weeks.  And I didn't get any other knowledge.  All I

19    knew was you give two checks and you get free care.

11:13 20        And that's what I did, even when I was working at Arbor, I

21    gave two checks.  And I didn't report all of the money I made,

22    and I only give the two checks, and that's how I got myself in

23    trouble.

24    Q.    So, Ms. Waruru, you told MassHealth, when you applied for

25    it, that you were making less money than you were actually

1     making at Arbor; is that right?

2     A.    Yes.

3     Q.    Okay.  How did your time at Arbor come to an end?

4     A.    When the agency closed in 2017.

5     Q.    Did you talk to Faith Newton about that?

6     A.    I don't -- I didn't talk to her direct because it was all

7     over, like, it was closed.

8     Q.    Okay.  Now, Ms. Waruru, yesterday in your testimony, we

9     took a look at your plea agreement with the government.

11:14 10          Do you remember that?

11    A.    Yes.

12    Q.    Okay.  Do you also have a cooperation agreement with the

13    government?

14    A.    Yes.

15          MR. BRADY:  Can we show, just for the witness,

16    Exhibit 701, please.

17    Q.    Can you see that on the screen, 701?

18    A.    Yes.

19    Q.    Do you recognize that, Ms. Waruru, as a copy of your

11:15 20   cooperation agreement with the government?

21    A.    Yes.

22          MR. BRADY:  Your Honor, I offer Exhibit 701.

23          MR. VIEN:  No objection.

24          THE COURT:  It's admitted.

25          (Exhibit 701 admitted into evidence.)

```
         1              MR. BRADY:  Now, Ms. Apfel, could we scroll to page 5

         2    of this agreement.  Can we blow up the top part, please.

         3    Q.   Ms. Waruru, whose signature do we see here on the

         4    acknowledgment of the cooperation agreement?

         5    A.   That's my signature.

         6              MR. BRADY:  Okay.  And let's back out of that, please.

         7    And can we go back to page 1, please.

         8    Q.   Do you see at page 1 and then on to page 2, there's a

         9    section that says "Terms of Cooperation."  Do you see that?

11:16   10    A.   Yes.

        11    Q.   And what does that say?  You see it refers to "defendant"

        12    here.  Do you see that?

        13    A.   Yes.

        14    Q.   And in this agreement, who is defendant?

        15    A.   That is me.

        16    Q.   That's you, okay.  And does this describe what you agreed

        17    to do in this agreement?

        18    A.   Yes.

        19    Q.   So, Ms. Waruru, what did you agree to do in this

11:17   20    cooperation agreement?

        21    A.   I agreed to speak the truth and nothing but the truth.

        22              MR. BRADY:  And if we zoom out of that.  Can we

        23    scroll -- scroll down to paragraph 2 here.

        24    Q.   Do you see, Ms. Waruru, there's a section that says

        25    "Substantial Assistance Motion."
```

1    A.    Yes.

2    Q.    And it says, "Should defendant provide substantial

3    assistance in the investigation or prosecution of another

4    person who has committed a criminal offense, the U.S. Attorney

5    agrees, at or before sentencing, the U.S. Attorney will take

6    one or more of the following steps."

7          Do you see that?

8    A.    Yes.

9    Q.    And it says it's at the U.S. Attorney's discretion.  Do

11:18 10    you see that?

11   A.    Yes.

12   Q.    And what do you understand that to mean?

13   A.    Can you repeat the question again, please.

14   Q.    Sure.

15         So it describes here that the U.S. Attorney may file a

16   motion to the court based on substantial assistance.

17         Do you see that?  Do you see what it says here in this

18   paragraph?

19   A.    Yes.

11:18 20   Q.    Okay.  And then if you look at the next paragraph.

21              MR. BRADY:  If we could blow that up.

22   Q.    Do you see, Ms. Waruru, it says, "The determination

23   whether defendant has provided substantial assistance rests

24   solely in the discretion of the U.S. Attorney and is not

25   subject to appeal or review."

1     Do you see that?

2  A.   Yes, yes.

3  Q.   And the next sentence says, "The U.S. Attorney will make

4  this determination based on the truthfulness and value of the

5  defendant's assistance regardless of the outcome or result of

6  any proceeding or trial."  Do you see that?

7  A.   Yes.

8  Q.   Is that consistent with your understanding of this

9  cooperation agreement?

11:19 10  A.   Yes.

11  Q.   And, Ms. Waruru, has the government made any promises to

12  you other than what's in this cooperation agreement and the

13  plea agreement that we looked at before?

14  A.   No.

15  Q.   And, Ms. Waruru, did you meet with the government before

16  your testimony here?

17  A.   Yes.

18  Q.   How many times did you meet with the government?

19  A.   Three times.

11:20 20  Q.   Did you say three times?

21  A.   Yes.

22  Q.   Maybe a few more times before that?

23  A.   Yeah, before that, I meet like two, two to three times.

24  Q.   Okay.  What is your understanding of what could happen to

25  you if you don't tell the truth today?

1    A.    I will go to prison.

2    Q.    And, Ms. Waruru, are you testifying -- are you hoping --

3    let me start that question over again.

4         Are you hoping for a lower sentence based on your

5    cooperation?

6    A.    Yes.

7    Q.    And, Ms. Waruru, who will ultimately decide what sentence

8    you get?

9    A.    The judge will decide.

11:21 10           MR. BRADY:  Your Honor, nothing further at this time.

11                THE COURT:  Cross?

12                MR. VIEN:  Yes, Your Honor.

13   CROSS-EXAMINATION BY MR. VIEN:

14   Q.    Ms. Waruru, my name is George Vien.  Along with Michelle

15   Pascucci, we represent the defendant, Faith Newton.

16        Do you understand that?

17   A.    Yes.

18   Q.    Good morning, Ms. Waruru.

19        Do you remember yesterday when you were asked on direct

11:22 20   about your work history?

21   A.    Yes.

22   Q.    And you gave the list of places that you worked prior to

23   going to work at Arbor.

24   A.    Yes.

25   Q.    Okay.  And do you remember you indicated you had been

1    interviewed, you met with the prosecutors a few times about --

2    to prepare for your trial testimony, and you've also been

3    interviewed by agents on several occasions.  Is that true?

4    A.   Yes.

5    Q.   You've probably been interviewed by agents -- do you

6    remember how many times?

7    A.   Two to three times.  But I'm not exact.

8    Q.   Could it have been six or seven times?

9    A.   I can't remember.

11:23 10   Q.   You can't remember how many times?

11   A.   (Nods.)

12   Q.   Do you remember telling the agents during one of those

13   interviews that at the time you worked at Arbor, you didn't

14   know it was illegal to pay patients or people who found the

15   patients and brought them to Arbor?

16   A.   Yes.

17   Q.   Because you didn't know it was illegal at the time you

18   worked at Arbor; is that correct?

19   A.   I knew, but, like -- but in my culture, when someone do

11:23 20   good to you, sometimes you do back to them as a thanksgiving.

21   So when Faith Newton told me this patient helped her to open

22   the agency, I took it like it's a not a bad thing, though I

23   knew it's a bad thing, but she told me that's how the agency

24   works.

25   Q.   So the bottom line, though, is at the time you worked at

```
 1   Arbor, you didn't think it was illegal to give patients or
 2   finders gifts or money; is that true?
 3              MR. BRADY:  Objection, Your Honor.
 4              THE COURT:  Basis?
 5              MR. BRADY:  I think she just answered that same
 6   question.
 7              THE COURT:  Overruled.
 8   Q.   So do you remember the question?
 9   A.   Can you say it again, please.
10   Q.   Sure, sure.
11        I'm just talking about the time you worked at Arbor, not
12   later on.
13   A.   Okay.
14   Q.   Okay?  When you worked at Arbor, did you know it was
15   illegal to give patients money?
16   A.   Yes.
17   Q.   Do you remember telling the agents that you didn't think
18   it was illegal to give patients money?
19   A.   Yes, based on my culture.
20   Q.   Okay.  So you're saying that you -- was that a lie, then,
21   that you told the agents?
22   A.   It was a lie, but as I say, it's my culture.  I thought
23   it's the right thing to do.
24   Q.   But you told the agents, though, that you didn't think it
25   was illegal to give money to patients while you were working at
```

1    Arbor; is that correct?

2    A.    Yes.

3    Q.    And you told them you only found out it was illegal after

4    you left Arbor and were trained at other places you worked; is

5    that correct?

6    A.    Yeah, other places that I was trained I was not trained to

7    give the money, even before I came to Arbor.  But when I came

8    to Arbor, I was told that's how the agency works.

9    Q.    But you told the agents that you learned it was improper

11:26 10    to give money to patients after you left Arbor and went to

11    another home health care business.  That's true, correct, that

12    you said those things?

13    A.    Yes.

14    Q.    Was that a lie?  Did you lie to the agents again on that

15    occasion?

16    A.    I wouldn't say I lie because the other agencies I was

17    taught it's not good to give any money or any present to the

18    patient.

19    Q.    You get the question, though.  The question is you learned

11:27 20    that after you left Arbor, correct?

21    A.    I had not even learned before Arbor.

22    Q.    But that's not what you told the agents, correct?

23    A.    Yes.

24    Q.    Okay.  Do you have an attorney who represents you now?

25    A.    Yes.

```
 1   Q.   What is his name?

 2   A.   Attorney Boumil.

 3   Q.   Could you say that again?

 4   A.   Attorney Boumil.

 5   Q.   And is he here with you today?

 6   A.   No.

 7   Q.   And he's brought a civil suit against Faith Newton.  Are

 8   you involved in that case at all?

 9   A.   Apart from this one?

10   Q.   Apart from this one.

11   A.   No.

12   Q.   And obviously you entered into a plea agreement where you

13   pled guilty to several charges against you; is that correct?

14   A.   Yes.

15   Q.   And one of them was conspiracy to commit health care

16   fraud?

17   A.   Yes.

18   Q.   And are you familiar with the charge in the indictment

19   against you?

20   A.   Yes.

21        MR. VIEN:  Your Honor, may I approach the witness?

22        THE COURT:  Sure.

23   Q.   Ms. Waruru, it's true that that's a copy of the indictment

24   I've placed before you; is that correct?

25   A.   Yes.
```

|     |     |
| --- | --- |
| 1 | Q.   Could I ask you to turn to paragraph 13 of the indictment, |
| 2 | on page 5.  Page 5, it's easier to find that way.  The page |
| 3 | numbers are weird.  They're at the top. |
| 4 |      Did you find that? |
| 5 | A.   Yes. |
| 6 | Q.   Okay.  Now, paragraph 13 reads, "Between in or about |
| 7 | January 2013 and January of 2017, defendants Newton and Waruru, |
| 8 | together with others known and unknown to the grand jury, |
| 9 | devised a scheme to defraud health care benefit programs." |
| 11:29 10 |      Do you know what the word "devise" means? |
| 11 | A.   No. |
| 12 | Q.   This is the indictment you pled guilty to? |
| 13 | A.   Yes.  Devise, it can mean . . . |
| 14 | Q.   How about conceived, came up with -- |
| 15 |      MR. BRADY:  I'm going to object, Your Honor. |
| 16 | Q.   -- invented?  Are those consistent with your |
| 17 | understanding -- |
| 18 |      THE COURT:  Hold on.  What's the basis? |
| 19 |      MR. BRADY:  Relevance. |
| 11:30 20 |      THE COURT:  What? |
| 21 |      MR. BRADY:  Relevance. |
| 22 |      THE COURT:  Overruled. |
| 23 | Q.   Do you understand that devise means you and Faith Newton |
| 24 | made up the scheme? |
| 25 | A.   Yes. |

```
      1    Q.    Okay.  And on paragraph 14, if you go down a little, in

      2    the second sentence it's talking about the false claims and it

      3    says over $100 million of those claims were fraudulent.

      4          Did I read that correctly?

      5    A.    Yes.

      6    Q.    And were you aware that, after you pled guilty, the U.S.

      7    Attorney put out a press release that said, "Lowell Nurse

      8    Pleads Guilty in 100 Million Dollar Home Health Care Fraud and

      9    Kickback Scheme"?

11:31 10    A.    I saw it on the news.

     11    Q.    So you created a scheme with Faith Newton, and it led to,

     12    according to the government, $100 million in fraud; is that

     13    true?

     14             MR. BRADY:  Objection, Your Honor.

     15             THE COURT:  Well, basis?

     16             MR. BRADY:  There's a lack of foundation, and I also

     17    -- I'll start with foundation.

     18             THE COURT:  Well, come up to sidebar for a second.

     19    SIDEBAR:

11:34 20             THE COURT:  So that last question is not

     21    objectionable.  You could have objected to the ones about the

     22    press release and about the news but you didn't.  So now I'm

     23    trying to figure out if the question -- are you objecting to

     24    the fact she saw it on the news, or are you objecting to the

     25    fact he asked her about devised a scheme.
```

1          MR. BRADY:  I'm objecting to that, I'm also objecting

2     to the fact that the way he's characterizing what the

3     government says, what the government did.  I also have

4     concerns, Your Honor, I understand your practice is to not send

5     the indictment back with the jury.  The defense, though, is

6     sort of selectively picking out parts of the indictment that

7     they want to take and use and characterize and put in front of

8     the jury like this.  So my concern, Your Honor, is if this is

9     not going to be a -- if they can't see the whole picture of the

11:34 10    indictment here the way it's being used, I have concerns about

11    the jury being misled.

12          THE COURT:  I'm not averse to sending the indictment

13    back.  I don't typically do it because there's always a lot of

14    stuff in there that I think needs to be redacted, but I'm happy

15    to send back a redacted version of it.  But I mean, the press

16    release thing is probably objectionable.  Her testifying about

17    what she saw in the news is probably objectionable.  But him

18    asking her if she devised a scheme with Faith Newton for

19    whatever it is is fine, unless he's linking it to the news.  I

11:34 20    wasn't sure exactly what your objection was, and I don't like a

21    speaking objection, so we're doing it up here.

22          MR. BRADY:  And I didn't want to go into detail.  My

23    concern is really, Your Honor -- and I appreciate he can ask

24    about, you know, what they did together, crimes committed

25    together, what she's charged with.  That's fair game.  It's

1    just trying to tie it to these external events.

2          THE COURT:  The objection was late on those.  You've

3    already elicited it.  So that last question is is it based on

4    what you saw on the news.

5          MR. VIEN:  That's not it was.

6          THE COURT:  That's not what he said.  So I'm going to

7    now assume that you're objecting to the news and press release

8    and you'll stay away from that, but the question is on what the

9    scheme is, the devised scheme.

11:34 10          MR. VIEN:  Okay.

11          MR. BRADY:  Thank you.

12    (End of sidebar.)

13    BY MR. VIEN:

14    Q.   Ms. Waruru, so can you remember that last question?  It's

15    been a bit.  Do you want me to a say it again?

16    A.   Please say it again.

17    Q.   So you and Faith Newton came up with, devised a scheme

18    that resulted in, according to the indictment, $100 million in

19    false claims.  Is that true?

11:35 20    A.   Yes, that's what they say.

21    Q.   I want to understand your immigration status a bit.  You

22    were born in Kenya; is that correct?

23    A.   Yes.

24    Q.   You came to the United States?

25    A.   Yes.

```
 1    Q.   You never became a United States citizen; is that correct?
 2    A.   No.
 3    Q.   This is weird because I asked it in a negative, but let me
 4    ask you it in a different way.  Did you ever become a United
 5    States citizen?
 6    A.   No.
 7    Q.   And you currently have a visa?
 8    A.   It expired.  I don't have a visa.
 9    Q.   And so currently you're in the United States illegally?
10    A.   Yes.
11    Q.   Okay.  And you understand that the government could deport
12    you at any time?
13    A.   Yes.
14    Q.   And if the government were to deport you, you would go
15    back to where you were born in Kenya, correct?
16    A.   Yeah.
17    Q.   And is it your understanding that Kenya is struggling
18    right now?
19    A.   Yes.
20    Q.   There's a lot of civil unrest?
21    A.   Yes.
22    Q.   You don't want to go back to Kenya, do you?
23    A.   It's possible.
24    Q.   Do you think that pleading guilty to the multiple frauds
25    would make it more likely or less likely that the government
```

1    would deport you?

2    A.    They will likely deport me.

3    Q.    More likely?

4    A.    Yes.

5    Q.    Even on your plea agreement that you signed it says that

6    you could be subject to deportation.  Is that true?

7    A.    Yes.

8    Q.    Has any government agent or lawyer directly or indirectly

9    told you that they would help you stay in the United States if

11:37 10    you cooperated?

11    A.    No.

12    Q.    But you do hope that they will help you stay in the United

13    States based on your cooperation, correct?

14    A.    I don't know whether they will help me by deportation.

15    Q.    No.  But my question was, you hope they will help you stay

16    in the United States; is that correct?

17    A.    Yeah, that's my prayer.

18    Q.    I'm just asking you what you think.  Do you think the

19    government would be more likely to help you if Faith Newton is

11:38 20    convicted in this case?

21    A.    I don't know.

22    Q.    Do you think the government would be happier with you if

23    Faith Newton were convicted in this case?

24          MR. BRADY:  Objection, Your Honor.

25          THE COURT:  Overruled.

```
 1   A.    No.

 2   Q.    You don't think it matters to them either way?

 3   A.    I don't know.

 4   Q.    Ms. Waruru, when you pleaded guilty, you pled guilty in

 5   front of another judge; is that true?

 6   A.    Yes.

 7   Q.    And do you remember his name?

 8   A.    (No response.)

 9   Q.    Let me help you.  Does "O'Toole" sound right?

 10  A.    Yes.

 11  Q.    Okay.  That was the judge in front of whom you pleaded

 12  guilty, correct?

 13  A.    Yes.

 14  Q.    That's not Judge Burroughs who is watching you testify and

 15  presiding over this trial, correct?

 16  A.    Yes.

 17  Q.    And you pled guilty back in September of 2022; is that

 18  correct?

 19  A.    Yes.

 20  Q.    And you haven't been sentenced yet; is that correct?

 21  A.    Yes.

 22  Q.    And your sentencing was postponed so you could testify in

 23  this case; is that correct?

 24  A.    I was told my case was moved.  It will go after Faith

 25  Newton case.
```

1    Q.    Right.  Could you pull the microphone a little closer?  Do

2    you mind?

3         So you were told your case was postponed until after this

4    trial; is that correct?

5    A.    Yes.

6    Q.    So you understand, of course, that the judge who will

7    sentence you won't see you testify here, correct?

8    A.    Say that again.

9    Q.    Judge O'Toole isn't watching you testify here today,

11:40 10   correct?

11   A.    Yes.

12   Q.    And is it your understanding he'll have to rely on the

13   government to tell him whether or not they think you told the

14   truth?

15   A.    I don't know what they will do.

16   Q.    No, but Judge O'Toole needs someone to tell him, did you

17   tell the truth or didn't you, right?

18   A.    Yes.

19   Q.    And that's the government, correct?

11:40 20   A.    Yes.

21             MR. BRADY:  Objection, Your Honor.

22             THE COURT:  Basis?

23             MR. BRADY:  Foundation.

24             MR. VIEN:  Sorry?

25             THE COURT:  Re-ask the question, if she knows.

1          MR. VIEN:  If you don't mind, I'll just move on, Your

2     Honor.

3          THE COURT:  Okay.

4          MR. VIEN:  Could I ask Ms. Apfel to bring up the plea

5     agreement, which I think is Exhibit 700.  Could we go to page 2

6     of the agreement.

7     Q.   Ms. Waruru, I wanted to ask you about your plea agreement

8     which is now up on the screen.  Paragraph 3, do you see that in

9     front of you?

11:41 10    A.   Yes.

11    Q.   And it talks about the sentencing guidelines; is that

12    correct?

13    A.   Yes.

14    Q.   And the sentencing guidelines are something that the

15    judges have to consider when sentencing a defendant; is that

16    correct?

17    A.   Yes.

18    Q.   And in your plea agreement, it says, "Defendant's offense

19    level is increased by 14 because the defendant caused a loss of

11:42 20    more than $550,000 and less than $1.5 million."

21         Did I read that correctly?

22    A.   Yes.

23    Q.   Yet in the indictment we talked about earlier, it said you

24    and Faith Newton created false claims for $100 million; is that

25    true?

1    A.    Yes.

2    Q.    So in this plea agreement, the government has already

3    given you a big break, isn't that true?

4    A.    Compared, yeah.

5    Q.    Compared to the indictment?

6    A.    Yes.

7    Q.    So in the indictment, they said you caused $100 million in

8    false claims, but in your plea agreement, they say it was less

9    than $1.5 million, correct?

11:43 10    A.    Yes, that's what they say.

11    Q.    Do you understand how those two things can both possibly

12    be true?

13    A.    No, I don't understand it.

14    Q.    I'm sorry, I didn't hear you.

15    A.    I don't understand it.

16    Q.    Were you arrested in this case?

17    A.    Yes.

18    Q.    And did you spend any time in jail?

19    A.    Yes.

11:43 20    Q.    How long did you spend in jail?

