UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                )
UNITED STATES OF AMERICA,        )
                                )          Criminal Action
         Plaintiff,              )          No. 21-10035-ADB
                                )
v.                               )
                                )
FAITH NEWTON,                    )
                                )
         Defendant.              )
                                )
```


JURY TRIAL DAY FOUR

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE

June 30, 2023


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
William B. Brady
Christopher R. Looney
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3287
william.brady@usdoj.gov
christopher.looney@usdoj.gov

On Behalf of the Defendant:
George W. Vien
Michelle R. Pascucci
Nathaniel R. B. Koslof
Donnelly, Conroy & Gelhaar, LLP
260 Franklin Street
Boston, MA 02110
617-720-2880
Fax: 617-720-3554
gwv@dcglaw.com
mrp@dcglaw.com
nrbk@dcglaw.com

INDEX

WITNESS                                                      PAGE

AIRANISSE QUINTANA, Resumed

    Continued Direct Examination By Mr. Brady          12
    Cross-Examination By Ms. Pascucci                  34

JOEL GORN

    Direct Examination By Mr. Looney                   48
    Cross-Examination By Ms. Pascucci                  56

ANA ROSA RIVERA COLON

    Direct Examination By Mr. Looney                   59
    Cross-Examination By Mr. Vien                      87

HELEN SECH

    Direct Examination By Mr. Brady                    106
    Cross-Examination By Ms. Pascucci                  135

REGINA ARREY

    Direct Examination By Mr. Looney                   145
    Cross-Examination By Ms. Pascucci                  159


                    E X H I B I T S


Exhibit No.            Received


    320                    82

    335                    152

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7    June 30, 2023.)
 8              MS. PASCUCCI:  Your Honor, I have copies of the
 9    exhibits that are subject to a motion we filed earlier today.
10    If you want me to pass them up, I'm happy to do that.
11              THE COURT:  Yeah, that's fine.  I read the motion but
12    I haven't gone back to the exhibits because I didn't want to do
13    it until I knew if the government was going to agree to exclude
14    them and I didn't want to spend any time.
15              MS. PASCUCCI:  Sure, sure.
16              MR. BRADY:  I assume we're on the record.
17              THE COURT:  Yes.
18              MR. BRADY:  I think, Your Honor, maybe some of them we
19    might, but I think after talking about it, I don't think that's
20    something that we need to take up today.  And so if we could
21    have an opportunity just to figure that out to the extent
22    there's anything left we need to talk about.  I don't think
23    that's going to affect anything, you know, any witnesses or
24    business we need to do here today.
25              THE COURT:  Okay.  I will have for you a draft of the
```

1  jury instructions by early next week.  I don't know if -- where

2  are we on -- does anyone have any rough estimates of when we

3  may need to charge, because that will govern how quickly I will

4  get them to you.

5          MR. VIEN:  When you will have to charge, Your Honor?

6          THE COURT:  What?

7          MR. VIEN:  Did you say "when"?

8          THE COURT:  Yeah.  I mean, what's the schedule?

9          MR. VIEN:  I think the government has a better idea

10  than I do.

11          MR. LOONEY:  We will finish presenting evidence

12  probably next Thursday.  Maybe Friday.

13          THE COURT:  That's fine.  That's fine.  I just -- so I

14  have plenty of time on the charge.  So that's fine.  I just

15  wanted to make sure I wasn't going to give it to you on

16  Wednesday morning and you were thinking you were going to

17  charge Wednesday afternoon.

18          MR. LOONEY:  No.

19          THE COURT:  Just thinking ahead just in terms of

20  crafting the charge, I normally -- well, I largely leave it to

21  the parties, but I'm looking for input.  Do you all have any

22  preference on whether I charge before or after you close?

23          MR. BRADY:  So I guess, our two cents, I think

24  probably after we close.  I can see the advantage of giving

25  them the framework of the charge beforehand, but I think that's

1  outweighed by a concern that they just might be a little spent

2  after hearing the charge and then hearing the closings.  So I

3  think it makes sense to do the closings first, Your Honor.

4          THE COURT:  Well, I don't want to waste their time.

5  So if I -- and I am going to do the closings together.  I'm not

6  going to break up the closings over the course of an evening.

7  So if we close the evidence, you know, sort of like midmorning

8  or whatever, I may give them the charge and then have them come

9  back for closings.

10         MR. BRADY:  Your Honor, I guess, whatever the Court

11 deems appropriate here.

12         THE COURT:  I take your point that you don't want them

13 to hear -- you don't want them -- I mean, the problem is I

14 don't want them to be sitting listening to stuff for three

15 hours before they hear the close, but if I can get at the

16 charge but not the closings at the end of one day, is that all

17 right with everybody?

18         MR. VIEN:  Yes.

19         MR. BRADY:  That's no issue for us, Your Honor.

20         THE COURT:  I think -- I actually think it helps them.

21 I mean, the point notwithstanding, I understand that, I won't

22 do that, but I think it can help them to have the charge first.

23 And it saves you from having to outline the law or anything

24 like that.

25         MR. BRADY:  I can see that as well, Your Honor.

```
 1              THE COURT:  So we'll just reserve on that until we get
 2       a better sense of what the schedule is, if nobody has strong
 3       views on it.
 4              MR. LOONEY:  We just have two other issues.
 5              THE COURT:  Yeah.
 6              MR. LOONEY:  One is that we had a breakthrough in
 7       relations this morning which allowed us to reach some
 8       stipulations.  And that means that the witness we'd anticipated
 9       having as our last witness today, we have -- Ms. Quintana is
10       still on direct, and then we have four more witnesses.  We had
11       a fifth, a law enforcement officer.  Everything that he was
12       going to say is now -- we expect to be stipulated to and we
13       hope to file motions this afternoon.  That leaves us -- he was
14       kind of a swing witness.  We weren't sure if we were going to
15       get to him.  Now we may -- there's a chance there's a gap.  We
16       can get someone in, but we've been providing rolling witness
17       lists to --
18              THE COURT:  That's a lot of words.  I get you.  I get
19       you.
20              MR. LOONEY:  What I'm saying is --
21              THE COURT:  I'm sure that no one is going to be
22       brokenhearted about leaving at little early today.  So let's
23       cut to the chase.  If you run out of witnesses, we'll call a
24       halt.
25              MR. LOONEY:  That's what I was saying.
```

```
 1            THE COURT:  I know.

 2            MR. LOONEY:  Great.

 3            THE COURT:  It was just taking a long time to get

 4    there.

 5            MR. LOONEY:  All right.  Thank you.

 6            The second is, for the witnesses today, we are going

 7    to -- we anticipate introducing a couple of exhibits that are

 8    emails written by Joseph Ouko, who is a former employee of

 9    Arbor, to Faith Newton, and also to the witnesses who will be

10    here.  They contain hearsay statements by Mr. Ouko.  We want to

11    put them in for notice to Ms. Newton and to elicit her response

12    to those.

13            And that's the -- they're emails raising issues about

14    nursing schedules, whether nursing visits are being done,

15    things like that.  So we anticipate seeking to admit them.  I

16    just wanted to alert you to the issue because I expect there

17    might be a hearsay objection and wanting to know why we think

18    that they can come in.

19            MR. VIEN:  It won't be on hearsay.  I understand if

20    the court tells the jury these are not admissible for the

21    truth.  The only objection I have -- assuming the proper

22    authentication, which I think they can do -- is 403, given that

23    it's -- and I know we can ask the witness if he testifies.  In

24    our opinion, it looks like a setup for his qui tam filing.  So

25    it's really hard for the jury to distinguish reading this for
```

1    notice but not actually for the truth of the allegations.

2           So I understand, I won't make the hearsay objection

3    given the situation.  But those are the objections we're going

4    to make, that normally they would be admissible, but there's

5    such a screen -- if that's the right word -- in the context of

6    him trying to leave Arbor and do a qui tam, I think 403 would

7    prohibit their admission.  That's our position.

8           THE COURT:  When were these -- when were the

9    conversations in relation to the qui tam?  Was he already

10    represented?

11           MR. LOONEY:  No.  It was when he was still employed at

12    Arbor.  I don't believe he was represented at that point.

13           MR. VIEN:  I don't think we really know if he was

14    represented, honestly, Your Honor.

15           THE COURT:  The qui tam hadn't been filed?  This isn't

16    like proactive cooperation with the government?

17           MR. LOONEY:  No, no.

18           THE COURT:  Okay.  I'm going to need to look at them

19    at some point.

20           MR. LOONEY:  I have copies.

21           MS. PASCUCCI:  Your Honor, one other housekeeping

22    matter.  We discussed the Adriana O'Donoghue text messages and

23    whether or not they're being brought in as context of

24    defendant's statements.  We highlighted a few that we thought

25    were more -- that they would only be admissible as

1    co-conspirator in furtherance.  Given the government's

2    statement that she's no longer an unindicted co-conspirator, we

3    would argue these should be excluded.  I have highlighted

4    copies of -- it's Exhibit 654, I think.

5          MR. LOONEY:  Yes.

6          MS. PASCUCCI:  Yeah, 654 for the court and the

7    government, where the conversations we're seeking to exclude

8    are highlighted.

9          To give you a very brief preview, Your Honor, most of

10   these conversations are ones where Ms. O'Donoghue says

11   something to Ms. Newton, and there's a lack of response.  The

12   only exception is one on June 30 where Faith Newton provides a

13   very non-substantive response of "I'm traveling because my

14   mother died."

15        That one, I think we were kind of on the fence about

16   it.  I don't think it's our strongest argument, but just giving

17   you a preview of what's highlighted in there so you have an

18   idea of what we're seeking to exclude.  Thank you.

19        THE COURT:  Okay.  Just someone refresh my

20   recollection.  When you went through these texts with her, were

21   any of these ones that you specifically highlighted?

22        MR. LOONEY:  No.

23        THE COURT:  Okay.

24        MR. LOONEY:  There may not be any disagreement here.

25   Maybe we can just provide you --

```
 1            THE COURT:  Let me know.  So that, obviously, also
 2   does not have to be resolved today, right?
 3            MS. PASCUCCI:  Yeah.
 4            THE COURT:  And if you do agree that these should be
 5   excluded, you should think about whether you just want them
 6   extracted from the exhibit or you want me to give the jurors an
 7   instruction.
 8            MS. PASCUCCI:  Okay.  Thank you, Your Honor.
 9            THE COURT:  It seems like an instruction might draw
10   more attention to it than it's worth if they weren't
11   highlighted for them.
12            MR. LOONEY:  I may well just provide a redacted copy
13   for the JERS disk.
14            THE COURT:  We just replace the exhibit, right?
15            MR. LOONEY:  Yes.
16            MS. PASCUCCI:  Yes.
17            THE COURT:  Okay.
18            MR. VIEN:  Your Honor, is it okay if it I step out
19   before we get going?
20            THE COURT:  You have ten and a half minutes to do as
21   you wish.
22            MR. VIEN:  Thank you.  I will use it efficiently.
23            COURTROOM CLERK:  All rise for the jury.
24            (Jury enters the courtroom.)
25            THE COURT:  Thank you all.  So we had to adjust the
```

 1    commute so it's going to be like 9:00 until 10:00.  So thanks

 2    to everyone for being here.  Just a little -- I don't know what

 3    I want to call it -- coming attraction for the day.  When we do

 4    9:00 to 1:00, we take our break at 11:00, 15-minute break at

 5    11:00.

 6            I'm going to remind the witness you're still under

 7    oath, and when you're ready.

 8            MR. BRADY:  Thank you, Your Honor.

 9                    AIRANISSE QUINTANA, Resumed

10    CONTINUED DIRECT EXAMINATION BY MR. BRADY:

11    Q.   Good morning.  Good morning, Ms. Quintana.

12    A.   Good morning.

13    Q.   Welcome back.

14    A.   Thank you.

15    Q.   Okay.  I think, Ms. Quintana, when we left off yesterday

16    we were talking about the home health aide program at Arbor.

17         Do you remember that?

18    A.   Yes.

19    Q.   Those were the HHAs?

20    A.   Mm-hmm.

21    Q.   Okay.  Now, while you were working at Arbor, did you ever

22    receive phone calls at the office from patients and their

23    families?

24    A.   Yes.

25    Q.   Okay.  Now, what do you recall hearing from patients and

1    their family on those calls?

2    A.   So some patient -- some family or some patient was calling

3    about that they don't have the visitor nurse coming or the home

4    health aides coming.  They want to know more information about

5    the service.

6    Q.   So for instance, would you get calls from patients or

7    families about nurses not showing up for all their scheduled

8    visits?

9    A.   Yes.

10   Q.   What do you remember about that?

11   A.   Well, I don't remember the nurse name or the case, but we

12   have some case that the patient, they don't see the nurse for

13   more than two days.

14           MS. PASCUCCI:  Objection, Your Honor.

15           THE COURT:  Is that a hearsay objection?

16           MS. PASCUCCI:  Yes.

17           THE COURT:  Okay.  So are you seeking to admit that

18   for the truth of the matter asserted?

19           MR. BRADY:  No, Your Honor.  It's for notice to the

20   company.  And so if a limiting instruction, anything

21   appropriate.

22           THE COURT:  Yes.  I will give them a limiting

23   instruction.  Does that suffice?

24           MS. PASCUCCI:  Thank you, Your Honor, yes.

25           THE COURT:  You probably all remember a couple of days

1    ago we talked about -- it's a hearsay objection, and we talked

2    about things that can come in for one purpose but not for

3    another.  So if somebody calls and says that a visiting nurse

4    hasn't been there for two days, that person is not on the

5    witness stand, they can't be cross-examined about whether they

6    personally actually showed up or didn't show up or any of that.

7    So that statement, haven't seen the nurse for two days, does

8    not come in for the truth of the matter asserted.  It comes in

9    for the fact that it was said.  It puts someone on notice, and

10   then it causes them to react it in some way.  So it can be

11   considered not for the truth, but for notice and for whatever

12   action it then causes.  Okay?

13           Sufficient from the government?

14           MR. BRADY:  That's fine, Your Honor.  Thank you.

15           THE COURT:  Ms. Pascucci?

16           MS. PASCUCCI:  Yes, Your Honor.  Thank you.

17           MR. BRADY:  May I go ahead, Your Honor?

18           THE COURT:  You may.

19   Q.   Ms. Quintana, let me ask you this.  Do you know why you

20   were the person who would receive and take these calls at

21   Arbor?

22   A.   Well, sometimes was because they are Spanish so they

23   transfer to me.  Sometimes was because I helped them since the

24   beginning and they want to speak with me.  But usually I don't

25   receive a lot of those phone call.  Usually it was receptionist

1   or office manager.

2   Q.    Okay.  And on those times when you did take one of those

3   calls, Ms. Quintana, what did you then do after getting a call

4   like that?

5   A.    So I notify to Joseph and then and I let Rosa, the office

6   manager, know and that way they can double-check if that is

7   true or not.

8   Q.    Let me ask you a question just to try and make sure we're

9   clear on who you're talking about there, okay.  You mentioned

10  Rosa?

11  A.    Yes.

12  Q.    Was that Rosa Gonzalez?

13  A.    Yes.

14  Q.    Okay.  And what was her job at Arbor?

15  A.    Office manager.

16  Q.    Office manager.  And you also mentioned someone named

17  Joseph?

18  A.    Yes.

19  Q.    Was that Joseph Muiruri?

20  A.    Yes, Joseph Muiruri.

21  Q.    Let me ask you this.  You know Ben Muiruri?

22  A.    Yes.

23  Q.    Faith Newton's husband?

24  A.    Yes.

25  Q.    Same last name as Joseph Muiruri?

1    A.    Yeah, but they are not -- well, I -- they are not related.
2    I believe so.
3    Q.    That was going to be my next question.  So as far as you
4    understand, they have the same name but they're not related?
5    A.    Yes.
6    Q.    Okay.  What was Joseph Muiruri's, what was his job, his
7    role at Arbor?
8    A.    The director of nurse, uh-huh, the director of nurse.
9    Q.    Okay.  And just to help us understand how things worked at
10   Arbor, do you know who Mr. Joseph Muiruri, as the director of
11   nursing, do you know who his boss was, who he reported to?
12   A.    Well, he report to Faith.
13   Q.    That position of director of nursing, did somebody else
14   have that job before Joseph Muiruri was hired?
15   A.    Yes.
16   Q.    Who do you remember having that position of director of
17   nursing before Joseph Muiruri?
18   A.    It was a guy, but he was there in the beginning, and I
19   don't know his name.
20   Q.    Was that another guy named Joseph?
21   A.    I don't remember his name.
22   Q.    Okay.  Now, Ms. Quintana, did you use -- did you use email
23   to communicate sometimes while you were working at Arbor?
24   A.    Yes.
25   Q.    Okay.  And did you typically send emails through, that

1    computer system?

2    A.    Yes.

3    Q.    Because there was a part of Axxess where you could send

4    emails to other people at Arbor?

5    A.    Yes, that was -- the company run on just with Axxess.

6    Q.    Ms. Quintana, at some point while you were working at

7    Arbor, did somebody tell you to not use email to communicate?

8    A.    Well, my -- both my emails need to be reviewed before I

9    send emails, before I send them out.

10   Q.    Explain to us what happened.  What was that about?

11   A.    So we cannot send out the information to the email.  First

12   of all, in the beginning I thought because I was misspelling.

13   And then second is because it's a confidential information that

14   we can solve in person.  So it's -- I just need to go

15   downstairs and talk and they can solve that situation without

16   having evidence or, like, having something on a piece of paper

17   that tells us trouble.

18   Q.    And did someone say that to you?  Did someone at Arbor

19   tell you, you know, about putting something on paper that would

20   cause trouble?

21   A.    No.  That was Joseph, and Faith was there.

22   Q.    Okay.  So set that up.  What do you remember from that?

23   Who was there?  Was Faith Newton there for that?

24   A.    Yes.

25   Q.    Okay.  And Joseph Muiruri was there for that?

1    A.    Yes.

2    Q.    Okay.  So tell the jury your best memory of what happened

3    then.

4    A.    What I say.

5    Q.    Just what you said?

6    A.    Yes.

7    Q.    Okay.  So just remind us again what was said at that

8    conversation with Mr. Joseph Muiruri and Faith Newton.

9    A.    So the thing is, I was sending emails, when I receive

10   phone calls what's happen on -- what was my conversation

11   between me and the person I receive the call.  And then they

12   call me, just to let me know that it's better for us to talk in

13   person than sending email.  That is not going to be, like, good

14   for the company, having those kind of email saying bad stuff

15   about the nursing.

16   Q.    And just so we're clear.  You say "saying bad stuff about

17   the nursing" --

18   A.    Yes.

19   Q.    -- what was the bad stuff that you all were talking about?

20   A.    Well, they are complaining that they don't see the nurse

21   and that's -- we cannot say that's true because we don't have,

22   we don't know how to monitor that, if the nurse is showing or

23   not.  So we don't know exactly.  So we need to -- we need to be

24   true what the patient is saying, but then we need to

25   investigate a little bit more if the nurse is showing or not.

1    So that is their job.  They need to find a way in checking if

2    the nurse is going and seeing the client or not.

3    Q.    Okay.  Ms. Quintana, let me shift a little bit and ask you

4    about something called a clinical review.

5    A.    Yes.

6    Q.    What was a clinical review at Arbor?

7    A.    So MassHealth send a documentation, then we need to

8    double-check if all of those paper was inside of the patient

9    folders.

10    Q.    Okay.  So a clinical review was a job you had to look in

11    the patient folders and see if all the papers were there?

12    A.    Yes.

13    Q.    And did someone ask you to do that review?

14    A.    Yes.

15    Q.    Who asked you to do that?

16    A.    Faith.  That was my job in the -- my first job in the

17    office.

18    Q.    That was your first job in the office, okay.

19         And do you remember when you were doing that clinical

20    review, do you remember seeing anything that concerned you?

21    A.    Yes.  Most of the --

22    Q.    Please -- I'm sorry to interrupt.  Please tell us about

23    that.

24    A.    The Plan of Care, some Plan of Care was not there, was not

25    signed or incomplete.  The ABN, so one of the paper MassHealth

1    required, was not there.  So what I need to do is let her know

2    and that way she call the nurse to having the nurse giving

3    those forms back to the office.

4    Q.    Okay.  So if you found -- when you found something that

5    was concerning to you in this review, what did you do with it?

6    A.    So I make a note and I was -- then I sitting down with her

7    and I let her know, oh, this patient is missing these

8    documentations.

9    Q.    Okay.  Were you ever asked to make any changes or do

10   anything to the documents?

11   A.    Just one time was denied, and then if they don't -- if we

12   have -- the doctor sign and also put in deny next to their

13   signature.  And then because it was signed, why did the doctor

14   deny?  And then I white-out that documentation.

15   Q.    What did you white-out?

16   A.    The "deny" word.

17   Q.    Why did you white that out?

18   A.    Because she was telling me that if the doctor deny the

19   document sign, why the doctor did put in deny.  And then she

20   was telling me that, oh, we just need to white-out, and I

21   white-out the documentation.

22   Q.    You said "she was telling me," and "she."  Who is the

23   "she"?

24   A.    I was with Faith at that moment.

25   Q.    Faith Newton?

1    A.    Mm-hmm.

2    Q.    Ms. Quintana, do you recall that back around February of

3    2015, that Arbor learned that it was going to be audited?

4    A.    February?

5    Q.    In February of 2015 --

6              MS. PASCUCCI:  Objection.

7              THE COURT:  Basis?

8              MS. PASCUCCI:  Yes, Your Honor.

9              THE COURT:  No.  Basis?

10             MS. PASCUCCI:  Oh.  Basis of knowledge.

11             THE COURT:  Well, basis of the objection?

12             MS. PASCUCCI:  Her basis of knowledge for the audit.

13             THE COURT:  Sorry.  I'm sorry.  Too many bases.

14             Can you lay a better foundation for that, please.

15             MR. BRADY:  Okay.

16   Q.    Do you recall at some point an audit that happened at

17   Arbor while you were working there?

18   A.    Yes, an audit, yes.

19   Q.    And was that back in 2015?

20   A.    It was -- yeah, I don't remember the year, but it was

21   around when I was working there.

22   Q.    Okay.  Now, how did you learn -- how did you learn that

23   there was an audit or there was going to be an audit?

24   A.    Oh, they was telling us that we are going to have the

25   state checking the folders.

1            MS. PASCUCCI:  Objection.

2            THE COURT:  All right.  You need to elicit who was

3    telling her.

