UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,     )
                              )          Criminal Action
          Plaintiff,          )          No. 21-10035-ADB
                              )
v.                            )
                              )
FAITH NEWTON,                 )
                              )
          Defendant.          )
                              )
```


JURY TRIAL DAY FIVE

BEFORE THE HONORABLE ALLISON D. BURROUGHS
UNITED STATES DISTRICT JUDGE


July 5, 2023


John J. Moakley United States Courthouse
Courtroom No. 17
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     On Behalf of the Defendant:
8    George W. Vien
     Michelle R. Pascucci
9    Nathaniel R. B. Koslof
     Donnelly, Conroy & Gelhaar, LLP
10   260 Franklin Street
     Boston, MA 02110
11   617-720-2880
     Fax: 617-720-3554
12   gwv@dcglaw.com
     mrp@dcglaw.com
13   nrbk@dcglaw.com

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1

 2                              CONTENTS

 3    WITNESS                                              PAGE

 4
      ALENA SHOEMAKER
 5
          Direct Examination By Mr. Brady                  17
 6        Cross-Examination By Mr. Vien                     31

 7    PAULA KEEFE TYRRELL

 8        Direct Examination By Mr. Brady                  49
          Cross-Examination By Mr. Vien                    98
 9
      CHHAN TOUCH
10
          Direct Examination By Mr. Brady                 104
11        Cross-Examination By Ms. Pascucci               124

12    ANTHONY EATON

13        Direct Examination By Mr. Looney                129
          Cross-Examination By Mr. Vien                   144
14        Redirect Examination by Mr. Looney              159
          Recross-Examination By Mr. Vien                 162
15
      CINDY GAVIN
16
          Direct Examination By Mr. Brady                 163
17        Cross-Examination By Ms. Pascucci               172

18    SCOTT WISNASKAS

19        Direct Examination By Mr. Brady                 176

20

21

22

23

24

25
</pre>

<u>E X H I B I T S</u>

| <u>Exhibit No</u>. | <u>Received</u> |
|---|---|
| 298 | 22 |
| 28 | 58 |
| 29 | 70 |
| 30 | 80 |
| 32 | 84 |
| 33 | 87 |
| 34 | 90 |
| 35 | 94 |
| 904 | 147 |
| 905 | 148 |
| 309 | 168 |
| 318-01 | 179 |
| 719 | 183 |
| 714 | 193 |
| 906 | 197 |

```
 1                    P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Allison D. Burroughs, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 17, Boston, Massachusetts, on
 7    July 5, 2023.)
 8    (Case called to order.)
 9              THE COURT:  So I've gotten the submission, ECF 430.
10    The government is not objecting to the proposed redactions, and
11    I think 654 is going to be replaced, so someone will take care
12    of that with Karen.
13              MR. BRADY:  Yes, Your Honor.  We'll square that away.
14              THE COURT:  Okay.  And then 629, the government is
15    agreeing to exclude 527, 528 and 531.  Their position is that
16    the other five records, which is 706 to 710, are not coming in
17    for the truth of the matter asserted and they're not hearsay.
18    So I'm happy to give that instruction.  But does the defense
19    have an argument beyond that?
20              MS. PASCUCCI:  Your Honor, we do have an objection
21    based on relevance for those exhibits.  And in a nutshell,
22    those exhibits are not authored by Faith Newton.  They're not
23    authored by Winnie Waruru and they're not authored by anyone
24    else who we've heard evidence on.  So we do think that there is
25    just a general relevance issue here.  There hasn't been
```

1  independent evidence beyond these exhibits that they're
2  connected to the conspiracy.
3       In other words, people who authored them, really the
4  only evidence is that they worked at Arbor, and none of those
5  individuals that authored these exhibits are testifying and the
6  patient themself, KU, will not be testifying either.
7       THE COURT:  Does there need to be some independent
8  connection to the conspiracy?
9       MS. PASCUCCI:  I think without it there is a question
10  of relevance showing that Ms. Newton is actually the one who
11  instructed these individuals to act this way.  And even if
12  there is some minimal relevance by virtue of them being at
13  Arbor, it just brings up a 403 issue.
14       THE COURT:  All right.  If we get to the 403 issue,
15  I'm not going to keep it out on that basis.  All the best stuff
16  is prejudicial.  So not on 403.  What's your position on the
17  rest of it?
18       MR. BRADY:  So, Your Honor, I think, you know, as set
19  forth in the papers, we are offering it for a non-hearsay
20  purpose, right, to show that these notes are just further
21  examples of these copy-and-pasted notes that the defendant, as
22  Ms. Waruru testified, that the defendant trained her to do to
23  carry out the fraud here.  And, you know, defense notes, well,
24  this isn't Ms. Waruru and it isn't Ms. Newton.  Our response to
25  that, Your Honor, is that's precisely the point, because I

1    expect that -- first of all, let me back up.

2         Since the opening, the defense here has been that this

3    is a big company; it was growing really fast; basically the

4    outlines of a good faith defense that how could this defendant

5    possibly know what was going on.  And I expect, Your Honor,

6    related to that, by the time we get to closings, we're probably

7    going to hear something along the lines of, well, yes, Winnie

8    Waruru, she's a crook, she's a fraudster, but she's a lone

9    wolf, she's a bad apple, she's the only one who is doing this.

10   And Your Honor, we think it is really important to meet that

11   defense to be able to show, as these documents show, that it

12   wasn't just limited to Winnie Waruru.  There were other nurses.

13        THE COURT:  How are you getting in that he was outside

14   of the United States?  Who is the witness on that?

15        MR. BRADY:  So the witness, this is going to come

16   through two witnesses.  So the first is going to be a gentleman

17   named Chhan Touch, who is a nurse practitioner, who was the

18   nurse practitioner for this individual.  And he's going to

19   testify I think later this morning, Your Honor, that he

20   remembers that this patient told him, "I'm going out of the

21   country for several months," and he was then upset to receive

22   Plans of Care for Arbor while he was out of the country.  So

23   that's one witness.

24        The other witness is going to be Special Agent

25   Wisnaskas from the Health and Human Services as kind of a

1    summary witness.  And he's going to speak to a stipulated

2    record from Customs and Border Protection, which basically

3    shows when this person left the United States to go to Cambodia

4    and then when he came back into the United States.

5           And we have agreed, we had on our witness list, Your

6    Honor, a CBP officer who could have spoken to that, but in our

7    discussions with the defense, and I appreciate we came to an

8    agreement, we don't have to call that person.  So I think that

9    record is going to come in, and then Special Agent Wisnaskas is

10   going to be able to speak to that to corroborate these facts as

11   far as this patient just not being in the U.S.

12          THE COURT:  Okay.  I think the fact that there are

13   Arbor records on Access and given her position at Arbor, those

14   are going to come in.  Of course you can argue that there's no

15   link to them.  So those are admitted.  The other three of the

16   government are excluded.

17          The defense made a motion to exclude the summary

18   exhibits.  Are those coming in today?  Can I defer that to the

19   lunch break or this afternoon?  I want to talk about the charge

20   for a few minutes.

21          MR. BRADY:  I think we can defer to until after the

22   lunch break.

23          MR. LOONEY:  After the lunch break.

24          MR. BRADY:  After the lunch break.  I think we may get

25   to that summary witness later today, but I think we have lunch

1   to deal with that.

2         I will say very briefly on that, I think the issue or

3   what I understand to be the basis to exclude those kind of

4   overlaps with what we just talked about, right; that the

5   underlying records are nursing notes by people who are not

6   Faith Newton, not Winnie Waruru.  And so the points I just made

7   and the reason why we want to offer those, it dovetails with

8   the discussion we just had.  And that's all I'll say about that

9   for the moment, Your Honor.

10         THE COURT:  I think just reading this without hearing

11   the government's response, there's a lot of this that seems to

12   me that it comes in, but I don't actually know what's on there.

13   So if there's hearsay, there's hearsay, but if it's just --

14   let's just go.  We'll defer on that.  Let's put it off after

15   lunch or during the lunch break.

16         MR. VIEN:  Your honor, I know you're going to defer,

17   which we don't object to, I think they're right.  But the other

18   day you said if you have stuff to look at, give it to me so I

19   can look at it.  So I have a copy of the exhibits that we're

20   seeking to exclude.

21         THE COURT:  Perfect.  Pass them up.  Thank you.

22         We are going to give you a draft of the jury

23   instructions.  I worked on these myself over the weekend, so my

24   law clerks haven't seen them, and I just asked them to, while I

25   was out here on the bench, read you the table of contents and

1    the pagination.  So I haven't looked at that.  So I'm hoping

2    this is all in reasonable order.

3           I'm going to pass them out to you.  There's parts of

4    it that are rough.  And I just want, there are a few things I

5    want to throw out there.  No one simply has submitted an overt

6    act instruction.  The instruction is simply, and I think it's

7    right, that it has to be an overt act in furtherance of the

8    substantive health care fraud -- I mean the health care fraud

9    conspiracy, but no one submitted an overt act instruction.

10           Do you want to submit me one, or do you want me to

11    make it up?

12           MR. LOONEY:  I don't believe there's an overt act

13    requirement for that conspiracy charge.

14           THE COURT:  On the health care fraud?

15           MR. LOONEY:  On the health care fraud charge.

16           THE COURT:  I thought there was.  First I thought

17    there was, and second of all, didn't you tell me at the

18    beginning of the trial there was?

19           MR. LOONEY:  I recall having the discussion, and we

20    confirmed with our learned counsel in the back of the room that

21    no, there's not, there's no overt act requirement for that

22    conspiracy.

23           And let me give you a little preview of the law.  If

24    you'd like us to submit more, we can.  My understanding is

25    every other circuit to decide the issue has held there is no

1    overt requirement for the health care conspiracy.

2          The First Circuit, which hasn't explicitly determined

3    the issue, it's cited in dicta as an example of a conspiracy

4    charge that does not have it in contradict -- in contrast to

5    other conspiracies that do have an overt act requirement.  So I

6    think that's where the law stands.

7          MR. VIEN:  Since it isn't controlling, Your Honor,

8    we'd ask for overt act instruction and we feel comfortable with

9    you drafting it.

10          THE COURT:  Let me, I sort of wrestled with this over

11    the weekend, and granted it was Fourth of July, so maybe my

12    brain wasn't charging on all four cylinders.  But in these

13    instructions, I'm having trouble differentiating between the

14    health care scheme and the health care conspiracy.

15          And what focused me on it is -- let me find the

16    language.  There's this language at the end I think that says,

17    "The government need not prove that the scheme was successful,

18    but the health care benefit program suffered a financial loss,

19    that the defendant knew that the victim of the scheme was a

20    health care benefit program, or that the defendant secured a

21    financial gain."  And if none of those things are proven,

22    what's the difference between that and a conspiracy?  You know

23    what I mean?

24          I mean, I'm focusing on, if it's not successful and

25    there's no overt act requirement, what's the difference between

1    devising a scheme and conspiring?  You don't have to answer,

2    but it's on my mind.

3         MR. BRADY:  Yes.

4         THE COURT:  You don't have to answer that.  Where

5    is --

6         MR. BRADY:  Actually, Your Honor, I think she's in

7    Europe at the moment.  We'll have to settle for other unnamed

8    brilliant minds on that.

9         THE COURT:  Put someone on that, and then the

10   government has asked for willful blindness instructions just

11   about everywhere, and the defendant has asked for good faith

12   instructions just about everywhere.  And I'm sort of inclined

13   to do one instruction for the whole instruction, do those two

14   things rather than repeating it everywhere, but that also got

15   me thinking, can you have a good faith defense to a conspiracy

16   charge?

17        Because the conspiracy charge, it requires that you

18   act to advance the purposes of the conspiracy, and that would

19   seem to me to obviate good faith or willful blindness, really.

20   It seems to me that goes to the substantive offenses and not

21   the conspiracy charges.

22        MR. LOONEY:  I think that's correct because of the

23   specific intent to enter the wrongful agreement.  I think

24   that's correct.

25        MR. VIEN:  I think you need the specific intent to

1    commit the underlying crime, if that's helpful, if that's what

2    you're asking.

3           THE COURT:  To join the conspiracy, if you proved

4    joining a conspiracy, doesn't that override the good faith?

5           MR. VIEN:  It does if you joined the conspiracy with

6    the specific intent to violate the underlying statute or crime.

7           THE COURT:  But how do you join a conspiracy, like

8    how --

9           MR. VIEN:  You can't.  You can't, if you don't join

10   the conspiracy with the intent to violate the underlying crime,

11   then you're not guilty.  And you can't join the conspiracy to

12   violate the underlying crime if you have a good faith belief

13   that it's not a crime.

14          All I'm trying to say is you're right.  The good faith

15   defense is assumed by the burden on the government to prove

16   specific intent, if that's a better way to say it.

17          THE COURT:  Same thing with willful blindness, right?

18          MR. VIEN:  Correct, in my view.

19          MR. LOONEY:  Correct.

20          THE COURT:  So I will revert that.  I did, I added

21   in -- so I just want to say I had in the charge the regulatory

22   violations.  That was much less fulsome than what the

23   government ultimately agreed to, so I substituted in the

24   government's more fulsome agreement, and I also added some

25   version of the unanimity charge that they wanted.  So anyway,

1    that's kind of where we are.  I'm going to pass these out and

2    let you guys look at them.  Do you think there's any chance of

3    you closing today -- I'm sorry, resting today?

4          MR. BRADY:  No, Your Honor.  Just in our best guess of

5    timing, I think we're going to take up today with evidence, and

6    I think tomorrow, I am pretty confident we're going to rest

7    tomorrow, and I think if we keep up the pace that we've been on

8    probably before we get to 4:00.  So I think that's our current

9    best estimate of the timing for the government's case.

10         THE COURT:  All right.  I have different things at

11    9:00 and 9:15.  So I'll be on the bench by 9:30.  Without

12    holding you to anything at the moment, Mr. Vien, what are you

13    envisioning in terms of time?

14         MR. VIEN:  For?

15         THE COURT:  Are you going to put on any case at all?

16    I'm trying to think when I'm going to need to charge.

17         MR. VIEN:  I don't anticipate doing that.

18         THE COURT:  Doing what?

19         MR. VIEN:  Putting on a case.

20         THE COURT:  Okay.

21         MR. VIEN:  And as far as time, what are you -- for

22    closing?

23         THE COURT:  No.  I want to know, I'm trying to figure

24    out when we're going to charge so I know when I can have the

25    charging conference.

1          MR. VIEN:  Oh, my suggestion is that you charge

2     tomorrow after we finish the evidence and probably close on

3     Friday.

4          THE COURT:  Okay.  So I would like to do that.  That

5     makes sense to me.  That means we need to carve out some time

6     for a charging conference.  So as I say, I have these two

7     things at -- you guys are going to need to let me know.  I'm

8     going to give you the charge now.

9          If you think we can do it in half an hour, we'll start

10    at 9:30 tomorrow.  If you don't think we can start at 9:30, do

11    it at 9:30, we'll start at 8:15 or 8:30, but I'll have to take

12    a break at 9:00.

13         Okay.  So you guys let me know what you want to do for

14    tomorrow once you take a look at these.  There are some rough

15    patches because I wasn't really sure, but I think most of those

16    I have just put out there for you.  How many copies do you

17    want?  Do you want four for the four of you?

18         MR. VIEN:  Four would be great.

19         THE COURT:  We haven't done a verdict form yet, but

20    we'll get to that.  Karen, do you want to see if the jurors are

21    here?

22         COURTROOM CLERK:  Yes.

23         MS. PASCUCCI:  Your Honor, I think before we seat the

24    jurors, I think we can wait until lunch because the witness is

25    going to be at the end of the day, but there are three

 1  documents we have hearsay objections.  I have copies for you,
 2  but we can probably hear it later and be fine.
 3          THE COURT:  Okay.
 4          MR. LOONEY:  Which witness?
 5          MS. PASCUCCI:  Touch and Gavin.
 6          MR. BRADY:  I'm sorry, Your Honor.
 7          THE COURT:  You submitted a charge.  You've heard
 8  evidence that the defendant made statements in which the
 9  government claims she admitted certain facts, so that's
10  suggesting to me like an interview statement.
11          MR. BRADY:  Yeah, no.  We're not going to do that.  I
12  know we had a lot of back and forth about recordings.  We're
13  not going to do that.  The statements are going to be what they
14  heard from the witness and seen in documents.
15          THE COURT:  So we'll take the recordings out.  Is the
16  jury going to hear any of the stipulations?
17          MR. BRADY:  Yes, Your Honor.
18          THE COURT:  So I'll make sure there's a charge on
19  stipulations.
20          MR. BRADY:  Yes.
21          COURTROOM CLERK:  All rise for the jury.
22          (Jury enters the courtroom.)
23          THE COURT:  Good morning, everybody.  I hope everybody
24  had a nice July Fourth weekend, the weather notwithstanding.
25          Just a little Wednesday morning update.  I just want

1    you all to know, people are always wondering, we are at or

2    ahead of schedule on this trial.  So the length of time that I

3    told you it would take, we're not going to exceed that, with

4    the possible exception of however long your deliberations take,

5    which are not in my control, and we certainly don't want to

6    rush you.  But we're at or ahead of schedule, so in part that's

7    because you all have been great about showing up on time every

8    day, so thank you for that.  We're going to pick up today.

9           And did we finish -- we finished the last witness, so

10   you're going to call a new witness?

11          MR. BRADY:  Yes, Your Honor.  The United States calls

12   Alena Shoemaker.

13          ALENA SHOEMAKER, Sworn

14          THE COURT:  That microphone in front of you, the whole

15   stand moves.  The arm moves up and down, and you can pull the

16   whole thing closer to you if you need to.

17          COURTROOM CLERK:  Would you state your name and spell

18   your last name for the record.

19          THE WITNESS:  Alena Shoemaker, S-h-o-e-m-a-k-e-r.

20          COURTROOM CLERK:  Thank you.

21   DIRECT EXAMINATION BY MR. BRADY:

22   Q.   Good morning, Dr. Shoemaker.

23   A.   Good morning.

24   Q.   Can you hear me okay?

25   A.   Yes.

```
 1   Q.   Okay.

 2   A.   Can you hear me?

 3   Q.   So Dr. Shoemaker, what do you do for work?

 4   A.   I'm a family doctor.

 5   Q.   And where are you a family doctor?

 6   A.   Currently I work at Dartmouth Hitchcock Medical Center in

 7   New Hampshire.

 8   Q.   Okay.  Is that near Dartmouth College?

 9   A.   Yes, right down the road.

10   Q.   Okay.  Could you describe for the jury what your medical

11   practice looks like today?

12   A.   Sure.  I'm a primary care doctor.  I take care of people

13   of all ages, cradle to grave, doing regular routine stuff.

14   Then I also work with pregnant women, babies, those sorts of

15   things.

16   Q.   And how long have you been a doctor for?

17   A.   Let's see, 12 years.

18   Q.   12 years.  You're familiar with something called a

19   residency for doctors?

20   A.   Oh, yes.

21   Q.   Could you explain to us what a residency is?

22   A.   Yeah.  So a residency is, after someone finishes medical

23   school, they choose their specialty of choice, and they go for

24   a number of years for more devoted training in that specific

25   specialty.  So it's where you decide if you're going to be a
```

1  surgeon or pediatrician or, in my case, a family doctor.

2  Q.   You guessed my next question.  What did you choose to do

3  for your residency?

4  A.   Family medicine.

5  Q.   Where did you do your residence?

6  A.   Greater Lawrence Family Health Center in Lawrence,

7  Massachusetts.

8  Q.   Could you describe for us, please, what was the Greater

9  Lawrence Family Health Center?

10 A.   Sure.  It's a federally qualified health center in

11 Lawrence, Massachusetts, which has historically been an

12 immigrant town and has right now and when I was there a

13 significant underserved Spanish-speaking population.  And so it

14 was a clinic really designed to give care to that group of

15 people to try to be a low-barrier, low-access place.  And we

16 had really comprehensive primary care services and also were

17 able to follow patients in the hospital when they needed us.

18 Q.   And how long did you work there at Greater Lawrence Family

19 Health Center?

20 A.   Almost eight years.  After I finished my training for

21 three years I stayed on for another four, five.

22 Q.   And Doctor, I think you started to describe this, but can

23 you describe for us the kinds of patients who you treated

24 there?

25 A.   Yeah.  Largely folks who did not have a lot of social

 1    capital, who were not English speakers or who English was not

 2    their first language.  But also a really beautiful community.

 3    It's a really cool place.

 4    Q.   While you were at Greater Lawrence Family Health Center,

 5    did you deal with home health agencies?

 6    A.   Yes.

 7    Q.   And do you remember having to deal with the home health

 8    agencies?

 9    A.   Yeah.  It was very common.  MassHealth is an insurer.  The

10    public health insurance is very generous with home health

11    services, services after people would be, for example, having a

12    surgery or needed, you know, a short course of additional help

13    in the home to keep them in the home.  It was very common for

14    our patients to need other short-term, long-term, you know,

15    level of services.

16    Q.   Doctor, was one of the home health agencies that you

17    remember dealing with, was that Arbor Homecare Services?

18    A.   Yeah.

19    Q.   Was that one of them?

20    A.   Yes.

21    Q.   And do you remember receiving documents, things from

22    Arbor?

23    A.   In abundance, yes.

24    Q.   In abundance.  Describe for us what you remember receiving

25    from Arbor.

1   A.   So it wasn't uncommon to get, we just got a lot of

2   paperwork from Arbor and other agencies that we would get, you

3   know, very thick documents with, you know, detailed care plans.

4   But if you didn't sign it pretty quickly, or, you know,

5   sometimes they'd send a couple in a day, so it was constantly

6   filling our boxes, for sure, as providers.

7   Q.   Okay.  Doctor, if you look, there should be a computer

8   screen in front of you.  Do you see that?

9   A.   Yes.

10        MR. BRADY:  And Ms. Apfel, could we please pull up

11   just for the court and the witness Exhibit 298.

12   Q.   Can you see Exhibit 298 on the screen in front of you,

13   Doctor?

14   A.   Yes.

15        MR. BRADY:  And Ms. Apfel, if we could scroll briefly

16   to the other pages.

17   Q.   Do you see all the pages for Exhibit 298?

18   A.   Yes.

19   Q.   So Doctor, what are we looking at here in Exhibit 298,

20   just generally?

21   A.   Yeah.  This is a fairly typical paper that you'd receive

22   from a care agency asking you to sign so that they can get paid

23   for their services.

24   Q.   Okay.  And do you see on the first page of this there's

25   some handwriting across the middle of the page?

```
 1   A.    Yes.

 2   Q.    Do you recognize that handwriting?

 3   A.    That is my handwriting.

 4   Q.    And during your time at Greater Lawrence Family Health,

 5   were records like this made and kept in the ordinary course of

 6   the practice?

 7   A.    Oh, yeah, mm-hmm.

 8             MR. BRADY:  Your Honor, I offer Exhibit 298.

 9             MR. VIEN:  No objection, Your Honor.

10             THE COURT:  It's admitted.

11             (Exhibit 298 admitted into evidence.)

12   Q.    Okay.  Doctor, let's walk through these now that we can

13   all see them.  So this first page, Dr. Shoemaker, what is this

14   document we're looking at?

15   A.    So this is just the front page of what you would see.

16   And, you know, if all was well, you would just sort of sign at

17   the bottom.  But you can see I wrote "Discussed with patient,"

18   you know, I wrote basically that I had spoken with the patient

19   about this request for services and that they weren't

20   requesting services.

21   Q.    Again, that's your handwriting?

22   A.    Yes.

23   Q.    Who was the patient here?

24   A.    Emelio Betancourt.

25   Q.    This is a physician order; is that right?
```

1    A.    Well, it would have been if I had approved it.

2    Q.    Got it.  So we're clear on how it works, you would get a

3    proposed order; is that right?

4    A.    Mm-hmm, yes.

5    Q.    And until you sign it, it's not an order; is that right?

6    A.    Correct.

7    Q.    Was there a date on this proposed order?

8    A.    It looks like 11-20-2014.

9    Q.    So back in November 2014?

10   A.    Mm-hmm.

11   Q.    And in the middle, somewhere in the middle of this do you

12   see it looks like a stamp that says "faxed"?

13   A.    Yes.

14   Q.    What's that?

15   A.    That was just our process, you know, to try to track

16   documents.  Once something had been submitted our health

17   administration people would stamp it just so we could keep

18   track of when we had corresponded, if we had corresponded,

19   things of that nature.

20   Q.    Okay.  So Doctor, am I right, the practice was you'd write

21   whatever you were going to write on it right on the document,

22   correct?

23   A.    Yeah.

24   Q.    Okay.  And then it would be faxed back to the agency that

25   sent it?

1    A.    Correct.

2    Q.    And in this case, which agency was that?

3    A.    This one was going to Arbor.

4    Q.    Okay.  Now, let me actually, do you see up at the top it

5    says Prestige Health Services?  Do you see that?

6    A.    Mm-hmm.  So they're a subsidiary perhaps.

7    Q.    Okay.  This patient, Emelio Betancourt, was he one of your

8    patients?

9    A.    Mm-hmm, yes.

10          MR. BRADY:  Let's go, can we go to the next page,

11    please.

12    Q.    That's a cover page for this fax.  Do you see that?

13    A.    Yeah.

14    Q.    Okay.  And you mentioned before that you received an

15    abundance of documents from Arbor.

16    A.    Mm-hmm.

17    Q.    Could you describe what you meant by that?

18    A.    It just felt that sometimes if you had already signed or

19    if you had kind of -- regardless of how you had signed it, more

20    would come.  I don't really know why, but we received a lot,

21    the fax machine would just be regularly cranking out -- it

22    wouldn't be uncommon, for example, to go through a work list,

23    which is like in our mailboxes they just put these papers, to

24    have three to five duplicates of the same set of papers.

25    Q.    And what typically would happen, Doctor, if you didn't

1    respond to those faxes right away?

2    A.    You'd get five more tomorrow.

3         MR. BRADY:   Can we go to page 4 of this, please.   I

4    realize this is a little grainy, but if we could blow up the

5    top half of this.

6    Q.    Can you make that out, Dr. Shoemaker?

7    A.    Yes, pretty good.

8    Q.    So what is this page?

9    A.    So this is more of the actual nitty-gritty of the Plan of

10   Care stating patient's diagnosis, and it's got my information

11   and license number and stuff on it.

12   Q.    Okay.  Who was the patient for this Plan of Care?

13   A.    The same.

14   Q.    The same?

15   A.    Emelio Betancourt.

16   Q.    And then can you tell which home health agency provided

17   this Plan of Care?

18   A.    That one says Arbor.

19   Q.    Okay.  And then there's also, before we zoom out, do you

20   see it also has a fax stamp on there?

21   A.    Yes, down at the bottom.

22   Q.    And what was the date on that stamp?

23   A.    12-4-14.

24   Q.    What did it mean that it had that 12-4-14 stamp on it?

25   A.    That we had sent the correspondence to the requesting

1  agency.

2  Q.   Okay.

3       MR. BRADY:  Can we zoom out from that, please.  Can we

4  blow up the bottom half of this, please.

5  Q.   Can you see the bottom half of this page on your screen,

6  Doctor?

7  A.   Yes.

8  Q.   And can you tell, can you tell what the period of time for

9  this Plan of Care was going to be, what the dates were?

10  A.   I think that says 10-1 to 11-26.

11  Q.   Okay.  And then there's a space at the bottom for the

12  physician's signature.  Do you see that?

13  A.   Yes.

14  Q.   And then there's some handwriting there.  Do you see that?

15  A.   Yeah, that's my handwriting.

16  Q.   That's your handwriting?

17  A.   Yes, sir.

18  Q.   What did you write in here?

19  A.   I wrote, "See attached," and "Does not meet criteria," and

20  dated it 12-4.

21  Q.   Why did you write that?

22  A.   Sometimes, I always was a bit worried that if I signed

23  something that was going where I was actually denying services

24  or asking for a modification of services, it was very common

25  for the signature to hold and any additional adjustments I

1    tried to make to the plan to sort of be not noted, and things

2    would continue.  So I adopted a policy where I would, if it was

3    going to be a denial or a change of plan, I would, as you kind

4    of see, write in all caps "see attached" and create a separate

5    document so that my signature would be attached to my actual

6    thoughts and not to, you know, 18 papers where one might not

7    be -- you know, one might be missed.

8    Q.    Okay.

9          MR. BRADY:  Can we go to page 5, please, the next

10   page.  Maybe we can blow up the top half to make it easier to

11   see.

12   Q.    Doctor, what's this page?

13   A.    This just looks like a list of their medications, again

14   more Plan of Care.

15   Q.    Let me ask you this, Doctor.  Along the top it says,

16   "Addendum to Home Health Plan of Care."

17   A.    Mm-hmm.

18   Q.    Did the Plans of Care that you got from the fax machine,

19   did they often have multiple pages?

20   A.    Yes.

21   Q.    And were those pages after the first page, were those

22   addendums or addenda to the Plan of Care?

23   A.    In this case it seems like it was.  They were often just a

24   lot of what seemed to be kind of computer-generated.  "The

25   nurse will remind patient to report any chest pain," you know,

1    just a lot of different things, and those would sometimes be

2    added as an addendum.  Sometimes they were legitimate.  In this

3    case I don't specifically recall, but it was not uncommon.

4    Q.    So sometimes that information in the addenda would be

5    legitimate to you?

6    A.    Yeah.  For example, let's say someone was admitted to the

7    hospital and had been receiving care, and they now have a

8    wound.  There could be an addendum to the Plan of Care saying

9    patient now needs wound care twice a day, and I would say,

10   sure, that's medically necessary for two to six weeks, and I

11   would sign that, and that would be appropriate.  I don't see

12   anything on this page that tells me what their specific

13   addendum was.

14          MR. BRADY:  We can zoom out.

15   Q.    Doctor, were there some times when you'd see the addendum

16   and think they were not legitimate?

17   A.    Oh, yes, often.

18   Q.    So why do you say that?

19   A.    I mean, sometimes it would just be adding on services that

20   didn't seem to me medically necessary or stating that a patient

21   was homebound when in fact to my knowledge they weren't, which

22   is why you can see on the first page I always called patients

23   in to discuss before I made any changes because I -- just like

24   medicines, you never want to pull the rug out from someone if

25   they really need a certain service or care.  But before signing

1    them I would always want to discuss with the patients if

2    anything seemed like different than what had been related to me

3    in our last visit.

4         MR. BRADY:  Can we please go to the next page of this

5    exhibit.

6    Q.   Doctor, can you see the letter on the screen in front of

7    you?

8    A.   Yes.

9    Q.   Can you explain to us, please, what this letter is?

10   A.   This is a letter I sent, I actually drafted this letter

11   because it was actually quite common for patients to get

12   requests like this where I didn't feel the patient qualified

13   and I would send a denial, and they'd send it back, like the

14   back and forth of the paper we talked about, or I tried to deny

15   it and it would in fact get approved.

16       So what I did is I learned the requirements and tried to

17   create a letter that really laid out a very clear rejection of

18   the services, my reasoning why, the time period, just to make

19   it exceedingly clear.

20   Q.   Okay.  Doctor, this particular letter relates to patient

21   Emelio Betancourt; is that right?

22   A.   Yeah.

23   Q.   But this was based off of kind of a template form you

24   created?

25   A.   Oh, yeah.  Like, our clinic team as a group created this

1    and other similar documents because it was just so common to

2    have to be quite clear about these types of rejections.

3    Q.    So let's take a moment and just walk through this briefly,

4    okay?

5    A.    Yeah.

6    Q.    What was the date on this letter?

7    A.    December 4, 2014.

8    Q.    Okay.  And then starting with point one, can you walk the

9    jury through what you wrote in this letter, please.

10   A.    Yeah.  So point one is just basically saying this letter

11   accompanies those pages that I received and specifies the

12   certification period so that there would be no question as to

13   which certification I was commenting on.

14   Q.    Okay.

15   A.    Point two talks about, you know, from an insurance

16   standpoint there are certain criteria one must meet to qualify

17   for home care services, and so I laid them out.  And then that

18   last sentence, you know, after having a visit with the patient

19   to discuss, to my knowledge the patient does not meet these

20   criteria and his diagnosis does not support the non-skilled

21   care need.

22   Q.    And Doctor, what was point three in your letter?

23   A.    I'm also not aware of multiple impairments of activities

24   of daily living.  So the idea of activities of daily living are

25   things like toileting, getting dressed, bathing, feeding

1   yourself.  And so you could understand if someone had

2   impairments to those things they might qualify for non-skilled

3   services such as someone to come in and help you, not a nurse

4   necessarily but a home aide.  Anyway, I wasn't aware that my

5   patient had any of those.

6   Q.   And Doctor, what was point four?

7   A.   Point four, I did not believe that the orders listed in

8   section 21 were medically appropriate for the patient.

9   Q.   And finally, point five, could you explain that to the

10  jury, please?

11  A.   Yeah.  So there are several situations in which a previous

12  care plan might have been signed and then you would later, for

13  example, after a discussion with the patient, realize that this

14  in fact isn't medically necessary.  And so it was very common

15  if you were rejected services that you would then get, oh, they

16  were previously approved, this was just a continuation of

17  services, you'd get a lot of continued correspondence.  So I

18  just tried to make it very clear, I'm aware that previously

19  this was signed, and that doesn't change my medical

20  recommendations right now.  If that makes sense.

21       MR. BRADY:  Okay.  Your Honor, I have nothing further

22  for this witness at this time.

23       THE COURT:  Cross?

24       MR. VIEN:  Thank you, Your Honor.

25  CROSS-EXAMINATION BY MR. VIEN:

```
 1   Q.   Good morning, Doctor.

