```
                   UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS


                              )
UNITED STATES OF AMERICA,     )
                              )         Criminal Action
         Plaintiff,           )         No. 21-10035-ADB
                              )
v.                            )
                              )
FAITH NEWTON,                 )
                              )
         Defendant.           )
                              )


           * * * * * E X C E R P T * * * * *

                  JURY TRIAL DAY 7

               TESTIMONY OF BRIDGET HORAN

        BEFORE THE HONORABLE ALLISON D. BURROUGHS
              UNITED STATES DISTRICT JUDGE


                    July 16, 2024


        John J. Moakley United States Courthouse
                   Courtroom No. 17
                   One Courthouse Way
              Boston, Massachusetts  02210
```

```
                         Kelly Mortellite, RMR, CRR
                         Official Court Reporter
                         One Courthouse Way, Room 3200
                         Boston, Massachusetts  02210
                         mortellite@gmail.com
```

1    APPEARANCES:

2    On behalf of the Government:
     William B. Brady
3    Christopher R. Looney
     United States Attorney's Office MA
4    1 Courthouse Way
     Suite 9200
5    Boston, MA 02210
     617-748-3287
6    william.brady@usdoj.gov
     christopher.looney@usdoj.gov
7
     Standby counsel on behalf of Pro Se Defendant:
8    Thomas J. Iovieno
     345 Neponset Street
9    Canton, MA 02021
     617-464-3300
10   tjilaw@yahoo.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            * * * * *
 2              MR. LOONEY:  The government calls Bridget Horan.
 3              THE COURT:  Mr. Looney, she's your last witness,
 4    right?
 5              MR. LOONEY:  Correct.
 6              THE COURT:  Do you have an estimate of how long her
 7    testimony is going to be, her direct?  Just trying to figure
 8    out when to take the break.
 9              MR. LOONEY:  I'm guessing about an hour.
10              THE COURT:  Okay.  Let's get started then.
11                     BRIDGET HORAN, sworn
12              COURTROOM CLERK:  Can you please state your name and
13    spell your last name for the record.
14              THE WITNESS:  My name is Bridget Horan.  Last name is
15    spelled H-o-r-a-n.
16              COURTROOM CLERK:  Thank you.
17    DIRECT EXAMINATION BY MR. LOONEY:
18    Q.   Good morning, Ms. Horan.
19    A.   Good morning.
20    Q.   How are you?
21    A.   I'm good.
22    Q.   Good.  What do you do for work?
23    A.   I'm a forensic accountant for the FBI.
24    Q.   How long have you been in that position?
25    A.   About eight years.
```

10:53 (line 10)
10:54 (line 20)

```
  1   Q.   And could you walk us through your educational background

  2   prior to -- your educational background?

  3   A.   I have a Bachelor's of Science in Business Administration

  4   with a concentration in accounting and finance.  And I have a

  5   master's degree, Master of Science in Accounting.

  6   Q.   All right.  And can you walk us through your professional

  7   history leading up to becoming an FBI forensic accountant?

  8   A.   Yes.  I hold two certifications.  I am a certified public

  9   accountant in the State of Massachusetts, and I am also a

10:55 10   certified fraud examiner through the Association of Certified

 11   Fraud Examiners.  And prior to working at the FBI, I worked at

 12   Price Waterhouse Coopers, an accounting firm, auditing health

 13   industries companies.

 14   Q.   You're a little quiet back here.  Is there any chance you

 15   could move, you can slide the base towards you.

 16   A.   Sorry.  I was getting a little feedback earlier.

 17   Q.   I heard.  So what are your responsibilities as a forensic

 18   accountant with the FBI?

 19   A.   My role as a forensic accountant is to assist

10:56 20   investigators by reviewing financial information, bank records,

 21   public records, business records.  The easiest way to think

 22   about it is, my job is to follow the money.

 23   Q.   Have you testified at trial previously in your capacity as

 24   an accountant?

 25   A.   Yes.
```

1    Q.    How many times?

2    A.    Six.

3    Q.    What did you do to prepare for your testimony in this case

4    today?

5    A.    I reviewed a variety of records, bank records, MassHealth

6    records, public records.  I reviewed them and prepared some

7    summary charts, some summary exhibits.

8    Q.    Okay.  If you could take a look in that binder in front of

9    you, could you tell us if those summary charts you just

10   referenced are included in there?  I think the tabs 712.01

11   through 712.22 would be the ones we're focusing on.

12   A.    Yes.  These appear to be the exhibits I reviewed or

13   prepared.

14   Q.    All right.  And what information did you use to prepare

15   those charts?

16   A.    The records that I reviewed, so MassHealth --

17   Q.    I'm having a hard time.  Sorry.  Thank you.

18   A.    The MassHealth records, bank records, and public records

19   as well.

20   Q.    Okay.  Do those public records concern real estate or

21   other financial transactions?

22   A.    Yes.

23   Q.    All right.  Did you do anything to ensure the accuracy of

24   the information contained in those charts?

25   A.    Yes.

| | |
|---|---|
| 1 | Q.   What was that? |
| 2 | A.   I compared the information from the various sources to |
| 3 | ensure that they tied together, they matched. |
| 4 | Q.   So comparing the charts you prepared to the source |
| 5 | documents, whether MassHealth records or bank account |
| 6 | statements? |
| 7 | A.   Yes. |
| 8 | MR. LOONEY:  I would ask that the following documents |
| 9 | be admitted as summary charts.  Exhibit 712.01, Exhibit 712.03, |
| 10:58 10 | Exhibit 712.05, Exhibit 712.06, Exhibit 712.07, Exhibit 712.08, |
| 11 | Exhibit 712.09, Exhibit 712.12, Exhibit 712.13, Exhibit 712.14, |
| 12 | Exhibit 712.15, Exhibit 712.16, Exhibit 712.18, Exhibit 712.19, |
| 13 | Exhibit 712.20, Exhibit 712.21, Exhibit 712.22. |
| 14 | THE DEFENDANT:  Objection. |
| 15 | THE COURT:  Basis? |
| 16 | THE DEFENDANT:  Those are business record. |
| 17 | THE COURT:  I think they're all summary charts.  Let |
| 18 | me take a look.  712.12 is a demonstrative. |
| 19 | THE DEFENDANT:  712 not a chart. |
| 11:00 20 | THE COURT:  Hold on.  That's right where I am. |
| 21 | Demonstrative, not a summary? |
| 22 | MR. LOONEY:  I think it summarizes the kind -- the |
| 23 | table is built to this information, which is a summary in a |
| 24 | graphical form. |
| 25 | THE COURT:  Okay.  I'm going to reserve on 712.12 |

 1    until we get there.

 2          MR. LOONEY:  I'm guessing we'll take our break before

 3    we get to that.

 4          THE COURT:  From 712 -- I know we skipped some here,

 5    but the ones that you've moved to admit from 712.12 through

 6    712.16 may be demonstratives, not summaries, right?  So I'll

 7    reserve on those.

 8          18 is a summary.  19 is fine.  20 is a summary,

 9    clearly a summary.  They might all be summaries, but for the

11:01 10   time being, so I'm going to defer on all the ones that are

11    included in 12 to 16.  So I think that's all the -- I think

12    that's inclusive.  12, 13, 14, 15 and 16.  Okay?  The rest will

13    be admitted.

14          (Exhibit 712.01, Exhibit 712.03, Exhibit 712.05,

15    Exhibit 712.06, Exhibit 712.07, Exhibit 712.08, Exhibit 712.09,

16    Exhibit 712.18, Exhibit 712.19, Exhibit 712.20, Exhibit 712.21,

17    Exhibit 712.22 admitted into evidence.)

18          MR. LOONEY:  There will be a natural break point.

19    Maybe that will be time for a break as well, hopefully.

11:01 20         Can we pull up one of those, I'm going to start with

21    Exhibit 712.19.  This is where I wanted to start.  I think it's

22    one of the ones you said is okay.

23          THE COURT:  It's not one of the ones I didn't say was

24    okay.

25          MR. LOONEY:  That's good.  That's a start.

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | THE COURT:  Yes, 19 is fine.                                 |
|       | 2  | Q.   All right.  So if we can bring this up for the jury.    |
|       | 3  | Is this one of the charts that you prepared?                 |
|       | 4  | A.   It is.                                                  |
|       | 5  | Q.   Okay.  And what's illustrated on here?                  |
|       | 6  | A.   This is the list of bank accounts that I reviewed in    |
|       | 7  | preparing my summary charts.                                 |
|       | 8  | Q.   Okay.  So this lists seven accounts on it?             |
|       | 9  | A.   Yes.                                                    |
| 11:02 | 10 | Q.   And you reviewed financial statements concerning these  |
|       | 11 | five accounts?                                               |
|       | 12 | A.   Yes.                                                    |
|       | 13 | Q.   And do the charts that you prepared summarize transactions |
|       | 14 | involving these accounts?                                    |
|       | 15 | A.   Yes.                                                    |
|       | 16 | Q.   All right.  Can you walk us through, first let's focus on |
|       | 17 | the top three accounts.  Could you walk us through, just     |
|       | 18 | identify what those accounts are.  They are all held in the  |
|       | 19 | name of Arbor Homecare Services LLC, correct?                |
| 11:02 | 20 | A.   Yes.  So these three bank accounts, they're all held at |
|       | 21 | Bank of America.  The first one is an operating account with an |
|       | 22 | account number ending 7768.                                  |
|       | 23 | The next account is a payroll account with an account        |
|       | 24 | number ending 7700.  And the third account is a savings account |
|       | 25 | with an account number ending 5931.                          |