21    A.    One day.

22    Q.    Just one day?

23    A.    One night.

24    Q.    Is it fair to say it was very unpleasant?

25    A.    Yes.

```
 1   Q.   You also understand that people convicted of fraud can go

 2   to jail for a long time; is that right?

 3   A.   Yes.

 4   Q.   And now you stand convicted of fraud, correct?

 5   A.   Yes.

 6            MR. VIEN:  Your Honor, I don't want to ask a question

 7   that you may find objectionable.  May I come to sidebar before

 8   I ask?

 9            THE COURT:  Yes.  I don't want you to ask a question

10   that I find objectionable either.

11            MR. VIEN:  Sometimes I need your help.

12   SIDEBAR:

13            MR. VIEN:  I'm sorry.  The next question --

14            THE COURT:  Keep your voice down.

15            MR. VIEN:  The next question I would like to ask is

16   that you know in fact that Faith Newton has been in jail for 28

17   months charged with the same crime that you're charged with.

18            THE COURT:  No, no.

19            MR. VIEN:  That's why I came up.

20            THE COURT:  You did right by coming up.  Don't ask the

21   question.  Your objection I anticipate that would have come is

22   sustained.  I don't want you to ask it because the question is

23   very prejudicial.

24            MR. VIEN:  I think I should get some credit for coming

25   up to --
```

```
 1              THE COURT:  I'll give you full credit.

 2              MR. VIEN:  Thank you.

 3              THE COURT:  Are you going to finish your cross before

 4    lunch?

 5              MR. VIEN:  I don't know.  Some chance.  What time is

 6    lunch, 12:00?

 7              COURTROOM CLERK:  It's a hot lunch.

 8              MR. VIEN:  Oh.

 9              THE COURT:  Right at 12:00 on the hot lunch days.

11:46 10          MR. VIEN:  Whatever.  If you want to break, we'll

11    break at 12:00 either way.

12              THE COURT:  I was just curious how much you had left.

13              MR. VIEN:  Yeah, depends.

14              THE COURT:  Okay.

15    (End of sidebar.)

16              THE COURT:  Mr. Vien is correct that his question was

17    objectionable and he's going to move on.

18              MR. VIEN:  But I am not.  Just the question.

19              Ms. Apfel, may we put up Exhibit 701, the cooperation

11:46 20    agreement.

21    Q.   Ms. Waruru, you've already testified on direct about the

22    cooperation agreement.  And is it fair to say that you're

23    hoping that you're not going to go to jail at all on this case?

24    A.   For that, I don't know whether I will go or not.

25    Q.   Ultimately it will be the judge who decides, Judge O'Toole
```

```
 1   who decides whether or not you go to jail at all, correct?
 2   A.   I don't know which judge because I have a different judge
 3   so I don't know whether it's --
 4   Q.   But Judge O'Toole is the judge in front of whom you
 5   pleaded guilty, correct?
 6   A.   Yeah.
 7   Q.   Okay.  And is it your understanding that the judge in
 8   front of whom you pleaded guilty will be the judge who
 9   sentences you?
10   A.   Yes.
11   Q.   Okay.  And that's Judge O'Toole?
12   A.   Sorry.  You mean the one I had before or the judge in
13   front of me?
14   Q.   The one you had before.  The one you had before, Judge
15   O'Toole, he's the one you pleaded guilty in front of, right?
16   A.   Yeah.
17   Q.   And he's the one who will sentence you, correct?
18   A.   I don't know now if he is the judge, in front him, or the
19   judge in front of me.
20   Q.   I didn't understand that.  I'm sorry.
21   A.   I don't know now whether it's the judge in front of me who
22   do the judgment or it's the judge who I pled guilty to.
23   Q.   You're just confused right now about the judges; is that
24   correct?
25   A.   I know the judge listening is the judge to judge.
```

```
 1   Q.   Let me try to ask it very simply.  Do you know who the
 2   judge is who will impose your sentence?
 3   A.   It's the judge in front of me.
 4   Q.   I couldn't hear the end of that.  Judge what?
 5   A.   The judge in front of me.
 6   Q.   The judge in front of you, Judge Burroughs?
 7   A.   Yes.
 8            MR. VIEN:  Okay.  Your Honor, could I ask for a
 9   correction in that it will be Judge O'Toole who will sentence
10   her, since it's a matter of public record?
11            MR. BRADY:  We can probably stipulate to that.
12            THE COURT:  I think the parties are in agreement that
13   I will not be the one that sentences her.
14   Q.   Anyway, let's go to page 2 of the cooperation agreement.
15   And if you go to paragraph 2, could we blow up the second
16   paragraph under number 2.  Thank you.
17            Now, you understand that this paragraph of the cooperation
18   agreement means it is entirely up to the government whether or
19   not they file a motion and ask Judge O'Toole to give you a
20   lower sentence than he otherwise would.  Do you understand
21   that?
22   A.   Yes.
23   Q.   And whatever the government decides, you've given up your
24   right to appeal or challenge that decision; is that right?
25   A.   Yes.
```

1    Q.    Now, approximately when did you become a licensed

2    practical nurse?

3    A.    2009.

4    Q.    And when did you go to work at Arbor?

5    A.    2014.

6    Q.    So you had about five years of experience as a licensed

7    practical nurse before you went to Arbor?

8    A.    Yes.

9    Q.    Okay.  And when you got to Arbor, approximately how many

11:50 10  people were working in the office?

11   A.    I would say more than ten, but I'm not -- approximately.

12   Q.    I'm sorry, I couldn't hear you.

13   A.    I would say like more than ten, but I'm not sure.

14   Q.    Those are just the office workers, correct?

15   A.    Yes.

16   Q.    And when you were working at Arbor, approximately how many

17   visiting nurses and home health care aide workers were there?

18   A.    I'm not sure.

19   Q.    Was it more than 100?

11:51 20  A.    I believe so.

21   Q.    And about how many patients were there at Arbor when you

22   went to work there?

23   A.    I don't know how many patients that Arbor had.

24   Q.    Could you estimate for us or not?

25   A.    No, I'm not sure.

```
 1   Q.    Okay.  When you first came to Arbor, what was the
 2   condition of the filing at Arbor, the records, hard copies of
 3   the records?
 4   A.    For the office, I don't know the filing because I didn't
 5   work in the office.
 6   Q.    You did not work in the office?
 7   A.    No.
 8   Q.    But you've been to the office, right?
 9   A.    Yeah.
10   Q.    And when you went to the office, you saw files all over
11   the place; is that fair to say?
12   A.    Yes.
13   Q.    It was a mess?
14   A.    They were arranged, so I don't know, when you say "mess,"
15   I don't know what you mean.
16   Q.    Well, let me just go back.  You saw files all over the
17   place when you went to the office to work at Arbor; is that
18   correct?
19   A.    Yeah.
20   Q.    Okay.  And do you know where the hard copies, paper copies
21   of the files were kept?
22   A.    When you go to the offices, you see the binders.  So I
23   believe that's where they put the paperwork.
24   Q.    And when you were working at Arbor, was Helen Sech working
25   there?
```

```
 1    A.    I remember somebody by the name Helen.

 2    Q.    You don't remember what she did, though?

 3    A.    I'm not sure what she did, but I remember the name Helen

 4    in the office.

 5    Q.    What about Joseph Muiruru?

 6    A.    Yes.

 7    Q.    You know him?

 8    A.    Yes.

 9    Q.    What was his job at Arbor?

11:53 10   A.    He was in nursing department.

11    Q.    And wasn't he the head of nursing?

12    A.    Yes.

13    Q.    Okay.  So he was above you in the hierarchy at Arbor; is

14    that correct?

15    A.    Yes.

16    Q.    And what about Rosa Gonzales, did she work there?

17    A.    Yes.

18    Q.    What was her job?

19    A.    She was giving the schedule.  Sometimes she will be a

11:54 20   scheduler.

21    Q.    And how about Airanisse Quintana, what did she do?

22    A.    That one, I don't remember her.

23    Q.    And who is the president of Arbor?

24    A.    There were -- say that question again.

25    Q.    Was there someone who had the title of president at Arbor?
```

```
 1   A.   Yes.
 2   Q.   And do you remember what his name was?
 3   A.   Syed.
 4   Q.   You mean Syed Hussain?
 5   A.   Yeah.
 6   Q.   Wasn't it another man whose last name was Kahn?
 7   A.   There was another one who came after Syed, but I don't
 8   remember his name.
 9   Q.   You're not sure if that's Mr. Kahn or not?
10   A.   No.
11   Q.   And Syed Hussain, did he overlap with you while you were
12   working at Arbor?
13   A.   Sometimes I'll call him if I need help.
14   Q.   Sorry.  By "overlap" I meant did you guys work at Arbor at
15   the same time?
16   A.   Yes.
17   Q.   Okay.  And what was his job?
18   A.   There was a time he was the one above the --
19   Q.   The one above whom?
20   A.   Like, he was overall for all the workers.
21   Q.   He was the boss in the office?
22   A.   Yeah.
23   Q.   Okay.  And what about Joseph Ouko?
24   A.   Joseph was in the department, nursing department.
25   Q.   And what was his job in nursing?
```

A.   I'm not sure, but even him, if you need anything with
nursing, you can talk to him.

Q.   If there are any problems with nursing, you can go to
Joseph Ouko?

A.   Yes.

Q.   Okay.  And that was at a different time than Ben Muiruru
was in charge of the nurses?

A.   I believe so.

Q.   Okay.  And do you know how long Syed Hussain and Joseph
Ouko stayed at Arbor?

A.   No.

Q.   Were they -- were they there in 2015; do you know?

A.   I don't remember.  I know they were there, but I don't
remember the exact year that they work there.

Q.   Is it fair to say that both of them only worked there for
a few months?

A.   Probably.

Q.   Okay.  You just don't know because you weren't in the
office or you can't remember?

A.   Yeah, I can't remember.  So I wasn't like in the office
every day, so that's why I'm not sure.

Q.   But it's fair to say they weren't there the entire time
you worked at Arbor, correct?

A.   No.

Q.   I'm sorry, I screwed that up because of the way I asked

1   the question.  Is it correct that they were not there

2   throughout the entire time you worked there?

3   A.   Yes.

4   Q.   Now, I wanted to ask you a couple of questions about

5   nursing notes in general.

6   A.   Yes.

7   Q.   Some of the nursing visits you do are repetitive; is that

8   correct?

9   A.   Yes.

11:58 10   Q.   You do the same thing, right?

11   A.   Yes.

12   Q.   And you're saying that -- on direct you said sometimes you

13   didn't actually do nursing visits, correct?

14   A.   Yes.

15   Q.   But did you ever do nursing visits?

16   A.   Yes.

17   Q.   And did you do nursing visits and provide skilled nursing

18   care to the patients?

19   A.   Yes.

11:58 20   Q.   And many of the patients you went to see needed the

21   skilled nursing care; is that correct?

22   A.   Yes.

23   Q.   And you provided it to them, correct?

24   A.   Yes.

25   Q.   And your notes, regardless of whether they reflected that,

1    you actually helped these people when you went and saw them,

2    correct?

3    A.    Yes.

4    Q.    Did Faith Newton or anyone else at Arbor tell you not to

5    do that?

6    A.    To do what?

7    Q.    Did they ever tell you not to go help these people?

8    A.    No.

9    Q.    And you did help these people, right?

11:59 10    A.    I did.

11    Q.    Well, you think because you're being humble.  But you went

12    and you're a licensed practical nurse and you provided skilled

13    nursing care to them, correct?

14    A.    When I visit them I will provide what is supposed to be

15    provided.

16    Q.    Right.  And can you say, what percentage of nursing notes

17    you sent in, what percentage were real and reflected actual

18    nursing visits where you helped these people versus the ones

19    that you talked about just making up?

11:59 20    A.    I am not sure.

21          MR. VIEN:  Your Honor, I know you want to stop at

22    exactly at 12:00 today, and I have a little bit more, so I

23    wanted to bring it to your attention.

24          THE COURT:  We can recess for lunch.  He's saying that

25    because I told him at sidebar that your lunch was hot today and

 1    we'd be sending you up right at 12:00.  So we'll recess for

 2    lunch until quarter-of-one.

 3               COURTROOM CLERK:  All rise for the jury.

 4               (Jury exits the courtroom.)

 5               THE COURT:  All right.  Back at quarter-of-one.  The

 6    witness is on cross-examination, so the government shouldn't be

 7    talking to her.  You can talk to her, but he's entitled to

 8    cross-examine on any conversations that you had during the

 9    break, so probably the safer course is not talking to her.

12:01 10               Anything else before we break?

11               MR. VIEN:  No.

12               MR. BRADY:  Not for us, Your Honor.

13               THE COURT:  Okay.  See everybody at quarter-of-one.

14    Thanks.

15               (Recess, 12:01 p.m. - 12:47 p.m.)

16               THE CLERK:  All rise for the jury.

17               (The jury is present for the following.)

18               THE CLERK:  Court is back in session.  Please be

19    seated.

12:48 20               THE COURT:  When you're ready, Mr. Vien.

21    BY MR. VIEN:

22    Q.    Ms. Waruru, to try to pick up where we left off, I had

23    asked you some questions about what you did as a nurse.  And is

24    it true that you provided services on many occasions?

25    A.    Yes.

Q.    And you tried to help the patients?

A.    Yes.

Q.    And some of the other nurses and home health care aides
did the same; is that correct?

A.    Yes.

Q.    Nobody was prevented from helping the patients in doing
their jobs; is that correct?

A.    No.

Q.    I'm sorry.  I keep doing that and asking you the reverse.

    Is it true that other nurses and home health aides cared
for the patients and did what they were supposed to do as well?

A.    They did.

Q.    Did other nurses and home health aides go to their
patients and provide the services --

        THE COURT:  Hold on, Mr. Vien.  You have got to leave
the phones in the jury room.  Okay.  Go ahead, Mr. Vien.

BY MR. VIEN:

Q.    So Ms. Waruru, I think we agree that you provided care to
a lot of patients; is that correct?

A.    Yes.

Q.    You attended the visits and did what you were supposed to
do?

A.    Yes.

Q.    And did other nurses, to your knowledge, do the same?

A.    I am not sure because everybody was assigned to their own

```
     1    patient.
     2    Q.    Okay.  So you weren't present, so you're saying you can't
     3    say whether or not they did what they were supposed to do?
     4    A.    Yeah, I cannot talk on behalf of other nurses or nurse's
     5    aide because we didn't, like, go to homes together.  You had
     6    your own patient assigned to.
     7    Q.    Did you ever go to homes with other nurses?
     8    A.    Yes.
     9    Q.    And when you did that, were they -- were you both
12:50 10    performing the duties you were supposed to perform?
    11    A.    Yeah, but with different shifts.
    12    Q.    Right.  And who are some of the nurses that, in your
    13    opinion, did a good job of providing care for the patients?
    14          Did you hear the question?
    15    A.    Repeat the question.
    16    Q.    You said sometimes you saw other nurses doing the patient
    17    care they were supposed to do --
    18    A.    Yes.
    19    Q.    -- correct?
12:50 20    A.    Yes.
    21    Q.    Who are some of the other nurses that you felt provided
    22    good care to the patients?
    23              MR. BRADY:  I object to that, Your Honor.
    24              THE COURT:  Basis?
    25              MR. BRADY:  Relevance.
```

```
 1              THE COURT:  I'll let him have the question.  Not
 2    unlimited in this area, though, Mr. Vien, please.
 3    BY MR. VIEN:
 4    Q.   Do you understand the question?
 5    A.   Yes.  There are different nurses.
 6    Q.   Which ones were good in your opinion?
 7    A.   I know one, Faith Ngigi.
 8    Q.   Just for the court reporter, do you know how to spell her
 9    last name?
10    A.   N-G-I-G-I.
11    Q.   And she's one of the few other nurses that you actually
12    worked with out in the field, so to speak, right?
13    A.   Yes.  She had -- she was a supervisor of one of my
14    patients.
15    Q.   And what about the home health care aides; did you ever
16    have occasion to see them provide the services they were
17    supposed to provide?
18    A.   Not all the time.  We did go in different times.
19    Q.   I think you said not all the time, but were there times
20    when you saw home health care aides actually providing the
21    services to the patients?
22    A.   Yes.
23    Q.   And do you remember some of the names of those home health
24    care aides who actually provided services to the patients?
25    A.   Yes.
```

```
 1   Q.   What are some of their names?
 2   A.   I worked with Lucy Muthoni, I've worked with Summer, and I
 3   worked with other Spanish-speaking nurse's aides.  I don't
 4   remember their names.
 5   Q.   And they all did a good job, right?
 6   A.   Yes.
 7   Q.   And they took care of the patients?
 8   A.   Yes.
 9   Q.   And nobody at Arbor told you not to do that, right?
10   A.   No.
11   Q.   No, nobody told you, correct?
12   A.   Nobody said you're not supposed to do the work.
13   Q.   And some of the visits are kind of redundant; is that
14   correct?  They're very similar, over and over again, right?
15   A.   Yes.
16   Q.   And in those situations when you cut and paste the nursing
17   notes, since you're doing the same thing over and over again,
18   the nursing note basically stays the same, right?
19   A.   Yeah, because there are sometimes the same patient and
20   they don't change.
21   Q.   And you're doing the same thing to them, right?
22   A.   Yes.
23   Q.   So instead of rewriting nursing notes for what you
24   actually did, you just copied and pasted when you were
25   basically doing the same thing, right?
```

```
 1   A.   I'll do copy and paste of the note, but the vital signs

 2   sometimes are different, because the vital signs you take maybe

 3   today is not be the same tomorrow, but the nurse's note --

 4   Q.   So in your opinion, just because you were cutting and

 5   pasting a note, it didn't mean that you didn't provide the care

 6   that the note reflects; is that true?

 7            MR. BRADY:  Objection.

 8            THE COURT:  Hold on.  Basis?

 9            MR. BRADY:  He's asking in your opinion.

10            THE COURT:  Well, rephrase the question, please,

11   Mr. Vien.

12   BY MR. VIEN:

13   Q.   Okay.  You've heard a lot about cutting and pasting notes,

14   right?

15   A.   Yes.

16   Q.   Okay.  When you're seeing a patient that required the same

17   kind of help or skilled nursing care, you see them over and

18   over again, right?

19   A.   Yes.

20   Q.   Okay.  You're basically going to do the same thing every

21   visit, right?

22   A.   Yes.

23   Q.   And so in those circumstances, you would cut and paste

24   from an earlier visit, right?

25   A.   Yes.
```

1   Q.   And -- but you actually provided the services, right?

2   A.   Not all the time.

3   Q.   No, but on the cases where you did provide the services,

4   the fact that a nursing note was cut and pasted didn't mean you

5   didn't work there, right?

6   A.   I'll copy and paste even if I didn't see the patient.

7   Q.   But you would also do it when you did see the patient?

8   A.   Yes.

9   Q.   Okay.  And the only people that know what actually went on

12:55 10  in a patient visit are the nurse or the home health care aide

11  and the patient, right?

12  A.   And the people in the office where I'll send the notes.

13  Q.   But the people in the office weren't actually at the

14  patient's home with the nurse or the home health care aide,

15  correct?

16  A.   No.

17  Q.   So you need the home -- the only people who would know,

18  unless other people are present, would be the home health care

19  aide and the patient, correct?

12:56 20  A.   Yes.

21  Q.   I just wanted to ask a couple of questions about some of

22  the patients you talked about.  Ernest, do you remember Ernest

23  Cate?

24  A.   Yes.

25  Q.   And during the time you were at Arbor, he actually had

1  surgery, right, while you were at Arbor?

2  A.    Not while I was in Arbor, but if I can recall, he had done

3  surgery already.

4  Q.    Before you started, he had just -- is it fair to say he

5  just had surgery when you started?

6  A.    I can't recall very well but --

7  Q.    And he had -- what does PCA stand for again?

8  A.    Personal care assistant.

9  Q.    And after surgery, he had a personal care assistant, right?

12:57 10  A.    Yes.

11  Q.    In addition to skilled nursing visits, right?

12  A.    Yes.

13  Q.    And he basically had a personal care assistant every day?

14  A.    Yes.

15  Q.    And so you -- and that was -- you saw that because you

16  were at his home frequently, right?

17  A.    Yes.

18  Q.    And you were taking care of it, right?

19  A.    Yes.

12:57 20  Q.    And Ernest Cate currently is homebound, right?

21  A.    When I started, he was not homebound.

22  Q.    Okay.  But now he is, correct?

23  A.    I don't know because I haven't seen him in like two to

24  three years.

25  Q.    And earlier today you were talking about some of the OASIS

```
      1   documents?

      2   A.   Yes.

      3   Q.   And you said they were signed by Faith Newton, right?

      4   A.   Yes.

      5   Q.   And they were signed electronically by Faith Newton, right?

      6   A.   Yes.

      7   Q.   So it's not her actual signature on it, correct?

      8   A.   You can sign electronically in the computer.  That's what

      9   we all used to sign.

12:58 10   Q.   But the point is, once you have an electronic signature,

     11   you can't look at it and say, oh, I recognize this as Faith

     12   Newton's signature, because it's electronic, right?

     13           MR. BRADY:  Objection, Your Honor.

     14           THE COURT:  Basis?

     15           MR. BRADY:  The form of the question.

     16           THE COURT:  Overruled.

     17   BY MR. VIEN:

     18   Q.   Correct?

     19   A.   Yes.

12:58 20   Q.   John Enright, Mr. Enright is actually an alcoholic; is

     21   that true?

     22   A.   Yes.

     23   Q.   And he was also legitimately prescribed Percocets, right?

     24   A.   Yes.

     25   Q.   And as a nurse, you know that combination of alcohol and
```

1  Percocets is very dangerous, right?

2  A.   Yes.

3  Q.   And so what you did is you frequently went to John

4  Enright's home because you kept the Percocets locked up, right?

5  A.   I'll do the med planner.  You put like the medication in

6  the med planner.  So you put them in for those days that you

7  wouldn't go, and the rest you're going to lock -- we had a

8  lockbox, and I used to lock the rest in the box.