4            MR. BRADY:  Okay.

5    Q.    Who told you?  I think you said it was announced?

6    A.    Yes.

7    Q.    Okay.  Who announced it?

8    A.    So we have a meeting.

9    Q.    And was Faith Newton at that meeting?

10   A.    Yeah.

11   Q.    Okay.  And at that meeting, you learned that there was

12   going to be an audit?

13   A.    Yes.

14   Q.    Okay.  And what was your understanding of what was going

15   to happen with the audit?  What was your understanding of the

16   audit?

17           MS. PASCUCCI:  Objection.  From whom did she get this

18   information?

19           THE COURT:  Go ahead and try and elicit it.  I think

20   it comes in not for the truth of the matter asserted anyway.

21   I'll give them an instruction on that, unless it's not hearsay,

22   and you can sort out for me whether it is or isn't with a

23   couple more questions.

24           MR. BRADY:  Your Honor, I can follow up and ask some

25   questions about who she heard it from and to the extent that --

```
 1              THE COURT:  Yes.
 2    Q.    So, Ms. Quintana --
 3    A.    Yes.
 4    Q.    -- who do you remember -- so you had this meeting and you
 5    learned that there was going to be an audit, right?
 6    A.    Yes.
 7    Q.    Who did you learn that from at the meeting?  Who do you
 8    remember talking about that?
 9    A.    I don't remember.  I believe it was Joseph.
10    Q.    Joseph Muiruri?
11    A.    Yes.
12    Q.    Who we were talking about before, the director of nursing?
13    A.    Yes, because most of the meeting he called, called to the
14    office, all the office staff to do the meetings.  So I believe
15    it was him at that time.
16    Q.    And so -- and you were there in the office at Arbor when
17    this audit happened, right?
18    A.    Yes.
19    Q.    Okay.  So what -- after this meeting where it's announced
20    there's going to be an audit, what do you remember happening
21    next?
22    A.    So the audit was for the home health aide documentation.
23    Q.    And so let me follow up about that.  And I think we talked
24    about this a little bit yesterday.  There's documentation
25    relating to the home health aides; is that right?
```

1    A.    Mm-hmm.

2    Q.    And so your understanding was that the audit was going to

3    be about auditing, checking, the documentation for the home

4    health aides; is that right?

5         MS. PASCUCCI:  Objection, leading.

6         THE COURT:  Sustained.

7    Q.    Okay.  So part of the audit was home health aide

8    documentation?

9    A.    Most of the audit was for human resource department.

10   Q.    Human resource.  And what was that?  What did that mean?

11   What did you understand the audit would be looking into

12   relating to the human resources department?

13   A.    So they are going to look if they have all the paper, if

14   they complete the questionnaire.  So they're just reviewing the

15   human resource department.

16   Q.    And were you involved?  Were you at Arbor when Arbor was

17   dealing with this audit?

18   A.    Yes.  I sent an email.

19   Q.    You sent an email, okay.  What did you observe, what did

20   you see at Arbor relating to this audit as the audit was

21   happening?

22   A.    So I send the email.  They was telling me that the home

23   health aide needs to stop by to the office, sign some

24   documentation.  If they don't sign those paper, we are going --

25   so the email doesn't say we are going to hold the check, but

1    the instruction was that I need to stop the direct deposit.

2    Q.    And who gave you that instruction?

3    A.    That was Faith.

4    Q.    So Faith told you, send out a message that the home health

5    aides have to come into the office to get paid?

6    A.    Mm-hmm.  No.  They need to come to the office.

7    Q.    They need to come to the office.  And what were they asked

8    to do?

9    A.    And then they need to sign some -- those documentation

10   that they -- is their requirement.  And then if they don't

11   come, the instruction is to hold their check.

12   Q.    And just to be clear, were these home health aides who had

13   already been out working for Arbor for a while?

14   A.    Yes.

15   Q.    Okay.  And do you know if any of those home health aides

16   came in and signed the papers?

17   A.    Yes, some of them, yes.

18   Q.    And do you know whether or not when they signed the papers

19   that they put the date on the papers?

20   A.    No, because we need to backdate.

21   Q.    Okay.  Explain that to the jury.

22           MS. PASCUCCI:  Objection.

23           THE COURT:  Basis?

24           MS. PASCUCCI:  Her basis of knowledge for the

25   backdating comment.

```
 1              THE COURT:  All right.  Lay a foundation for that,
 2    please.
 3    Q.   You just mentioned a moment ago that the HHAs needed to
 4    backdate when they signed?
 5    A.   The date.
 6    Q.   The dates needed to be backdated?
 7    A.   Yeah, they just need to sign.
 8    Q.   Let me just ask you a question.  How do you know that
 9    about the backdating?  How do you know that?
10    A.   The backdate?
11    Q.   Yeah, how do you know about that?
12    A.   Because they're supposed to having those paper done in the
13    hiring process.
14    Q.   And did you see some of these papers?
15    A.   Yes.
16    Q.   And were you able to tell that the dates were backdated?
17    A.   No.
18    Q.   No.  Okay.
19         Did someone say anything to you about backdating?
20              MS. PASCUCCI:  Objection, leading.
21              THE COURT:  That's not leading.  Overruled.
22    Q.   Let me ask you that again.  Do you remember anybody saying
23    anything about the backdating of these papers?
24    A.   So that was the instruction we have.
25              MS. PASCUCCI:  Objection, calls for a yes or no
```

1    answer.

2          THE COURT:  Okay.  No.  The answer can stand, but you

3    need to ask the follow-up question.

4    Q.   Okay.  You said that was the instruction we had.  From

5    who?

6    A.   From the management.

7    Q.   And just to be clear, who was the management?

8    A.   Well, it was between Joseph, Faith.

9    Q.   Ms. Quintana, in your last answer you mentioned management

10   at Arbor, right?

11   A.   Yes.

12   Q.   Were you ever accused or told that you had done something

13   wrong by management at Arbor?

14   A.   Can you repeat the question.

15   Q.   Yeah.  Did management at Arbor ever say to you, tell you

16   that you had done something wrong, that they thought you did

17   something wrong?

18   A.   Yes.

19   Q.   All right.  Tell us about that.  Tell us what happened.

20   A.   So Joseph sent an email to me, really aggressive, because

21   I was not following the instruction.  And then it was a

22   situation in Arbor that I end up testify.  And then Tom was

23   accusing me, and then Tony is the human resource manager at

24   that time.  That is in the end when I ending working with them.

25   Q.   Can I ask you a question about that.  Sorry to interrupt

1    you.

2    A.    Yes.

3    Q.    You said there was a situation at Arbor where you had to

4    testify?

5    A.    Yes.

6    Q.    What was that about?

7    A.    It's about the pay, the pay rates.

8    Q.    And what was -- was there a lawsuit relating to the pay

9    rate?

10   A.    Yes.

11   Q.    What do you remember about that?

12   A.    So when I was doing payroll, like I say in the beginning,

13   we have a calculation, the overtime.  So we don't pay overtime

14   for the home health aide.  We just pay the regular hours.  And

15   then one of the home health aides sue the company.

16   Q.    Let me interrupt you.  I'm sorry to do that.

17         Do you remember who that was?  Do you remember the name of

18   that home health aide?

19   A.    Yes.

20   Q.    What was that person's name?

21   A.    Emanuel.

22   Q.    Emanuel?  Okay.

23   A.    Yes.

24   Q.    So that person sued the company.  And what was your

25   understanding of what they were suing about?

1    A.    So then Faith and Ben end up pay all the overtime for all

2    the home health aides.  So they do -- they do that part.  But I

3    don't remember what I say in that moment, but it was not what

4    they was expecting.

5    Q.    Let me follow up on that.  Sorry to interrupt you again.

6    But you said you don't know what you said in that moment.  Was

7    there, like, a deposition?  You had to testify for that?

8    A.    Yes.  I need to say what I was doing.  So I told them what

9    I was doing, the same thing I am telling here.  And it was a

10   small court in -- it was not a court.  It was like a lawyer

11   office.  And then after I get out from there, everything

12   changed.

13   Q.    How did everything change after that?

14   A.    So I don't -- then Faith doesn't talk to me at all that

15   day.  And then Tom was telling me that, oh, what do you say

16   doesn't help to the company.

17            MS. PASCUCCI:  Objection.

18            THE COURT:  Basis?

19            MS. PASCUCCI:  Hearsay.

20            THE COURT:  Overruled.

21   Q.    You mentioned that Tom told you something?

22   A.    Yes.

23   Q.    Who was Tom?

24   A.    The human resource director.

25   Q.    So Tom was the human resource director at Arbor?

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   And did Tom have a boss at Arbor? |
| 3 | A.   Yes. |
| 4 | Q.   Who was that? |
| 5 | A.   He report to Faith.  They are really close. |
| 6 | Q.   Tom and Faith are really close? |
| 7 | A.   Yes. |
| 8 | Q.   Why do you say that they're really close? |
| 9 | A.   They're always together. |

10  Q.   Okay.  And so -- and then Tom, after you testified in this

11  matter, Tom says to you what?

12  A.   He start gossiping that I don't help to the company.  But

13  I say what I was doing, and I thought we already talk before

14  and was fine.  And then he was, like, really on point on me,

15  every single time, every single day he was saying something

16  really bad.  I don't remember right now what he was telling me,

17  but it was affecting me.

18       So then I decide to quit that day, because I was really

19  exasperate, and I was seeing like a lot of stuff that I don't

20  like it.  Like, nobody listen when I was talking, and I say I

21  don't want to continue and fight.  That's something -- this is

22  not going to be fixed anyway.  So we need to start from the

23  top.

24            MS. PASCUCCI:  Objection.

25            THE COURT:  Hold on.  What's the objection?

 1          MS. PASCUCCI:  Hearsay.  You know, "not going to be

 2    fixed anyway," these extraneous comments.

 3          THE COURT:  Overruled.

 4    Q.   Ms. Quintana, I think you were explaining why you left

 5    Arbor.  Please, do you want to continue your answer?

 6    A.   And then when I quit that day, the same day I receive a

 7    call from Dani, that she was telling me that Faith and Tom was

 8    telling everybody that I got paid $2,000 per hour.

 9          MS. PASCUCCI:  Objection.

10          THE COURT:  Hold on.

11          MS. PASCUCCI:  Objection based on hearsay.

12          THE COURT:  Sustained.

13          MR. BRADY:  Okay.

14    Q.   So you did end up leaving Arbor, yes?

15    A.   Yes.

16    Q.   Ms. Quintana, I want to ask you about something you

17    mentioned yesterday, kind of early on in your testimony.  Okay?

18    You mentioned something about brain surgery, having brain

19    surgery at some point.

20    A.   Yes.

21    Q.   Okay.  And why did you have brain surgery?

22    A.   So they found that I have a brain tumor, so they took it

23    out on February 5, 2021.  Well, they never took it out

24    because it's -- the tumor is root in my main areas.  And so I

25    have hearing loss after that.  I have some memory issues.  So

1   my memory issues is after my surgery.  Whatever happened before

2   I remember clearly, but now I am really bad with names, place I

3   go.

4       So I'm having balance problem.  I used to use a cane, but

5   I fell with the cane so I end up using the walker.  I don't

6   like it but it's more safe for me.  I'm having problem with my

7   vision.  So sometimes I am blind for a few minutes, and I have

8   photophobia.  That's after the surgery.  So that's a

9   consequence of operating my brain, here in Brigham & Women's.

10  Q.   And, Ms. Quintana, I want to ask you just one thing about

11  that.  You mentioned something about memory?

12  A.   Yes.

13  Q.   Has that affected in any way your ability to recall the

14  events and the matters you testified about today?

15  A.   No.

16  Q.   Let me move on to one last thing.

17           THE COURT:  Sorry.  Can I just -- photophobia?

18           MR. BRADY:  I'm sorry?

19           THE COURT:  Did she say photophobia?  I don't know

20  what that is.

21           MR. BRADY:  I'd be interested in learning it, too,

22  Your Honor.

23  Q.   What does that mean, Ms. Quintana?

24  A.   So the bright of the sun or the light make me dizzy and I

25  fell down.

1    Q.    So light can have an impact on you?

2    A.    Yes.  That's why I have the sunglasses.  I have multiple

3    sunglasses everywhere because I've been losing -- so, yes,

4    that's what photophobia means.

5            THE COURT:  Thank you.

6    Q.    So just one last thing.  I think you testified yesterday

7    that you first met Faith Newton when she came to evaluate your

8    grandma?

9    A.    She used to be my mom's grandma nurse.

10   Q.    And before you left Arbor, was your mother's mother, was

11   she still a patient at Arbor?

12   A.    Can you repeat.

13   Q.    Before you left Arbor, was your grandmother still a

14   patient of Arbor?

15   A.    One of my grandmother, yes; but then my grandma from my

16   dad's side, she left Arbor before me.

17   Q.    Okay.  Did you ask about transferring your grandmother to

18   a different home, a different provider?

19   A.    Yes, yes.

20   Q.    Did Faith Newton say anything to you about that?

21   A.    Yeah, that day Faith was really upset.

22   Q.    What did she say to you that day?

23   A.    She feel like I was, like, trading her because if -- she

24   knew that in the moment my grandma is moving, I am going to

25   move, I am going to move from there.  But I was not planning to

1    quit from Arbor.  In that moment, I was feeling a lot of

2    emotional situation about the payroll situation, Tom, gossiping

3    in the office, and it was too much for me to handle, and that's

4    why I was looking in my family.  And then my mom was the one

5    who decide to move my grandma to other agency.

6    Q.    Okay.  And what did Faith Newton say about that?

7    A.    No, she just was really upset that my grandma move -- my

8    grandma was moved.  But in that moment, I was not aware until

9    she was telling me, when my mom took that decision.

10   Q.    Okay.

11         MR. BRADY:  I have nothing further at this time, Your

12   Honor.

13         THE COURT:  Cross?

14   CROSS-EXAMINATION BY MS. PASCUCCI:

15   Q.    Ms. Quintana, good morning.

16         My name is Michelle Pascucci.  I'm here with my colleague

17   George Vien, and we're representing Faith Newton in this

18   matter.

19   A.    Hi.

20   Q.    Hi.  How are you today?

21   A.    Nervous.

22   Q.    So I want to walk through some of your direct testimony

23   today.  So you talked a little bit about Joseph Muiruri.

24   A.    Yes.

25   Q.    Could you tell me about who he is?

1    A.    Well, Joseph Muiruri?

2    Q.    Yes.

3    A.    Uh-huh.  Who is in Arbor?

4    Q.    What was his role at Arbor?

5    A.    Oh, the director of nurse.

6    Q.    And it was Joseph Muiruri who made comments to you about

7    saying things in person versus writing things in email --

8    A.    Yes.

9    Q.    -- correct?

10    A.    Uh-huh.

11    Q.    And Joseph Muiruri, he was your day-to-day supervisor; is

12    that right?

13    A.    Not really.  To be honest, I need to report to everybody

14    so I used to report to him, to Faith, to Rosa.  So it's not

15    like -- also sometimes to Ben.  So I was not having as a job

16    description at that time for who to me report.  And also to the

17    Cambodian guy, his name was -- I forget his name.

18    Q.    And what was Rosa's role at the office?

19    A.    Office manager.

20    Q.    And Tom's role, what was his role?

21    A.    Human resource.

22    Q.    Now, let's go back to that comment about emails versus

23    in-person.

24    A.    Yes.

25    Q.    Would you say it's fair to say that when things are

 1    written in email things can get lost in translation?

 2    A.   Can you repeat.

 3    Q.   Things can be misinterpreted over email?

 4    A.   So the first time when they was telling me don't send

 5    emails before you talk to us in person, I was thinking that I

 6    misspelling the information.  Because I have a huge accent in

 7    English, and every single time when I talk I just translate

 8    what I am going to say in Spanish.  So I translate in English.

 9    So I was thinking that that's what was wrong.

10    Q.   Just to go over your direct testimony a little bit.  You

11    said something they said to you is when you bring something up

12    to them, they want to have the ability to investigate it,

13    right?

14    A.   Yes.

15    Q.   They said, we need to investigate when you bring things in

16    person; is that correct?

17    A.   Yes.

18    Q.   So prior to working at Arbor, you mentioned that you

19    worked at Compassionate Home Care.

20    A.   Yes.

21    Q.   Were you ever a home health aide at Compassionate Home

22    Care?

23    A.   Yes.

24    Q.   Your grandmother, she was a patient at Compassionate Home

25    Care at the time, correct?

1    A.    Yes.

2    Q.    Both of your grandmothers, or just one?

3    A.    First of all, one; and then my older, older, older one was

4    a patient and I was the person who taking care of her.

5    Q.    So you were a home health care aide for your grandmother?

6    A.    Yes.

7    Q.    And that was at Compassionate Home Care, correct?

8    A.    Yes.

9    Q.    And other home health aides from Compassionate Home Care

10    went to Arbor as well, correct?

11    A.    Yes.

12    Q.    And those home health care aides, they would have received

13    training at Compassionate Home Care, correct?

14    A.    No.

15    Q.    Well, I believe you testified earlier that many documents

16    were the same as Compassionate Home Care documents, correct?

17    A.    Yes.

18    Q.    And did Arbor have the same training program that

19    Compassionate Home Care had?

20    A.    Yes.

21    Q.    And the exams and answer sheets from Arbor, those were the

22    same at Compassionate Home Care, correct?

23    A.    Yes.

24    Q.    And at Compassionate Home Care, you were also given exams

25    with answer sheets, correct?

1    A.    Correct.

2    Q.    And Ms. Newton, she worked at Compassionate Home Care

3    before she worked at Arbor, correct?

4    A.    Yes.

5    Q.    I want to go back to some of the things you said about

6    training at Arbor Homecare.  You testified that you did

7    trainings at Arbor.

8    A.    Yes.

9    Q.    Yes.  That was for about two months, correct?

10   A.    Yes.

11   Q.    And after you left, Amanda Muchioki and I believe Regina

12   Arrey took over; that's correct?

13   A.    Yes.

14   Q.    So you didn't train all home health care aides at Arbor,

15   correct?

16   A.    No.

17   Q.    Were you aware that home health care aides could also do

18   online training?

19   A.    It was in the end of 2006, they bought a training online

20   they can do, but it was almost when the company shutting down.

21   Q.    But they did implement an online training program in

22   addition to the classroom training, correct?

23   A.    Yes, for the new one, yes.

24   Q.    And you were in-office at Arbor, correct?

25   A.    Yes.

```
 1   Q.   You weren't in the field as -- you weren't -- you were not

 2   a visiting home health care aide or visiting nurse for most of

 3   your time at Arbor, correct?

 4   A.   Can you repeat.

 5   Q.   Sure, of course.

 6        Most of your time at Arbor, you worked inside the office,

 7   right?

 8   A.   No.  Half and half.

 9   Q.   Okay.  Were you a home health care aide for Arbor for some

10   time?

11   A.   In the beginning, yes.

12   Q.   And then later you were in the office?

13   A.   Yes.

14   Q.   When would you say that transition took place?

15   A.   In 2015.

16   Q.   And from 2015 onward, you wouldn't have been present for

17   whether or not home health care aides were trained in the

18   field, correct?

19   A.   I was going in and out from the office because I used to

20   do filings, but I was not inside of the office every single

21   day.

22   Q.   Were you going on visits with other home health care aides

23   from 2015 onward?

24   A.   Can you repeat the question.

25   Q.   Once you had a more in-office role, were you doing patient
```

```
 1   visits with nurses or home health aides?
 2   A.   Just one time I did for, like, two or three weeks or less.
 3   Q.   Okay.  Fair to say, once you were no longer a home health
 4   care aide, your work wasn't with patients most of the time?
 5   A.   Yes.
 6   Q.   I believe you also testified on direct that Arbor grew
 7   really quickly?
 8   A.   Yes.
 9   Q.   How many people would you say worked at Arbor when you
10   started?
11   A.   When I started, it was like seven.
12   Q.   In office?
13   A.   In the office, two.
14   Q.   And by the time that you left, there were hundreds of home
15   health care aides?
16   A.   Well, when I left from Arbor, there was over, like, 2,000.
17   Q.   Over 2,000 employees?
18   A.   Between employee and patient.
19   Q.   Oh, okay.  So there were thousands of patients?
20   A.   Yeah, it was a lot.
21   Q.   And hundreds of employees?
22   A.   Yeah.
23   Q.   So this is a company that grew really quickly in a short
24   amount of time.  Is that fair to say?
25   A.   Yes.
```

1  Q.   And Ms. Newton, she said that she needed help with medical

2  records, correct?

3  A.   Yes.

4  Q.   And you testified on direct about your management of

5  health care records.  Is it fair to say that they were a mess?

6  A.   The medical record?

7  Q.   Mm-hmm, yes.

8  A.   Yes.

9  Q.   And did you ever overlap with Syed Hussain?

10  A.   Overlap?

11  Q.   Did you work at the same time as Syed Hussain?

12  A.   Yes.

13  Q.   What was his role?

14  A.   He was an office manager or office administrator.  Well,

15  he run the company, but in the beginning.

16  Q.   He ran the company in the beginning?

17  A.   Yes.

18  Q.   Was he at the company, would you say, less than a year?

19  A.   Him?  Less than a year?  I don't remember.

20  Q.   Do you remember Joseph Ouko?

21  A.   Oh, that's him, yes.  But I just saw him one time and I

22  never talk to him.

23  Q.   You think it's fair to say he didn't work at the company

24  that long, Mr. Ouko?

25  A.   No.  He was there, like, less than six months.

1    Q.    Now, I think that you testified regarding an audit,

2    correct?

3    A.    Yes.

4    Q.    You said that that audit was in 2015, correct?

5    A.    I say it was before I left.

6    Q.    Before you left?

7    A.    Yes.

8    Q.    And did you do any work for that audit, Ms. Quintana?

9    A.    Yes, so I was helping with the -- sending emails to having

10   all the HHA come, and also with the patient profiles.

11   Q.    But did you work on any documents for that audit?

12   A.    Yes, they give me a paper and I need to check if those

13   papers are inside of the folders.

14   Q.    Do you think that it's fair to say that when there's an

15   audit, there's often a lot of work than just making sure that

16   things are in place and documents are in order?

17   A.    Can be, yes.

18   Q.    And did you ever see any results from this audit?

19   A.    No.

20   Q.    Ever meet any auditors?

21   A.    We -- so they present the lady -- two lady.  First, the

22   first lady who come to do like a pre-auditing; and then the

23   second one, we just say hi.

24   Q.    But you didn't have any substantive conversations with

25   these people?