 2   A.   Good morning.

 3   Q.   My name is George Vien.  I'm with Michelle Pascucci who is

 4   seated at the table.

 5   A.   Hi.

 6   Q.   We represent the defendant, Faith Newton.  Do you

 7   understand that?

 8   A.   Yes, hi.

 9   Q.   Thank you.

10        Do you remember how many times you spoke to government

11   representatives in preparing for this case?

12   A.   I spoke with them once in preparing, and I received a

13   subpoena from someone once.

14   Q.   Okay.  Does that include telephone conferences?

15   A.   Correct.  I guess the only time I met with them was over a

16   Webex.  I live like two and a half hours from here.

17   Q.   So you only had one conversation with them?

18   A.   Correct.

19   Q.   Okay.  And you indicated on your direct testimony that you

20   dealt with Arbor?

21   A.   Mm-hmm.

22   Q.   And could you name some of the other health care companies

23   you dealt with?

24   A.   There were many.  There was Maestro.  I think one was

25   called Better Care, Helping Hands.  There were a number of
```

1    them.  It's been ten years, so I can't rattle them all off.  I

2    apologize.  But there was an abundance of health care.

3    Q.    Do you remember whether or not you dealt with Avenue?

4    A.    It rings a bell, but I have to be honest, I don't

5    specifically remember.

6    Q.    Is it fair to say similar things that you just talked

7    about happened with all the health care home health aide

8    companies?

9    A.    Not unilaterally, but yeah, with others for sure.

10   Q.    I don't understand "unilaterally."

11   A.    I mean, I can't say that every single home care company I

12   interacted with had such a similar pattern, but it was not

13   uncommon in the industry at that time.

14   Q.    Okay.  I understand.  Thank you.

15        MR. VIEN:  Now, if Ms. Apfel could bring up the

16   exhibit on the first page.

17   Q.    Now, you were asked on direct, Mr. Brady asked you, and

18   you received these and then faxed them back to the agency that

19   sent.  Do you remember being asked that question?

20   A.    Yeah.

21   Q.    And you said yes, correct?

22   A.    The office did, yeah.

23   Q.    I mean you didn't do it; somebody else did it, but the

24   office did it?

25   A.    Yeah.

1    Q.   But on this document, if you look in the upper left-hand

2    corner, it says "Prestige Health Care Services Inc."  Is that

3    correct?

4    A.   Yes, it is.

5    Q.   And that's not Arbor, correct?

6    A.   That's true.

7    Q.   And is it fair to say you speculated that Prestige might

8    be a subsidiary of Arbor?

9    A.   That's fair.  I am not 100 percent certain of that.

10   Q.   Is it fair to say that that was speculation?

11   A.   Sure.

12   Q.   And that you really have no idea whether or not Prestige

13   is a subsidiary of Arbor?

14   A.   Yes.

15   Q.   Okay.  And if I told you that those two companies are

16   entirely separate, you don't have any basis to disagree with

17   me, do you?

18   A.   Not today.  Like I said, it's been almost ten years.

19   Q.   Okay.  And on page 1, if you look at the bottom, the date,

20   what's the date on there?

21   A.   At the bottom, you said the bottom?  It says 11-20-2014.

22   Q.   11-20-2014.

23        MR. VIEN:  And if Ms. Apfel could go to page 4 of the

24   document and try to blow up the bottom of it.

25   Q.   Now, down at the bottom, do you see the sentence that

1    says, "I anticipate" something, "care will be required."  Then
2    it says "from"?
3    A.    Yes.
4    Q.    Can you make that out?
5    A.    Yeah.
6    Q.    What does it say, from what date?
7    A.    I believe it says 11-1 -- 10-1.  I apologize.  It's a
8    little granular.
9    Q.    10-1-2014 to what date?
10   A.    11-26-2014.
11   Q.    Okay.  And that's the -- 11-20 is the date on page 1,
12   right?
13   A.    Yes.
14   Q.    Okay.  So is this consistent with a patient having gone to
15   Arbor and then switch providers back to Prestige?
16   A.    I'm afraid I don't understand the question.  I apologize.
17   Q.    Is this document, given the time periods that you sent it
18   back to Prestige, isn't this consistent with this patient
19   seeking home health care services from Prestige?
20   A.    Instead of --
21         MR. BRADY:  Objection, Your Honor.
22         THE COURT:  Hold on.  Basis?
23         MR. BRADY:  Foundation, lack of foundation.
24         THE COURT:  Overruled.  If she knows.
25   A.    I don't know, honestly.

```
 1   Q.   Okay.  And but as you --
 2   A.   It's possible someone would have requested to transfer
 3   agencies.  That did happen from time to time also, yeah, but I
 4   don't recall.
 5   Q.   You don't recall whether the person was actually seeking
 6   care at Arbor or Prestige, correct?
 7   A.   I see both names on this document.
 8   Q.   But then on direct, Mr. Brady asked you, you faxed it back
 9   to the agency that sent it or your office did, correct?
10   A.   We did.  It doesn't say to which.
11   Q.   But it's --
12   A.   Or to both.
13   Q.   It says in the upper left-hand corner of page 1, it says
14   Prestige, not Arbor, right?
15   A.   But then on a different page it says Arbor.
16        MR. BRADY:  Objection.
17   A.   I didn't work --
18        THE COURT:  Hold on, hold on for just a minute.
19   Basis?
20        MR. BRADY:  Basis, Your Honor, is this particular
21   document does say Arbor on it.
22        MR. VIEN:  This particular document says Prestige on
23   it.
24        THE COURT:  Gentlemen, the objection is overruled.
25   The document will speak for itself, and you can make whatever
```

1    argument you want, and you have redirect.  Go ahead.

2    Q.   So as you sit here today, you don't remember whether

3    Mr. Betancourt was seeking services from Arbor or from

4    Prestige; is that correct?

5    A.   Yeah, I see both names there, so I agree.

6    Q.   You just don't know?

7    A.   It's been a long time.

8    Q.   I know.  I understand.

9         Now, do you remember whether or not Mr. Betancourt was in

10   a wheelchair?

11   A.   Am I allowed --

12   Q.   It's a long time ago.

13   A.   From a HIPAA standpoint, I worry about, like, I don't know

14   if I'm allowed to speak about the patient's general health or

15   if that's not general health.

16        MR. VIEN:  We've already spoken about patients, Your

17   Honor.

18        THE COURT:  Let me see you at sidebar about that for a

19   second.

20   **SIDEBAR:**

21        THE COURT:  Fair point she's raised.  Do you have

22   patients sign off on their records are being discussed?

23        MR. BRADY:  I don't have individual patients sign off.

24   We got these records from the medical practice, from the

25   Greater Lawrence Medical practice.

1          THE COURT:  Well, disclosing to the government is

2     different than agreeing to -- responding to a subpoena is

3     different under HIPAA in open court.  So I feel like being in a

4     wheelchair is a directly observable act, so I'll let you have

5     that one.  Where are you going after that?

6          MR. VIEN:  Going after what treatment she gave him and

7     whether he was really on all those drugs, if she remembers.

8     Look, you can't -- I don't think it's fair to put on a witness,

9     ask them about an interaction with a patient, and then not

10    allow the defense to ask.

11         Don't touch me.  I get nervous when people touch me.

12    I don't like it.  I do not like it.  I got a thing with people

13    touching me.

14         MR. BRADY:  I apologize.  I just don't --

15         THE COURT:  Don't touch him.

16         MR. BRADY:  It's a little loud.

17         MR. VIEN:  I am an attractive man.  I will say that,

18    okay.  I understand my attractiveness.

19         THE COURT:  We'll make a record of the fact that

20    beauty is in eye of the beholder.

21         MR. VIEN:  And apparently it's in Mr. Brady's eye.

22         THE COURT:  I will agree that Mr. Brady --

23         MR. VIEN:  Is attracted to me?

24         THE COURT:  No, that he touched you.  I will instruct

25    him not to touch you again.  I think we're all on common ground

 1    here.

 2            MR. VIEN:  Okay.  It happens a lot.

 3            THE COURT:  Do you want additional findings,

 4    Mr. Brady?

 5            MR. BRADY:  Lord, no.

 6            THE COURT:  Do you want me to make a finding that

 7    you're not attracted to him?  I can't do that.  No personal

 8    knowledge.

 9            MR. BRADY:  I'm going to stay as far away as I can,

10    Your Honor.

11            THE COURT:  I'm going to take it question by question.

12    I'm going to let you have the wheelchair question because

13    it's --

14            MR. VIEN:  Observable, you said.

15            THE COURT:  -- observable.  I was going to let you

16    have the next question because it's on a document that's

17    already been admitted, but then we're going to slow it down

18    other than that.  Okay?  Take it question by question.

19            MR. VIEN:  You'll tell her, so I don't have to, that

20    she can answer?

21            THE COURT:  Yes.

22    (End of sidebar.)

23            THE COURT:  She's quite right to raise the question

24    about patient privacy.  We've now discussed it at sidebar.

25    This is what I'm going to do.  We're going to take it question

1    by question.

2          The question he just asked you I think was is was he

3    in a wheelchair.  I'm going to let you answer that because I

4    think it's directly observable.

5          THE WITNESS:  Sure.

6          THE COURT:  I'm also going to allow you to answer

7    questions where the information is already on the document

8    we've admitted.  Beyond that, we'll take it question by

9    question as need be.  Go ahead, Mr. Vien.

10   BY MR. VIEN:

11   Q.   Doctor, do you remember if Mr. Betancourt was in a

12   wheelchair?

13   A.   I don't recall ever seeing him in a wheelchair.

14   Q.   So you're not saying no, you don't remember seeing him --

15   A.   I would not have -- no, he was not in a wheelchair.

16   Q.   You remember now that he was not in a wheelchair?

17   A.   Yeah.  I mean, I knew this patient well.  I saw him often.

18   Like I said, it's been ten years, so I don't know -- I'm

19   fairly, fairly confident he was never in a wheelchair.  I don't

20   know if he ever had an injury or something that put him in it

21   for three weeks and I didn't know about it, but he was not in a

22   wheelchair that I was aware of.

23   Q.   Not on a regular basis?

24   A.   Correct.  That's not something that I recall that came up

25   in our visits.

1    Q.    Okay.

2    A.    And he walked in on his own accord to the visits.

3    Q.    Your answer says maybe he was in a wheelchair; you don't

4    remember on a certain occasion and that's because people's

5    health can get better and worse, correct?

6    A.    Yeah.

7    Q.    And Mr. Betancourt, do you remember that you had him on a

8    large number of prescription drugs?

9    A.    You can see on the list there were several.  I also

10   remember -- well, so yes.

11        MR. VIEN:  Could we look at page 4 in the middle.

12   A.    The other thing I remember about him, I was very proud of

13   this patient because he got off a lot of them while I was

14   taking care of him.  Because he was really working hard on his

15   health.  I think that's general enough to say.

16        MR. VIEN:  Could you blow up the middle under

17   "Prescribed Medications."

18   Q.    What are the prescription medications on page 4?

19   A.    So these two, one of them is Flomax, and the other is

20   Percocet.

21   Q.    I know I should know, but what's Flomax?

22   A.    Flomax is for like prostate stuff generally, like benign

23   prostatic hypertrophy.

24   Q.    What is Percocet?

25   A.    Percocet is a pain medication.

1  Q.    And is there an active ingredient in Percocet?

2  A.    It's like oxycodone mixed with Tylenol.

3         MR. VIEN:  Can we go to the next page, Ms. Apfel,

4  please.  Could you blow up those prescribed medications.

5  Q.    And I won't belabor this, but you had him on all these

6  other medications as well; is that right?

7  A.    Either myself or somebody else involved in his care.  I

8  recall, though, that he was no longer taking many of these by

9  the time -- by this time.

10  Q.   So ten years ago you can remember that in December of 2014

11  that he wasn't taking all of the medications that are on the

12  document?

13  A.   Yeah.  I just, he lost like almost 100 pounds and cured

14  himself of several ailments in the process and so had really

15  become quite healthy.

16  Q.   What was the Percocet for?

17  A.   Percocet is a pain medication.

18  Q.   Why did Mr. Betancourt -- why was he on it?

19         THE COURT:  That, I'm going to hold her up on that.

20  Q.   Okay.  You know, you said on direct and in your interviews

21  about, it looks like some things were click, click, click.

22  Could you explain that, what you were talking about.

23  A.   Yeah.  I mean this happens in a lot of sectors of health

24  care where in the interest of computerization and making things

25  a little bit easier for to staff to fill out, you can click

1    through and say I want to import these things into the

2    document.  And so a lot of the care plan just became kind of

3    clunky.  This exists of health care everywhere.  You'll look at

4    a medical note and there's a lot of imported stuff from click

5    boxes.  So sometimes it was hard to see the forest from the

6    trees in those care plans.  That's all I meant from that.

7    Q.    When you say from click boxes, is it also called

8    autopopulate?

9    A.    It can be autopopulate.  It also can be user-specific

10   where they go through and choose from a menu what they want to

11   pull into their care plan.

12   Q.    Okay.  And if you click a box, then a narrative shows up?

13   A.    Sometimes.  I don't know specifically how their health

14   records worked, but we have similar things in ours.

15   Q.    What electronic medical records do you use when you're

16   practicing now?

17   A.    Epic.

18   Q.    Epic.  When you put click on a box on that, it will

19   autopopulate, correct?

20   A.    If you program it to do so, yes.

21   Q.    So sometimes when you're doing an electronic medical

22   record, whether it's a physician like you or someone else and

23   the program is programmed the right way, if you check a box, a

24   narrative pops up, right?

25   A.    Yes.  And you have to be quite careful.  We joke with our

```
 1  residents, tell them to watch out for slop-and-paste because it
 2  can be problematic.
 3  Q.   It's such a prevalent issue you do what with the
 4  residents?
 5  A.   We talk to the residents very specifically about being
 6  careful when you're clicking boxes like that because it can
 7  create quite a bit of prose that isn't exactly true.
 8  Q.   Exactly.  Now, can we talk about the letter that is on
 9  page 6?
10  A.   Mm-hmm.
11  Q.   Now, this was a template that the practice you were
12  working on created; is that right?
13  A.   I created it along with a few other people on my small
14  team to just address the issue of the home care.
15  Q.   And we're talking about the template, right, not this?
16  A.   Yeah, like the template.  Some parts of that were what you
17  were just talking about, where I could type in "doc home health
18  response," and a template would pull in and then I could fill
19  it in.
20  Q.   Then you had different templates for different occasions;
21  is that right?
22  A.   Yeah, yeah.
23  Q.   Okay.  And who created the templates again?
24  A.   I can't recall if I specifically created this one or if it
25  was my office mate, but there was a small group of us who kind
```

1    of were on a team to try to address the issue.

2    Q.    Do you remember telling Mr. Brady that your medical

3    practice got together and developed a template response?

4    A.    Yeah, as part of that.  That's what I'm alluding to.

5    Q.    Who else helped you create this response?

6    A.    There were other doctors that I worked with.  I can't

7    specifically remember who was on the team.  I could tell you

8    who was at the practice.

9    Q.    Who was at the practice?

10   A.    So Jean Tabit, Kelly Carrigan.

11            COURT REPORTER:  I'm sorry.

12   A.    Jean Tabit, T-a-b-i-t.  She was our medical director.

13   Kelly Carrigan was a nurse practitioner I shared an office

14   with.  Jeff Geller was a physician there.  Again, I don't

15   remember who specifically was at what team meeting.  It's been

16   a while.  But there was a small group of us.

17   Q.    So others at your practice helped create a variety of

18   templates, and then you would use the appropriate one depending

19   on what letter you wanted to write, correct?

20   A.    Yeah.

21   Q.    Okay.  And on your letter with Mr. Betancourt, you said

22   that you were aware you "previously signed similar documents

23   for this patient and that has been my error, which I cannot

24   repeat."

25   A.    Mm-hmm.

1  Q.   Do you remember writing that?  It's on the letter and you

2  signed the letter, right?

3  A.   Yeah, I clearly wrote it, yeah.

4  Q.   So did you sign other Plans of Care for Mr. Betancourt?

5  A.   It's possible that I had signed one while awaiting to see

6  the patient because I, on principle -- not everyone felt this

7  way, but I refused to deny something until I had a chance to

8  speak to the patient directly, just to make sure I wasn't

9  missing something.

10  Q.   So what's your best memory; did you sign one?

11  A.   I must have or I wouldn't have written that.  I don't

12  remember.

13  Q.   You don't remember if you did or not?

14  A.   No.

15  Q.   Okay.

16  A.   If I had added that, though, it says that, "I am aware I

17  previously signed similar documents."  And so either the amount

18  of stacks that came through, one got signed where I wrote

19  "denied" and signed it and it didn't get accepted or I signed

20  it as a courtesy while awaiting the visit.  But it's hard for

21  me to say exactly.

22  Q.   You can't remember, right?  But the only time you would

23  have signed -- would it have been in error that you signed one

24  of these before?

25  A.   Yeah.  I mean, it's not impossible that it could have come

```
 1    across my desk and I could have been in -- that was part of why
 2    we received so much paper -- I take that back.  We received so
 3    much paper that sometimes, if you were busily trying to do your
 4    work, it would be possible to sign something without reading
 5    every detail of every 18 pages and sometimes things slipped
 6    through.  And there were those who thought that was kind of the
 7    hope of the agencies.  I obviously can't speak to whether that
 8    was, but it's possible that I inadvertently signed something
 9    that contained an addendum that was not what I meant to sign.
10    Q.   I know it's possible.  But at the time you signed this
11    letter, did you know that you had signed a prior Plan of Care
12    in error?
13    A.   Like I said --
14              MR. BRADY:  Objection.
15              THE COURT:  Hold on a second.  Basis?
16              MR. BRADY:  Asked and answered.
17              THE COURT:  Overruled.
18    Q.   So let me ask again.  At the time you signed this letter,
19    did you know that you had previously signed a Plan of Care in
20    error?
21    A.   I said that I did and that was -- I wouldn't have put that
22    if I hadn't done that.
23    Q.   You would have checked every time; that was your practice?
24    A.   I wouldn't have generated such a specific letter and added
25    that.  That point is sort of odd to me.  That wasn't part of
```

1    like a standard.

2    Q.   But wasn't that part of the template?

3    A.   No.  My sense is I added that.

4    Q.   Your sense.  You don't really remember either way on it,

5    right?

6    A.   I'm pretty sure that that would be an odd comment to be on

7    the form.  I'm fairly confident that that was probably

8    something I added.  To the first parts, the certification

9    period and the requirements, that "I am not aware of multiple

10   impairments," that sounds very standard to me.  But I

11   apologize, I can't be more specific.

12   Q.   You just can't remember what you did at that point; is

13   that correct?  Whether you had inadvertently signed a Plan of

14   Care for this patient or not?

15   A.   If I write wrote that, I must have.  But it's been ten

16   years and so I don't know.  I can't say with certainty.

17   Q.   Okay.

18            MR. VIEN:  Thank you.  I have nothing further, Your

19   Honor.

20            THE COURT:  Redirect?

21            MR. BRADY:  No, Your Honor.  Nothing further for this

22   witness.

23            THE COURT:  You're excused.

24            THE WITNESS:  Thank you.

25            MR. BRADY:  Your Honor, the United States calls Paula