```
 1   Q.   And those are all accounts held in the name of Arbor
 2   Homecare Services, correct?
 3   A.   Yes.
 4   Q.   All right.  Moving now, if we could just blow up the next
 5   two accounts.
 6        So is it correct that you reviewed two sets of bank
 7   accounts that were held in the name of Faith Newton?
 8   A.   Yes.
 9   Q.   And what were those two accounts?
10   A.   They were two accounts held at Bank of America.  They were
11   a linked checking and savings account, so the account numbers
12   both end in 9723.
13   Q.   Okay.  Linked checking and savings?
14   A.   Yes.
15   Q.   All right.  And then if we can just look at the last two,
16   two accounts held in the name of Ben Muiruri at Bank of
17   America.  And what are those?
18   A.   Yes.  So these are again another set of linked checking
19   and savings accounts.  The account numbers both end in 6118,
20   and they're held in the name of Ben Muiruri.
21   Q.   Okay.  So two accounts held in the name of Ben Muiruri
22   with account number 6118?
23   A.   Yes.
24        MR. LOONEY:  All right.  At this point just for the
25   court and the parties I'd like to bring up Exhibit 816, please.
```

1    I think we've previously discussed this, but I'd ask that this

2    be admitted and published for the jury.

3                THE COURT:  Any objection?

4                THE DEFENDANT:  No objection.

5                THE COURT:  It's admitted.

6                (Exhibit 816 admitted into evidence.)

7    Q.   All right.  Can we publish this to the jury.

8         The seven accounts that you reviewed statements for were

9    all held at Bank of America, correct?

11:04 10   A.   Correct.

11   Q.   And in front of you now is a Federal Deposit Insurance

12   Corporation Certificate, correct?

13   A.   Yes.

14   Q.   And this certificate certifies that the deposits of each

15   depositor in Bank of America, National Association, Charlotte,

16   North Carolina, are insured to the maximum amount provided by

17   the Federal Deposit Insurance Act.

18        Did I read that correctly?

19   A.   Yes.

11:05 20   Q.   All right.  And this is dated July 1999, July 23, 1999,

21   and signed by the Chairman of the Board of Directors of the

22   FDIC, correct?

23   A.   Correct.

24                MR. LOONEY:  We can take that down and move along.

25   Can we bring up now for the witness and the parties Exhibit 94.

1    I'd ask that this be admitted pursuant to Rule 902.11.

2           THE COURT:  Are you waiting for Karen?

3           MR. LOONEY:  I asked if this could be admitted

4    pursuant to Rule 902.11.

5           THE COURT:  Which exhibit number are we on?

6           MR. LOONEY:  It's 94.

7           THE COURT:  Do I have 94?

8           MR. LOONEY:  I believe it should be in the back.  If

9    not, it's up on the screen along with a certificate of

11:06 10   authenticity.

11          THE COURT:  All my ones in back begin with an 800 I

12   think.  Any objection?

13          THE DEFENDANT:  No.

14          THE COURT:  It's admitted.

15          (Exhibit 94 admitted into evidence.)

16   Q.   If we could take down the certificate and just show

17   Exhibit 94 to the jury.

18        Do you recognize this document?

19   A.   I do.

11:07 20   Q.   What is it?

21   A.   It is a signature card for the Bank of America bank

22   account ending 7768 for Arbor Homecare Services LLC.

23   Q.   Okay.  And to remind the jury, the 7768 account is the

24   operating account for Arbor Homecare Services?

25   A.   Yes.

Q.   All right.  And this is a signature card from Bank of
America for that account?

A.   Yes.

Q.   Can we go down to the bottom and blow up the section
identifying the authorized signatories.  Who are the authorized
signatories on this account?

A.   Benjamin Muiruri and Faith Newton.

Q.   Okay.  What does it mean to be a signatory on a bank
account?

A.   It means you can conduct business with the bank account.
So you can write checks, withdraw money, conduct any standard
activity that you would in a bank account.

Q.   So this indicates that Faith Newton and Ben Muiruri were
authorized to conduct transactions out of the Arbor operating
account, correct?

A.   Correct.

Q.   Could we take this down.  Now, to get back in order, can
we move to Exhibit 712.01.  I think this is one of the ones you
indicated is fine.  Can we blow up the header in the first two
rows just to see what this is.

     Can you tell us what this chart is?

A.   It is a summary of deposits from MassHealth to Arbor
Homecare Services operating account ending 7768.

Q.   Okay.  So this shows deposits that originated from where?

A.   From MassHealth.

1  Q.   Okay.  And went into where?

2  A.   The Arbor Homecare Services operating account ending 7768.

3  Q.   Okay.  And can we walk through what information is

4  contained in each of the three columns?

5  A.   The first column is the date of the transaction.  The

6  second column is the total amount of the deposit, so the total

7  amount transferred from MassHealth to the bank account.  And

8  then the third column is a subset of the total that

9  specifically relates to home health aide services billed with

11:09 10  CPT Code G0156.

11  Q.   For instance, looking at the very first payment on here it

12  indicates that there was a payment from MassHealth on January

13  6, 2014, correct?

14  A.   Yes.

15  Q.   And that date, the payment was $320,797.82?

16  A.   Correct.

17  Q.   And then the right-hand column shows the portion of that

18  that is associated with claims for home health aides?

19  A.   Yes.

11:10 20  Q.   All right.  What's the source of the data illustrated in

21  this chart?

22  A.   The MassHealth claims records and payment details.

23  Q.   Okay.  So this was created from the data provided by

24  MassHealth on the payments that they made on claims?

25  A.   Yes.

1   Q.   Okay.  Did you do anything to verify the accuracy of the

2   data contained in here?

3   A.   I did.

4   Q.   What was that?

5   A.   I verified the information, the total deposit amount and

6   the deposit date and compared it to the bank records for the

7   operating account ending 7768 and then compared the two and

8   confirmed that they did in fact agree.

9   Q.   Okay.  So to create the chart, you looked at one set of

11:11 10   data that came from MassHealth on payments?

11   A.   Yes.

12   Q.   And then to confirm it was accurate, you looked at the

13   Bank of America statements, which shows those as credits into

14   the account?

15   A.   Yes.

16   Q.   And you were able to verify that the two sources matched?

17   A.   Yes.

18   Q.   All right.  Before we -- I'm going to illustrate how we

19   did that in a second.  But before we do that, what's the first

11:11 20   date shown here?  I just want to see the date span for this.

21   A.   January 6, 2014.

22   Q.   Okay.  And then if we could go to the last page just to

23   show the last date.  What's the date of the last payment from

24   MassHealth to Arbor?

25   A.   January 9, 2017.

```
 1   Q.   Okay.  All right.  If we could go back up to the first
 2   page, and if we could look at the top four rows of this table,
 3   please.
 4        All right.  The first rows, they show four payments in
 5   January 2014, correct?
 6   A.   Correct.
 7   Q.   On a weekly basis?
 8   A.   Correct.
 9   Q.   Each one something above $300,000?
10   A.   Yes.
11   Q.   So in that month Arbor was paid a little over $1.2 million
12   for January 2014?
13   A.   Yes.
14        MR. LOONEY:  Could we now go just for the parties and
15   the witness, could we bring up what's been marked as Exhibit
16   851.
17        I would ask that this be admitted pursuant to Rule
18   902.11, it's up on the screen, and the certificate of
19   authenticity as Exhibit 958.
20        THE COURT:  Wait a second here.  902.11?
21        MR. LOONEY:  I believe that's the one.  Maybe.  Sorry.
22   Maybe 902.6.  I apologize if I cited the wrong rule.
23        THE COURT:  No.  It's 11.  It's admitted.  Any
24   objection?
25        THE DEFENDANT:  Yes.
```

11:12 at line 10
11:13 at line 20

         1              THE COURT:  Excuse me?

         2              THE DEFENDANT:  Relevance.

         3              THE COURT:  I can't understand -- oh, relevance.

         4     Overruled.

         5              (Exhibit 851 admitted into evidence.)

         6     Q.   If we could put up side by side Exhibits 712.01, the first

         7     page, and 851.  So what we're seeing now -- or what is this new

         8     document we brought up, Exhibit 851?

         9     A.   It is a page from the bank statement for Arbor Homecare

11:14   10     Services LLC operating account ending 7768 for the period of

        11     January 1, 2014 to January 31, 2014.

        12     Q.   So this statement covers that same period we're focused on

        13     in Exhibit 712.01, that is January 2014?

        14     A.   Correct.

        15     Q.   Okay.  And on your summary chart it shows four payments in

        16     the amount, the first one, January 6, 2014, is in the amount of

        17     $320,797.82?

        18     A.   Correct.

        19     Q.   What's reflected for this same date on the Bank of America

11:15   20     statement for the Arbor operating account?

        21     A.   There is a deposit on January 6, 2014 from Comm of Mass

        22     with a description of HC claim pmt, or payment, for the same

        23     amount of $320,797.82.

        24     Q.   Okay.  All right.  And can you confirm the other three

        25     payments are similarly reflected in both your chart and the

1    Bank of America financial statement?

2    A.    Yes.  The January 13, January 21, and January 27 payments

3    in the bank statement match the dates and amounts in Exhibit

4    712.01.

5    Q.    Do they match down to the penny?

6    A.    Yes.

7    Q.    All right.  Now, I think we're going to push the

8    technological limits.  We're not able to bring up Exhibit 808

9    next to Exhibit 1205, can we?  I think we may not be able to.

11:16 10        All right.  This was previously admitted Exhibit 808.  Do

11    you recognize this?

12    A.    I do.

13    Q.    And what is this spreadsheet?

14    A.    It is a summary of payments from MassHealth to Arbor

15    Homecare Services.

16    Q.    Okay.  So we're talking about summary charts.  You said

17    they were created from MassHealth and you also matched it to

18    Bank of America records.  This is the MassHealth record you

19    looked at or one of the MassHealth records that contains the

11:16 20    source information?

21    A.    Yes.

22    Q.    And can you verify that the first four payments that are

23    indicated on your summary chart that we were just looking at

24    are also reflected in the MassHealth data?

25    A.    They are.

Q.   We can take that down.  If we could take down 851.  I just
want to focus back on 712.01.

     In those examples we just looked at, we looked in the
middle column.  How was the right-hand column created?

A.   The right-hand column, I reviewed an additional MassHealth
record which lists out all of the details behind each payment,
every claim that was paid, and I summarized the claims specific
to this particular CPT code.

Q.   Okay.  So for the January 6 entry in the right-hand column
of $143,862.40, that summarizes the payments for all claims on
that date for claims billed under G0156?

A.   Correct.

Q.   All right.  I'm not going to go through the source data
for that.  Can we go down to the bottom of this table.  Yes,
the last page of this, very end of the exhibit.

     So it's four pages long, and it shows weekly payments from
MassHealth to Arbor.  Is that accurate?

A.   Yes.

Q.   Could we blow up and highlight the totals, please.

     What's illustrated in the total line here?

A.   So for the period of January 6, 2014, through January 9,
2017, MassHealth paid Arbor Homecare Services $162,118,182.72.

Q.   Okay.  And what does the total in the next column
indicate?

A.   For that same period, MassHealth paid Arbor Homecare

1    Services $99,734,517.50 specifically for claims related to home

2    health aide services with CPT Code G0156.

3    Q.    Thank you.  We can take this down.  And could we bring up

4    Exhibit 712.03, please.  It's another dense table.  Can we blow

5    up the header, the first row and the top section so we can see

6    what's going on.

7         Can you tell us what's depicted in this exhibit?

8    A.    This is a summary of deposits into Arbor Homecare Services

9    LLC Bank of America operating account ending 7768, so the same

11:20 10    account that the MassHealth deposits went into.  It's a summary

11    of all deposits going into the account.

12    Q.    So the last table was just deposits from MassHealth on a

13    weekly basis.  This is all deposits into the same account?

14    A.    Yes.

15    Q.    Okay.  Can you just walk us through the columns.

16    Ms. Apfel, to make it easier, could we zoom out of this section

17    and blow up the table as big as we can make it.

18         Could you just walk us through the columns here, starting

19    at the left.

11:20 20    A.    Yes.  The left two columns are the year and the month.

21    This information is summarized on a monthly basis.  The

22    following column is the total deposits that were deposited into

23    the bank account for that particular month.  The following four

24    columns, some are what make up the total deposit, so those four

25    columns sum up to total the third column.

1       So in particular, the first of those is MassHealth
2   deposits, so those are a summary of what we saw in the previous
3   exhibit based on following --
4   Q.   Let me pause you here.  For that middle column, MassHealth
5   Deposits, the total there is the same total that was reflected
6   on the prior chart?
7   A.   Yes.
8   Q.   Okay.  If you want to move next to the next column titled
9   Transfers from Arbor - 5931.
11:21 10  A.   Yes.  So these are transfers or deposits from Arbor's
11  savings account ending 5931.
12  Q.   Okay.  And Arbor 5931, that's one of the charts that was
13  -- that's one of the accounts that was referred to on the first
14  chart?
15  A.   Yes.
16  Q.   And is that the Arbor savings account?
17  A.   Yes.
18  Q.   Okay.  So that's not transfers from a source external to
19  Arbor but it's internal transfers among different Arbor
11:22 20  accounts; is that right?
21  A.   Yes.
22  Q.   Okay.  And then what's the next column, Reverse
23  Transactions?
24  A.   Reverse Transactions, these are a handful of transactions
25  where the money went out but then immediately came back or very

1  quickly came back in.  So while it appears as money flowing

2  into the account, it's actually a wash.  There's no difference

3  in the balance due to these transactions.

4  Q.   So they're transactions that were canceled out by a

5  withdrawal of the same amount at the same time?

6  A.   Yes.

7  Q.   And what's Other Deposits?

8  A.   These are just various other deposits.  So, you know,

9  maybe a check being deposited, just other small items,

11:22 10  miscellaneous items, fee reversals, anything like that.

11  Q.   And for that Other Deposits, that total is just under

12  $9,000?

13  A.   Yes.

14  Q.   Okay.  So based on the information contained in this

15  table, is it accurate to conclude that nearly all of the funds

16  deposited into the Arbor operating account with the account

17  number ending 7768 were either directly from MassHealth or were

18  internal Arbor's --

19          THE DEFENDANT:  Objection.  Improper opinion.

11:23 20          THE COURT:  Overruled.

21  Q.   It was a long question.  I want to start again.

22       Based on the information in this table, can we conclude

23  that nearly all of the funds within the 7768 account were

24  either directly from MassHealth or were internal Arbor

25  transfers of money that originated from MassHealth?