9  Q.   Right.  Because you didn't want him to get them when he

12:59 10  was drinking?

11  A.   Yes.

12  Q.   But he needed the Percocets, right?

13  A.   Yes.

14  Q.   And so that required you to make frequent visits to his

15  home, correct?

16  A.   Yes.

17       MR. VIEN:  Now, I was wondering if Ms. Apfel could

18  take a -- put up the text messages, which are here -- I have

19  here somewhere.  Excuse me.  Exhibit 675.  And could we go to

01:00 20  USAO number -- the last five -- four numbers are 5066.

21       And could we find somewhere it says P-L-Z?  Let's try

22  5095.

23  BY MR. VIEN:

24  Q.   Could you blow up the text messages that says -- in the

25  middle there, it says yap, Y-A-P.

```
 1          Now, is that -- did you write that "yap, the daughter
 2    wants more hours"?
 3    A.    Let me read it.
 4          (Witness reviews document.)
 5    A.    Yes.
 6    Q.    Is that you or Faith Newton that wrote that?
 7    A.    It says it's me, Winnie Waruru.
 8    Q.    And you say that, "Tell her we will give her more hours if
 9    the doctor approves; otherwise, no more after July 4th."
10    A.    Yes.
11    Q.    And that means you needed a doctor's approval to increase
12    her hours; is that right?
13    A.    Yes.
14    Q.    Okay.  And Faith Newton didn't tell you not to wait for
15    the doctor.  She accepted that, right?
16    A.    I cannot remember, but I can see the message.
17    Q.    Well, she doesn't say don't worry about the doctor?  She
18    didn't say anything like that, right?
19    A.    No, I don't see it.
20          MR. VIEN:  Okay.  And could you go to 5100, please.
21    BY MR. VIEN:
22    Q.    I don't want to waste your time on that because I can't
23    find the one I wanted to talk about.
24          So let me ask you, when you made these false statements to
25    the agents, Faith Newton wasn't with you, correct?
```

```
 1    A.    No.

 2    Q.    You did that on your own, right?

 3    A.    Yes.

 4    Q.    And when you did these patient visits or didn't do the

 5    patient visits, that was up to you, right?

 6    A.    Say that again.

 7    Q.    Faith Newton wasn't with you telling you when you did

 8    patient visits, right?

 9    A.    Yeah, but she has trained me before.

10    Q.    She talked to you, but you're the one who went out to the

11    house, right?

12    A.    Yes.

13    Q.    And you could have done the visits had you wanted to,

14    right?

15    A.    Yes.

16    Q.    And Faith Newton didn't enter those patient nursing notes

17    for you, right?

18    A.    No.

19    Q.    You did that on your own, correct?

20    A.    Yes.

21          MR. VIEN:  I don't have anything else right now, Your

22    Honor.

23          THE COURT:  Redirect?

24

25
```

1          MR. BRADY:  Just briefly, Your Honor.

2     REDIRECT EXAMINATION BY MR. BRADY:

3     Q.    Good afternoon, Ms. Waruru.

4     A.    Good afternoon.

5     Q.    I am going to ask you a few questions about the

6     cross-examination, follow up on that, okay?

7     A.    Yes.

8     Q.    Okay.  Do you remember that Mr. Vien asked you a couple of

9     questions on cross-examination about the size of the fraud that

01:05 10   you agreed to commit with Faith Newton?

11    A.    Yes.

12    Q.    You remember he showed you -- showed you the indictment?

13    A.    Yes.

14    Q.    And he referred you to somewhere in there where it said

15    $100 million fraud?

16    A.    Yes.

17    Q.    Okay.  And then, do you recall he also directed you to

18    your plea agreement?  Do you remember looking at that, too?

19    A.    Yes.

01:05 20   Q.    Okay.  And he directed you to a number in there that was

21    $1.5 million?

22    A.    Yes.

23    Q.    Okay.  Did you and Faith Newton have different roles in

24    committing this fraud?

25          MR. VIEN:  Objection to the relevancy, given the point

```
 1    he's trying to make.
 2            THE COURT:  Overruled.
 3    BY MR. BRADY:
 4    Q.   Let me ask a different question.
 5         Did you and Faith Newton have different roles at Arbor
 6    Homecare?
 7    A.   Yes.
 8    Q.   How were your roles different?
 9    A.   My role was to see the patient in the field and her role
10    was in the office.
11    Q.   So you worked out in the field as a nurse, right?
12    A.   Yes.
13    Q.   And Ms. Newton worked back in the office at Arbor, right?
14    A.   Yes.
15    Q.   Did you have any ownership stake in Arbor?  Did you own
16    Arbor?
17    A.   No.
18    Q.   Did you have the ability to hire anybody at Arbor?
19    A.   No.
20    Q.   Did you have the ability to fire anybody at Arbor?
21    A.   No.
22    Q.   Did you have anybody who you supervised at Arbor, somebody
23    who reported to you?
24    A.   No.
25    Q.   No, okay.  Did Faith Newton have people who reported to
```

1   her at Arbor?

2   A.   Yes.

3   Q.   How many?

4   A.   Almost, like, if anybody need, have any question, most of

5   the people are going to her, most of the nurses.

6   Q.   So for most of the nurses at Arbor, she was the go-to

7   person, right?

8   A.   Yeah.

9   Q.   Because she was the boss, right?

01:07 10   A.   Yes.

11   Q.   What role did you have at Arbor relating to training other

12   people?

13   A.   I didn't have any.

14   Q.   What role did you have at Arbor relating to the home

15   health aide program?

16   A.   I didn't have any.

17   Q.   Okay.  Did you have anything to do with creating documents

18   relating to the home health aide program?

19   A.   No.

01:08 20   Q.   So did you ever create like a certificate saying somebody

21   was trained to be a home health aide at Arbor?  Did you ever do

22   that?

23   A.   No.

24   Q.   One of the numbers you were asked about on cross was $1.5

25   million from the plea agreement.  Remember that?

```
 1    A.    Yes.

 2    Q.    Do you know how much money Arbor made billing for your

 3    nursing visits?  Do you know what that amount was?

 4    A.    No.

 5    Q.    Because you got paid by the hour, right?

 6    A.    Yes.

 7    Q.    Do you know if Faith Newton was paid just by the hour?

 8    A.    I don't know.

 9    Q.    Okay.  You testified about this earlier, but how much

10    money did you make?

11              MR. VIEN:  Objection to the scope.  That was not

12    subject to cross-examination.

13              THE COURT:  Overruled.

14    BY MR. BRADY:

15    Q.    How much money, Ms. Waruru, did you make from your time

16    working at Arbor?

17    A.    Over $200,000.

18    Q.    Over $200,000?

19    A.    Yes.

20    Q.    Do you have any idea how much money Faith Newton made from

21    Arbor?

22    A.    No.

23              MR. BRADY:  Nothing further, Your Honor.

24              MR. VIEN:  No recross, Your Honor.

25              THE COURT:  You're excused.  Thank you.  You're
```

1    excused, Ms. Waruru.  You can go.

2              THE WITNESS:  Thank you.

3              THE COURT:  Next witness, please.

4              MR. BRADY:  Your Honor, the United States calls Andrew

5    Olowu.

6              Your Honor, I believe we have binders for this

7    witness, which we may need to approach to hand up, unless

8    they're already there.

9              THE CLERK:  Please raise your right hand.

01:10  10              (Witness sworn.)

11              THE WITNESS:  I do.

12              THE CLERK:  Thank you.

13              Can you please state your name and spell your last

14    name for the record.

15              THE WITNESS:  My name is Andrew Olowu, O-L-O-W-U.

16              THE CLERK:  Thank you.

17              MR. BRADY:  Your Honor, may I approach the witness and

18    hand him the binder?

19              THE COURT:  You may.

01:11  20              MR. BRADY:  May I proceed, Your Honor?

21              THE COURT:  Of course.

22                   ANDREW OLOWU, duly sworn

23    DIRECT EXAMINATION BY MR. BRADY:

24    Q.   Good afternoon, Mr. Olowu.

25    A.   Good afternoon.

```
 1   Q.   And I know you already stated your name here, but could I
 2   ask just to introduce yourself again to the jury.
 3   A.   My name is Andrew Olowu.
 4   Q.   Mr. Olowu, where do you live?
 5   A.   I live in Dallas, Texas.
 6   Q.   Welcome to Boston.
 7   A.   Thank you.
 8   Q.   Where do you work, Mr. Olowu?
 9   A.   I work for Axxess.
10   Q.   What is Axxess?
11   A.   Axxess is a health technology company.  We provide
12   electronic medical record systems for care-at-home
13   organizations, like home health, hospice agencies.
14   Q.   And for the benefit of the court reporter, can I ask you
15   to spell "Axxess."
16   A.   Sure.  It's A-X-X-E-S-S.
17   Q.   Okay.  Where is Axxess located?
18   A.   Axxess is located in Dallas, Texas.
19   Q.   Okay.  How big a company is Axxess?
20   A.   We have over 3,000 organizations and with over 800
21   employees.
22   Q.   And how long has Axxess been around?
23   A.   Axxess has been around since 2007.
24   Q.   And how long have you been with Axxess?
25   A.   Since the beginning, since 2008.
```

```
  1    Q.   And what's your job at Axxess?

  2    A.   I'm the chief technology officer at Axxess.

  3    Q.   And for how long have you been in that role at Axxess?

  4    A.   Since the beginning.

  5    Q.   And I think, Mr. Olowu, you started to describe this

  6    before, but what types of companies does Axxess work with?

  7    A.   So we work with home health/home care hospice agencies.

  8    Q.   Okay.  Was Arbor Homecare Services one of those companies?

  9    A.   Yes.  Arbor was a client.

 10    Q.   Arbor was a client.  Now, as a client, what products or

 11    services did Axxess provide to Arbor?

 12    A.   We provided EMR, electronic medical record system, to

 13    Arbor for their home health services.

 14    Q.   So an electronic medical record system?

 15    A.   Uh-huh.

 16    Q.   How did that work?

 17    A.   Well, the EMR is a system where you can store your patient

 18    records, you can schedule your visits, you can file your

 19    claims, your billing and your reporting, your annual reporting.

 20    So it's a comprehensive system.

 21    Q.   Was there an application that went along with it?

 22    A.   Yes.

 23    Q.   Can you describe for the jury how that worked?

 24    A.   Yes.  The application that I just described, you gain

 25    access to it, you -- we typically, for the administrative
```

1    agency, create credentials for them to be able to access the

2    system, and from there they are able to create additional

3    users, who in turn can complete their documentation and use the

4    system for their daily running of the operation.

5    Q.    So Axxess, in other words, Axxess kind of sets up for a

6    client, like Arbor, a specific database and web application?

7    A.    Web application, yes.

8    Q.    And you mentioned something about users for the database.

9    How could the users access the Axxess database?

01:15 10    A.    So the users have their own email addresses and

11    credentials, passwords to access the system.

12    Q.    Okay.  And once Arbor was set up on the Axxess system,

13    could they add documents and records into the system?

14    A.    Absolutely.

15    Q.    How would they do that?

16    A.    Well, once they log in, we have visit notes, we have

17    orders in the system that they can fill out.  The system also

18    allows them to upload notes that they've completed by hand into

19    the system as well.

01:16 20    Q.    Have you heard of the term "audit trail"?

21    A.    Yes.

22    Q.    What's an audit trail?

23    A.    So an audit trail, in our situation, is just an electronic

24    way of storing all the actions that a user performs in our

25    system.  So we are able to retrieve all the action undertaken

1    in the system.  So that's what the audit trail is.

2    Q.    And was there an audit trail for Axxess's application?

3    A.    Yes.

4    Q.    Okay.  Now, with Arbor's use of the Axxess system, were

5    users at Arbor able to send and receive messages through

6    Axxess?

7    A.    Yes.

8    Q.    How did that work?

9    A.    So we do have a messaging functionality within the system

01:16 10   that they are able to use to send information within the

11   system.

12   Q.    So when a user logged or logs into the Axxess application

13   for Arbor, is it possible for that user to run searches on the

14   application?

15   A.    It is.

16   Q.    How does that work?

17   A.    In the system we provide functionality to search for

18   patients by their names or their medical record numbers.

19   Q.    Okay.  And so is it possible to run a search in the system

01:17 20   for a particular patient to find their records?

21   A.    Yes, absolutely.

22   Q.    Okay.  Mr. Olowu, at some point in response to a search

23   warrant, did Axxess provide the government with a copy of its

24   database for Arbor?

25   A.    Yes, we did.

1   Q.   And was there -- is there a term for the way that Axxess

2   provided that data to the government?

3   A.   Yes.  What we do is when we respond to that, we copy or

4   replicate or clone the database so that we can have a snapshot

5   of the data as of that time based on the request we got from

6   the government.

7   Q.   Okay.  And was that back in April of 2016?

8   A.   That is correct.

9   Q.   Okay.  And that replicated database that was provided to

01:18 10   the government at that time, was that a copy of the same data

11   that Arbor had used?

12   A.   Yes, that is correct.

13   Q.   Fair to call that a snapshot?

14   A.   Yes, it's a snapshot.

15   Q.   Now, after that snapshot or when that snapshot was

16   provided to the government, could the government change or

17   alter Arbor's data within that replicated database?

18   A.   No.  No, the government isn't able to do that.

19   Q.   Why do you say no?

01:18 20   A.   Because when we clone -- well, the government only has

21   access to a read-only version of the data.

22   Q.   When you say it's read-only version of the data, what does

23   that mean?

24   A.   Yes.  I should explain.  It means that you can't make

25   changes to it, that you can only view the data that was copied

       1   from the original database.

       2   Q.    Okay.  Now, so that copy of the database, the replicated

       3   database that was provided to the government, did that database

       4   contain records of Arbor?

       5   A.    It did.

       6   Q.    Okay.  And were those records that were made and kept in

       7   the ordinary course of business?

       8   A.    Yes.

       9   Q.    Okay.  Mr. Olowu, what were the -- what are the types or

01:19 10   categories of the record -- of records that were kept in the

      11   Axxess database for Arbor?

      12   A.    So we kept orders like physician notes and plan of cares;

      13   we kept nursing documents, like skilled nursing notes; therapy

      14   documents; aide documents; as well as summaries and other types

      15   of notes.

      16   Q.    How about OASIS documents?

      17   A.    Yes.  OASIS is a nursing note.

      18   Q.    Okay.  Got it.  One of the types of documents you

      19   mentioned, Mr. Olowu, was a plan of care?

01:20 20   A.    That's correct.

      21   Q.    Are you familiar with what that is?

      22   A.    Yes, I am.

      23   Q.    Can you just generally describe that to the jury, what

      24   that means?

      25   A.    So a plan of care document is usually created by the

1    assessing clinician, and it contains the orders or the goals

2    that the clinician has for the patient in that episode of care.

3    Q.    Mr. Olowu, if you wanted to go into Axxess and look at a

4    plan of care for a patient of Arbor --

5    A.    Yes.

6    Q.    -- what would you do?  How would you do that?

7    A.    Well, I mean, you log in securely with your credentials,

8    and you go to the patient's chart, you identify the patient you

9    want.  From the chart you can filter by the type of documents

01:21 10    you want, nursing documents.  In this case, an order.  You can

11    filter by orders, and you would see a listing of all of the

12    orders that belong to the particular patient, and then you can

13    click on it to enter it in or if you wanted to view it, you

14    would click on a print icon that gives you a preview of the

15    plan of care, so you can see a view of it.

16    Q.    Okay.  And does that way of searching for something, does

17    that -- does that have a name?  Is there a term you use to

18    describe that?

19    A.    For the chart?

01:21 20    Q.    To kind of get to that print view, how do you refer to

21    that?

22    A.    Well, we just say it's a print preview of the document.

23    Q.    Okay.

24    A.    Yes.

25    Q.    And so for a plan of care, if you searched it and you use

1    the print preview to find it, would that plan of care include

2    any addendum or addenda?

3    A.    Yes, it would.

4    Q.    Okay.  And that would be two, three pages?

5    A.    That's correct.

6    Q.    Okay.  Now, let me ask you this, is it possible for a user

7    to print out hard copies of Arbor documents from the Arbor

8    Axxess database?

9    A.    Yes, it is possible.  You can use the print functionality

01:22 10   that I just mentioned.  The print preview allows you to print

11   that out.  You can also use a bulk feature to print several

12   documents at the same time.

13   Q.    Okay.  Now, Mr. Olowu, in front of you on the witness

14   stand there's a binder of records.  Do you see that?

15   A.    Yes, I do.

16   Q.    Okay.  And let me just -- let me ask you and just, you

17   know, make clear what's in there.  Do you see that that

18   contains Exhibits 410 through 429?

19   A.    Yes.  410 to 429, yes.

01:23 20   Q.    Okay.  And then 431 to 461?

21   A.    Yes.

22   Q.    Okay.  And then do you see it has Exhibits 463 to 485?

23   A.    Yes, I do.

24   Q.    I tried to skip some to keep it interesting.

25         Then do you see it has 489 -- Exhibits 489 to 497?

```
 1   A.   Yes, I do.
 2   Q.   Okay.  And then it also has Exhibits 499 to 515; do you
 3   see that, also?
 4   A.   Yes, I do.
 5   Q.   Okay.  And then it's got Exhibits 517 to 532?
 6   A.   Yes, I do.
 7   Q.   And then do you see Exhibit 537 in the binder?
 8   A.   Yes, I do.
 9   Q.   And then from there it's from 539 to Exhibit 548; do you
10   see that?
11   A.   Yes.  Yes, I do.
12   Q.   And then to round it out, do you see Exhibits 706 to 710?
13   A.   Yes, I do.
14   Q.   Okay.  Any other exhibits I missed that are in that
15   binder?
16   A.   No.
17   Q.   Okay.  Now, Mr. Olowu, did you have a chance to review
18   those exhibits prior to your testimony?
19   A.   Yes, I did.
20   Q.   Okay.  And based on your review, what are those records
21   generally?
22   A.   So from my review, these documents came from our system.
23   They look -- well, they are skilled nursing notes that were
24   OASIS documents in there, plan of care documents in there.
25   There were several types of documents that were printed from
```

1  our system in this exhibit.

2  Q.    Just to be clear, Mr. Olowu, did you go through that

3  binder and compare that to what's in the Arbor database --

4  A.    Yes, I did.

5  Q.    -- in Axxess?

6  A.    Yes, I did.

7  Q.    You did that yourself?

8  A.    I did that myself.

9  Q.    Okay.  And what did that exercise, that comparison, what

01:25 10 did it show?

11  A.    Well, it showed that the exhibits that you have is

12  consistent with what we have in the system.

13  Q.    Okay.  Let me ask you kind of a separate question.

14      If you wanted to print out the medical records for a

15  single patient in Axxess and you wanted to do it in bulk, is

16  there a way to do that?

17  A.    Yes.  We have that bulk export functionality, yes.

18  Q.    Something called a bulk export?

19  A.    Yes.  A bulk printing, bulk export, yes.

01:25 20 Q.    Can you explain to us what happens when you use that bulk

21  export functionality?

22  A.    So what happens is when you use it on a particular patient

23  chart, it takes all the documents associated with that patient

24  and it puts it in a file format, a PDF format for printing, and

25  it, you know, aggregates all of that in one place where you can

1  print it at once, instead of printing the documents one at a

2  time.

3  Q.   And if you were to print the documents one at a time, that

4  could be thousands of pages, right?

5  A.   Yes.

6  Q.   Okay.  So if you wanted to print out a large volume of

7  documents for a single patient, which functionality would you

8  use?

9  A.   I'll use the bulk.

01:26 10  Q.   Okay.  Now, when a user like yourself of Axxess uses the

11  bulk export to print an entire record for a patient in hard

12  copy -- are you with me?

13  A.   Yes.

14  Q.   -- does the entire document always print out?

15  A.   No.  We do have some documents that don't make it into the

16  export.

17  Q.   Okay.  What exactly are those documents when you print it

18  out that way?

19  A.   So if you print it out using the bulk export

01:27 20  functionality, documents that were uploaded by users into our

21  system that were not entered directly into the system but that

22  was uploaded by the user don't make it into the export, but

23  they are part of the patient's chart.  They just don't -- based

24  on the functionality of the export, it doesn't pull those

25  files.  It also, we noticed, didn't pull the addendum in the

1    485 for the plan of care for some of the documents.

2    Q.    And you used the term "in the 485."  Is that another term

3    used to describe the plan of care?

4    A.    Yes.  I apologize.  It's the original document type for

5    the plan of care, but since it's referred to as plan of care.

6    Sorry.  I've been doing this a long time.

7    Q.    And that's just the way the code works for the bulk print;

8    is that right?

9    A.    That's right.  That's just the way the code works.

01:27 10    Q.    It just pulls out the first page instead of the addendum?

11    A.    Yes, it pulled out the first page and didn't print out the

12    addendum.

13    Q.    Let me ask you this, Mr. Olowu, even though the first page

14    comes out in that bulk print, what happens to the data?  Is the

15    data still in the database?

16    A.    The snapshot is still intact.  The data is still there.

17    The bulk functionality just didn't show the additional data.

18    Q.    And other than the plans of care, does the software code

19    issue, does that affect any other documents?

01:28 20    A.    No.

21    Q.    Okay.  And how do you know that?  Are you confident that

22    that's the case?

23    A.    I am because I looked through it.  I took some time to

24    look at it.

25    Q.    Okay.  So, Mr. Olowu, if I could direct your attention

1    back to that binder in front of you.

2    A.    Sure.

3    Q.    Does that binder contain exhibits that are copies of

4    records from the Arbor Axxess -- the Arbor-replicated database

5    that was maintained by Axxess?