1  A.   No.

2  Q.   Okay.  And I think you testified regarding a 2016 lawsuit

3  when you did a deposition, yes?

4  A.   Yes.

5  Q.   And this was -- this lawsuit, it had to do with

6  compensation of home health care aides, right?

7  A.   Yes.

8  Q.   And basically it had to do with how does Arbor pay

9  overtime to their home health aides?

10 A.   Yes.

11 Q.   And you said that you were deposed as part of this

12 lawsuit?

13 A.   Yes.

14 Q.   And do you recall being asked during this deposition, "Who

15 was on top?" and responding, "In the top is Ben"?

16 A.   Can you repeat the question.

17 Q.   Sure.

18      To help out here, I can provide you a copy of this

19 deposition.

20 A.   Sure.

21      MR. BRADY:  Your Honor, I want to raise an objection

22 where I think this is going.

23      THE COURT:  Are you trying to refresh her

24 recollection?

25      MS. PASCUCCI:  Yes.  I asked her whether she

1  remembered saying something at the deposition, and she did not

2  remember having said it.

3          THE COURT:  No.  All she asked was that you repeat the

4  question.

5          MS. PASCUCCI:  Sure.  My apologies.

6  Q.  Do you recall being asked during the deposition, "Who was

7  on top?" and responding, "In the top is Ben"?

8  A.  Well, I don't remember the paper, how it was looking, but

9  Ben, on paper, he's the owner of Arbor.

10 Q.  But do you remember being asked who was on top, and

11 saying, "In the top is Ben"?

12         MR. BRADY:  Objection, Your Honor.  It was just asked

13 and answered.

14         THE COURT:  Overruled.

15 Q.  Do you want me to restate the question?

16 A.  Yes.

17 Q.  Sure.

18     Do you recall being asked during the deposition, "Who was

19 on top?" and responding, "In the top is Ben"?

20 A.  Can be, yes.

21 Q.  And do you recall being asked during the deposition, "Did

22 Faith have the power to hire and fire employees?" and

23 responding, "No"?

24 A.  Hire and fire employee?

25 Q.  Yes.  Do you recall being asked during the deposition,

1    "Did Faith have the power to hire and fire employees?" and

2    responding, "No"?

3    A.   Well, usually --

4    Q.   I'm not asking what was in place at the time.  I'm just

5    asking about what your testimony was during this deposition.

6    A.   I don't remember what was the question there.

7    Q.   Sure.

8              MS. PASCUCCI:  Your Honor, may I show her the

9    deposition --

10             THE COURT:  Yes.

11             MS. PASCUCCI:  -- to refresh her recollection?

12             THE COURT:  Yes.

13             MS. PASCUCCI:  Thank you.

14             I apologize, Your Honor.  I'm just having a quick

15   pagination problem.

16             THE COURT:  That's fine.  Take your time.

17             MS. PASCUCCI:  Your Honor, I thought I had a copy for

18   the government as well.  It appears I have two copies.  May I

19   give this to you after I give it to the witness?

20             THE COURT:  Show them that page.

21             MS. PASCUCCI:  Sure.  Let me look.

22             MR. BRADY:  Perhaps if we put it on the ELMO.

23             THE COURT:  That's fine too.

24             MR. BRADY:  Just for --

25             THE COURT:  She can show it to you or she put it on

1    the ELMO.

2            MS. PASCUCCI:  That would be perfect, yeah.

3            MR. BRADY:  Can we just look at it here before you

4    show it to the jury?

5            MS. PASCUCCI:  No, we can talk here.  My apologies.

6            (Discussion off the record.)

7            MS. PASCUCCI:  I'm going to put this up.  My apologies

8    for the interruption.  I'm going to put this up on the ELMO and

9    impress everyone with my technological ability today.

10   Q.   Again, I want to ask about -- you were asked regarding who

11   you reported to during the deposition and you were asked, "Who

12   was on top?  Benjamin?"  And you responded, "In the top is

13   Ben."

14        Does that refresh your recollection as to what you

15   testified during the deposition?

16   A.   Yes, because he is the owner.

17   Q.   And then you were asked, "Who is next in the hierarchy,

18   next lower?"  You answered, "For the time, or right now?"

19        "No, beginning in April.  Beginning in April, would it be

20   Faith?"

21        And you said, "I report every" -- let me make sure -- "I

22   know for me is I report everything to Joseph Muiruri."

23        Correct?  Does that refresh your recollection as to what

24   you testified?

25   A.   Yes.

1   Q.   Now, after you were deposed with respect to this
2   compensation lawsuit, you left Arbor, correct?
3   A.   Yes.
4   Q.   And fair to say that you were really upset at the time you
5   left Arbor?
6   A.   Yes.
7   Q.   And it was a really, really emotional time for you,
8   correct?
9   A.   Yes.
10   Q.   And around that time, September 2016, that you left Arbor,
11   that's when you started talking to federal agents, correct?
12   A.   Yes.
13   Q.   And in between now and the time you left Arbor, you've
14   talked to federal agents a bunch of times; is that right?
15   A.   Four times.
16   Q.   Do you think it would be right if it were five times?
17   A.   It can be.
18   Q.   And those conversations with federal agents, those were
19   after you had this deposition, correct?
20   A.   Yes.
21   Q.   And I want to ask one last thing.  You recruiting new
22   patients for Arbor, correct?
23   A.   Yes.
24   Q.   Did you know at the time that you were at Arbor that it
25   was illegal to make -- to pay for referrals?

```
 1    A.    So we know that when they hire a community license --

 2    Q.    I'm just asking.  I'm sorry to cut you off, Ms. Quintana.

 3    I'm just asking did you know whether it was illegal to pay for

 4    patient referrals at the time you were at Arbor?

 5    A.    No.

 6              MS. PASCUCCI:  Thank you.  No further questions.

 7              MR. BRADY:  I've got nothing further for this witness,

 8    Your Honor.

 9              THE COURT:  You're excused.  Thank you.

10              THE WITNESS:  Okay.

11              MR. LOONEY:  The government calls Joel Gorn.

12              JOEL GORN, Sworn.

13              COURTROOM CLERK:  You can be seated.

14              Will you please state your name and spell your last

15    name for the record.

16              THE WITNESS:  My name is Joel Gorn.  Last name

17    G-O-R-N.

18              Can I raise this chair?  Okay.  All right.

19              THE COURT:  I actually have no idea.

20              COURTROOM CLERK:  You should be able to.

21              THE WITNESS:  I'm short.

22    DIRECT EXAMINATION BY MR. LOONEY:

23    Q.    Good morning, Dr. Gorn.

24    A.    Good morning.

25    Q.    I may have just given it away, but can you tell us what
```

1    you do for a living?

2    A.    I'm a family physician in the City of Lawrence.

3    Q.    All right.  And where do you live?

4    A.    I live in Lawrence.

5    Q.    Okay.  Can you just provide us with your educational

6    background starting post high school?

7    A.    I got my undergraduate degree at the University of

8    Wisconsin in Madison, Wisconsin.  I went on to go to medical

9    school at the University of Rochester School of Medicine &

10   Dentistry in Rochester, New York.  And then I did my

11   postgraduate training and residency at the Greater Lawrence

12   Family Health Center in Lawrence, Massachusetts.

13   Q.    After that, what did you do?

14   A.    Immediately after residency I started a private practice

15   in Lawrence, Massachusetts, and 24 years later I'm still

16   practicing in Lawrence.

17   Q.    Okay.  Same practice?

18   A.    Same practice.

19   Q.    What's the name of that practice?

20   A.    Name of the practice is Lawrence Family Doctors.

21   Q.    Okay.  And what type of practice is it?

22   A.    This is a family practice.  Family practice typically

23   specializes in pediatrics, internal medicine, gynecology.  We

24   did obstetrics for 12 years.  We basically provide care to all

25   ranges of ages and illnesses.

1    Q.    Are you generally familiar with the idea of home health
2    care?
3    A.    Yes, I am.
4    Q.    Okay.  How did you become familiar with that?
5    A.    Well, throughout one's career, typically we would find
6    that patients leaving the hospital, upon discharge, patients
7    that needed further care would receive home health care and
8    visiting nurse, most often following surgery or following an
9    inpatient hospitalization.
10   Q.    Okay.  I think you started this, but can you just
11   generally describe what home health care is?
12   A.    Home health care provides services to patients in need of
13   assistance with activities of daily living, specifically
14   bathing, dressing, feeding one's self, personal hygiene,
15   transferring from the bed to a wheelchair.  And, you know,
16   those are the five activities of daily living.  If they are
17   unable to perform two of the five, home health aides are
18   typically solicited to assist to keep people in their home and
19   keep people independent.
20   Q.    Okay.  And you're racing right ahead of me.  My next
21   question was going to be, what makes a person eligible for home
22   health care services?
23   A.    Patients, to be eligible for home health, have to have a
24   disability.  They have to be unable to care for themselves.
25   They have to need assistance with two of the five activities of

```
 1    daily living that I mentioned previously.  Sometimes there are
 2    some psychosocial needs that also have to be addressed.
 3         But in the classic sense, these are mostly patients that
 4    are leaving the hospital, postsurgical patients that need
 5    dressing changes, infusion pumps; but, also, as I mentioned,
 6    assist with daily activities to keep one independent and also
 7    in their home.
 8    Q.   Okay.  What type of services might be provided as part of
 9    a home health care treatment plan?
10    A.   Typically home health care treatment plans are accompanied
11    by a skilled nurse that provides intermittent skilled nursing
12    either on a biweekly basis or a daily basis.  There are also
13    frequently in-home physical therapy rendered, occupational
14    therapy as well as the individual home health aide which
15    provides that personal care.
16    Q.   Are you familiar with something called a Plan of Care for
17    home health care?
18    A.   Yes, I am.
19    Q.   And what is that?
20    A.   A Plan of Care is a document that is -- it is -- basically
21    spells out the disability that a patient has, their medical
22    diagnoses, their medications, what it is that they require home
23    health care for.  And these are usually done in collaboration
24    with a physician, and they're signed off by both the physician
25    and the organization providing the care.  And this is the
```

```
 1    basis -- basic document that is the guideline and dictates the
 2    care that's going to be provided.
 3    Q.    And you mentioned signature of a physician.  Is that a
 4    requirement for there to be a valid Plan of Care?
 5    A.    Absolutely.
 6    Q.    Okay.  Are you familiar with a company called Arbor
 7    Homecare Services, or Arbor?
 8    A.    I am.
 9    Q.    How did you become aware of Arbor?
10    A.    You know, there were several main home health companies
11    that popped up in Lawrence.  Arbor was one of them, and Arbor
12    was providing home care services to patients in the City of
13    Lawrence.
14    Q.    Okay.  Did that include your patients?
15    A.    Many of my patients were receiving home care services from
16    Arbor, yes.
17    Q.    Okay.  How did your patients obtain or come to seek
18    services from Arbor?
19    A.    That was the odd thing.  Most cases we would do a referral
20    requesting home evaluation to provide home care when there was
21    a need that we had identified.  However, in this situation, we
22    started receiving Plans of Care that we had not requested.
23    These were services it had seemed had already been initiated,
24    but they were not initiated with the request of the physician,
25    nor with a Plan of Care that we were aware of.
```

1    Q.    And when one of your patients sought home health care, how

2    did that come to your attention?

3    A.    We would be faxed a Plan of Care, and this was a period of

4    time where we were faxed, you know, 10 to 20 Plans of Care on a

5    daily basis for patients that suddenly were soliciting home

6    care.  It was unclear to us how they were arriving at

7    requesting home care, whether they were doing it on their own

8    or whether they were being recruited.

9    Q.    Okay.  Were these Plans of Care you were receiving, were

10   they only from Arbor or from Arbor and other institutions?

11   A.    There were several institutions that were sending those

12   Plans of Care.  Arbor was one of the main players.

13   Q.    Okay.  And you mentioned this, but what was the volume

14   that they were coming in on a daily, weekly basis?

15   A.    Oh, at the height, it was -- you know, it could have been

16   20 a day.

17   Q.    Okay.  And of that, do you have an approximation of how

18   many were coming from Arbor?

19   A.    Maybe a third to a quarter.

20   Q.    Those Plans of Care that you were receiving, what did you

21   do with them?

22   A.    Well, frequently when we suddenly realized that these

23   Plans of Care were arriving on our desk for patients that we

24   had not requested services for, we were refusing to sign them.

25   On other instance when they continued to send them to us, we

1    would say denied, and, you know, please discontinue services

2    immediately.  These are services that apparently had already

3    been instituted and were ongoing.

4        But this barrage of faxes to our office for us to sign

5    Plans of Care came in with, you know, 200 other documents on a

6    daily basis.  But we realized very quickly that these were, you

7    know, in excess of what we were used to; and, also, they were

8    Plans of Care that we had never solicited.

9    Q.   Okay.  Did you assess the needs of the patients for whom

10   these Plans of Care were coming in?

11   A.   Absolutely.  We would look at the patient.  We would look

12   at their chart.  We would try to see if they, you know, had any

13   disability that would be at all suggestive of requiring home

14   health care.  But more often than not, they were just, you

15   know, relatively healthy middle-aged individuals that were

16   receiving home care, skilled nursing, and the like.

17   Q.   Okay.  And in that case, were the services on the Plans of

18   Care medically necessary?

19   A.   In most circumstances they were not medically necessary.

20   Q.   Okay.  So you mentioned that you would, I think -- did you

21   say you would write "denied" on the Plans of Care?

22   A.   Mm-hmm.

23   Q.   What would you do with those next?

24   A.   Fax them right back to the agency.

25   Q.   Okay.  What happened to patients for whom you denied Plans

1    of Care?

2    A.    Well, unfortunately, many of them were told to seek care

3    elsewhere and were transferring out of my practice to other

4    physicians in the community that were more likely to sign those

5    documents.

6    Q.    Okay.  To whom did they go?

7    A.    They went predominantly to two physicians in the

8    community.  One was named Ramon Suarez, and the other was named

9    Anthony Eaton.

10   Q.    Okay.  And how do you know that?

11   A.    Because they requested their medical records.  When I told

12   them that it was not an appropriate use of resources, that they

13   didn't qualify for any home care, they quickly sought care

14   elsewhere and requested their records.

15        Record requests typically come from the office that they

16   go to, that they transfer to.  Once they transfer, that

17   particular physician has the patient sign a record release form

18   and we forward the records.

19   Q.    Okay.  So you transfer the records to another doctor?

20   A.    Correct.

21   Q.    Approximately how many patients transferred in that way?

22   A.    I mean, it's hard to say, but it decimated my practice.

23   It was probably more than 100.  Maybe close to 200.

24   Q.    Okay.  And of that, do you have an approximation of how

25   many were seeking care from Arbor?

1    A.   That is really hard to say.  I would say probably at least

2    25 percent.

3              MR. LOONEY:  Nothing further at this time for the

4    witness.

5              THE COURT:  Cross?

6              MS. PASCUCCI:  Thank you, Your Honor.

7    CROSS-EXAMINATION BY MS. PASCUCCI:

8    Q.   Dr. Gorn, my name is Michelle Pascucci.  I'm here with

9    George Vien, and we are representing Ms. Newton today.

10             Dr. Gorn, have you ever met Faith Newton?

11   A.   I have never met Faith Newton.

12   Q.   Have you ever been to the offices of Arbor Homecare?

13   A.   I have never been to the offices of Arbor Homecare.

14   Q.   Is self-referring to home health care agencies illegal?

15   A.   I have -- I'm unclear whether it's legal or illegal, but

16   in my experience, it's not a common pathway to seek home

17   services.

18   Q.   But you aren't aware of it being illegal; that's correct?

19   A.   No.

20   Q.   And I believe you testified that your office would receive

21   many Plans of Care; is that correct?

22   A.   That's correct.

23   Q.   And these Plans of Care were for different home health

24   care agencies, correct?

25   A.   Yes.

1  Q.   Not just Arbor?

2  A.   Not just Arbor.

3  Q.   And sometimes your office signed off on these Plans of

4  Care, correct?

5  A.   More often than not, they would not.

6  Q.   But sometimes your office did sign off on these Plans of

7  Care, correct?

8  A.   When they required -- when it was an elderly disabled

9  individual that required care, yes.

10  Q.   So it's fair to say that, yes, your office did sign off on

11  some of these plans?

12  A.   Some of these plans, we did.

13  Q.   And it wasn't just you who were individually assessing

14  patients in your office, correct?

15  A.   That's correct.

16  Q.   You have other doctors?

17  A.   Yes.

18  Q.   I presume you have physician's assistants as well,

19  registered nurses?

20  A.   Yes.

21  Q.   And I believe that you talked about a doctor by the name

22  of Dr. Eaton, correct?

23  A.   Yes.

24  Q.   Isn't it correct that Dr. Eaton has never received any

25  discipline for signing off on Plans of Care?

1   A.   I would be unaware --

2        MR. LOONEY:  Objection.

3   A.   -- whether he has or has not.

4        MR. LOONEY:  I think he answered.

5   Q.   And you recall that Dr. Eaton did sign off on Plans of

6   Care that you did not sign off on, correct?

7        MR. LOONEY:  Objection.

8        THE COURT:  If he knows.

9   Q.   Do you want me to ask the question again?

10  A.   I didn't hear what -- I would imagine he did.

11  Q.   And there were Plans of Care that you didn't sign off on

12  that went to other doctors in the community; is that correct?

13  A.   Yes.

14       MS. PASCUCCI:  No further questions, Your Honor.

15       THE COURT:  Redirect?

16       MR. LOONEY:  Nothing further.

17       THE COURT:  You're excused.  Thank you.

18       THE WITNESS:  Thank you.

19       MR. LOONEY:  The government calls Rosa Gonzalez, who

20  also goes by Rosa Rivera Colon.

21       ANA ROSA RIVERA COLON, Sworn

22       COURTROOM CLERK:  Can you please state your name and

23  spell your last name for the record.

24       THE WITNESS:  My name is Ana Rosa, last name Rivera

25  Colon.

```
 1              THE COURT:  You're going to have to speak -- keep your
 2    voice up.  Okay?
 3              THE WITNESS:  Okay.  Ana, A-n-a, middle name Rosa,
 4    R-o-s-a, last name Rivera, R-i-v, Victor, e-r-a, Colon,
 5    C-o-l-o-n.
 6    DIRECT EXAMINATION BY MR. LOONEY:
 7    Q.    Good morning, Ms. Rivera Colon.
 8    A.    Hi, good morning.
 9    Q.    How are you doing this morning?
10    A.    Okay.  Thank you.
11    Q.    I'm just going to start by asking some questions about
12    your background.  Can you just tell me where you live now?
13    A.    I live in Bridgeport, Connecticut.
14    Q.    Okay. Are you currently employed?
15    A.    Yes, sir.
16    Q.    Okay.  What are you doing?
17    A.    Home care, scheduler coordinator.
18    Q.    Okay.  Are you providing care in the field, or are you in
19    the office?
20    A.    In the office.
21    Q.    Are you familiar with a company called Arbor Homecare
22    Services?
23    A.    Yes, sir.
24    Q.    Okay.  How did you learn about that company?
25    A.    My friend Airanisse Quintana.  We was working at Walmart
```

1    at that time, and she mentioned they was looking for front desk
2    receptionist.
3    Q.    Okay.  Did you apply for that job?
4    A.    Yes, sir.
5    Q.    And how did that process go?
6    A.    I went to fill the application, and then I saw Syed
7    Hussain, who was -- I'm not sure what was his title at that
8    time, and then I went back for a second interview with
9    Ms. Faith Newton, and then Muiruri.
10   Q.    Okay.  And after that what happened?
11   A.    They hire me.
12   Q.    Okay.  What was the job you were hired for?
13   A.    Front desk receptionist.
14   Q.    Okay.  And who were your supervisors?
15   A.    Faith Newton.
16   Q.    Okay.  And what was Ms. Newton's job at Arbor when you
17   began there?
18   A.    She was running the office.  Everything was supposed to go
19   through her first, all decisions.
20   Q.    Okay.  And as a front office receptionist, what were your
21   responsibilities?
22   A.    Answering phone calls, greeting the visitors, and filing.
23   Q.    Okay.  Did you stay in that role for your time at Arbor?
24   A.    I'm sorry?
25   Q.    Did you stay in that role for your whole time with Arbor?

1   A.   No, sir.

2   Q.   Okay.  What other roles did you hold at Arbor?

3   A.   After office manager, and then after the lady who do the

4   schedule for cleaning the office, they remove me from

5   everything.

6   Q.   Sorry.  Can you just repeat that?

7   A.   They put me as an office manager, and then after, at the

8   very end, I just was the person who was scheduling the cleaning

9   office.  I didn't do any more scheduling or filing.

10   Q.   Okay.  What were your responsibilities when you were the

11   office manager?

12   A.   I was doing scheduling, scheduled for nurses and HHA, also

13   I was running the background for employee.

14   Q.   Okay.  Did you have any responsibilities related to

15   training of any new employees?

16   A.   At some point, I was helping with the Spanish population.

17   Q.   With training for the Spanish population?

18   A.   That's correct.

19   Q.   Okay.  And when you say -- was that for new employees?

20   A.   That's correct.

21   Q.   Okay.  New employees in what role?  What job were these

22   new employees coming into?

23   A.   Home health aide.

24   Q.   Okay.  So you were helping with training for

25   Spanish-speaking home health aides?

1    A.    That is correct.

2    Q.    Okay.  When you did training, what did the training

3    consist of?

4    A.    Ms. Faith Newton provide me a binder with all the

5    procedures, and I make a PowerPoint for them how -- also, they

6    like test -- let me see if I remember.  Like bed bods.

7          COURT REPORTER:  I'm sorry?

8    A.    Bods, like b-o-d-s.  I'm sorry.  I have an accent.

9    Q.    There was paperwork, there were exams on various topics;

10   is that right?

11   A.    That is correct.

12   Q.    Okay.  Did you provide any -- on the exams, how were the

13   exams administered?

14   A.    They -- we give them to do the exam at the end of the

15   orientation.

16   Q.    Okay.  Before those exams were given, did you train them

17   on the topics -- how long did the orientation take?

18   A.    Maybe half day, not long at all.

19   Q.    Is that the total amount of training that you provided to

20   HHA?

21   A.    For the new employees, at the beginning when I was in

22   charge, yes.

23   Q.    Okay.  It was only about three hours?

24   A.    Like three hours, four hours.

25   Q.    Okay.  At the end of that, they took examinations?

1    A.    Yes.

2    Q.    Okay.  Did you help the Spanish speakers with the

3    examinations?