```
 1  Keefe Tyrrell.
 2          With the court's permission, I'm just going to
 3  approach to hand up a binder.
 4          PAULA KEEFE TYRRELL, Sworn
 5          COURTROOM CLERK:  Can you please state your name and
 6  spell your last name for the record.
 7          THE WITNESS:  Paula C. Keefe Tyrrell.
 8          COURTROOM CLERK:  Sorry, can you spell your last name.
 9          THE WITNESS:  Oh.  T-y-r-r-e-l-l.
10          COURTROOM CLERK:  Thank you.
11  DIRECT EXAMINATION BY MR. BRADY:
12  Q.  All right.  Good morning, Ms. Tyrrell.  And that
13  microphone in front of you, it moves forward and bends down.
14  A.  Okay.
15  Q.  Can you hear me okay?
16  A.  I can hear you okay.  Can you hear me?
17  Q.  Yeah, thank you.  Why don't you go ahead and introduce
18  yourself to the jury, please?
19  A.  Okay.  My name is Paula Keefe Tyrrell.  I'm a -- I was a
20  visiting nurse.  I'm now retired.  I've been retired about five
21  years, and I've been a nurse for about -- well, the last --
22  I've got to say about the last 21 years with what we're doing
23  today.
24  Q.  Okay.  Where to you currently live, Ms. Tyrrell?
25  A.  I live in Chelmsford, Massachusetts.
```

1  Q.   Okay.  And you said that you were a nurse before retiring?

2  A.   Yes.

3  Q.   Okay.  When you were working as a nurse, where did you

4  work?

5  A.   I worked in first a hospital and then I worked in -- well,

6  first it was a hospital, then I went into VNA, then I went into

7  certain things in VNA, then I started Harvard Vanguard and been

8  there.  And that was it.

9  Q.   Ms. Tyrrell, you mentioned VNA.

10 A.   I had a lot of VNA experience.

11 Q.   And what does VNA stand for?

12 A.   Visiting Nurse Association.

13 Q.   And visiting nurse, just generally, what does a visiting

14 nurse do?

15 A.   A visiting nurse goes out to your house.  It's

16 intermittent care.  You go out to the house, and whatever the

17 patient needs they get.  It could be nursing, it could be

18 physical therapy, could be occupational therapy, home health

19 aide.

20 Q.   Okay.  And Ms. Tyrrell, you mentioned you worked at a

21 place called Harvard Vanguard.

22 A.   Yes.

23 Q.   What is Harvard Vanguard?

24 A.   It's an actual doctor's office.

25 Q.   And what was your job at -- before I ask you that, how

1    long did you work at that doctor's office, Harvard Vanguard?

2    A.    21 years.

3    Q.    21 years.  And what was your job in those 21 years when

4    you were working at Harvard Vanguard?

5    A.    Case manager.

6    Q.    Case manager.  What did you do as a case manager?

7    A.    As a case manager we actually managed the patients,

8    usually the patients that were going home or in their home, had

9    been in a nursing home, and we sent all the services they

10   needed --

11   Q.    So let me --

12   A.    -- in their home.

13   Q.    I'm sorry to interrupt.  Let me follow up on that.

14   A.    Yeah.

15   Q.    Was one of your responsibilities as a case manager at

16   Harvard Vanguard to try and coordinate home health care for the

17   patients?

18   A.    Yes, that was -- yes.

19   Q.    Okay.  And I think you were beginning to describe this,

20   but how did it typically work when one of Harvard Vanguard's

21   patients needed home health services?

22   A.    The usual process is a patient is in the hospital, and

23   then they're discharged sometimes to a nursing home and

24   sometimes to a home.

25   Q.    Okay.

1  A.   That's basically what it is.

2  Q.   All right.  And when they're discharged, let's say, for

3  instance, a patient needed home health services --

4  A.   Yes.

5  Q.   -- how would that typically work and how would you be

6  involved?

7  A.   Well, if they go home, then they need -- depending what

8  they need, they could need a nurse.  They could need a physical

9  therapist.  They could need an occupational therapist or home

10  health aide.  And that's intermittent, and we would just send

11  the VNA.  We worked with a certain VNA, and we would just send

12  all the services they needed.

13  Q.   Okay.  And Ms. Tyrrell, did somebody at Harvard Vanguard

14  have to sign off on those services if a patient needed them?

15  A.   The doctors.

16  Q.   The doctors.  And you worked with the doctors on that?

17  A.   Yes.

18  Q.   How did you work with the doctors on that?  What was your

19  job in the process?

20  A.   Well a lot of it was, they came out of the hospital.  They

21  would have a Plan of Care, so we would take that, and what they

22  needed.  A lot of people just needed services, whether it be

23  PT, OT, nursing, or home health aide.

24  Q.   Okay.

25          MR. BRADY:  Could we please pull up just for the

 1    witness Exhibit 28.  I think that TV screen comes over.

 2             THE WITNESS:  Yeah, so I can see it.

 3             MR. BRADY:  If we could scroll through.  There's a

 4    couple of pages to this.

 5    Q.   Ms. Tyrrell, do you recognize this as records from Harvard

 6    Vanguard?

 7    A.   Yes.

 8    Q.   And who was the patient for these records?

 9    A.   For this patient?  You mean this actual patient?

10    Q.   Yeah, if you look on page --

11             MR. BRADY:  Ms. Apfel, if you could go back to the

12    first page, please, and if you see where it says "client."

13    Q.   Who was the patient for these records?

14             MR. BRADY:  Can we blow that up?

15    A.   Bin Porang.

16    Q.   Were these records, Ms. Tyrrell, that were made and kept

17    in the ordinary course of business at Harvard Vanguard?

18    A.   Yes.

19    Q.   And so we go through here.  On the first page, do you see

20    there's some handwriting on there?

21    A.   Yes.

22    Q.   And on the other pages there's some additional

23    handwriting.  Do you see that?

24    A.   Yes.

25    Q.   Whose handwriting was that?

1   A.    Mine.

2   Q.    And for documents like this, did you have a practice for

3   what you would do after you wrote something on it?  Would you

4   send them someplace?

5   A.    This one was sent -- this we would -- anything that I

6   wrote on that, it would be fax page, it would be faxed back

7   over to the company, yes.

8   Q.    Okay.  Thank you.

9           MR. BRADY:  So Your Honor, I offer Exhibit 28.

10          MR. VIEN:  I have an objection based on a conversation

11  we had outside of court and I was wondering if I could come to

12  sidebar.

13          THE COURT:  Sure.

14  **SIDEBAR:**

15          MR. VIEN:  Your Honor, if she says she recognizes it

16  and she says that's her handwriting, that's probably good

17  enough.  However, I think this was subject to our conversation

18  which parts of it were supposed to be redacted.

19          THE COURT:  I don't think that I ever -- I don't think

20  we fully resolved it.  So I think that the things that are

21  typed in are business records.  And I think that these things

22  can also be business records.  The one that I wasn't sure about

23  was the characterization of the nephew's demeanor, angry.  So I

24  think, I mean, just not sure with that about that word.

25          MR. BRADY:  So Your Honor, I think it's fair game

1   because it helps to explain what she did, but to make it easier

2   here, we can redact that out, Your Honor.

3          THE COURT:  I'll let you have it not for the truth of

4   the matter asserted if you want an instruction.  But it's sort

5   of confusing to say this is a business record but the part

6   characterizing his mood can only be used to understand why she

7   did what she did next.  Is she going to say she took different

8   action because he was angry?

9          MR. BRADY:  No, she's not going to say in a specific

10  instance.  I think it's more kind of generally how she handled

11  these things, if she was inundated with these things.

12         THE COURT:  So why don't you just redact "angry."

13         MR. BRADY:  Okay.

14         MS. PASCUCCI:  I may be misremembering, and I'm sorry

15  if I am, but I thought the last Tuesday we talked about

16  redacting this one on the basis of the only way to know that

17  would have been a statement by the patient, which can't come in

18  as a business record because it's a third party to the

19  business.

20         THE COURT:  But that statement can also be a business

21  record.

22         MS. PASCUCCI:  I thought --

23         THE COURT:  I don't think we resolved it, but the

24  third party to the business, that can also be a business

25  record.

1          MS. PASCUCCI:  I thought it would be only independent

2     hearsay --

3          THE COURT:  That's what I'm saying.  I think that the

4     business record covers both, right?

5          MS. PASCUCCI:  I'm not sure about that, Your Honor.

6          THE COURT:  I'm not sure why not.

7          MS. PASCUCCI:  Because at least as I understand the

8     business records, it has to be statements by those that are

9     within the business.  The patient is not within the business.

10    We don't think the patient's statements of a third party to

11    the --

12         THE COURT:  Show me one.

13         MS. PASCUCCI:  So this says they're now sending

14    patients and family members.  So the only basis for that

15    statement would be what the patient told.

16         THE COURT:  No.  I think what they're doing with it is

17    a business record.  I'm going to let that in under the business

18    record exception.  All right.  But you'll redact --

19         MR. BRADY:  We'll redact the word "angry."

20         THE COURT:  You can redact the word "angry," and you

21    can redact the "and" if you want or you can leave it.

22         MR. BRADY:  Your Honor, I'll try to make it simple.

23    Everything after the date there, we'll just redact that out.

24    Is that fair?

25         THE COURT:  Okay.

1          MR. BRADY:  We may need just a moment to do that, but

2     Ms. Apfel can do that on the fly.  I think, Your Honor, as you

3     can see in the book, I intend for this witness to offer the

4     other Harvard Vanguard documents I think based on the argument

5     we had and court's ruling on those documents.  I'm not sure

6     that there are other items we need to discuss at this point.

7          THE COURT:  I don't remember seeing any others, but

8     raise your hand if there are and we'll take a look at them.

9     Okay.

10    (End of sidebar.)

11         MR. BRADY:  Your Honor, I think I may have left a

12    binder up there.  Can I approach to grab it?

13         THE COURT:  And we'll just give her a second to redact

14    the word.

15         MR. BRADY:  Your Honor, I can make some use of the

16    time if I can proceed.

17         THE COURT:  That's fine.  Go ahead.

18    BY MR. BRADY:

19    Q.   Ms. Tyrrell.

20    A.   Yes.

21    Q.   You mentioned that the medical practice where you worked

22    was called Harvard Vanguard?

23    A.   Medical Associates.

24    Q.   Harvard Vanguard Medical Associates.  Did it also go by

25    the name Atrius?

1  A.    They did.  Now it's Atrius.

2  Q.    So now if we see "Atrius" on a piece of paper, that would

3  be the same practice?

4  A.    Yes.

5           MR. BRADY:  All right.  Thank you very much,

6  Ms. Apfel.  So we have on the screen Exhibit 28.  To the extent

7  I have to, Your Honor, I'd offer Exhibit 28.

8           MR. VIEN:  No objection, Your Honor.

9           THE COURT:  It's admitted.

10          (Exhibit 28 admitted into evidence.)

11  Q.    And Ms. Tyrrell, now that the jury can see it, too, am I

12  right that this exhibit is a collection of Harvard Vanguard

13  records relating to patient Bin Porang?

14  A.    Yes.

15  Q.    Let's take a walk through these.  What are we looking at

16  on the first page here?

17  A.    That's just a fax sheet.

18  Q.    The fax sheet, okay.  Now, what company did this come

19  from?

20  A.    Arbor Care.

21  Q.    What was the date on this?

22  A.    4-1-2016.

23  Q.    Okay.  And do you see the name of the person who signed

24  this from Arbor?

25  A.    Yeah.

1    Q.    Joseph Muiruri, is that right?

2    A.    Yes, Muiruri.

3    Q.    And do you see it says the client name.  Do you see that?

4    A.    Yes.

5    Q.    And who is the client?

6    A.    Bin Porang.

7    Q.    And that was a patient of Harvard Vanguard?

8    A.    Yes.

9    Q.    Okay.  Now, the letter is addressed to the M.D.; is that

10   right?

11   A.    Yes.

12   Q.    And what did this letter say?

13   A.    This letter?  This was from Joseph.

14   Q.    It was from Joseph.  What did Joseph write to Harvard

15   Vanguard?

16   A.    Oh, I want -- do yo want the whole -- to the M.D., "I

17   hereby wish to request you to review this Plan of Care for the

18   above mentioned client.  Just know that we have received all

19   your client's Plans of Care back in our office unsigned and

20   denied.  Arbor Homecare provides care to clients with medically

21   necessary and company will be appreciate if you can urge your

22   staff" -- "your office staffs to allow you to return these

23   documents before faxing it back to us.  Your office staff,

24   mostly nurses, cannot sign or decide a case about a document

25   that is meant for the PCP.  This has become a regular routine

```
 1   to your staffs to judge and make decisions without any
 2   justification for the denials."
 3   Q.   Ms. Tyrrell, let me stop you there.  Now, this came from
 4   Arbor Homecare Services; is that right?
 5   A.   Yes.
 6   Q.   Do you remember Arbor?
 7   A.   Yes.
 8   Q.   Why do you remember Arbor?
 9   A.   Yes.  Oh, why do I remember?
10   Q.   Yeah.  Why do you remember?
11   A.   Because we had difficulty getting -- I more want to say
12   that the patients didn't really need as much services as they
13   thought they required.
14   Q.   Okay.  And it looks like, there's like a box on this,
15   looks like a Post It note.  Do you see that?
16   A.   Yeah.
17   Q.   And was that in fact like a sticky note on there?
18   A.   Yes.
19   Q.   And that's your handwriting?
20   A.   Yes.
21   Q.   What did you write on there?
22   A.   "Persistent repeat faxes."
23   Q.   Why did you write that?
24   A.   Because we were receiving the same faxes repeatedly for
25   the same patient.
```

1   Q.   And do you remember what types of documents would come

2   along with these faxes?

3   A.   Oh, you mean what they had for services?

4   Q.   Yeah, just -- well, just generally, what the document

5   faxed, do you remember the name of that type of document for

6   the services?

7   A.   Oh, yeah.

8   Q.   What was that document called?

9   A.   It was a -- I think it was a -- I'm going to say a 485.

10  Q.   485, right?

11  A.   Yeah.  Okay.

12  Q.   That's for a Plan of Care?

13  A.   That's it.

14  Q.   And do you recall that Harvard Vanguard denied Plans of

15  Care that Arbor sent over?

16  A.   Yes.

17  Q.   Why, do you know why?

18  A.   Because the patients didn't need the services.

19       MR. BRADY:  Okay.  Could we zoom out from that and go

20  to page 2.

21  Q.   Can you see what's on page 2 of this exhibit, Ms. Tyrrell?

22  A.   Yes.

23  Q.   What is this a printout of?

24  A.   You mean the second page?

25  Q.   The second page, it says, "Atrius Health Inc." at the top.

1    Do you see that?

2    A.    Yeah, yeah, 4-4-16.  Okay.  My writing, is that what you

3    want?

4    Q.    Let me ask you, before we get to your writing,

5    Ms. Tyrrell, the page that you wrote on, is that printed out

6    from a system at Harvard Vanguard?

7    A.    I'll look at it here.

8    Q.    Take your time.

9    A.    Yeah, this is a Plan of Care.  But this, it's a Plan of

10   Care.  This is not a Plan of Care.  This is -- it is 485, it's

11   a Plan of Care but it's not.  That's all it is, just a Plan of

12   Care.

13   Q.    Okay.  So I want to ask you about that, but Ms. Tyrrell,

14   if you look on the screen in front of you, do you see there's a

15   page, and it describes call documentation for Bin Porang.  Do

16   you see that?

17   A.    Yes.

18   Q.    The information there?  Okay.  And can you tell the date

19   on this underneath Bin Porang's name?

20   A.    Yes, 3-31-16.

21   Q.    Okay.  And then if you go also along the top here it says

22   "Provider"?

23   A.    Yes.

24   Q.    Who is the provider identified here?

25   A.    Dr. Meda, Mythily Meda.

```
 1   Q.   Do you know who Dr. Meda was?

 2   A.   Yes.  She's one of the PCPs at Harvard Vanguard.

 3   Q.   Somebody you worked with at Harvard Vanguard?

 4   A.   Yes.

 5   Q.   Now, if you follow along with me, Ms. Tyrrell, blow that

 6   up, there's a section that's highlighted and it says, "Call

 7   documentation."  Do you see that?

 8   A.   Yes.

 9   Q.   And was there a practice at Harvard Vanguard if a call

10   came into the office to create a document of what was said on

11   the call?

12   A.   Yes.

13   Q.   Okay.  Is this an example of one of those documents?

14   A.   Yes.

15   Q.   And what was recorded for this call?

16   A.   Do you want me to read?

17   Q.   Before I do that, do you see where it says Felicia Sneed?

18   A.   Yes.  She was the secretary.

19   Q.   She was the secretary.  So what did Felicia Sneed record

20   from this call?

21   A.   Okay.  "Porang Bin is a 69-year-old patient of Mythila

22   Meda, M.D.  Patient's nephew Bora calling.  We don't have

23   permission to speak with him.  He wants to know why patient is

24   no longer receiving VNA help from Arbor Care.  Bora says he

25   wants to hear back from Paula today.  He says his uncle has a
```

1    lot of problems.  Just had a stroke.  He's blind in one eye and

2    he was in an MVA recently."

3    Q.   Okay.  Let me ask you, what's MVA; what does that mean?

4    A.   I would say motor vehicle accident.

5    Q.   Motor vehicle accident, okay.  Then it says, after that,

6    "Sent to CM pool."

7    A.   Case management pool.

8    Q.   And that was when you worked as a case manager?

9    A.   Yes, yes.

10   Q.   Now, if we go down to the bottom part of the page, there's

11   some handwriting there.  Do you see that?

12   A.   Yes.

13   Q.   I believe you testified, Ms. Tyrrell, that was your

14   handwriting?

15   A.   Yes.

16   Q.   What did you write on the?

17   A.   "Arbor continues to call and fax.  Also now sending

18   patient and/or family members to the PCP office with papers to

19   be signed."

20   Q.   And why did you write that on here?

21   A.   Because we weren't, the PCP wasn't signing them.  He

22   didn't need them.

23   Q.   Was that something that happened a lot, what you recorded

24   here?

25   A.   Yes.

```
 1   Q.   Arbor continuing to call and fax?

 2   A.   Yes.

 3        MR. BRADY:  Okay.  Now could we go to the next page of

 4   this exhibit, please.

 5   Q.   Can you see the next page, and it might be, Ms. Tyrrell,

 6   it may be easier if we look on the screen together.

 7   A.   Oh, yeah.

 8   Q.   Can you see up on the screen the next page of additional

 9   records relating to this patient from Harvard Vanguard?

10   A.   Yes.

11   Q.   Okay.  And can we blow up the progress note where there is

12   a handwriting, "My conversation with nephew."

13   A.   Yeah.

14   Q.   Okay.  It says here, "Progress Notes."  Do you see that?

15   A.   Yes.

16   Q.   What was a progress note, what did that mean at Harvard

17   Vanguard?

18   A.   It just has an update on the patient's care.

19   Q.   Okay.  And you put that in the system, create a record of

20   that?

21   A.   Yes.

22   Q.   Okay.  And then it says, looks like it says your name next

23   to the date, March 31, 2016?

24   A.   Yes.

25   Q.   Okay.  Is that because you wrote this progress note?
```

1   A.   Yes.

2   Q.   And then there's some handwriting also with it?

3   A.   Right.

4   Q.   Your handwriting?

5   A.   Yes.

6   Q.   And what did you write along with this?

7   A.   This was my conversation with the patient's nephew.

8   Q.   Okay.  Can you walk us through, can you read what you

9   recorded in this progress note, please?

10  A.   "Case manager contacted patient's nephew Bora to discuss

11  Arbor Homecare Services.  HVMA case manager and PCP were

12  unaware patient was receiving home care services through Arbor

13  Homecare.  The patient currently is attending outpatient

14  physical therapy at the Chelmsford practice.  Explained that

15  patient cannot have home care and go out" -- "go to outpatient

16  services.  Nephew reports he is considering switching to new

17  PCP located in Chelmsford.  Nephew reports this M.D. will sign

18  orders for Arbor care.  Nephew has case management phone number

19  to call back and let Harvard Vanguard know if and when he is

20  switching.  Patient has a new appointment" -- "has appointment

21  with new PCP 4-8-16."

22        MR. BRADY:  Okay.  Can we zoom out of that, please.

23  Q.   And at the bottom, Ms. Tyrrell, am I right that you wrote

24  another note at the bottom of this?

25  A.   Yeah.

```
 1   Q.   And for the part that you can see there, could you read
 2   what you wrote at the bottom of this?
 3   A.   "Nephew came to PCP office Friday 4-1-16."
 4        MR. BRADY:  Now can we go to page 4 of this exhibit,
 5   please.
 6   Q.   Am I right that this is another copy of a fax from Arbor?
 7   A.   Yes, yes.
 8   Q.   Yes.  Okay.  Same patient, Bin Porang?
 9   A.   Yes.
10   Q.   And you also wrote a note on this one, correct?
11   A.   Yes.
12        MR. BRADY:  If we could blow that up, could I ask you
13   to read what you wrote on this one.
14   A.   Yes.  "Arbor gave this letter and 485 home care plan to
15   family to hand deliver to PCP."
16        MR. BRADY:  Zoom back out of that, please, and can we
17   go to page 6.  Maybe we can blow up the top half of this.
18   Q.   Can you see what -- can you describe for us what we're
19   looking at here on page 6 of this exhibit.  What is this
20   document?
21   A.   It's a Home Health Care Certificate and Plan of Care.
22   Q.   All right.  Plan of Care.  Is this document sometimes
23   called a Form 485?
24   A.   Yes.
25   Q.   And can you tell who was the patient for this Plan of
```

1  Care?

2  A.    Oh, it's Porang Bin.

3  Q.    Then also can you tell from this who the provider was for

4  the home care?

5  A.    Arbor Homecare Services LLC.

6  Q.    Okay.

7        MR. BRADY:  If we can zoom back out of that, please.

8  If we could zoom into box 21 in the middle of the page.

9  Q.    Can you see, Ms. Tyrrell, that there's part of this Plan

10 of Care where it includes orders for --

11 A.    Yes.

12 Q.    -- and treatments?

13 A.    Yes.

14 Q.    And just generally, like what's included in that part of

15 the Plan of Care?

16 A.    Plan of Care is, you go out and you visit the patient,

17 figure out what services they need.  Some of them have nursing,

18 some have PT, OT and home health aides.

19 Q.    So Ms. Tyrrell, in this part of the Plan of Care, would it

20 typically identify how many visits the patient was supposed to

21 get?

22 A.    Yes.

23 Q.    Okay.  So for this, if I could ask you to look at the

24 first line here, what was the frequency of visits that were

25 requested for this patient?

1    A.    Okay.  "Skilled nurse frequency, seven visits per week

2    with three PRN," which means, you know, extra.  Do you want the

3    whole sentence?

4    Q.    Yeah.

5    A.    Seven --

6    Q.    Right.  Sorry to interrupt.

7    A.    Okay.  "Seven visits per week with three PRN for acute

8    condition changes for nine weeks."

9    Q.    Then it says "HHA frequency."

10   A.    "Home health aide frequency, eight hours per day, seven

11   days a week to help with ADLs and IADLs."

12   Q.    And Ms. Tyrrell, what was your reaction to that?

13   A.    No patient gets that service.  There are just not services

14   for that.

15         MR. BRADY:  Okay.  Can we take that down, Ms. Apfel,

16   please.  And can we just for the witness pull up Exhibit 29.

17   Q.    All right.  And Ms. Tyrrell, do you recognize Exhibit 29

18   as additional Harvard Vanguard records this time for patient

19   Danielle Small?

20   A.    Yes.

21         MR. BRADY:  Your Honor, I offer Exhibit 29.

22         MR. VIEN:  Just to the handwriting, Your Honor, the

23   redaction issue that we discussed.

24         THE COURT:  This is the document we just discussed at

25   sidebar?

```
 1                MR. VIEN:  It's a similar document but it's --
 2                THE COURT:  All right.  As far as I can see, this
 3    comports with my earlier ruling.  Do you have something you
 4    want to, page you want to specifically direct my attention to?
 5                MR. VIEN:  I feel I have to continue making --
 6                THE COURT:  Same objection?
 7                MR. VIEN:  Yes.
 8                THE COURT:  Okay.  Overruled.
 9                MR. BRADY:  So Exhibit 29, I'll offer it, Your Honor.
10                THE COURT:  Admitted.
11                (Exhibit 29 admitted into evidence.)
12    Q.   Okay.  So Ms. Tyrrell, now that we can all see it, who was
13    the patient for these records?
14    A.   Danielle Small.
15    Q.   Okay.  And then do you see it also lists a physician on
16    here, Raj Gupta?
17    A.   Yes.
18    Q.   Who is Raj Gupta?
19    A.   She's another primary care physician at Harvard Vanguard.
20    Q.   Is that a doctor who you worked with?
21    A.   Yes.
22    Q.   And if we look in the upper left-hand corner of this
23    record, can you tell who the home health agency was for this?
24    A.   Yes.  Arbor Homecare Services LLC.
25    Q.   Okay.  Now, along the top it says "Physician Order" here?
```

1    A.    Right.

2    Q.    What did that mean, just generally, like what's a

3    physician order?

4    A.    Well, this is an order for medicine, "Warfarin, five

5    milligrams by mouth, Monday, Wednesday, Thursday, Sunday," and

6    then "Warfarin, six milligrams by mouth, Tuesday and Friday,

7    and next INR on 8-19-15."

8    Q.    Okay.  Then below that, Ms. Tyrrell, there's some

9    handwriting on here, do you see that?

10    A.    Yes.

11    Q.    Whose handwriting is that?

12    A.    Mine.

13    Q.    If we could blow that up, I'd ask you to please read what

14    you wrote here.

15    A.    "Not authorized, no skilled services, Warfarin is managed

16    by Harvard Vanguard Medical Associates anti-coag clinic."

17    Q.    Now, why did you write that?

18    A.    Because Arbor Care wanted to manage -- well, I guess Arbor

19    Care was managing the anti-coag.

20    Q.    What was your practice after writing a note like this?

21    What was your practice after writing a note on something like

22    this?

23    A.    After, you know, we had to discuss it with the primary

24    care physician to figure out who was managing it and who was

25    taking -- you know, managing the meds in the home.  So that was