```
 1   A.   Yes.
 2   Q.   Okay.  And when you say "nearly all," do you have an
 3   approximation of what percent originated either from internal
 4   transfers of MassHealth money or directly from MassHealth?
 5   A.   It's approximately 99 percent.
 6   Q.   Okay.  So 99 percent of the funds from MassHealth were
 7   internal Arbor transfers?
 8   A.   Correct.
 9   Q.   Did you do the same analysis for the --
10        THE COURT:  Hold on.  If you're starting another
11   exhibit, I'm going to give them their break.  I was just
12   letting you get through the exhibit.  We'll take 15 minutes,
13   okay?
14        COURTROOM CLERK:  All rise for the jury.
15        (Jury exits the courtroom.)
16        THE COURT:  All right.  15 minutes.
17        (Recess, 11:24 a.m. - 11:42 a.m.)
18        MR. BRADY:  We can do the redline version we got from
19   the court yesterday.
20        THE COURT:  Redline from yesterday.  I added some
21   version of everything that you each asked for.
22        MR. BRADY:  Can't wait to see it.
23        THE COURT:  I also moved the statute of limitations.
24   To the beginning, I added as an element to each offense that
25   you must find that the offense happened within the statute of
```

1   limitations period but without putting the dates in again.

2                COURTROOM CLERK:  All rise for the jury.

3                (Jury enters the courtroom.)

4                COURTROOM CLERK:  Court is back in session.  Please be

5   seated.

6                MR. LOONEY:  Can we bring back up, just to wrap up

7   this section, Exhibit 712.03.

8   Q.   All right.  I think at the very end before the break you

9   had said that you were able to conclude that all or nearly all

11:44 10   of the money deposited into the 7768 account originated either

11   from MassHealth or from internal Arbor transfers, correct?

12   A.   Correct.

13   Q.   Were you able to reach a similar conclusion with respect

14   to the Arbor savings account with account number 5931?

15   A.   Yes.

16   Q.   And the same thing held true with respect to that account?

17   A.   Yes.

18   Q.   How about the 7700 account?

19   A.   Yes.

11:45 20   Q.   You were able to reach the same conclusion that nearly all

21   of the funds originated either from MassHealth or internal

22   Arbor transfers?

23   A.   Yes.

24   Q.   If we could take this down and bring up Exhibit 712.05.  I

25   think this has been admitted.  All right.  Can we scroll

1   through.  This is a six-page document.  If we could go back up

2   to the first page, I'm going to ask some general questions

3   before walking through some specific items.

4       So in general, what does this table illustrate?

5   A.   This table is a flow of funds leaving Arbor Homecare

6   Services Bank of America account ending 7768, the operating

7   account, to specific other accounts.

8   Q.   Okay.  So it's not all the money flowing out of the

9   account but the money flowing out of the account to other

11:46 10   specified accounts?

11   A.   Correct.

12   Q.   Okay.  So before we were looking at how the money flowed

13   into the 7768 account.  This is where it goes after that; is

14   that right?

15   A.   Yes.

16   Q.   All right.  Can you walk us -- let's just start with the

17   -- walk us through the first three columns to start.

18   A.   The first column is the date the transaction was made,

19   whether it be a check, a wire, an online transfer.

11:46 20       The next column are funds leaving the operating 7768

21   account going to the Arbor payroll account ending 7700.

22       And the next column are funds leaving the operating

23   account going to the Arbor savings account ending 5931.

24   Q.   Okay.  So these are internal transfers among Arbor's

25   accounts in the second and third columns, correct?

1   A.   Yes.

2   Q.   And the pattern is approximately, for the payroll account,

3   weekly transfers from the operating account to the payroll

4   account, roughly speaking?

5   A.   Roughly speaking, yes.

6   Q.   In round numbers of hundreds of thousands of dollars?

7   A.   Yes.

8   Q.   All right.  And then similarly, fairly regular transfers

9   from the operating account which received the MassHealth

11:47 10   deposits into the Arbor 5931 account, correct?

11   A.   Correct.

12   Q.   What is illustrated here in the third column?

13   A.   The fourth column?

14   Q.   The fourth column.

15   A.   These are transfers from the operating account 7768 to Ben

16   Muiruri's 6118 checking account.

17   Q.   Okay.  So this is flow of funds from Arbor's account into

18   Ben Muiruri's personal checking account?

19   A.   Correct.

11:48 20   Q.   And we'll go down and look at some of these transactions

21   in a moment, but before that, what are the fifth and sixth

22   columns?

23   A.   The final two columns are transfers to Faith Newton's

24   checking and then savings accounts at Bank of America, both

25   ending 9723, and these transfers are from, again, the operating

1    account ending 7768.

2    Q.    Okay.  I just want to highlight a few of these

3    transactions.  What transaction took place on April 21, 2014?

4    A.    There were two transactions.

5    Q.    If we could highlight the whole row.  Thank you.

6    A.    On April 21, 2014, there was a transfer from the operating

7    account to the 7700 payroll account in the amount of $370,000,

8    and there was also a transfer of $500,000 to Faith Newton's

9    savings account ending 9723.

11:49 10    Q.    Could we move forward, please, a couple of pages until we

11    get to March 2016.  Okay.

12        Now, looking at this portion of this chart, what

13    transaction is illustrated on March 24, 2016?

14    A.    On March 24, 2016, there is a $1.3 million transfer from

15    the Arbor operating account 7768 to Faith Newton's 9723 savings

16    account.

17    Q.    Okay.  And then going down to May 16, 2016, was there a

18    transfer to Faith Newton's checking account?

19    A.    Yes.

11:49 20    Q.    In what amount on that date?

21    A.    $3.5 million.

22    Q.    Okay.  And then on June 1, 2016, was there a transfer to

23    Mr. Muiruri's personal checking account?

24    A.    Yes.

25    Q.    And what was the amount of that transaction?

1    A.    $2 million.

2    Q.    And can we go down until we get to the next page.  I just

3    want to look at another transaction.

4          Was there a transaction on September 15, 2016?

5    A.    Yes.

6    Q.    What was that transaction?

7    A.    There was $2 million transferred from the operating

8    account 7768 to Faith Newton's checking account 9723.

9    Q.    Before we get to the totals, I just want to look at the

11:50 10   source documents for a few of these to verify the transactions.

11         Just for the parties and the court, could we bring up

12   Exhibit 853, please.

13         I would ask that this be admitted and published to the

14   jury.  We have a certificate of authenticity.  The certificate

15   is right next to it.  May it be admitted and published to the

16   jury?

17         THE COURT:  I'm sorry.  Yes.  Do you have any

18   objection to that, Ms. Newton?

19         THE DEFENDANT:  No.

11:51 20        THE COURT:  It's admitted.

21         (Exhibit 853 admitted into evidence.)

22   Q.    Let's take down the certificate and show the jury the bank

23   statement, please.  And for Exhibit 712.05, could we go to

24   September 2016.  Thank you.

25         So on the left-hand side we have up your exhibit depicting

1    transactions from account 7768 to specified accounts, correct?

2    A.    Correct.

3    Q.    We're focusing on the period now September 2016?

4    A.    Yes.

5    Q.    All right.  And then on the right-hand side we have the

6    Arbor Homecare Services bank statement, correct?

7    A.    Yes.

8    Q.    A this is combined for all three accounts for the period

9    September 1 through September 30, 2016, correct?

11:52 10    A.    Correct.

11    Q.    Could we go to page 11 on the document on the right.

12          Can you tell us what this portion of that bank statement

13    is?

14    A.    This portion of the bank state relates specifically to the

15    operating account 7768 for the period of September 1, 2016 to

16    September 30, 2016.

17    Q.    Okay.  On this first page we see a series of credits on a

18    weekly basis coming from the Commonwealth of Massachusetts,

19    correct?

11:53 20    A.    Yes.

21    Q.    That was what was illustrated in that first chart?

22    A.    Yes.

23    Q.    Then below that as we move forward in this statement we

24    then see withdrawals and debits; is that accurate?

25    A.    Yes.