6    A.    Yes, it does.

7    Q.    And are those records that were made, kept and maintained

8    in the ordinary course of business?

9    A.    Yes.

01:29 10          MR. BRADY:  Your Honor, I offer -- I offer these

11    exhibits, and I can read the numbers into the record, Your

12    Honor.  I did it before.

13          THE COURT:  I got some of them down but not all of

14    them.  So let's just make a record of what exhibits you are

15    moving in.  It's 410 to 429.

16          MR. BRADY:  Correct.

17          THE COURT:  431 to 461.

18          MR. BRADY:  Correct.

19          THE COURT:  463 to --

01:29 20          MR. BRADY:  485.

21          THE COURT:  -- 485.  What's the next batch?

22          MR. BRADY:  489 to 497.

23          THE COURT:  Yes.

24          MR. BRADY:  499 to 515.

25          THE COURT:  Yes.

1          MR. BRADY:  517 to 532.

2          THE COURT:  And then 537.

3          MR. BRADY:  Yes, Your Honor.

4          THE COURT:  539 to 548 and 706 to 710.

5          MR. BRADY:  You got it, Your Honor.

6          MR. VIEN:  Your Honor, I don't object.  I think the

7    foundation is fine.

8          THE COURT:  Yes.

9          MR. VIEN:  We can deal with it later, not to waste

01:30 10    everyone's time, about -- I have about eight exhibits that I

11    have sub or specific objections to, but as far as the

12    foundation, I think that's what was necessary.

13          THE COURT:  Okay.  So I'm going to admit those

14    documents.  I'm not going to use the jury's time now to go

15    through the eight that he has an issue with.  So are you going

16    to ask him about individual documents or no?

17          MR. BRADY:  Your Honor, what I plan to do is put up

18    maybe one or two examples real quick.

19          THE COURT:  If one or two examples happen to be one or

01:30 20    two of his eight, we'll find a different example.

21          MR. BRADY:  We don't need to make a mess, Your Honor.

22          (Exhibits 410 to 429, 431 to 461, 463 to 485, 489 to

23          497, 499 to 515, 517 to 532, 537, 539 to 548, and 706

24          to 710 admitted into evidence.)

25          THE COURT:  Go ahead, Mr. Brady.

```
  1              MR. BRADY:  Thank you, Your Honor.

  2              Ms. Apfel, could you please pull up Exhibit 417.

  3      BY MR. BRADY:

  4      Q.   All right.  Mr. Olowu, can you see Exhibit 417 on the

  5      screen in front of you?

  6      A.   Yes, I can.

  7              MR. BRADY:  And, Ms. Apfel, maybe we --

  8      BY MR. BRADY:

  9      Q.   Well, let me ask you this first.  What is this?  Do you

01:31 10      recognize what kind of document this is?

 11      A.   Yes, I do.

 12      Q.   What is this document?

 13      A.   This is a plan of care.

 14      Q.   And can you tell -- excuse me.

 15              MR. BRADY:  Maybe, Ms. Apfel, if we could blow up the

 16      top half.

 17      BY MR. BRADY:

 18      Q.   Can you tell who the patient is?

 19      A.   Yes, you can.

01:31 20      Q.   Okay.  Who is the patient's name?

 21      A.   It's Ernest Cate.

 22      Q.   Okay.  Let's back out of that, and then let's --

 23              MR. BRADY:  We can take that down.

 24      BY MR. BRADY:

 25      Q.   I was going to ask you about a nursing note, but I think
```

 1    we've seen enough of those.

 2            MR. BRADY:  So nothing further, Your Honor.

 3            THE COURT:  Mr. Vien.

 4            MR. VIEN:  I couldn't hear that, Your Honor.

 5            THE COURT:  He says nothing further.

 6            MR. VIEN:  Oh, good.  I just have a couple of

 7    questions.

 8            THE COURT:  That's fine.

 9    CROSS-EXAMINATION BY MR. VIEN:

01:32 10    Q.   Good afternoon.

11    A.   Good afternoon.

12    Q.   My name is George Vien, along with me is Michelle

13    Pascucci.  We represent the defendant, Faith Newton, in this

14    case.

15        You -- what happened here is you received a search warrant

16    and then gave the government an image of the records that are

17    in your system; is that correct?

18    A.   That is correct.

19    Q.   And once you did that, you did it in a read-only version,

01:32 20    and so that means that after the government received it or as

21    soon as you made the image, those documents couldn't be

22    altered?

23    A.   That's correct.

24    Q.   Just like the name implies, it can only be read, right?

25    A.   That's correct.

```
 1   Q.   Now, prior to that time, if people had a password, could
 2   they go into the system and edit the documents?
 3   A.   Yes.
 4   Q.   Okay.  And the -- if you had someone else's -- if I, for
 5   instance, not to -- if I had someone else's password, could I
 6   log on as them and go in and alter documents?
 7   A.   You could if you had all the -- if you had their
 8   credentials, yes.
 9   Q.   And you referred to them I think as EMRs?
10   A.   Yes.
11   Q.   And with other EMRs, there's something called
12   auto-populate?
13   A.   Yes.
14   Q.   Does Axxess have that?
15   A.   We do have some of that functionality.
16   Q.   Okay.  Could you explain to the jury what auto-populate
17   means?
18   A.   Well, auto-populate just means that if there's a piece of
19   information that is known to be accurate, for instance, the
20   patient's name, when you create a new document, you can
21   automatically populate it with the patient's name.  They don't
22   have to fill the patient's name again on every document.  So
23   it's auto-populated into the new note.
24   Q.   And what about in other EMRs, if you check a particular
25   box and auto -- something will auto-populate, a narrative, is
```

01:33  10
01:33  20

1    that a functionality of Axxess?

2    A.    Could you be specific?  If you check --

3    Q.    Check a particular diagnosis or something else, a

4    narrative will auto-populate?

5    A.    In our system specifically or other EMRs?

6    Q.    In your system during 2014 to 2017.

7    A.    No.

8    Q.    Okay.  What auto -- what auto-populated in your system

9    during 2014 to 2017?

01:34 10    A.    So for the documents we're looking at, it would usually be

11    the demographic information.  So patient name, Social Security

12    number, the things that we already collected that is required

13    on the additional document is moved over.

14    Q.    Now, you said the -- it would usually be demographic

15    information, and I just want to try to, you know, nail it down.

16    Was it other information as well; do you know?

17    A.    Could you clarify?

18    Q.    The question relates to auto-populate.

19    A.    Yes.

01:35 20    Q.    Okay.  And I asked if from 2014 to 2017 was -- did the

21    system have that functionality, did it auto-populate?

22    A.    Yes.

23    Q.    When you went wrote John Smith --

24    A.    Yes.

25    Q.    -- birth date would pop up?

```
 1   A.   Yes.
 2   Q.   Okay.  During the time period 2014 to 2017 with your
 3   program, was there other functionality that related to
 4   auto-populate?
 5   A.   Yes, I'm sure we do.
 6   Q.   Okay.  Do you know what those are?
 7   A.   Outside of the demographics that we collect during intake,
 8   I can't think of any right now.
 9   Q.   Okay.  But there were some?
10   A.   Oh, yes.  I'm sure there were.
11   Q.   You just -- you know, obviously it's 2014 to '17.  You
12   just don't know off the top of your head what those things
13   were?
14   A.   Uh-huh.
15   Q.   Now, in other EMRs, auto-populate, if you checked the box
16   for diagnosis or something like that, then a narrative would
17   pop up; is that true?
18   A.   I can't -- I don't know which software you're talking
19   about.
20   Q.   You're a loyal Axxess man?
21   A.   I'm a loyal guy, yeah.
22   Q.   We just don't know what else auto-populated during that
23   relevant time period, right?
24   A.   Uh-huh.
25   Q.   I don't mean to waster your time, but you're from Dallas?
```

```
 1   A.    I am from Dallas.

 2   Q.    Is it really that hot down there right now?

 3   A.    It is.

 4   Q.    How hot is it?

 5   A.    105.

 6   Q.    Wow.  Thank you.

 7            MR. VIEN:  I don't have anything further.

 8            THE COURT:  Recross?

 9            MR. BRADY:  No, nothing further, Your Honor.

10            THE COURT:  No more questions about the weather in

11   Dallas?  You're excused.

12            THE WITNESS:  Thank you.

13            MR. LOONEY:  The government calls Adriana O'Donoghue.

14            May I just retrieve the binder?

15            THE COURT:  Yes, of course.

16            THE CLERK:  Will you raise your right hand.

17              (Witness sworn.)

18            THE WITNESS:  Yes.

19            THE CLERK:  Thank you.  You may be seated.

20            Will you please state your name and spell your last

21   name for the record.

22            THE WITNESS:  My last name?

23            THE CLERK:  Yes.

24            THE WITNESS:  Is O'Donoghue, capital O, apostrophe,

25   capital D, as in David, O-N-O-G-H-U-E.
```

```
 1              THE CLERK:  Thank you.

 2                   ADRIANA O'DONOGHUE, duly sworn.

 3    DIRECT EXAMINATION BY MR. LOONEY:

 4    Q.   Good afternoon, Ms. O'Donoghue.

 5         Down here (indicating).

 6         Could you pull your microphone closer to you, just so I'm

 7    able to hear you.

 8    A.   Sure.

 9              THE COURT:  The whole stand moves.  Not just the arm,

10    the whole stand.

11    A.   Like this.  Thank you.

12    Q.   All right.  Can you just introduce yourself to the jury,

13    starting with just your name.

14    A.   Adriana.

15    Q.   And last name, just so...

16    A.   O'Donoghue.

17    Q.   Ms. O'Donoghue, can you describe your education, just

18    starting back in high school and moving forward.

19    A.   I studied psychology.  So I have a bachelor of science in

20    psychology.

21    Q.   Okay.

22    A.   And also, I have a human services, graduating from the

23    Springfield College.

24    Q.   From Springfield --

25    A.   From Springfield College.
```

1    Q.    Where do you live now?

2    A.    I am in between Lawrence and also New Hampshire because --

3    for, you know, other personal reasons.

4    Q.    Okay.  Are you currently employed?

5    A.    I am retired, but I'm working now and then, yes.

6    Q.    Okay.  What do you do now and then?

7    A.    I actually continue working with elderly.

8    Q.    Okay.  In what capacity?

9    A.    I do multiple things, like social worker, you know,

01:40 10   duties.  I also do companion for just a couple of them that I

11   know.  I don't do from the streets or for anybody, no.

12             THE COURT:  I'm sorry.  I didn't hear who she worked

13   for.  I just didn't catch it.

14             MR. LOONEY:  Currently?

15             THE COURT:  Yes.  I just didn't hear what she said.

16             MR. LOONEY:  She's retired but works periodically with

17   the elderly.

18             THE COURT:  With the elderly, okay.

19             MR. LOONEY:  Yes.

01:40 20   BY MR. LOONEY:

21   Q.    I would like to go back in time a little bit.  Was there a

22   time when you became aware of a company called Arbor Homecare

23   Services?

24   A.    Yes.

25   Q.    Okay.  At the time that you became aware of the company,

```
 1   where were you working then?
 2   A.   I was the assistant director for a private company called
 3   Lowell Eldercare.
 4   Q.   All right.  And how did you become aware or how did you
 5   find out about Arbor Homecare?
 6   A.   I also was acting as a social worker for that private
 7   company, and I met a person who was working for Arbor.  And she
 8   came to my office and asked -- you know, she wanted to actually
 9   work for my company, and there was no position available.  That
10   was the first time I met this woman who worked for Arbor.
11   Q.   Okay.  Who was that?
12   A.   Airanisse.
13   Q.   Airanisse.  Do you remember her last name?
14   A.   No, I don't.
15   Q.   And what did Ms. Airanisse tell you about Arbor?
16   A.   Well, she was -- she was working for Arbor, and she said
17   she was doing two things there.  She was doing some marketing
18   and also doing PCA or something, you know, personal care
19   assistant.
20   Q.   Okay.  Did you come to work with Arbor at some point in
21   time?
22   A.   Yes.  Later when I left the company --
23   Q.   I am going to pause you.  I want to move in sequence.
24        Not work for them, but did you -- did your relationship
25   with Arbor go forward past that meeting with Ms. Airanisse?
```

```
 1   A.    Yes.  Actually, when Airanisse offered me to do some
 2   marketing because, you know, we have to exchange members from
 3   my company to Arbor company and mention that they work, you
 4   know -- they needed to do that marketing, and then I said she
 5   talk about it, about, you know, other things.  And she said
 6   that if I could refer them, you know, my members, and she would
 7   also help me to refer me -- the members from Arbor.
 8   Q.    Okay.  Did you eventually come to refer people to Arbor?
 9   A.    Yes.  So I --
10   Q.    I was going to ask you how that came about?
11   A.    Say that question again.
12   Q.    How did that come about?
13   A.    About, okay.  So I -- I asked to meet with the owner of
14   the company, Arbor.
15   Q.    Okay.  Did you?
16   A.    Yes, I did went to meet with the owner of the company.
17   Q.    Okay.  And who was that?
18   A.    Faith Newton.
19   Q.    Okay.  When you met with Ms. Newton, did you discuss --
20   what did you discuss with her?
21   A.    As soon as we saw each other, we recognized our faces
22   together.
23   Q.    Okay.  You had met her before?
24   A.    Yes, I did.
25   Q.    Okay.  And where did you recognize her from?
```

```
 1    A.    I work as a case manager for another company, MHA.  They
 2    called them Mental Health Associates.
 3    Q.    Okay.  And at that time, what was Ms. Newton doing?
 4    A.    She was the visiting nurse from one of those vendors.
 5    Q.    Going back to when you met Ms. Newton at Arbor, what did
 6    you discuss?
 7    A.    I went right to the point, that what Airanisse actually
 8    presented to me in my office.  And I said, I understand that
 9    you are recruiting members, and I'm here actually to know more
10    about it.  And we talk about it, you know, how -- you know, it
11    is -- for me, I was -- my job also was recruiting members for
12    the company that I was working, and we talk about that,
13    recruiting one another.
14    Q.    Okay.  Did she ask you to do anything?
15    A.    Yes.  She told me that if I refer her members to Arbor,
16    she will pay me $100 per person.
17    Q.    Okay.  Did you enter some agreement or reach some
18    understanding?
19    A.    It was a verbal agreement.
20    Q.    Okay.  And what was that verbal agreement?
21    A.    She will pay me $100 per member.
22    Q.    All right.  At the time that you entered this agreement,
23    did you know whether it was legal or illegal to pay for the
24    referral of patients to Arbor?
25    A.    No, I didn't know at all, because at the Lowell Eldercare,
```

1    they also pay bonus to the members, to the staff, and also, you

2    know, for referrals.

3    Q.    Okay.  So they were doing the same thing.  So you did not

4    believe it was illegal at that time?

5    A.    No, I did not know it was illegal.

6    Q.    Okay.  Did you actually refer patients to Arbor?

7    A.    Yes, I did.

8    Q.    Okay.  Do you recall how many?

9    A.    Well, the total amount number is this, according to my

01:45  10   memory, I sent 40, 45.  However, I was never paid for 40 or 45

11   referrals.

12   Q.    Okay.  Do you know how many patients you were actually

13   paid for --

14   A.    Yes.

15   Q.    -- or approximately?

16   A.    The first time that she paid me $300 in cash, and then I

17   got another check for $600, and another check for $500.  So it

18   will be like $1,400 that I was paid.

19   Q.    Okay.  That's a total amount you were paid?

01:46  20   A.    Yes.

21   Q.    For referring how many patients?

22   A.    That's 14 people.

23   Q.    Okay.  And I think you said that you were paid first in

24   cash?

25   A.    Yes, I was paid cash.

1   Q.   How much in cash?

2   A.   $300.

3   Q.   Okay.  And then subsequently you were paid in -- you said

4   two checks; is that right?

5   A.   Yes.  Because I told Ms. Newton that I didn't want to take

6   any cash because my husband told me that I needed -- I needed

7   for, you know -- how you call them -- to retrieve where the

8   money was coming from, I needed to really know to pay, you

9   know, by check.

01:47 10   Q.   Okay.  So you wanted a record of the payments?

11   A.   That's correct.

12   Q.   What was Ms. Newton's response to that request?

13   A.   I don't think she -- I don't think she did agree with

14   that, because she did not like it, no.

15   Q.   Okay.  Were you eventually paid by check, though?

16   A.   She was -- she didn't have no other choice, I guess,

17   because I was not going to get any cash.

18   Q.   Okay.  I would like to show you -- and just for the Court

19   and the witness at this point -- what's been marked as Exhibit

01:47 20   536.

21          It's very small.  That's a little bigger, all right.

22          Do you recognize this document?  And then we can also

23   show the next page as well.

24   A.   Yes, I can see that.

25   Q.   Okay.  Do you recognize this document?

          1    A.    Yes, I do.

          2    Q.    Okay.  What are these two items?

          3    A.    This is a --

          4    Q.    Let's start with the second one.

          5    A.    -- a check paid.

          6    Q.    The second one, what's this document?

          7    A.    It's a check from Arbor, from Arbor Homecare Services for

          8    $500.

          9    Q.    Who is it made out to?

01:48    10    A.    It's made out to me.

         11    Q.    And what's the date?

         12    A.    The date?

         13    Q.    Yes.

         14    A.    It's March 27th, 2014.

         15    Q.    Okay.  Is this a check that you received?

         16    A.    Yes, I did.

         17    Q.    Okay.  From whom did you receive this?

         18    A.    It's BE.  It must be for Benjamin, and the last name is

         19    not recognized here.  But it must be the person who was the

01:48    20    owner with her.

         21    Q.    But my question is a little bit different.  How did you

         22    physically get this check?  From whom?

         23    A.    It was handed to me.  She did hand it to me.  I never met

         24    the other person.

         25    Q.    When you say "she," who do you mean?

```
 1    A.    Excuse me?

 2    Q.    You said she gave it to me.

 3    A.    It's Mrs. Newton gave it to me.

 4    Q.    Okay.  And can we go back to the first page.  And do you

 5    recognize this document?

 6    A.    Yes, I do.

 7    Q.    And what is it?

 8    A.    It's a check written for $600 on May 6th, 2014.

 9    Q.    Okay.  To whom?

10    A.    Written to me, Adriana O'Donoghue.

11    Q.    And whose name appears in the signature line?

12    A.    Faith Newton.

13          MR. LOONEY:  All right.  I'd ask that this be admitted

14    as Exhibit 536.

15          MS. POSCUCCI:  No objection, Your Honor.

16          THE COURT:  It's admitted.

17          (Exhibit 536 admitted into evidence.)

18    BY MR. LOONEY:

19    Q.    All right.  Looking at these two images, and let's go to

20    the second one first again.

21          THE COURT:  You are admitting the two checks as 536?

22          MR. LOONEY:  Yes.

23    BY MR. LOONEY:

24    Q.    What was -- why was this check given to you?

25    A.    It was for referrals.
```

1   Q.   And what did that mean?

2   A.   I was paid for the members that I referred to her company.

3   Q.   Okay.  And it was $500?

4   A.   Correct.

5   Q.   In March of 2014?

6   A.   Excuse me?

7   Q.   In March of 2014?

8   A.   Yes, March 27th, '14.

9   Q.   Okay.  And then is the check on the first page -- if you

01:50 10   go back to it.  What was the check on the first page payment

11   for?

12   A.   Yeah, it's for $600, May 6th, 2014.

13   Q.   Okay.  And -- okay.

14        MR. LOONEY:  We can take that down now.

15   BY MR. LOONEY:

16   Q.   I would like to change topics for a moment.

17        How did you communicate with Ms. Newton?

18   A.   We did phone calls and also by text messages.

19        MR. LOONEY:  Okay.  Could we put up for the witness

01:51 20   and lawyers and the Court only Exhibit 654.