4    A.    Yes, sir.

5    Q.    Okay.  What did you do to help them?

6    A.    I reading the -- like, give them examples.

7    Q.    Give them?

8    A.    Examples.

9    Q.    Examples.

10   A.    And --

11   Q.    Examples of the answers, or...

12   A.    No, not the answers, but, like -- I cannot say.  It's not

13   coming to my mind.

14   Q.    Okay.  Did you provide any training on how to fill out

15   time sheets to home health aides?

16   A.    Well, the clients or patients have individual Plan of

17   Care.

18          MR. VIEN:  Objection, Your Honor.  It's a yes or no.

19   I don't mean to be difficult.

20          THE COURT:  It is a yes or no question.

21   Q.    I think the question was, during the training, yes or no,

22   did you provide training on how to fill out time sheets for the

23   work that home health aides did?

24   A.    Correct.

25   Q.    Correct, you did?

1    A.    Yes.

2    Q.    Okay.  What was that training or instruction you provided?

3    A.    We told them the Plan of Care, doing by the nurse, nurses,

4    and how they proceed to fill the paper with the hours.

5    Q.    Okay.  When you say "fill," there was paperwork on which

6    to fill out the time or tasks they performed?

7    A.    Yeah, that is correct.

8    Q.    And did that paperwork have to match the Plans of Care?

9    A.    That is correct.

10   Q.    And is that the instruction you provided to the home

11   health aides?

12   A.    I don't remember that part, or I don't remember I was the

13   one who provide that or the nurse.

14   Q.    Okay.  So during the orientation someone provided that?

15   A.    I don't remember.

16   Q.    Okay.  Were you provided guidance from someone on how home

17   health aide time should be recorded or tasks should be

18   recorded?

19   A.    That's correct.

20   Q.    From whom did you receive instruction?

21   A.    From Faith Newton.

22   Q.    And what did she tell you about how time sheets should be

23   filled out?

24   A.    That we need to follow the Plan of Care.

25   Q.    Okay.  That everything that was in the Plan of Care needed

1    to be filled out in the time sheets?

2    A.    That's correct.

3    Q.    Okay.  Did she tell you why?

4    A.    No, I don't remember.

5    Q.    Okay.  Did she give you any information about why it was

6    important that the time sheets were filled out that way?

7    A.    Regulations.

8    Q.    Because of regulations?

9    A.    Mm-hmm.

10   Q.    Was part of your job dealing with patient records at any

11   point in time?

12   A.    At the beginning I was doing filings, yes.

13   Q.    Okay.  Filings of what sort of papers?

14   A.    60-day summary and the referral from the doctors.

15   Q.    Okay.  Are the referrals sometimes called Plans of Care,

16   do you know?  Do you recognize that term?

17   A.    Referral was initial procedure to admit the client to the

18   company for the services.

19   Q.    The paperwork for admitting the clients?

20   A.    Correct.

21   Q.    Okay.  Did that paperwork need to be signed by doctors?

22   A.    That's correct.

23   Q.    Were there ever difficulties getting doctors to sign that

24   paperwork?

25   A.    Sometimes.

 1    Q.    Okay.  What happened when there were difficulties getting

 2    doctors to sign that paperwork?

 3    A.    She take over so I don't know what happened after.

 4    Q.    Who is "she" in that question?

 5    A.    Faith Newton.

 6    Q.    If there were problems getting doctors to sign paperwork,

 7    Faith Newton took over?

 8    A.    Yeah.

 9    Q.    Okay.  Do you know if paperwork was sent to any particular

10    doctor if it needed to be signed and there were problems?

11    A.    I remember two doctors, but one I don't remember the name.

12    He was very strict and he didn't sign or fax any paper if one

13    of us was there -- was not there.

14    Q.    Sorry.  He would not -- there was one doctor who wouldn't

15    sign paperwork if something was there.  I didn't hear what you

16    said.

17    A.    One of us.

18    Q.    If one of you wasn't there?

19    A.    Most of the time it was Airanisse or myself to go to that

20    doctor.

21    Q.    Okay.  Would that doctor -- you said he's very strict --

22    would he sometimes refuse to sign paperwork?

23    A.    Only if the client was not his.

24    Q.    Okay.  And you mentioned a second doctor that you recall?

25    A.    Dr. Eaton.

1    Q.    Okay.  And what was Dr. Eaton's relationship to Arbor?

2    A.    At some point he was the doctor of the company.

3    Q.    The doctor of the company.  So he was a doctor for Arbor?

4    A.    That's correct.

5    Q.    Okay.  Did you ever try and get him to sign the paperwork?

6    A.    Yes, sir.

7    Q.    Why was that?

8    A.    Because sometimes they forget to -- they are very busy and

9    they don't have time to go through the papers.  So we want just

10   to make sure everything was okay, but at some point he refused

11   to continue signing papers.

12   Q.    Okay.  So for one point of time, you could go to him and

13   he would sign off on paperwork?

14   A.    Yes, mm-hmm.

15   Q.    And then later he started -- began to refuse?

16   A.    Yes, sir.

17   Q.    Did he tell you why he refused?

18   A.    He mention that -- I mean, I don't remember so I don't

19   know want to say something that...

20   Q.    If you don't remember, you don't remember.

21   A.    Mm-hmm.

22   Q.    You mentioned when you were front office, one of your

23   responsibilities was receiving phone calls?

24   A.    That's correct.

25   Q.    Okay.  Were there ever concerns raised in those phone

1   calls about whether nurses were doing their visits?

2   A.   That's correct.

3   Q.   Okay.  Did you ever raise those conversations with

4   Ms. Newton?

5   A.   That's correct.

6   Q.   You did?

7   A.   Yes.

8   Q.   Okay.  And did you talk to Ms. Newton about those

9   conversations?

10  A.   Yes.

11  Q.   Can you tell us what happened in those conversations with

12  Ms. Newton about that issue?

13  A.   I remember especially one nurse, Winnie Waruru.  One of

14  the clients called me and say she was not doing their visit.

15  So when I check the schedule, she was scheduled to do the

16  visit.  So I talked to Ms. Newton, and she respond that you are

17  not the FBI.  You cannot accuse her.  You need to follow her

18  and make sure she's not doing the visit.  Then Winnie Waruru

19  call me and she was very upset with me.  Faith Newton call her

20  and let her know what happened, and she accusing me that trying

21  to revoke her license.

22  Q.   Okay.  When Ms. Newton said you're not the FBI, what did

23  you understand that to mean?

24  A.   Keep your nose out of it.

25  Q.   Keep your nose out of it?

1   A.    Mm-hmm.

2   Q.    Okay.  Were there ever issues about the scheduling of

3   nurses and how many hours nurses were scheduled for?

4   A.    Yes, sir.

5   Q.    There were?

6   A.    Yes.

7   Q.    Did you ever talk about that issue with Ms. Newton?

8   A.    I spoke with Mr. Ben Muiruri and Ms. Faith Newton, yes.

9   Q.    Okay.  Was anyone else present for that conversation?

10  A.    I think it was Syed Hussain as well.

11  Q.    Okay.  Can you tell us what was discussed in that

12  conversation?

13  A.    Yeah.

14        MR. VIEN:  Objection to the relevance, conversation

15  with other people.

16        MR. LOONEY:  I think she said that Ms. Newton was

17  there and present.

18        THE COURT:  She did.  She did.

19        MR. VIEN:  I didn't hear that.  Thank you.

20        THE COURT:  That's okay.

21  Q.    So I think what you've testified is that there were

22  conversations involving yourself, Ben Muiruri, Faith Newton,

23  and Syed Hussain --

24  A.    That's correct.

25  Q.    -- about the topic of how many hours nurses were being

1    scheduled for?

2    A.    That's correct.

3    Q.    What happened in those conversations?

4    A.    Well, what we brought to the office was how a nurse can do

5    so many hours during the day, plus adding the traveling time.

6    Q.    Okay.  And what was Ms. Newton's response to those

7    conversations?

8    A.    Can I say, first, what Mr. Muiruri say?  He want to stop,

9    but she say no.

10    Q.    Okay.  So how did Mr. Muiruri -- what was Mr. Muiruri's

11    first name?

12    A.    Benjamin.

13    Q.    What did Benjamin Muiruri say?

14    A.    To stop that.

15    Q.    And then how did Ms. Newton respond?

16    A.    She say, no, we are not going to stop anything.

17    Q.    They're not going to change the way you were doing things?

18    A.    Mm-hmm.

19    Q.    In that conversation, who was the ultimate decision-maker

20    on the issue?

21    A.    They continue doing it the same.

22            MR. VIEN:  Objection, Your Honor.

23            THE COURT:  Foundation?

24            MR. VIEN:  Foundation, I was going to say specificity,

25    but it's the same thing.

```
 1              THE COURT:  Yeah, you need to lay a better foundation
 2     for that.
 3              MR. LOONEY:  Okay.
 4     Q.   After that conversation -- and you were responsible for
 5     scheduling nurses, or maintaining the schedule for nurses; is
 6     that right?
 7     A.   They remove it from me and give it to someone else.
 8     Q.   Okay.  To the extent you know, did anything change after
 9     that conversation about the issues that were raised?
10     A.   No.
11     Q.   What happened to Mr. Syed Hussain?
12     A.   After he was complaining, Ms. Faith Newton start, like --
13     it's, like, they fire him.
14     Q.   Okay.  And I should have asked this earlier.  Who raised
15     the issues about the number of hours that were being worked by
16     nurses?
17     A.   Syed Hussain and myself.
18     Q.   Okay.  So you raised those issues?
19     A.   Mm-hmm.
20     Q.   Okay.  And then Mr. Hussain was fired; is that right?
21     A.   Yeah, he was fired after couple months.
22     Q.   Did you discuss the firing of Mr. Hussain with Faith
23     Newton?
24     A.   Well, we have a meeting with Ms. Faith Newton about it,
25     and she mentioned that he was stealing from the company.
```

```
 1   Q.   Okay.  Did you see any evidence that he was stealing from
 2   the company?
 3   A.   No.
 4   Q.   Okay.  Did you communicate via email while you were at
 5   Arbor?
 6   A.   About?
 7   Q.   Generally.  Did you use email?
 8   A.   That's correct.
 9   Q.   Okay.  Did you do that through a system called Axxess?  Do
10   you recall using that?
11   A.   Axxess, yes.
12        MR. LOONEY:  Ms. Apfel, could you put up what was
13   marked as Exhibit 320, just for the court and the witness for
14   now.
15        I'm actually going to approach with a hard copy as
16   well.
17   Q.   And I've put up on the screen and also handed you a
18   document that's marked as Exhibit 320.  Do you recognize this
19   document?
20   A.   That's correct.
21   Q.   You do.  Can you tell us what it is?
22   A.   Joseph recommendation --
23        MR. VIEN:  Objection, Your Honor.  It's an email
24   perhaps I received from Joseph Ouko, might be appropriate.
25        MR. LOONEY:  If I may just lead through the
```

 1    identification of the document.

 2              MR. VIEN:  I won't object to that.

 3              THE COURT:  Go ahead.

 4    Q.    Is it correct that this is an email from Joseph Ouko?

 5    A.    That's correct.

 6    Q.    Okay.  And the date of that email is October 8, 2014?

 7    A.    I don't remember exactly.

 8    Q.    Okay.  You don't remember?

 9    A.    I don't remember the years that what happened, but I

10    remember the document.

11    Q.    You remember the document itself.

12          And is it sent to Benjamin Muiruri, Faith Newton, Rosa

13    Gonzalez, and Syed Hussain?

14    A.    Correct.

15    Q.    And do you recognize this as a document that you actually

16    received via email during your time at Arbor?

17    A.    Correct.

18    Q.    Okay.

19              MR. LOONEY:  I ask that it be admitted into evidence

20    and published for the jury.

21              MR. VIEN:  Objection, Your Honor.  We had the

22    discussion earlier about this.  This is that document.

23              MR. LOONEY:  I'm not going to belabor the document

24    itself.  I just want to ask some questions about it.

25              THE COURT:  We've had a lot of discussions and I'm not

 1    sure which one we're talking about.

 2            MR. VIEN:  This is the one about not for the truth,

 3    and then I made the 403 objection to it.

 4            THE COURT:  Okay.  I thought we weren't going to get

 5    to that today.  Did I misunderstand that?

 6            MR. LOONEY:  Yes.  I intended to raise it for today.

 7    There were other issues we were putting aside.

 8            THE COURT:  Okay.

 9            MR. VIEN:  I just note there's another person on the

10    witness list who sent the document.  We could address it with

11    that witness.

12            THE COURT:  I'm going to address it now, but I have to

13    do at sidebar since I don't remember the conversation.  I don't

14    remember where we left it.

15    **SIDEBAR:**

16            THE COURT:  I didn't realize you were getting to this

17    today.

18            MR. LOONEY:  Okay.

19            THE COURT:  Why did I not rule on it this morning?

20            MR. LOONEY:  I think the thought was we'll get to the

21    point and we'll be able to see where -- I ask a few questions

22    that were similar in nature.

23            THE COURT:  I thought we weren't going to get to this

24    so I haven't read it.

25            MR. VIEN:  We have.  We can just argue about it later

1    after you've had a chance to read it, and we don't have to put

2    it in through this witness, if that's okay.

3         THE COURT:  Do you have questions about the document

4    being admitted?

5         MR. VIEN:  What did you do with it?  Perhaps.  Did you

6    show it to Faith?  Things like that.

7         MR. LOONEY:  We could do -- we would like to put it in

8    through this witness.  Everyone else in this email will be a

9    witness.  There are other people who may be witnesses.  The

10   foundation we lay wouldn't be any different than the foundation

11   she lays.

12        MR. VIEN:  I'm not -- she said she got -- I'm not

13   going to object later on to the foundation that this is the

14   email she received, if that is helpful to the court in trying

15   to figure out the right scheduling way to do this.  I'm not

16   going to play games with some other witness, they didn't see it

17   or anything like that.  The objections are not authenticity.

18        My objections are that it's hearsay if offered for the

19   truth.  However, I know the government's position is it's not

20   offered for the truth, it's offered for notice.  And we're

21   saying, given this witness who later filed a qui tam not long

22   after this, and I don't know --

23        MS. PASCUCCI:  I have the dates the qui tam was filed.

24   The qui tam was filed -- this is October of 2014.  The qui tam

25   is filed in June of 2015.  So we're talking six, eight months

 1   later.

 2           MR. VIEN:  Anyway, the person who wrote this was not

 3   long for the company.  So given that background and given the

 4   allegations he makes are basically what this case is about, I

 5   think it would be impossible for the jury to distinguish

 6   between the two.  And that's why we think it should be excluded

 7   under 403.

 8           MR. LOONEY:  A lot of the opening was about, this was

 9   a big place, she couldn't possibly know what's going on with

10   the nurses in the field, what documentation happened.  A lot of

11   the opening was there's no way she could have known.  And

12   that's been part of --

13           THE COURT:  I just haven't had a chance to read it.

14   How long is she going to be on the stand for?

15           MR. LOONEY:  Not a long.

16           MR. VIEN:  I'm not going to be difficult about putting

17   it in through another witness.

18           THE COURT:  So I just -- I can't rule on it without

19   reading it, and I don't want to.

20           COURTROOM CLERK:  Their snacks are up there.

21           THE COURT:  If it's super important to come in through

22   this witness, we can take the recess now and I can read it.

23           MR. LOONEY:  We'd like to have the opportunity to put

24   it in through this witness.

25           THE COURT:  Why?  He's just telling you he's not going

1    to object.

2            MR. LOONEY:  We don't know if the other witnesses are

3    going to come in.  She's here.  This is the witness that we are

4    going to put it in through.

5            MR. VIEN:  No one is going to say Faith Newton opened

6    this email.  So if you put it in later --

7            MR. LOONEY:  No.

8            THE COURT:  That's fine.  We'll take the recess now.

9    I don't know how I missed that you were going to offer it this

10   morning, I don't know.  I could have read it.  But we'll take

11   the recess now.

12   (End of sidebar.)

13           THE COURT:  All right.  This was raised to me this

14   morning, and I don't know if it was my mistake or a lack of

15   clarity, but I didn't realize they were going to seek to move

16   it in before the break this morning.  And it's a long enough

17   document that I need to read it before I can make the decision.

18   So what we're going to do is, I'm going to send you out for

19   your break from now until as soon as I can rule on this.  So

20   five of 11:00 or 11:00, and then we'll resume.  Okay?

21           Karen says your snacks are there.

22           COURTROOM CLERK:  All rise for the jury.

23           (Jury exits the courtroom.)

24           (Recess, 10:38 a.m. - 10:58 a.m.)

25           THE COURT:  They're objecting to this.  It's marked

 1    Exhibit 320.  And it's hearsay as to this witness, and if it

 2    comes in just for notice or not for the truth of the matter

 3    asserted, it's overly prejudicial given how close it is to the

 4    actual allegations here.  The government is telling me that

 5    Mr. Ouko is going to take the stand.

 6            MR. LOONEY:  Mr. Ouko -- we're not certain.

 7            THE COURT:  Okay.  So I understand the defense's point

 8    on this.  But I think that the government is entitled to a

 9    notice and reaction.  So my proposal is -- and I'm happy to

10    hear you on it -- is that we give them a strong instruction and

11    we leave in for each of the -- I think he's got three main

12    subject areas that he identifies.  They are numbered.  One is

13    Patient Plans of Care; two is Clinical Documentation, and three

14    is Skilled Nursing Visits.  My suggestion would be that we

15    leave in his findings as to those things but redact the

16    Implications and the Recommendations.

17            MR. LOONEY:  I don't think we have any objection to

18    that.

19            MR. VIEN:  Without waiving my objections to the

20    document coming in, I don't object to that.

21            THE COURT:  Okay.  Do you need time to redact it?  Are

22    you going to try and show this to the jury?

23            MR. LOONEY:  Yeah, we are.

24            THE COURT:  Can you do it by blowing up just the --

25            MR. LOONEY:  We can certainly only highlight the

```
 1    portions of the findings because, yeah, the issue is that she

 2    was aware of these findings, which are issues in the case.

 3              MR. VIEN:  I think Ms. Apfel, she can do it quickly.

 4    So if they're the --

 5              MR. LOONEY:  It may not be a redacted version we show,

 6    but we'll only blow up and discuss the Findings portions or

 7    maybe not the Implications or Recommendations portions.

 8              THE COURT:  Okay.  Karen, you can turn it on and off

 9    so the jury doesn't see it until it's blown up, right?

10              COURTROOM CLERK:  Mm-hmm.

11              THE COURT:  Okay.  So let's try and work that out.

12    All right?  I don't even want the jury to know there are

13    Findings and Implications sections.

14              COURTROOM CLERK:  Should I let the witness see it, or

15    just leave it on?

16              THE COURT:  How are you going to do this, Ms. Apfel?

17              COURTROOM CLERK:  I can just shut off her table

18    completely so nothing's up.

19              MS. APFEL:  I can redact it right now.

20              THE COURT:  Redact it now.  Let's do that.  There's

21    three sections captioned "Implications," and three sections

22    captioned "Recommendations," and each of those should be

23    blocked out.

24              Implications and Recommendations are out.  Findings

25    are in.
```

1          MR. BRADY:  Your Honor, there's a second document that

2     goes with this.  It says "Memo" at the time top, 3/22.  It's a

3     shorter --

4          THE COURT:  Why didn't someone mention the memo to me

5     before we took the break so I could have also read this during

6     the break?

7          MR. VIEN:  Another failure on behalf of the

8     government.

9          THE COURT:  Yes.

10          MR. BRADY:  I'm sorry, Your Honor.  I'm sorry.  I

11     thought that these two were in together.  We had mentioned them

12     earlier, but, sorry.

13          THE COURT:  Let's get the witness back on.  Bring the

14     jury in.  I'll rule on this.

15          MR. LOONEY:  The document marked 322 is not going in

16     through this witness.

17          THE COURT:  322 is not going through this witness.

18          MR. LOONEY:  Not through this witness, another witness

19     on an email -- it's coming next.

20          THE COURT:  Okay.  So I will review this one while

21     this witness is on the stand.

22          COURTROOM CLERK:  This one is all set to show the

23     jury?

24          THE COURT:  Yes, the Findings and Implications and

25     Recommendations are blocked out.  And I'll give them an

1    instruction.  Okay?

2          MR. BRADY:  Fine.  Thank you, Your Honor.

3          THE COURT:  Are you objecting to what's been marked as

4    Exhibit 322?

5          MS. PASCUCCI:  Sorry, Your Honor.  Yes, we would

6    object to 322 as well on the same basis.

7          THE COURT:  There are parts of this that seem --

8          MS. PASCUCCI:  Did you say -- I'm sorry, Your Honor.

9    I didn't hear --

10         THE COURT:  There are parts of this that don't seem

11   inconsistent with your defense, but let me read it.

12         COURTROOM CLERK:  All rise for the jury.

13         (Jury enters the courtroom.)

14         COURTROOM CLERK:  Court is back in session.  Please be

15   seated.

16         THE COURT:  You want a ruling on the document now?

17         MR. LOONEY:  Yes, Your Honor.

18         THE COURT:  Okay.  All right.  For members of the

19   jury, the exhibit that we've been discussing is Exhibit 320.

20   This is -- it's a correspondence.  It identifies itself as a

21   correspondence written by someone who is not on the witness

22   stand at the moment.  That makes this document hearsay.

23         Beyond ruling on whether or not something is hearsay,

24   there are other reasons why something may not be admitted, and

25   the ruling that I have made here is that portions of this

```
 1   document will come in.  They may not, they may not be
 2   considered for the truth of the matter asserted in the
 3   document.  You may consider them for notice and the fact that
 4   the information is being conveyed so that you can consider any
 5   responses to the information after it's been conveyed.
 6             I'm being stern in my instruction on this document
 7   because some of the things that are said in the document will
 8   sound like some of the theories of the government's case.  You
 9   may not consider them as proof of what the government is
10   alleging.  You may only consider what's in document 320 as
11   notice and to consider the reaction of what follows.  Okay?
12             Okay with the government?
13             MR. LOONEY:  Yes, Your Honor.
14             MR. VIEN:  Yes, Your Honor.
15             THE COURT:  Okay.  Go ahead, Mr. Looney.
16             So 320 is admitted in its redacted form.
17             (Exhibit 320 admitted into evidence.)
18   BY MR. LOONEY:
19   Q.   Just to take a step back, do you see a document up on your
20   screen?
21   A.   Yes.
22   Q.   And what is that document?
23   A.   Email from Joseph.
24   Q.   Okay.  And who was it sent to?
25   A.   Benjamin Muiruri; Faith Newton; myself, Rosa Gonzalez at
```

1    that time; Syed Hussain.