```
 1    what they were doing.
 2              MR. BRADY:  So let's go to the second page of this
 3    exhibit, please.
 4    Q.   Am I correct, Ms. Tyrrell, these are more internal records
 5    that were created at Harvard Vanguard for this patient?
 6    A.   Yes.
 7              MR. BRADY:  Okay.  Can we blow up the top half of
 8    this, please.
 9    Q.   There's a section here for call documentation.  Do you see
10    that?
11    A.   Yes.
12    Q.   All right.  I want to ask you about first, do you see the
13    name Dawn Brown Mariano listed here?
14    A.   Yes.
15    Q.   Who was Dawn Brown Mariano?
16    A.   The medical secretary.
17    Q.   She's the medical secretary.  Now, who was Myrna Cruz?
18    A.   She's another secretary.
19    Q.   Okay.  And then last, I see the name Kathleen Russell on
20    here.  Do you see that?
21    A.   She's another medical secretary.
22    Q.   Medical secretary, okay.  It looks like the first of these
23    call documentations was on August 25, 2015 at 12:59 p.m.  Do
24    you see that?
25    A.   Yes, yes.
```

1    Q.    Okay.  Now, what was recorded here where it says, "Leyla

2    from Arbor Homecare Services"; what was recorded there?  Could

3    I ask you to read that in, please?

4    A.    Yeah.  "Leyla called again regarding fax below."

5    Q.    Okay.  Do you see the part that's highlighted here?

6    A.    Yes.

7    Q.    Could I ask you to read that.

8    A.    "Leyla from Arbor Homecare Services calling with some

9    confusion on a physician's order for medication that was faxed

10   to them from our office.  She states that it is handwritten and

11   states 'no skilled services.'  Leyla is confused about this and

12   would like a call-back.  Please clarify."  Call that number.

13   Q.    And Ms. Tyrrell, what's your memory, what typically would

14   happen after you'd send a fax back to Arbor with a note like

15   that; what typically happened?

16              MR. VIEN:  Objection.  "Typically," Your Honor.

17              THE COURT:  Overruled.

18   A.    Okay.

19   Q.    So let me try to ask that again.

20   A.    Okay.

21   Q.    So you testified before, Ms. Tyrrell --

22   A.    Yeah.

23   Q.    -- that you would get documents from Arbor and you would

24   write something on it.

25   A.    Yes.

1    Q.   And then you'd send it back to Arbor, right?

2    A.   Yes.

3    Q.   So my question, Ms. Tyrrell, is what would typically

4    happen after you would do that?  Would you get something back?

5    A.   You know, this, I know, I have to say that I'm not sure

6    what happened with this one that I'm looking at.

7         MR. BRADY:  Okay.  Let's back out of this and can we

8    go to page 3, then.

9    Q.   Okay.  Now, can you see this one on the screen,

10   Ms. Tyrrell?

11   A.   Yes.

12   Q.   Okay.  And more handwriting.  Whose handwriting is that?

13   A.   My writing.

14   Q.   Okay.  And can we highlight the date on this, please?

15   A.   9-17-15.

16   Q.   Okay.  And who -- this is a fax; is that right?

17   A.   Yes.

18   Q.   And it was a fax from Arbor?

19   A.   Yes.

20   Q.   Who is the fax to?

21   A.   Dr. Raj Gupta, M.D.

22   Q.   Now, what did you write on this?

23   A.   That the patient -- "no longer patient's PCP."

24   Q.   Okay.  Did you write more below that towards the bottom?

25   A.   Yes.

1   Q.   What did you write?

2   A.   "No skilled nursing needs identified.  No auth given per

3   PCP."

4          MR. BRADY:  Okay.  Now, can we go ahead, Ms. Apfel,

5   could we go to the next page.

6   Q.   Okay.  And am I right that this was a Plan of Care for

7   this patient, Danielle Small?

8   A.   Yes, yes.

9   Q.   Okay.

10         MR. BRADY:  If we could blow up, Ms. Apfel, towards

11  the bottom where it's box 23 and below that.  Thank you.

12  Q.   Now, Ms. Tyrrell, was there part of the Plan of Care where

13  a nurse would sign the Plan of Care?

14  A.   No.

15  Q.   Let me ask you, this box 23, do you see nurse's signature

16  and date of verbal?

17  A.   I don't know.  That has to be -- that's not a Harvard

18  Vanguard person.

19  Q.   All right.  My question was confusing.  Would that come to

20  Harvard Vanguard like that with the signature?

21  A.   Yes.

22  Q.   Okay.  And then the ask from Harvard Vanguard would be to

23  have the physician sign it?

24  A.   (Nods.)

25         MR. BRADY:  Okay.  So we can back out of that and we

1    can go to the next page, please, page 6.  And then can we go to

2    the next page.

3    Q.   Now, do you see there's another proposed physician order

4    on the screen here?

5    A.   Yes.

6    Q.   Who was the patient for this one?

7    A.   Danielle Small.

8    Q.   Okay.  And what was the date on this proposed order?

9    A.   It is 5-1-15.

10   Q.   Okay.  And there's handwriting on here?

11   A.   Yes.

12   Q.   Your handwriting?

13   A.   Yes.

14   Q.   What did you write here?

15   A.   "No back authorizations."

16   Q.   And Ms. Tyrrell, why did you write that, "no back

17   authorizes"?

18   A.   Because you didn't -- if it's not current, you don't sign

19   it.

20   Q.   And how do you know that?

21   A.   That's just a rule.

22   Q.   Where did you learn that rule?

23   A.   From my job.

24   Q.   And was this, you wrote this because you were asked or

25   Harvard Vanguard was asked to provide a back authorization?

1    A.    Yes.

2    Q.    And did that happen often with Arbor?

3    A.    Depends.

4    Q.    Okay.  Now, when you say -- let me go to page 8 of this

5    exhibit, please.  This is a little tough to see.

6    A.    Mm-hmm.

7          MR. BRADY:  Can we try to blow up the fax where the

8    "to" and "from" is so we can see that.

9    A.    I think it's Wooseung Lee.

10   Q.    That was going to be my question.  Do you know who the

11   doctor giving this was --

12   A.    Yes, that was Wooseung Lee.

13   Q.    Is that another doctor that was at Harvard Vanguard?

14   A.    Yes.

15   Q.    Is that a doctor you worked with?

16   A.    Yes.

17   Q.    Okay.  The date on this one was what?

18   A.    12-28-15.

19   Q.    So after the documents and faxes we were just looking at,

20   right?

21   A.    Right.

22   Q.    Okay.  What did you write on this one?

23   A.    "No further auth for this patient.  She's been referred to

24   another agency."

25          MR. BRADY:  Now can we back out of that, please, and

1    go to the next page.  Can we go to the page after that, please.

2    Then the page after that, the page after that, please, page

3    after that.

4    Q.    What is this?  What are we looking at here?

5    A.    This is another form from Arbor care.

6    Q.    And what's the date on this one?

7    A.    11-25-15.

8    Q.    And who was the doctor to whom this was directed?

9    A.    Dr. Raj Gupta.

10    Q.    And it says here "episode," and then there's a date range.

11    Do you see that?  It's a little small.

12    A.    10-29-2015 to 12-27-2015.

13    Q.    And Ms. Tyrrell, when we were talking about home health

14    care, what does the term "episode" mean?  Does that mean

15    anything special?

16    A.    No, not really.

17    Q.    Is that just a period of time when care is provided?

18    A.    Yeah, yeah, yeah.

19    Q.    Okay.  Now, what did you write on the bottom of this one?

20    A.    "Per PCP," primary care physician, "no skilled needs, no

21    backdated or further auth signed or given."

22          MR. BRADY:  Let's go to the next page, please.

23    Q.    This is another proposed physician's order.

24    A.    Yes.

25    Q.    And who was the patient for this one?

1    A.    Danielle Small.

2    Q.    Okay.  And what was the date on this one?

3    A.    This is -- let me get the date.  10-28-15.

4    Q.    And what did you write on this one?

5    A.    "No auth will be given now or in the future."

6           MR. BRADY:  Okay.  So we can take that down, and can

7    we pull up just for the witness Exhibit 30, please.

8    Q.    Can you see on the screen in front of you, Exhibit 30,

9    Ms. Tyrrell?

10   A.    Yes.

11   Q.    And is Exhibit 30 additional records from Harvard Vanguard

12   for a patient named Chea Hoa, H-o-a?

13   A.    Let me find it.

14   Q.    Take a moment.

15   A.    Yeah.  Chea Hoa.

16   Q.    And these are additional records from Harvard Vanguard for

17   that patient?

18   A.    Yes, sir.

19   Q.    And the handwriting here is your handwriting; is that

20   right?

21   A.    Yes.

22           MR. BRADY:  Your Honor, I offer Exhibit 30.

23           MR. VIEN:  Same objection, you overruled, so I assume

24   you'll overrule it.

25           THE COURT:  Yes.  The objection is preserved.  It's

1    overruled.

2            (Exhibit 30 admitted into evidence.)

3    Q.    Okay.  So what's this one, Ms. Tyrrell?  What are we

4    looking at here?

5    A.    This is another fax.

6    Q.    Another fax from where?

7    A.    It was from Arbor.

8    Q.    Okay.  And we were talking about this before, but can you

9    tell the name of the patient for this.

10   A.    Yes.

11   Q.    Was that Chea Hoa?

12   A.    Yes.

13   Q.    H-o-a?

14   A.    Yes.

15   Q.    What did you write on this one?

16   A.    "Attention Virginia, Dr. Meda denies auth for skilled

17   nursing and home health aide services.  No skilled."

18   Q.    And why did you write that?

19   A.    Because that was the M.D.'s request.

20   Q.    And would it have been consistent with your practice to

21   then send that back to Arbor?

22   A.    Yes.

23            MR. BRADY:  Let's go to page 4 of this exhibit,

24   please, and if we could blow up just the top part so we can see

25   the name of the patient.

1    Q.    Can you see that, Ms. Tyrrell?

2    A.    I can, yes.

3    Q.    And do you recognize this as a Plan of Care for that same

4    patient, Hoa?

5    A.    Yes.

6    Q.    All right.  And if we back out from that, is that your

7    handwriting we see on this?

8    A.    Yes.

9    Q.    And what did you write on that?

10   A.    "No auth."

11   Q.    What did that mean?

12   A.    No services.

13   Q.    Okay.

14         MR. BRADY:  Let's go to page 5 of this exhibit,

15   please.

16   Q.    And do you see that this is an addendum to a Plan of Care,

17   too?

18   A.    Yes.

19   Q.    And you wrote the same thing on that, right?

20   A.    Yes.

21         MR. BRADY:  Okay.  And let's go to page 6, and then

22   page 7, please.

23   Q.    Can you see, can you see this proposed physician order?

24   A.    Yes.

25   Q.    Okay.  And this is also for the same patient, Hoa?

1    A.    Right, yes.

2    Q.    And what was the date on this?

3    A.    11-3-15.

4    Q.    Okay.  And this came from Arbor?

5    A.    Yes.

6    Q.    What did you write on this one?

7    A.    "Patient active with another VNA.  No auth given and no

8    backdating orders."

9    Q.    And why did you write that?

10    A.    Because they couldn't have more than one VNA.

11    Q.    And the part about backdating, why did you write that?

12    A.    Because they probably wanted us to -- they wanted to get

13    money, probably.

14            MR. BRADY:  Can we go ahead to page 11 of this

15    exhibit.  Let's jump ahead to page 21 of this.

16    Q.    Now, on this page, am I right this is another fax that

17    came in from Arbor?

18    A.    Yes.

19    Q.    And what was the name of this fax?

20    A.    2-11-16.

21    Q.    This is for that same patient, Hoa?

22    A.    Yes.

23    Q.    Okay.  And walk us through, please, what you wrote on this

24    one, starting at the top with your handwriting.

25    A.    Okay.  "Patient goes to day care four days a week.  Vital

1   signs checked at day care.  No skilled nursing needs.  No

2   further auth from PCP.  Patient does not need home health aide

3   eight hours a day.  Not homebound."

4   Q.  And let me ask you, along the top there, what did you

5   write about -- did you write anything about backdated?

6   A.  "No backdated auth will be given by PCP."

7          MR. BRADY:  And could we go to page 29 of this.

8   Q.  Okay.  Now, page 29 is another fax from Arbor; is that

9   right?

10  A.  Yes.

11  Q.  And also for the same patient, right?

12  A.  Yes.

13  Q.  And can you tell what the date was on this one?

14  A.  Yes.

15  Q.  What was the date on this one, Ms. Tyrrell?

16  A.  This one is 2-11-16.

17  Q.  Okay.  And did you write on this as well?

18  A.  Yes.

19  Q.  What did you write on this?

20  A.  "This is the newest auth trick."

21  Q.  Then there are some dates below that?

22  A.  Oh.  1-3-15 to 3-2-16.

23  Q.  When you wrote, "This is the newest auth trick," what did

24  that mean?

25  A.  It meant that they were prolonging services that they

 1    didn't need.

 2            MR. BRADY:  Let's take that one down.  Then can we

 3    take a look at Exhibit 32, please, just for the witness.

 4    Q.    Okay.  Ms. Tyrrell, am I right that Exhibit 32 is

 5    additional Harvard Vanguard records, these relating to a

 6    patient named Sav Longh?

 7    A.    Yes.

 8            MR. BRADY:  Your Honor, I offer Exhibit 32.

 9            MR. VIEN:  Same objection, Your Honor.

10            THE COURT:  The objection is preserved.  It's

11    overruled.

12            (Exhibit 32 admitted into evidence.)

13    Q.    The first page on this exhibit, Ms. Tyrrell, is another

14    one of those faxes from Arbor?

15    A.    Yes.

16    Q.    Okay.  This one is for that patient, Mr. Longh?

17    A.    Yes.

18            MR. BRADY:  Now, if we can go to page 2 of this

19    exhibit, please.

20    Q.    Page 2, this is a proposed Plan of Care for Mr. Longh,

21    right?

22    A.    Right.

23    Q.    Now, you had a lot to say about that, right?

24    A.    I did.

25    Q.    All right.  Now, this is a Plan of Care for Sav Longh for

1    Arbor?

2    A.    Yes.

3          MR. BRADY:    If we could blow up just the middle part,

4    that box 21, please.

5    Q.    Ms. Tyrrell, how much care was in this Plan of Care?    What

6    was the frequency for Mr. Longh, according to this?

7    A.    "14 visits per week with three PRN for acute condition

8    changes for nine weeks.    Home health aide frequency around the

9    clock 24 hours to help with ADLs for nine weeks."

10          MR. BRADY:    Okay.    Let's back out of that.

11    Q.    And then you wrote, let me ask you, along the side in the

12    margin of this, it looks like it starts, "Nobody will

13    authorize."    Do you see that?

14    A.    Yeah.

15    Q.    What did you write there?

16    A.    "Nobody will authorize this amount of care.    Home health

17    aide for hands-on care."

18    Q.    And why did you write that, Ms. Tyrrell?

19    A.    Because -- I'm reading it.    "Home health aide for hands-on

20    care."    I don't really know that one.

21    Q.    How about the part about, "Nobody will authorize this

22    amount of care."    Why did you write that?

23    A.    Where is this, down the side?    Oh, yeah.    "Patient has no

24    skilled needs.    No auth, inappropriate amount of care, home

25    health aide does not provide care 24 hours a day.    No

1    appropriate use of services."

2    Q.   And why did you write that?  What was that based on?

3    A.   On the fact that they didn't need what they wanted.  You

4    have to have skilled needs, and this person had no skilled

5    needs.

6    Q.   And this individual was a patient of Harvard Vanguard; is

7    that right?

8    A.   Yes.

9    Q.   This individual's primary care physician was a doctor you

10   worked with at Harvard Vanguard; is that right?

11   A.   Yes.

12   Q.   Okay.  And again, your practice was, after you wrote that

13   down, what was your practice; what would you do with it?

14   A.   With the --

15   Q.   After you would write this down on the Plan of Care, where

16   would you send it?

17   A.   Oh, it would be in my notes.

18   Q.   It would be in your notes?

19   A.   Yes.

20   Q.   Would you also send it back to Arbor?

21   A.   Yes, yes, yes, yes.

22        MR. BRADY:  Okay.  We can take that one down, and can

23   we please pull up, just for the witness, Exhibit 33.

24   Q.   All right.  And hopefully, Ms. Tyrrell, you can see it all

25   on the screen in front of you, Exhibit 33.  Do you see that?

1    A.    Yes.

2    Q.    And am I right that Exhibit 33 is additional records from

3    Harvard Vanguard for the same patient we were just talking

4    about?

5    A.    Yes.

6          MR. BRADY:  Your Honor, I offer Exhibit 33.

7          MR. VIEN:  Same objection.

8          THE COURT:  The objection is preserved, and it's

9    overruled.

10          (Exhibit 33 admitted into evidence.)

11    Q.    Now, Ms. Tyrrell, now that we can all see this, am I right

12    that the first page of Exhibit 33 is another fax cover from

13    Arbor for this patient?

14    A.    Yes.

15          MR. BRADY:  Okay.  Now, can we go to page 2 of this,

16    please.

17    Q.    Now, page 2, Ms. Tyrrell, is another one of those proposed

18    physician orders from Arbor?

19    A.    Yes.

20    Q.    And it's for the same patient, Sav Longh, right?

21    A.    Yes.

22    Q.    Can you tell us, can you make out the date on the proposed

23    order?

24    A.    12-13-15.

25    Q.    Okay.  And this relates to a recertification for Sav

1    Longh?

2    A.    Yes.

3    Q.    So that would be like a request for additional care?

4    A.    Yes.

5    Q.    All right.  It looks like you wrote something on this.

6    A.    I did.

7    Q.    Walk us through what you wrote, please.

8    A.    All right.  "BID," which is twice a day, "skilled nursing

9    not needed.  Home health aide is not available seven days a

10   week.  Home health aide is for personal care.  Patient may need

11   PCA, but home health aide for 24/7 will not be authorized."

12   Q.    Let me ask you about, it says, "May need PCA."  What is

13   PCA?

14   A.    That's a personal care attendant.

15   Q.    What did you mean when you wrote that, "May need PCA but

16   HHA not authorized"?  Explain that to us.

17   A.    He doesn't need somebody to watch him.  He just needs a

18   personal care -- well, a personal care attendant.  It's just

19   through VNA -- I mean, it's not through VNA.  It's through

20   elder services and stuff like that.  Just a personal care

21   attendant.

22   Q.    Is different training required for an HHA versus a PCA?

23   A.    Probably not.

24   Q.    Do you know, do you know for sure?

25   A.    No.

```
 1   Q.   Now, let me ask you --

 2            MR. BRADY:  We can take that down.  Can we pull up

 3   just for the witness Exhibit 34.

 4   Q.   Ms. Tyrrell, if you look at the screen in front of you, am

 5   I right, can you see this document on the screen?

 6   A.   Oh, yeah.

 7   Q.   Am I right that this Exhibit 34 is a additional records

 8   from Harvard Vanguard relating to that patient Sav Longh?

 9   A.   Yes.

10            MR. BRADY:  I offer Exhibit 34, Your Honor.

11            MR. VIEN:  Objection, Your Honor.  There's one other

12   issue on this one in particular that I just want to raise at

13   sidebar.

14            THE COURT:  You want to do it at sidebar, or do you

15   want to tell me the page?  Is it going to be obvious to me, or

16   would you like to talk about it?

17            MR. VIEN:  I'd like to talk about it.

18            THE COURT:  Okay.  Come up to sidebar.

19   SIDEBAR:

20            MR. VIEN:  The objection --

21            THE COURT:  Keep your voice down.

22            MR. VIEN:  You're picking up on what he said.  I

23   didn't think I was that loud.

24            MR. BRADY:  There's no touching, I promise.

25            THE COURT:  That's what got him talking too loud.  Now
```

 1    he's in a bad habit.

 2            MR. VIEN:  I know.  On this exhibit, on the second

 3    page there's a note that says "Faith is asking for call back

 4    regarding 485 for Plan of Care."  There's a couple Faiths

 5    working at Arbor, and she has no ability to say which Faith it

 6    is, and it would be prejudicial because there's nothing linking

 7    Faith Newton, the defendant, directly to any of these things.

 8            THE COURT:  You can deal with that on cross.  It's

 9    overruled.

10    (End of sidebar.)

11            MR. BRADY:  So Your Honor, Exhibit 34, I've offered

12    it.

13            THE COURT:  Admitted.

14            MR. BRADY:  Admitted, thank you.

15            (Exhibit 34 admitted into evidence.)

16            MR. BRADY:  Could we show that up on the screen,

17    please.

18    Q.   Now, Ms. Tyrrell, can you see Exhibit 34 on the screen in

19    front of you?

20    A.   Yes.

21    Q.   Okay.  And let's try to just walk through this.  Looks

22    like there's a couple of messages recorded here in this

23    exhibit.  Do you see that?

24    A.   Yes.

25    Q.   Okay.  Now, the way these things I think typically work,

```
 1    and correct me, usually the earlier messages are like in the
 2    back, right, it goes most recent to --
 3    A.    Yeah.
 4          MR. BRADY:  Let's go to page 2 of this, please.
 5    Q.    And it looks like the first of these messages recorded was
 6    by Dawn Brown Mariano on March 21, 2016?
 7    A.    Yes.
 8    Q.    Do you see that?  And can you remind us again who Dawn
 9    was?
10    A.    She's the medical secretary.
11    Q.    Medical secretary.  Okay.
12          MR. BRADY:  Could we blow up the top half of this,
13    please, Ms. Apfel.
14    Q.    Was it Dawn's job when calls would come in to make a
15    record of them like this?
16    A.    Yes.
17    Q.    So what is -- let me ask you, beginning where it says,
18    "VNA is calling," do you see that?
19    A.    Oh, yes.
20    Q.    Could I ask you, Ms. Tyrrell, to read in the message that
21    was recorded here?
22    A.    Okay.  You mean -- you want the -- thank you.
23    Q.    Where it's been highlighted.  Can you read that in,
24    please.
25    A.    Yes, okay.  "Name of RN calling, Faith.  VNA calling from
```

1    Arbor Homecare.  Call back number for VNA.  Specific message

2    from VNA.  She needs a call back to discuss some things with

3    Dr. Meda.  She said not a nurse.  Message sent to RN for

4    further review.  Message sent from medical secretary."

5    Q.    Okay.  Let me ask you, do you recall, Ms. Tyrrell, that

6    calls would come in from home health agencies where they'd say,

7    "I don't want to talk to the nurse.  Give me the doctor.  I

8    want to talk to the doctor."

9    A.    Yes.

10   Q.    Okay.  Let me ask you to read then the next message up, do

11   you see the timestamp on that is 3:46 p.m.  Do you see that?

12   A.    Yes.

13   Q.    So not quite an hour after that first message, right?

14   A.    Okay.

15   Q.    Let me ask you.  It looks like Danielle Fiore.

16   A.    Yeah, she's a nurse.

17   Q.    She was a nurse?

18   A.    At Harvard Vanguard.

19   Q.    Somebody you worked with?

20   A.    Yes.

21   Q.    What does it say here, what was recorded?

22   A.    "Faith is asking for call back regarding 485 form for Plan

23   of Care.  Patient really needs home care services.  Please call

24   her back Tuesday.  Thanks, Danielle."

25             MR. BRADY:  Can we back out of this, please, and can

1    we go back to page 1, so the page before this.  And can we blow

2    up the rest of these messages.

3    Q.    Okay.  So do you see after that on March 22, 2016 -- we're

4    going from the bottom up.  Do you see that?  There's another

5    message from Dr. Meda?

6    A.    Yes.

7    Q.    What does it say Dr. Meda wrote after that?

8    A.    "Paula spoke with me that this patient has daily VNA

9    services and 24 hour home health aide which is not needed.  She

10   can have VNA three times a week and home health aide two to

11   three hours a day," and then "FYI, Paula.  Thanks, Meda. "

12   Q.    And Paula was who?

13   A.    Me.

14   Q.    And then there's another message recorded by Felicia Sneed

15   after that on March 24, 2016.  Do you see that?

16   A.    Yes.

17   Q.    What did that message say?

18   A.    "Patient's daughter is calling back.  She's asking to

19   speak with Dr. Meda now.  She's not understanding why patient

20   is being discharged from services.  She wants to clear up a few

21   things with Dr. Meda about the kind of services her mom needs

22   at this time, see also," then the telephone number.  Okay.

23   Q.    And then after that, there's another message from Dr.

24   Meda?

25   A.    Yes.

1    Q.   And what does it say Dr. Meda recorded?

2    A.   "Message received from Paula that she spoke with the

3    patient and nursing three times a day is not approved and has

4    not" -- "and has been referred to social work for community

5    intervention."

6    Q.   Okay.

7              MR. BRADY:  I think we can back out of that.  We can

8    take that one down.  Can I ask you to please pull up Exhibit 35

9    just for the witness.

10   Q.   Now, Ms. Tyrrell, can you see on the screen in front of

11   you Exhibit 35?

12   A.   Yes.

13   Q.   And am I correct that Exhibit 35 is additional records

14   from Mr. Longh, the patient Sav Longh's patient record at

15   Harvard Vanguard?

16   A.   Yes.

17             MR. BRADY:  Your Honor, I off Exhibit 35.

18             MR. VIEN:  Same, Your Honor.

19             THE COURT:  The objection is preserved.  It's

20   overruled.  The document is admitted.

21             (Exhibit 35 admitted into evidence.)

22             MR. BRADY:  Can we try to blow up -- that would be

23   great.  Thank you.

24   Q.   So, Ms. Tyrrell, this another one of those faxes from

25   Arbor, right?

1    A.    Yes.

2    Q.    And it's got your handwriting and response?

3    A.    Yes.

4    Q.    What was the date on this one?

5    A.    4-20-16.

6    Q.    And who was this fax directed to?

7    A.    Dr. Meda.

8    Q.    Dr. Meda, okay.  What did you -- can you just walk us

9    through what you wrote on this one.

10    A.    Right.  Okay.  "Daughter is Phalla."  That's her name.

11    "Aware PCP is not signing orders.  Please do not re-fax."

12    Q.    Let me interrupt you here.  Why did you write, "Please do

13    not refax back"?

14    A.    Because Arbor would send it back.

15    Q.    Okay.  And then what did you write below that?

16    A.    "Harvard Vanguard social worker has been in contact with

17    family.  PCP will not be authorizing any more services or

18    signing any further orders on this patient."

19         MR. BRADY:  Your Honor, I have nothing further at this

20    time.

21         THE COURT:  Mr. Vien, we're almost to the lunch break.

22    Would you like to start your cross now or would you like --

23         MR. VIEN:  I'm always in favor of eating, Your Honor.

24         THE COURT:  We're going to take the lunch break now,

25    and we'll see you back at quarter of 1:00.

1          COURTROOM CLERK:  All rise for the jury.

2          (Jury exits the courtroom.)

3          THE COURT:  The government passed the witness.  She's

4     on cross-examination, so have your conversations accordingly.

5          I've made some revisions to the jury charge as we sit

6     here.  The only thing I want to note, I'm going to throw out

7     for you is, I did look at the Woodlock instructions you passed

8     up.  I know it's ten years old now, but he does charge on overt

9     acts for the health care conspiracy.  So, I don't know --

10          MR. LOONEY:  May we suggest we'll file something this

11     evening.

12          THE COURT:  It just seems like this case is not going

13     to rise or fall on the presence of an overt act, and it seems

14     safer to include it, but I'll hear you on it.  But I just note

15     that he did include it.  It's nice how much shorter

16     instructions can be in 2013 than they can seemingly be in 2023.

17          All right.  See you back at quarter of 1:00.  Thanks,

18     everyone.

19          MR. BRADY:  Thank you, Your Honor.

20          (Recess taken 11:59 a.m. - 12:45 p.m.)

21          MS. PASCUCCI:  So I just passed up 309, 310, and 311,

22     these exhibits are probably going to come through witness Cindy

23     Gavin, and this is a similar objection as to the Harvard

24     Vanguard, where there's comments from patients and patients'

25     relatives have incorporated in here.  In particular, we think

1    Cindy Gavin is going to be asked about a conversation she had

2    with a patient's daughter where the daughter says, you know,

3    the patient is -- this lady is current on her meds, she doesn't

4    need home health care services and we'd object to that as

5    hearsay. In each of these documents, the hearsay bit -- the bit

6    we're alleging as hearsay is a bit at the end of the document

7    so I'm flagging it for you now so there's an opportunity to

8    review before the witness comes.

9            MR. BRADY:  And, Your Honor, not to get into this

10   before the Court has a chance to look at it but I think I can

11   maybe make it a little easier.  We do intend to offer 309 but

12   then 310 and 311 are the other two?

13           MS. PASCUCCI:  Yes.

14           MR. BRADY:  We're not going to do that, Your Honor, so

15   you can ditch that and the distinction or one distinction, Your

16   Honor, is we're going to have the witness who was the nurse for

17   309, she's going to be subject to cross-examination, we're not

18   going to call the other witness for the other so I'm not going

19   to press that.

20           THE COURT:  Okay.  All right.  Get the jury, please. I

21   didn't throw away 309.

22           MS. PASCUCCI:  Thank you, Your Honor.

23           MR. BRADY:  Your Honor, should I check and see if the

24   witnesses may be outside in the hall?

25           THE COURT:  Sure, put her on the witness stand.

```
 1              (The jury entered the courtroom at 12:48 p.m.)
 2              THE COURT:  Where's your witness?
 3              MR. BRADY:  Your Honor, I think the agents went out to
 4    find her.  I'll go out myself and see, have another set of
 5    eyes.  Sorry, Your Honor, I understand the witness is just in
 6    the restroom and on her way back.
 7              THE COURT:  What do you want to talk about?  I always
 8    tell the same stories during these moments.  This is my
 9    favorite one.  You know, these robes that they give you when
10    you're a judge are like polyester, they're very slippery and
11    when I first started, I borrowed somebody else's chair which
12    was also very slippery.  And one of my first days at work, I
13    sat down on the chair and went -- I ended up right on the
14    floor.  And that's how I know that being a judge is different
15    than any other job because when I stood up, nobody was
16    laughing.  That was my "we're not in Kansas anymore" moment.
17    When you're ready, Mr. Vien.
18    CROSS-EXAMINATION BY MR. VIEN:
19    Q.   Good afternoon, Ms. Tyrell.  My name is George Vien, and
20    Michelle Pascucci and I represent the defendant Faith Newton.
21    You understand that.  Right?
22    A.   Yes.
23    Q.   I just wanted to ask you a few questions about what you
24    testified to.  First, Arbor wasn't the only home health care
25    company that you dealt with when you were at Harvard Vanguard,
```

1   was it?

2   A.   No.

3   Q.   What are some of the others?

4   A.   We had Lowell VNA and Home Health VNA up in -- it's up in

5   the north.   That was basically, we have contracts, so those

6   were the two companies we used.

7   Q.   Did you have a contract with Arbor as well?

8   A.   No.

9   Q.   Did you use any other home health care that you didn't

10  have?

11  A.   Only if they were out of area.

12  Q.   And what are some of those names if you remember.   I know

13  it was a while?

14  A.   You know, I really only -- I might have -- Emerson VNA.

15  Q.   And did Harvard Vanguard, did it open its own home health

16  care business, if you will, in 2016?

17  A.   No, not that I know of.

18  Q.   You're not aware of that?

19  A.   No.

20  Q.   And could you tell us the difference between home health

21  care and palliative care?

22  A.   Oh, yeah.   Home health care is obviously people that are

23  home and getting services through the VNA and palliative care

24  is hospice care.   It's taking care of people that are end of

25  life.

1    Q.   And does that take place in their homes as well?

2    A.   Yes.

3    Q.   And that -- does that require generally, if you can

4    generalize, more or less services than home health care?

5    A.   Totally depends on the patient.

6    Q.   So sometimes palliative care would require daily visits,

7    if you will?

8    A.   Yeah, but, most of the time it probably could but not that

9    often.

10   Q.   And sometimes home health care required a lot of visits?

11   A.   You mean home health VNA visits?  Depends on the patient.

12   Q.   It varies depending on the patient and the patient's

13   needs, right?

14   A.   Yes.

15   Q.   And are you familiar with a nurse who worked at -- a

16   registered nurse who worked at Arbor named Faith Ngigi?

17   A.   No.

18   Q.   And in your testimony you talked about one of the exhibits

19   in which the medical secretary reported that a woman named

20   Faith had called.  Right?

21   A.   Yes.

22   Q.   Do you remember that?

23   A.   Yes, but --

24   Q.   And you didn't actually speak to Faith, did you?

25   A.   No.

1    Q.   And you don't have any idea, do you, whether it was Faith

2    Newton or another woman such as Faith Ngigi who called, right?

3    A.   No.

4    Q.   It just says Faith on the note?

5    A.   I have no idea, no.

6    Q.   All you know is what's on the piece of paper, right?

7    A.   From what I've seen today.  Is that what you mean?

8    Q.   That's what I mean?

9    A.   Yeah.

10   Q.   And some Plans of Care were -- from Arbor were signed; is

11   that correct?

12   A.   By the PCPs?

13   Q.   By the PCPs?

14   A.   They may -- you know what?  I wouldn't know that, because

15   things were coming in -- you know, things come in in different

16   directions.  I wouldn't know that.

17   Q.   So they could have been signed by the PCPs and you just

18   wouldn't know?

19   A.   Well, I'd see the forms.

20   Q.   You would see the forms?

21   A.   Yeah.

22   Q.   Okay.  So do you remember --

23   A.   Well, they were forms -- there's forms that are signed and

24   forms that weren't signed.

25   Q.   Okay.  So there were forms, Plan of Care forms that were

1   signed by PCPs?

2   A.    I can't say that.

3   Q.    You just can't remember either way?

4   A.    Well, I just -- I mean, I'd have to be looking at it right

5   now.

6   Q.    So you just can't remember either way if some were --

7   A.    I haven't -- you know, it's over five, six years, so it's

8   kind of hard to remember all that.

9   Q.    Well, I'm not challenging you.  I'm just pointing out that

10  you can't remember either way.  I'm not blaming you for not

11  remembering, I'm just saying you don't remember.  Right?

12  A.    I don't remember.

13  Q.    Okay.  Good.

14          MR. VIEN: Could we take a look at Exhibit 28 on page

15  1?

16  BY MR. VIEN:

17  Q.    And I won't belabor this, but who signed this document for

18  Arbor?  Whose name is at the bottom after sincerely?

19  A.    Joseph Muiruri.

20          MR. VIEN: And then on Exhibit 29 on page 4?  And if

21  you could blow up box 21, please.  Oh, I'm sorry, I thought

22  there was another 21.  Could you go back, please. 23.

23  BY MR. VIEN:

24  Q.    And who signed this form for Arbor?

25  A.    Charles Githinji.

1           MR. VIEN:  And could we go to page 9 of this document,

2      last three Bates are 104.  And could you blow up clinician's

3      signature?

4           THE WITNESS: I don't -- Maxwell Ngigi, LPN.

5           MR. VIEN:  And if we could go to Exhibit 32 on page 3,

6      please.  Excuse me, I meant to go to Bates 164.  I think it's

7      on the prior one.  And could you blow up box 23 again, please?

8      BY MR. VIEN:

9      Q.   And who signed this one?

10     A.   Charles Githinji.

11          MR. VIEN:  And the last one we'll do, Exhibit 33,

12     Bates number 168.  If you could blow up under clinician

13     signature.

14     BY MR. VIEN:

15     Q.   And who signed this one?

16     A.   Same person:  Charles Githinji, RN.

17     Q.   And I don't want you to have to walk through every piece

18     of paper there, but you don't have any memory of Faith Newton

19     signing any of these forms, do you?

20     A.   With these people?

21     Q.   With these people.

22     A.   No.

23          MR. VIEN:  I don't have anything else, Your Honor.

24          THE COURT:  Redirect?

25          MR. BRADY:  No, Your Honor.

```
 1              THE COURT:  You're excused.  Thank you.

 2              MR. BRADY:  Your Honor, the United States calls Chhan

 3    Touch.

 4              COURTROOM CLERK:  Can you please state your name and

 5    spell your last name for the record.

 6              THE WITNESS: My name is Chhan Touch.  C-h-h-a-n.  Last

 7    name Touch.

 8                        CHHAN TOUCH sworn

 9    DIRECT EXAMINATION BY MR. BRADY:

10    Q.   Good afternoon, Mr. Touch.  I'm over here.

11    A.   Yes, sir.

12    Q.   Can you hear me okay?

13    A.   Yes, sir.

14    Q.   And that microphone in front of you, it moves so be sure

15    to speak right into that.

16    A.   Okay, thank you.

17    Q.   I know you just stated and spelled your name but could I

18    ask you just to introduce yourself to the jury, please?

19    A.   Good afternoon.  My name is Chhan Touch.  I'm a family

20    nurse practitioner.  I worked at Lowell Community Health Center

21    from 2002 to 2018.

22    Q.   And, again, if you want to pull that mic just a little bit

23    closer, it's a little hard to hear in the courtroom sometimes.

24    A.   Okay sir.  Thank you.

25    Q.   And I believe you mentioned you're a nurse practitioner?
```

1   A.   Yes, sir.

2   Q.   And you work as a nurse practitioner in Lowell,

3   Massachusetts?

4   A.   Yes, sir.

5   Q.   And what's the name of the practice where you work?

6   A.   Lowell Primary -- Lowell Community Health Center.

7   Q.   Lowell Community Health Center.  And I know you said this

8   a second ago but to make sure we got it straight.  How long

9   have you worked at Lowell Community Health Center?

10  A.   From 2000 to 2018.

11  Q.   2000 to 2018?

12  A.   Yes, sir.

13  Q.   Where are you working right now?

14  A.   Right now I work at Lowell Primary Care Center.  That's a

15  private practice.

16  Q.   So a private doctor's office?

17  A.   Yes, sir.

18  Q.   And can you explain to us or describe for us the types of

19  patients that you -- while you're working at Lowell Community

20  Health Center, describe for us the types of patients who you

21  saw and treated?

22  A.   Well, I saw a lot of elderly people, bilingual, and people

23  who have a lot of chronic health condition.

24  Q.   And where, generally, did those patients live?

25  A.   Mostly they live in Lowell, Massachusetts.