```
 1    Q.   Could we go to the next page.  I apologize.  I want to
 2    make sure I'm in the right spot.  Okay.
 3         So first, looking at the payment, we'll start at September
 4    19, 2016.  Can you highlight that, maybe on both documents.
 5         So what's reflected on the bank statement for this period
 6    for that highlighted transaction, September 19, 2016?
 7    A.   The bank statement shows on September 19, 2016 there is an
 8    online banking transfer to a checking account ending 7700 which
 9    is the Arbor payroll account, and it's for the total of
10    $750,000.
11    Q.   Okay.  Then going down below that to the debit on
12    September 26, 2016, what's reflected on the bank statement?
13    A.   On September 26, 2016, there is an online banking transfer
14    to checking account ending 7700, which is the payroll account,
15    for a total of $700,000.
16    Q.   Okay.  And does your summary chart accurately reflect that
17    transaction?
18    A.   Yes.
19    Q.   Okay.  Could we go next to the transaction on September
20    15, 2016.  And what's reflected on the bank statement there?
21    A.   On September 15, 2016, there is a wire transfer with a
22    beneficiary of Faith Newton, specifically, account ending 9723,
23    and the amount is $2 million.
24    Q.   And is that accurately reflected on your summary chart?
25    A.   Yes.
```

1    Q.   All right.  That's just an illustration of how your

2    summary chart was created using the bank statements?

3    A.   Yes.

4    Q.   If we could take down the Bank of America statement and

5    just focus again on Exhibit 712.05, please.  If we could go to

6    the end of the document, please, and focus on totals.

7        All right.  So can you just walk us through what's

8    indicated in the totals for each of these columns?

9    A.   Excuse me.  Yes.  So for the period of January 2014 to

11:56 10   February 2017, the Arbor Homecare Services operating account

11    ending 7768 transferred $97,469,999.99 to the Arbor payroll

12    account ending 7700.  For the same time period, the operating

13    account transferred $35,846,088.94 to the Arbor savings account

14    ending 5931.

15    Q.   Before we get to the next few columns I want to ask you

16    one question about those two.  I think you indicated earlier,

17    but did all the funds deposited into those two accounts

18    originate either from the 7768 account or from other Arbor

19    transfers, all or nearly all?

11:57 20   A.   Nearly all.  Not all.

21    Q.   When you say "nearly all," do you have a ballpark of the

22    percentage?

23    A.   Between 97 and 99 percent.

24    Q.   Okay.  Now, can you walk us through what's indicated in

25    the total under the Ben Muiruri Bank of America 6188 checking

```
 1   account.
 2   A.   The operating account 7768 transferred to Ben Muiruri 6118
 3   checking account $2,002,000.
 4   Q.   How about the two columns for Ms. Newton's checking and
 5   savings accounts?
 6   A.   The operating account transferred $5,806,270 to the 9723
 7   checking account for Ms. Faith Newton.  And the 9723 Faith
 8   Newton savings account received $1,800,000 from the operating
 9   account.
11:58 10   Q.   Okay.  How much in total did Faith Newton's two personal
11   accounts receive from the Arbor 7768 account over this
12   timeframe?
13   A.   $7,606,270.
14   Q.   We can take this down.  Could we move now to Exhibit
15   712.09.  Mercifully, this one is shorter.
16        What's illustrated here?
17   A.   This is a summery of the flow of funds from Arbor Homecare
18   Services Bank of America account ending 7700, the payroll
19   account, to specific accounts.
11:59 20   Q.   Okay.  So far we've traced money originating from
21   MassHealth arriving in the 7768 account, correct?
22   A.   Yes.
23   Q.   And then we showed transfers from that account to multiple
24   other accounts, right?
25   A.   Yes.
```

1  Q.   And one of them was this account, the 7700 account?

2  A.   Yes.

3  Q.   And then this illustrates the further flows from that 7700

4  account, correct?

5  A.   Correct.

6  Q.   All right.  Can you walk us through, I know the first

7  column is the date.  The next few columns, maybe we can just

8  focus on totals -- actually, if you could walk through each of

9  these columns, what's indicated in there.

11:59 10  A.   Yes.  The next column after Date is transfers from the

11  payroll account 7700 to Ben Muiruri's 6118 checking account.

12  There are two transfers, one in January of 2015, for 500,000

13  and one in January of 2017 for $2 million, for a total of $2.5

14  million.

15  Q.   What's illustrated in the next column?

16  A.   The next column are transfers to Ben Muiruri's 6118

17  savings account.  There's one transfer in December of 2015 for

18  $500,000, for a total of $500,000.

19  Q.   And then what's illustrated for transfers from the Bank of

12:00 20  America 7700 account to the Faith Newton 9723 checking account?

21  A.   To the checking account there are two transfers, one in

22  January of 2015 for $500,000 and one in January 2017 for $2

23  million for a total of $2.5 million.

24  Q.   Okay.  Then what is the total amount transferred from the

25  7700 account at Arbor to Faith Newton's personal savings

1    account, 9723?

2    A.    $1 million.

3    Q.    And then what are the total amounts transferred to all

4    accounts held by Ben Muiruri and all accounts held by Faith

5    Newton illustrated on this chart from the 7700 account?

6    A.    The 7700 account transferred a total of $3 million to the

7    checking and savings account 6118 in the name of Ben Muiruri,

8    and there were, from the 7700 payroll account, there was a

9    total of $3.5 million transferred to Faith Newton's 9723

12:01 10   checking and savings accounts.

11   Q.    Okay.  We saw on one of the earlier charts that $7.6

12   million was transferred from the 7768 account to Ms. Newton's

13   personal checking and savings accounts, correct?

14   A.    Correct.

15   Q.    Is the transfer of 3.5 million illustrated in this chart a

16   subset of those earlier transfers we looked at, or is this

17   separate and additional to that money?

18   A.    This $3.5 million is separate and in addition to the $7.6

19   million.

12:02 20   Q.    And is the same true with respect to Mr. Muiruri?

21   A.    Yes.

22   Q.    And then before we leave this, I just want to look at the

23   last row, January 12, 2017, if you could blow that up.  There

24   are two transactions illustrated on that date.

25   A.    Yes.

1    Q.   And they're both $2 million for Mr. Muiruri and $2 million

2    for Ms. Faith Newton?

3    A.   Yes.

4    Q.   And those are the two largest transactions or transfers

5    from the 7700 account to both Mr. Muiruri and Ms. Newton,

6    correct?

7    A.   Correct.

8    Q.   All right.  We'll get back to those.

9         All right.  Can we take this down and go to Exhibit

12:02 10   712.07, please.  If we could blow up this.

11        What's illustrated on this chart?

12   A.   Similar to the previous chart, this is the flow of funds

13   from Arbor Homecare Services LLC Bank of America account ending

14   5931, this savings account, to specific accounts.

15   Q.   Okay.  And is it the same accounts as we were looking

16   at -- the same recipient accounts as we were looking at in the

17   last table?

18   A.   Yes.

19   Q.   So the last table flows from 7700 to these four accounts.

12:03 20   This is from the other, the Arbor savings account to these four

21   accounts held in the name of Ben Muiruri and Faith Newton,

22   correct?

23   A.   Correct.

24   Q.   And let's just go right to the totals, and we'll go to the

25   bottom line totals.

1    How much was transferred from the Arbor 5931 savings

2    account to personal accounts held by Ben Muiruri at Bank of

3    America with accounts ending 6118?

4    A.    $3,550,000.

5    Q.    Okay.  How much was transferred from the Arbor Homecare

6    Services LLC Bank of America account ending 5931 to Faith

7    Newton's personal checking and savings accounts held at Bank of

8    America.

9    A.    $6,831,000.

12:04 10    Q.    Okay.  Then we saw charts earlier transfers to Faith

11    Newton and Ben Muiruri from the 7768 and 7700 account, correct?

12    A.    Yes.

13    Q.    Are the transfers reflected on this chart to Ms. Newton

14    and Mr. Muiruri a subset of those earlier transfers, or is this

15    separate and in addition to those other transfers?

16    A.    This is separate and in addition to.

17    Q.    All right.  Could we go next to Exhibit 712.21.

18    What's this one?

19    A.    This is a summary of payroll deposits from Arbor Homecare

12:05 20    Services LLC to Ben Muiruri and Faith Newton for the period of

21    2014 through early 2017.

22    Q.    Okay.  And so when you say, "payroll deposits," what does

23    that mean?

24    A.    Direct deposits.  Standard, you know, weekly or biweekly

25    payroll.

1    Q.    A payroll processing company?

2    A.    Yes.

3    Q.    All right.  How much was Ben Muiruri paid through the

4    payroll processor from Arbor Homecare Services for the period

5    2014 through 2017?

6    A.    $814,018.18.

7    Q.    Okay.  And how much was Faith Newton paid in payroll from

8    Arbor Homecare Services LLC?

9    A.    $838,432.33.

12:06 10    Q.    Okay.  I'll ask you the same wrap-up question as before.

11    Are the amounts illustrated on this chart, Exhibit 712.21, a

12    subset of any of the previous transfers we looked at, or are

13    these separate and in addition to those?

14    A.    These amounts are separate and in addition to the amounts

15    we previously reviewed.

16         MR. LOONEY:  Okay.  Your Honor, at this point we are

17    getting the graphical illustrations.  I was going to start with

18    Exhibit 712.12.

19         THE COURT:  All right.

12:06 20         MR. LOONEY:  I think this is a fair summary in the

21    sense of it totals up the funds, shows how they flowed through

22    the different routes.

23         THE COURT:  712 is a summary chart.  You can have that

24    one.  713 is a demonstrative as far as I can tell.  714 is a

25    demonstrative.  715 is a demonstrative.  And 716, well, I'll