21   BY MR. LOONEY:

22   Q.   Do you recognize the contents of this document?

23   A.   Yes, I do.

24   Q.   Okay.  And what is it?

25   A.   It is -- we are communicating with each other, Ms. Newton

```
 1   and I.
 2   Q.    Okay.  What kind of communications?
 3   A.    Well, this is -- the first line, you want me to read it?
 4   Q.    You mentioned emails, phone calls, text messages.  What
 5   are these?
 6   A.    It says, well, "Dear Mrs. Faith" --
 7   Q.    What type of communication is this?
 8   A.    We were talking about money.
 9   Q.    But what mode of communication?  Is this phone messages?
10   A.    No.  This was a text message.
11   Q.    Okay.  So the contents are text messages exchanged between
12   yourself and Faith Newton?
13   A.    Yes, Ms. Newton.
14   Q.    And do you recognize the content of these?
15   A.    Yes, I do.
16   Q.    Okay.
17          MR. LOONEY:  I'd ask that this be admitted as Exhibit
18   654.
19          MS. POSCUCCI:  No objection.  Your Honor.
20          THE COURT:  Admitted.  654, right?
21          MR. LOONEY:  Yes.  I apologize for not speaking loudly
22   enough.
23          THE COURT:  I thought you said 624.
24          MR. LOONEY:  654.
25          (Exhibit 654 admitted into evidence.)
```

```
        1   BY MR. LOONEY:

        2   Q.   All right.  Could we go to the message beginning "Hi Dear

        3   Faith.  It's me Adriana."  Could you just read that out loud

        4   and the next message as well.

        5   A.   "Hi Dear faith.  It's me Adriana O'Donoghue.  When is a

        6   good time to see you to talk about business?  I have more

        7   referrals.  However, I like to sign a contract for the bonus,

        8   if it's okay with you?  Contact me direct," and I -- I gave my

        9   phone number.

01:53  10   Q.   Okay.  What were you talking about when you mentioned

       11   referrals in that text message?

       12   A.   It was, you know, that -- what we discuss about verbally,

       13   you know, the bonus, the $100 for referrals.

       14   Q.   And then there is a reference to "I like to sign a

       15   contract."  Did you do so?

       16   A.   No.  It was never written down.

       17   Q.   Okay.  Why not?

       18   A.   I am sure she didn't want to sign a contract.

       19   Q.   Could we go to page 12 of this document.

01:54  20   A.   Page 12?

       21            THE COURT:  Do you want to give a Bates number?

       22            MR. LOONEY:  Bates number 778.

       23   A.   778.

       24   Q.   It should pop up on the screen for you, Ms. O'Donoghue.

       25   A.   Okay.  You are talking about 778, okay.  I've got it.
```

```
 1   What part?
 2            THE COURT:  It's the last page.
 3            MR. LOONEY:  Last page of the document.
 4   Q.   And then there's a message that's dated 8/10/2015
 5   beginning with "Good morning, Faith.  Please review my salary."
 6   A.   8/10/15.  Okay.
 7   Q.   We'll blow it up for you in a second.
 8   A.   Okay.
 9   Q.   Do you see the one that says, "Good morning, Faith.
10   Please review my salary"?
11   A.   Yes.  "Good morning, Faith.  Please review my salary.  It
12   was offered to be paid $14 per hour.  I did not realize the
13   rate is too low.  I gave you over 45 clients directly to others
14   directly.  I really appreciate you change the hour rate for me.
15   God will be with you always and keep prospering you in life.
16   God bless, Adriana."
17   Q.   Did you in fact refer over 45 clients to Ms. Newton.
18   A.   I did.  My office -- from my office actually I did refer
19   her, yes.
20   Q.   Were you paid for 45 clients?
21   A.   No.
22   Q.   Why not?
23   A.   There was -- Mrs. Newton never wanted to see me, I guess,
24   regarding this verbal agreement.
25            MS. POSCUCCI:  Objection, Your Honor.
```

```
 1              THE COURT:  Sustained.
 2    BY MR. LOONEY:
 3    Q.   Okay.  Did you try and get paid for 45 clients for
 4    Ms. Newton?
 5    A.   Yes, I tried, but it never happened.
 6    Q.   And what was the response you received?
 7    A.   She was actually refusing.  She was ignoring me after the
 8    that.
 9    Q.   Okay.  Did she tell you why you would not be paid for the
10    45 clients?
11    A.   There were other people being paid for the referral that I
12    made.
13              MS. POSCUCCI:  Objection.
14              THE COURT:  Lay a foundation for that, please.
15    BY MR. LOONEY:
16    Q.   When you say -- what did Ms. Newton tell you about why you
17    weren't paid for 45 clients?
18    A.   Because there were other people that were trying to get
19    paid, yes.  They say they referred them, not I didn't refer
20    them.  So they referred them and not that I referred them, and
21    that was the issue in the office.
22    Q.   I just want to be clear, is that the reason that
23    Ms. Newton gave to you?
24    A.   Yes.
25    Q.   Okay.  This text message references the phrase -- it says,
```

1    "Please review my salary," correct?

2    A.    The salary about the $14 is --

3    Q.    Let me just ask a question.

4          From whom were you -- what does that salary refer to?

5    A.    This is actually for the personal care position that I

6    applied for a couple of clients, you know.

7    Q.    Okay.

8    A.    And they offer to pay -- they offer me to pay $14, but

9    actually they were only paying $11 per hour and something.

01:57 10   Q.    Sorry.  Okay.  Let me start with this question:  Did

11   you -- did you become an employee of Arbor at some point in

12   time?

13   A.    I did.  I did.  Because in order to be employed for that,

14   Arbor, you were supposed to have your own referral.

15          MS. POSCUCCI:  Objection.

16          THE COURT:  Hold on a second.

17          MS. POSCUCCI:  It was a yes-or-no question.

18   BY MR. LOONEY:

19   Q.    Okay.  So the question was, and this is just yes or no.

01:57 20   Did you become an employee of Arbor at some point?

21   A.    Yes.

22   Q.    Can you tell me how you became employed by Arbor?  What

23   was the hiring process for you?

24   A.    The hiring process, I got the application, completed an

25   application, and then my client was submitted to and admitted

1    to Arbor, and I did the work.

2    Q.   Okay.  I want to ask you a couple of things.  When you say

3    your client was admitted to Arbor, what was that?

4    A.   It was one of my referrals that it have to be.  I didn't

5    have anybody's client.  It was somebody that I referred to

6    Arbor.

7    Q.   So you referred a client to Arbor --

8    A.   Correct.

9    Q.   -- at the same time?

01:58 10    A.   Correct.

11    Q.   When you say client, someone who would be a patient at

12    Arbor?

13    A.   Yes.

14    Q.   And at the same time you applied to be a -- what position

15    at Arbor?

16    A.   I applied for, you know, for personal care assistant for

17    the person I referred to because I didn't think anybody will

18    take, you know, a client from the street, so you have to be --

19    you have to apply for the job if you want to work and have

01:58 20    somebody who really needed you.

21    Q.   Okay.  So in order to apply for a job at Arbor, you needed

22    to bring with you a patient?

23    A.   That's correct.

24         MR. LOONEY:  Okay.  We can take this down, Ms. Apfel.

25    BY MR. LOONEY:

```
 1    Q.   And what was your understanding at the time you applied
 2    for a job at Arbor, what position you were applying for?
 3    A.   I did apply for personal care assistant or management
 4    position.
 5    Q.   Personal care assistant or PCA and/or management position?
 6    A.   Correct.
 7    Q.   Okay.
 8         MR. LOONEY:   Ms. Apfel, could you bring up Exhibit
 9    363, which was previously admitted, and could we go to the
10    third page of this document which bears Bates number 806.
11    BY MR. LOONEY:
12    Q.   Do you recognize this document?
13    A.   Yes, I do.
14    Q.   Okay.  And there is a line -- what is this document?
15    A.   This is an employment application.
16    Q.   Okay.  Is it an employment application that you filled
17    out?
18    A.   Yes, I did.
19    Q.   Applying for what job?
20    A.   For personal care assistant or case manager.
21    Q.   Where?
22    A.   For Arbor.
23    Q.   Okay.  And is that your name that appears on the line,
24    last name, first name?
25    A.   Yes, it is.
```

01:59 (line 10)
02:00 (line 20)

```
 1   Q.   Okay.  And is that your handwriting?

 2   A.   Yes, it is.

 3   Q.   And then the date of application is February 25th, 2014?

 4   A.   Yes.

 5   Q.   Is that the date you applied for a job with Arbor?

 6   A.   I don't remember, but it's there written.

 7   Q.   Okay.  Is that approximately the time when you applied for

 8   a job at Arbor?

 9   A.   I guess so.

10   Q.   You are not certain?

11   A.   No, I'm not certain.

12   Q.   Okay.  And then on the "Position applying for" line, it

13   says, "PCA or case manager"?

14   A.   Yes.

15   Q.   Okay.  Is that the role you understood you were applying

16   for?

17   A.   Yes.

18   Q.   Did you understand that you were applying for a job as a

19   home health aide?

20   A.   No.

21   Q.   Okay.  Could we go to page 14 of this document, and I'll

22   give you the Bates number in just one moment.  817.

23        The first question, did you ever see this document during

24   the time you were at Arbor Homecare?

25   A.   This is a certificate for Adriana Kam-O'Donoghue written
```

1    by Faith Newton, I never saw that.

2    Q.    At your time at Arbor, did you ever see it?

3    A.    I never saw it.

4    Q.    When is the first time you saw this document?

5    A.    Just recently I was presented this.

6    Q.    By whom?

7    A.    By the USA attorneys.

8    Q.    By the government, our office?

9    A.    Yes.

02:02 10   Q.    Okay.  Let me read it out loud, and then I'm going to ask

11   you a couple of questions.  This document states, "This

12   certifies that Adriana Kam-O'Donoghue" -- that's you, right?

13   A.    Yes.

14   Q.    -- "has successfully completed the HHA required course of

15   study approved by the state of Massachusetts and is therefore

16   awarded this certificate."  Did I read that correctly?

17   A.    Yes, you did.

18   Q.    Did you, in fact, successfully complete the HHA required

19   course of study approved by the state of Massachusetts?

02:02 20   A.    No, I didn't.

21   Q.    Okay.  More generally, when you came to Arbor and were

22   employed there, what orientation or training did you receive

23   for your job?

24   A.    None.

25   Q.    None.  Did you ever receive 75 hours of training?

1    A.    No, never.

2    Q.    Did you take 16 hours of training in a classroom?

3    A.    No.

4    Q.    Did you receive any onsite training from nurses?

5    A.    No.

6          MR. LOONEY:  All right.  Can we go to page 27 of this

7    document.  If we could scroll down to get the Bates number,

8    please.  Thank you, Ms. Apfel.  This is Bates number 830 at the

9    bottom.  And if you go back up to the top.  Could we get it on

02:03 10   one page, please -- thanks -- so we can look at the whole

11   thing.

12   BY MR. LOONEY:

13   Q.    This document is titled "Orientation For All Direct

14   Patient Care Employees," correct?

15   A.    Yes.

16          MR. LOONEY:  I'll just wait a moment while we get it

17   up on the screen.

18   BY MR. LOONEY:

19   Q.    And there are a number of topics down the left-hand side,

02:03 20   correct?

21   A.    Yes.

22   Q.    Okay.  At the start of your time at Arbor, did you receive

23   training on any of these topics?

24   A.    Not at all.

25   Q.    Okay.  Did you initial this document?

```
 1    A.    No, I didn't.
 2    Q.    Okay.  Do you know one way or another whether that's your
 3    signature on the employee's signature line?
 4    A.    It's not my signature.
 5    Q.    Okay.  As part of your orientation and training at Arbor,
 6    did you have to take any examinations or tests when you
 7    arrived?
 8    A.    Part of the package it was, yes.
 9    Q.    When you say part of the package, what do you mean?
10    A.    Part of the package of orientation, part of the
11    orientation there were a lot of packages that you have
12    to complete.
13          MR. LOONEY:  Go to page 16 of this document.  Okay.
14    BY MR. LOONEY:
15    Q.    Do you recognize this document?
16    A.    I can see this page, but I didn't complete it.
17    Q.    You don't recall taking this test?
18    A.    No.
19    Q.    Okay.  When you did take exams at Arbor, were they
20    difficult to complete?
21    A.    Number one --
22    Q.    Not this one.  Not this one.  Just generally, you
23    mentioned taking exams at Arbor.  Was it hard to get the
24    answers correct?
25    A.    It was hard, yes, because no training.
```

1   Q.   Okay.  Did you have anything to assist you?

2   A.   No.  There were answers.  When I asked the question of the

3   person, they said the answers were located in after --

4        MS. POSCUCCI:  Objection.  Someone said.

5   A.   -- each exam.

6        THE COURT:  Hold on.  Hold on.

7        Ask the question again.

8        MR. LOONEY:  We'll take it in steps.

9   BY MR. LOONEY:

02:05 10  Q.   Okay.  So you took an exam at Arbor, correct?

11       Did you take an examination -- or fill out an examination

12  as part of your application for orientation at Arbor?

13  A.   Yes.

14  Q.   Okay.  Can you describe how you took that -- how you

15  completed the examination?

16  A.   At the last page it was the answers.

17  Q.   Okay.

18  A.   And all you had to do is copy the answers.

19  Q.   Okay.  Do you recall --

02:06 20  A.   But I don't recall doing this.

21  Q.   You don't recall this exam in particular?

22  A.   No, no.

23  Q.   Okay.  Do you recall taking many examinations at Arbor?

24  A.   Not many.  Because I have to see how, and I see it that I

25  was, you know, I didn't know.

1   Q.   Okay.  Could we go to page 53 of this document.  And do

2   you recognize this document, this page?

3   A.   Yes, I do.

4   Q.   Okay.  Is that your name at the top?

5   A.   Yes, it is.

6   Q.   And is that your handwriting at the top?

7   A.   It is.

8   Q.   Okay.  Did you fill out this exam?

9   A.   Yes, I did.

02:06 10   Q.   Before you did, did you receive any training on HIPAA or

11   the Health Insurance Portability Accountability Act?

12   A.   Not from Arbor.

13   Q.   Okay.  Had you had some previously?

14   A.   Yes.

15   Q.   When you took this test, did you have an answer key as you

16   mentioned before?

17   A.   Excuse me?

18   Q.   When you took this examination, did you have an answer key

19   for it?

02:07 20   A.   Did I have the answers?

21   Q.   Did you have a page with the answers?

22   A.   Yes.  The answers were all the time behind the examination.

23   Q.   Okay.  So when you took the test, were you taking it from

24   your knowledge or from that piece of paper?

25   A.   Honestly, I just wrote what the answer says.

```
 1              MR. LOONEY:  Can we go to page 56 of this document.
 2   All right.
 3   BY MR. LOONEY:
 4   Q.   And do you recognize this document?
 5   A.   I can see the results.
 6   Q.   You can read it?
 7   A.   Yes.
 8   Q.   But do you recall it?
 9   A.   No, because that's not my handwriting.
10   Q.   I was just going to ask.  Your name is on the top of this,
11   correct?
12   A.   Yes.
13   Q.   Is that your handwriting?
14   A.   No, it's not.
15   Q.   Did you fill out this test?
16   A.   No.
17              MR. LOONEY:  Okay.  Could we go to page 58 of this
18   document.  All right.
19   BY MR. LOONEY:
20   Q.   Do you recognize this document?
21   A.   You guys presented to me, but medical device form, I don't
22   know.
23   Q.   Do you recall it from your time at Arbor?
24   A.   No.
25   Q.   Is that your name at the top and initial?
```

1    A.    It's my name, but it's not my handwriting.

2    Q.    Did you fill out this test?

3    A.    No, I didn't.

4    Q.    Let me do just one more.

5          MR. LOONEY:  Could we go to page 62.  Okay.

6    BY MR. LOONEY:

7    Q.    Do you recognize this document -- could we go to the next

8    slide, and the next, and the next, and the next.

9          We just scanned through a few tests.  Do you recall take

02:09 10    anything of those examinations at Arbor?

11    A.    No, none.  No.

12    Q.    Okay.

13          MR. LOONEY:  Can we go to page 145 of this document.

14    All right.

15    BY MR. LOONEY:

16    Q.    And this document is titled "Home Health Aide Skills

17    Checklist," correct?

18    A.    Yes.

19    Q.    All right.  And it has your name on it, right?

02:09 20    A.    It has my name on it.

21    Q.    Is that your handwriting?

22    A.    It's not my handwriting, no.

23    Q.    And who's listed on the preceptor/supervisor line?

24    A.    Faith Newton.

25    Q.    Okay.  And then there's a date of hire and date completed

1     line.  What dates appear on that?

2     A.    It is March 3rd, 2014, and completed March 3rd, 2014.

3     Q.    Okay.  Is that around when you were hired at Arbor?

4     A.    I don't remember, but it --

5     Q.    Approximately?

6     A.    Approximately.

7     Q.    Okay.  And in the position, HHA is circled.  Do you know

8     what HHA stands for?

9     A.    No.

02:10 10    Q.    You don't.  What position did you think you were being

11    hired for at Arbor?

12    A.    For a personal care assistant, PCA.

13    Q.    All right.  And then, this document below it, there's the

14    word "orientation" is circled, correct?

15    A.    It's incorrect, because it says "HHA."

16    Q.    Below that in the next line.

17    A.    Orientation.

18    Q.    It's circled, correct?

19    A.    It is circled.  It says "orientation."

02:10 20    Q.    Okay.  And then going down the left-hand side, there's a

21    column titled "Skills/Experience," correct?

22    A.    Yes.

23    Q.    All right.  And it lists temperature: oral, rectal or

24    axillary; and then pulse: radial, and other topics underneath

25    there, correct?

```
 1   A.    Yes.
 2   Q.    All right.  And then going over there, there is a column
 3   "Observer's Initials," correct?
 4   A.    Yes.
 5   Q.    And then below there, about halfway down the table, there
 6   are handwritten initials and a date.  Can you read those
 7   initials?
 8   A.    The initials?
 9   Q.    Yes.  Are you able to read it?
02:11 10   A.    Well, it is not my initials.  So it look -- 3/3/14.
11   Q.    If you can't read it, just let me know.
12   A.    That's not me initialing either.
13         MR. LOONEY:  Can we go to the next page.
14   BY MR. LOONEY:
15   Q.    And this document continues, correct?
16   A.    Yes.
17   Q.    And then it --
18         MR. LOONEY:  Can we go to the following page.
19   BY MR. LOONEY:
02:11 20   A.    Yes.
21   Q.    And it continues, and then there's a signature line at the
22   bottom?
23   A.    Yes.
24   Q.    Okay.  Is that your signature on the employee's signature
25   line?
```

```
 1   A.    Employee's signature is signed, but it's not me signing.
 2   Q.    You did not sign this document?
 3   A.    No.  That's not my signature.
 4   Q.    Okay.  And whose name appears on "Preceptor Signature"?
 5   A.    Faith Newton.
 6   Q.    Okay.  When you were at Arbor, did you have to fill out
 7   time sheets for the time you spent with patients?
 8   A.    Yes.
 9         MR. LOONEY:  Okay.  Can we show Exhibit 50.01, please.
02:12 10  Take it down for the jury, please.  Sorry.  Just for the --
11   BY MR. LOONEY:
12   Q.    Do you see this document?
13         MR. LOONEY:  Can you put up 50.01 for the witness.
14   All right.
15   BY MR. LOONEY:
16   Q.    Do you recognize this document?
17   A.    Yes, I do.
18   Q.    And what is it?
19   A.    It's a weekly visit time sheet from Arbor.
02:13 20  Q.    Okay.  And what were these weekly visit time sheets used
21   for?
22   A.    This is supposed to be when you completed, you know, the
23   tasks with each client.
24   Q.    Okay.  Is this a form you filled out while at Arbor?
25   A.    Never, not at Arbor, no.
```

```
 1    Q.    You didn't use this form at Arbor?

 2    A.    No.

 3          MR. LOONEY:  Okay.  Can we take this down.

 4    BY MR. LOONEY:

 5    Q.    More generally, were you required to fill out time sheets

 6    at Arbor?

 7    A.    Yes.

 8    Q.    Okay.  Did you receive instructions on how to do that?

 9    A.    No.

10    Q.    Were you told how to record your time anyway?

11    A.    I went to the office, and I pick up the time sheet that I

12    was supposed to, and I only recorded what I did.

13    Q.    Okay.  Were you ever told to record anything else?

14          MS. POSCUCCI:  Objection, Your Honor.

15    Q.    Yes or no?

16          MS. POSCUCCI:  Hearsay.

17          MR. LOONEY:  I'm asking for an instruction she was

18    given.

19          THE COURT:  I don't know that it's hearsay on that.

20    That was just a yes-or-no question, right?

21          MR. LOONEY:  Correct.

22    BY MR. LOONEY:

23    Q.    You said that you went to the Arbor office to fill in time

24    sheets, correct?

25    A.    No.  To pick up the time sheet.
```

```
 1   Q.   Okay.  And then what did you do with that time sheet?
 2   A.   I complete myself, and the client sign it and I sign it.
 3   Q.   Okay.  Did you accurately record the time that you spent
 4   with patients in those time sheets?
 5   A.   Not really.  It was a lot of, you know, complaints about
 6   it.  You know, you have to complete it the way they wanted to,
 7   but that was the issue.
 8   Q.   What was the way they wanted you to do?
 9   A.   They wanted to complete everything --
10           MS. POSCUCCI:  Objection.
11   A.   -- X, X, X, and everywhere.
12           THE COURT:  Hold on a second.  Basis?
13           MS. POSCUCCI:  Hearsay, they wanted.  And relevance,
14   we don't know who it is.
15           THE COURT:  Can you lay a better foundation, please.
16           MR. LOONEY:  Okay.
17   BY MR. LOONEY:
18   Q.   You say you received instructions on how to fill out the
19   time sheet?
20   A.   Never.
21   Q.   You were told that you were -- what were you just saying
22   about how you were -- the method in which you were instructed
23   to fill out the time sheet?
24   A.   For the time sheet --
25           MS. POSCUCCI:  Same objection, Your Honor.
```

1          THE COURT:  Stop.  Overruled.  Let him try and do it,

2     please.

3     BY MR. LOONEY:

4     Q.    Did you talk to anyone at Arbor about how they wanted the

5     time sheets to be filled out?

6     A.    I asked Rosa.

7     Q.    Okay.

8     A.    Yes.

9     Q.    And do you know Rosa's full name?

02:15 10   A.    Gonzalez.

11     Q.    What did she instruct you or tell you about how the time

12     sheets should be filled out?

13     A.    She told me that she has to complete everything, every box

14     that is supposed to be there on the time sheet.

15     Q.    When you say every box, what do you mean by that?

16     A.    By every duty that you're supposed to do, and I didn't

17     know I was supposed to do.  I only marked what I did, and they

18     didn't like -- Rosa did not like that.  She said that I was

19     supposed to mark down everything else.

02:16 20   Q.    Okay.  So you were supposed to -- the instruction was to

21     mark both things you had performed and tasks you had not

22     performed; is that accurate?

23     A.    Correct.

24          MR. LOONEY:  Nothing further.

25          THE COURT:  Cross?

1              Why don't we take our break now.  That's a good idea.

2    A little after 2:30.

3              THE CLERK:  All rise for the jury.

4              (The jury is not present for the following.)