2    Q.    Okay.  And what was the subject?

3    A.    "Agency performance improvement."

4    Q.    Okay.  Do you recall this email?

5    A.    Yes.

6    Q.    Okay.  Before we get into specifics, can you tell us the

7    general subject of it, what was it about?  Do you recall it?

8    A.    He was letting everyone know about what he found and what

9    we need to do to fix -- fix it.

10          MR. LOONEY:  Okay.  Can we go to the second page.

11   Q.    Starting at the top, do I read this correctly, "This

12   correspondence is a summary of some of the clinical areas of

13   improvement and need I have identified so far in the course of

14   performing my job responsibilities."

15          Did I read that correctly?

16   A.    Yes.

17   Q.    And then I just want to go down to the section "My

18   Findings."  And am I correct that this document is divided into

19   subparts, and the first part numbered 1 relates to patient

20   Plans of Care?

21   A.    Yes.

22   Q.    Okay.  And going to bullet C, is one of the findings set

23   out in this document that essentially only 50 percent of the

24   agency's patients Plans of Care that are sufficiently approved

25   and signed by the PCP --

```
 1    A.    Yes.
 2    Q.    -- the periods established by state and federal
 3    regulations and the agency's policy?
 4    A.    Yes.
 5    Q.    Do you recall those issues being raised with you?
 6    A.    Yes, and with Ms. Faith Newton.
 7    Q.    Okay.  Going to the following page.  There's another
 8    section and the header is "Clinical Documentation."  Is that
 9    right?
10    A.    Yes.
11    Q.    And below that is "My Findings," correct?
12    A.    Yes.
13    Q.    And then bullet A is, "I have found an OASIS documentation
14    scheduled for patients six to eight months back that are still
15    on the skilled nurses' task list on the 'not yet started'
16    list"?
17    A.    Yes.
18    Q.    Do you recall those issues being raised to yourself?
19    A.    And to Faith Newton.
20    Q.    Then can we go to the next page, part C -- or part 3,
21    rather.  This section is "Skilled Nursing Visits."  Below that
22    reads, "I have found that some of the agency's skilled nursing
23    care is not being provided in accordance with the patients'
24    Plans of Care."  Is that right?
25    A.    Yes.
```

1    Q.   Then the first finding is, "I have increasingly become

2    aware of skilled nurses who recommend skilled nurse visit

3    frequencies contrary to the patient's medically necessary needs

4    as assessed"?

5    A.   Yes.

6    Q.   And then it continues, "The skilled nurses then pretend to

7    perform such visits and submit billable and payable skilled

8    nurses' notes for visits which are not actually occurring"?

9    A.   Yes.

10   Q.   Was that an issue that was raised to you?

11   A.   Yes, and Ms. Faith Newton.

12   Q.   Okay.  Is this a topic, aside from this email, that -- was

13   there a conversation about this email that you were a part of?

14   A.   No, but I know he was --

15        MR. VIEN:  Objection.  The answer is "no."

16        MR. LOONEY:  Okay.

17   Q.   Did you ever discuss topics in this email or the subjects

18   with Ms. Faith Newton?

19   A.   Yes.

20   Q.   And what did she tell you about these subjects?

21   A.   She will take care of the situation.

22   Q.   Okay.  Can you tell me, how did that conversation come

23   about between you and Ms. Newton?

24   A.   Oh, my God.  So many years.  So I cannot, like, say

25   exactly what.

```
 1    Q.   Okay.  Well, what do you recall, as best as you remember,
 2    about what Ms. Newton told you about the subjects raised in
 3    this email?
 4    A.   She said she will take care of that.  That's it.  She
 5    didn't mention anything else.
 6    Q.   Okay.  Did she tell you to take any actions in response to
 7    these issues?
 8    A.   No.
 9    Q.   Did she tell you to do anything differently in response to
10    these issues?
11    A.   No.
12    Q.   Okay.  What happened to the individual who sent this
13    email?
14    A.   Get fired.
15    Q.   Okay.  By whom?
16    A.   Ms. Faith Newton.
17    Q.   How long did you stay at Arbor?
18    A.   I don't remember how many years.
19    Q.   Do you recall about when you left?
20         MR. LOONEY:  We can take down this document.
21    A.   No.
22    Q.   You don't recall when you left?
23    A.   No.
24    Q.   Do you recall why you left?
25    A.   I left because proof that something was not quite right
```

```
1   and I don't want to be part of that.
2              MR. LOONEY:  Nothing further for this witness.
3              MR. VIEN:  Thank you, Your Honor.
4   CROSS-EXAMINATION BY MR. VIEN:
5   Q.    Good afternoon.
6   A.    Good afternoon.
7   Q.    My name is George Vien.  Along with Michelle Pascucci, I
8   represent Faith Newton.  Do you understand that?
9   A.    Yes.
10  Q.    And I'm sorry because I know you have Ms. Colon or
11  Ms. Gonzalez, how would you like to be referred to, ma'am?
12  A.    Rosa Rivera.
13  Q.    Rivera.  I'm not going to call you Rosa in court.
14  A.    Rivera.
15  Q.    Okay.  I'll call you "ma'am."
16         So now, prior to coming into court, during the course of
17  the investigation, how many times were you interviewed by law
18  enforcement officers?  Do you remember?
19  A.    Like once -- one by phone, one in person, and then another
20  one video call, and yesterday.
21  Q.    When did the video call take place?
22  A.    Last week, Thursday.  I think it was Thursday.
23  Q.    Okay.  And then there was one other call or meeting?
24  A.    Yesterday.
25  Q.    And when did that one occur?
```

```
 1    A.    At what time?

 2    Q.    No, when.  About what day did the last one occur?

 3    A.    A week.

 4    Q.    A week ago?

 5    A.    Between both.

 6    Q.    I'm not trying to hold you to a particular date, but in

 7    the last couple of weeks you've had two interviews, one by

 8    video and the other one was on the telephone again?

 9    A.    Person.

10    Q.    In person, the last one was in person?

11    A.    Correct.

12    Q.    Okay.  The other interviews you had, those took place some

13    time ago; is that correct?

14    A.    That's correct.

15    Q.    The first one was with FBI?

16    A.    That's correct.

17    Q.    And that was a few months after you left Arbor; is that

18    correct?

19    A.    That's correct.

20    Q.    And then a few years later, you were interviewed by Health

21    and Human Services; is that correct?  Do you remember that?

22    A.    Can you repeat the question.

23    Q.    So you had your first interview fairly close to when you

24    left Arbor, correct?

25    A.    Correct.
```

1    Q.    Then a few years passed and you were interviewed again by

2    federal agents, but they weren't FBI agents; is that correct?

3    A.    That's correct.

4    Q.    Okay.  And recently in the last couple of weeks you've had

5    two more interviews; is that correct?

6    A.    Correct.

7    Q.    Okay.  Let's talk about the first of the two last ones, if

8    that makes sense.  The videoconference, the video, who

9    interviewed you on that videoconference?

10   A.    It was Mr. Scott.  I don't remember their names, but these

11   two gentlemen here.

12   Q.    The prosecutors and a man named Scott you said, last name

13   Scott?

14   A.    Yes.

15   Q.    Did you understand he was a law enforcement officer of

16   some kind?

17   A.    They present it, yeah.

18   Q.    And when you were interviewed that time, was Mr. Scott

19   writing down notes about what you said?

20   A.    That's correct.

21   Q.    Okay.  And then the last time you were interviewed right

22   before you came into court today, who interviewed you on that

23   occasion?

24   A.    Mr. Castle.  I call him Castle, but the gentleman over

25   here.

1  Q.   Just in case it makes him uncomfortable, what do you call

2  him?

3  A.   It's a TV show, Castle.

4  Q.   A TV show?  Okay.

5       Who else was present during that interview?

6  A.   It was Scott.  Ms. Hernandez.

7  Q.   And you're pointing to Special Agent Hernandez, who is

8  sitting in the back of the courtroom?

9  A.   Yes, yes.

10 Q.   And did you understand that she was the case agent or the

11 lead investigator in this case?

12 A.   That's correct.

13 Q.   And you understood that she's been involved in the case

14 for years, right?

15 A.   That's correct.

16 Q.   From the very beginning, she was the one leading this

17 investigation, correct?

18 A.   That's correct.

19 Q.   Okay.  And she interviewed you just the most recent time

20 before you took the stand today, correct?

21 A.   Directly not.  She was there.

22 Q.   She was there?

23 A.   Mm-hmm.

24 Q.   Did you say there was another agent there as well or just

25 her and the prosecutors?

1    A.    There was another person, but I don't know the name.

2    Q.    Okay.  Were they taking notes during that interview of

3    you?

4    A.    They was typing.

5    Q.    And who was typing?

6    A.    (Witness points.)

7    Q.    From my angle, is that the prosecutor?

8          THE WITNESS:  What is your name?  I'm sorry.

9    Q.    We know who you're talking about.  It's one of the

10   prosecutors?  Okay.

11        Do you know if Special Agent Hernandez was taking notes as

12   well?

13   A.    No.

14   Q.    You don't know, or she wasn't?

15   A.    No, I don't.

16   Q.    Just the prosecutor?

17   A.    I don't recall it, no.

18   Q.    Okay.  So you worked at Arbor from about September of 2012

19   to 2016; is that right?

20   A.    I'm not quite sure, but, yes, it sound right.

21   Q.    And could you list -- could you go through your job

22   history at Arbor, like how did you start and then what did you

23   become?

24   A.    Sure.  I was hired in as a front desk receptionist, then

25   after, they make me office manager.  And at the very end, I was

```
 1  keep the office manager title, but I was not in charge of
 2  scheduling or nothing else like that.
 3  Q.   What were you -- at the end, what were you only in charge
 4  of?
 5  A.   Just make schedule to clean the office.
 6  Q.   Okay.  And now, you talked about some of the jobs you had
 7  after you left Arbor.  Are you a home health aide?
 8  A.   No.  I work in the office.
 9  Q.   Even at the new job, you're not a home health aide, right?
10  A.   No.
11  Q.   Okay.  When did Joseph Muiruri come into the company,
12  about?
13  A.   I'm not sure, but I believe after Syed get fired.
14  Q.   After Syed, then Joseph Muiruri.  And what was his job?
15  A.   Administrator.
16  Q.   Administrator.  And what about Joseph -- how do you say
17  his last name, Ouko?
18  A.   Ouko.
19  Q.   How long did he work at Arbor?
20  A.   Not long.
21  Q.   Not long?
22  A.   It was not too long.
23  Q.   What about Syed?
24  A.   Syed was there before I start.
25  Q.   And how long did he stay after you started?
```

```
 1   A.   Can you repeat the years that I work there?

 2   Q.   My question before was, did you work there from about

 3   September 2012 to about July of 2016.  That was my question.

 4   A.   So I believe it was a year before I left.  He get fired a

 5   year before I left, around then.

 6   Q.   So did he leave close in time when Joseph Ouko left?

 7   A.   Correct.

 8   Q.   Okay.  And do you know whether they filed what's called

 9   civil suits asking for a monetary reward from Arbor?

10   A.   No, I don't recall that.

11            MR. LOONEY:  Objection.

12            THE COURT:  Hold on a second.  Basis?

13            MR. LOONEY:  Relevancy.  This is a civil suit she's

14   not involved in.

15            THE COURT:  Well, he asked her if she knew and she

16   said she doesn't.

17   Q.   And after Mr. Hussain was fired, were you in the office

18   when he came in demanding money?

19   A.   No, I was not there.  I don't recall that.

20   Q.   You don't recall it or you haven't heard that from anybody

21   else?

22   A.   (Nods.)

23   Q.   And on direct, you talked about conversation with Winnie

24   Waruru; is that correct?

25   A.   You say I hear conversations about her?
```

```
 1   Q.   On direct didn't you testify that Winnie Waruru called you
 2   and said she wasn't going to do a nursing visit?
 3             MR. LOONEY:  Objection.  I think the prior testimony
 4   is Winnie --
 5             THE COURT:  I can't hear a word you're saying.
 6             MR. LOONEY:  The prior testimony was just Winnie, it
 7   wasn't as to the last name.
 8             THE COURT:  Okay.  Well, all right.  The jury will
 9   recall what the prior testimony was.  If he's misstating it,
10   they'll sort it out.
11   Q.   Do you know anybody named Winnie who worked at Arbor?
12   A.   I think we have two Winnies.
13   Q.   Do you know their last names?
14   A.   I don't remember the last name.
15   Q.   Was one of them a licensed practical nurse?
16   A.   That's correct.
17   Q.   Okay.  Was that the one who called you?
18   A.   Yes, sir.
19   Q.   Okay.  And she called you and told you that she wasn't
20   going to do a particular visit that she was scheduled to do; is
21   that correct?
22   A.   No.
23   Q.   What did she tell you?
24   A.   She just called me to -- upset because I communicate to
25   Ms. Faith Newton she -- a client called me and she was not
```

1    doing her visit.

2    Q.    A client -- a patient called and said Winnie --

3    A.    The nurse is not doing the visit.

4    Q.    Not doing the visit.  And you told Faith Newton that?

5    A.    Correct.

6    Q.    Correct.  And then Winnie, the licensed practical nurse,

7    called you and was upset with you for telling Faith Newton,

8    correct?

9    A.    Making those comments, because she say, you are going to

10   make they revoke my license.

11   Q.    Right.  And she was upset that you revealed the complaint

12   to Faith Newton, right?

13   A.    Yeah, she was upset.

14   Q.    Because she was afraid that she would lose her license

15   based on Faith Newton knowing that she didn't do a visit,

16   right?

17   A.    No, based on what I was saying.

18   Q.    Okay.  Now, when you started to work at Arbor, is it fair

19   to say that you saw the business grow rapidly?

20   A.    Correct.

21   Q.    And about how many people did you have working in the

22   Arbor office?

23   A.    More than ten.  There was a lot.

24   Q.    And do you have any idea how many patients there were at

25   Arbor?

```
 1   A.    When I start working in Arbor, I believe it was like
 2   20-something, 50, and then after, like 500.
 3   Q.    And did it go up from there?
 4   A.    I don't remember.
 5   Q.    Okay.  And do you know about how many home health aides
 6   you had at Arbor?
 7   A.    No.  A lot, but I don't remember the number.
 8   Q.    Okay.  Could you recap to the jury who was in charge of
 9   the training program while you worked at Arbor?
10   A.    Faith Newton.
11   Q.    Initially, right?  She started it?
12   A.    She was in charge all the time.
13   Q.    But didn't you testify that Syed Hussain, assisted by
14   Airanisse -- excuse me -- Quintana, was in charge of training?
15   A.    Training, I don't recall Syed doing training.
16   Q.    Do you remember, do you remember telling Special
17   Agent Hernandez that Syed Hussain was in charge?
18   A.    No, I don't recall that.
19             MR. VIEN:  May I approach and show her something to
20   refresh, Your Honor?
21             THE COURT:  Yes, yes.
22   Q.    This is a little weird.  I'm just going place a document
23   in front of you, ask you to read something, and then I'm going
24   to take it away and ask you if that helped you to remember.
25   Okay?  So let me place the document in front of you and point
```

1    out a particular paragraph and ask you to read that to

2    yourself.

3    A.    (Witness reviews document.)

4    Q.    You're done.    Thank you.

5    A.    Mm-hmm.

6    Q.    Does that help you remember that you told Special

7    Agent Hernandez that Hussain was in charge of the training

8    program?

9    A.    Correct.

10   Q.    Okay.  So you do remember that now?

11   A.    Mm-hmm.

12   Q.    Okay.  And do you remember who took over after he was

13   fired?

14   A.    Airanisse Quintana took over, but he was still in the

15   office.

16   Q.    And he was still working on the training?

17   A.    No.

18   Q.    Okay.  Now, when you came into Arbor, what was the state

19   of the filing, the hard-copy filing at Arbor when you started?

20   A.    When I started, I know Syed was doing filing, then I was

21   doing filing.

22   Q.    And you saw the files, right?

23   A.    Yeah.

24   Q.    And what kind of shape were they in?

25   A.    Plan of Care, 60-day summary.

```
 1   Q.   But where were they?

 2   A.   Where?

 3   Q.   Right.

 4   A.   The filing, where was the filing?

 5   Q.   Let me just ask you the last question.  Were the files a

 6   mess when you came in?

 7   A.   I'm sorry?

 8   Q.   Were the files in a messy condition when you went to work

 9   at Arbor?

10   A.   Not really.  At that time, I didn't know much about

11   working in an office, so...

12   Q.   And do you know they kept files, hard copies of files as

13   well as the files electronically on the computer?

14   A.   I don't recall electronic file.

15   Q.   Have you ever heard of Axxess?

16   A.   That's the system we was using to make the schedules.

17   Q.   To make the schedules?

18   A.   And the Plan of Care and 60-day summary.

19   Q.   Is it your understanding there were electronic versions of

20   files on Axxess?

21   A.   Yeah.

22   Q.   And plus, there were hard copies in the office?

23   A.   That's correct, yes.

24   Q.   And when you left Arbor in, I think, 2016, where were all

25   the paper files?
```

1    A.   I don't know where they move it.  I don't remember.  I

2    believe some of them was in Mr. Muiruri office.

3    Q.   In whose office?  I'm sorry.

4    A.   Mr. Ben Muiruri.

5    Q.   Okay.  That's not Joseph Muiruri?

6    A.   No.

7    Q.   And is it fair to say you didn't like Joseph Muiruri?

8    A.   It's not that I didn't like him.  He was very

9    disrespectful with -- to our staff.

10   Q.   And to you as well, right?

11   A.   That's correct.

12   Q.   Could you tell us how he was disrespectful?  What did he

13   do that you considered disrespectful?

14   A.   Well, at some point, we was not able to even to laugh in

15   the office.  He call our attention.  He want me to make some

16   schedule for a nurse that I hear was in Africa because she

17   commit a fraud, and she want me to -- he want me to do the

18   schedule.  I tell him, no, I'm not going to do the schedule.

19   If you want to bring her on board, you need to do the schedule,

20   not me.

21   Q.   And he told you to do that and you said no, and then how

22   did your relationship evolve after that?

23   A.   Very respectful.

24   Q.   So it was just this one incident that you thought he was

25   disrespectful to you?

```
 1   A.   Like I say, he was very disrespectful to all of the womens
 2   in the office.
 3   Q.   He was disrespectful to the women in the office?
 4   A.   Yeah, like, the way he talked to us, mm-hmm, and
 5   approached to us.
 6   Q.   How did he talk to the women in the office?  I'm sorry.
 7   Just tell us --
 8   A.   It's like -- like, it feel like he didn't like women,
 9   maybe, I don't know, women who work.
10   Q.   And he would get angry at them quickly?
11   A.   Yeah, at some point, he say, you are not in the park,
12   yelling at us, this is an office, why are you laughing?
13   Q.   He said you're not in the park doing what?
14   A.   You are not in a park.  This is a office.
15   Q.   So don't laugh in the office?
16   A.   No, we was not able to laugh, no.
17   Q.   And you felt that that was directed more at women than
18   men?
19   A.   Exactly.
20   Q.   Okay.  And it was directed at you as well, right?
21   A.   Yeah.
22   Q.   Now, when you left Arbor, right before you left, you had
23   some physical problems.  Is that true?
24   A.   With who?
25   Q.   No.  Physically, like you had some medical issues.  Do you
```

1    remember that?

2    A.    I've been having medical issues since I born.  So I'm not

3    sure what you mean.

4    Q.    Do you remember telling the FBI agent that in 2016 you

5    started having seizures?

6    A.    That's correct, but not nothing to do with Arbor.

7    Q.    No.  But you were starting to have seizures at that point,

8    right?

9    A.    That's correct.

10   Q.    And you wanted to try to work mostly from home; is that

11   correct?

12   A.    That's correct.

13   Q.    And home, at that point, was with your mother in

14   Connecticut?

15   A.    She was in Connecticut, but it was more about my father.

16   Q.    But you wanted to -- and I don't want to delve into your

17   family, but just, you wanted to work in Connecticut four days a

18   week and then come to Arbor one day a week; is that correct?

19   A.    Yes.

20   Q.    Okay.  And with whom did you make that request?

21   A.    I don't recall if it was with Joseph, and he talk to Faith

22   or Ben.  I don't recall.

23   Q.    You don't know, but do you remember it was with Joseph

24   Muiruri?  Is that what you said?

25   A.    I don't remember with who.

```
 1    Q.    Okay.  But in any case, your request was denied; is that
 2    right?
 3    A.    Yes.
 4    Q.    And that was upsetting to you, wasn't it?
 5    A.    Not really.  I love my job.  I love what I'm doing.
 6    Q.    You love your current job?
 7    A.    Well, I love to help people, in general.
 8    Q.    Okay.  So you loved working at Arbor?
 9    A.    I was -- yeah, what I was doing, interact with clients,
10    yes.
11    Q.    So you loved that part of the job, right?
12    A.    Yes.
13    Q.    So you worked at Arbor for about four years?
14    A.    Around there.
15    Q.    And during that time, did you agree with anyone to commit
16    fraud?
17    A.    No.
18    Q.    You didn't do that?
19    A.    No.
20    Q.    Okay.
21            MR. VIEN:  I don't have anything else, Your Honor.
22            THE COURT:  Redirect?
23            MR. LOONEY:  No, Your Honor.
24            THE COURT:  You're excused.
25            THE WITNESS:  Thank you.
```

```
1           THE COURT:  Thank you.  Next witness, please.

2           MR. BRADY:  Your Honor, the United States calls Helen

3     Sech, who also goes by Rivas.

4           THE COURT:  Are you putting in the next exhibit for

5     this witness?

6           MR. BRADY:  Yes, Your Honor, I am.

7           THE COURT:  Come up to sidebar.

8     SIDEBAR:

9           THE COURT:  Okay.  This is Exhibit 322.  I'm basically

10    making the same kind of ruling.  What you can have in is the

11    opening memo section.  You can have in the portion of the big

12    paragraph that begins, "In October 2014," through the middle of

13    the paragraph which says -- the end of the sentence that begins

14    with, "Again, skilled nurses."  I'm going to leave it to the

15    defense whether you want in -- do you want -- I am inclined to

16    leave in the first sentence, but I'll hear the defendant on it.

17          MS. PASCUCCI:  I don't object to leaving in the first

18    sentence.

19          THE COURT:  To give some context, and the same on the

20    last paragraph.

21          MS. PASCUCCI:  Okay.  And, Your Honor, I don't object

22    to, again, that last paragraph.

23          THE COURT:  You want it in or out?

24          MS. PASCUCCI:  Leaving it in.  But I do want to bring

25    up one broader objection with respect to this.  The last
```

1    Exhibit 320 was an email, so it showed at the very least it had

2    been sent to Faith Newton.  In contrast this was a memo.  It

3    wouldn't have been sent over email.  And the testimony that I

4    gave this to Ms. Newton, and, therefore, she had notice, would

5    come in through Mr. Ouko.