```
 1   Q.    So to take a step back, Mr. Touch, where did you go to
 2   school?
 3   A.    Umass-Lowell -- I went to UConn and then I went to
 4   Atlantic Union College in Lancaster and then University of
 5   Massachusetts in Lowell.  I'm a Cambodian refugee, I came here
 6   in 1989.
 7   Q.    I'm sorry.  I do it -- sometimes I speak over you so I'm
 8   sorry I interrupted you.  You just testified that you came as a
 9   Cambodian refugee to the United States?
10   A.    Yes, sir.
11   Q.    And when was that, sir?
12   A.    1989.
13   Q.    And you went to school, you became a nurse practitioner?
14   A.    Yes, sir.
15   Q.    And before you started at the Lowell Community Health
16   Center, what did you do for work?
17   A.    I'm a hospice nurse.
18   Q.    How long were you a hospice nurse for?
19   A.    I was hospice nurse for about five years.
20   Q.    And as a hospice nurse, did you work with a visiting nurse
21   agency or a VNA?
22   A.    Actually, I work for visiting nurse, yes.
23   Q.    And you did that for how long?
24   A.    About four or five years, yeah.
25   Q.    Now, I want to focus in on the period of time when you
```

1    were working at Lowell Community Health, okay?  What type of

2    health insurance did your patients typically have when you were

3    working there?

4    A.    A majority had MassHealth, Medicare, and some private

5    insurance.

6    Q.    You say the majority had MassHealth?

7    A.    Yes, sir.

8    Q.    Now, you are a nurse practitioner; is that right?

9    A.    Yes, sir.

10   Q.    Now, at the practice, did you also work with doctors,

11   medical doctors?

12   A.    I worked under supervision of a physician, yes.

13   Q.    So you worked under the supervision of a physician.  Can

14   you explain to us just generally how did that work?

15   A.    It means that what do I do?  I need to get the consent

16   from my supervising physician.  Normally if I see a patient and

17   if I decide to give certain treatment, my supervisor sometimes

18   takes a look at it and approves it.

19   Q.    Do you remember the names of any of the doctors at Lowell

20   Community Health whose supervision you worked under?

21   A.    I worked with four physicians, Dr. Phaneuf, Dr. Miller,

22   Dr. Staii and the last one, Dr. Maxwell.

23   Q.    Dr. Maxwell was the last one?

24   A.    Yes, sir.

25   Q.    Nurse practitioner Touch, do you recall a home health

1    agency called Arbor Homecare Services?

2    A.    Yeah, there was one of them.  You know, I believe that,

3    but kind of vaguely.

4    Q.    Kind of vaguely.  It was a couple years ago.  Right?

5    A.    About eight or almost ten years ago.

6    Q.    Eight or so years ago.  Okay.  I want to ask you to kind

7    of go back.  How did you learn about Arbor?  How did you come

8    to learn about them?

9    A.    Basically, you know, I got some requests, you know, for

10    patient approval to be evaluated, if they had a health issue so

11    they need to be seen at home.  And for me, after I verify it to

12    make sure it is appropriate and then I will inform my

13    supervisor physician that the patient might need some help at

14    home.

15    Q.    Have you -- in the context of home health care, have you

16    heard the term self-referral?  Is that a term you've heard

17    before?

18    A.    I heard it a lot.

19    Q.    You heard that a lot.  What did that term mean?

20    A.    It means that commonly I'm the one that should refer my

21    patient for care if I think they might need it.  But sometimes

22    everything was done pretty much -- I'm kind of forced into

23    signing it.

24    Q.    So you said usually you're the one as the primary care

25    provider who's referring out for care.  Right?

1  A.    Yes.

2  Q.    And self-referral was when patients would come in and

3  they'd ask for care?

4  A.    Yes, they'd already contact the agency.

5  Q.    Did you have patients who self-referred to Arbor Homecare?

6  A.    I believe so, yes, but I cannot remember specifically.

7  Q.    So generally, though, what do you generally remember about

8  those patients from Arbor Homecare who self-referred to you?

9  A.    We always had some issue because when they came to me, I

10  always say that I need to look at the health care to make sure

11  that they really need health care, they require nursing, you

12  know, nursing skill.  For nursing skill, you know, you need to

13  have insulin injection, you need to have all of those kinds.  I

14  have to go according to the regulation of MassHealth.

15  Q.    And did you eventually come up with a policy with respect

16  to Arbor and self-referrals, how you handled those?

17  A.    Well, those decisions was up to my supervising physician,

18  not me.

19  Q.    Do you know what those decisions were, though, how the

20  practice handled those?

21  A.    We believed that, you know, the patient needs care but

22  they need to be evaluated first before they went to home health

23  care themselves.

24  Q.    Now, do you recall times when your practice refused to

25  sign off on care for an Arbor self-referral?

A.    I cannot remember specifically for Arbor, but I did refuse

sometimes when I think it was inappropriate.

Q.    And on those times, do you remember how the patients

reacted when you did that?

A.    They were angry.

Q.    They were angry?

A.    Yes.

Q.    And what ended up happening with those patients as far as

who their doctor was going forward?

A.    They left the practice, they went someplace else.

Q.    I want to zero in on Arbor and do you recall issues with

the care that you were asked to sign off on from Arbor?  Do you

remember issues with that?

A.    There were some, yes.

Q.    And generally, what was the issue that you saw with that

care?

A.    Sometimes I think the request is rather excessive or might

not meet nursing skill.

Q.    So, in other words, sometimes it wasn't necessary?

A.    Correct.

Q.    Now, let me ask you about home health aides, HHAs.  Do you

know what that is?

A.    Yes, sir.

Q.    Now, for patients of yours who had home health aides

through Arbor, who was the HHA, usually?  What was their

1   relationship to the patient?

2   A.   I never ask.  Because normally they never came with

3   patients.

4   Q.   Let me ask you this:  Did you ever ask patients to bring

5   their HHAs with them to see you?

6   A.   Normally, yes, I always ask them to do that.

7   Q.   You always asked them to do that.  Why did you ask the

8   patients to bring the HHA like that?

9   A.   Because sometimes most of my patients were elderly and

10  they did not remember so if they bring the helper, it's easier

11  for me to communicate.

12  Q.   Now Mr. Touch, are you familiar with Plan of Care or form

13  485 for home health care?

14  A.   Yes, sir.

15  Q.   Could you tell the jury what that is?

16  A.   That form will send a period of time, for example, they

17  give, like January 1 to March 3 or something like that, for

18  three months or nine weeks and they are placed on medication

19  and they request for skilled nurse and also request for home

20  health aide.

21  Q.   Mr. Touch, do you remember a patient of yours named Kevin

22  Ung, U-N-G?

23  A.   I think so, yeah.  Not very clear, but, yeah.

24  Q.   But Mr. Ung was a patient of yours?

25  A.   Yes, sir.

```
 1   Q.   Do you remember getting a Plan of Care from Arbor for

 2   Mr. Ung that they asked you to sign off on?

 3   A.   Not really, there's so many forms.

 4   Q.   Let me ask maybe a slightly different question.  Do you

 5   remember getting a Plan of Care from Arbor for a patient who

 6   you knew was out of the country?

 7             MS. PASCUCCI:  Objection, leading.

 8             THE COURT:  Sustained.

 9   BY MR. BRADY:

10   Q.   Do you recall getting a Plan of Care from Arbor for a

11   patient and having concerns?  Let me withdraw that.  Do you

12   recall getting a Plan of Care from Arbor for a patient and

13   having concerns about that Plan of Care?

14   A.   There were some, yes.

15   Q.   And was there one patient -- do you recall a patient who

16   you knew was going to be out of the country?

17             MS. PASCUCCI:  Objection, leading.

18             THE COURT:  Overruled.

19   BY MR. BRADY:

20   Q.   Was there one patient you had who you knew he was going to

21   be out of the country?

22   A.   I think more than -- I think so, yeah.  Because I had 2500

23   patients.

24   Q.   Let me ask you this:  Was there a time that you got a Plan

25   of Care or Plans of Care from Arbor and it upset you, you were
```

1  upset about it?

2  A.   Yes.

3  Q.   And did one of those times have to do with a patient --

4  one of those patients who was out of the country?

5  A.   Yes.

6  Q.   Explain to us what happened with that.  What do you

7  remember about that?

8  A.   Normally when patient informs me that he or she is out of

9  the country, I normally notify -- I wrote down on the form

10  informing my supervising physician that the patients will be

11  out of the country and the service should be postponed.

12  Q.   And do you also recall calling Arbor one time when you

13  were upset getting a Plan of Care like that?

14        MS. PASCUCCI:  Objection.

15        THE COURT:  Sustained.

16  BY MR. BRADY:

17  Q.    Did you ever call Arbor after getting a Plan of Care

18  like that?

19  A.   Normally we don't have correct contact with them, no.  My

20  nurse might do it, but I never did.

21        MR. BRADY:  Could we pull up Exhibit 76, please?  Just

22  for the witness to start.

23  BY MR. BRADY:

24  Q.   Can you see on the screen in front of you the first page

25  of Exhibit 76?

1    A.    Yes, sir.

2    Q.    Do you see that?  Okay?  And do you see that these are

3    medical records from Lowell Community Health Center for a

4    patient named Larry Logan?

5    A.    Yes, sir.

6              MR. BRADY:  I offer Exhibit 76.

7              MS. PASCUCCI:  Objection.  Foundation.

8              THE COURT:  Sustained.

9    BY MR. BRADY:

10   Q.    Mr. Touch, do you see -- can you tell which patient these

11   records were for?

12   A.    The record for PCA, personal care services.

13   Q.    Okay, but can you tell who the patient was for these

14   records?

15   A.    Mr. Larry Logan.

16   Q.    And do you see below that it says provider?  Do you see

17   that?

18   A.    Yes, sir.  That's me.

19   Q.    That's your name there?

20   A.    Yes, sir.

21   Q.    Why are you listed as the provider for Mr. Logan?

22   A.    Because as a nurse practitioner I am one of the providers

23   who see patients, but under direct supervision of a physician.

24   Q.    And did Lowell Community Health Center, did they keep

25   records for their patients?

1  A.   I believe so, yes.

2  Q.   Records like the records in front of you for Mr. Logan?

3  A.   Yes, sir.

4  Q.   And were those records that were made and kept in the

5  ordinary course of business at Lowell Community Health Center?

6  A.   I don't know.

7  Q.   Well, let me ask you.  As a nurse practitioner at Lowell

8  Community Health Center, did you regularly create medical

9  records for patients like Mr. Logan?

10  A.   After I saw a patient, I will submit it for verification

11  and they keep the record in medical records.

12  Q.   They keep it, the practice keeps that record, right?

13  A.   Yes, sir.

14       MR. BRADY:  Your Honor, I offer it.

15       MS. PASCUCCI:  Same objection, Your Honor.

16       THE COURT:  Overruled.

17  BY MR. BRADY:

18  Q.   So now that we can all see it, medical records for Larry

19  Logan; is that right?

20  A.   Yes, sir.

21  Q.   And Larry Logan was one of your patients?

22  A.   Yes, sir.

23  Q.   Okay.

24       MR. BRADY: Can we go ahead to page 101 here?  And if

25  we could blow up the top half of this, please.

```
 1   BY MR. BRADY:
 2   Q.    Can you tell what this document is?
 3   A.    This is the Plan of Care.
 4   Q.    And who is the patient for this Plan of Care?
 5   A.    Mr. Larry Logan.
 6   Q.    And who was -- who or what was the provider for this care?
 7   A.    Arbor Homecare, sir.
 8   Q.    And do you see at the top there's a box that says
 9   certification period?
10   A.    Yes, sir.
11   Q.    What was the certification period?
12   A.    December 28, 2012 to February 25, 2013.
13        MR. BRADY:  And can we Zoom out from this, please?  If
14   we could blow up box 21.
15   BY MR. BRADY:
16   Q.    How much care was called for by this Plan of Care for --
17   A.    They requested one visit per week for nine weeks.
18        MR. BRADY:  And we can box back out of that, please.
19   And then if we go to the next page, please.
20   BY MR. BRADY:
21   Q.    This is a second page to that Plan of Care.  Is that
22   right, Mr. Touch?
23   A.    Yes, sir.
24        MR. BRADY: And can we blow up the bottom, the last two
25   boxes of this?
```

1    BY MR. BRADY:

2    Q.   You see the spot it says signature of physician?

3    A.   Yes, sir.

4    Q.   Whose signature is there?

5    A.   The first one is mine.  I believe the second one is

6    Dr. Staii.

7    Q.   Why was there also the doctor's signature on this?

8    A.   NP has no authority to approve anything.  The only thing I

9    did is to verify and my supervising physician will decide

10   whether the request of care is appropriate or not.

11   Q.   And then do you see below that in box 11 it says digitally

12   signed by someone?

13   A.   By Faith Newton.

14   Q.   It says Faith Newton?

15   A.   Yup.

16          MR. BRADY:  Can we back out of that, please?  Can we

17   go to page 99?  And if we could blow up the top half of this,

18   please.

19   BY MR. BRADY:

20   Q.   Now, what's this page?

21   A.   The same Plan of Care.

22   Q.   And for the same patient?

23   A.   Yes, sir.

24   Q.   And what's the certification period here?

25   A.   December 5 -- sorry.  February 3, 2014 or the April 3,

1    2014.

2    Q.    And what was the name of the provider?

3    A.    Arbor care.

4          MR. BRADY:  If we back out of this.  If we look at the

5    bottom here, box 23.  Thank you.

6    BY MR. BRADY:

7    Q.    Can you tell which nurse signed this?

8    A.    The first one is mine, the second one is my supervising

9    physician, Dr. Zinabu Maxwell.

10   Q.    And you're referring to the handwritten signatures in box

11   27.  Is that right?

12   A.    Yes, sir.

13   Q.    If you look at box 23, what does it show there?  What does

14   it say there?

15   A.    Electronically signed by Faith Newton.

16         MR. BRADY:  If we could back out of this, please?  And

17   let's go to page 93, please.  And can we blow up the part with

18   the text, please?

19   BY MR. BRADY:

20   Q.    What is this page showing us?

21   A.    This is just the cover letter from Arbor.

22   Q.    So the fax cover sheet from Arbor?

23   A.    Yes, sir.

24   Q.    What was the date on this?

25   A.    June 15, 2014.

1  Q.   And then below that it says -- you see where it says

2  "episode" and it gives a date range?

3  A.   June 3, 2014, to August 1, 2014.

4  Q.   What did that mean, an episode for home health care?  What

5  did that mean?

6  A.   I believe that's the certification period that they

7  request.

8  Q.   That would be the period of care, you refer to that as an

9  episode?

10  A.   Yes, sir.

11       MR. BRADY:  And if we back out of this, go to the next

12  page.

13  BY MR. BRADY:

14  Q.   It's another Plan of Care for Mr. Logan?

15  A.   Yes, sir.

16  Q.   And can you see what the period covered for this one is up

17  in the top?

18  A.   That will be from June 3, 2014 to August 1, 2014.

19       MR. BRADY:  And if we could blow up box 21 on here,

20  please.

21  BY MR. BRADY:

22  Q.   Do you see that?  Generally, what's the information shown

23  in this box 21?

24  A.   Normally they request a skilled nurse visit.

25  Q.   All right.  What was the frequency of nursing visits in

1    this Plan of Care?

2    A.    Ten to 14 visits per week with three as-needed PRN.

3    Q.    And then there's a whole bunch of other information that's

4    listed there.  Right?

5    A.    Yes, sir.

6    Q.    Do you know who puts that in?

7    A.    That's from the visiting nurse.

8    Q.    So the nursing service that sends the Plan of Care,

9    they're the ones who put all the information in.  Right?

10    A.    Yes.

11    Q.    And did you rely on that information deciding to sign

12    these Plans of Care?

13    A.    Sometimes we verify it.

14    Q.    Sometimes you verify it.  Did you always verify it?

15    A.    Normally we always did.  For me, I always take a look at

16    it.  But when you have 100 pages with 2,000 patients, sometimes

17    it's hard to look all.

18    Q.    Sometimes some slip through.  Fair.  I see you nodding but

19    is the answer yes?

20    A.    Yes, sir.

21    Q.    And if we blow up the bottom part of this, the nurse's

22    signature and the attending physician.  Do you see that?  In

23    box 23, what's the name of the nurse who signed this.

24    A.    Sarah Robe.

25    Q.    And then who signed in the physician signature space?

1    A.    Dr. Maxwell.

2    Q.    Dr. Maxwell.  Did anybody else sign this?

3    A.    I signed the first one.

4          MR. BRADY:  Let's back out of that, please.  And could

5    we go to page 69.  Can we blow up the top part of this one,

6    too, please?

7    BY MR. BRADY:

8    Q.    Mr. Touch, this is another Plan of Care for the same

9    patient, Larry Logan; is that right?

10   A.    Yes, sir.

11   Q.    And what's the certification period for this one?

12   A.    May 29, 2015 to July 27, 2015.

13   Q.    And what was the name of the provider for this?

14   A.    Arbor.

15         MR. BRADY:  And if we could back out a little bit and

16   then blow up the middle part, 21?

17   BY MR. BRADY:

18   Q.    Do you see in this box 21 it says something about the

19   nurse frequency?

20   A.    Yes, sir.

21   Q.    What was originally written there?

22   A.    Ten to 14 visits per week for four weeks.

23   Q.    There's some markings in handwriting there.  Do you see

24   that?

25   A.    Yeah.

1    Q.    Whose handwriting is that?

2    A.    I believe that's mine.

3    Q.    What did you do and write there?

4    A.    "As the patient has been better, I want to review the

5    service."

6    Q.    And what did you reduce it to?

7    A.    To once a week.

8    Q.    And why did you make that change?

9    A.    Because as the patient's getting better, I will cut down

10   the service.

11         MR. BRADY:  And if we Zoom out from that, please.

12   BY MR. BRADY:

13   Q.    Who signed this at the bottom?

14   A.    The first one is mine.  The second one I believe

15   Dr. Staii.

16   Q.    And when you signed it, did you sign it with the change

17   you made?

18   A.    Yes.

19         MR. BRADY:  And if we could back out of this and go to

20   page 64, please.  And maybe we can blow up the text part.

21   BY MR. BRADY:

22   Q.    Is this another fax cover sheet from Arbor?

23   A.    Yes, sir.

24   Q.    And who was the patient this was for?

25   A.    Mr. Larry Logan.

1    Q.   And what was the date of the fax?

2    A.   October 28, 2015.

3    Q.   All right.  And what was the -- what dates were listed for

4    the episode here?

5    A.   September 26, 2015 to November 24, 2015.

6              MR. BRADY:  Okay, let's back out of that.  Can we go

7    to page 65, please?  And can we blow up the top part?

8    BY MR. BRADY:

9    Q.   This is another Plan of Care from Arbor for Larry Logan;

10   is that right?

11   A.   Yes, sir.

12   Q.   And what was the certification period for this one?

13   A.   September 26, 2015 to November 24, 2015.

14   Q.   And this came from Arbor?

15   A.   Yes, sir.

16             MR. BRADY:  If we could back out of that and if we

17   could blow up box 21, please.

18   BY MR. BRADY:

19   Q.   Is that also your handwriting?

20   A.   Yes, sir.

21   Q.   What did you write here?

22   A.   Denied for the skilled nurse.

23   Q.   And what else did you do to this section?

24   A.   Basically I cross it.

25   Q.   Why did you do that?

1    A.   The client was evaluated and I feel that he's competent

2    enough to take care of himself.

3         MR. BRADY:  Can we back out of this, please?  And can

4    we go to page 68?

5    BY MR. BRADY:  What is this page that says "physician order" at

6    the top.

7    A.   This is the cover letter from visiting nurse that they

8    always send it.

9    Q.   What was the date on this order?

10   A.   November 24, 2015.

11   Q.   Is that your signature?

12   A.   Yes, that's mine.

13   Q.   And was it common to -- when you would reduce the care

14   requested, was it common to then get the same request back

15   after?

16   A.   Yes.

17        MR. BRADY:  Nothing further for this witness, Your

18   Honor.

19        THE COURT:  Cross?

20        MS. PASCUCCI:  Yes, Your Honor, thank you.

21   CROSS-EXAMINATION BY MS. PASCUCCI:

22   Q.   Good afternoon, Mr. Touch, my name is Michelle Pascucci,

23   I'm here with George Vien and we represent the defendant Faith

24   Newton in this matter.

25   A.   Good afternoon, ma'am.

```
 1        MS. PASCUCCI:  Would you mind pulling up the exhibit we
 2   just had?  I believe it was 76.  And could you go ahead to
 3   Bates 280?
 4   BY MS. PASCUCCI:
 5   Q.   You were just asked about this exhibit, this file for
 6   Larry Logan, and I want to start by asking about this document.
 7   This is from 2012.  Correct?
 8   A.   Yes, ma'am.
 9   Q.   And this document you were asked it's signed by Faith
10   Newton.  Correct?
11   A.   Yes, ma'am.
12   Q.   And the visitation that's requested is one visit per week
13   for nine weeks.  Correct?
14   A.   Yes, ma'am.
15   Q.   And you signed off on that Plan of Care.  Correct?
16   A.   Actually, the other page with my signature.  This one I
17   didn't have my signature on this one.
18   Q.   But if we go to the other page, this was the Plan of Care
19   that was approved?
20   A.   Yes, ma'am.
21        MS. PASCUCCI:  And could we go to Bates 248?
22   BY MS. PASCUCCI:
23   Q.   So this is 2015.  Correct?
24   A.   Yes, ma'am.
25   Q.   And this is three years later?
```

1    A.    Yes, ma'am.

2    Q.    And this is asking for ten to 14 visits per week.

3    Correct?

4    A.    Yes, ma'am.

5    Q.    And in this one, you say we should modify this, we should

6    make it once a week; isn't that right?

7    A.    Yes, ma'am.

8    Q.    And the person that signed this one, the nurse that signed

9    this, is Judy Mwaniki.  Correct?  Box 23?

10   A.    Yes, ma'am.

11   Q.    And, in fact, if we look at this specific Plan of Care for

12   this date period from May, 2015, to July, 2015, we don't see

13   Faith Newton's name on there; am I right?

14   A.    Yes, ma'am.

15   Q.    And then if we go ahead to -- would you mind pulling up

16   244?

17   BY MS. PASCUCCI:

18   Q.    And this is another Plan of Care, this is also from 2015.

19   Correct?

20   A.    Them.

21   Q.    And in this one you deny -- it again requests 14 visits

22   per week.  Correct?

23   A.    Yes, ma'am.

24   Q.    And you deny this one as well.  Correct?

25   A.    Yes, ma'am.

1    Q.    And this is also signed by Judy Mwaniki; am I correct?

2    A.    I don't see the name here.

3            MS. PASCUCCI:  If we go one forward, Ms. Apfel.

4    BY MS. PASCUCCI:

5    Q.    Am I correct that Ms. Newton's signature does not appear

6    on this Plan of Care?

7    A.    Yes, ma'am.

8    Q.    And if we go back to Bates 244, if we look at box 7 at the

9    very top, what is the e-mail that's listed for Arbor Homecare?

10   A.    I believe bmulruri17@comcast.net.

11   Q.    And you've never met Faith Newton before.  Correct?

12   A.    Never.

13   Q.    And you've never gone to Arbor Homecare's offices?

14   A.    Never.

15   Q.    And we talked a little about self-referrals.  It's not

16   illegal to self-refer for home care services.  Correct?

17           MR. BRADY:  Objection, Your Honor.

18           THE COURT:  Basis?

19           MR. BRADY:  Calls for a legal conclusion.

20           THE COURT:  If you can ask him to his knowledge.

21   BY MS. PASCUCCI:

22   Q.    To the best of your knowledge, do you understand it to be

23   illegal to self-refer for home health care services?

24   A.    My supervising physician never said anything, so I don't

25   know.

```
 1   Q.   And you testified regarding Plans of Care that you've
 2   received in your practice.  Correct?
 3   A.   Yes, ma'am.
 4   Q.   And you received Plans of Care from many home health care
 5   agencies.  Correct?
 6   A.   Yes, ma'am.
 7   Q.   And what are some other home health care agencies that
 8   you've received Plans of Care from?
 9   A.   I cannot remember.  There's too many.
10   Q.   And sometimes you would -- and going back to Arbor,
11   sometimes you would approve Arbor Plans of Care.  Correct?
12   A.   Yes.
13   Q.   And even today, there are times that you receive Plans of
14   Care that you deny.  Correct?
15   A.   Yes, ma'am.
16   Q.   And even today there are Plans of Care where you modify
17   the services requested by the agency.  Correct?
18   A.   Yes, ma'am.
19           MS. PASCUCCI:  No further questions, Your Honor.
20           THE COURT:  Redirect?
21           MR. BRADY:  Nothing for this witness, thank you, Your
22   Honor.
23           THE COURT:  You're excused.  Thank you.
24           MR. LOONEY:  The United States calls Anthony Eaton.
25                ANTHONY EATON, sworn
```

```
 1              COURTROOM CLERK:  Can you please state your name and
 2     spell your last name for the record.
 3              THE WITNESS:  Dr. Anthony Eaton.
 4     DIRECT EXAMINATION BY MR. LOONEY:
 5     Q.   Good afternoon.  Can you introduce yourself to the jury
 6     starting with your name?
 7     A.   Anthony Eaton, MD.
 8     Q.   And you gave it away professionally, but what do you do
 9     professionally?
10     A.   I'm a physician.
11     Q.   You went to med school?
12     A.   Yes.
13     Q.   Where was that?
14     A.   St. Louis University Medical School.
15     Q.   What did you do after med school?
16     A.   After medical school I went to residency in New York.
17     Q.   In what area?
18     A.   In internal medicine.
19     Q.   What name next?
20     A.   I did a three-month stint in hematology.
21     Q.   What is that?
22     A.   Study of blood cell disorders.
23     Q.   And after that?
24     A.   After that, I went into practice in Massachusetts, got my
25     license in Massachusetts.
```

1    Q.   And where did you go into practice in Massachusetts?

2    A.   I practiced at Pentucket Medical for several years, three

3    years, and then another practice called Pleasant Valley for two

4    years and then went on my own and ever since 2009 I've been in

5    practice by myself, solo practice.

6    Q.   So you've had a solo practice since 2009 and that runs

7    through the present?

8    A.   Yes.

9    Q.   Where is that solo practice located?

10   A.   In Methuen, Massachusetts.

11   Q.   Does it have a name?

12   A.   Eaton Medical Associates.

13   Q.   And what type of practice is it?

14   A.   It's a primary care practice, so we're treating general

15   adult patients age 17 and up and we also have a -- well, I also

16   have an interest in addiction treatment as well.

17   Q.   Are you generally familiar with the idea of home health

18   care?

19   A.   Yes.

20   Q.   Can you briefly describe for us what it is?

21   A.   Home health care agencies are usually run by nurses and

22   they assist patients that are in need of activities of daily

23   living.  They might need help with bedding, toileting,

24   medication management, blood pressure management, education on

25   any of the above as well as supervision for those who cannot

1    take care of themselves.

2    Q.    And your answer touched on this a little bit, but what

3    makes a patient eligible for home health care?

4    A.    Usually it's if they're not able to provide ADL -- they're

5    not able to execute any ADLs or activities of daily living on

6    their own.

7    Q.    And I noticed you pulling the microphone.  If you want to

8    pull it closer so everyone can hear you, that's great.  The

9    base moves itself even if you want to slide it closer.  Are you

10   familiar with something called a Plan of Care?

11   A.    Yes.

12   Q.    And what is that?

13   A.    Plan of Care is usually a form that's given to us, the

14   primary care doctor, and it is usually a form that is written

15   by a nurse that is employed by the agency.  The form usually

16   outlines the patient's history, physical exam, medications, and

17   there is usually an assessment that is done by that nurse and

18   that is based on a number of variables that they assess and at

19   the end of that form, they usually say, you know, recommend the

20   number of hours that the patient needs for them to do their

21   job.

22   Q.    You say a number of hours.  You mean a number of hours of

23   treatment by a skilled nurse or home health aide?

24   A.    Yes.

25   Q.    For a Plan of Care to be valid, is there a requirement

1    that it be signed by a physician?

2    A.   Yes.

3    Q.   Are you familiar with a company called Arbor Homecare

4    services?

5    A.   Yes.

6    Q.   How did you come to know about Arbor?

7    A.   Arbor -- well, there were a number of agencies in Methuen

8    and Lawrence area at the time, I think around 2012 or so.  I

9    was approached by Ben and Faith and they approached me to be

10   their medical director and that's --

11   Q.   Let me pause you for a second just so I'm clear.  Can you

12   tell us their last names?  You mentioned Ben and Faith?

13   A.   Ben and Faith Newton -- or, yeah --

14   Q.   It was Ben and Faith Newton?

15   A.   Yes.

16   Q.   All right.  You were saying they approached you to become

17   their medical director?

18   A.   Yes.

19   Q.   And is that at their agency?

20   A.   I wasn't employed to be at their agency physically there.

21   I was employed to be available for consultation if they had any

22   questions and usually we were meeting once every quarter or so.

23   Q.   So you were approached by Faith Newton and Ben to become

24   the medical director for the facility, not physically present

25   there, but for the business.  Is that right?

1    A.    Correct.

2    Q.    What were the responsibilities as medical director?

3    A.    It was mainly just to be available if there were any --

4    when I say "available" I just mean available for any questions,

5    any problems that come up for any operational issues that might

6    happen on a day-to-day basis.

7    Q.    What was the -- let me strike that.  Just to go back, what

8    kind of business was Arbor Homecare?

9    A.    It was a home health care agency.

10   Q.    When you were approached to become the medical director,

11   did you have a sense of the size of the business?  How many

12   employees, patients, anything like that?

13   A.    My feeling -- I mean, I can't quite recall, it was a while

14   ago, but at that moment in time I think they were pretty small

15   scale, maybe a dozen or so employees.  That's just kind of

16   ballpark recollection.

17   Q.    Did that change over the time you were involved with

18   Arbor?

19   A.    Yes, they grew.

20   Q.    How much?

21   A.    I can't say exactly how much.

22   Q.    Substantially?

23   A.    Substantially, yes.

24   Q.    You said you met with Ms. Newton, approximately,

25   quarterly?

1    A.    Yes.

2    Q.    What were the subject of those meetings?

3    A.    Meetings were generally just kind of -- rarely were there

4    any questions that came up on patient matters.  We would

5    discuss more things just like general things, how the nurses

6    are doing, how things are going for the business, if there are

7    any issues.  And to my knowledge, there was never really any

8    particular major issue that seemed to ever come up.

9    Q.    So no issue was raised to you about how the business was

10    operating or the care that's being provided?

11    A.    In the beginning phases, no.

12    Q.    We'll get back to that.  As a medical director, was it

13    your responsibility as medical director to sign off on Plans of

14    Care for Arbor's patients? Was that part of your job as medical

15    director?

16    A.    No.

17    Q.    Independent of that role, did you have involvement with

18    Arbor's patients?  Any of Arbor's patients?

19    A.    Yes.

20    Q.    In what capacity?

21    A.    They would occasionally send some of their patients or

22    some of my current patients would have already been in the

23    process of enrolling with Faith Newton's company.

24    Q.    So either Arbor would send new patients to you who were in

25    the process of enrolling in Arbor or your existing patients

1    would enroll with Arbor?

2    A.    That's correct.

3    Q.    And what was the process of getting -- when a new patient

4    was referred to you -- let's start with that.  When a new

5    patient was referred to you, what was the process of their

6    enrolling with Arbor services?  What would you get?

7    A.    So typically the patient would come in usually with

8    another person and that was typically the physical or the

9    initial visit.  That would typically be a Plan of Care that

10   would come by my way either before the visit or after --

11   closely thereafter the visit, the first initial visit with the

12   patient and then we would look at the Plan of Care and sign

13   accordingly.

14   Q.    And sign off on the Plan of Care you mentioned sometimes

15   Plans of Care came before you saw a patient.  Is that right?

16   A.    Yes.

17   Q.    Did those Plans of Care come filled in as you described

18   before with medical information and a treatment plan?

19   A.    Yes.

20   Q.    Did you discuss with Ms. Newton how those Plans of Care

21   were prepared?

22   A.    Yes.

23   Q.    What did you discuss?

24   A.    We would sometimes during our meeting, we would ask how

25   the Plans of Care were generated --

1    Q.    I want to ask you one question before you complete this.

2    You said we would ask.  Who's the we would ask?  Was there

3    someone else from your team there?

4    A.    Myself would ask, yes.

5    Q.    Go ahead?

6    A.    So I would ask how the Plans of Care were generated.  What

7    means were used, how was that patient assessed and typically it

8    was -- the discussion would lead to that it was another system

9    that they used called oasis and that system was something that

10   their nurses would plug information into based on the patient's

11   history, physical exam findings, et cetera, and that would give

12   them an idea of hours, what things were necessary to take care

13   of the patient, and that's where, you know, that last section

14   on the Plan of Care would be generated for.

15   Q.    So it was a -- generated by a system but nurses would --

16   what you were told is that nurses would put patient information

17   or patient assessment into that system and a Plan of Care would

18   be generated with a treatment plan; is that right?

19   A.    Correct.

20   Q.    You described instances in which a Plan of Care would come

21   to you and subsequently you would see a patient or you would

22   begin seeing a patient at the same time a Plan of Care care in?

23   A.    Yes.

24   Q.    Did you ever see discrepancies between what was set forth

25   in terms of medical symptoms and the plans of care and what you

```
 1    observed yourself in the patient?