```
 1   give you 716 as a summary chart.  So the ones that are
 2   demonstratives don't get admitted as exhibits so you can see
 3   them during her testimony because they illustrate the point
 4   he's trying to make, or he arguably illustrates the point he's
 5   trying to make, but it won't go back as an exhibit.  The ones
 6   that are summary charts you'll get as exhibits.
 7        So of the ones we discussed, Mr. Looney, you can admit
 8   712.12 and 712.16 and the other 13, 14 and 15 will just be
 9   demonstratives.
10        MR. LOONEY:  Thank you, Your Honor.
11        THE DEFENDANT:  Note my objection.
12        THE COURT:  Yes.  Thank you.
13        (Exhibit 712.12 admitted into evidence.)
14   Q.   All right.  If we could begin by bringing up Exhibit
15   712.12.  All right.
16        And is this one of the documents that you prepared?
17   A.   Yes.
18   Q.   And there's seven slides total, correct?
19   A.   Yes.
20   Q.   I'm going to pass over a couple.  Could we go to the fifth
21   slide, please.  All right.  Can you tell us what's illustrated
22   on this chart?
23   A.   This chart depicts the flow of funds from MassHealth to
24   Arbor operating account 7768 and then the further disbursement
25   of the funds to the other two Arbor accounts.
```

1          THE COURT:  Guys, what's that noise?

2          THE WITNESS:  It's feedback.

3          THE COURT:  See if you can slide it away a little bit.

4     A.    And the continuation of the funds from the three Arbor

5     accounts to Faith Newton's personal checking and savings

6     accounts ending 9723.

7     Q.    And this illustrates what we've been talking about, that

8     money flowed into the account, into 7768 account, and then

9     reached Ms. Newton's account either directly or via two other

12:09 10   internal Arbor accounts, correct?

11    A.    Yes.

12    Q.    All right.  Can we go now to the next slide.

13          And what information has been filled in on this chart?

14    A.    The actual dollar amounts of the transfers has been filled

15    in.  It is the same chart as we just looked at, just with

16    dollar amounts.

17    Q.    Okay.  Could we walk through these, and maybe you can put

18    an arrow on which we're talking about as we go along.  If you

19    try to highlight this, the color is awful.

12:10 20        All right.  So what's that first arrow pointing to on

21    that?

22    A.    The first arrow is pointing to the transfers from

23    MassHealth to Arbor Homecare Services operating account ending

24    7768, and that is for a total of $162,118,182.72.

25    Q.    Okay.  And then let's work from top to bottom through the

1    next ones.  What does the next arrow in sequence show?

2    A.   The next arrow shows transfers from Arbor Homecare

3    Services operating account 7768 to Arbor Homecare's savings

4    account ending 5931 for a total of $35,846,088.94.

5    Q.   Okay.  Then what does the next arrow indicate?

6    A.   This is transfers from that Arbor savings account ending

7    5931 to Ms. Newton's personal checking and savings accounts

8    ending 9723, and that's for a total of $6,831,000.

9    Q.   Then let's move down and go to the middle arrow.  What

12:11 10   does that illustrate?

11   A.   That is transfers directly from the operating 7768 account

12   to Ms. Newton's checking and savings accounts ending 9723 for a

13   total of $7,606,270.

14   Q.   Okay.  Then moving to the bottom section, what is shown

15   here?

16   A.   This is transfers from the Arbor operating account 7768 to

17   the Arbor Homecare Services payroll account ending 7700 for a

18   total of $97,469,999.99.

19   Q.   Okay.  And then what do the next two arrows illustrate?

12:12 20   A.   The next two arrows are, the top one are transfers

21   directly from Arbor's payroll account 7700 to Ms. Newton's

22   personal checking and savings accounts ending 9723 for a total

23   of $3.5 million.  And the bottom arrow are the payroll

24   deposits, so money that transferred from the Arbor Homecare

25   Services LLC payroll account 7700 to Ms. Newton's personal

1    checking and savings accounts 9723 that were processed through

2    a third party payroll processor.  And that is a total of

3    $838,432.33.

4    Q.    Thank you.  If we could go now to the second slide in this

5    exhibit.

6           THE COURT:  Mr. Looney, while you're going there, I'm

7    going to reverse myself on 16.  After looking at it further, I

8    just don't think it's voluminous enough to count as a summary

9    chart.  So demonstrative for 16 also, okay?  Sorry about that.

12:13 10           MR. LOONEY:  Thank you.

11    Q.    Okay.  We just turned to the second slide of this Exhibit

12    712.12.  Can you tell us what's illustrated on there?

13    A.    This is a depiction of the transfers from Arbor's various

14    accounts to Mr. Muiruri's checking and savings accounts ending

15    6118.

16    Q.    Okay.  So set up similar to the chart we were just looking

17    at?

18    A.    Yes.

19    Q.    But for Mr. Muiruri instead of Ms. Faith Newton, correct?

12:13 20    A.    Yes.

21    Q.    And maybe we can just focus on the right hand, the

22    transfers into the 6118 account and move from top to bottom and

23    tell us what's illustrated here.

24    A.    This is the transfers from Arbor savings account 5931 to

25    Mr. Muiruri's checking and savings accounts ending 6118 for a

1    total of $3,550,000.

2    Q.   And then going to the middle arrow?

3    A.   These are transfers from the Arbor operating account 7768

4    to Mr. Muiruri's checking and savings accounts ending 6118 for

5    a total of $2,002,000.

6    Q.   And then on the next two arrows, can you tell us what

7    those reflect?

8    A.   These are transfers, specifically the top arrow are

9    transfers directly from the Arbor payroll account 7700 directly

12:14 10    into Mr. Muiruri's checking and savings accounts ending 6118

11    for a total of $3,001,445.39 and the indirect transfers of

12    $815,463.57 from the payroll account 7700 to the checking and

13    savings accounts 6118 that were processed through the payroll

14    processor.

15    Q.   All right.  Can we go down to the last slide in this

16    exhibit.  I think it's slide 7.  Thank you.

17         What information is summarized on here?

18    A.   This is an even higher level summary of the amounts we

19    have previously reviewed, and it is depicting the flow of funds

12:15 20    from MassHealth to Arbor and then out to Ms. Newton and

21    Mr. Muiruri's checking and savings accounts at Bank of America.

22    Q.   Okay.  How much of the MassHealth funds that were

23    initially paid into the Arbor 7768 account subsequently flowed

24    from there either directly or indirectly into Faith Newton's

25    personal accounts?

1    A.    $18,775,702.33.

2    Q.    Okay.  And how much of the funds that were paid by

3    MassHealth into the Arbor 7768 account subsequently flowed from

4    there either directly or indirectly into Ben Muiruri's personal

5    accounts at Bank of America?

6    A.    $9,368,908.96.

7    Q.    Okay.  So combining those two totals, how much of the

8    money that originated with MassHealth and flowed through

9    Arbor's accounts subsequently was transferred to the personal

12:16 10  checking and savings accounts of Faith Newton and Ben Muiruri

11   together?

12   A.    $28,146,058.29.

13          MR. LOONEY:  If we could take that down and move now

14   to Exhibit 712.20.

15   Q.    What does this document illustrate?

16   A.    This document is a summary of deposits into Faith Newton's

17   personal checking and savings accounts at Bank of America

18   ending 9723 for the period of January 1, 2014 through July 6,

19   2017.

12:17 20  Q.    Okay.  If you could walk through the columns, what

21   information is included in the Total Deposits column?

22   A.    Total Deposits depicts either the beginning balance of the

23   account or the total amount of money that flowed into the

24   account for each of the years.

25   Q.    Okay.  And what was the total inflow plus of the initial

1    balance over this period?

2    A.    $19,251,686.68.

3    Q.    Okay.  And the next column just illustrates the beginning

4    balance in the account prior to 2014?

5    A.    Correct.

6    Q.    And what was that amount?

7    A.    $367,567.67.

8    Q.    Okay.  And the next column shows the transfers from

9    Arbor's three accounts to Ms. Newton's personal checking and

12:18 10    savings accounts?

11    A.    Yes.

12    Q.    So this is the amount that was illustrated in the prior

13    chart?

14    A.    Yes, very closely.

15    Q.    Okay.  Is there a slight discrepancy?

16    A.    Yes.

17    Q.    Can you explain why?

18    A.    There was one deposit in the very beginning of January

19    2014 that was from one of the Arbor accounts that is not

12:18 20    related to this.  It was a check written in 2013 that was

21    deposited in 2014.  And that was approximately in an amount of

22    approximately $1,400.

23    Q.    Okay.  Aside from -- this column matches the prior chart,

24    the total flows into Ms. Newton's account from MassHealth,

25    except for that $1,400 check?

1   A.   Correct.

2   Q.   All right.  And what's miscellaneous credit?

3   A.   Those are various deposits made into the account, whether

4   it's checks or interest or any number of small items.

5   Q.   Okay.  So based on the information in this chart, is it

6   accurate that roughly 98 percent of the funds that flowed into

7   Faith Newton's personal accounts were from Arbor's accounts?

8   A.   Yes.

9   Q.   Okay.  So, conversely, something less than two percent

10  were from sources other than Arbor?

11  A.   Correct.

12  Q.   All right.  Having traced the flow of funds from

13  MassHealth through accounts held by Arbor into accounts held in

14  the name of Faith Newton, Ben Muiruri, did you then look at

15  transactions that were executed using the funds in Ms. Newton's

16  accounts?

17  A.   Yes.

18  Q.   All right.  And now we're going to look at one of those

19  demonstratives if we can.  Can we bring up 712.13.

20       And what information did you depict on this slide we're

21  looking at now?

22  A.   This is the -- it depicts a check for $50,000 for the

23  purchase of a 2013 Maserati Gran Turismo.

24  Q.   And where did you obtain that information pertaining to

25  that check?

          1    A.    In Ms. Newton's bank accounts, bank records for the

          2    checking account ending 9723.

          3    Q.    Okay.  I want to ask some questions about the transaction.

          4    First, from which account was that check written from?

          5    A.    Ms. Newton's checking account ending 9723 at Bank of

          6    America.

          7    Q.    Okay.  And then is there a check number for the check?

          8    A.    Yes, check 313.

          9    Q.    Okay.  And the date on that is October 1, 2016?

12:21    10    A.    Correct.

         11    Q.    And it's payable to an individual named Francesco Insolia?

         12    A.    Yes.

         13    Q.    The amount of the check is what?

         14    A.    $50,000.

         15    Q.    Whose signature appears on the signature line of that?

         16    A.    Faith Newton.

         17    Q.    And what's indicated on the memo line?

         18    A.    2013, balance on Maserati.

         19    Q.    Okay.  Could we bring up just for the court and the

12:22    20    parties Exhibit 115.  I would ask that be pre-authenticated --

         21    or be admitted.

         22            THE COURT:  Pre-authenticated?

         23            MR. LOONEY:  I guess we're a little late for

         24    pre-authentication.

         25            THE COURT:  Is that a thing?

1          MR. LOONEY:  It's not a thing.  I'm sorry.  I'm

2    adapting to the ruling on these exhibits as we go.

3          THE COURT:  Okay.

4          MR. LOONEY:  I would ask that this be admitted

5    pursuant to and authenticated pursuant to Rule 902.11.

6          THE COURT:  Any objection?

7          THE DEFENDANT:  No objection.

8          THE COURT:  It's admitted.

9          (Exhibit 115 admitted into evidence.)

12:23 10   Q.    And what we're looking at now is the account statement for

11   Ms. Newton, correct?

12   A.    Yes.

13   Q.    And it's Bank of America, and it covers the two accounts

14   we've been talking about, the 9723 checking and the 9723

15   savings account; is that right?

16   A.    Correct.

17   Q.    Okay.  And on your demonstrative we're looking at a

18   transaction that occurred October 3, 2016, correct?

19   A.    Yes, a check with a date written on it of October 1, 2016.

12:23 20   Q.    Okay.  Could we scroll forward two pages.  And is it

21   correct that this portion we're now looking at is for the

22   checking account 9723 held in the name of Ms. Newton?

23   A.    Yes.

24   Q.    Okay.  And this portion relates to the deposits.  If we

25   can move forward to the withdrawals.  Then below that there's a

1    section that shows the checks written against this account,

2    correct?

3    A.    Correct.

4    Q.    And is there a check written on October 3, 2016?

5    A.    There is a check that is cashed on October 3 or was

6    processed and posted on October 3, 2016, check number 313,

7    which we just reviewed.

8    Q.    Okay.  That's in the amount of $50,000?

9    A.    Yes.

12:24 10    Q.    Could we move forward in this exhibit to I think the end,

11    all right.  If we pause here.  Can we blow up, I want to focus

12    on two checks.  Actually, can we start with the one on the top.

13         All right.  We're looking now at a check written by --

14    written on the account of Faith Newton; is that correct?

15    A.    Yes.

16    Q.    This one is dated September 17, 2016?

17    A.    Yes.

18    Q.    Payable to Francesco Insolio, correct?

19    A.    Correct.

12:25 20    Q.    In the amount of $10,000, correct?

21    A.    Yes.

22    Q.    And what's written in the memo line?

23    A.    Maserati.

24    Q.    And who signed this one?

25    A.    Faith Newton.

 1    Q.    Okay.  Can we back out of that, please, and then go to the

 2    check at the bottom, please.

 3          All right.  Is this the check that we were looking at

 4    before in your demonstrative?

 5    A.    Yes.

 6    Q.    Okay.  So this is a check written from the account of

 7    Faith Newton?

 8    A.    Yes.

 9    Q.    Who is it to and in what amount?

12:25 10    A.    It's to Francesco Insolia for $50,000.

11    Q.    And what's it dated?

12    A.    October 1, 2016.

13    Q.    And who signed it?

14    A.    Faith Newton.

15    Q.    And what's indicated in the memo line?

16    A.    2013 balance on Maserati.

17    Q.    Okay.  If we could -- all right.  If we could take that

18    down now, and I would ask to bring up Exhibit 70.01, again,

19    just for the parties, not for the jury.  I'd ask that this

12:26 20    document be authenticated pursuant to Rule 902.1 and 902.4 and

21    that it be admitted into evidence.

22              THE COURT:  Any objection?

23              THE DEFENDANT:  No objection.

24              THE COURT:  It's admitted.

25              (Exhibit 70.01 admitted into evidence.)

1    Q.    Can we just zoom on the top half, make it bigger and

2    easier to read.  Maybe the top half, capture the information

3    below.  Perfect.  Thank you.

4        Ms. Horan, what is this?

5    A.    It is a certificate of title from the Massachusetts

6    Department of Transportation.

7    Q.    Okay.  So it's a title for a car?

8    A.    Yes.

9    Q.    All right.  And what is the model year indicated?

12:27 10  A.    2013.

11   Q.    And make is MASE?

12   A.    Yes.

13   Q.    For Maserati?

14   A.    Yes.

15   Q.    Model name GRANTU, short for Gran Turismo?

16   A.    Correct.

17   Q.    Who is identified as the owner on this?

18   A.    Faith Newton.

19   Q.    And the date of issue is when?

12:27 20  A.    The date of issue is December 2, 2016.

21   Q.    We can take this down now.  If we could bring up now as a

22   demonstrative Exhibit 712.14.  This is a slide you prepared?

23   A.    Yes.

24   Q.    What's illustrated on here?

25   A.    The transfer of funds of approximately $2 million for the

           1    purchase of 440 Great Pond Ave., North Andover, Mass.
           2    Q.   And were you able to verify that this transaction occurred
           3    in the Bank of America bank statements?
           4    A.   Yes.
           5    Q.   All right.  Could we go back to Exhibit 115, please.  This
           6    is the Bank of America statement for that period September 27,
           7    2016 to October 25, 2016 we were just looking at, correct?
           8    A.   Correct.
           9    Q.   Could we go to the withdrawal section a few pages ahead.
12:28     10    I think it's on page 5 of this.  And this is the section of the
          11    statement that pertains to the savings account; is that
          12    correct?
          13    A.   Yes.
          14    Q.   And what transaction is reflected on October 3, 2016?
          15    A.   The transaction highlighted on October 3, 2016 is a wire
          16    transfer going out of the account, and the beneficiary is
          17    Robert T. Wyman, Esquire, and the amount is $2,012,177.82.
          18    Q.   All right.  Could we take down this exhibit.  I'm going to
          19    skip the other demonstrative and go right to the --
12:29     20              THE DEFENDANT:  Objection.  I'd like to see that
          21    again.
          22              THE COURT:  You want to leave it up?
          23              THE DEFENDANT:  No -- yes.
          24              THE COURT:  Can you put it back up for her, please?
          25              THE DEFENDANT:  The one that was there, the white

1    thing.

2         THE COURT:  What's the exhibit number on this,

3    Mr. Looney?  If I have a hard copy, I'll give it to her.

4         MR. LOONEY:  It's Exhibit 815 -- sorry -- 115.  We

5    have a copy here.

6         THE COURT:  I don't have anything that low in this

7    binder.

8         THE DEFENDANT:  Withdraw.

9         THE COURT:  Okay.  He's going to give you a hard copy

12:30 10  so you have it.  Give her that page, please.  Then you can take

11   down the exhibit.

12   Q.   If we could bring up, I think just for the parties and the

13   witness, Exhibit 855, please.  I would ask that this be

14   admitted.  We have a certificate, which is Exhibit 968.

15        THE COURT:  Any objection?

16        THE DEFENDANT:  No objection.

17        THE COURT:  It's admitted.

18        (Exhibit 855 admitted into evidence.)

19   Q.   Okay.  Could you tell us what this exhibit is?

12:32 20  A.   This is a Bank of America bank statement for Arbor

21   Homecare Services LLC for the period of January 1, 2017 through

22   January 31, 2017, specifically for the three accounts we've

23   previously referenced.

24   Q.   Okay, so the statement for the three accounts we were

25   looking at for the period January 1, 2017 through January 31,

1    2017.  Can we please go to page 11 of this.

2       All right.  And which of those three accounts held at

3    Arbor does this section of the statement relate to?

4    A.   This is related to the Arbor operating account ending

5    7768.

6    Q.   Okay.  And as we've seen before, this statement first

7    includes the deposits, correct?

8    A.   Yes.

9    Q.   We've seen, otherwise, there are two deposits, one on

12:33 10   January 3, 2017 and one on January 9, 2017, correct?

11   A.   Correct.

12   Q.   And then below that there are withdrawals?

13   A.   Yes.

14   Q.   And then if we could go forward one more, one more.

15   There's a section indicating checks written against this

16   account; is that correct?

17   A.   Correct.

18   Q.   Could we blow up the check with number 2111.  So does this

19   statement reflect a check number 2111 drawn against the

12:33 20   account?

21   A.   Yes.

22   Q.   On what date?

23   A.   The posted date is January 17, 2017.

24   Q.   Okay.  What's the amount of that check?

25   A.   $100,000.

         1    Q.    Okay.  Can we go now to page 46 of this document.  If we

         2    could zoom in right there.

         3         All right.  Is this the check, same check that was

         4    referenced in that last section we looked at?

         5    A.    Yes.

         6    Q.    Okay.  Let's walk through the information on this check.

         7    First, what's the check number again?

         8    A.    2111.

         9    Q.    What account is it written on?

12:34   10    A.    Arbor Homecare Services LLC, Bank of America account

        11    ending 7768.

        12    Q.    Okay.  What's the amount of the check?

        13    A.    $100,000.

        14    Q.    Okay.  And who is it payable to?

        15    A.    DC Development and Construction, LLC.

        16    Q.    And whose signature appears in the signature line?

        17    A.    Faith Newton.

        18    Q.    Okay.  All right.  We can take this down now.

        19         Could we look next -- can we look back at Exhibit 712.09,

12:35   20    please.  And on this chart, as we mentioned earlier, there are

        21    two transactions taking place on January 12, 2017?

        22    A.    Correct.

        23    Q.    What were those two transactions again?

        24    A.    They were $2 million each to Ben Muiruri and Faith Newton.

        25    Q.    Did you look into the financial records surrounding those

1  transactions?

2  A.   Yes.

3  Q.   And did you prepare charts concerning those transactions?

4  A.   Yes.

5  Q.   Okay.  Could we start by bringing up the demonstrative

6  that is marked as Exhibit 712.16.

7       Okay.  So generally, what is the subject of this

8  demonstrative?

9  A.   It is a summary of checks written out of the Arbor 7700

12:36 10  payroll account, specifically checks ranging, check numbers

11  ranging from 3521 to 3531.

12  Q.   Okay.  And I want to focus first on an image that's in the

13  upper right.  What's that?

14  A.   This is a check, this is check number 3526 out of the 7700

15  payroll account in the amount of $2 million to Mr. Muiruri.

16  Q.   Okay.  What's the date of that check?

17  A.   December 24, 2016.

18  Q.   And what is identified on the For or Memo line?

19  A.   Bonus.

12:37 20  Q.   And whose signature appears on the signature line for this

21  check?

22  A.   Faith Newton.

23  Q.   Can we take that down and move to the check in the lower

24  right-hand corner, please.

25       What's illustrated here?

1    A.    This is check number 3527 written from the Arbor Homecare

2    Services LLC payroll account ending 7700.  It is a check to

3    Faith Newton for $2 million.

4    Q.    Okay.  What date is written on this check?

5    A.    December 24, 2016.

6    Q.    Same as the check to Mr. Muiruri, Christmas Eve?

7    A.    Correct.

8    Q.    And it's payable to Faith Newton, correct?

9    A.    Yes.

12:37 10    Q.    $2 million, just like the check to Mr. Muiruri?

11    A.    Correct.

12    Q.    What's written on the For line?

13    A.    Bonus.

14    Q.    And who signed this check?

15    A.    Faith Newton.

16    Q.    Can we blow up the center of this exhibit, center of this

17    demonstrative rather.  What's illustrated in the center section

18    of the exhibit?

19    A.    These are checks in sequential order from 3521 to 3527.

12:39 20    Q.    Okay.  So these are the checks leading up in sequence to

21    the two checks we were just looking at, correct?

22    A.    Yes, and including those two checks.

23    Q.    Okay.  Looking at the first check up in the left, what's

24    the check number for that check?

25    A.    3521.

1                MR. LOONEY:  Okay.  I realize, in light of your

2      ruling, I'd like to do this a little bit differently.  Can we

3      take this down for a moment and move to Exhibit 855, and I

4      believe this has been previously admitted.  If we could move to

5      the end of this document and scroll back up.  We have to go

6      back up a few pages.  Keep going, keep going, keep going.  I

7      apologize.  Keep going.  We're there.  Thank you.  Can we blow

8      up this image, please.

9                First, this document I think you have previously

12:41 10     identified as a Bank of America statement for the combined

11     Arbor accounts.

12     A.   Yes.

13     Q.   And it covers the period January 2017, correct?

14     A.   Correct.

15     Q.   So looking at this page, which is page 21 of the document,

16     of Exhibit 855, what's illustrated on that first check in the

17     upper left?  Who is it to, what's the check number, and what's

18     the date?

19                Maybe we can blow them up one by one to make them bigger?

12:41 20     A.   I apologize if I mispronounce any names.

21     Q.   I gave you a hard one.  I'll withdraw that question.

22                I think the information I'm interested in is, could you

23     tell me the date and the check number for this one?

24     A.   The date written on the check is January 12, 2017, and the

25     check number is 3521.

1    Q.    Okay.  Then can we go to the next one.

2         What is the check number and the date on this one?

3    A.    This is check number 3522, with a date written on it of

4    January 12, 2017.

5    Q.    Can we go to the following one.  What is the date in the

6    check number on this one?

7    A.    3523, with a date of January 12, 2017.

8    Q.    Next one?

9    A.    This is check number 3524, with a date of January 13,

12:42 10   2017.

11   Q.    Next one.

12   A.    This is check number 3526 we previously reviewed, and this

13   is a check dated December 24, 2016.

14   Q.    Okay.  And check number 3526 for $2 million to Ben

15   Muiruri?

16   A.    Yes.

17   Q.    Okay.  And what's the next one?

18   A.    This is check number 3527 with a date of December 24,

19   2016.  And this is again a check we previously reviewed for $2

12:43 20   million to Faith Newton.

21   Q.    Okay.  What's the next check, or what is the check number

22   and date for the next check?

23   A.    It's check number 3528, and it is dated January 13, 2017.

24   Q.    All right.  Can we go to the next check.

25        What's the check number and the date on this one?

1    A.   This is check number 3529, and it is dated January 13,

2    2017.

3    Q.   If we could go to the next one.

4    A.   Is there a question?

5    Q.   What's the check number and the date?

6    A.   The check number is 3530 and the date is January 13, 2017.

7    Q.   Okay.  Fair that the check numbers run, as we move up in

8    the check numbers, the date moves up from January 12 to January

9    13 in sequence, with two exceptions?

12:44 10   A.   Correct.

11   Q.   And those two exceptions are the checks written to Ben

12   Muiruri and Faith Newton?

13   A.   Correct.

14   Q.   Which are dated December 24, 2016, correct?

15   A.   Correct.

16   Q.   Some three weeks earlier than the other checks in the

17   check sequence?

18   A.   Approximately, yes.

19          MR. LOONEY:  Can we move now to Exhibit 712.18 just

12:45 20   for the parties and witness for now.

21          Your Honor, I believe you indicated this is one of the

22   ones that was admissible but I wanted to check.

23          THE COURT:  Yes, this one is admissible.

24          MR. LOONEY:  Okay.

25   Q.   What information is illustrated on this exhibit before us?

1    A.    This is a summary of checks written out of Arbor Homecare

2    Services account ending 7700, specifically check numbers 3500

3    through 3540.

4    Q.    Okay.  We were just looking at, in Exhibit 855, a sample

5    of ten of the checks written around the check sequence of the

6    checks to Mr. Muiruri and Ms. Newton?

7    A.    Correct.

8    Q.    And this is just a broader sample?

9    A.    Correct.

12:46 10    Q.    All right.  Can you walk through the information that's

11    contained in each of the columns.

12    A.    Yes.  The first column is the check number, and you'll

13    note the exhibit is in order by check number.  The next column

14    is the name or the payee on the check.  The next column is the

15    amount the check was written for.  The next column is the date

16    that was written on the check.  And the final column is the

17    Memo or the For section of the check, whatever was written

18    there, if anything.

19    Q.    Okay.  Were you able to identify any pattern in the date?

12:46 20    A.    Yes.

21    Q.    What was that pattern?

22    A.    Generally speaking, the checks are written, when ordered

23    in sequential order, the dates also are in sequential order

24    with the exception of the two checks that we identified.

25    Q.    Okay.  So when put in order of check number, fair to say

1  that the dates from check -- or let me start that question

2  again.

3      When ordered by check number, checks 3500 to 3524 run in

4  date sequence from January 5 to January 13?

5  A.   Correct.

6  Q.   Then there is a gap of one check that was apparently not

7  cashed?

8  A.   Correct.

9  Q.   And then there are two checks to Mr. Muiruri and

12:47 10  Ms. Newton dated Christmas Eve 2016?

11  A.   Correct.

12  Q.   And then starting at check number 3528, the dates resume

13  in sequence from January 13; is that right?

14  A.   Correct.

15  Q.   Were you able to verify whether these checks were actually

16  cashed or deposited?

17  A.   Yes.

18         MR. LOONEY:  Could we bring up Exhibit 856, please.  I

19  would ask that be admitted.

12:48 20         THE COURT:  Any objection?

21         THE DEFENDANT:  No objection.

22         THE COURT:  It's admitted.

23         (Exhibit 856 admitted into evidence.)

24  Q.   What is this document in front of us now?

25  A.   This is a Bank of America bank statement for Faith Newton,

1    specifically the accounts, the checking and savings accounts

2    ending 9723 for the period of December 24, 2016 through January

3    25, 2017.

4    Q.    Can we move to the third page, please.

5          What is this part of the statement?

6    A.    This is the part of the statement that relates to the

7    checking account.

8    Q.    Okay.  And what transaction is identified here on January

9    12, 2017?

12:49 10   A.    On January 12, 2017, there is a transaction with the

11   description of Counter Credit in the amount of $2 million.

12   Q.    Okay.  That's January 12, 2017, right?

13   A.    Correct.

14   Q.    That's right around the date of the checks surrounding the

15   checks to Faith Newton and Ben Muiruri in sequence, correct?

16   A.    Correct.

17   Q.    I want to ask some questions about the significance of

18   these dates.  Do you recall from your preparation of these

19   charts what was the date of the last payment that Arbor

12:49 20   received from MassHealth?

21   A.    January 9, 2017.

22   Q.    So a few days before the deposit of the $2 million into

23   Ms. Newton's account?

24   A.    Correct.

25   Q.    And then can we bring up previously admitted Exhibit 719,

 1    please.

 2         Do you recognize this document?

 3    A.    I do.

 4    Q.    And what is that?

 5    A.    It is a notice of withholding of payment from the

 6    Commonwealth of Massachusetts Executive Office of Health and

 7    Human Services addressed to Arbor Homecare Services LLC.

 8    Q.    Okay.  And the date on this document is January 3, 2017?

 9    A.    Yes.

12:50 10   Q.    Okay.  Please blow up the last paragraph.

11         What does this letter indicate?

12    A.    That MassHealth will be withholding 100 percent of all

13    payments effective immediately as of January 3, 2013 -- or

14    sorry, January 3, 2017.

15    Q.    Okay.  So we can take this down and maybe we can bring

16    back up just to refocus us on demonstrative 712.16.

17         Is it accurate that the two checks we've been talking

18    about are among a sequence of checks all dated after the date

19    on that notice of withholding of payments?

12:51 20   A.    Yes.

21    Q.    And is it accurate that those two $2 million checks were

22    transacted, that is, deposited after the date of that notice of

23    withholding of payments we were just looking at?

24    A.    Correct.

25    Q.    But the date written on the Date line of these two checks