5              THE COURT:  She's on cross-examination.  Don't talk to

6    her with respect to cross on any conversations, all right?

7              MR. BRADY:  Yes, Your Honor.

8              MR. LOONEY:  Yes, Your Honor.

9              THE COURT:  2:35.

02:36 10         (Recess taken 2:16 p.m. - 2:36 p.m.)

11             COURTROOM CLERK:  All rise for the jury.

12             (Jury enters the courtroom.)

13             COURTROOM CLERK:  Court is back in session.  Please be

14   seated.

15             THE COURT:  When you're ready.

16             MS. PASCUCCI:  Thank you, Your Honor.

17   CROSS-EXAMINATION BY MS. PASCUCCI:

18   Q.   Good afternoon, Ms. O'Donoghue.  My name is Michelle

19   Pascucci.  I'm here with George Vien and we represent Faith

02:39 20   Newton.

21   A.   Good afternoon.

22   Q.   Now, Ms. O'Donoghue, you've met with the prosecutors in

23   this case, with federal agents, multiple times, correct?

24   A.   Yes.

25   Q.   How many times, would you say?

```
 1   A.   I don't remember.  Three or four.

 2   Q.   Three or four.  And when you met with the government, you

 3   had a proffer agreement; is that correct?

 4   A.   Say that again.

 5   Q.   A proffer agreement?

 6   A.   What agreement?  I don't have -- I don't understand.  What

 7   agreement?

 8   Q.   Perhaps I can help you.

 9        MS. PASCUCCI:  Your Honor, is it okay if I approach

10   the witness?

11        THE COURT:  Sure.

12   Q.   Ms. O'Donoghue, do you recognize that agreement?

13   A.   Yes, I do.

14   Q.   And that's an agreement that's between you and the

15   government in this case, right?

16   A.   Yes.

17   Q.   And it's signed by your attorney?

18   A.   Yes.

19   Q.   And it's also signed by attorneys for the government?

20   A.   Correct.

21   Q.   And pursuant to this agreement, no statements that you

22   made to the government could be used against you in a criminal

23   proceeding; is that right?

24   A.   Ask that again, please.

25   Q.   Sure.  So if we go to page 1 and look at paragraph 1 here,
```

1    let me restate the first -- let me read it for you.  "No

2    statements made or other information provided by Adriana

3    O'Donoghue," that's you, "will be used by the United States

4    Attorney directly against her" --

5    A.    I --

6    Q.    -- "evidence offered for or factual assertions made by or

7    on behalf of Adriana O'Donoghue at any stage of a civil or

8    criminal proceeding."

9         So in other words, am I saying it correctly, what you told

02:41 10    the government couldn't be used against you in a future

11    proceeding.  Am I stating that correctly?

12         MR. LOONEY:  Objection.  There are some limited

13    exceptions.

14    A.    No.  Because I had an attorney at the time.

15         THE COURT:  Hold on.  You can come back on that, but

16    she asked if she read it correctly.  That's a yes or no answer.

17    If you want to come back to it, you can.  So the objection is

18    overruled.  You can answer the question.

19    Q.    So what was your understanding of what this agreement

02:41 20    provided you during your conversations with the government?

21    A.    I didn't know.  I did not know.  So my attorney is the one

22    who explain to me, but I was totally confused.  I don't know.

23    Q.    But in any case, you recognize this agreement, correct?

24    A.    I do recognize because my attorney read for me and said

25    it's okay, you can sign it.

```
 1              MS. PASCUCCI:  Your Honor, I would move to admit this
 2      as Defense Exhibit 901.
 3              MR. LOONEY:  No objection.
 4              THE COURT:  It's admitted.
 5              (Exhibit 901 admitted into evidence.)
 6              MS. PASCUCCI:  Thank you.
 7      Q.   Now, Ms. O'Donoghue, you've also testified before the
 8      grand jury in this case, correct?
 9      A.   Yes.
10      Q.   And when you testified before the grand jury, you were
11      placed under oath, right?
12      A.   Yes.
13      Q.   And you were explained that that's under the pains and
14      penalties of perjury, correct?
15      A.   Yes.
16      Q.   And when you were questioned in the grand jury, that was
17      with another prosecutor in this case, correct?  It wasn't one
18      of the two gentlemen at that table.
19      A.   Excuse me?
20      Q.   When you were questioned before the grand jury, you
21      weren't questioned by one of the two gentlemen at that table;
22      is that right?
23      A.   Yes, yes.
24      Q.   And do you think that -- in March 2020, that's when that
25      testimony was?
```

1    A.    With the other prosecutor?

2    Q.    Yes.

3    A.    I don't recall the dates.

4    Q.    Okay.  Now, you testified on direct about referral

5    payments that you received from Ms. Newton.  And I believe you

6    said that Ms. Newton would pay you referral bonuses for

7    patients that you brought to Arbor; is that correct?

8    A.    Correct.

9    Q.    And you've also testified that you didn't know that was

02:43 10   illegal at the time, correct?

11    A.    Correct.

12    Q.    The practice was common at Arbor; is that right?

13    A.    Correct.

14    Q.    It wasn't a secret at the company?

15    A.    Correct.

16    Q.    And you worked at Lowell Elder Care before you worked at

17    Arbor, right?

18    A.    Correct.

19    Q.    And Lowell Elder Care also paid for referrals of new

02:44 20   clients, right, you testified?

21    A.    Correct.

22    Q.    Now, let's turn back to Arbor.  And I think you talked

23    about on direct that Ms. Newton would give you checks, right?

24    A.    She gave me cash and checks.

25          MS. PASCUCCI:  Now, Ms. Apfel, would you mind pulling

1    up the check, I think it's Exhibit 536.  And could you go to

2    the second check there.

3    Q.   Now, you testified on direct that this check was signed by

4    Ben Muiruru, correct?

5    A.   The signature is there, yes.

6    Q.   And this check, if we look in the upper left-hand corner,

7    it's coming from an Arbor Home Care Services account, right?

8    A.   Yes.

9    Q.   And let's look at the lower left of that check.

02:44 10        MS. PASCUCCI:  I don't know if you can zoom in, Ms.

11   Apfel.

12   Q.   Does that say "referral" right on the check?

13   A.   But it was for a referral.

14   Q.   Yes.  So the check was for a referral?

15   A.   Correct.

16   Q.   And it says "referral" right on the check?

17   A.   If you really understood it, you know, whatever, it is

18   referral.

19   Q.   And I believe you said that after a while Ms. Newton

02:45 20   stopped paying you?

21   A.   Correct.

22   Q.   And when she stopped paying you, you generally stopped

23   seeing her, right?

24   A.   Correct.

25   Q.   So would you say that your last payment from her was in

```
 1    about 2014 when that check was dated?

 2    A.    When this, 3-27-2014?

 3    Q.    Yes.

 4    A.    No.  There's another check.

 5          MS. PASCUCCI:  Can you go to the first page,

 6    Ms. Apfel.

 7    Q.    May 2014, you don't really see much of her after May 2014?

 8    A.    No.

 9          MS. PASCUCCI:  You can take that down, Ms. Apfel.

02:46 10    Thank you very much.

11    Q.    So most of your communications with Ms. Newton where

12    you're seeing her on a regular basis, that's 2014 and earlier,

13    correct?

14    A.    3-2014?

15    Q.    Let me restate that.  That was a bad question on my part.

16          You are seeing -- when you saw Ms. Newton, that was

17    primarily in 2014, correct?

18    A.    I don't recall.

19    Q.    Okay.  But you don't remember seeing much of her after

02:46 20    2014, right?

21    A.    Exactly, yes.

22    Q.    And I believe you also testified you started working at

23    Arbor in 2014, correct?

24    A.    Approximately, yes.

25    Q.    And you testified that you were at Lowell Elder Care prior
```

1    to that?

2    A.    Correct.

3    Q.    And am I right that Lowell Elder Care provides adult day

4    care to the elderly?

5    A.    Yes.

6    Q.    And is it fair to say that individuals who need adult day

7    care tend to need supervision and care throughout the day?

8    A.    That's correct.

9    Q.    And is it fair to say that individuals who need

02:47 10    supervision and care throughout the day tend to have serious

11    medical issues?

12    A.    Correct.

13    Q.    And you referred those patients that were at Lowell Elder

14    Care to Arbor, correct?

15    A.    Yes.

16    Q.    And you also testified that you eventually became a

17    personal care attendant at Arbor, right?

18    A.    Yes.

19    Q.    You knew a nurse named Charles Githinji at Arbor.  Am I

02:47 20    getting his name right?

21    A.    Only Charles.  I don't know his last name.

22    Q.    Okay.  There was a nurse named Charles?

23    A.    Yes.

24    Q.    And Charles, he was the nurse who conducted initial

25    assessments for patients you referred to Arbor?

A.    Correct.

Q.    And after you started working at Arbor, you would accompany Charles when he would do these initial assessments for patients you referred, right?

A.    Once in a while.

Q.    But it's fair to say that you accompanied him on patient visits?

A.    It was assessment for other clients.

Q.    Okay.  So you accompanied him on assessments for clients?

A.    Assessment.

Q.    And it wasn't your role to assess whether a patient was eligible for services?

A.    As a social worker, yes.

Q.    But you were a -- you viewed yourself as a personal care attendant at the time?

A.    No, I was not a personal care attendant.  I assisted to help, translating Mrs. Charles -- Mr. Charles.

        MS. PASCUCCI:  Your Honor, may I approach the witness again?

        THE COURT:  Sure, yes.

        MS. PASCUCCI:  I grabbed the wrong copy.  My apologies, Your Honor.

        THE COURT:  That's fine.  No worries.

Q.    Now, Ms. O'Donoghue, could you take a moment to just review this document.  Not every page because that would take

```
 1   an extraordinarily long amount of time.  But just take a quick
 2   gander at it.
 3   A.    Sure.
 4   Q.    This is your testimony before the grand jury, correct?
 5   A.    Yes.
 6   Q.    And if we turn, I believe to page 62, lines 8 to 10.
 7   A.    162?
 8   Q.    It's page 62, in the upper right-hand corner.
 9   A.    Okay.  Hold on a minute.
10   Q.    Lines 8 through 10, the prosecutor asked, "Were you
11   involved in assessing, you personally involved in assessing
12   whether a patient was eligible for services?"  And you state,
13   "No."
14   A.    Hold on a minute.  I cannot see 62 because this is stuck
15   together.  Okay.
16   Q.    I'm going to blame the printers at my office,
17   Ms. O'Donoghue.
18   A.    I'm sorry.
19   Q.    No problem.
20   A.    So do you want me to read this?
21   Q.    So I'll restate for you, if we go to lines 8 -- maybe
22   start with line 3 where the prosecutor said, "I think you
23   testified earlier that you, when you would refer patients for
24   services at Arbor, you would wait to find out if the patient
25   was eligible or not for services."  Is that right?
```

```
 1    A.    Yes.

 2    Q.    And you say "Correct."

 3    A.    Correct.

 4    Q.    "Were you involved in assessing, you personally involved

 5    in assessing whether a patient was eligible."

 6    A.    Yes, in my office.

 7    Q.    And you said "No" at the time, that you were not involved.

 8    A.    I'm sorry.

 9    Q.    So is it true that you were involved in assessing whether

02:51 10    patients were eligible?

11    A.    In my office, yes.

12    Q.    But for Arbor Home Care, were you involved?

13    A.    In my office for Arbor when we were referring, yes.

14    Q.    Okay.  But did you understand it was predominantly the

15    nurse's role to assess whether a patient was eligible?

16    A.    It is.

17    Q.    Okay.  And it was the nurse's role to determine what was

18    medically necessary for patients?

19    A.    Yes.

02:52 20    Q.    When you were at Arbor, Arbor was a pretty large company,

21    right?

22    A.    I don't know how large it was.

23    Q.    How many nurses would you say there were?

24    A.    I don't know anything about that.

25    Q.    Okay.  But is it fair to say there were some people who
```

1    worked in the office there?

2    A.    No.

3    Q.    Okay.  So you did not work in the office?

4    A.    No.

5    Q.    So you were predominantly in the field; that's correct?

6    A.    Correct.

7    Q.    Thank you.

8          So Ms. O'Donoghue, you also testified regarding some

9    documents in your personnel file today, right?

02:52 10   A.    In my files, they were personal.

11   Q.    Yes.  And you testified today that you weren't familiar

12   with some of those documents?

13   A.    Correct.

14   Q.    You testified that you had never seen those documents

15   before they were shown to you by prosecutors?

16   A.    Correct, prior to, yes, the investigation.

17   Q.    But Ms. O'Donoghue, isn't it true that you gave some of

18   those documents to prosecutors in this case?

19   A.    In 2015, approximately, there was a package that they

02:53 20   wanted me to sign it again, and I never sign it for them.

21   Q.    Perhaps you misunderstood my question.  But when this case

22   was investigated and you went in to testify before the grand

23   jury --

24   A.    Yes.

25   Q.    -- before you went to testify, you produced some documents

1    to prosecutors, right?  You produced some documents to federal

2    agents?

3    A.    Correct.

4    Q.    And some of the documents that we were discussing today

5    were the same documents that you produced to the government?

6    A.    Well, yes, because they gave it to me, saying that I

7    needed to complete it, and I didn't complete it because, if I

8    did it once, I didn't have to do it a second time.  So that is

9    the one that I submitted to USA.

02:54 10    Q.    So it is correct that some of the documents you were asked

11    about that you said you hadn't seen before you had in fact

12    produced those to the government?

13    A.    The whole package I did.

14    Q.    Yes.  And before that, those documents were stored at your

15    home?

16    A.    Yes.

17         MS. PASCUCCI:  Let's look, Ms. Apfel, could we pull up

18    363 and in particular the orientation for all employees -- the

19    orientation checklist.

02:54 20         MS. APFEL:  Do you have a page number?

21         MS. PASCUCCI:  It would be Bates 829, I think it says

22    23 at the bottom, Orientation For All Employees.

23    Q.    Now, Ms. O'Donoghue, weren't you asked about this -- let's

24    back up.  Today when you testified about this document, you

25    said you had never initialed this document, correct?

```
 1    A.    Correct.

 2    Q.    You said you had never seen the document before today?

 3    A.    Before today?

 4    Q.    Sorry, my bad.  Before prosecutors showed it to you.

 5    A.    No, because I didn't sign that.

 6    Q.    But Ms. O'Donoghue, again, if we go to your grand jury

 7    testimony, weren't you asked about this same document before

 8    the grand jury?

 9    A.    I don't understand your question, ma'am.

10    Q.    Here, let me help out.  If we could just skip to page 34

11    of your grand jury testimony.  I'm going to read you from the

12    record an exchange starting at line 8.  The prosecutor says,

13    "And I'm going to show you what I've marked as grand jury

14    Exhibit 9."

15    A.    Okay.

16    Q.    "And do you see that this is a document titled Orientation

17    For All Employees?  One column says Topics Covered and the

18    other says Date and Initials."

19    A.    Page 34, I don't see that.

20    Q.    Page 34, if we start at line 8.

21    A.    Line 8, it says, "Oh, yes, I did, yes.

22    Q.    Okay.  If we look at "By Ms. Hemani" under that, starting

23    at line 8, "I'm going to show you what I've marked as grand

24    jury Exhibit 9.  And do you see this is a document titled

25    Orientation For All Employees.  One column says Topics Covered
```

1    and the other says Date and Initials.  And the date here is

2    3-6-14.  What does K stand for?"  You respond, "K is my maiden

3    name."

4        She asks, "Your maiden name?"  You respond, "My maiden

5    name."

6        And she says, "So these are your initials, right?"  And

7    you respond, "Yes."

8        "And do you see that down here on the bottom it's also

9    dated March 6, 2014.  Is that your signature there?"

02:57 10   A.    Wrong.

11   Q.    And you respond, "Yes."

12   A.    Sorry.  Wrong.  This question is not the same question.

13   That is not my initials.  My initials, my maiden name is KAM,

14   but I didn't say that I initial in that orientation, that's not

15   correct.

16   Q.    Ms. O'Donoghue, when you testified under oath before the

17   grand jury, you said that these were your initials, correct?

18   A.    My initials, I understood, as I said KAM, my initials, but

19   not that I have signed this form.  So that is incorrect.  I'm

02:58 20   correcting today.

21   Q.    But didn't you testify, when she asked, is that your

22   signature there, did you not testify yes, it was?

23   A.    I don't remember what I said or not.  This is the correct

24   answer.  This is the correct answer.  It's not my initials and

25   not my signature.

1    Q.    But again, Ms. O'Donoghue, you testified under oath that

2    it was, correct?

3    A.    Again, I have my attorney.  I don't know whether I

4    understood KAM as for my maiden name initials, but I don't ever

5    initial my maiden name ever.

6    Q.    So let's turn ahead from this and let's turn to your work

7    at Arbor.

8    A.    Mm-hmm.

9    Q.    Ms. O'Donoghue, I want to ask you about some of the

02:58  10   patients that you saw at Arbor.  One patient that you saw was

11   Wanda Villegas, correct?

12   A.    Wanda Villegas.

13   Q.    And Wanda, you referred her to Arbor, right?

14   A.    Correct.

15           MS. PASCUCCI:  Ms. Apfel, you can take that down.

16   Thank you for bringing it up.

17   Q.    And Wanda, she had cognitive delays, correct?

18   A.    Correct.

19   Q.    She needed someone to help groom her?

02:59  20   A.    Yes.

21   Q.    And her nurse was Charles, right?

22   A.    Charles, correct.

23   Q.    And didn't Wanda's mom tell you that she was happy with

24   Charles' services?

25   A.    Yes, she did.

```
 1    Q.   And another one of your patients that you referred that

 2    was -- excuse me, if I say it wrong -- Theodora Rosas?

 3    A.   Correct.

 4    Q.   And you saw Ms. Rosas almost every day, right?

 5    A.   Yes.

 6    Q.   And after Arbor closed you continue to see her every day

 7    as a personal care attendant, right?

 8    A.   No.

 9    Q.   You did not?

10    A.   I stop for a while.  No, not right away.  Much later, yes.

11    Q.   And Mr. Schenk, was he another patient of yours?

12    A.   Correct.

13    Q.   And you visited him every day?

14    A.   Yes.

15    Q.   And I believe on direct, Ms. O'Donoghue, you were asked if

16    you billed for hours that you didn't work, and you said that

17    you did, right?

18    A.   Say your question.

19    Q.   You were told that I think Ms. Gonzalez, Rosa Gonzalez

20    told you to bill for hours, to mark down visits that you did

21    not work; is that correct?

22    A.   Not the way you are asking the question.

23    Q.   Okay.  Can you rephrase it for me?  What was it that Rosa

24    told you to do?

25    A.   Rosa will be concerned because I was not completing the
```

1   time sheet according to their expectation, and I said no,

2   that's not correct, this is not correct, this is not correct.

3   And so she said you have to -- you do it this way or you're not

4   going to get paid.

5   Q.   Okay.  And in response to that did you ever bill for hours

6   that didn't happen?

7   A.   We have to bill it, otherwise, you know, they were not

8   going to pay.

9   Q.   So you billed for hours that did not happen, correct?

03:01 10   A.   That was, according to them, my break time or my

11   lunchtime.

12   Q.   Okay.  And Ms. O'Donoghue, I want to ask you, is it true

13   that you sued Arbor?

14   A.   Yes, I did.

15        MS. PASCUCCI:  And with the permission of the court,

16   Your Honor, may I approach the witness again?

17        THE COURT:  Yes.

18        MS. PASCUCCI:  Okay.

19   Q.   Do you recognize this document?

03:02 20   A.   Yes, I do.

21   Q.   And what is this?

22   A.   It is a Demand For Jury Trial against Arbor.

23   Q.   And this is a suit that you filed against Arbor, correct?

24   A.   Yes, I did.

25   Q.   And you also sued Ben Muiruru?

```
 1   A.   Yes, I did.
 2        MS. PASCUCCI:  I would move to admit this document,
 3   Your Honor.
 4        MR. LOONEY:  No objection.
 5        THE COURT:  It's admitted.
 6        (Exhibit 902 admitted into evidence.)
 7        THE COURT:  Is that 902?
 8        MS. PASCUCCI:  902.  To turn on the Elmo, do I just --
 9        COURTROOM CLERK:  Just hit the power button.  It might
10   take a second.
11        MS. PASCUCCI:  Wow, this is a very fancy Elmo.  My
12   apologies for my technological defunctness over here.
13        THE COURT:  It's only lawyers who ever ask if they
14   turn it on by hitting the power button.
15        MS. PASCUCCI:  Your Honor, it's not my fault that they
16   don't offer IT classes at law school.
17        THE COURT:  You're not the first one; nor will you be
18   the last one.
19   Q.   And in this suit you state that it was Ben Muiruru who
20   managed Arbor; is that correct?
21   A.   Did I say?  This is written by my attorney, I assume.
22   Q.   Yes, but you would have --
23   A.   He was representing me.
24   Q.   But you would have authorized any complaint that your
25   attorney filed, correct?  You would have needed to sign off on
```

1    it?

2    A.    Yes, but I don't remember what it says there.

3    Q.    And you can take a moment to review this, but am I correct

4    that Faith Newton isn't mentioned once in this complaint?

5    A.    I don't know.  I don't remember about Faith Newton.

6    Q.    In this complaint you're alleging that Arbor did not pay

7    you enough for your work there, correct?

8    A.    That's correct.

9    Q.    And in conjunction with this complaint, you later filed an

03:04 10    affidavit; is that correct?