6              I don't know if Helen Sech has the knowledge.  She can

7    testify to that.  And if we don't have the testimony regarding

8    notice, I'm not sure how it comes in at all.

9              THE COURT:  That's a fair point.

10             MR. BRADY:  Your Honor.

11             MR. VIEN:  I was just agreeing that it was a good

12   point.

13             THE COURT:  He thinks she's brilliant.

14             MR. VIEN:  So do I.

15             THE COURT:  I said you think she's brilliant.  That's

16   what I said.

17             MR. VIEN:  I do.

18             MR. BRADY:  Your Honor, I think we can lay a

19   sufficient foundation with this witness pointing out the fact

20   that while this is not an email, it is nevertheless similar to

21   an email.  And that is a memo, it is directed -- I'm just kind

22   of going based on the document that, you know, it is directed

23   to the defendant.  She's in the "to" line.

24             This witness will recall receiving this memo.  I think

25   I can lay a foundation that it was in the ordinary course of

1    business that memos would be created and be sent to people if

2    they appear like this and there's a reliable basis that was a

3    memo from this company.

4        THE COURT:  I'll let it in on that basis, but they can

5    cross-examine on the fact this witness has no knowledge that

6    she received it.  And I think that this "In October" through

7    "clinical notes of the patient" fairly captures the notice

8    aspect of it but limits the prejudice.  There's no need for the

9    specific examples around any of that.

10        MS. PASCUCCI:  I will not -- I guess I'll say I don't

11    want to waive my further objection but am okay with these

12    redactions.

13        THE COURT:  That's fine.  All right.  Do you have it?

14    Do you want to take this?  This stays in.  This stays in.  You

15    can give my copy to Ms. Apfel, if you want.

16        MR. BRADY:  That might be best, Your Honor.

17        THE COURT:  That stays in and this is in.  So there's

18    three portions, everything up to here in, in, in.  Okay?

19        MR. BRADY:  Your Honor, just to be heard on this

20    point, right, so this is connected in timing, right?  This

21    comes after the other memo that was shown before.  And the

22    example here, if I can just for one second be heard on this.

23        THE COURT:  I understand that the example is

24    consistent with what came in before.  But it is hearsay and it

25    only comes in for notice.  So that thing saying I sent it to

1  you before and didn't hear back from you, that goes beyond

2  notice, that is something more prejudicial.  So what he wants

3  is -- I think this is a fairly close call anyway because this

4  is prejudicial.  Of course all the great evidence is

5  prejudicial -- that you get that in for notice, and if you put

6  the witness on the stand, you can perhaps have the rest of it,

7  but not through this witness or the previous witness.

8            MR. BRADY:  I understand.  Thank you, Your Honor.

9            MS. PASCUCCI:  Thank you, Your Honor.

10  (End of sidebar.)

11            HELEN SECH, Sworn

12            COURTROOM CLERK:  Can you please state your name and

13  spell your last name for the record.

14            THE WITNESS:  Helen, H-e-l-e-n, last name Sech,

15  S-e-c-h.

16            COURTROOM CLERK:  Thank you.

17            MR. BRADY:  With the Court's permission, I'll approach

18  the witness.

19            THE COURT:  Yes.

20  DIRECT EXAMINATION BY MR. BRADY:

21  Q.   Good morning, Ms. Rivas.

22  A.   Yes.

23  Q.   Could you go ahead and introduce yourself to the jury,

24  please.

25  A.   My name is Helen, Helen Sech Rivas.

1  Q.   And Sech, that's S-e-c-h?

2  A.   Yes.

3  Q.   Is that your maiden name?

4  A.   That is.

5  Q.   Okay.  Now, Ms. Rivas, where do you live?

6  A.   In Lowell, Mass.

7  Q.   And are you currently working?

8  A.   Yes.

9  Q.   What do you currently do for work?

10 A.   I am a personal care attendant.

11 Q.   And what -- can you explain to us what you do as a

12 personal care attendant?

13 A.   I work with a disabled person.  I help them with their

14 daily needs and their, say, like, showers and stuff like that.

15 Just daily life activities.

16 Q.   And in your current role as a personal care assistant,

17 that's with one person, one patient?

18 A.   Correct.

19 Q.   Okay.  Ever heard of a company called Arbor Homecare

20 Services?

21 A.   Yes.

22 Q.   How?

23 A.   I used to work for Arbor Homecare Services.

24 Q.   When did you work at Arbor?

25 A.   Between 2014 and 2015.

1  Q.   Like roughly, is that kind of a rough memory?

2  A.   Yes, it is.

3  Q.   Okay.  And can you explain to us how you came to work at

4  Arbor?

5  A.   I was recommended by my sister.

6  Q.   Who is your sister?

7  A.   Jenny Sech.

8  Q.   Jenny Sech, okay.  And how did it come about that your

9  sister Jenny recommended you to work at Arbor?  What was she

10 doing?

11 A.   My sister was the intake person at Arbor Homecare at the

12 time.

13 Q.   So your sister Jenny was working at Arbor?

14 A.   Yes.

15 Q.   When that happened, where were you working?  Where were

16 before Arbor?

17 A.   I was working at a convenience store.

18 Q.   And then you took the job at Arbor?

19 A.   Correct.

20 Q.   And what was the job at Arbor?

21 A.   In the beginning, I was hired to do intake and also some

22 translation as needed.

23 Q.   Okay.  So we'll come back and talk a little bit about

24 intake.  The translation part, what language were you

25 translating to and from?

1  A.    I speak Khmer so I was translating from English to Khmer.

2  Q.    Khmer, okay.

3        And is there a country where people speak Khmer?

4  A.    Yes, Cambodia.

5  Q.    Cambodia, okay.

6        And then did you have another job at Arbor after doing the

7  intake at first?

8  A.    Yes.  I eventually started helping with scheduling and

9  then taking over scheduling.

10  Q.   Okay.  So we'll come back to walk through those.

11       First I want to ask you, do you know someone named Faith

12  Newton?

13  A.   I do.

14  Q.   And do you recognize her here in the courtroom today?

15  A.   I do.

16  Q.   Okay.  How did you meet Faith Newton?

17  A.   She was the owner of Arbor.  I met her through working at

18  Arbor.

19  Q.   Your understanding was she was the owner at Arbor?

20  A.   Yes.

21  Q.   Okay.  Did she also work at Arbor?  Did she have a role at

22  the company?

23  A.   Yes.

24  Q.   What did Faith Newton do at the company?  What was her

25  role?

```
 1   A.   It switched as time passed, but I believe when I came in,
 2   at one point she was the director of nursing, and then played
 3   the administrative role for a little bit.
 4   Q.   Okay.  So I want to ask you about intake.  That was your
 5   first job at Arbor?
 6   A.   Yes.
 7   Q.   How did that work?
 8   A.   So the intake process would be if somebody came in and was
 9   looking for services, it would be my job to just gather some
10   information from that person.  And then once I gathered the
11   information, if they qualified for the services, I would then
12   generate a referral to be sent to the doctor's office.
13   Q.   You mentioned information that you would gather from a
14   patient?
15   A.   Yes.
16   Q.   What was the information that you would gather from a new
17   patient during this intake?
18   A.   Their name, their address, their insurance number, the
19   name of the physician, and a med list, if it was available.
20   Q.   And then once you had this information, what did you do
21   with it?  What was the next step?
22   A.   It would be to verify the insurance.
23   Q.   And what was the insurance?  What were you verifying?
24   A.   If they had MassHealth.
25   Q.   And how did you verify that?  How did you check that?
```

 1    A.    There was a portal that we used.

 2    Q.    How did that work?

 3    A.    It was a MassHealth portal where you would log in and

 4    input the -- either the name or the social or the insurance

 5    number.  And then it will show if that person is, like, active.

 6    Q.    And what did you understand that to mean, that if somebody

 7    was active with MassHealth?

 8    A.    They have insurance.

 9    Q.    When you'd put a patient into this portal to see if they

10    had MassHealth, what would happen if they didn't have

11    MassHealth?

12    A.    Then we would tell them that they didn't qualify for the

13    services or we didn't accept the insurance.

14    Q.    Okay.  Have you heard of the term "self-referral"?

15    A.    Yes.

16    Q.    What does that term mean?

17    A.    It means the person is referring themselves for services.

18    Q.    Instead of being referred by who or what?

19    A.    Instead of being referred by a physician.

20    Q.    Now, these self-referrals, how common was that at Arbor?

21    A.    Very common.

22    Q.    And these self-referring patients, did they typically have

23    someone who they wanted to be their home health aide?

24    A.    Yes.

25    Q.    And who, typically, was that?

```
 1   A.   Either a family member or somebody that they knew in their
 2   life.
 3   Q.   And when Arbor enrolled those patients, what did Arbor do
 4   with those family members or friends, that close person in
 5   their life?
 6   A.   Initiate the hiring process for them.
 7   Q.   Put them on the payroll?
 8   A.   I'm sorry?
 9   Q.   Put them on the payroll?
10   A.   Right.
11   Q.   So that was the intake.  I believe you testified before
12   that at some point you started doing scheduling as well?
13   A.   Yes.
14   Q.   Okay.  And how did that work?
15   A.   So I would get a printout of patients that were due for
16   their recertification, and I would check the Plan of Care and
17   schedule according to that Plan of Care.
18   Q.   And let me ask you, during your time at Arbor, was the
19   company growing?
20   A.   Yes.
21   Q.   Was it growing fast?
22   A.   Yes.
23   Q.   Okay.  And you described the scheduling process.  You
24   would get the Plan of Care?
25   A.   I would check the Plan of Care, yes.
```

1   Q.   Okay.  And for the scheduling, did you schedule both
2   skilled nurse visits and home health aide visits?
3   A.   Yes.
4   Q.   And what did it look like?  What did the schedule look
5   like?  How would you prepare that?
6   A.   So I would go in and -- I'm sorry.  It's just been a
7   while.  I'm just trying to think.
8        I would go in and create the skilled nursing visits, the
9   home health aide visits, and recertification at the end of that
10  episode or period.
11  Q.   You used the term "episode."
12  A.   Yes.
13  Q.   Is that a term that has some meaning with Plans of Care?
14  A.   Yes.
15  Q.   Can you explain to us what an episode means when we're
16  talking about Plans of Care?
17  A.   An episode is a timeframe of when the Plan of Care is
18  active.  They typically will be 60 days.  So the episode would
19  be 60 days of services.
20  Q.   And then if the patient continues to get services after
21  that 60 days, then that's another episode?
22  A.   Yes.
23  Q.   And then there could be another episode after that, is
24  that --
25  A.   Yes.

```
 1   Q.    Okay.  And am I right that the episode is based on that
 2   Plan of Care?
 3   A.    Yes.
 4   Q.    Okay.  Now, how did the Plan of Care figure into what you
 5   ended up scheduling for visits; how did that work?
 6   A.    So the Plan of Care have the frequencies, how many visits
 7   the nurses have and how many visits or hours the home health
 8   aide will have.  So that's how I was able to determine how many
 9   days I have to schedule for employees.
10   Q.    Where would you go to find the Plans of Care?
11   A.    They would be in the patient chart and a software that we
12   use called Axxess.
13   Q.    So you would be able to pull up the Plan of Care in
14   Axxess?
15   A.    Yes.
16   Q.    Do you recall having concerns about the Plans of Care that
17   you saw?
18   A.    Yes.
19   Q.    What were those concerns?
20   A.    When I was going to create schedule, part of it is to
21   check the Plan of Care for the frequency as well as if the
22   physician have signed the Plan of Care.  I did come across some
23   that were not signed.
24   Q.    And was that something that you saw often as you looked
25   through these Plans of Care?
```

1    A.    Yes.

2    Q.    And why were you concerned about that?

3    A.    Because I was told that the Plan of Cares had to be signed

4    in order to provide services.

5    Q.    Who told you that?

6    A.    The HR person.

7    Q.    Do you remember who that was?

8    A.    Amanda Muchioki.

9    Q.    Okay.  So what, if anything, did you do based on those

10   concerns about the unsigned Plans of Care?

11   A.    I would send out a mass email to anybody that was involved

12   with that patient to let them know that there's, like,

13   outstanding Plan of Cares that hadn't been signed.

14   Q.    And when you would send out those mass emails, would those

15   also go to Faith Newton?

16   A.    Yes.

17          MR. BRADY:  Ms. Apfel, could we pull up, just for the

18   witness, please, Exhibit 537.

19          Your Honor, I understand this is in evidence, so could

20   we show it to the jury as well?

21          THE COURT:  Karen, is it in evidence?  537.  I think

22   it is.

23          COURTROOM CLERK:  Is it one of those?

24          THE COURT:  Axxess records.

25          (Discussion off the record.)

```
 1              COURTROOM CLERK:  It's in.
 2              THE COURT:  It's been admitted.  You can show it to
 3     the jury.
 4     Q.   Okay.  Can you see -- it's probably easier if you look on
 5     the little TV screen in front of you.  Can you see that?
 6     A.   I can.
 7     Q.   Okay.
 8              MR. BRADY:  And maybe, Ms. Apfel, could you blow up
 9     the top half of this.
10     Q.   What are we looking at here in Exhibit 537?
11     A.   It's a communication note that I created or I create when
12     I come into a situation where a Plan of Care isn't signed.
13     Q.   Okay.  So who was the patient for this communication note?
14     A.   Elizabeth A. Butz.
15     Q.   What was -- is this something that comes out of Axxess?
16     A.   Yes.
17     Q.   Okay.  And it says "my communication note" here.  Do you
18     see that?
19     A.   Yes.
20     Q.   What was a communication note like this in Axxess?
21     A.   I'm sorry.  I didn't --
22     Q.   Sorry.  So this is an example of a communication note?
23     A.   Yes.
24     Q.   And what was a communication note?  Like, how would that
25     be used?
```

1    A.    A communication note is something that we would use to

2    write notes in regards to that patient in the system and, you

3    know, issues or notices that we would like to, you know, leave

4    a remark or something on their profile.  We would create a

5    communication note for that.

6    Q.    Okay.  And what was the date on this communication note?

7    A.    December 15, 2015.

8    Q.    Okay.  Now, this communication, this note, it doesn't have

9    like a "to" or a "cc" showing who it went to, right?

10   A.    It does not.

11   Q.    But -- so let me ask you this.  Who did this go to?

12   A.    It would go to the home health aide, the nurses, the

13   office staff, including medical records, and also Faith Newton,

14   and Benjamin Muiruri.

15   Q.    Okay.

16   A.    I'm sorry.  Benjamin -- I think it's Muiruri, yeah.

17   Q.    Benjamin Muiruri?

18   A.    Yes.

19   Q.    You mean Faith Newton's husband?

20   A.    Yes.

21   Q.    Okay.  What did you write in this communication note?

22   A.    I wrote that there was two Plan of Cares that have yet to

23   be returned with the physician's signature and that we cannot

24   continue to provide services if the physician isn't aware of

25   consent to the services.  I was requesting for the nurses or

1    office staff to view their demographic chart to confirm that

2    the information for the patient is correct or if there's any

3    changes that the office needs to be made aware of.

4    Q.    And was this -- am I right, this was an example of a note

5    that you would send?

6    A.    Yes.

7    Q.    So you sent other notes where you raised similar issues

8    with Plans of Care, right?

9    A.    Yes.

10   Q.    Okay.

11          MR. BRADY:  You can take that down, Ms. Apfel.

12   Q.    Now, in your role as scheduler at Arbor, were you able to

13   see the number of visits that were being conducted by each

14   nurse at Arbor?

15   A.    I would be able to generate a list with that information,

16   yes.

17   Q.    All right.  So you were able to see for each nurse how

18   many visits they were scheduled to do in, say, a week?

19   A.    Yes.

20   Q.    Okay.  Now, were some of those nurses scheduled to do what

21   seemed to you to be a really high number of visits per week?

22   A.    Yes.

23   Q.    Like how high are we talking?

24   A.    About 90 to 100 visits per week.

25   Q.    90 to 100 visits in one week?

1    A.   Yes.

2    Q.   Okay.  Do you remember which nurses were scheduled for

3    that many visits?

4    A.   I can recall a few.  Eunice Muiruri, Gladys Kiboi, there

5    was a Dana Maxwell.

6    Q.   How about Joseph Muiruri?

7    A.   Joseph Muiruri, as well.

8    Q.   And did Joseph Muiruri also have an office job at Arbor?

9    A.   Yes.

10   Q.   And what was that office job?

11   A.   He became the director of nursing.

12   Q.   Okay.  And for that job, was he generally in the office

13   during the week?

14   A.   Yes.

15   Q.   Okay.  So when you first started at Arbor, was there

16   somebody who had the job of administrator at Arbor?

17   A.   Yes.

18   Q.   Who was that?

19   A.   His name was Syed Hussain.

20   Q.   And kind of based on what you saw, what did he do?  What

21   was his job as administrator, what did that entail?

22   A.   It seemed like he made the choices for the business.  Any

23   issues we had we would go to him.

24   Q.   Was Mr. Hussain, as far as you were aware, was he an owner

25   of the business?

1   A.   No.

2   Q.   Okay.  So is there somebody who -- again, based on what

3   you saw and you perceived, was there somebody else who

4   Mr. Hussain ultimately answered to?

5   A.   Besides the owners of the company?

6   Q.   Well, let me ask a better question.

7   A.   Sorry.

8   Q.   Did Mr. Hussain, did he answer to, did he report to the

9   owners of the company?

10  A.   Yes.

11  Q.   And who were the owners of the company?

12  A.   Ben Muiruri and Faith Newton.

13  Q.   Okay.  Do you know somebody named Joseph Ouko?

14  A.   Yes.

15  Q.   How do you know Joseph Ouko?

16  A.   When I started working with Arbor, he was the director of

17  nursing at the time.

18  Q.   Okay.

19       MR. BRADY:  Can we pull up for -- can we pull up for

20  the witness only, please, Exhibit 322.

21  Q.   Ms. Rivas, if you could take a look at Exhibit 322.

22       MR. BRADY:  We can probably flip to the second page,

23  too, just to -- if we could scroll back to the first page.

24  Q.   What is this Exhibit 322?

25  A.   It's a memo.

1    Q.    And who was the memo from?

2    A.    Joseph Ouko.

3    Q.    And who was it to?

4    A.    It was to Benjamin Muiruri and Faith Newton.

5    Q.    What was the date on this memo?

6    A.    October 29, 2014.

7    Q.    And was it part of the practice at Arbor for people to

8    send memos, send and receive memos that looked like this?

9    A.    No.

10    Q.    No.  Well, let me ask you, do you remember this memo?

11    A.    I do.

12    Q.    And do you remember receiving this memo?

13    A.    Yes.

14    Q.    Okay.

15            MR. BRADY:  Your Honor, I offer 322.

16            MS. PASCUCCI:  Objection, Your Honor.

17            THE COURT:  Beyond what we discussed at sidebar?

18            MS. PASCUCCI:  Well, in addition, there's no evidence

19    that the defendant saw this.

20            THE COURT:  Can you ask some questions in that vein

21    and then I'll rule on it, whatever the record is on it.

22    Q.    So after receiving this memo, fair to say there's some

23    issues discussed in this memo?

24    A.    Yes.

25    Q.    Okay.  Was there any discussion at Arbor of these issues

1    after the memo?  Is that something people talked about?

2    A.    Yes.

3    Q.    Okay.  Were some of the people who talked about it Faith

4    Newton?

5    A.    Yes.

6            MR. BRADY:  Your Honor, I offer it.

7            THE COURT:  Yes.  Do you want a limiting instruction?

8            MS. PASCUCCI:  Yes, Your Honor.  Thank you.

9            THE COURT:  Okay.  This is another document like the

10   last one.  It purports to be a memo from Joseph Ouko, and

11   you'll see that on the top.  Again, Mr. Ouko is not here to be

12   cross-examined.  We have no way of testing whether what he says

13   is true or not true, so it may not be considered for the truth

14   of the matter asserted.

15           But he says some things and that communicates certain

16   information that other people may respond to or not.  So you

17   can consider it for the fact that he raises issues that are

18   transmitted to somebody else and how they reacted to it, but

19   you may not consider it for the truth of the matter asserted.

20   He's not here.  He can't be cross-examined.  His basis for

21   knowledge, his observations, his recollection, none of that can

22   be tested through this witness, not for the truth of the matter

23   asserted.  Government?

24           MR. BRADY:  That's fine for the government, Your

25   Honor.

1          MS. PASCUCCI:  Yes, Your Honor, subject to, we're not

2    going to waive our objection.

3          THE COURT:  Yes, I understand.

4          MS. PASCUCCI:  Thank you, Your Honor.

5          THE COURT:  Okay.

6    Q.   So Ms. Rivas, now that we can all see this document, let

7    me ask you again.  What are we looking at here?

8    A.   It looks like a memo that was sent by Joseph Ouko

9    regarding nursing issues.

10   Q.   Okay.  And you were one of the recipients of this memo on

11   the "cc" line?

12   A.   Yes.

13         MR. BRADY:  Okay.  And can we blow up just the top

14   half of this, please, Ms. Apfel.  Great, thank you.

15   Q.   What was the date on this memo?

16   A.   10-29-2014.

17   Q.   And how did the memo start?  Can you read that for us,

18   beginning with "I am writing this."

19   A.   "I am writing this to highlight some occurrences over the

20   past few weeks which are concerning for the agency's

21   performance review."

22         MR. BRADY:  Okay.  Can we scroll down, please.  If we

23   could blow up that next part.  That's great.

24   Q.   Ms. Rivas, can I ask you to read starting where it says,

25   "In October 2014."

1    A.    "In October 2014, the agency office embarked on an

2    intensive effort to highlight and resolve the issues with

3    unapproved/unrenewed Plan of Care.  Since then the office staff

4    has reportedly encountered many patients who allege that the

5    care they were receiving is not being provided consistently in

6    a manner that it was initially explained to them at the time of

7    admission.  Some of these patients did not even know that there

8    was a skilled nurse assigned to them, despite the skilled

9    nurses in question submitting billable and payable clinical

10   notes for these patients.  One patient even remarked that she

11   was not aware that she was signed on to a home health agency

12   because she has never received any visits from the agency

13   personnel.  Again, skilled nurses in question were submitting

14   billable and payable clinical notes for this patient."