 2    A.    Yes.

 3    Q.    What were those differences?

 4    A.    Sometimes it would seem as if the -- what I was seeing in

 5    the exam room with the patient didn't necessarily correlate

 6    with the need that was recommended on the behalf -- from the

 7    company.

 8    Q.    Was it that they did not need the services set forth in

 9    the Plan of Care?

10    A.    Not that --

11    Q.    All of the extent of the services?

12    A.    Yes. Right.

13    Q.    Was there a time -- and let's focus at the beginning of

14    your relationship with Arbor, when you signed Plans of Care

15    prior to conducting any medical assessment of the patient?

16    A.    Yes.

17    Q.    And does that mean you signed Plans of Care prior to --

18    without conducting any independent medical assessment of

19    whether those -- whether the services set forth in the Plans of

20    Care were necessary?

21    A.    Yes.

22              MR. LOONEY:  Could we bring up previously admitted

23    Exhibit 463?

24    BY MR. LOONEY:

25    Q.    And this is previously admitted so I'd like to publish it
```

1    to the jury.  Do you recognize maybe not this specific example

2    but this type of document?

3    A.   Yes.

4         MR. LOONEY: I wanted to show him the second page as

5    well.  I believe it's two pages.

6    BY MR. LOONEY:

7    Q.   So is this the type of Plan of Care you received from

8    Arbor?

9    A.   Yes.

10   Q.   And let's just walk through some of the details in here.

11   If we could highlight the patient's name box, box 6.  So this

12   is for a patient Amber Gardner.  Correct?

13   A.   Correct.

14        MR. LOONEY:  I meant pop out, Ms. Apfel, to make

15   things easier to see.

16   BY MR. LOONEY:

17   Q.   And this is for a patient Amber Gardner?

18   A.   Yes.

19   Q.   And going down to the bottom, the nurse's signature on

20   this one.  It's signed by Faith Newton.  Correct?

21   A.   That's correct.

22   Q.   And you're identified as the physician for this patient?

23   A.   Yes.

24   Q.   And then in the -- in box 27, there is an electronic

25   signature signed by Anthony Eaton MD, February 3, 2014.

1    Correct?

2    A.    That's correct.

3    Q.    Let's start with this question.  Do you recall this

4    patient?

5    A.    No.

6    Q.    Do you recall signing off on this document?

7    A.    No.

8    Q.    So you can't say with any degree of recollection whether

9    or not this patient needed the services set forth in this Plan

10   of Care?

11   A.    That's correct.

12   Q.    But did you sign Plans of Care such as this without

13   independently assessing whether the patient needed medical

14   care?

15   A.    Yes.

16   Q.    I noticed that that document was electronically signed

17   down at the bottom.  Was there -- how did you sign documents at

18   your business?

19   A.    Usually it was -- and to my knowledge it was either

20   hand-signed or we had a -- I had a stamp that -- for different

21   forms that was like a rubber stamp.

22            MR. LOONEY:  Ms. Apfel, could you blow up box 26 here?

23   BY MR. LOONEY:

24   Q.    This box reads physician or allowed practitioner

25   certification statement.  Correct?

```
1    A.    Correct.
2    Q.    And then it reads I certify/recertify that this patient is
3    confined to his or her home and needs intermittent skilled
4    nursing care, physical therapy and/or speech therapy and
5    continues to need occupational therapy." Did you sign documents
6    where that was not accurate?
7    A.    Yes.
8    Q.    And that's during the time you were hired as medical
9    director for Arbor?
10   A.    Correct.
11          MR. LOONEY:  We could take down Exhibit 463.  Thank
12   you, Ms. Apfel.
13   BY MR. LOONEY:
14   Q.    Did patients ever transfer from other doctors to your
15   care?
16   A.    Yes.
17   Q.    Do you recall specifically receiving patients who
18   transferred from a Dr. Joel Gorn?
19   A.    Yes.
20   Q.    Do you know why patients transferred from Dr. Joel Gorn to
21   you?
22   A.    No.
23   Q.    You don't know why?  Did you ever authorize Plans of Care
24   that had been previously denied by another doctor?
25   A.    Yes.  But that was -- finding that out later, not before.
```

```
 1   Q.    You found out after the fact that another doctor had
 2   previously denied it?
 3   A.    Exactly.  Yes.
 4   Q.    Were you the only person at your office that signed Plans
 5   of Care?
 6   A.    No.
 7   Q.    Who else did it?
 8   A.    I had several medical assistants at that time and later
 9   found out that they had accessed the rubber stamp and they were
10   signing off on what the rubber stamp --
11   Q.    Did you authorize them to do that?
12   A.    No.
13   Q.    Do you know why they did that?
14   A.    I don't know why.
15   Q.    What was your financial arrangement with Arbor as medical
16   director?
17   A.    Financial arrangement was that at every meeting, after
18   every meeting, usually this was two to three times a year
19   around every quarter that I would submit time, availability,
20   and we would have these meetings.  At the meetings, we would
21   discuss whatever topics they wanted to bring up and I would
22   provide my advice and they would basically, I believe it was a
23   check was every -- was given for every visit or every meeting
24   that we had and that was usually around $500.
25   Q.    Aside from the payment as medical director, did you
```

1   receive any additional funds from Arbor or Faith Newton?

2   A.    No.

3   Q.    Were you ever offered any?

4   A.    Yes.

5   Q.    What happened?

6   A.    After one of our meetings, there was a check that was

7   offered, and the check was around $5,000 to $6,000, I can't

8   recall exactly.  But it was, you know, kind of out of the norm

9   for me and I didn't know, really, how to respond to it.  I

10  didn't feel comfortable with it so I declined to take the check

11  or cash the check.

12  Q.    I wasn't clear from your answer.  Who offered you that

13  check?

14  A.    Faith Newton.

15  Q.    Going back to these Plans of Care you signed and you

16  indicated you signed some without conducting any independent

17  medical assessment.  Why did you do that?

18  A.    Well, at the time, our relationship was -- I think it's

19  important to kind of highlight the relationship was one that

20  was really based on kind of a mutual trust or Faith or good

21  Faith.

22  Q.    Pause your answer.  When you say "our relationship," your

23  relationship with whom?

24  A.    With Faith Newton.

25  Q.    Go on.

1    A.    So a lot of these -- well, some of these patient forms

2    were filled out because I had the inclination that they knew or

3    the nurses on their part knew what they were doing, they had

4    conducted the exam, their systems were intact and so on my end,

5    my thinking was, okay, well I'm going to see this patient,

6    everything's going to be fine, they've done their part and so

7    that was kind of my thinking in terms of pre-signing or signing

8    before I had done the exam.

9    Q.    So fair to say that when you received the Plans of Care

10   from Arbor you trusted that the information in there was

11   accurate?

12   A.    True, yes.

13   Q.    In retrospect was that trust well placed?

14   A.    No.

15   Q.    We've been speaking generally about your practices with

16   respect to Plans of Care at the outset of your relationship

17   with Arbor, right?  Did that change?

18   A.    Yes.

19   Q.    In what way?

20   A.    Our -- basically, we eliminated the use of the rubber

21   stamp when I found out the staff was misusing that.  My

22   scrutinizing of the clients, the patients that came in the door

23   for, you know, services, really heightened and basically we --

24   well, myself, I eliminated dealing with the number of agents, a

25   number of agencies in the area at the time.  There were

```
 1   probably at least two dozen separate agencies that we were
 2   working with and so just to get control of the situation, I
 3   eliminated that number down to about six agencies.
 4   Q.   You said you worked with about a dozen agencies.  Was
 5   Arbor the only one for whom you were medical director?
 6   A.   No.
 7   Q.   You were medical director for other ones as well?
 8   A.   Yes.
 9   Q.   Did you continue working with Arbor going forward or is
10   that one of the ones you eliminated?
11   A.   That was one we eliminated, yeah.
12   Q.   Why did you make those changes you just described?
13   A.   Well, mainly because I just felt like it was -- you know,
14   once I saw the discrepancies in terms of what I was seeing in
15   the patients -- within the patient, the need that I felt they
16   needed and on the forms that I just felt like it was something
17   that heightened my awareness that this needs to be looked at.
18   And also just in general, just kind of -- it was so much of a
19   burden on the office that, you know, I felt like it was kind of
20   taking away from just the day to day demand that normal
21   patients need.
22            MR. LOONEY:  Thank you, nothing further.
23   CROSS-EXAMINATION BY MR. VIEN:
24   Q.   Dr. Eaton, good afternoon.
25   A.   Hello.
```

1   Q.   My name is George Vien.  Michelle Pascucci and I represent

2   the defendant, Faith Newton.  Do you have an attorney with you

3   today?

4   A.   Yes.

5   Q.   And what's his name?  You're pointing to him because he's

6   here in court but his name is Jamie Sultan?

7   A.   Yes.

8   Q.   And were you interviewed by the Government?

9   A.   Yes.

10   Q.   And did you have your attorney with you when you were

11   interviewed?

12   A.   Yes.

13          MR. VIEN:  Your Honor, may I approach the witness?

14          THE COURT:  Sure.

15   BY MR. VIEN:

16   Q.   I've placed two documents in front of you.  Could we talk

17   to the one where it says "Re:  Dr. Anthony Eaton."  Do you

18   understand what this document is?

19   A.   Not entirely, but generally, yes.

20   Q.   What's your general understanding?

21   A.   I'd like to consult with James on this.

22   Q.   With your lawyer?

23   A.   Yes.

24   Q.   It's up to the Court.

25          THE COURT:  Sure.  Why don't we take our break a

```
1   little bit early?  We'll take a 15-minute break now.
2           (Recess, at 2:05 p.m. - 2:20 p.m.)
3           COURTROOM CLERK:  All rise for the jury.
4           (Jury enters the courtroom.)
5           COURTROOM CLERK:  Court is in session.  Please be
6   seated.
7           THE COURT:  All right, Mr. Vien.
8   BY MR VIEN:
9   Q.   Doctor, you've had an opportunity to speak with your
10  lawyer.  I'll try to remember the question exactly, but what is
11  your understanding of the letter that I placed in front of you
12  just generally?
13  A.   This is a letter, proffer letter, written by James Sultan.
14  It's basically stating that I will cooperate and speak
15  truthfully with the government about my recollection of events
16  and, in exchange, that those statements will not be used
17  against me.
18  Q.   And just to clarify, was the letter written by Mr. Sultan
19  or to Mr. Sultan?
20  A.   It was written by Mr. Sultan.
21  Q.   Are you sure about that?
22  A.   It says at the top James Sultan.
23  Q.   But isn't that the person to whom it is written?
24  A.   Oh, yes.  Dear, Mr. Sultan.  Yes.
25  Q.   Okay.  So it was written by the government to your lawyer,
```

```
 1   Mr. Sultan?

 2   A.   Yes.

 3   Q.   About your status, is that correct?

 4   A.   That's correct.

 5   Q.   Do you believe that's an accurate copy of the letter you

 6   received?

 7   A.   Yes.

 8   Q.   Is that your signature that appears on the second page?

 9   A.   Yes.

10   Q.   And also the signature of your lawyer, is that correct?

11   A.   That's correct.

12        MR. VIEN:  Your Honor, at this point I'd offer his

13   proffer letter, which I believe should be Exhibit 904.

14        MR. LOONEY:  No objection.

15        THE COURT:  It's admitted, 904.

16        (Exhibit 904 admitted into evidence.)

17   Q.   I put a second letter in front of you as well, correct?

18   A.   Correct.

19   Q.   And that's another letter to Mr. Sultan, is that correct?

20   A.   Correct.

21   Q.   But this one is not regarding you.  It's regarding your

22   wife, is that correct?

23   A.   That's correct.

24   Q.   Could you turn that over.  Is that her signature that

25   appears on the back?
```

1    A.    Yes.

2    Q.    Is that Mr. Sultan's signature?

3    A.    Yes.

4    Q.    And is that letter a proffer letter for your wife as well?

5    A.    Yes.

6          MR. VIEN:  Your Honor, at this point I observe the

7    offer letter for the doctor's wife.  I think it should be

8    Exhibit 904, 905.  Excuse me.

9          MR. LOONEY:  No objection.

10          THE COURT:  It's admitted, 905.

11          (Exhibit 905 admitted into evidence.)

12    Q.    Did your wife also give an interview with the government?

13    A.    Yes.

14    Q.    Okay.  I just have a copy of the letter.  I'd just like to

15    put up on the elmo, if that's okay.  And I will try adjust it.

16          All right.  The last paragraph on the first page of that

17    letter is displayed.  Dr. Eaton, do you mind reading that last

18    paragraph to the jury, please?

19    A.    From "to" or the very last paragraph?

20    Q.    It's the very last paragraph.  It's under number two but

21    it's not the first paragraph that starts with "the government."

22    It's the second paragraph that starts with "the United States

23    Attorney."

24    A.    "The United States Attorney is not hereby agreeing that he

25    will subsequently enter into a plea or immunity agreement with

1    your client.  The foregoing is the complete agreement between

2    your client and the United States Attorney with regard to your

3    client's proffer."

4    Q.   And does the same language appear in your wife's proffer

5    letter?

6    A.   That's correct.

7    Q.   And are you aware that the government has named you as an

8    unindicted co-conspirator?

9    A.   No.

10   Q.   Did you agree with anyone to commit violations of the

11   federal law?

12   A.   No.

13   Q.   Now, after working hard your entire life to go to medical

14   school, do medical school, do your residency, get additional

15   training, get your practice going, it must have been a bit

16   upsetting to be called in to talk to the government, is that

17   correct?

18   A.   That's correct.

19   Q.   And perhaps more upsetting must have been to have your

20   wife pulled in as well, is that correct?

21   A.   Correct.

22   Q.   And you didn't want to get prosecuted for anything, did

23   you?

24   A.   No.

25   Q.   Of course not.  How is your wife involved in this?

```
1    A.    My wife was an office manager at the time.

2    Q.    For your practice?

3    A.    Yes.

4    Q.    So but neither one of you have been prosecuted, is that

5    correct?

6    A.    That's correct.

7    Q.    And that's -- even though you basically admitted on direct

8    that you certified certain things were true when they weren't

9    true, right?

10   A.    Can you be more specific?

11   Q.    Well, you said that you certified that you had examined

12   patients and said that they needed the care that they were

13   trying to get, right?

14   A.    Yes.

15   Q.    And that wasn't true?

16   A.    That -- no.  Where there were -- I did my part from my

17   standpoint.

18   Q.    From your standpoint, but you hadn't examined the

19   patients, right?

20   A.    There were instances where I hadn't examined.

21   Q.    Okay.  So when you hadn't examined them, weren't those

22   untrue?

23   A.    Untrue in what sense?

24   Q.    Didn't you say I certified I've examined this patient and

25   this patient needs this care, and you were relying on nursing
```

1   notes, right?

2   A.   That's correct.

3   Q.   Okay.  So when you said, I certify, that wasn't true,

4   correct?

5   A.   That's correct.

6   Q.   And you did that, you signed that form, and this is kind

7   of technical language, but in relation to the provision of a

8   healthcare service, right, a home health aide?

9   A.   Correct.

10  Q.   You understand that's a federal crime?

11  A.   No, not at the time.

12  Q.   Okay.  But in any case, you signed the proffer letter.

13  You and your wife went in and talked to the government,

14  correct?

15  A.   Correct.

16  Q.   Okay.  And, at some point, did the government tell you or

17  your lawyer that they weren't going to prosecute you?

18  A.   No.

19  Q.   Okay.  It just never happened?

20  A.   Right.

21  Q.   And that's after you gave interviews with the government,

22  right?

23  A.   That's correct.

24  Q.   And that's after your wife gave interviews with the

25  government, right?

1    A.    Correct.

2    Q.    So you never -- you understand that you're never going to

3    be prosecuted in this case, right?

4    A.    I don't understand that.

5    Q.    You don't understand that?  Well, what you did took place,

6    what, in 2014?

7    A.    Correct.

8    Q.    So you think the government could still come back and

9    prosecute you for what you did?

10   A.    I don't know.

11   Q.    You're not sure either way?

12   A.    I'm not sure.

13   Q.    Okay.  Now, you said you began to work with Arbor in 2014,

14   is that correct?

15   A.    That's correct.

16   Q.    At that point, is it fair to say you were unfamiliar with

17   home health aides?

18   A.    Yes.

19   Q.    And can you tell us again what your job was with Arbor?

20   A.    I was their medical director.

21   Q.    Okay.  And is that what you described on direct where you

22   would be available?

23   A.    Yes.

24   Q.    When you first met with Faith Newton and Ben, did you

25   discuss complicated or difficult cases with them?

1    A.    Not to my recollection.

2    Q.    Okay.

3          MR. VIEN:  May I approach, Your Honor?

4          THE COURT:  Sure.

5          MR. VIEN:  It's the 302 of February 13, 2023.

6    Q.    This is a weird way do this, but I've put a document in

7    front of you.  I have to ask you to read something.  Then I'm

8    going to take it away and ask you did that refresh your

9    recollection.  Okay?

10   A.    Okay.

11   Q.    So I'll put the document in front of you and I'll ask you

12   to read the third paragraph to yourself.

13   A.    To myself?

14   Q.    To yourself.

15   A.    Okay.

16   Q.    I'll take it back.

17         Doctor, does that refresh your recollection that you and

18   Faith Newton and her husband Ben discussed major and complex

19   cases?

20   A.    That refreshed my memory that that is one of the

21   responsibilities of the role, but I don't recall answering any

22   particular questions about any complex patients.

23   Q.    So you don't remember whether you actually discussed major

24   and complex cases with any specificity but just the concept?

25   A.    Yes.

1    Q.    That's what --

2    A.    That's correct.

3    Q.    Okay.  Did you ever discuss major and complex cases with

4    them?

5    A.    Not to my recollection.

6    Q.    Do you remember while you were medical director whether

7    any of your patients received home healthcare or other care,

8    palliative care, anything like that from Arbor?

9    A.    Yes.

10   Q.    At that time, did you know whether or not the MassHealth

11   rules allowed a medical director to be the treating physician

12   and authorize home healthcare for the business he was the

13   medical director of?

14   A.    No.

15   Q.    You just didn't know either way?

16   A.    No.

17   Q.    At that point you were medical director of about 12

18   different home healthcare companies?

19   A.    I don't think that was the number but.

20   Q.    What's your -- I'm not trying to trick you, but what's

21   your best -- what's your best estimate of the number?

22   A.    I would say four.

23   Q.    About four?

24   A.    Yeah.

25   Q.    And did you -- did you have patients?  Did you send

1  patients or authorize their treatment by all those home

2  healthcare companies?

3  A.   Not all their patients, but the patients that I had seen

4  in office, yes.

5  Q.   Right.  The patients who needed it.

6  A.   Yes, in office, yes.

7  Q.   The ones you saw in your office who needed home

8  healthcare, you would authorize home healthcare visits for, is

9  that correct?

10  A.   That's correct.

11  Q.   And sometimes you would do it at the companies that you

12  were a medical director of?

13  A.   That's correct.

14  Q.   And, at that time you did that, you didn't know what the

15  MassHealth regulations were, correct?

16  A.   Correct.

17  Q.   Now, also, when you started working with these healthcare

18  agencies, did you understand that it was okay if you saw a

19  patient within 60 days of the date of the plan of care you

20  could sign off on it?

21  A.   At the time, no.

22  Q.   At the time you didn't understand that?

23  A.   No.

24  Q.   Okay.

25         MR. VIEN:  May I approach again, Your Honor?

1          THE COURT:  Sure.

2          MR. VIEN:  This is investigation on 2/8/2019.

3     Q.   I'm going to do the same drill before I'll give it to you

4     and you'll read it.

5     A.   Okay.

6     Q.   All right?  I just want you to read to yourself the third

7     paragraph, the yellow highlighted part there.

8     A.   Okay.

9     Q.   Does that refresh your recollection of what you understood

10    at the time about signing off on plans of care?

11    A.   Yes.

12    Q.   Okay.  What do you remember about what you knew at the

13    time about signing off on plans of care?

14    A.   My recollection was that the patient had to be seen on or

15    around within weeks or days within, you know, before or after

16    seeing the patient he had to sign off on the plan of care.

17    Q.   But did you tell the agents you thought it was 60 days?

18    A.   No.  I don't recall that.

19    Q.   You don't recall doing that?

20    A.   No.

21    Q.   Okay.  And, at the time, was it your understanding that

22    you could not make adjustments to the nursing notes?

23    A.   That's true.

24    Q.   Okay.  So you thought it was take it or leave it with the

25    nursing notes.  Is that a fair way to say it?

1    A.    Yes.

2    Q.    Okay.  And your understanding in this is this is in large

3    part because of the health regulations, is that correct?

4    A.    I can't really state either way on that.

5    Q.    Are you familiar with the MassHealth regulations now?

6    A.    Yes.

7    Q.    Okay.  Obviously, you're tremendously high achieving

8    academically, went to college, got into med school, graduated

9    from med school, you're a practicing doctor.  Fair to say the

10   MassHealth regulations are pretty complicated?

11   A.    Yes.

12   Q.    And I'm just going to ask you if you remember some

13   particular patients.  Okay?  And I say that just to help orient

14   you.

15        Do you remember seeing a patient named Emilio Betancourt?

16   A.    I vaguely recollect him, yes.

17   Q.    And do you remember whether or not he was in a wheelchair?

18   A.    No.

19            MR. VIEN:  I think the Court has authorized me to

20   approach.

21            THE COURT:  Yes.  Go ahead.

22   Q.    So I'll show you that same report and ask you to read the

23   second full paragraph to yourself.

24   A.    Okay.  Okay.

25   Q.    Does that refresh your recollection whether or not

```
1   Mr. Betancourt was in a wheelchair?

2   A.   No.

3   Q.   You just don't remember either way?

4   A.   Either way.

5   Q.   Do you remember telling the agents that he was in a

6   wheelchair?

7   A.   No.

8   Q.   And right now as you sit here today, you can't remember

9   either way?

10  A.   No.

11  Q.   Do you remember anything about Mr. Betancourt's physical

12  condition?

13  A.   I know that he had a number of medical issues.

14  Q.   Serious medical issues, including chronic pain?

15  A.   Yes.

16  Q.   Now, you were also asked on direct about taking patients

17  from Dr. Goren.  Do you remember that?

18  A.   Yes.

19  Q.   And did you -- did you accept patients from Dr. Goren?

20  A.   I didn't know that I was taking a patient from Dr. Goren.

21  When a patient comes into the office, typically it's, you know,

22  a number of reasons why they may come into the office, and I

23  rarely ask them why are you transferring from your previous

24  doctor.

25  Q.   So at the time you just didn't know?
```

1    A.    Yeah.

2    Q.    Okay.  And I don't want -- I want to say this delicately

3    but, in 2015, your mother had a serious stroke, is that

4    correct?

5    A.    That's correct.

6    Q.    And she needed home healthcare services, correct?

7    A.    Correct.

8    Q.    And, as a doctor, having dealt with Arbor, you sent her to

9    Arbor to be taken care of by one of their home health aides,

10   didn't you?

11   A.    That's correct.

12   Q.    And you did that because you thought she would get the

13   services she needed, right?

14   A.    Correct.

15          MR. VIEN:  I don't have anything else, Your Honor.

16          THE COURT:  Redirect?

17          MR. LOONEY:  Few questions.

18   REDIRECT EXAMINATION BY MR. LOONEY:

19   Q.    First, you were asked a few questions about your proffer

20   letter, correct?  Is it your understanding that the government

21   promised not to use the statements you made during interviews

22   in a prosecution against you?

23   A.    Yes.

24   Q.    Okay.  Did the government ever promise not to prosecute

25   you in exchange for statements you made during interviews?

1    A.    No.

2    Q.    Did the government ever promise not to prosecute you in

3    exchange for testimony today?

4    A.    No.

5    Q.    Did the government ask you -- were you told to answer

6    questions truthfully during your proffer statements?

7    A.    Yes.

8    Q.    Your proffer sessions?

9    A.    Yes.

10   Q.    Just as you were today?

11   A.    Yes.

12   Q.    And is that the -- did you promise to do that then?

13   A.    Yes.

14   Q.    And promise to do so now?

15   A.    Yes.

16   Q.    You were asked questions about whether you could sign

17   plans of care after the start date of the care set forth in

18   those plans.  And I think you said that, in some instances,

19   that was okay, but you also said the MassHealth regulations

20   were complex?

21   A.    Yes.

22   Q.    Was it ever appropriate to sign off on plans of care that

23   contained false or inaccurate information?

24   A.    No.

25   Q.    Are the MassHealth rules around that complex?

1    A.    Yes.

2    Q.    Around whether or not you can sign false information on a

3    plan of care?

4    A.    No.

5    Q.    They're pretty straightforward on that point?

6    A.    Yes.

7    Q.    Emilio Betancourt, you were asked a number of questions

8    about him.  You said he had a number of medical issues.  Do you

9    recall if you reached conclusion about whether twice per day

10   skilled nursing visits as specified in the plan of care were

11   appropriate for that patient?

12   A.    I can't recall that.

13          MR. LOONEY:  May I approach?

14          THE COURT:  Sure.

15          MR. LOONEY:  February 8, 2019 report.

16   Q.    I'm going to show you this document and ask you to read

17   that paragraph, last sentence.

18   A.    Okay.

19   Q.    I'm going to take that away.

20   A.    Sure.

21   Q.    Do you recall now whether you ever reached a conclusion

22   about whether twice a day skilled nursing visits were

23   appropriate for a patient named Emilio Betancourt?

24   A.    They were not in my opinion.  Right.  That's correct.

25          MR. LOONEY:  Nothing further.

 1          MR. VIEN:  Just a couple, Your Honor.

 2          THE COURT:  Go ahead.

 3     RECROSS-EXAMINATION BY MR. VIEN:

 4     Q.   Doctor, I only have a couple questions.

 5     A.   Sure.

 6     Q.   Then you'll be relieved.

 7          We talked about those proffer letters again on redirect,

 8     the ones that are in front of you.  What are the dates on those

 9     letters?

10     A.   February 8, 2019, and the other one was the same day,

11     February 8, 2019.

12     Q.   And you haven't been prosecuted since you signed this

13     document, correct?

14     A.   Correct.

15     Q.   Even though you've admitted to the government and the

16     world you made a false statement in relation to a healthcare

17     matter, correct?

18     A.   Correct.

19     Q.   So do you really think you're going to get prosecuted?

20     A.   I don't know.

21     Q.   Okay.  And is it fair to say you want to do everything

22     possible not to get prosecuted?

23     A.   Yes.

24     Q.   And you want your wife to avoid prosecution as well,

25     right?

1    A.    Correct.

2              MR. VIEN:  I don't have anything else, Your Honor.

3              THE COURT:  You're excused.  Thank you.

4              I only give them two rounds each:  Cross, recross,

5    direct, redirect.  That's it.  I don't have to turn back and

6    ask them for that third round.  It's just a no.

7              MR. BRADY:  Your Honor, the United States calls Cindy

8    Gavin.

9                        CINDY GAVIN, sworn

10             COURTROOM CLERK:  Would you please state your name and

11   spell your last name for the record.

12             THE WITNESS:  Cindy Gavin, and it's G-A-V-I-N.

13   DIRECT EXAMINATION BY MR. BRADY:

14   Q.    All right.  Good afternoon, Ms. Gavin.

15   A.    Good afternoon.

16   Q.    Can you hear me okay?

17   A.    Yes.

18   Q.    So that microphone in front of you, it can go closer and

19   moves around.  Just be sure to speak right into that.  Okay?

20         And I know you just had to say and spell your name but

21   could you introduce yourself to the jury, please.

22   A.    Hi.  I'm Cindy Gavin.

23   Q.    Okay.  And, Ms. Gavin, where do you currently work?

24   A.    I work for Mass General Brigham Home Care.

25   Q.    And what do do at Mass General Brigham?