```
 1    was earlier than the notice of withholding of payments,
 2    correct?
 3    A.    Correct.
 4          MR. LOONEY:  Nothing further.
 5          THE COURT:  All right.  We've been sitting for a long
 6    time, so we're going to take our lunch break and come back for
 7    cross after lunch.  Okay?
 8          COURTROOM CLERK:  All rise for the jury.
 9          (Jury exits the courtroom.)
10          THE COURT:  You're excused.  Half an hour break, Ms.
11    Horan.  Let's say 1:15, okay?
12          Every trial I learn over and over again not to listen
13    to a lawyer on the estimate of time for anything.
14          MR. BRADY:  I was just going to say I'm sorry.  I
15    thought it was -- I said an hour.
16          THE COURT:  Half hour for lunch.  Let's come back at
17    1:15.
18          MR. BRADY:  I think we'll finish today with some time
19    to spare, so yes.
20          THE COURT:  You're done, right, except for her cross?
21          MR. BRADY:  Yes, that's what I'm saying.  Then I know
22    we have some other business to attend to.
23          THE COURT:  We just passed out verdict forms.  And
24    it's definitely redlined, the instructions.  I'm not entirely
25    sure what it's redlined against.  That's my fault.  We'll see
```

12:52 (line 10)
12:53 (line 20)