11    A.    I don't remember.  My attorney must have done it.

12          MS. PASCUCCI:  I'm doing great over here with the

13    tech.

14    Q.    Again, with the permission of the court, I'm going to hand

15    you this document.  I'd ask you to skip ahead to what is

16    Exhibit 2 in this affidavit.

17    A.    Exhibit 2?

18    Q.    Yes.  If you look, it's a Notice of Assessment of Damages

19    Hearing.

03:06 20    A.    Yes.

21    Q.    Is this an affidavit signed by you?

22    A.    This is my signature.

23    Q.    This is an affidavit that was submitted by your attorney

24    in that civil case?

25    A.    Yes.

1          MS. PASCUCCI:  Your Honor, I'd move to admit this

2    document.

3          MR. LOONEY:  No objection.

4          THE COURT:  It's admitted.

5          (Exhibit 903 admitted into evidence.)

6          THE COURT:  Is that 903?

7          MS. PASCUCCI:  Yes, Your Honor, 903.

8    Q.    And if we go to paragraph 5, you wrote under oath, "I

9    worked 12 hours a day for seven days a week caring for several

03:06 10   different clients," correct?

11   A.    Which one are you reading?

12   Q.    If we look at paragraph 5 of that first page of the

13   affidavit, you worked 12 hours a day for seven days a week

14   caring for different patients.

15   A.    Different -- yeah.  In the beginning you say, correct.

16   Q.    We're still looking at Exhibit 2.  So it's under,

17   "Plaintiff Adriana O'Donoghue's affidavit is support of her

18   assessment for emotional damages."  I think it's supposed to

19   say "in support."

03:07 20   A.    Number 5, you want me to read it for that?

21   Q.    That would be great.

22   A.    "I usually work 12 hours a day for seven days a week.

23   Usually work, that's another word for several different

24   clients.  Yes."

25   Q.    And then if we go ahead to the next page, you write, "I

        1    estimate I worked 84 hours a week, 12 hours a day for seven

        2    days a week and was not paid for overtime after 40 hours."  Is

        3    that correct?

        4    A.    Where are you reading?

        5    Q.    This is 8C.

        6    A.    C?

        7    Q.    Yes.

        8    A.    I don't recall all these numbers, no.

        9    Q.    But in any case, you signed this document?

03:08   10    A.    Yes, I did.

       11    Q.    And it was submitted in court?

       12    A.    I don't know.  I was not in court.

       13    Q.    As a result -- did this case eventually settle,

       14    Ms. O'Donoghue?

       15    A.    It was, but we never went to court.

       16    Q.    Sure.  But the case settled, and after it was settled it

       17    was dismissed?

       18    A.    They did, yes.

       19    Q.    And as a result of the settlement you were paid by Arbor,

03:08   20    correct?

       21    A.    Correct.

       22    Q.    And Ms. O'Donoghue, do you know who Joseph Muiruru is?

       23    A.    Joseph Muiruru?

       24    Q.    Yes.

       25    A.    At Arbor, at Arbor, I never met Joseph Muiruru, but in

1    2018 I met Joseph Muiruru.

2    Q.   And do you recall that he was a director of nursing at

3    Arbor at one time?

4    A.   No.

5    Q.   And at some point did Mr. Muiruru tell you that he was

6    starting his own home health care agency?

7    A.   Never spoke to Mr. Muiruru and I never knew his name at

8    Arbor.

9    Q.   But after you worked at Arbor you said you did speak to

03:09 10   Mr. Muiruru, correct, in 2018?

11   A.   2018, correct.

12   Q.   And in 2018, did he ask you to come work for him?

13        MR. LOONEY:  Objection, relevance.

14        THE COURT:  I don't know where she's going with it, so

15   I'll give her the question and then we'll see.

16        MS. PASCUCCI:  Your Honor, I can skip this question.

17   Thank you.

18        THE COURT:  Okay.

19   Q.   Ms. O'Donoghue, do you believe that you are a

03:09 20   co-conspirator with Ms. Faith Newton in this case?

21   A.   Excuse me?  Say that again.

22        MR. LOONEY:  Objection.  This might be an opportunity

23   for a sidebar.

24        THE COURT:  Okay.

25   **SIDEBAR:**

```
 1            THE COURT:  The question calls for a legal conclusion.
 2   I'm happy to hear you on it.  But depending on what comes out
 3   of his mouth next, at the moment you can have something like
 4   that, but without the term "co-conspirator" which is a legal
 5   term.
 6            MR. LOONEY:  She is an unindicted co-conspirator in
 7   Count Three, which is being dismissed.  She's not a
 8   co-conspirator in this case.
 9            THE COURT:  I mean, doesn't seem to me like you should
10   get into Count Three, which has been dismissed.
11            MS. PASCUCCI:  Okay, got it.
12            THE COURT:  If you want to ask if she colluded with
13   her in any way, I think "co-conspirator" is a legal term.
14            MS. PASCUCCI:  Got it, okay.
15   (End of sidebar.)
16   Q.   Did you ever enter into an agreement with Ms. Newton to
17   commit health care fraud?
18   A.   Excuse me, say that again.
19   Q.   Did you ever enter into an agreement with Faith Newton to
20   commit health care fraud?
21   A.   Did I ever have an agreement with her to commit --
22   Q.   Yes.
23   A.   What is the question?
24   Q.   Did you ever enter into at agreement --
25   A.   No.
```

```
 1    Q.    -- with Ms. Newton to commit health care fraud?
 2    A.    No.
 3    Q.    And Ms. O'Donoghue, have you ever faced any criminal
 4    charges for your work at Arbor?
 5    A.    No.
 6          MS. PASCUCCI:  No further questions, Your Honor.
 7          THE COURT:  Redirect.
 8          MR. LOONEY:  Briefly.
 9    REDIRECT EXAMINATION BY MR. LOONEY:
10          MR. LOONEY:  Ms. Apfel, could you pull back up Exhibit
11    363, page 27.
12    Q.    Ms. O'Donoghue, do you see the document in front of you?
13    A.    Yes.
14    Q.    And you were asked some questions about your initials and
15    signature just now?
16    A.    Can I ask you questions?
17    Q.    You were asked questions about your initials on this
18    document and your signature on there, correct?
19    A.    Yes, I did, yes, yes.
20    Q.    I'm going to ask a question more generally.  Did you ever
21    receive orientation on the subjects of this document from Faith
22    Newton?
23    A.    No.
24          MR. LOONEY:  Can we go to page 145 of this document.
25    Actually, this is the HHA skills checklist we looked at before.
```

1    Can we go to the third page of this one as well.

2    Q.    Regardless of the signature issue, did you ever go on a

3    joint visit with Ms. Newton to a patient?

4    A.    Never.

5              MR. LOONEY:  Nothing further.

6              THE COURT:  Recross?

7              MS. PASCUCCI:  Nothing further, Your Honor.

8              THE COURT:  You're excused.  Thank you.

9              THE WITNESS:  Do I leave these things here?

03:13 10          THE COURT:  Yes, you can leave those there.

11             MR. BRADY:  Your Honor, the United States calls

12   Airanisse Quintana.

13             Your Honor, may I approach the witness?

14             THE COURT:  Yes.  You all don't have to ask to

15   approach.  Just make yourself at home.

16             MR. BRADY:  Okay.

17             THE COURT:  Okay.

18             AIRANISSE QUINTANA, Sworn

19             COURTROOM CLERK:  Thank you.  Can you please state

03:15 20   your name and spell your last name for the record.

21             THE WITNESS:  Airanisse Quintana Rodriguez,

22   Q-u-i-n-t-a-n-a.

23   DIRECT EXAMINATION BY MR. BRADY:

24   Q.    Good afternoon, Ms. Quintana.

25   A.    Good afternoon.

1    Q.    Can you hear me okay?

2    A.    Yes.

3    Q.    Okay.  I just ask that, the microphone in front of you, it

4    moves forward, so if you can, speak into the mic.  That will

5    make it easier for us to hear you.  Okay?

6    A.    Okay.

7    Q.    Could I ask you to go ahead and just introduce yourself to

8    the jury, please.

9    A.    Hi.  My name is Airanisse Quintana.

03:15 10    Q.    And Ms. Quintana, where do you live?

11    A.    In Lawrence, Massachusetts.

12    Q.    And what do you currently do for work?

13    A.    Right now nothing.

14    Q.    Nothing.  Do you do any volunteer work these days?

15    A.    Yes.

16    Q.    Tell the jury about that.

17    A.    So after my brain surgery, I am not able to work, so I am

18    doing volunteer from the church.

19    Q.    And is that, you volunteer at like a church camp?

03:16 20    A.    Yes, uh-huh.

21    Q.    Did you used to work at a place called Arbor Home Care?

22    A.    Yes.

23    Q.    When did you work there?

24    A.    I worked in 2013 until 2016 or 2012 to 2016.

25    Q.    Okay.  Did you have a couple of different jobs at Arbor?

```
 1   A.   Yes.
 2   Q.   Okay.  What were the different jobs that you had there?
 3   A.   So I used to be like marketing, recruiting, community
 4   license, covering for reception.  I work, I do filing, I also
 5   work in human resource, helping, in payroll.  Sometimes I
 6   help -- usually I translate for the nurse English to Spanish to
 7   the patient and also with the home health aide.
 8   Q.   Ms. Quintana, before you came to Arbor, did you have a
 9   different job in health care?
03:17 10   A.   Yes.
11   Q.   What was that job?
12   A.   Compassionate Home Care.
13   Q.   Compassionate Home Care?
14   A.   Yes.
15   Q.   And what was your job at Compassionate Home Care?
16   A.   Home health aide.
17   Q.   As a home health aide?
18   A.   Yes.
19   Q.   Do people sometimes refer to that as an HHA?
03:17 20   A.   Uh-huh.
21   Q.   And what kind of company was Compassionate?
22   A.   What kind?
23   Q.   What kind of a company?  What did Compassionate do?  What
24   kind of company was that?
25   A.   Home care.
```

1    Q.    Home care, okay.  Can you describe for us what you did,

2    what your job was like as an HHA at Compassionate.  What did

3    you do?

4    A.    So I used to take care of patients like me now.  Usually

5    all patient or patient that they cannot do -- they cannot do

6    things by their self.

7    Q.    So you'd help patients with some of their daily

8    activities?

9    A.    Yes.

03:18 10    Q.    Okay.  Ms. Quintana, do you know the defendant, Faith

11    Newton?

12    A.    Yes.

13    Q.    Do you recognize her here in the courtroom?

14    A.    Yes.

15    Q.    Sitting over at defense table?

16    A.    Yes.

17    Q.    Okay.  How did you first meet Ms. Newton?

18    A.    Because she used to be my grandma nurse.

19    Q.    She used to be your grandmother's nurse?

03:19 20    A.    Yes.

21    Q.    Okay.  And was that before you started working at Arbor?

22    A.    Yes.

23    Q.    Okay.  Was that back when you were working at

24    Compassionate?

25    A.    Yes.

```
 1   Q.   Okay.  And did Ms. Newton also work at Compassionate?

 2   A.   Yes.

 3   Q.   Do you know what her job at Compassionate was?

 4   A.   Yes.

 5   Q.   What was Ms. Newton's job at Compassionate?

 6   A.   Nurse.

 7   Q.   She was a nurse?

 8   A.   Yes.

 9   Q.   And she was a nurse for your grandmother?

10   A.   Yes.

11   Q.   Okay.  And do you remember when you first met Ms. Newton,

12   do you remember what that was about, what was going on with

13   your grandmother at that point?

14   A.   She was visiting my grandma.

15   Q.   Okay.  Was she doing an intake for your grandmother?

16   A.   Well, she visit my grandma from my mom's side.  And then

17   she -- then I believe she was my other grandma nurse.

18   Q.   So Ms. Newton ended up being a nurse for both of your

19   grandmothers on both sides?

20   A.   Just the evaluation, the first evaluation, that's all.

21   Q.   Just the evaluation, okay.  Now, Ms. Quintana, at some

22   point do you know if Ms. Newton left Compassionate?

23   A.   Yes.

24   Q.   Did she say to you why she was leaving Compassionate?

25   A.   She's going to open her own agency because there was
```

```
 1   something, a situation in Compassionate she used to have active
 2   there, like she used to be part of the boss, and then she want
 3   to open her own agency and they let her.  They just give her -~
 4   she opened her own agency.
 5   Q.   So Ms. Newton opened her own home health agency?
 6   A.   Yes.
 7   Q.   What was the name of that home health agency?
 8   A.   Arbor Home Care.
 9   Q.   That was Arbor.  Okay.  At some point, Ms. Quintana, did
10   Ms. Newton ask you to come work at Arbor?
11   A.   Yes.
12   Q.   What do you remember about that meeting that, that
13   conversation?
14   A.   So we have a meeting in Dunkin' Donuts.
15   Q.   Do you remember where that was, what town that was?
16   A.   In Lowell, Massachusetts.
17   Q.   And what do you remember happening at that meeting?
18   A.   So she asked me if I can be part of her team and also if I
19   can -- well, in the beginning was no numbers.  So she doesn't
20   have MassHealth number.  And then she told me when she has
21   MassHealth number, then she's going to accept more clients.
22   Q.   So let me follow up on that.  Ms. Newton explained to you
23   or told you that when Arbor started up, they weren't yet a
24   provider for MassHealth?
25   A.   Uh-huh.
```

Q.   And did that have something to do with the number of
clients that they had as you understood it?
A.   No.  The number, like she cannot recruit a lot of patient
because she need to pay by her pocket the payroll.
Q.   Got it.  So they started but eventually they'd get a
number and they could go with MassHealth?
A.   Yes.
Q.   Okay.  And did Ms. Newton ask you at that meeting if you
wanted to come work for her?
A.   Huh?
Q.   Did Ms. Newton ask you at that meeting if you would come
and work for her at Arbor?
A.   Yes.
Q.   And did she tell you what the job would be?
A.   Well, she offered me to be recruiter or receptionist.
Q.   Recruiter or receptionist?
A.   Uh-huh.
Q.   And what was that job, recruiter; what did that mean?
A.   So just, the patient I was referred to Compassionate, let
them know that this agency is closer, and they are going to
have the same kind of service they used to have with the
previous agency, just with closer location because
Compassionate used to be in Worcester, and then most of the
patient, they live in Lowell, so Chelmsford is closer to the
patients, was more closer.

```
 1   Q.   Okay.  So did you decide, did you accept, did you decide

 2   to work at Arbor?

 3   A.   Yes.

 4   Q.   Why did you decide to work at Arbor?

 5   A.   First of all, it was more closer for me because to pick up

 6   the paycheck, I need to drive to Worcester almost one hour

 7   away, and then I would get paid more.

 8   Q.   So it was closer to home?

 9   A.   Uh-huh.
```
03:24 10   Q.   And you'd also get paid more than you were making at
```
11   Compassionate?

12   A.   Yes.

13   Q.   Okay.  How much more would you get paid at Arbor?

14   A.   One dollar more.

15   Q.   One dollar more per hour?

16   A.   Yes.

17   Q.   Okay.  You mentioned that the job at Arbor involved

18   recruiting patients to Arbor?

19   A.   Yes.
```
03:24 20   Q.   Could you describe for us how that worked.
```
21   A.   So every single patient I brought, they used to give $100.

22   Q.   Okay.  Who gave $100 to who?

23   A.   So Faith used to give it to the person who used to

24   brought, so they used to give $100 for patient.

25   Q.   So was that called a referral bonus at Arbor?
```

1    A.    Yes.

2    Q.    Okay.  And did you receive that $100 for every new patient

3    you brought into Arbor?

4    A.    Yes.

5    Q.    So can you walk us through, can you explain to us the

6    process, as a patient recruiter, like, what did you do to go

7    find these patients?

8    A.    So usually where my grandma live is a building for senior.

9    So they used to see the nurse coming to see my grandma, and

03:25 10    also there was a person helping my grandma doing the laundry,

11    taking care of my grandma, also cleaning, so all those stuff.

12    So they was asking to my grandma, and it was more easy for me

13    to let them know, oh, so if you want those services, you can

14    apply to this company, but your doctor need to sign the

15    approval first in order to come to join, to have that service.

16    Q.    Okay.  So let me come back to that $100 referral bonus.

17    How was that money paid?  How did you receive that money?

18    A.    So I don't remember if it was cash or check.

19    Q.    Do you remember at one point the referral bonus was paid

03:26 20    through the payroll as a bonus?

21    A.    Yes.

22    Q.    Do you remember how many referral bonuses, like how much

23    you received for referring patients?

24    A.    For myself?

25    Q.    Yeah, yourself?

```
 1   A.    Well, I think I receive 10,000.
 2   Q.    $10,000?
 3   A.    Mm-hmm.
 4   Q.    So those referral bonuses, was that a common practice at
 5   Arbor?
 6   A.    Huh?
 7   Q.    Was it a common practice at Arbor to pay those referral
 8   bonuses?
 9   A.    Yes.
10   Q.    Okay.  Now, when you first started at Arbor, what was
11   Faith Newton's position there?
12   A.    Nurse.
13   Q.    Nurse.  Was she still seeing patients outside the office
14   out in the field when you started?
15   A.    Yes.
16   Q.    And did you ever talk with Ms. Newton about how many
17   nursing visits she would order for the patients?
18   A.    Can you repeat?
19   Q.    Yeah, did you ever talk with Faith Newton about how many
20   nursing visits she would order for the patients?
21   A.    That was after.
22   Q.    Okay.  After what?
23   A.    After I start working in the office.
24   Q.    Okay.  What do you remember about that?
25   A.    We have, there is PA, prior authorization system come up,
```

1    the hours the nurse was getting decreasing.  And then we was

2    talking about how MassHealth is increasing the hours.  And then

3    she explained to me what was important to have in the nurse

4    visit.  Like, the agency get paid more if they have nurse than

5    they have home health aides.

6    Q.    So Ms. Newton said to you that the agency Arbor gets paid

7    more if the patient has a nurse?

8    A.    Yes.

9    Q.    And that means that the patient would have nursing visits,

03:28 10    that the patient would have visits done by a nurse; is that

11    right?

12    A.    Can you repeat?

13    Q.    Let me ask you a different question.  At some point after

14    you started at Arbor, did Ms. Newton start spending more time

15    in the office?

16    A.    Yes.

17    Q.    And at that point what was your understanding of

18    Ms. Newton's role at Arbor?  What was she doing there?

19    A.    Well, she is the head of the nurse.

03:29 20    Q.    Was she also one of the owners?

21    A.    Yes.

22    Q.    Okay.  Now, who was -- do you know who Ben Muiruru is?

23    A.    Yes.

24    Q.    Who was Ben Muiruru?

25    A.    Her husband.

1    Q.   Her husband.  Now, what was his role at Arbor?

2    A.   So he is also the owner.

3    Q.   Okay.  Did you interact with him, with Ben Muiruru?

4    A.   Yes.

5    Q.   Who did you deal with more, Faith or Ben?

6    A.   With Faith.

7    Q.   Now, at some point after you were doing the recruiting

8    role, did Ms. Newton ask you to take on a different position at

9    Arbor, a different job?

03:30 10   A.   Yes.

11   Q.   And when was that, best memory of when that was?

12   A.   So in 2015, something happen with the person who used to

13   be like the office manager.  He used to do the payroll, and

14   then she, 2015 or 2016, she asked me if I can do the payroll.

15   Q.   So Faith Newton asked you if you could start doing the

16   payroll?

17   A.   Yes.

18   Q.   Okay.  And describe for us what you did in that job?

19   A.   Well, basically, it was a spreadsheet in Excel that have

03:31 20   all the employees' name there, and they also have a calculator.

21   Then depending how many hours the home health aide has, we need

22   to put in those hours, and the calculator is going to give us

23   how much you're supposed to -- the home health aide is supposed

24   to get paid by hours.  And then after we finish, I need to send

25   an email to her, with her and the guy who work in Complete

1    Payroll Solution, and he submit the payroll.

2    Q.    So Ms. Quintana, after you put together the payroll -- and

3    that was based on the number of hours for each nurse and each

4    home health aide?

5    A.    Yes.

6    Q.    Okay.  You would then take that information, and you would

7    email it, share it with Faith Newton?

8    A.    Yes, in the beginning, yes.

9    Q.    In the beginning, okay.  Then you would also, you

03:32 10   mentioned Complete Payroll Solutions, right?

11   A.    Yes.

12   Q.    Was that an outside company that Arbor worked with to help

13   with the payroll?

14   A.    Yes.

15   Q.    Okay.  So you'd send it to them so they could process it?

16   A.    Mm-hmm.

17   Q.    Okay.  Now, did someone teach you how to do that, how to

18   do the payroll?

19   A.    So I get trained by Faith.

03:32 20   Q.    And as part of that process, that payroll process, did you

21   use Axxess?

22   A.    Yes, the company run by Axxess at that time.

23   Q.    Okay.  Was your position the head of payroll at Arbor?  Is

24   that fair?

25   A.    Yes.

1  Q.   Okay.  As the head of payroll, did you also handle

2  payments of those referral bonuses?

3  A.   Yes.

4  Q.   Okay.  How did you know what to pay?

5  A.   So when intake receive the call, the referral, so usually

6  the person who called, they let them know that, oh, I refer

7  this patient.  And then we wait three months, in order, like,

8  when they used to have the doctor approval and the patient was

9  in the company for three months, then we made the bonus for the

03:33 10  patient for that person.

11  Q.   So over time, am I right, did it change where somebody had

12  to be there for three months before the referral bonus would be

13  paid, a patient would have to be there?