15         MR. BRADY:  All right.  Now, Ms. Apfel, can we zoom

16   out from that and let's go down to page 2, then below the black

17   box there, could we blow that up.

18   Q.   Again, Ms. Rivas, could I ask you to read starting with,

19   "I thank you."

20   A.   "I thank you for reviewing this correspondence.  It is a

21   highlight for some occurrences over the past few weeks which

22   are concerning for the agency's performance review.  I

23   identified these so far in the course of performing my job

24   responsibilities.  These highlights are not all inclusive of

25   the overall clinical environment within the agency.  I look

1    forward to continue serving as a clinical resource for the

2    agency so we may work together in planning the overall

3    development and administration of the agency as set forth in

4    the agency's own policies and procedures relating to local,

5    state, and federal regulations.  Again, approval and authority

6    to proceed with executing any plans of action based on this

7    correspondence is solely upon your discretion as the owners of

8    the agency."

9    Q.    Okay.  Thank you, Ms. Rivas.

10        You testified before that after this memo there was some

11   discussion relating to these issues that included Ms. Faith

12   Newton?

13   A.    Yes.

14   Q.    Tell us about those discussions.  What do you remember

15   about that?

16   A.    I just remember us being informed that the accusations

17   that were made against the company were untrue.

18   Q.    Who informed you of that?

19   A.    Faith Newton.

20   Q.    Okay.  After this memo, were you aware of any changes made

21   by the agency relating or responding to the issues raised here?

22   A.    I recall Joseph Ouko being let go after.

23   Q.    Well, yeah, let me ask you about that.

24        Joseph Ouko wasn't at Arbor for very long, right?

25   A.    No.

```
 1    Q.   What happened to Joseph Ouko after this memo?

 2    A.   After the memo, I believe he was told that his services

 3    weren't needed anymore.

 4              MS. PASCUCCI:  Objection, basis for knowledge.

 5              THE COURT:  Yes.  Foundation, please.

 6              MR. BRADY:  Okay.

 7    Q.   Did you ever hear from Faith Newton or Ben Muiruri about

 8    what Mr. Ouko was told about his services being needed at

 9    Arbor; did you ever hear from them about that?

10    A.   No.

11    Q.   Okay.  But you are aware that Mr. Ouko stopped working at

12    Arbor, right?

13    A.   Yes.

14    Q.   Okay.  And how about Mr. Hussain, Syed Hussain, did he

15    stop working at Arbor?

16    A.   Yes.

17    Q.   And relative to when Mr. Ouko left Arbor, when did

18    Mr. Hussain leave?

19    A.   Right after him.

20    Q.   And do you know what happened to Mr. Hussain?

21    A.   Once Joseph Ouko --

22              MS. PASCUCCI:  Objection, calls for yes or no.

23              THE COURT:  It's a yes or no question.

24              MR. BRADY:  Yes.

25    Q.   How do you know that?
```

1    A.    Sorry, what was the question again?

2    Q.    Sorry.  Let me back up.

3    A.    Yeah.

4    Q.    The question was, do you know what happened to

5    Mr. Hussain?

6    A.    Yes.

7    Q.    Okay.  Next question is, how do you know that?

8    A.    He was no longer with us.

9    Q.    Okay.  Now, were you involved with any decisions relating

10   to Mr. Hussain's leaving the company?

11   A.    No.

12   Q.    Did you talk with Faith Newton or Ben Muiruri about that?

13   A.    I recall Faith telling me that he was fired.

14   Q.    Okay.  Did Faith tell you why he was fired?

15   A.    For allegedly stealing.

16   Q.    Do you know anything about that, about allegedly stealing

17   by Mr. Hussain?

18   A.    No.

19   Q.    Did you ever see any evidence, any indication that

20   Mr. Hussain had stolen from the company?

21   A.    No.

22   Q.    Who was hired by Arbor to replace Mr. Ouko as the director

23   of clinical services?

24   A.    I believe the person that came in after him was Regina

25   Arrey.

1    Q.    Okay.  And did Regina Arrey stay at Arbor for very long?

2    A.    She was there for a period of time, left and came back.

3    Q.    After that was there somebody else who was brought in to

4    be the new director of clinical services?

5    A.    Yes, Joseph Muiruri.

6    Q.    Okay.  Do you know who hired Joseph Muiruri?

7    A.    I do not know.

8    Q.    Don't know, okay.  And in your job at Arbor, did you

9    interact, did you deal with Mr. Muiruri, Mr. Joseph Muiruri?

10   A.    Yes.

11   Q.    Now, at some point did you report concerns you had about

12   nursing visits to Joseph Muiruri?

13   A.    Yes.

14   Q.    What were those concerns?

15   A.    I received a call one day from a patient stating that they

16   weren't receiving any nursing services.  When I went into the

17   system to verify, it showed that there were nursing services

18   scheduled and completed.

19   Q.    So what's the problem with that?

20   A.    The nurses weren't showing up to the visits as they were

21   documenting.

22   Q.    Okay.  Do you remember a nurse named Winnie Arungu?

23   A.    Yes.

24   Q.    And do you know what relationship, if any, there was

25   between Faith Newton and Winnie Arungu?

1    A.    I believe they were friends.

2    Q.    What do you remember happening with Winnie Arungu?

3    A.    So she was the nurse that the patient had called about.  I

4    forwarded the issue over to the director of nursing, which was

5    Joseph Muiruri.

6    Q.    And what happened after you forwarded the issue to Joseph

7    Muiruri?

8    A.    He came back with the list and told me to reschedule all

9    of her entire schedule.

10   Q.    Let's get this straight.  You took Winnie Arungu off the

11   schedule after you heard that?

12   A.    As requested by the director of nursing, yes.

13   Q.    But then Winnie Arungu ended up getting back on the

14   schedule?

15   A.    Yes.

16   Q.    How did that happen?

17   A.    I was later told by Faith Newton to reinstate the

18   schedule.

19   Q.    So Faith Newton told you to put Winnie Arungu back on the

20   schedule?

21   A.    Yes.

22   Q.    Now, Ms. Rivas, were there other times that you heard from

23   patients about nurses not showing up as they were scheduled?

24   A.    Yes, I have.

25   Q.    And you ended up taking some of those calls at the office?

1    A.    If it came to me, yes.

2    Q.    And why would those calls come to you sometimes?

3    A.    I do the scheduling, so I believe the person that

4    forwarded it to me felt that I would be able to, like, clarify

5    that better for the patient.

6    Q.    Was there also a language reason why you would get some of

7    these calls?

8    A.    Yes.

9    Q.    What was that?

10   A.    Some of the patients and home health aides didn't speak

11   English.

12   Q.    And when you would get these calls with these complaints,

13   what would you do with them?

14   A.    If it's in regards to nursing, I would send out an email

15   and I would also go to the director of nursing to let them know

16   what the issues are.

17   Q.    Okay.  And the director of nursing at the time was Joseph

18   Muiruri?

19   A.    Yes.

20   Q.    And what if anything did Joseph Muiruri say to you about

21   sending emails about that?

22   A.    He said not to write such email in the patient's chart.

23   Q.    Did he say why?

24   A.    No.  He just said it was just better to discuss it

25   verbally.

1   Q.   Do you recall at one point there was an audit done of
2   Arbor?
3   A.   Yes.
4   Q.   And were you given any jobs in connection with that audit?
5   A.   Yes.
6   Q.   By who?
7   A.   By the office manager and people like upper management.
8   Q.   Okay.  Just so we're clear who we're talking about here,
9   the office manager was?
10  A.   Rosa Gonzalez.
11  Q.   Rosa.  And then you mentioned upper management.  At Arbor,
12  who was upper management?
13  A.   It would be Joseph Muiruri and Faith Newton.
14  Q.   Okay.  So what job did upper management give you in
15  connection with the audit?
16  A.   I was asked to go to doctors' offices to see if I can get
17  Plan of Cares that weren't signed to be signed or to figure out
18  why they weren't being signed.
19  Q.   Okay.  Were you also given a job relating to the nursing
20  notes that were in Axxess?
21  A.   Yes.
22  Q.   Okay.  Tell the jury about that job.
23  A.   I was asked to generate a list on Axxess for notes that
24  weren't completed in the system.
25  Q.   And let me follow up with the question to try and clarify

1    that.  These were visits that had happened in the past but

2    there wasn't a note to go along with it in the system, is that

3    right, or there wasn't a complete note to go along with it?

4    A.    They were -- right.  They weren't yet started.

5    Q.    Okay.  So you were asked to go into the system, identify

6    those notes?

7    A.    Yes.

8    Q.    And then what were you asked to do after you identified

9    those notes?

10   A.    I was asked to give the list that I generated to the

11   director of nursing.

12   Q.    And that was Joseph Muiruri?

13   A.    Yes.

14   Q.    And did you do that?  Did you give him that list?

15   A.    Yes.

16   Q.    And then did you do something; after you had made up that

17   list, did you do something else in Axxess relating to those

18   incomplete nursing notes?

19   A.    He came back to me with the list of notes that he wanted

20   reassigned to him.

21   Q.    All right.  Let's make sure we understand that.  So in

22   Axxess, could anybody at Arbor just go into any nursing note

23   and start making changes?

24        Let me ask a better question.  I'll withdraw that and ask

25   you a better question.  What did it mean to have a nursing note

 1    assigned to somebody in Axxess?

 2    A.    If a nursing note is assigned to somebody, it's their

 3    responsibility to complete that note.

 4    Q.    So by assigning those incomplete nursing notes to Joseph

 5    Muiruri, what did that mean?

 6    A.    He completed them.

 7    Q.    And do you know if he then completed those incomplete

 8    notes?

 9    A.    I did see that there were some notes that were previously

10    not completed completed afterwards.

11    Q.    Okay.  Now, as scheduler, in addition to the nurses visits

12    I think you testified you also scheduled the HHA visits; is

13    that right?

14    A.    Yes.

15    Q.    All right.  And did you also, when you were doing the

16    intake for the new patients, did that also include intake for

17    the home health aides?

18    A.    Yes.

19    Q.    How quickly after an HHA would be hired, how quickly would

20    they be put on the schedule for visits?

21    A.    If they completed the hiring process right away, so that

22    would probably be like within three, four days if their CORI

23    came back clean.

24    Q.    Now, sometimes was it the case that HHAs would be hired

25    and the next day they would start doing visits after they did a

1    morning orientation.  Did that happen?

2    A.    Not that I'm aware of.

3    Q.    Now, Ms. Rivas, did you decide to leave Arbor at some

4    point?

5    A.    Yes.

6    Q.    When was that?

7    A.    I'm sorry, you said when was that?

8    Q.    I'm sorry.  When was that, when did you decide to leave?

9    A.    In 2015.

10    Q.    If I told you March 2016, does that sound right?

11    A.    Maybe.  I don't recall actually if it was in -- you said

12    '16?

13    Q.    Let me ask a different question.

14          Why did you leave Arbor?

15    A.    I left Arbor because I had ran into an issue where I made

16    a scheduling error.  I received a call from a nurse saying that

17    she had a patient that hasn't been on her schedule for a couple

18    of weeks.

19    Q.    Okay.  Any other reason why you left Arbor?

20    A.    I brought that issue to the director of nursing because

21    the notes, the patient was actually scheduled to a different

22    nurse with similar names, and that nurse completed those notes.

23          MR. BRADY:  Nothing further for this witness, Your

24    Honor.

25          THE COURT:  Cross?

```
 1              MS. PASCUCCI:  Yes, Your Honor.  Thank you.
 2     CROSS-EXAMINATION BY MS. PASCUCCI:
 3     Q.    Before I get started, it's Ms. Rivas; am I correct?
 4     A.    Rivas, yes.
 5     Q.    Thank you.  My name is Michelle Pascucci.  I'm here with
 6     George Vien.  We represent Faith Newton.
 7           You were introduced to Arbor through your sister, correct?
 8     A.    Yes.
 9     Q.    And you started working there in September of 2014.  Does
10     that sound right?
11     A.    No.  I started working there the weekend -- I know it was
12     like either Memorial Day weekend or Labor Day weekend.
13     Q.    2014, does that sound -- that's the right year at least?
14     A.    Sounds about right, yes.
15     Q.    Okay.  And when you interviewed for your job, you
16     interviewed with Mr. Hussain, right, Syed?
17     A.    Yes.
18     Q.    And you talked about it a little on direct, but what was
19     Mr. Hussain's role?
20     A.    He was administrator for the company.
21     Q.    Can you talk about what he would do as administrator?
22     A.    Oversee the company, our day-to-day, you know, office
23     stuff.  Like, if we were coming in late, we would notify him.
24     If we needed to leave early, he would be the person we spoke
25     to.
```

1  Q.   I believe the language you used on direct was he made

2  choices for the business; is that correct?

3  A.   I wouldn't say choices for the business, but you would

4  bring issues or any concerns to him and, you know, he would

5  resolve it.

6  Q.   Are you still in contact with Mr. Hussain today?

7  A.   No.

8  Q.   And I believe that you were asked on direct about

9  allegations that he had stolen from the company.  Do you recall

10  being asked about that?

11  A.   Yes.

12  Q.   And if you know, were you aware of the police report that

13  was filed regarding Mr. Hussain having stolen from the company?

14      MR. BRADY:  Objection, Your Honor.

15  A.   I don't recall --

16      THE COURT:  Hold on a second.  Basis?

17      MR. BRADY:  Foundation.

18      THE COURT:  No.  She asked if she knows.  You can

19  answer the question.

20  A.   I do not know if there was a police report filed.

21  Q.   I want to talk more about your role at Arbor.  You never

22  worked as a home health aide prior to your time at Arbor,

23  correct?

24  A.   No.

25  Q.   And to the best of your knowledge, it's not illegal for

1    patients to refer themselves to home health care agencies,
2    correct?
3    A.    No.
4    Q.    And it's not illegal for family members to serve as home
5    health aides for family, correct?
6    A.    No.
7    Q.    I believe you also testified about Mr. Ouko and his time
8    at Arbor.  So you worked with him, correct?
9    A.    For a short period of time, yes.
10   Q.    Accurate to say he was at Arbor for less than six months?
11   A.    I started after him, so he was no longer with Arbor after
12   maybe three, four months that I was there.
13   Q.    And you were asked about a memo that he had written.  Did
14   you ever see him give this memo to Faith Newton?
15   A.    No.
16   Q.    And this memo, it wasn't sent or -- withdraw the question,
17   Your Honor.
18        And this memo, it's dated 2014, correct?
19   A.    Yes.
20   Q.    You stayed at Arbor through 2016, correct?
21   A.    I know I was with Arbor less than two years and a little
22   over a year.  I just don't remember the exact.
23   Q.    Fair to say you didn't leave the company right after
24   receiving this memo, correct?
25   A.    No.

1   Q.   You stayed for a little bit of time after, for at least a

2   year after?

3   A.   Roughly.

4   Q.   Are you still in contact with Mr. Ouko at all?

5   A.   No.

6   Q.   Are you aware that Mr. Ouko has filed a civil lawsuit?

7   A.   While I was working at Arbor, yes.

8   Q.   Are you aware now as you sit here today?

9   A.   I'm not understanding the question.

10  Q.   Do you know that Mr. Ouko has filed a lawsuit against

11  Arbor?

12  A.   I don't know about a lawsuit, but I know that he did make

13  allegations against Arbor.

14  Q.   And are you aware that based on what -- based on what

15  happens with respect to those allegations, he may be poised to

16  get a certain amount of money as a response?

17  A.   I have no idea.

18  Q.   And I believe that you were also examined about certain

19  communication notes, correct?

20  A.   Correct.

21  Q.   And you were asked in particular about communication notes

22  dealing with Elizabeth Butz, right?

23  A.   Yes.

24  Q.   Now, the way it worked with these communication notes,

25  tell me if I'm wrong on this, but you'd send a communication

1    note and it would go to a whole bunch of people, right?

2    A.    Yes.

3    Q.    So you'd put it in the Axxess, you'd put the note through

4    the Axxess system first, right?

5    A.    Yes.

6    Q.    And then it sends out an alert to a whole bunch of people?

7    A.    Whomever I select to cc.

8    Q.    And those people may open the email; they may not?

9    A.    They typically open them because that's how we communicate

10   while working in the office.

11   Q.    But you can't say whether anyone saw the email just

12   because you sent it, right?

13   A.    It does not have anything that would show that it was

14   read, no.

15   Q.    Okay.  And in your position at Arbor, you did not see

16   patients, correct?

17   A.    I see them when they, like, they come in.  Like, what do

18   you mean if I see patients?

19   Q.    Let me clarify.  You weren't a home health aide for Arbor?

20   A.    No.

21   Q.    You weren't a visiting nurse, you weren't a nurse for

22   Arbor?

23   A.    No.

24   Q.    Okay.  You never attended patient visits?

25   A.    No.

1    Q.    And you and Rosa Gonzalez, she was the office manager at

2    the time you started, correct?

3    A.    Yes.

4    Q.    And what were her roles and responsibilities as office

5    manager?

6    A.    To manage the office.  I'm not sure, like, how do you want

7    me to --

8    Q.    Sure.  If she's managing the office, she's looking at the

9    day-to-day operations in the office?

10   A.    Yes.

11   Q.    And what about Vanek Kon?

12   A.    He was somebody that was hired temporarily to I guess be

13   the administrator.

14   Q.    What was his position at the office as administrator?

15   A.    What was his position?

16   Q.    What would his -- was his title administrator, or was it

17   something else?

18   A.    I believe it was administrator.

19   Q.    And what would he do?

20   A.    I'm not sure what he -- he was in the office and he spent

21   time out of the office, too.  I wasn't really sure exactly what

22   his responsibilities were.

23   Q.    And I'm just going to walk through some of the process, I

24   want to walk through some of the processes around Plans of Care

25   with you.  And I think you testified about how you dealt with

 1    Plans of Care.

 2         So generally, Plans of Care, they were filled out by

 3    nurses, right?

 4    A.   Yes.

 5    Q.   And then the Plan of Care, after it's filled out by the

 6    nurse, it gets uploaded into the Axxess database, correct?

 7    A.   Yes.

 8    Q.   And then from there the Plan of Care, is it faxed out to

 9    the doctor's office for signature?

10    A.   I believe it goes to -- I want to say it was quality -- it

11    was a department that reviewed the notes before it gets cleared

12    out.

13    Q.   Okay.  So the Plan of Care, it goes to quality assurance

14    first, right?

15    A.   Quality assurance.

16    Q.   It goes to quality assurance, then it goes out to the

17    doctor's office?

18    A.   Yeah, medical records would send it out.

19    Q.   So it goes quality assurance, medical records, then the

20    doctor's office?

21    A.   Yes.

22    Q.   Okay.  And then the Plans of Care presumably sometimes are

23    signed at the doctor's office, right?  The doctors would

24    sometimes sign off on them?

25    A.   Yeah.

```
 1   Q.   And then they're returned back to Arbor; is that right?
 2   A.   Yes.
 3   Q.   And then sometimes those were loaded into Axxess, but
 4   isn't it true that sometimes they were never loaded back into
 5   the Axxess system once they were signed?
 6   A.   They were loaded into the system, yes.
 7   Q.   But weren't there instances where they weren't loaded?
 8   A.   Not that I'm aware of.
 9   Q.   Okay.  But in any case, is it fair to say that this
10   process sending the Plans of Care through multiple different
11   departments, getting them back, it's a pretty complicated
12   system?
13   A.   I don't believe it's a complicated system.
14   Q.   There's a lot of stages that it has to go through before
15   it comes back to Arbor.  It goes through different departments,
16   then it comes back?
17   A.   I mean, the notes will get completed.  Majority of it is
18   electronic, everything is like computer-based, except for it
19   being re-faxed back from the physician's office.
20   Q.   And you testified about what you would do when you came
21   across Plans of Care that were not signed, and it sounds like
22   most of the time you would bring it specifically to the
23   attention of a nurse, the home health aide that's on the
24   patient but also John Muiruri, right?
25   A.   Joseph Muiruri.
```

1    Q.    Joseph Muiruri.  My apologies.  Joseph Muiruri.

2    A.    When he was present as the director of nursing, yes.

3    Q.    I think we've talked a lot about Joseph Muiruri.  If you

4    know, are you aware whether he's been charged criminally with

5    respect to his role at Arbor?

6    A.    No.

7    Q.    Okay.  And most of your -- you did not see Ms. Newton --

8    she wasn't always in the office, correct?

9    A.    No.

10   Q.    But Joseph Muiruri, he was in the office frequently,

11   right, once he started?

12   A.    He was in and out of the office as well.

13   Q.    And after Joseph Muiruri started, fair to say that he took

14   over a lot of responsibility?

15   A.    When he started, if he took over a lot of the

16   responsibilities?

17   Q.    Or is it fair to say that he had a lot of different roles

18   at Arbor?

19   A.    From what I can recall he was just a director of nursing.

20   Q.    But when nurses complained about the schedules, didn't you

21   testify that you brought those complaints to Joseph Muiruri?

22   A.    Yes.

23   Q.    And when nurses didn't put their notes in the system, it

24   was Joseph Muiruri that you went to, right?

25   A.    Yes.

1    Q.    And I think Mr. Brady, he walked you through an instance

2    where notes were reassigned to Joseph Muiruri, unfinished notes

3    were reassigned to Mr. Muiruri.  Do you recall that testimony?

4    A.    Yes.

5    Q.    And after they were assigned to him, it was Joseph Muiruri

6    who you presume completed them, correct?

7    A.    The ones he requested to be reassigned to him, yes.

8    Q.    And ultimately, you left Arbor, correct?

9    A.    Yes.

10   Q.    And when you did, that was due to a conflict regarding

11   nurse scheduling, right?

12   A.    Yes.

13   Q.    And that conflict, that was a conflict specific with

14   Joseph Muiruri; is that correct?

15   A.    Yes.

16           MS. PASCUCCI:  No further questions, Your Honor.

17           MR. BRADY:  Nothing further.  Thanks.

18           THE COURT:  You're excused.

19           THE WITNESS:  Thank you.

20           MR. LOONEY:  The government calls calls Regina Arrey.

21           REGINA ARREY, Sworn

22           COURTROOM CLERK:  Can you please state your name and

23   spell your last name for the record.

24           THE WITNESS:  My name is Regina Arrey.  My last name

25   is A-r-r-e-y.