```
1   A.    I'm an IV educator.

2   Q.    What does that mean?

3   A.    I train all the nurses how to do anything intravenous, so

4   I care for certain types of central lines, how to put in IVs,

5   how to draw blood, how to administer antibiotics through

6   various pumps or gravity flow or specialized things that have

7   to do with home infusion.

8   Q.    You're a nurse by training?

9   A.    Yes.

10  Q.    How long have you been a nurse?

11  A.    33 years.

12  Q.    33 years.  Okay.  And we've learned there's a couple

13  different kinds of nurses.  What kind of nurse are you?

14  A.    Registered nurse.

15  Q.    Registered nurse?

16  A.    Yes.

17  Q.    R.N.?

18  A.    Yes.

19  Q.    Okay.  Did you used to work at some place called Nizhoni?

20  A.    Yes.

21  Q.    N-I-Z-H-O-N-I?

22  A.    Yes.

23  Q.    What is Nizhoni?

24  A.    Nizhoni is a visiting nurse association.  It had a

25  specialty for more behavioral patients.  That's what its niche
```

1    was.

2    Q.   Can you describe for us, when you say behavioral patients,

3    tell us what you're talking about.

4    A.   So patients that had psychiatric diagnoses like

5    schizophrenia, schizoaffective disorder, depression, bipolar

6    disorder, so along with their needs for nursing, they would

7    have some kind of psych diagnosis or behavioral diagnosis

8    component.

9    Q.   You testified you are a nurse.  What role did you have at

10   Nizhoni?

11   A.   I had two or three roles, but my role for most of the

12   period was clinical manager.

13   Q.   And just to put some dates around this, what was the

14   period, roughly, what was the period when you were working at

15   Nizhoni?

16   A.   2014 to 2019, something like that.

17   Q.   You mentioned -- you mentioned you were a clinical

18   manager?

19   A.   Yes.

20   Q.   Can you explain to us what that meant?

21   A.   I made sure to hand out the assignments for the nurses

22   that worked under me in the field.  So they -- the nurses in

23   the field would do the visits to the patients and I would make

24   sure they got assignments in a certain area for each of them.

25   So if we got a new patient coming on board, that would go into

1    somebody's certain area so that people stayed to a certain

2    territory.  So I gave them assignments, handled any clinical

3    issues that came up, made sure that they had their time off

4    scheduled and things like that.  So I did a lot of clerical and

5    administration work and made sure that they got their

6    assignments.

7    Q.    Okay.  Have you heard of a company called Arbor Homecare

8    Services?

9    A.    Yes.

10   Q.    When or how did you hear about that?

11   A.    We received referrals from Arbor at a certain point, a

12   number of referrals, and we had heard that the company closed,

13   and we needed to make sure that these patients had what they

14   needed.  So the referrals were made to us, and I assigned

15   nurses to go out in the field to their homes and see what kind

16   of services that they required.

17   Q.    And you said at one point, if I told you January 2017,

18   does that sound right?

19   A.    Sounds right.

20   Q.    Okay.  And you described you had a role with respect to

21   these assessments?

22   A.    Yes.  So if the nurses -- if the nurses went out to see a

23   patient with their referral and they didn't answer the door or

24   they didn't answer their telephone and they tried numerous

25   times, they usually came back to the manager to, okay, let's

1   see who we can reach, and we'd look through the emergency

2   contact phone numbers and things, and we'd reach out to the

3   patients again for rescheduling a nurse to go back out.  So

4   there was an attempt made out in the field.  I talked to one of

5   the family members.

6   Q.   Okay.

7        MR. BRADY:  Could we pull up, please, Exhibit 309.

8   Q.   And before I ask you about that, did Nizhoni have -- were

9   you involved with overseeing a number of evaluations by Nizhoni

10  for a number of patients by Arbor?

11  A.   I couldn't put a number to it, but yes.

12  Q.   More than a handful?

13  A.   Yes.

14  Q.   And do you recall any concerns you had, anything coming

15  out of those assessments generally?

16  A.   I just remember that most, the majority of them were what

17  we called NTUCs or not taken under care.  So they didn't have

18  skilled nurse needs that we found.

19  Q.   So that term NTUC, that just means based on Nizhoni's

20  evaluation, they didn't need skilled nursing?

21  A.   Correct.

22  Q.   Okay.  You should have in front of you on the computer

23  screen, do you see -- do you see a document on that screen in

24  front of you?

25  A.   Yes.  That's our intake form at Nizhoni.

1   Q.   And do you see on --

2        MR. BRADY:  Maybe if we can blow up the top third of

3   it.

4   Q.   Do you see on here that this indicates the manager on this

5   intake form?

6   A.   Yes.

7   Q.   And who was the manager for this?

8   A.   That was me, Cindy Gavin.

9   Q.   Was this intake form created and maintained in the

10  business of Nizhoni?

11  A.   Yes.

12       MR. BRADY:  Your Honor, I offer Exhibit 309.

13       MS. PASCUCCI:  Subject to the objection we discussed

14  earlier.

15       THE COURT:  Yes.  I'm going to overrule the objection

16  and admit the document, 309.

17       (Exhibit 309 admitted into evidence.)

18  Q.   Okay.  Ms. Gavin, now that everybody can see it, just one

19  more time, what are we looking at here?

20  A.   We are looking at a referral or intake form for Nizhoni.

21  Q.   And how did this document -- what was this document used

22  for at Nizhoni?

23  A.   So we have an intake department, so if a provider,

24  hospital, or a skilled nursing facility rehab had a patient

25  that wanted, they wanted to have home or felt that they needed

 1    to have home services, they'd call in to our intake department,

 2    and this is the standardized list of information that we needed

 3    to get going.

 4    Q.   Now, let me see.  In the upper right corner here, do you

 5    see there's a section that says "Referral Received?"

 6    A.   Yes.

 7    Q.   What was the date -- before I ask you what was the date,

 8    what does that mean, "Referral Received"?

 9    A.   Whoever started this document, that's when the call came

10    in for it.  So it's a referral received date.

11    Q.   So what was this referral received date?

12    A.   One -- is that 13, 2017 or is that a two?  1/23/2017.

13    Q.   Sorry.  It's a little grainy.  There's a name -- do you

14    see some handwriting on here?

15    A.   I do.

16    Q.   Do you recognize that handwriting?

17    A.   I recognize the nurse from my area.  Caroline Tamfu was

18    one of the nurses who worked underneath me.  So I'm not

19    positive that I wrote this note, but, basically, it's saying

20    she's going -- Caroline's going out 1/24/17 to meet this

21    patient.

22    Q.   Okay.  And then below that, there's a section that says

23    "Client Demographic Information."  Do you see that?

24    A.   Yes.

25    Q.   What's contained?  What's generally contained in that

1    part?

2    A.    Patient's name, address, phone number, their age, language

3    they speak is important because it would let the nurse know if

4    they needed interpreter services.  Emergency contact name, the

5    relationship.  It says friend.  And their telephone number.

6    Q.    And what was the name of the patient for this intake form?

7    A.    Esmeralda Ayala.

8         MR. BRADY:  Let's go ahead, if we could zoom out of

9    that, please, and then if you scroll down here -- before we

10   leave that page, if we could go back, please.  If we can blow

11   up the part that's "Clinical Information," that part.

12   Q.    Again, just generally, Ms. Gavin, what's contained in this

13   section?

14   A.    So it's telling me a little more about the patient, their

15   medical diagnoses.  So I can see arthritis, chronic pain,

16   hypertension, asthma.

17   Q.    I'm sorry to interrupt you.  Keep going.  Are you

18   finished?  I'm sorry.

19   A.    I'm not sure what this -- it might be rheumatoid

20   arthritis, yeah, R-H-E-U.  It is grainy.

21   Q.    Do you see here there's a section that says "Other

22   Significant Information?"  Do you see that, below "Allergies?"

23   A.    Yes.

24   Q.    What does it say beneath that?

25   A.    "Referred by Arbor, dual insurance," which is usually

1    Medicare, Medicaid, who the primary care physician is, Dr.

2    Folch.  "Patient is active with PCP."  They would check that

3    before we went out.  And what the last appointment was, and

4    that was 11/30/2016.

5         MR. BRADY:  If we can back out of that and scroll

6    again, scroll again, and if we can blow up this page 4.

7    A.    Okay.  So this is the same patient.

8    Q.    So my question, Ms. Gavin, is what -- this is a record

9    from Nizhoni that you created?

10   A.    Yes.

11   Q.    Okay.  And is that your -- where it says "Signature," is

12   that your name next to it?

13   A.    Yes.

14   Q.    What did that mean to have your name next to that line?

15   A.    That I wrote this document.

16   Q.    Okay.  What did you write here?

17   A.    I wrote "client refused services.  Several attempts made.

18   Skilled nurse," that's SN, "skilled nurse reports client

19   slammed door in her face.  Writer spoke to granddaughter

20   Shandall Rios by telephone." This in quotes, so they said this.

21   "My grandmother appreciates the attempts made to provide

22   services.  However, she doesn't need skilled nursing as she has

23   always been right 'on point' with her meds.  Granddaugher has

24   been made to be home health aide in the past and is looking for

25   similar."

1    Q.    And what ended up happening with Ms. Ayala's case?

2    A.    We did not take her under care, so that's the NTUC, not

3    taken under care.  So from the attempts and from my

4    conversation with the daughter, we ascertained that she didn't

5    have a skilled nursing need and home health aide services for

6    her to get the granddaughter to be paid.  They can go through

7    MassHealth.  They wouldn't need my company to do that.

8    Q.    Did Nizhoni do that, do the home health aide stuff?

9    A.    Not for family members to get paid that I recall.

10    Q.    Okay.

11         MR. BRADY:  Nothing further for this witness, Your

12    Honor.

13         THE COURT:  Cross?

14    CROSS-EXAMINATION BY MS. PASCUCCI:

15    Q.    Good afternoon, Ms. Gavin.  My name is Michelle Pascucci.

16    I'm here with George Vien.  We represent defendant Faith

17    Newton.

18         You talked about your role at Nizhoni.  Am I saying

19    Nizhoni correctly?

20    A.    Nizhoni, yes.

21    Q.    I thought it was Nizhoni.  So you were -- you had a

22    supervisory role at Nizhoni, correct?

23    A.    Correct.

24    Q.    And, in 2017, you were not out there visiting patient

25    homes, correct?

1    A.    I could.  My primary role would be clinical manager, but

2    if staffing levels needed it, I would.  Like if somebody was on

3    vacation, I would fill in.  I would pick up on weekends, that

4    kind of thing.  So I could.

5    Q.    But, by and large, when patients were referred from Arbor

6    in January 2017, you weren't personally assessing those

7    patients, correct?

8    A.    No.  I would assign the referrals.

9    Q.    And you testified regarding patients that were referred to

10   Nizhoni after Arbor had closed, correct?

11   A.    I believe that's what I was told, that Arbor was closed.

12   Q.    So, in this case, Nizhoni was evaluating patients that had

13   previously been treated by home healthcare aides at Arbor?

14   A.    Don't know that.

15   Q.    You understood at that time that Arbor had closed and

16   there were no services from Arbor at that time?

17   A.    Correct.

18   Q.    Isn't it true that a patient's condition can change over

19   time?

20   A.    Yes.

21   Q.    Patients can get better?

22   A.    Yes.

23   Q.    A patient that once needed frequent services, say daily

24   services or two times per day services, they may need once a

25   week services or no services at all at some point?

1    A.    Correct.

2    Q.    And if you know, it is not illegal to have family as a

3    home health aide, correct?

4    A.    No.

5    Q.    And you also testified you worked at Nizhoni between 2014

6    and 2019, correct?

7    A.    Uh-hum, yes.

8    Q.    Isn't it true that, in 2016, Nizhoni was found to have

9    improperly billed 8 million to MassHealth?

10         MR. BRADY:  Objection.

11   A.    I don't know that.

12         THE COURT:  Hold on.  Basis?

13         MR. BRADY:  Relevance.

14         THE COURT:  She said she didn't know anyway, so I'm

15   going to overrule the objection.

16   Q.    Nizhoni is still in operation, correct?

17   A.    Yes, under a new name.

18   Q.    And when you were work at Nizhoni, Nizhoni also received

19   referrals from another home healthcare agency named

20   Commonwealth Care, is that correct?

21   A.    Sounds familiar, yes.

22   Q.    And isn't it true that there were referrals from

23   Commonwealth Care that you characterized as NTUC's, people that

24   weren't taken under care?

25   A.    I don't know the number of NTUC's from Commonwealth care.

1    Q.    But isn't it generally true that there were some patients

2    from Commonwealth Care that you did not take under your care at

3    Nizhoni?

4    A.    I don't recall.  Directly in my section of greater Lowell,

5    I do not recall.

6            MS. PASCUCCI:  Ms. Apfel, if we can pull up Exhibit

7    309 and if we could go to Bates 072.  Thank you.

8    Q.    According to this document, the nurse that was overseeing

9    this patient, Ms. Ayala, at Arbor, that was Marie Kamau,

10   correct?

11   A.    This would be Arbor's sheet.  Primarily clinician Mary

12   Kamau, yes.

13   Q.    And Ms. Gavin, you've never met Ms. Newton, correct?

14   A.    No.

15           MS. PASCUCCI:  No further questions.

16           MR. BRADY:  Nothing further, Your Honor.

17           THE COURT:  You're excused.  Thank you.

18           MR. BRADY:  Your Honor, the United States calls Scott

19   Wisnaskas.

20           Your Honor, I think we have some witness binders.  May

21   I distribute those?

22           THE COURT:  Sure.

23               SCOTT WISNASKAS, sworn

24           COURTROOM CLERK:  Thank you.  Please be seated.  Would

25   you please state your name and spell your last name for the

1    record.

2              THE WITNESS:  It's Scott Wisnaskas, W-I-S-N-A-S-K-A-S.

3    DIRECT EXAMINATION BY MR. BRADY:

4    Q.    Good afternoon.

5    A.    Good afternoon.

6    Q.    Where do you work?

7    A.    I work at the United States Department of Health and Human

8    Services, Office of Inspector General, which is often shortened

9    to HHSOIG

10   Q.    And what is the HHSOIG?

11   A.    So we are a quasi-y independent part of the Department of

12   Health and Human Services.  Our mission is to investigate

13   allegations of waste fraud abuse within all the programs that

14   the department offers with most of our resources, I believe,

15   going towards Medicare and the state Medicaid programs, like

16   MassHealth.

17   Q.    What's your job at HHSOIG?

18   A.    So the official title is Criminal Investigator, but we're

19   generally known as special agents.  So my job is to carry out

20   those investigations.

21   Q.    How long have you been a special agent at HHS?

22   A.    About 15 and a half years.

23   Q.    Did you have prior government experience before that?

24   A.    Yeah.  Prior to HHSOIG, I worked for the Office of

25   Personnel Management conducting background investigations for

1  security clearances.

2  Q.   Have you received training as a special agent at HHS?

3  A.   I have.

4  Q.   Can you generally describe that training.

5  A.   I completed the criminal investigator training program at

6  the Federal Law Enforcement Training Center in Georgia.  I also

7  completed my agency's own special agent training program, as

8  well as the Inspector General academy training program, and

9  over the years received continuous training on a quarterly

10  basis.

11  Q.   Where did you go to school?

12  A.   Northeastern University here in Boston.

13  Q.   And did you get a degree from there?

14  A.   I did. I got a bachelor's degree and master's degree, both

15  in criminal justice.

16  Q.   Was HHSOIG -- so the health and human service, the Office

17  of the Inspector General, were they part of an investigation

18  into the defendant Faith Newton?

19  A.   They were.

20  Q.   What was -- what was your agency's role in the

21  investigation?

22  A.   They were one of three agencies that were investigating

23  Arbor Home Care, along with FBI and the IRS's Criminal

24  Investigations Division.

25  Q.   When did this investigation start?

1   A.    2015.

2   Q.    When did you join the investigation?

3   A.    May of 2022.

4   Q.    And since joining the investigation, generally, what's

5   been your role in the investigation?

6   A.    Preparing for trial, speaking to witnesses, going through

7   documents and records.

8   Q.    Now, before you joined the case, was there another case

9   agent or another agent assigned to the case at HHS?

10  A.    There was.

11  Q.    Who was that?

12  A.    Special Agent Fradette Hernandez.

13  Q.    Do you know how long she was on the case?

14  A.    I believe she was on from the beginning until sometime

15  during 2022.

16  Q.    Okay.  And do you know did she go and take a role in 2022?

17  A.    She did.  She took advantage of a promotion to, still

18  staying within our agency, but she's now within our training

19  branch at the Federal Law Enforcement Training Center training

20  new agents.

21  Q.    Okay.  And Special Agent Wisnaskas, have you been in the

22  courtroom for this trial?

23  A.    Yes.  As much as I have been able to, yes.

24  Q.    And when you weren't in the courtroom, what were you

25  doing?

1    A.    Usually out speaking to witnesses and just sort of

2    coordinating arrivals for witnesses.

3    Q.    Now, as part of the investigation, did you and the team

4    obtain records from MassHealth relating to Arbor?

5    A.    We did.

6    Q.    Okay.

7          MR. BRADY:  Could we pull up, please, Exhibit 318.01

8    for the witness.  And if we could go to the next page and the

9    next page.  If we could go back one.

10   Q.    Special Agent, what is this document?

11   A.    This is a provider contract between MassHealth and Arbor

12   Home Care Services, LLC.

13         MR. BRADY:  Your Honor, I offer Exhibit 318.01.

14         MR. VIEN:  No objection.

15         THE COURT:  Admitted.

16         (Exhibit 318-01 admitted into evidence.)

17         MR. BRADY:  Ms. Apfel, if we could please just blow up

18   the top half of this page.

19   Q.    And Special Agent, now that we can all see it, what is

20   this document?  What are we looking at?

21   A.    This is reflecting that the provider, Arbor HomeCare

22   Services, has centered into a contract with MassHealth to be a

23   MassHealth provider.

24   Q.    And so who is this contract between?  Can you tell?

25   A.    The provider is Arbor HomeCare Services, LLC with

1    MassHealth.

2         MR. BRADY:  Ms. Apfel, can we bounce out of that and

3    jump to page 6, please, and can we blow up the signatures here.

4    Q.    Special Agent, what are we looking at here?

5    A.    This is the signature portion of the contract.

6    Q.    And who signed for the provider Arbor HomeCare Services?

7    A.    Benjamin Muiruri.

8    Q.    What was the date of that signature?

9    A.    July 19, 2013.

10   Q.    And then did somebody sign for the Executive Office of

11   Health and Human Services?

12   A.    They did.

13   Q.    And what was the date of that signature?

14   A.    August 16, 2013.

15        MR. BRADY:  Ms. Apfel, if we can come out of that and

16   go back to page 3, please.  If we can blow up -- actually,

17   below that, the "Executive Office of Health."  Thank you.

18   Q.    What's the first paragraph of this agreement say?

19   A.    "The Executive Office of Health and Human Services

20   operates a program of Medical Assistance under 42 U.S.C. 1396

21   (herein MassHealth) and desires to purchase services and goods

22   for eligible members in said program from participating

23   providers, and desires to operate said program in a fiscally

24   responsible manner."

25   Q.    And what does it say below that starting with the

1    provider?

2    A.    "The Provider desires to furnish services and/or goods to

3    eligible members in accordance with the legal requirements of

4    MassHealth and the terms of this Provider Contract and to

5    receive reimbursement therefore."

6    Q.    And then do you see below that there's a heading in bold?

7    What does that say?

8    A.    "The Provider and MassHealth mutually agree."

9    Q.    All right.

10              MR. BRADY:  And then if we can back out of that, if we

11   could go to the next page, please.  If we can blow up, you see

12   roman numeral two, "the provider agrees."  If we can blow up

13   before that and after that.  Thank you.

14   Q.    Do you see, Special Agent, where it says in bold "The

15   Provider agrees?"

16   A.    I do.

17   Q.    Again, the provider for this contract was what?

18   A.    Arbor HomeCare Services.

19   Q.    Could I ask you to read the first paragraph under the

20   "Provider agrees."

21   A.    The provider agrees to furnish services and/or goods that

22   conform to the requirements for such services and/or goods as

23   set forth in MassHealth regulations; to furnish only those

24   services and goods that qualify as medically necessary under

25   MassHealth regulations; and to furnish services and/or goods

1    that conform to the professionally recognized standards of

2    healthcare within the Commonwealth for the applicable provider

3    time and/or specialty type, or, if appropriate, that conform to

4    the generally accepted standards within the Commonwealth for

5    the trade."

6    Q.   And then could I ask you -- there's point B.  Can I ask

7    you to read that one, please, right below that.

8    A.   "To comply with all federal and state laws, regulations,

9    and rules applicable to the Provider's participation in

10   MassHealth, now existing or adopted during the term of this

11   Provider Contract."

12   Q.   Okay.

13        MR. BRADY:  We can back out of that.  And if we

14   could -- we can take that document down, please, Ms. Apfel.

15   And can we please pull up just for the witness Exhibit 719.

16   Q.   Special Agent, can you see Exhibit 719?

17   A.   I can.

18   Q.   What is Exhibit 719?

19   A.   This is a notification letter to Arbor HomeCare Services

20   notifying of withholding payments.

21   Q.   What's the date on this?

22   A.   January 3, 2017.

23        MR. BRADY:  Your Honor, I offer Exhibit 719.

24        MR. VIEN:  No objection, Your Honor.

25        THE COURT:  It's admitted.

1          (Exhibit 719 admitted into evidence.)

2    Q.   Can you see on here where this notice was addressed to?

3    A.   Arbor HomeCare Services, LLC, 3 Courthouse Lane, Unit 9,

4    Chelmsford, Massachusetts, 01824.

5    Q.   Can you ask you to read starting with the first paragraph

6    what this says.

7    A.   "MassHealth is authorized pursuant to 130 CMR 450.249 to

8    withhold payments from a provider when it has reasonable cause

9    to believe that the provider has committed any violations of

10   the rules, regulations, standards and laws governing MassHealth

11   or that overpayments have been made to the provider.  It is

12   also authorized to withhold payments where there is a credible

13   allegation of fraud.  In addition, in cases where there is a

14   credible allegation of fraud for which an investigation is

15   pending, federal regulations at 42 CFR 455.23 generally require

16   MassHealth to withhold all payments, unless MassHealth has good

17   cause not to withhold payments or to withhold payments only in

18   part."

19   Q.   All right, Special Agent, can I ask you to then read the

20   next paragraph here, please.

21   A.   "MassHealth has received credible allegations of fraud

22   involving your violations of rules, regulations or standards

23   and laws governing MassHealth.  The general allegations of the

24   investigation include the allegation that Arbor HomeCare

25   Services, LLC was billing patients for more than 96 units of

```
 1    G0156 (15 minutes of home health aide in home health setting)
 2    per day and billing for home health services for a member that
 3    was provided services by another home health agency on the same
 4    day."
 5    Q.   And what -- the next sentence that followed, what did it
 6    say next?
 7    A.   "Accordingly, pursuant to 42 CFR 455.23 and 130 CMR
 8    450.249, MassHealth is withholding one hundred percent of all
 9    payments from you effect immediately, as of January 3, 2017
10    unless MassHealth issues further notice or determines there is
11    insufficient evidence of fraud."
12    Q.   Let me stop you there.
13             MR. BRADY:  Can we go to the next page.
14    Q.   You see that there is signed by somebody from the director
15    of the MassHealth Program Integrity?  Do you see that?
16    A.   Yes.
17             MR. BRADY:  Okay.  We can take that down, Ms. Apfel.
18    Thank you.
19    Q.   Special Agent Wisnaskas, were you asked to do anything in
20    preparation for your testimony here today?
21    A.   I was.
22    Q.   What were you asked to do?
23    A.   I was asked to pull together some summary charts of
24    exhibits that otherwise would be too burdensome or voluminous
25    to show.
```

1    Q.    And did you review records, documents to create those

2    charts?

3    A.    I did.

4    Q.    And can you generally describe for the jury what those

5    documents were.  Were there categories of documents?

6    A.    Yeah.  There's generally three categories.  I looked at

7    Axxess records for a number of Arbor patients, looking through

8    the narrative sections of the different skilled notes, Oasis

9    forms.

10   Q.    Let me interrupt you there.  Why were you looking through

11   those?

12   A.    I was looking for notes that had narratives that seemed to

13   be repetitive, identical, as well as certain statements that

14   were contained multiple times in those records.

15   Q.    What else did you review?

16   A.    I reviewed text messages.

17   Q.    Okay.  Where did those text messages came from?

18   A.    These came from Faith Newton's phone.

19   Q.    Okay.  And then did you review anything else?

20   A.    I reviewed claims records from MassHealth.

21   Q.    Okay.  When you say claims records from MassHealth, can

22   you just briefly explain what that means, a claim from

23   MassHealth?

24   A.    Sure.  It's a record of payments from MassHealth to Arbor

25   for particular services.

1    Q.    And who asked you to do that?

2    A.    The investigative team or the trial team.

3    Q.    Including the prosecutors?

4    A.    Yes.

5    Q.    And did you, in fact, do that?

6    A.    I did.

7    Q.    So let's kind of walk through those, and we'll focus first

8    on the patient records.  Okay?

9    A.    Okay.

10    Q.    First question, where did you get those from?

11    A.    These were Axxess records.

12    Q.    And remind us, what's Axxess?

13    A.    Axxess is the program Arbor used for submitting their

14    visit notes.

15    Q.    As part of that review, did you look at the Oasis

16    assessments for any patients?

17    A.    I did.

18    Q.    What was Oasis's assessment?

19    A.    That was the assessment conducted by the Arbor nurse that

20    would have eventually been used to provide a plan of care to

21    doctors.

22    Q.    Okay.  And do you recall which patients you looked at the

23    Oasis assessments for?

24    A.    I do.  Amber Gardner and Oscar Ortiz.

25    Q.    And did you create any charts summarizing those records?

1   A.   I did.

2        MR. BRADY:  Can we please pull up for the witness and

3   the Court Exhibit 715-01.

4   Q.   Can you see Exhibit 715-01?

5   A.   I can.

6   Q.   What is Exhibit 715-01?

7   A.   This is my summary chart of comparing the Oasis Start of

8   Care narratives for Amber Gardner and Oscar Ortiz.

9        MR. BRADY:  Your Honor, I offer Exhibit 715-01.

10       MR. VIEN:  Your Honor, I understand the summary rule,

11  and that's okay.  It's just this seems to go beyond that.  I

12  was wondering if we could have a sidebar.

13       THE COURT:  Sure.

14            *** Beginning of sidebar ***

15       MR. VIEN:  I just noticed on some of them, when we go

16  through them, they had a narrative at the top that I don't

17  think is appropriate for a summary.  This is the paragraph.  I

18  think that goes beyond where the summary ends.

19       THE COURT:  I'm not sure it does, but I'll tell you

20  where I have an issue.  This is a different question, but as

21  long as I have you up here, these notes seem problematic to me.

22       MR. BRADY:  Why, Your Honor?

23       THE COURT:  Well, I don't know how you can have a

24  note.  It's supposed to be reflecting the substance.

25       MR. VIEN:  That's what I was trying to say.  You said

1  it a lot better than I.

2         THE COURT:  It says "note".  I don't think that's

3  okay.

4         MR. BRADY:  We can redact that out, Your Honor.

5         THE COURT:  It's in all of them.

6         MR. BRADY:  I think only on some of them.

7         THE COURT:  It's on many pages in this one.  The rest

8  of it -- I mean, if it had a title on the chart, I think that's

9  okay.  What might be problematic, and I'll hear the government,

10  is the characterization of it being identical.  Isn't that what

11  the jury is supposed to figure out?

12         MR. BRADY:  Well, the defendants can cross on that,

13  Your Honor.  The reason why it started this way, Your Honor, is

14  that these are voluminous documents.  There's a lot of notes.

15  So we're trying to come up with some sort of a way to

16  summarize.

17         THE COURT:  I think the note is okay, but there's a

18  number of narratives, all including.  I think that's okay

19  because you're not characterizing it.  It's the identical.

20         MR. BRADY:  I think he's reviewed it.  If you want to

21  call it a characterization or not, he's prepared to testify

22  that, having reviewed this, that's what it looks like, and so

23  that -- I guess this goes back to the note comment too.  Those

24  notes are footnotes and consistent with what I would expect he

25  is going to testify to.