```
 1    you after lunch.
 2              (Recess, 12:54 p.m. - 1:33 p.m.)
 3              COURTROOM CLERK:  All rise for the jury.
 4              (Jury enters the courtroom.)
 5              COURTROOM CLERK:  Court is in session.  Please be
 6    seated.
 7              THE COURT:  Cross, Ms. Newton.
 8    CROSS-EXAMINATION BY MS. NEWTON:
 9    Q.   Hi Bridget.
10    A.   Hello.
11    Q.   Do you have experience in forensic accounting, especially
12    in health care fraud?
13    A.   I do.
14    Q.   I'm going to be referring to the document I'm going to put
15    here.
16    A.   Okay.
17              THE COURT:  This is admitted, right?
18              MR. LOONEY:  Yes.
19              COURTROOM CLERK:  Yes.
20    Q.   And before I do that, I will put one document first and
21    ask a question.
22              MR. LOONEY:  This was admitted.
23              THE COURT:  It can go to the jury.
24    Q.   What does that say?
25    A.   The name right there?
```

1    Q.   The name, that line, yes.

2    A.   Faith Newton.

3    Q.   This one.

4    A.   My apologies.  Benjamin Muiruri, Manager.

5    Q.   Signature?

6    A.   Where you're pointing, your pen appears to be Ben

7    Muiruri's signature.

8    Q.   And the date?

9    A.   The date is July 2, 2013.

01:35 10   Q.   And the second one?

11   A.   The second line is, Faith Newton is the name, the title is

12   Signer.  The signature appears to be Faith Newton, and the date

13   is the same, July 2, 2013.

14   Q.   Do you know when Arbor was opened?

15   A.   I do not recall.

16   Q.   Do you know when Arbor was closed by MassHealth, when the

17   payments were suspended?

18   A.   The letter for the payment suspension was dated January 3,

19   2017.  There was a payment received, a final payment received

01:36 20   on January 9, 2017.

21   Q.   So you know when Arbor was -- payments was suspended but

22   you don't know when Arbor was opened, correct?

23   A.   Correct.

24   Q.   When it started its business, correct?

25   A.   Correct.  I did not review the Articles of Incorporation

1    with the Secretary of State.

2    Q.   Did I already ask you, do you have experience in forensic

3    -- I already ask you that.  Did I?  No?

4         So do you have experience in forensic accounting,

5    especially in health care fraud?

6    A.   I do.

7    Q.   You testified about this amount, $162,118,000.  How much

8    of that amount came from the billing for nurses' visits that

9    are not medically necessary?

01:37 10   A.   Sorry.  Can you repeat the question?

11            THE COURT:  She wants to know what of that amount, the

12   162 number, how much of that amount came from billing for

13   nurses' visits that were not medically necessary.

14   A.   I do not know.  I only summarized based on the CPT code.

15   I did not review anything related to medical necessity of

16   visits.

17   Q.   How much of that came from the billing for patients said

18   to be out of the country when billed, how much of that?

19   A.   I do not know.

01:38 20   Q.   How much of that came from overbilling for home health

21   aides' visits for the home health aides who were not trained?

22   A.   My summary chart simply depicts the home health aide

23   services billed under CPT Code G0156, and that total is

24   displayed here.  That's all I know about that particular

25   number.

1   Q.   How much of the said amount, 162,118,000, came from the

2   doctor's order that were not signed by a physician, how much of

3   that money came from there?

4   A.   I do not know.

5   Q.   Do you know any funds back to the fraud that the

6   government has said I committed through this trial, do you know

7   how much was traced?

8        I will ask that again.

9        Do you know whether -- do you know whether there was any

01:39 10   tracing of any funds back to the fraud that the government said

11   that I committed throughout this trial?  Or do you know anybody

12   who traced the amount?

13   A.   My understanding is the $99 million is part of the $162

14   million that was traced through two other accounts.  But that's

15   the extent of my knowledge in terms of the alleged fraud and

16   different categories of alleged fraud.

17   Q.   Was that from the nursing visits which were not medically

18   necessary?

19   A.   That is not what the $99 million depicts, no.

01:39 20   Q.   Was it from the patients who were billed while they were

21   outside of the country?

22   A.   No.

23   Q.   Was it from the doctor's orders which were not signed by

24   the physician?

25   A.   That particular number does not represent that, no.

         1    Q.   So is it fair for me to say that none of these funds were
         2    traceable to the health care fraud?  Nobody did tracing of the
         3    funds, correct?
         4    A.   I mean, I traced the 162 million to various accounts, and
         5    specifically the home health aide services CPT Code G0156 is
         6    included in that amount and proportionately would be part of
         7    that tracing.
         8    Q.   I don't think you understand my question.
         9    A.   I apologize.  Could you repeat the question.
01:41   10    Q.   I need to know how much money of fraud was traced from the
        11    patients who were billed and they did not need services,
        12    nurses' visits?  How much money was traced from this amount
        13    here?
        14    A.   I did not trace claims specifically to those categories
        15    you were referring to.  I only traced it specific to that CPT
        16    code.
        17    Q.   Is it fair to say you just made up numbers?
        18    A.   No, not at all.
        19    Q.   But you don't seem to know whether the money was traced
01:41   20    because nobody traced the money?  So all this money was made is
        21    connected to the fraud?
        22    A.   The $162 million was traced, and a portion of it is
        23    related to that particular CPT code.  I did not separately and
        24    individually trace any claims related to the specific
        25    categories you previously listed, no.