14  A.   Yeah, mm-hmm.

15  Q.   And do you remember getting sticky notes with information

16  about what to pay for bonuses?

17  A.   Yes, that information -- so the sticky note was together

18  with the patient folder.

19  Q.   All right.  So describe to us how that worked.  You'd get

03:34 20  a patient folder.  And what was the sticky note?

21  A.   Okay.  So when intake receives the information, intake put

22  in the name of the person who brought it on the sticky note.

23  And then sometime the sticky note was lost, so we end up

24  putting it on the first paper cover sheet, but then we take it

25  out because we are not supposed to have those there and then we

1    go back to the sticky note.

2    Q.   Okay.  Let me just try to break that down and follow up

3    real quick.  So there was, first you'd get the information on

4    what bonus to pay on a sticky note?

5    A.   Yes.

6    Q.   Okay.  And then was it you or other people who created a

7    document that was part of the patient file that indicated who

8    got paid the bonus?

9    A.   Yes.

03:35 10    Q.   Okay.  Did you create that?

11    A.   Rosa.

12    Q.   Rosa Gonzalez did?

13    A.   Mm-hmm.

14    Q.   But you could see in the file that that sheet was there,

15    right?

16    A.   Yes.

17    Q.   And it would say the name of the person who referred and

18    got paid for that referral, right?

19    A.   No, doesn't get paid until the folder goes to payroll.

03:35 20    Q.   Got it.  Okay.  But it would have the information for who

21    should be paid, right?

22    A.   Yes.

23    Q.   Okay.  And then at some point, that document, that cover

24    page was taken out of the patient files?

25    A.   And we go back to the sticky note.

```
 1   Q.   Okay.  Why did that happen?
 2   A.   We thought it was going to be more easy having in the
 3   patient folder, but then we learned that we cannot pay for
 4   referrals.
 5   Q.   Okay.  Did Faith Newton say anything to you about that
 6   document that was in the file?
 7   A.   Yes.
 8   Q.   What did Faith Newton say to you and tell you to do?
 9   A.   So she explained to us that in order -- so she explained
10   to us that we cannot have referral unless it's one person has a
11   community license.  That is the only person that can refer a
12   patient to us.  We cannot market patient outside.
13   Q.   So did Faith Newton tell you to remove the document from
14   the patient files?
15   A.   Yes, we go back to the sticky note, and that way the
16   company is not in trouble.
17        MR. BRADY:  One moment, please.
18   Q.   Ms. Quintana, at one point did you also help with the
19   medical records at Arbor?
20   A.   Before payroll, yes.
21   Q.   Okay.  So before payroll you were asked to help with the
22   medical records; is that right?
23   A.   Yes.
24   Q.   And who asked you to do that?
25   A.   Faith.
```

1    Q.    Faith Newton?

2    A.    Yes.

3    Q.    And can you describe for us what you did with respect to

4    the medical records?

5    A.    So in the beginning I was filing and then they hire Helen

6    Sech to do filing.  And then I was doing like QA for the

7    folder.  But this medical record review, that's the name of the

8    department they open.  Because my English, in the beginning, I

9    was like scared to talk.  I am a Spanish, so I was not -- I

03:38 10    want to work in the office, but I was scared to make mistake

11    with my pronunciation, or sometimes I forget some words or

12    don't say correctly.  In that department I don't need to talk

13    with nobody.  So she give me a piece of paper.  That piece of

14    paper, I just need to make sure those paper, they are in the

15    folders.

16    Q.    Okay.  So Faith Newton gave you a piece of paper that

17    identified what should be in the folder?

18    A.    Yes.

19    Q.    And your job was to make sure that that was in the folder?

03:39 20    A.    Yes.

21    Q.    And as you did that, did you find that there were things

22    missing from the folders?

23    A.    Yes.

24    Q.    What sort of things were missing from the folder?

25    A.    Usually the doctor's signature.  In some of them the

1   doctor never signed.  Some of them they put in, they deny the

2   case.  Some doctor, they put a frown on the paper, and some

3   doctor we never heard back from them.

4   Q.   Have you ever heard of something called a Plan of Care?

5   A.   Yes.

6   Q.   Okay.  And was that the type of, sort of part of the

7   documents that you were looking for?

8   A.   Yes, that one that was one of many.

9   Q.   One of many, okay?

03:39 10  A.   Uh-huh.

11  Q.   And as you went through, as you did this review and you

12  went through the files and you found doctors' orders that

13  didn't have the signature on it, what did you do then, what did

14  you do with those?

15  A.   So the instruction was if I saw three Plan of Care without

16  signature, I need to let her know and also call the doctor

17  office to let them know if they can sign.  Or we need to

18  discontinue the service because that mean the doctor is

19  refusing to sign and the company doesn't get paid, and we need

03:40 20  to discontinue the service right away.

21  Q.   And you said you would give it to her.  Who is the her,

22  who would you give it to?

23  A.   I let Faith know.

24  Q.   And let me ask you, you were at Arbor for a couple of

25  years?

    1    A.    Yes.

    2    Q.    And at Arbor, over time did Arbor grow as a company?

    3    A.    Yes.

    4    Q.    All right.  Got a lot more patients, right?

    5    A.    Yes.

    6    Q.    Got more nurses, right?

    7    A.    Yes.

    8    Q.    Got more HHAs?

    9    A.    Yes.

03:41 10    Q.    And throughout that time, what was Faith Newton's role as

   11    the company grew?

   12    A.    Can you repeat the question?

   13    Q.    Sure.  What was Faith Newton's role at the company as the

   14    company grew?  What was her job there?

   15    A.    Well, she still a nurse but she doesn't have patients

   16    where the companies are growing.

   17    Q.    Let me shift gears a bit and ask you about health aides,

   18    HHAs.

   19    A.    Okay.

03:41 20    Q.    And am I right that sometimes you would cover HHA visits

   21    at Arbor?

   22    A.    Yes.

   23    Q.    Okay.  Did you have any certifications or licenses?

   24    A.    In the beginning, no.

   25    Q.    Okay.  Did you end up getting any certifications?

```
 1   A.   Yes.

 2   Q.   And was that in 2013?

 3   A.   Yeah, I believe so, '13 or '14.

 4   Q.   What certification did you get?

 5   A.   Nurse assistant.

 6   Q.   CNA?

 7   A.   CNA.

 8   Q.   Okay.  And how did you get the CNA?

 9   A.   So I went to a school, Three Dimensions School in Dracut.

03:42 10   Q.   Did you have to pay for that?

11   A.   Yes.  $800.

12   Q.   I'm sorry?

13   A.   $800.

14   Q.   And how many hours did you have to spend to get that CNA?

15   A.   So it was one month, I believe it was 75, 80 hours for the

16   whole entire month.

17   Q.   Now, Ms. Quintana, at the beginning of your time at Arbor,

18   did some people start working as HHAs without any training?

19   A.   Yes.

03:43 20   Q.   Did some HHAs, new HHAs come in and sign papers and just

21   leave?

22   A.   Yes.

23   Q.   Now, at some point did you become responsible for training

24   the new HHAs at Arbor?

25   A.   Well, not responsible but I was part of the training team.
```

```
 1   Q.   Okay.  Explain that to the jury, how you became part of
 2   that and what your role was with that.
 3   A.   So they open, they open a department called HHA department
 4   to start to train the new home health aides, and that way they
 5   have the knowledge to start working with the patient.
 6   Q.   And how long, how long was that training?  Like, how long
 7   did the training last for when that started?
 8   A.   Well, so should be four hours.  In the beginning it was
 9   the whole entire day, and then they finish in four hours.
10   Q.   So it would wrap up, start in the morning and wrap up
11   around noon?
12   A.   Yes.
13   Q.   Okay.  And for how long, for how long were you involved
14   with the training in that way?
15   A.   Like almost two months.
16   Q.   Almost two months?
17   A.   Being in the training, yes.  And then after that I just
18   introduce myself, let them know that I am in charge of payroll,
19   and also I speak Spanish if they need some translate.
20   Q.   Did somebody else -- well, did somebody else take over the
21   HHA training?
22   A.   Yes.
23   Q.   Who was that?
24   A.   Amanda Muchioki.
25   Q.   And how did that happen?  How did it go down that Amanda
```

1    Muchioki took over for you?  What happened?

2    A.    No, no.  So when I have the -- when she asked me to work

3    in the office was as a medical record.  That's the first time.

4    And then I went on vacation.  When I came back, Amanda was

5    there already doing the HHA trainings, HHA department.

6    Q.    Were the HHAs paid for the time that they spent in

7    training at Arbor?

8    A.    No.

9    Q.    Okay.  Did you ever talk with Faith Newton about that?

03:46 10    A.    Yes, because they was complaining that -- they was

11    complaining that -- because we thought there is going to be

12    like several day they need to come to the office to complete

13    the training, so they was asking if they are going to get paid.

14    Q.    And what was the answer?

15    A.    No, we don't pay for the training because if the

16    company -- so the training costs $800, and then they are given

17    the training for free, if they go to the office, but they

18    supposed to be coming to different days, and they just show up

19    once.

03:46 20    Q.    Okay.  What else did Faith Newton say to you about how you

21    conducted -- how you handled the training for the HHAs?

22    A.    So like I say in the beginning, it was a joke, but for me

23    it was a little bit joke that she was telling me that I take

24    too long on my training, doing my training.  But for me, what I

25    understand when I take the CNA training is this is really

1    serious.  We are working with patients that can injure -- we

2    can injure the patient and also injure ourself.  So that's why,

3    after that joke, I was not part of the team anymore.  I just

4    introduce myself.

5    Q.   I think you touched on it before, but let me ask you this.

6    Were you familiar with the state-required amount of training

7    for an HHA, how much the state required, how long that training

8    had to be?  Were you familiar with that?

9    A.   Yes.

03:48 10    Q.   And did that include the requirement for a certain number

11    of hours of training?

12    A.   Mm-hmm, yes.

13    Q.   Do you remember how many hours?

14    A.   I think it's 70, 75.

15    Q.   70, 75 hours, okay.  And how did you learn that?  How did

16    you learn that that was the requirement?

17    A.   In the school.

18    Q.   In the school to be a CNA?

19    A.   Yes.

03:48 20    Q.   Okay.  As far as you are aware, did anybody, any HHA at

21    Arbor ever receive 75 hours of training?

22              MS. PASCUCCI:  Objection as to basis for knowledge.

23              THE COURT:  Well, he said as far as she is aware.

24              MS. PASCUCCI:  Okay, thank you.

25              THE COURT:  Limited to her knowledge.

```
 1   Q.   Do you understand that question, or should I ask it again?
 2   A.   Yes.
 3   Q.   Okay.  Ms. Quintana, as far as you're aware, did any HHA
 4   at Arbor receive the 75 hours of training?
 5   A.   No.
 6   Q.   Now, did you have other members of your family who worked
 7   as HHAs for Arbor?
 8   A.   Yes.
 9   Q.   Okay.  Tell us about that.
10   A.   So they apply, they have the training.  So if the doctor
11   sign -- well, so this is the way they used to be when I used to
12   be working with them.  So we send a referral, we refer the
13   patient.  If the doctor approve the patient, then we hire the
14   employee.  If the doctor doesn't approve that patient, they
15   don't hire the employee because they don't want to have one
16   person, like one folder if that person is not going to be
17   working with a client.
18        So until the patient is on the system, then the family
19   member apply and get the training.  So you go to orientation.
20   It's orientation.  It's not a training.  So they give
21   orientation, and then they start working the next day.
22   Q.   Okay.  So who are the members of your family who worked as
23   HHAs for Arbor?
24   A.   So I have my mom, my dad, and also my --
25   Q.   Did your brother work as an HHA, too?
```

1    A.    Yes.  And my -- I'm trying to say tia in English.

2    Q.    Aunt, your aunt?

3    A.    Aunt.

4    Q.    So your mother, your father, your aunt and your brother

5    all worked as HHAs?

6    A.    Yes.

7    Q.    Do you know if any of them received the 75 hours of

8    training?

9    A.    No.

03:51 10         MR. BRADY:  Ms. Apfel, could we please pull up Exhibit

11   50.2 just for the court and the witness, please.

12   Q.    Ms. Quintana, can you see on the screen in front of you

13   what we're calling Exhibit 50.2?  Can you see that document?

14   A.    Yes.

15   Q.    Okay.  And do you recognize that?

16   A.    Yes.

17   Q.    How do you recognize it?  How do you know that?

18   A.    That's part of the hiring paper.

19   Q.    Okay.  And what is this, what is this document, this one?

03:52 20   A.    Well, it's a job summary.

21   Q.    A job summary for what job?

22   A.    Home health aide.

23   Q.    From what company at what company?

24   A.    Oh, Arbor.

25         MR. BRADY:  Okay.  I offer Exhibit 50.2.

```
 1              MS. PASCUCCI:  No objection, Your Honor.
 2              THE COURT:  It's admitted.
 3              (Exhibit 50.2 admitted into evidence.)
 4     Q.   Okay.  Do you know, Ms. Quintana, do you know who wrote
 5     this, who created this?
 6     A.   Well, I work in Compassionate, so it's the same paper from
 7     Compassionate at Arbor.
 8     Q.   So you used to work at Compassionate, which is the same
 9     place where Ms. Faith Newton used to work?
10     A.   Uh-huh.
11     Q.   And you recognize this same job summary was the same thing
12     that they had at Compassionate?
13     A.   Yes.
14              MR. BRADY:  Okay.  Now, Ms. Apfel, if we could maybe
15     blow up the part of this that says "Qualifications."
16     Q.   Do you see it says, "preferred unless required by law."
17     Do you see that, Ms. Quintana?
18     A.   Yes.
19     Q.   Could I ask you to read the third bullet point here under
20     "Qualifications."
21     A.   "Completion of a basic aide training program consistent
22     with the state and federal requirement and for which a
23     certificate was obtained."
24              MR. BRADY:  Okay.  We can zoom out of that.  Can we
25     please show Exhibit 50.3.  I think just for the witness.
```

```
 1   Q.   Ms. Quintana, can you see on the screen Exhibit 503?

 2   A.   Yes.

 3   Q.   And can we jump to the last page of 50.3.  Do you see

 4   that, too?  Can you see that, Ms. Quintana?

 5   A.   Yes.

 6   Q.   What is this, what is this document, 50.3?

 7   A.   That's the answering of the 100 questions before.

 8   Q.   And so just to be clear, it's an HHA exam from Arbor and

 9   the answer key?

10   A.   Yes.

11   Q.   Okay.

12          MR. BRADY:  Your Honor, I offer Exhibit 50.3.

13          MS. PASCUCCI:  Objection, foundation.

14          THE COURT:  Yes, you need to offer a better foundation

15   on that.

16          MR. BRADY:  Okay.

17   Q.   How do you know, have you seen this document before?

18   A.   Yes.

19   Q.   Okay.  Where have you seen it before?

20   A.   In Compassionate.

21   Q.   At Compassionate?

22   A.   Yes.

23   Q.   Did you also see it at Arbor?

24   A.   Yes.

25   Q.   And how did you come to see it at Arbor?  Like, was it as
```

```
 1    part of your job you'd see it?
 2    A.    So they -- when they give the exam, they attach the
 3    answering key behind for the employee to do the check if they
 4    have any wrong or not, and then they put in the score.
 5    Q.    Okay.  So let me ask you a question about that.  But
 6    before I do that, Your Honor, I offer this again.
 7             MS. PASCUCCI:  No objection, Your Honor.
 8             THE COURT:  Admitted.
 9             (Exhibit 50.3 admitted into evidence.)
10    Q.    All right.  So I think we're looking at, Ms. Quintana, do
11    you see that's the answer key on the screen, now that we can
12    all see that?
13    A.    Yes.
14    Q.    Okay.  So explain to us how this exam and answer key were
15    used at Arbor.
16    A.    So new employee cannot be under 80 percent because if they
17    have a lot of wrong answer, we are not supposed to hire them.
18    So that's why they have the answering key in order to do the
19    correction, make the modifications.
20    Q.    To ensure that everybody got the passing score?
21    A.    Yes.
22    Q.    Okay.  Were there HHAs who only spoke Spanish at Arbor?
23    A.    No.
24    Q.    Let me -- were there HHAs who didn't speak English at
25    Arbor?
```

```
 1   A.    Uh-huh.

 2   Q.    Were there some home health aides who did not speak

 3   English?

 4   A.    Yes.

 5   Q.    There were some, okay.  And those HHAs, some of them, they

 6   only spoke Spanish; is that right?

 7   A.    Yes.

 8   Q.    Okay.  Was the HHA exam, was that ever given in Spanish at

 9   Arbor?

10   A.    No.

11         MR. BRADY:  We can take that down, Ms. Apfel.  Now

12   could we pull up, I believe Exhibit 353 is in evidence.  I

13   believe it's in evidence.  Can we pull up Exhibit 353, please.

14   Q.    Ms. Quintana, do you recognize this document, Exhibit 353?

15   A.    Yes.

16   Q.    What is it?

17   A.    That's the certification Arbor provide after they take the

18   orientation training.

19   Q.    Okay.  And it says here that that individual successfully

20   completed the HHA required course of study approved by the

21   State of Massachusetts.  Do you see that?

22   A.    Yes.

23   Q.    To your knowledge was that true?

24   A.    Huh?

25   Q.    Do you know if that -- did the State of Massachusetts
```

1    require the 75 hours of training?

2    A.    Yes.

3    Q.    Okay.  And as far as you you're aware, the HHAs didn't get

4    that at Arbor, right?

5    A.    No.

6    Q.    So this statement, the required course of study approved

7    by the State of Massachusetts, is that true or false?

8    A.    False.

9    Q.    Okay.  Do you remember a nurse named Regina who worked at

03:58 10    Arbor?

11    A.    Yes.

12    Q.    And what was her job there?

13    A.    I think she was the nurse director.

14    Q.    The nurse director?

15    A.    Uh-huh, or QA nurse.  One of those positions.

16    Q.    One of those positions?

17    A.    Mm-hmm.

18    Q.    Did Regina stop working at Arbor at some point?

19    A.    Yes.

03:58 20    Q.    Do you know why she stopped working at Arbor?

21    A.    What I heard was that she don't want to sign.

22              MS. PASCUCCI:  Objection, Your Honor.

23              THE COURT:  Sustained.

24              MR. BRADY:  Okay.  Your Honor, this may be a good

25    spot.

1        THE COURT:  Okay.  That's fine.  We can recess for the

2    day.  Okay.  Keep an open mind.  Don't talk to anybody about

3    the case.  No extracurricular research on the case.  And

4    tomorrow we'll go from 9:00 to 1:00, so we'll see you all here

5    at 9:00, okay?

6        COURTROOM CLERK:  All rise for the jury.

7        (Jury exits the courtroom.)

8        THE COURT:  Just a couple of quick things.  Mr. Vien,

9    you had objections to --

04:00 10        MR. BRADY:  May the witness step down first?

11        THE COURT:  She can step down.

12        Mr. Vien, I think you had objections to eight of the

13    Arbor records -- the Axxess records.

14        MR. VIEN:  May I submit something in writing so we can

15    all look at it and talk about the same thing?

16        THE COURT:  Just a quick reminder, none of the

17    stipulations have been presented to the jury.  So at some point

18    if you want to read them or you want me to read them, that's

19    fine.  Just a reminder that they are there and they haven't

04:00 20    been presented yet.

21        MR. BRADY:  Thank you, Your Honor.  I think one of

22    them just refers to business records and the admissibility of

23    them.  I think most of those we're going to present through

24    summary charts, so I'm not even sure -- if we're agreed on the

25    admissibility, I'm not sure we have to read it in to the jury.

1          THE COURT:  Okay.  If you want them read to the jury,

2     I'm just reminding you that they have not been.  9:00 tomorrow.

3     I should be on the bench, I can be here by 8:30, I think.

4          MS. PASCUCCI:  Your Honor, I'd like to just raise one

5     additional issue.

6          THE COURT:  Okay.

7          MS. PASCUCCI:  We didn't object to the admission of

8     Adriana O'Donoghue's text messages on the basis of her being an

9     unindicted co-conspirator.  After their admission we had a

04:01 10     sidebar where it was discussed the count where she was

11     unindicted co-conspirator was dismissed.  So we would like to

12     retroactively raise an objection to the admission of those text

13     messages, to the extent they're being admitted, on the basis of

14     her being an unindicted co-conspirator of statements --

15          MR. BRADY:  They're texts.  I think they're

16     exclusively texts back and forth with the defendant, Faith

17     Newton, so there's an independent basis for them to come in

18     that way.

19          THE COURT:  Well, someone take a look at them and tell

04:02 20     me, her statements come in -- the witness's come in for

21     context, and I think that the witness's responses were fairly

22     short, but if there are specific ones you have an objection to,

23     let me know.

24          MS. PASCUCCI:  Understood.  Thank you, Your Honor.

25          THE COURT:  All right.  See you guys tomorrow.

1           MR. BRADY:  Thank you, Your Honor.

2           (Adjourned, 4:02 p.m.)

3                    * * * * *

4

5           CERTIFICATE OF OFFICIAL REPORTERS

6           Kelly Mortellite, RPR, RMR, CRR, and Linda Walsh,

7    RPR, CRR, in and for the United States District Court for the

8    District of Massachusetts, do hereby certify that the foregoing

9    transcript is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter to the best of our skill and ability.

12           Dated this 29th day of June, 2023.

13

14           /s/ Kelly Mortellite

15           _____

16

17           /s/ Linda Walsh

18           _____

19

10:33 20

21

22

23

24

25