1          COURTROOM CLERK:  Thank you.

2    DIRECT EXAMINATION BY MR. LOONEY:

3    Q.   Good afternoon, Ms. Arrey.

4    A.   Good afternoon, sir.

5    Q.   How are you?

6    A.   I'm fine, thank you.

7    Q.   To briefly introduce yourself to the jury, can you tell us

8    where you live?

9    A.   I live at 51 Pines Road, Billerica, Massachusetts, zip

10   code 01821.

11   Q.   All right.  What do you do for work?

12   A.   I'm a registered nurse.

13   Q.   How long have you been a registered nurse?

14   A.   Since 2001.

15   Q.   Little over 20 years?

16   A.   Yes.

17   Q.   All right.  In your nursing experience have you worked in

18   the home health care setting?

19   A.   Yes, I have.

20   Q.   For how long have you done that?

21   A.   I started working in home care in 2011 with Missoni Health

22   Care Services.

23   Q.   Have you worked in the home health care setting since

24   then?

25   A.   Yes.

1    Q.    Are you familiar with the defendant, Faith Newton?

2    A.    Yes, I know Faith Newton.

3    Q.    How long have you known her?

4    A.    It's been at least 15 years.  I worked with her in a

5    nursing home in Lexington.  They call it -- it used to be

6    Beverly Enterprise.  They change it to Golden Living Center of

7    Lexington.

8    Q.    Okay.

9    A.    I worked there for nine years, and she met me there, so I

10   work with her for at least six or seven years, yeah.

11   Q.    Okay.  Did you work with her anywhere else?

12   A.    Yes.  She is the one who introduced me to Missoni.  She

13   started working there, so she called me to go apply.

14   Q.    What's Missoni?

15   A.    Missoni is a home care agency in Somerville.

16   Q.    How long did you stay at Missoni?

17   A.    At Missoni I was actually doing per diem, so I work there

18   2011, '12, '13, '14, up to '15, I was still taking shifts

19   there.

20   Q.    2015?

21   A.    Yes.

22   Q.    Did you ever work at a company called Arbor Homecare

23   Services?

24   A.    Yes, I worked at Arbor Homecare Services.

25   Q.    How did that come about?

1    A.    Faith called me when she went to open the company to come

2    and be a director of nursing.  I told her, no, I don't think I

3    want to be the director of nursing because I had just started

4    with home care services of Missoni, so I was not really

5    experienced in that part, so I refused.  So she was the

6    director of nursing.

7        So when the company started fully, she employed me as a

8    field staff.  I was working, seeing patients in the field.

9    That was I think 2013, 2014, yeah.

10   Q.    Okay.  So your first job with Arbor was working in the

11   field as a field nurse?

12   A.    Yes, yes.

13   Q.    Who did you report to at that time?

14   A.    At that time you call the office, you either spoke to Rosa

15   or Syed.  Syed was the administrator.

16   Q.    Did you change roles at all during your time at Arbor?

17   A.    Yes, I changed role.  I actually traveled to Africa for

18   vacation.  So when I came back, I saw an email that Syed had

19   send that some nurses had gone on vacation without taking --

20   leaving patients without coverage.

21       So when I was looking at the email, I got a phone call

22   from Faith, what is this I'm seeing on the computer about

23   nurses on vacation?  I took vacation and I applied for vacation

24   and Syed approved.  She said, no, Regina, it's not you.  It's

25   about some other nurses.  She said, but the reason why I'm

1    calling you, I need a director of nursing.  I said, what
2    happened?  Syed, the administrator and director, have just
3    quit.  I said, what happened?  She said, they are making
4    certain  allegations, and I need director of nursing.  I said,
5    no, I don't think I want that position.
6    Q.    Let me just pause you for a moment.  I appreciate it.  So
7    you left at some point in time from Arbor.  You had been
8    working as a field nurse?
9    A.    Yes.
10   Q.    You left.  You took a trip to Africa.  Do you remember
11   when that trip was?
12   A.    I believe it was around December.  I cannot really
13   remember.
14   Q.    Of what year?
15   A.    December, should be I think either 2014 --
16   Q.    So you think around December 2014 you left, you took a
17   trip, returned to the United States.  When you returned to the
18   United States you received a phone call from Ms. Newton.  And
19   during that phone call she asked you if you would be the
20   director of nursing at Arbor?
21   A.    Yes, yes.
22   Q.    All right.  Did you accept?
23   A.    No.  I refused.
24   Q.    Okay.  What happened from there?
25   A.    Then she called me again, said, okay, since you don't want

1   to be the director, can you do staff development for me?  I

2   know you're a good teacher.  I said, okay, that I can do for

3   you.

4        So she got a nurse to take my patients.  That's when I

5   started in the office.  So when I went to the office, she said,

6   well, you do staff development and you do quality assurance.

7   Q.   Let me pause you.  Let me ask you the two parts.  Let's

8   start with the quality assurance.  What did that mean?

9   A.   Quality assurance, when the nurses do their notes or they

10  do admission, before it goes to payment or to MassHealth, we

11  have to go through the documentation to see if they wrote in

12  the notes.  Sometimes they forget to put blood sugar or blood

13  pressure reading for the patient.  Or if you read the note and

14  you see they don't have anything, any diagnosis of the patient

15  in there, you write a little note and send it back to them to

16  do correction and they send it to you.

17  Q.   The other job I think you said was staff development.

18  What was that?

19  A.   That was quality assurance.

20  Q.   That wasn't a separate role?

21  A.   Quality assurance is separate role.  Then the staff

22  development, she want me to teach, do in-services for the

23  nurses, home health aide.

24  Q.   Okay.  Did you do that?

25  A.   Yes, I did.

1    Q.    Okay.  When you were in that role, what sort of training

2    did you provide for home health aides?

3    A.    Actually they had a training package that they put

4    together for Arbor Homecare, and then they had like videos that

5    they had ordered and instruction manuals to teach.  So that's

6    what I used to teach the home health aides.

7    Q.    Let me ask this.  At any time you were responsible for

8    training, did you provide 75 hours of training to new HHAs?

9    A.    No, it was not 75 hours.

10   Q.    Okay.  About how much was it, at most?

11   A.    At most three days, I can say the training would go for

12   three days.  After that we continue with, like, monthly

13   training because the home health aide is like four in-services

14   a year, so we did, every month we did like training for

15   different topics.  But for training at that time that was like

16   three days.  We did not do 75 hours.

17        And secondly, to train the home health aide, you need to

18   have like skills done in the facility.  Everything that we did

19   we did inside Arbor, in Arbor because it was like a home

20   in-house training.

21   Q.    Okay.

22   A.    Yeah.

23   Q.    So you didn't do the practical skills.  Is that what

24   you're saying?

25   A.    We didn't do it out of the facility.  We did it inside

1    Arbor, yeah.

2             MR. LOONEY:  Can we pull up for the witness only

3    Exhibit 335.

4    Q.    Did a document pop up on your screen?

5    A.    Yes.

6    Q.    Okay.  Do you recognize this document?

7    A.    Yes, I recognize this one.

8    Q.    Can you tell us what this is.

9    A.    "This certifies Alyaa Ala Sheik has successfully completed

10   the home health aide required course of study approved by the

11   State of Massachusetts and is therefore awarded this

12   certificate."

13   Q.    Do you recognize this document?

14   A.    Yes, I recognize this document.  But what I did not

15   recognize --

16   Q.    Pause for a moment.

17   A.    Yes, yes.

18   Q.    What is it?

19   A.    The thing, I never saw this State of Massachusetts because

20   the training we were doing was in-house.

21   Q.    Let me ask a different way.  Is this a certificate for a

22   home health aide that suggests they completed a course of

23   study.  Is that what this is?

24   A.    The certificate, actually I objected to giving

25   certificates, but Faith told me no --

```
 1              MS. PASCUCCI:  Objection, Your Honor.

 2              THE COURT:  Hold on.  Hold on.  The question just says

 3    is this a certificate for a home health aide that suggests they

 4    completed a course of study.  Just a yes or no answer.

 5    A.    Yeah.

 6              THE COURT:  Next question.

 7    Q.    And is that your name in the lower right?

 8    A.    Yes, that's my name.

 9    Q.    Okay.  Do you believe you signed this certificate?  Do you

10    know one way or the other?

11    A.    Yeah, this particular one, I signed it, this one, I can

12    tell this one.

13              MR. LOONEY:  I would ask this be admitted and

14    published for the jury.

15              MS. PASCUCCI:  Objection, foundation.

16              THE COURT:  What's the exhibit number we're talking

17    about?

18              MS. PASCUCCI:  335, Your Honor.

19              THE COURT:  She just testified that she signed it,

20    correct.  Admitted.

21              (Exhibit 335 admitted into evidence.)

22    Q.    All right.  So this certificate says that "Alyaa Al Sheik

23    has successfully completed the HHA required course of study

24    approved by the State of Massachusetts and is therefore awarded

25    this certificate, dated this 5th day of May 2015."  Correct?
```

1    A.    Yes.

2    Q.    Then it's signed with your name?

3    A.    Yes.

4    Q.    Why did you sign this document?

5    A.    The idea I had at that time was that we doing an in-home

6    training, Arbor home training.  Because I had a problem with

7    the home health aide that they employed.  First of all, I don't

8    know the process how they employ them, but they came with

9    family members.

10        So I told Faith, how come the doctor orders for patients

11   to be admitted, and then the family members are taking care of

12   them?  They are not certified.  They're already taking care of

13   the patients.  I said, okay, you know we just need to train

14   them so they know how to take care of the patients, because

15   some of them had no clue of home health aide.  So after that --

16   Q.    Let me stop you.  When you arrived at Arbor, there were

17   health aides who were employed there who had no clue how to do

18   home health care?

19   A.    When I was training them I realized that some of them had

20   no knowledge of home health aide.

21   Q.    And were those home health aides who had been working at

22   Arbor already?

23   A.    The thing is that Rosa is the one who made up the program

24   for the training.  She put a package, and she would tell me we

25   have employees to be trained.  We have home health aides to be

1    trained.  Some of them were new.

2    Q.   Some were new.  Were some people who had been working at

3    Arbor for a period of time before you came and trained them?

4    A.   I'm not sure if they had been working there, but they

5    already working with patients by the time we're doing training.

6    Q.   So before you trained them, they had already been working

7    with patients?

8    A.   Yes.

9    Q.   Is that correct?

10   A.   Because when they admit a patient, we cannot leave the

11   patient without care, so someone has to be there.

12   Q.   Okay.  Is this certificate in front of you accurate?  Did

13   you provide the state approved HHA required course?

14   A.   This certificate is not accurate.  I can tell you the

15   truth.  It is not accurate.  If I knew, I did not see the State

16   of Massachusetts.  If I saw this, I would never have signed the

17   certificate.  She told me it was just in-house training we were

18   doing.  That's why I encouraged them to go to Red Cross.

19   Q.   Pause for a moment.  You said you told her that it was

20   just in-house training?

21   A.   She told me it was just in-house.

22   Q.   And who is "her" in that?

23   A.   Faith told me it's in-house training.  They will just get

24   certificates.  I said, no, they don't need certificates.  They

25   need a state certificate to do this job.  She said, no, when

1    you do the training, just show that they have at least had some

2    training in home health aide.  They would print the

3    certificates in Arbor, they would make certificates for them.

4    Q.   Can I pause you for a moment.

5         Did you tell Ms. Newton that there needed to be additional

6    training beyond what was being provided?

7    A.   Yes, I did.

8    Q.   Okay.  What was her response to that?

9    A.   I suggest that because she was worried about the home

10   health aide, I told her you need to send them to get trained.

11   They have certificates that they train at Red Cross.  And I

12   even found out how much it would pay.  At that time it was $800

13   to do the course.

14   Q.   So there's an $800 course that you thought they should

15   take?

16   A.   At that time, yes.

17   Q.   Okay.  What was her response to that?

18   A.   So she said, you know, some of them don't have that kind

19   of money.  I said, well, what you can do is the agency has

20   money now.  You can actually contract with them, pay for their

21   training, and then you can get like $20 from their paycheck

22   every week.  By one year it will be done.  The first thing I

23   ask --

24   Q.   Okay.

25   A.   I'm sorry.

```
 1    Q.    How did Ms. Newton respond to that suggestion?

 2    A.    She actually appreciated it.  Yes, she agreed with me.

 3    Q.    And did she do it?

 4    A.    The first thing I ask, I said, why don't you hire aides

 5    that have certificates to take care of this patient instead of

 6    having family members take care of them?  Family members can

 7    take care of patients.  But once they become on the payroll of

 8    Arbor, they become employees, not family members anymore.

 9          We train family members to take care of patients at home

10    when we are not there.  But now this one is on the payroll so

11    they are employees, so they need to go get that certificate.

12    They can go to Red Cross.  I remember Vinek Kon, the

13    administrator, came with information that he had seen a school

14    in Lowell that could train the home health aides.

15    Q.    Okay.  Were you ever asked at Arbor to sign certificates

16    for individuals you hadn't trained?

17    A.    Yes.

18    Q.    By whom were you asked to do that?

19    A.    The staff in the human resources called me that I was

20    needed in human resources.  At that time I was doing QA.  So I

21    went upstairs.  There was Jenny, and there was Joe I think

22    working in human resources.  They had the pile of certificates

23    on the table.

24    Q.    Okay.

25    A.    And they said, well, Joe Muiruri, the director, asked us
```

1    to tell you to sign these certificates.  I said, me sign the

2    certificate, why?  They said, I don't know.  I said, well,

3    Catherine and Merika Mou are the one training the home health

4    aides.  They are RNs.  Why did they not sign the certificate?

5    Why do I have to sign the certificate?  They said, well, Joe

6    asked us.  I said, tell Joe he's an RN like myself.  He has a

7    license like myself.  If he thinks it's okay for me to come and

8    sign certificates when I did not train the home health aide, he

9    should sign it himself.  And then I walked out.

10   Q.   Did you discuss that with Ms. Newton?

11   A.   I did not discuss it with Ms. Newton.  I discuss it with

12   Helen, because Helen came to me.  I don't know if Joe sent her

13   to me.  She said, Regina, Joe wants you to sign this.  I said,

14   yes, I just went to human resources.  That's what Jenny -- I

15   said, I'm not signing.  He should sign it if it's okay.

16        Then Faith Newton came to me and said Joe says I am not

17   cooperating.  I said, what does that mean I am not cooperating?

18   Q.   Who told you you're not cooperating?

19   A.   Ms. Newton, Faith Newton, that Joseph Muiruri, director,

20   says I'm not cooperating.

21   Q.   Okay.  And what did that mean?

22   A.   I asked, what does that mean?  She said, I don't know, she

23   shook and said I don't know.  That's when she came again with

24   this idea, she doesn't know what to do with home health aides.

25   I said, I've told you before, send them to go get trained.

1    Q.    What was her response to that?

2    A.    She's like, okay.

3    Q.    Did it happen?

4    A.    I left the company shortly after that, so I don't know if

5    it ever happened.

6    Q.    Okay.  Why did you leave the company?

7    A.    After Joe had asked me to sign the certificates, I

8    refused.  For a couple of days when I come to the office I

9    would see a little note on my desk, Regina, this job is a 9:00

10   to 5:00 job, it's not a 9:00 to 2:00 job.  Like three occasions

11   they did that.

12        After I spoke with Faith, we only say, hi, hi.  We have no

13   more conversation.  We were close.  We worked together for a

14   long time.  There was that distance between us.  So I said,

15   okay, I'll rather go to Ben, the CEO.  So I took the notes,

16   went to Ben.  I said, Ben, this is what Joe is leaving on my

17   desk every day.  I said, remember when your wife called me to

18   come back to do quality assurance, she asked me to do it at

19   home.  I said, no, I'd rather have structured environment at

20   work.  I work from 9:00 to 2:00 and then I leave at 3:00 to go

21   to my job at McLean Hospital.  That was the agreement.  So Joe

22   is leaving me these notes.  I don't know what to do, what it

23   means.  He said, okay, I'll ask Faith to talk to you.  I said,

24   okay.  I left the office.

25        It was at that time that I applied for a couple of days to

1    go to Atlanta.  I had a Christian crusade in Atlanta.  So I

2    give Joe two weeks' notice to take time off.  He never replied

3    to me, never said anything.  So Friday was my last day.  I had

4    to go to Atlanta.  So I said, what is this?  He doesn't respond

5    to me.  He treats me as if I'm nothing.  I applied to take time

6    off.  He never responds.  Why should I stay on this job?

7        I started feeling uncomfortable.  That Friday was my last

8    day.  I went in the computer, and then I resign, I said, I

9    resign with the effect of now, and that's how I left Arbor.

10              MR. LOONEY:  No further questions.

11              THE COURT:  How much cross do you think you have?

12              MS. PASCUCCI:  Your Honor, I think I can do this

13   quickly.  I realize I'm the last thing between the jurors and

14   lunch.

15              THE COURT:  We're recessing for the day at 1:00.  As a

16   courtesy, if her cross-examination is short, I'd like to let

17   this witness finish today.  Can you all stay?  Does anyone have

18   an objection to staying just a couple of extra minutes?

19              Okay.  Go ahead.

20   CROSS-EXAMINATION BY MS. PASCUCCI:

21   Q.   Ms. Arrey, my name is Michelle Pascucci.  I'm here with

22   George Vien, and we represent Faith Newton in this case.

23        So you testified regarding the in-house training that you

24   provided to home health aides, correct?

25   A.   Correct.

1    Q.    And you say that Rosa helped make that program, correct?

2    A.    Yes.

3    Q.    And you said it was a three-day training, correct, and

4    that there were also monthly in-services, right?

5    A.    Right.

6    Q.    And it was Ms. Newton who asked you to do this?

7    A.    Yes.

8    Q.    And Ms. Newton, she never provided training, right?

9    A.    At that time I was the one doing the training, yes.

10   Q.    And did you ever recall seeing Ms. Newton sign

11   certificates for training?

12   A.    No, I don't recall.

13   Q.    And we looked at Exhibit 335.  I don't think we need to

14   pull it up again, but you saw that was your signature on the

15   certificate, correct?

16   A.    Yes.

17   Q.    You also worked at quality assurance at Arbor, right?

18   A.    Yes, I did.

19   Q.    And it was Ms. Newton who asked you to do quality

20   assurance at Arbor?

21   A.    Yes.

22   Q.    And there were tons of nurses at Arbor at that time or

23   many nurses?

24   A.    Yes.

25   Q.    And it was the nurses who did their own notes, correct?

1    A.    Correct.

2    Q.    And then you would look at those notes to make sure

3    everything was correct, and it was Ms. Newton who wanted you to

4    do that?

5    A.    Yes.  Actually, there were three of us doing it.  There

6    was another nurse who was doing quality assurance, too, and

7    Ms. Newton was doing it, too.

8    Q.    But there was a team of you who were doing quality

9    assurance?

10   A.    Yeah.

11   Q.    And it sounds like, when you left Arbor, it was because of

12   a conflict you had with Joseph Muiruri; is that correct?

13   A.    Yes.

14   Q.    It wasn't a conflict that you had with Ms. Newton?

15   A.    No, I didn't have any conflict with her.  It was Joe,

16   yeah.

17   Q.    And you testified you've been a registered nurse since

18   2001?

19   A.    Yes.

20   Q.    You're trained as a nurse?

21   A.    Yes, I'm trained as a nurse.

22   Q.    You went to nursing school?

23   A.    Yes.

24   Q.    And you were a nurse for a long time before you went to

25   Arbor.  That's fair to say?

1   A.    Yes.

2   Q.    You came to Arbor with over a decade of experience?

3   A.    (Nods.)

4   Q.    And you said initially you worked as a field nurse seeing

5   patients.  Did you ever bill for visits that you didn't do when

6   you were at Arbor?

7   A.    No.

8   Q.    Did you ever falsify hours when you worked at Arbor?

9   A.    Falsify hours?  No.

10  Q.    And you provided services to patients, correct?

11  A.    Yes, I did.

12         MS. PASCUCCI:  No further questions, Your Honor.

13         THE COURT:  Redirect?

14         MR. LOONEY:  No, Your Honor.

15         THE COURT:  All right.  You are excused.  The witness

16  is excused.  You can go.

17         THE WITNESS:  Thank you.

18         THE COURT:  For the jurors, we have not just a long

19  weekend but a long, long weekend.  So I'm going to ask you to

20  completely put this case out of your mind until we're back

21  together again on Wednesday.  Don't talk to anybody about it.

22  Keep an open mind about it.  No extracurricular research.  Put

23  it out of your mind.  Enjoy the long weekend, Fourth of July.

24  We will resume at 10:00 on Wednesday morning.  All right.

25  Thanks everyone.  Have a great weekend.

 1          COURTROOM CLERK:  All rise for the jury.

 2          (Jury exits the courtroom.)

 3          THE COURT:  All right.  I'll have a draft charge for

 4  you before we reconvene on Wednesday, if not sooner.  I know

 5  it's no one's fault.  This is going smoothly.  But I don't like

 6  to be in the position of having to review documents while the

 7  jury is here.

 8          So what I have in front of me is what Ms. Pascucci

 9  filed this morning.  It's document 419.  And I'm waiting on the

10  government to let me know which of those exhibits they're going

11  to agree to exclude and which they're not.

12          And then basically the same posture on the text

13  messages.  She's highlighted a few that she thinks are no

14  longer co-conspirator statements based on the dismissal of

15  Count Three.  So the government will let me know which, if any,

16  of these they are contesting.

17          MR. BRADY:  We will, and we'll do that in advance of

18  when we're back before Your Honor.

19          THE COURT:  It's fine.  This has gone pretty smoothly.

20  I'm not being critical.  I just want to avoid it if I can.

21          MR. VIEN:  I'll remind the government to get with the

22  program and do what you want.

23          THE COURT:  You should probably call them every single

24  day more than once over the weekend.  I'm sure they'll

25  appreciate that.

1              Anything else?  So we're starting on Wednesday.

2     Karen, do I have anything Wednesday morning?

3              I have a revocation at 9:15, so that will be in the

4     courtroom, and I'll be available as soon as that's over as I

5     can be, okay, if anybody needs anything.

6              MR. VIEN:  Thank you, Your Honor.

7              THE COURT:  I'll be here.

8              MR. BRADY:  Thanks, Your Honor.

9              THE COURT:  Have a good weekend all.

10             (Adjourned, 1:04 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this  30th day of June, 2023.

10

11              /s/ Kelly Mortellite

12              _____

13              Kelly Mortellite, RMR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25