```
 1              THE COURT:  But you couldn't transcribe his testimony
 2   and give it to him, right?  He's supposed to testify about a
 3   summary.  Hold on.  Let me get the book.  I forget the rule
 4   number.
 5              MR. BRADY:  Is it 1001?
 6              THE COURT:  That's why I'm going to it.
 7              MR. LOONEY:  I think 1006.
 8              THE COURT:  1006.  You can use a summary, chart or
 9   calculation to prove the content of.  All right.  I'll let you
10   have this one.  The only thing I was concerned about, for the
11   record, was the word "identical".  I'm more concerned about
12   these things that say "note".  That seems -- it bothers me that
13   it's a note.  I think you can probably include that information
14   on it.
15              MR. VIEN:  I have to disagree.  Unless they put it in
16   a chart form that says, here are the 17 documents for this that
17   AMPPM, and that's all it is, but the narrative is the problem.
18              MR. BRADY:  This is the challenge you run into at some
19   point.  You put so much information in there.  You're trying to
20   strike that right balance.  Your Honor, if the characterization
21   or the word "note" or the way it's cast, I'm happy to make
22   whatever changes the Court deems appropriate.
23              THE COURT:  I guess this seems testimonial, so I would
24   take out the notes.
25              MR. BRADY:  Okay.
```

```
1           THE COURT:  The other thing -- I'm not sure it should

2    say "identical" but he's going to testify to it.  It's a close

3    call.  I'll let you have that.  Delete the little note

4    commentaries.  I feel like that's an aside, to me, that aren't

5    part of the summary.

6           MR. BRADY:  I understand the Court's point.  We'll do

7    that.

8           MR. VIEN:  Your Honor, do you want to deal with the

9    other objection we made to the subset of those documents?

10          THE COURT:  Isn't that what I just did?

11          MR. VIEN:  Well, you did in part.  Our objection was

12   to all of them, and then we had the subset that we gave you

13   that we don't think should come in.  That was the ones we asked

14   to be excluded.

15          THE COURT:  You don't think they should come in

16   because the nurses' notes are --

17          MR. VIEN:  Correct.

18          THE COURT:  Aren't they still -- I mean, it's a

19   summary of the Axxess records, right?

20          MR. VIEN:  Yes.  The summary is the summary.  That's

21   sort of step one.  As I said, the other argument, regardless of

22   whether the summary is accurate, it shouldn't come in because

23   they're not tied to Faith Newton or any co-conspirator in the

24   case.

25          THE COURT:  But the documents have already been
```

```
 1    admitted with the Axxess records, right?
 2              MR. VIEN:  The Axxess records have been admitted.
 3              THE COURT:  So these are going to come in.
 4              MR. BRADY:  Can I make a programming note here because
 5    I see we have a half hour left?  One of the things with this
 6    witness is we have a bunch of text messages to read in.  I
 7    think there's less issue with the recitation of those.  What I
 8    might do is switch the order, spend this time we have going
 9    through that.  And then, if we have to make any changes, we
10    don't have to do it on the spot.
11              THE COURT:  He'll take a look at it.
12              MR. VIEN:  We're going to do something else with the
13    text.  Are you guys okay with the texts we gave you?  And how
14    do you want them?
15              MR. BRADY:  And since I know you want to use them,
16    we're going to ask him to read them in.  So we'll give it an
17    exhibit number.
18              MR. VIEN:  Great.
19              MR. BRADY:  We'll give it a number and read that in
20    with the rest.
21              MR. VIEN:  Part of it is that he's physically
22    attracted to me, but we need to neutralize these things.  You
23    should talk to Mr. Brady.
24              MR. BRADY:  May we return to our spots?
25              THE COURT:  Yes.
```

```
 1                       *** End of sidebar ***
 2    Q.    Special Agent Wisnaskas, I was -- we were going to take a
 3    look at some of the patient records from Axxess.
 4    A.    Yes.
 5    Q.    We're going to switch gears.  You said something about
 6    text messages that you reviewed?
 7    A.    That's right.
 8    Q.    So I'm going to come back to the patient records.  Let me
 9    ask you about the text messages.
10    Q.    As part of the investigation, did the government at one
11    point get a copy of the defendant's phone?
12    A.    They did.
13    Q.    Do you know when that was?
14    A.    I believe it was around July 30 of 2017.
15    Q.    And did that phone include text messages that were sent
16    and received by the defendant?
17    A.    That's correct.
18    Q.    Did you review those messages?
19    A.    I did.
20    Q.    And did you identify certain messages that were relevant
21    to your investigation?
22    A.    I did.
23    Q.    And did you create any charts to summarize those messages?
24    A.    Yes.
25    Q.    For these charts, did you include every message you saw?
```

1    A.   No.

2    Q.   Did you include every relevant message you saw?

3    A.   No.

4         MR. BRADY:  So let's pull up, please, Exhibit 714.

5    Q.   Can you see Exhibit 714 on the screen?

6    A.   I can.

7    Q.   What is Exhibit 714?

8    A.   It's a chart I created of a text message conversation

9    between Faith Newton and Eleanor Connors.

10         MR. BRADY:  Your Honor, I offer Exhibit 714.

11         MR. VIEN:  No objection.

12         THE COURT:  It's admitted.

13         (Exhibit 714 admitted into evidence.)

14         MR. BRADY:  Can we, Ms. Apfel, blow up the top part

15    there where the conversation is.

16    Q.   What is -- what are we looking at, Special Agent?

17    A.   So I took the information from -- so, basically, the text

18    messages come downloaded into a very large Excel file.  So this

19    was taking the pertinent information from that Excel file,

20    including the date and time the message was sent, from, to, as

21    well as the actual text.

22    Q.   And who were these text messages between?

23    A.   These were between Faith Newton and Eleanor Connors.

24    Q.   And I note there is some shading in this exhibit, in this

25    chart.

1  A.   Yeah, to make it easier to keep track of who was saying

2  what.  All of the messages from Faith Newton are shaded in

3  gray.

4  Q.   Let's real briefly walk through the columns.  What's the

5  first column on this chart?

6  A.   It's date and time.

7  Q.   Just so we're not confused here, how is the date -- how is

8  the date represented here?

9  A.   Yeah.  So the date is represented by first showing the

10  actual day of the month, followed by the month, followed by the

11  year.

12  Q.   So the day and the month are reversed on how we usually

13  use it?

14  A.   Yes.  It's from the software we usually use to pull from a

15  phone.  It uses this standard.

16  Q.   In your clearest voice, can you read through this message

17  for us.

18  A.   Sure.  Eleanor Connors, "Hey Faith.  What was the name of

19  the doctor from Lawrence that I was going to see that you and I

20  talked about last week."

21      Faith Newton, "Doctor Goren."

22      Eleanor Connors, "Oh, okay, thank you."

23      Faith Newton, "Okay."

24      Eleanor Connors, "Hi Faith, Dr. Goren is not happy with

25  us."

1      Faith Newton, "Why?"

2           MR. BRADY:  Can we go to the next page of this,

3  please.  Can we blow up the texts.

4  Q.   Were these more texts between Faith Newton and Eleanor

5  Connors?

6  A.   They are.

7  Q.   And what was the date on these messages?

8  A.   This was January 6, 2017.

9  Q.   And how does that compare to the messages we were just

10  looking at?

11  A.   I believe it was a week later, but I don't recall the date

12  of the first one.

13  Q.   Can you read these messages to us, please.

14  A.   Sure.

15      Eleanor Connors, "Why were you asking about Dr. Goren

16  yesterday?  Is everything okay?"

17      Faith Newton, "Cause he has been reporting homecares to

18  Anthony generals office.  Hope he doesn't call and report us."

19  Q.   Let me interrupt you right there, Special Agent.  The

20  reference to "Anthony generals office," does that make any

21  sense to you?

22  A.   No.  I think it probably means Attorney General's Office.

23  Q.   Keep going, please.

24  A.   Sure.

25      Eleanor Connors, "Oh, he said he already did to all the

1    homecares, Avenue, Nizhoni and us were on the top of the list

2    for abuse.  I asked him if I could have the paperwork so that I

3    could look into everything and he said no one is getting this

4    paper.  He said they told him to keep it and all the paperwork

5    from all agents in a file.  I don't know why."

6        Faith Newton, "Okay."

7        Eleanor Connors, "But that's where I'm trying to be very

8    careful when we are getting referrals, cause if we are being

9    shopped, we have to be very strict.  Like if there is no date

10   on when the last face to face encounter was so that I know it's

11   been within 90 days, not taking it or calling doctors to verify

12   when patient last seen.  If not in past 90 days, not taking

13   referral until they go to doctor for appointment.  If no FTF

14   with referral waiting till we get one, because sometimes the

15   doctor office never sends it over and that's not good.  Things

16   like that.  We have to be careful going forward."

17       Faith Newton, "Yes, of course."

18       Eleanor Connors, "I think Joseph is being more careful too

19   because we have not been admitting as many patients as usual.

20       Faith Newton, "That's good."

21       Eleanor Connors, "Yes, I think so."

22       MR. BRADY:  We can take that one down.  And just for

23   the Court and the witness, may I have the overhead.

24   Q.   Special Agent, can you see on the screen in front of you

25   some additional text messages between Faith Newton and Eleanor

1    Connors?

2    A.    I can.

3    Q.    And this is Exhibit 906, what's been marked as 906?

4    A.    Correct.

5            MR. BRADY:  Your Honor, I offer 906.

6            MR. VIEN:  No objection, Your Honor.

7            THE COURT:  It's admitted.

8            (Exhibit 906 admitted into evidence.)

9    Q.    All right.  Special agent, if you can go ahead and read --

10   let me ask you about -- the format's a little bit different on

11   this, right?

12   A.    Yeah.  This is a little bit different.  It appears that in

13   the greenish shading, those are messages that are going from

14   Faith Newton to Eleanor Connors, while the messages that say

15   "read," which are kind of highlighted in blue, are messages

16   that have come into Faith Newton's phone.

17   Q.    Okay.  This is a format you're familiar with?  You've seen

18   them like this?

19   A.    Yes, I have.

20   Q.    Okay.  Go ahead and please -- what are the dates on

21   these -- let me start that over.  What's the date on these

22   messages?

23   A.    So without knowing the exact format, if it's different

24   from what we were just looking at, this appears to be

25   February 9, 2016.

1    Q.   What do these messages say?  Walk us through.

2    A.   Sure.

3         Faith Newton, "We been so busy in the office due to the

4    state audit going on in the homecare agency.  So we are doing

5    our own audit just in case they show up here."

6         Eleanor Connors, "Oh, okay, if you need any help, I'm

7    looking for some temporary work.  Lol.  Running out of money.

8    Winter is slow.  Good luck with audit.  I'm sure you guys are

9    good."

10        Faith Newton, "Thanks."

11             MR. BRADY:  Okay.  Can we go to the next page of this

12   Exhibit, which is page 3.

13   Q.   Who are these text messages between?

14   A.   This is a text conversation between Faith Newton and Ana

15   Rosa Gonzalez.

16   Q.   Same Ana Rosa Gonzalez, as you understand it, who

17   testified in this trial?

18   A.   That's correct.

19   Q.   And when were these messages sent and received?

20   A.   September 11, 2014.

21   Q.   Can I ask you to read three these messages.

22   A.   Sure.

23        Faith Newton, "I am going to send you the names of two

24   clients.  Check them for me.  Guillermina pagan colon y maria

25   idel pagan berrios."

1       Rosa Gonzalez, "Okay."

2       Faith Newton, "Adriana is claiming those patients."

3          Rosa Gonzalez, "Guillermo was her rep.  We don't have

4    the second patient.

5          Faith Newton, "Okay.  I think I paid her for him."

6          MR. BRADY:  Let's zoom out of that.  Go to the next

7    page, please.

8    Q.   What are we looking at on this page?

9    A.   This is a text message conversation between Faith New

10   Hampshire and Linda Hin.

11   Q.   Who is Linda Hin?

12   A.   In the text messages, she identifies herself as an HHA, as

13   well as an recruiter.

14   Q.   So an HHA and a recruiter for?

15   A.   For Arbor.

16   Q.   When were these text messages sent and received?

17   A.   December 24, 2013.

18   Q.   Can you read through these for us, please.

19   A.   Sure.

20       Faith Newton, "By the how many patient have you referred

21   so far?"

22       Linda Hin, "3 including her."

23       Linda Hin, "Haven't received a bonus yet for it."

24          MR. BRADY:  We can zoom out of this.  Let's go to the

25   next page, please.

1    Q.    And what's on this page?

2    A.    This is another conversation between Faith Newton and

3    Linda Hin.

4    Q.    When did this one take place?

5    A.    January 20, 2014.

6    Q.    Let's read through this one, please.

7    A.    Linda Hin, "Good morning.  It's Linda.  I was just

8    wondering if I can get the referral bonus for the 2 clients I

9    brought in."

10        Faith Newton, "Sure, but today I'm busy doing payroll.

11    Tomorrow is okay."

12        Linda Hin, "Sure thing.  See you then.  Thanks."

13        Faith Newton, "Okay, and bring some more clients."

14        Linda Hin, "I'm working on two more.  Just waiting for

15    them to fax over their information."

16        Linda Hin, "They are from Boston."

17        Faith Newton, "That okay.  We have nurses in Boston."

18        Linda Hin, "Sounds good."

19        Faith Newton, "Yap."

20            MR. BRADY:  Let's zoom out of that and go to the next

21    one.

22    Q.    More messages between Faith Newton and Linda Hin?

23    A.    That's correct.

24    Q.    What's the date on these?

25    A.    February 25, 2014.

```
 1   Q.   Can you read through these please, read them for us.

 2   A.   Linda Hin, "Good morning!  Could you please verify their

 3   eligibility?  Thank you!  He's on disability.  He has mental

 4   issues."

 5        Faith Newton, "Okay, will let you know.  You never came

 6   for your money."

 7             Linda Hin, "Oh, okay.  Can I come but today?  At 245?

 8   Bye and thank you."

 9   Q.   Do you see a reference there to somebody named Syed who

10   worked at Arbor?

11   A.   Yes, Syed Hussain.

12   Q.   What was his position at Arbor?

13   A.   He was an administrator.

14   Q.   And do you know roughly when he left Arbor?

15             MR. VIEN:  Objection, Your Honor.  This is all

16   hearsay.

17             MR. BRADY:  Your Honor, I'm happy to move on.

18             THE COURT:  Okay.  Good idea.

19             MR. BRADY:  Let's back out of that. Can we go to the

20   next one, please.

21   Q.   What's the date on these?

22   A.   It's June 19, 2014.

23   Q.   And please, starting at the top, read through these.

24   A.   Faith Newton, "Call Syed and give him the name please.

25   You can tell him I send you to him."
```

1    Linda Hin, "Thank you!  He's also my referral and Bunly

2  Am.  Who do I speak to about the referral bonus?"

3    Faith Newton, "Ben."

4    Linda Hin, "Okay, thanks."

5    MR. BRADY:  Let's back out of that and go to the next

6  page, please.

7  Q.   And these are some additional text messages.  Who are

8  these messages between?

9  A.   These are between Faith Newton and Syed Hussain.

10  Q.   Okay.  What's the date of this conversation?

11  A.   This conversation begins a date of September 21, 2013 and

12  continues on to September 22, 2013.

13  Q.   Could you read these, please.

14  A.   Faith Newton, "Good afternoon, Syed.  Can you please help

15  me with notes if you have free time.  Thank you."

16    Syed Hussain, "Yeah, no problem Faith.  I will start

17  saving them.  I'm going out right now but it be done by Sunday

18  night."

19    Faith Newton, "Wow.  Thank you so much.  I owe three not

20  one."

21    Syed Hussain, "I will start working on them tonight.  Is

22  that okay?"

23    Faith Newton, "Yes, that fine.  No problem.  I just need

24  to be done before Tuesday 11 a.m.  I do not want that guy Syed

25  to call me if I'm not done by billing due date."

1          Syed Hussain, "Lol.  Yep.  You will get that phone call if

2    it's not complete."

3          Faith Newton, "I know that why I'm looking for help cause

4    I'm getting nervous.  Thanks for your help.  Did you change the

5    vital signs or do I need to change them?"

6          Syed Hussain, "No, I didn't not change them Faith."

7          Faith Newton, "Okay, thanks."

8          Syed Hussain, "The dates for the bowel is changed and the

9    date at the bottom is saved.  The remains is times, vitals and

10   signature.  And there was one that's a new patient.  So there

11   was no previous notes to save from.  Sorry.  If there is

12   anything else you need, let me know."

13         Faith Newton, "I'm all set.  Thank you.  They are saved.

14   It is easy for me to do them.  Thank you much."

15         Syed Hussain, "Okay.  No problem, Faith."

16         Faith Newton, "Thank you."

17             MR. BRADY:  Let's go on to the next one, please, and

18   let's blow that up.

19   Q.   Am I right this is from a couple of days after the text

20   messages you just read?

21   A.   Correct.

22   Q.   That week after?

23   A.   Yes.

24   Q.   Okay.  Could you read these ones, please.

25   A.   Syed Hussain, "All set, Faith, but there was three that

1    didn't have any previous notes to save from."

2         Faith Newton, "No problem.  Thank you so much.  Did you

3    change the vital signs or do I need to change them?"

4         Syed Hussain, "No, I changed them but just take a look at

5    them and tell me if they're fine so I know for next time."

6         Faith Newton, "Okay.  I will let you know tomorrow.  I'm

7    gonna finish them tonight."

8         Syed Hussain, "Okay, great."

9         MR. BRADY:  Let's go to the next page, please.

10   Q.   More text messages between Mr. Hussain and Faith Newton?

11   A.   Yes.

12   Q.   When are these from?

13   A.   January 12, 2013.

14   Q.   Can you read them in, please.

15   A.   Syed Hussain, "All set, Faith, except for Cristina Aponte,

16   there only one completed note.  So I'm not sure if you want me

17   to copy the same previous note for 7 day."

18        Faith Newton, "Yes, you can.  I will fix it.  And Rebecca

19   have not done any notes still.  If she is not done by tomorrow,

20   we have to assign those patient to another nurse."

21        Syed Hussain, "Yup.  No problem.  I'll call her today

22   too."

23        Faith Newton, "Okay, thanks, and do not think she needs a

24   job."

25             MR. BRADY:  Can I get the overhead, please.

1    Q.   And this is Exhibit 906.  You see this is Exhibit 906 in
2    evidence?
3    A.   Yes.
4    Q.   Can you see on the screen, Special Agent, additional texts
5    to and from Faith Newton with Syed Hussain?
6    A.   I do.
7    Q.   According to this exhibit, what's the date on these?
8    A.   Looks like the date is October 2, 2014 and October 3,
9    2014.
10   Q.   Can I ask you to read through these?
11   A.   Sure.
12        Faith Newton, "Hi Syed.  I just hard ann Njoroge went to
13   Kenya this morning.  Is that true?"
14        Syed Hussain, "No, she didn't."
15        Faith Newton, "Is she still working with us?"
16        Syed Hussain, "I don't know.  She won't return my calls or
17   emails.  I asked her to come to the office which she said she
18   would do but never showed up."
19        Faith Newton, "Okay.  I called her.  She never pick up.
20   So I think we should just resign her patient.  One y irungu
21   wants for patient.  We can give her those patient.  She told me
22   Anna is working for Boston homecare.  So who cares."
23        Syed Hussain, "Okay, will do."
24        Faith Newton, "Okay.  Thanks."
25        Syed Hussain, "At the dentist office."

1        Faith Newton, "Okay."

2        Syed Hussain, "I'll call you as soon as I'm out."

3        Faith Newton, "Okay.  No problem."

4        Faith Newton, "Hi Anna.  I tried to call you last night

5    after I got report that you unprofessional abandon your patient

6    by writing a email to Syed at 5 a.m. about you leaving for

7    Kenya for emergency and you never pick up your phone from the

8    office or from me.  You cannot just write a mail and not talk

9    to anyone there after.  How about if the email did not go

10   through it was never read?  How about the patient?  That is

11   neglect and abuse of patient and your professional license.

12   And I hope you did the same thing to Boston homecare.  Thanks

13   and be blessed Faith."

14       Syed Hussain, "I love you Faith.  Wow.  Very well written.

15   Good job.  She is probably freaking out."

16       Faith Newton, "That want I'm trying to do?"

17            MR. BRADY:  And if we can go back to trial director,

18   please.  Let's go to the next, please.

19   Q.   Now, who were these messages between?

20   A.   Between Faith Newton and Joan Kagendo.

21   Q.   Who is Joan Kagendo?

22            MR. VIEN:  Objection, Your Honor.  This will be

23   hearsay, the response.

24            THE COURT:  Why don't you try laying a foundation.  I

25   don't know if it's going to be hearsay, but.

```
 1   Q.    Through your investigation, have you come to learn who
 2   Joan Kagendo is?
 3   A.    I have.
 4   Q.    How did you learn that?
 5   A.    Through witness interviews and documents.
 6   Q.    Who is Joan Kagendo?
 7              MR. VIEN:  Objection.
 8              THE COURT:  If it came from the documents, he can have
 9   that.  It's overruled.
10   A.    She's a nurse at Arbor.
11   Q.    When were these messages from?
12   A.    This would be August 19, 2014.
13   Q.    What do they say?
14   A.    Joan Kagendo, "You need to give Pedro referral money for
15   Carmen Perez.  I don't know even know her."
16        Faith Newton, "No, I did not."
17        Joan Kagendo, "You did not what?"
18        Faith Newton, "Give Pedro referral money."
19        Joan Kagendo, "Yeah.  I'm telling you to give him.  He's
20   asking for it."
21              MR. BRADY:  Let's back out of that one and go to the
22   next.
23   Q.    Another group of messages between Ms. Newton and Joan
24   Kagendo?
25   A.    Yes.
```

1    Q.    When were these from?

2    A.    This was December 2, 2014.

3    Q.    And what did these ones say?

4    A.    Joan Kagendo, "I'm so sick of this ouko.  Why can't he be

5    simple.  Writing emails.  Jesus."

6         Faith Newton, "Tell him that I just hold him off.  He is

7    copying from the policy book."

8         Joan Kagendo, "He's full of shit."

9         MR. BRADY:  Let's go to the next one, please.

10   Q.    What's this?

11   A.    This is additional conversations between Faith Newton and

12   Joan Kagendo on May 25, 2016.

13   Q.    Starting at the top, could you read this, please.

14   A.    Faith Newton, "I know.  They think I'm made of money."

15        Joan Kagendo, "You are."

16        Faith Newton, "Everyone needs a place of me."

17        Joan Kagendo, "I hate to be you right now."

18        Faith Newton, "It is not easy.  Even unice was asking me

19   for 5000 last week."

20        Joan Kagendo, "Oh, my gosh.  Are people crazy?"

21        Faith Newton, "And Nyambura wanted 20,000."

22        Joan Kagendo, "Oh my lord.  What 20,000.  People have no

23   shame."

24        Faith Newton, "They think I get it free from MassHealth."

25        Joan Kagendo, "You do."

1        Faith Newton, "I know.  Can I peek some for you.  Just let

2   me know how much."

3        Joan Kagendo, "Haha.  You're funny.  Don't worry.  I'll

4   all set.  I'm not that greedy like the rest of them."

5        Faith Newton, "That okay.  I did not want to leave you

6   behind.

7        Joan Kagendo, "Haha."

8            MR. BRADY:  Let's go to the next one, please.

9   Q.   Who are these text messages between?

10  A.   Faith Newton and Joan Kagendo.

11  Q.   What's the date of these messages?

12  A.   September 12, 2016.

13  Q.   Could you walk us through.

14  A.   Faith Newton, "What did aira write?  She writes stopped

15  stuff.  She is not supposed to post anything before it is

16  review by us."

17       Joan Kagendo, "I'll take care of it and I'll remove the

18  scheduling tab from her."

19       Joan Kagendo, "She made up pay a hha when patient was on

20  vacation.  I have those emails cause these stupid HHAs can take

21  them anywhere else now."

22       Faith Newton, "Did we bill for it?"

23       Joan Kagendo, "Yes.  And the we have an order signed by

24  doctor to hold.  I talked to Kelly biller.  She'll take care

25  of."

1     Faith Newton, "That is bad.  That is what they are nailing

2     people on.  Okay."

3     Joan Kagendo, "And that HHA will be deducted from her

4     check.  We have to give it back to MassHealth."

5     Faith Newton, "Okay."

6     Joan Kagendo, "It will be okay."

7     Faith Newton, "Okay."

8          MR. BRADY:  Can I get the overhead, please.

9     Q.   You see we're back on the Exhibit 906?

10    A.   Yes.

11    Q.   And do you notice that -- never mind my marking.  Do you

12    notice there's some additional messages before and after when

13    you just read?

14    A.   There are.

15         MR. VIEN:  Can we just have the -- excuse me.  Can you

16    give us a USAO number on it, if there is one?  Which one is it?

17         MR. BRADY:  663.

18         MR. VIEN:  Thank you.

19    Q.   Can I ask you at the top to read in the other messages

20    here?

21    A.   Sure.

22    Kagendo, "The nurses have very high numbers.  That's why

23    even their documentation is not good, so the PA gets denied if

24    the note doesn't make sense.  You can do a good PA, but if the

25    notes are bad, then too bad.  I will hold a meeting for all the

1   nurses to go over PAs this month."

2       Faith Newton, "I know but avenue have lost lot of patients

3   and I heard MassHealth is not paying them."

4       Kagendo, "Oh, boy.  It will be okay.  Arbor will be okay.

5   God will protect us."

6       Faith Newton, "Amen."

7       Kagendo, "Can you tell your friend Eunice Muiruri to call

8   me.  And Airanese is gonna put you in trouble with the stupid

9   emails she's writing to HHAs.  Who knows where they're gonna

10  end up."

11      Faith Newton, "What did she write?  That is her number.

12  Please call her.  I'm so tried.  Just got home since this

13  morning."

14      Kagendo, "I have called her so many times, even text, and

15  it's important about her patients.  Are you okay?  Don't worry.

16  Get some rest.  I'll keep trying."

17      Faith Newton, "I'm okay.  Did a lot of walking in downtown

18  Boston."

19      Kagendo, "Oh, gosh."

20          MR. BRADY:  I think we can stop there.  Your Honor,

21  this might be a decent spot.

22          THE COURT:  All right.  Keep an open mind.  Don't talk

23  to anybody or in any place about the case.  No extracurricular

24  research.  And we will see you all tomorrow morning at 10.

25  Thanks, everyone.

```
 1              COURTROOM CLERK:  All rise for the jury.
 2              (Jury exits the courtroom.)
 3              THE COURT:  What time do you all want to start
 4    tomorrow?
 5              MR. VIEN:  9:30?
 6              THE COURT:  Can we do a charge conference in a half an
 7    hour?
 8              MR. VIEN:  If you tell us.
 9              THE COURT:  I'll give the charge that I have.
10              MR. BRADY:  Perhaps if we play it safe, if we say
11    nine?
12              THE COURT:  I can't do it at nine.
13              MR. VIEN:  9:15?
14              THE COURT:  I have statuses at nine and 9:15.  They
15    should be relatively quick.  I'll come out at the end of the
16    day.
17              MR. VIEN:  Do you want to do it at the end of the day?
18              THE COURT:  No.  I want to charge them tomorrow.
19              MR. LOONEY:  To be on the safe side, we should allow
20    more than a half an hour in the morning.
21              THE COURT:  We can also use lunch but I have a quick
22    status at lunch too.
23              MR. LOONEY:  And I get hungry.  I'm sorry.
24              THE COURT:  Can we start at 8:30, quarter of nine?
25    That only gives us 15 minutes.  If we have 8:30 to nine and
```

1    then 9:30 to ten.

2            MR. VIEN:  That sounds okay.

3            THE COURT:  Kelly, is that all right with you?  All

4    right.  We'll start at 8:30.  Thank you, everyone.

5            (Adjourned, 4:00 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            We, Kelly Mortellite, Jessica Leonard and Kristin

4    Kelley, Official Court Reporters in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of our skill and ability.

9                    Dated this  5th day of July, 2023.

10

11                    /s/ Kelly Mortellite

12                    /s/ Jessica Leonard

13                    /s/ Kristin Kelley

14                    Official Court Reporters

15

16

17

18

19

20

21

22

23

24

25