```
 1   Q.   Do you know what services were provided by Arbor Homecare?
 2   A.   I do not.  In general, like specific appointments, no, I
 3   don't.  I know that there were home health aide services, but
 4   generally speaking, I do not know the additional services.
 5   Q.   Is it fair to say that you don't have the amount of fraud
 6   connecting to the providing of the services for the medically
 7   -- not medically necessary?
 8   A.   I did not calculate the total specific to any claims that
 9   may have been identified as medically unnecessary.  That was
 10  not part of my analysis.
 11  Q.   Do you know if Arbor ever billed for any nursing visits
 12  that were not performed?
 13  A.   I do not know whether or not services were performed or
 14  medically necessary or whether or not they were approved by a
 15  doctor.  I simply summarized the MassHealth data in terms of
 16  payments in this particular CPT code.  I do not know if
 17  specific claims occurred or did not occur.
 18  Q.   So you spoke about bank transactions.  By themselves, are
 19  the bank transactions you spoke about illegal?
 20  A.   I don't know if I'm qualified to answer that question
 21  whether or not something is illegal.
 22  Q.   Is it illegal in the United States to transfer funds from
 23  one account to another?
 24  A.   Generally speaking it is not illegal to transfer money,
 25  unless there is some other potentially illegal activity
```

1    occurring with the transfer.

2    Q.   So is it fair to say that all the transactions you are

3    showing are not illegal because you did not trace them to the

4    health care fraud for the medically unnecessary visits for the

5    patients who are billed and are outside of the country and for

6    the home health aides who are not trained; is it fair to say

7    that, that all the transaction are not illegal, correct?

8    A.   I don't think I have the ability to determine whether or

9    not something -- decide whether or not something is illegal.

01:45 10   But I did trace the payments from MassHealth to other accounts.

11   Q.   Is that illegal for MassHealth to deposit money into the

12   business account?

13   A.   No.

14   Q.   Is that illegal?

15   A.   No.

16   Q.   Okay.  Is it illegal to buy a Maserati in America?

17   A.   Again, generally, I don't know that I am able to determine

18   whether or not something is illegal.  The purchase of a

19   vehicle, generally speaking, is a very common transaction that

01:46 20   would not be illegal.

21   Q.   Is it fair to say that if you traced where the funds came

22   from, whether they came from health care fraud or anything

23   else, if you did, if you traced the money, is it fair to say

24   that -- is it fair to say that -- I can just strike.

25        Is it fair to say that since you did not trace that money,

1    it's not illegal to buy a Maserati because that's what you only

2    -- that's the only evidence you showed about Maserati.  There

3    was not tracing.

4    A.    There was tracing to the purchase of the Maserati.  There

5    was tracing of the 162 million through the various Bank of

6    America accounts.  And a portion, approximately 60 percent of

7    the funds deposited into the operating account from MassHealth

8    related to the home health aide services CPT Code G0156.  So

9    approximately 60 percent of the funds would be traceable to the

01:47 10    Maserati.

11    Q.    Is transferring money from one account or writing a check

12    from one account to another illegal?

13    A.    Again, generally, I don't think I am in a place to say

14    whether or not something is illegal.  Generally speaking,

15    transferring money between accounts is not illegal, but that

16    doesn't mean that certain transactions may not be illegal -- or

17    may be illegal.

18    Q.    The answer is either yes or no.

19          MR. LOONEY:  Objection.

01:48 20          THE COURT:  Overruled.

21    Q.    So is it illegal to transfer money from one account to

22    another, and is it illegal to write a check to buy a Maserati,

23    and is it illegal to buy a house?  Is it illegal, yes or no?

24    A.    Again, generally speaking, I don't think that I am the

25    appropriate person to determine whether or not a transaction is

1    illegal, and it depends on the circumstances.

2    Q.   Do you know or can you say with certain that any of the

3    funds that were deposited in Arbor Homecare account came from

4    fraud?

5    A.   The deposit into Arbor Homecare -- excuse me -- operating

6    account for MassHealth included 99 million of the home health

7    aide services, $99 million of home health aide services.  CPT

8    Code G0156 is, generally speaking, all home health aide

9    services.

01:49 10   Q.   I didn't ask you that.  Can I ask you again?

11        Do you know or can you say with certain that any of the

12   funds that were deposited into Arbor account came from fraud,

13   yes or no?

14   A.   I don't know that I am the person to identify something as

15   fraudulent or not fraudulent.  I just know that the proceeds

16   included $99 million worth of home health aide services billed

17   as CPT Code G0156.  But it's not up to me to determine whether

18   or not that is fraudulent or identify that as fraudulent.

19   Q.   Out of this amount, do you know how much went to the

01:50 20   payroll for Arbor, do you know how much?

21   A.   How much went to what?

22        THE COURT:  Payroll for Arbor.

23   Q.   Do you know how much went to the payroll for Arbor?

24   A.   I know that approximately 99 million went to the payroll

25   account.  I do not have a subtotal of how much specifically

```
 1  went through the third party payroll process or was accounted
 2  for as payroll.
 3  Q.   Do you know how much went to the business operating cost?
 4  A.   I do not know that number, no.
 5  Q.   Do you know how much went to the supplies for the company,
 6  like medical company, gloves, dressings?  Do you know how much
 7  the company expense?
 8  A.   I do not know how much was spent on supplies, no.
 9  Q.   Do you know how much went to the software that the company
01:51 10 used?
11  A.   I do not know how much was paid for software.
12  Q.   Do you know how much related to the third billing of three
13  percent of $162 million went to the third billing company?
14  A.   The third party billing company?  I do not know how much
15  money was paid to a third party billing company.
16  Q.   Do you know how much went to the IRS?
17  A.   I do not.
18  Q.   You don't know?
19  A.   No.
01:51 20 Q.   Do you know -- and do you know who did the transactions
21  you are demonstrating?  Do you know whether it was Benjamin
22  Muiruri or Faith Newton?
23  A.   It depends on the transaction.  Some of the transactions
24  we reviewed were checks that would appear to be your, Ms.
25  Newton's, signature on it.  Other transactions we do not have
```

1    enough detail to identify whether or not it was you,

2    Ms. Newton, or Mr. Muiruri.

3    Q.   So did you really do the forensic accounting for this

4    case?

5    A.   I performed a certain analysis as requested, yes.

6    Q.   And you don't know which money is written to the fraud?

7    A.   Again, the $99 million for CPT Code G0156 is what I

8    traced.  It is not up to me to determine whether or not

9    something is fraud.

01:52 10   Q.   How do you know that is fraud?

11   A.   It's not --

12          MR. LOONEY:  Objection.

13   Q.   So is it fair to say that you never, nobody traced the

14   money?  There was no tracing done on the accounts to trace the

15   fraud money?

16   A.   I traced specific funds related to MassHealth and

17   specifically related to CPT Code G0156.  It is not up to me to

18   determine whether or not something is fraudulent.

19   Q.   So you did not trace any medically necessary services?

01:53 20   You did not trace for the orders which were billed and paid for

21   without doctor signature; you did none of that?

22   A.   Those two categories you just listed, I did not trace

23   claims specifically to those categories of claims.

24          THE DEFENDANT:  No further questions.

25          THE COURT:  Redirect?

1          MR. LOONEY:  No, Your Honor.

2          THE COURT:  You're excused.  Thank you.

3          THE WITNESS:  Thank you.

4                    *  *  *  *  *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 14th day of August, 2024.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter